## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HARRIET LOWELL and WESTCHESTER DISABLED ON THE MOVE, INC., individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br>  v.<br><br>LYFT, INC.,<br><br>     Defendant. | CASE NO. 7:17-cv-06251-EAW<br><br>**CLASS ACTION COMPLAINT**<br><br>**ECF CASE**<br><br>**JURY TRIAL DEMANDED** |

### AMENDED CLASS ACTION COMPLAINT

Plaintiffs Harriet Lowell and Westchester Disabled on the Move, Inc. ("WDOMI") (collectively "Plaintiffs"), by and through their undersigned attorneys, on behalf of themselves and on behalf of all others similarly situated, hereby make the following allegations against Defendant Lyft, Inc. ("Defendant" or "Lyft"), with personal knowledge as to their own actions, and upon information and belief as to those of others:

### NATURE OF THE ACTION

1.  This actions seeks to redress Defendant's ongoing discrimination against disabled individuals, particularly people who require the use of wheelchairs or other assistive devices for mobility.

2.  Transportation access is a central civil rights issue for people with disabilities.  In 1978 in Denver, the lack of accessible transportation led a group of wheelchair users to block busses with their own bodies to protest the buses' inaccessibility.  That protest grew to a national movement and, in 1990, led to the passage of the Americans with Disabilities Act ("ADA"), with

its guarantee of full participation in all aspects of society, working to end the historical isolation and segregation of people with disabilities.

3.       In passing the ADA, Congress embraced a national mandate to eliminate discrimination against persons with disabilities, including discrimination in travel services.  As a House Committee report on the bill that would become the ADA aptly stated:  "Transportation is the linchpin which enables people with disabilities to be integrated and mainstreamed into society."  Without reliable transportation options, people cannot maintain employment, obtain healthcare, visit friends and family, or otherwise be full and regular participants in civil life.

4.       However, as new technologies and innovations are creating a watershed change in transportation services across the United States, some of the emerging leaders in the public conveyance and transportation industry, including Defendant, are implementing pervasive and systematic policies of discrimination against disabled individuals.  With these new transportation services rapidly supplanting traditional public conveyances, such discriminatory policies threaten a return to the isolation and segregation that the disability rights movement has fought to overcome.

5.       Defendant is one of the most prominent companies in the revolutionary and disruptive new smartphone application-based ridesharing transportation industry, which provides new freedom of travel for many people throughout the United States, including in New York City and Westchester County.  Lyft and similar companies are now a significant part of the national transportation system and are positioning themselves to be an indispensable part of the transportation systems of the future.

6.       Lyft, like other ridesharing transportation companies, uses an electronic ride-hailing application, available for use on smartphones, to allow users of this application to

summon drivers to their location, designate a destination, and make payments electronically. This provides millions of riders with the highly convenient ability to arrange cheap, door-to-door transportation with just a few minutes' notice.

7.     Defendant has secured its prominent position in the ridesharing market by representing to consumers that it will provide consumers with a ride from a friendly driver within minutes.  As a result, Lyft generates billions of dollars in revenue annually.

8.     Were it to be reliably accessible to people who use wheelchairs and other assistive devices, Lyft's transportation service could have life-changing effects for such individuals, improving their ability to work, study, participate in community life, and generally to live more independently.

9.     However, the reality is that Lyft's promises of accommodation are only available to able-bodied consumers.  As a large-scale public accommodation, Lyft has demonstrated a total disregard for the needs of people with disabilities in the provision of its transportation services, and has persistently and systematically failed to ensure that these services are available to disabled individuals.

10.     As a result, disabled individuals are routinely denied accommodations in transportation on the basis of their disabilities.  As a provider of public conveyances and public accommodations, Lyft's ongoing policies and practices thus deny equal service to disabled individuals in violation of federal, state, and local laws.

11.     This suit is brought pursuant to the Americans with Disabilities Act, 42 U.S.C. § 12181, *et seq*., the New York State Human Rights Law, N.Y. Exec. Law § 290, *et seq.*, ("NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq*., ("NYCHRL").

## PARTIES

12.     Plaintiff Harriet Lowell is a citizen of New York residing in White Plains, New York.

13.     Plaintiff Lowell has a mobility disability that substantially limits the major life activity of walking.  Plaintiff typically uses a motorized scooter to travel.  In order for Plaintiff to travel by car or van, the vehicle must be equipped with a ramp or lift to accommodate her scooter.  Plaintiff is a person with a disability within the meaning of the ADA, NYSHRL, and NYCHRL.

14.     Plaintiff Lowell would like to use Lyft's transportation services, both in Westchester County and in her trips to and from New York City.  However, Plaintiff has been deterred from using Lyft's transportation services because she is aware that Lyft discriminates against people with mobility disabilities in its transportation services.

15.     Plaintiff Lowell plans to and will attempt to use Lyft's ride-hailing application and Lyft's programs, services, facilities, and accommodations in the future, should those programs, services, and facilities, and accommodations become wheelchair accessible.

16.     Plaintiff Lowell presently fears that she will encounter the mobility-related barriers and unequal services which exist within Lyft's transportation system.

17.     Plaintiff Lowell continues to desire to utilize Lyft's ride-hailing application and transportation services, but will continue to be deterred until the violations detailed herein are removed.

18.     Plaintiff Westchester Disabled on the Move, Inc. is a non-profit community based organization headquartered in Yonkers, New York.  Within the meaning of 29 U.S.C. § 796f-4, WDOMI operates as an independent living center, a consumer-controlled, community-based,

cross-disability, nonresidential private nonprofit agency, designed and operated within a local community by individuals with disabilities and providing an array of independent living services.

19.    WDOMI is an organization that is run and governed by people with disabilities, in accordance with 29 U.S.C. §§ 796f-4(c)(2) and (6).  The majority of WDOMI's board members and staff are persons with disabilities, including mobility-related disabilities.

20.    WDOMI's mission, in compliance with 29 U.S.C. § 796f-4(b)(1), is to empower people with disabilities to control their own lives, advocate for civil rights and a society free of barriers to people with disabilities, encourage people with disabilities to become politically and socially active, educate government entities, businesses, other organizations, and society as a whole to understand, accept and accommodate people with disabilities, and generally create and environment for people with disabilities that inspires self-respect.

21.    A key component of WDOMI's mission is ensuring that people with mobility disabilities are able to effectively use the transportation services they require.  To this end, WDOMI has expended time and resources on advocacy work to improve access, including transportation options, for disabled residents of Westchester County.

22.    WDOMI itself has been injured as a direct result of Defendant's actions and omissions as discussed herein.  WDOMI's interests are adversely affected because it must expend resources advocating for its constituents who are harmed by Lyft's discriminatory policies and practices.  WDOMI has suffered injury in the form of diversion of these resources and frustration of its mission.

23.    In addition, one or more members of WDOMI have been and will be injured as a direct result of Defendant's discriminatory policies and practices and would have standing to sue in their own right.  WDOMI can bring this action on behalf of its members because the interests

at stake are germane to WDOMI's purpose and neither the claims it asserts, nor the relief it requests, require the participation of individual members in this lawsuit.

24.     Defendant Lyft, Inc. is a foreign corporation, organized and existing under the laws of the State of Delaware, with its principal place of business located in San Francisco, California.  It is a ridesharing transportation company, providing transportation services, public conveyance, and public accommodation to customers in the United States, including New York. It has thousands of customers in New York and elsewhere, and billions of dollars in revenues.

## JURISDICTION AND VENUE

25.     This is an action for declaratory and injunctive relief pursuant to Title III of the ADA.  Plaintiffs also seek declaratory relief, injunctive relief, and compensatory damages pursuant to the NYSHRL and NYCHRL.  This Court has federal question jurisdiction under the provisions of the ADA pursuant to 28 U.S.C. § 1343 and 28 U.S.C. § 1331, and supplemental jurisdiction over Plaintiffs' remaining claims pursuant to 28 U.S.C. § 1367, because those claims are related to Plaintiffs' federal claims and rise out of a common nucleus of operative facts.

26.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because the parties to this action are citizens of different states.

27.     Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b)(2), because Plaintiffs reside in this District, and were denied equal service in this District on the basis of their disabilities.  Defendant is also liable for systemically denying accommodation in transportation to disabled individuals throughout this District; Defendant maintains significant business contacts within this District; and Defendant engaged in the unlawful conduct alleged in this Complaint within this District.

28.     Following the commencement of this action, a copy of this Complaint will be served on both the New York City Commission for Human Rights and the Office of the

Corporation Counsel of the City of New York, thereby satisfying the notice requirements of the New York City Administrative Code.

## BACKGROUND FACTS

29.     Millions of people in the United States depend on a wheelchair or other assistive devices for day-to-day tasks and mobility.  In New York City alone, as of 2014, more than 500,000 non-institutionalized residents have a mobility-related disability.  Hundreds of thousands of people with disabilities, moreover, visit New York City, Westchester County, and other regions across the country serviced by Lyft each year.

30.     Plaintiff Lowell relies on compliance by public accommodations, including transportation services, with local, state, and federal disability accessibility requirements, in order to gain equal access to all services as people without disabilities.

31.     Plaintiff WDOMI's members rely on compliance by public accommodations, including transportation services, with local, state, and federal disability laws' requirements to be accessible, in order to gain equal access to all services as people without disabilities.

32.     In or about 2012, Defendant launched its ride-hailing application to connect riders and drivers to provide public conveyance and transportation services across urban and suburban areas across the United States.  Lyft began offering its public conveyance services in New York City on or about July 25, 2014, and presently offers its services in Westchester County, as well.

33.     By using Lyft's ride-hailing application, a customer can remotely hail a nearby Lyft vehicle, select a destination to which he or she wishes to be driven, and have all payments for this conveyance electronically processed.

34.     However, since its inception and throughout its operation in New York City, Westchester County, and in hundreds of other regions throughout the United States, Lyft has remained a relatively unregulated public transportation entity.

35.     For instance, unlike New York's traditional Yellow and Green Boro Taxi cabs, as well as "For-Hire" Livery Vehicles, Lyft's drivers and public conveyance operations remain largely beyond the purview of the Taxi and Limousine Commission's ("TLC") rules and regulations with respect to accessibility for disabled individuals.

36.     While Lyft requires that its New York City drivers be registered with the TLC, it is not subject to the TLC's 2014 agreement to enact regulations so as to render 50% of all taxicabs operating in New York City accessible to individuals requiring the use of a wheelchair by 2020.[1]   Instead, Lyft continues to operate without any regulatory requirement that it purchase, convert, or provide accessible vehicles to the public.

37.     Lyft provides a valuable transportation alternative to millions of individuals throughout the United States, allowing people to more easily travel to work, social events, community engagements, appointments, and other destinations, yet Lyft pervasively and systematically excludes people with mobility disabilities from these same benefits of its convenient transportation.

38.     Lyft and its fellow application-based ride-sharing transportation companies are quickly supplanting traditional taxi companies and becoming the public's primary option for on-demand transportation services.

39.     Lyft's quarterly ridership more than doubled between the fourth quarter of 2015, when it logged 21.1 million rides, to the fourth quarter of 2016, when it logged 52.6 million rides.

---

[1] This agreement was reached as part of a settlement in a federal class action:  *The Taxis For All Campaign, et al. v. New York City Taxi and Limousine Commission, et al.*, No. 11-237, ECF No. 220-1 (S.D.N.Y. 2014).

40.     Conversely, traditional taxicab ridership has declined.  In New York City alone, the average number of yellow cab rides decreased by over 120,000 rides per day between November 2010 and November 2016.

41.     As ridesharing companies, like Lyft, grow, it could be an especially crucial transportation option for people with disabilities because other transportation options also have significant barriers to access.  For example, the New York City subway system is largely unusable by people with disabilities, as almost 80% of its stations are inaccessible for anyone who cannot use stairs.  And even if the subways were completely accessible, the system does not extend to many New York City neighborhoods the way that Lyft does.

42.     New York City's bus system is even more limited, particularly after major service cuts that have occurred over the past decade, and is an agonizingly slow and largely inefficient means of travel overall.

43.     New York City's paratransit system has been widely criticized as ineffective, and it provides users with a dramatically more limited level of service than is available to riders who are able to reliably use subways and buses.

44.     On-demand transportation services, such as Lyft, can fill the significant transportation gaps for riders with disabilities, if providers operate these services in a non-discriminatory way.

45.     However, Lyft does not operate its services in a non-discriminatory way.

46.     In Westchester County and many other cities and regions where Lyft provides its transportation service, Lyft does not make wheelchair-accessible vehicles available at all.

47.     People with mobility disabilities must toggle on the "Access Mode" function in the Lyft smartphone application to attempt to be matched with a wheelchair-accessible vehicle.

48.     In the numerous cities and regions where Lyft does not make any wheelchair-accessible vehicles available, including Westchester County, customers with Access Mode enabled who attempt to use the Lyft smartphone application to hail a ride are simply sent a text message with information on other transportation services in the area.  As Lyft itself acknowledges on its website, "Many of [these] accessible vehicle dispatches must be booked at least 24 hours in advance," and that "it may take several weeks to complete the enrollment process before being able to book a ride" with such vendors thereby defeating the primary benefits of Lyft's service, e.g. convenience and the ability to hail a ride on short notice.[2]

49.     Even in cities and regions where Lyft does make some wheelchair-accessible vehicles available, such vehicles typically make up only an extremely small portion of Lyft's vehicle fleet.  Thus, customers with Access Mode enabled routinely experience significantly longer wait times to be matched with a wheelchair-accessible vehicle.

50.     Lyft exercises very significant, comprehensive, and detailed control over its transportation services and drivers.

51.     Lyft decides who may provide its transportation services.  Individuals who wish to drive as part of the Lyft transportation service undergo a screening process and must be at least 21 years of age, complete various forms, undergo a driving record check, undergo a check for registered sex offender status, undergo a seven-year criminal background check, complete an in-person interview with a current Lyft driver, and present their driver's license (which they must have had for more than 1 year), vehicle registration, and proof of driver's insurance.  In addition,

---

[2] *See* Lyft.com, "Accessible Vehicle Dispatch," available at
https://help.lyft.com/hc/en-us/articles/213584508-Accessible-vehicle-dispatch (last visited Aug. 11, 2017).

before a driver may use a vehicle to provide Lyft services in New York City, the driver must

obtain a TLC commercial license.

52.     Lyft exercises exclusive control over termination of Lyft drivers.  Lyft routinely

terminates drivers for any of several reasons, including for poor customer satisfaction ratings or

discriminatorily refusing to provide service to customers.

53.     Lyft controls which trip requests it transmits to each of its drivers.

54.     Lyft requires all drivers to provide it with information about the make, model, and

age of the vehicle that they will drive while providing Lyft transportation.

55.     Lyft sets standards for which vehicles can be driven to provide Lyft

transportation.

56.     Lyft also sets standards for which vehicles can be driven for various classes of

Lyft transportation services, such as Lyft, Lyft Plus, and Lyft Premier.

57.     Lyft prohibits its drivers from discriminating against people based on race,

religion, national origin, disability, sexual orientation, sex, marital status, gender identity, age, or

any other characteristic protected under applicable federal or state law.

58.     Lyft instructs drivers that they should consistently accept a high share of the trip

requests that they receive through Lyft's app.

59.     Lyft prohibits drivers from accepting street hails from potential passengers.

60.     Lyft encourages drivers to provide personal information to their respective

profiles, as available through the Lyft smartphone application, including information such as the

driver's hometown and music preferences.

61.     In addition, Lyft issues training and directives concerning other requirements to

Lyft drivers.

62.     Lyft closely monitors its drivers.

63.     Lyft records numerous details about the rides that its drivers provide, including the pickup location, time of pickup, drop off location, time of drop off, distance traveled, route taken, trip duration, and customer's identity for each trip.

64.     Furthermore, Lyft also monitors its drivers' performance by asking customers for written feedback and a 1 to 5 "star" rating for each ride to be provided after every trip via the Lyft smartphone application.  Lyft likewise allows its drivers to rate and provide feedback on customers.

65.     Lyft regularly terminates or suspends Lyft drivers whose average customer rating falls below a certain threshold.

66.     In addition, Lyft maintains commercial liability policies for each driver to cover claims concerning incidents that occur while drivers are providing Lyft transportation services.

67.     Lyft tightly controls payments for its transportation services.

68.     Lyft likewise controls who may use Lyft's transportation services.

69.     Lyft makes its services available only to members of the public who have a credit card and a smartphone capable of running one of Lyft's applications, who create a Lyft account, and who request a ride through Lyft's smartphone application, or to individuals traveling with these Lyft customers or in vehicles ordered by these Lyft customers.

70.     Customers do not pay Lyft's drivers directly.

71.     Lyft automatically charges a customer's credit card after the rider arrives that the desired destination.

72.     Customers can also provide gratuities to drivers through the Lyft application.

73.     Lyft has exclusive control over the fares that customers pay and the compensation that its drivers receive.

74.     Fares for Lyft's transportation services are based on the duration and distance of each trip and other factors such as demand at the time and place of the ride, as determined by Lyft.

75.     Lyft keeps a percentage of each fare.

76.     Thus, Lyft compensates its drivers based on the duration and distance of the trips that they provide to riders.  Payments are not transferred directly from customers to drivers; rather, Lyft collects and holds customer payments, deducts fees, and then later transfers money to drivers.

77.     Customers who dispute the fare for a particular trip must contact Lyft customer service representatives to request an adjustment to their fares.

78.     Lyft encourages its drivers to provide feedback, in the form of a rating of one to five "stars," for riders.

79.     Thus, Lyft closely monitors and controls interactions between its drivers and customers.

80.     Across the United States, in approximately 300 cities and regions, Lyft provides transportation services totaling approximately 18.7 million rides per month through its fleet of vehicles.

81.     This massive transportation service allows members of the public to quickly and efficiently obtain a ride through Lyft.

82.     Customers choose which class of Lyft service they want.  Customers can choose, for instance, Lyft services that provide luxury vehicles, standard vehicles, and large vehicles.  In

many cities, customers can choose to use an option that will carpool passengers with other riders heading in the same direction for a reduced fare.

83.     Customers select the class of Lyft service they want, and then request a vehicle.

84.     Lyft's application matches the rider with a nearby driver who is providing transportation service with the requested class of vehicle.  For example, a customer who requests a Lyft Plus service will be matched with a driver operating a six-seater vehicle.

85.     After the Lyft application matches the rider and the driver, the driver picks up the rider and transports the rider to the rider's desired destination.

86.     While Lyft offers a range of services and classes of vehicles, the overwhelming majority of the vehicles in its fleet are not wheelchair accessible.

87.     By denying disabled individuals accommodation in the form of accessible vehicles, Lyft also denies disabled individuals who require such accommodations the ability and right to utilize and enjoy the attractive features that have made Lyft's services so popular and desired.  These services are not available with taxicab services.

88.     These features include the ability to pay for a ride without using cash or presenting a credit card because Lyft charges the customer's previously-entered credit card instantly when the vehicle reaches the rider's destination.

89.     Another key Lyft feature is the ability to call for a ride from anywhere in New York City and throughout Westchester County without having to identify a particular company that serves the neighborhood where the customer is presently located.  Taxi companies and neighborhood livery services often serve only limited geographical areas, but Lyft is available throughout New York City and Westchester County, as well as in hundreds of other cities across the United States.

90.     Lyft offers door-to-door service across New York City and Westchester County, as well as in hundreds of other cities across the United States, and has precise locator technology. This is unlike taxi services, which typically must be hailed on major thoroughfares, or livery vehicles, which typically must be called via telephone with an address specified.

91.     Lyft vehicles typically are higher-end vehicles than those used as medallion taxis or livery vehicles, giving the rider the feeling of traveling in an exclusive, safe, and private vehicle rather than a typical taxicab.

92.     When Lyft fails to provide full and equal service to disabled individuals who require wheelchair-accessible vehicles, these individuals experience numerous harms.

93.     At times, because of delays or a total lack of wheelchair-accessible vehicle availability, disabled individuals must arrange alternate transportation that is sometimes more costly and significantly less convenient.

94.     People who use wheelchairs also face the denigrating experience of being denied a basic service that is available to all other paying customers.

95.     Even when a wheelchair-accessible vehicle is technically available, because so few exist there are typically frequent and lengthy delays.  Thus, people who require such vehicles and use Lyft's services are harmed because they must contend with missed appointments, being late for events, and other stress and inconvenience related to these delays.

96.     By denying equal service to riders needing wheelchair-accessible vehicles, Lyft causes real harm by interfering with their ability to work, attend school, shop for groceries, receive medical care, enjoy entertainment and cultural events, maintain family and social ties, and otherwise participate fully in civil life.

97.     Due to distances between destinations and the severe limitations of public transportation and paratransit, many persons with disabilities must use private transportation services to travel from one place to another.  Such alternative transportation may be more costly, less convenient and/or less comfortable.

98.     When people do not have ready access to transportation, they suffer significant social isolation and seclusion as well as other harms.

99.     Plaintiff Lowell was given notice that Lyft has very few wheelchair-accessible vehicles in its service, and that people who need such vehicles often cannot get service from a Lyft vehicle at all, or frequently have wait times far longer than people who do not need such vehicles.

100.    Plaintiff Lowell is aware of the ongoing discrimination by Lyft against people with disabilities because she has heard from friends and acquaintances who have mobility disabilities and have witnessed Lyft's failure to provide equivalent, non-discriminatory service. For example, when Plaintiff Lowell's friend in White Plains tried to order an accessible Lyft, he was told that none were available and received a text message from Lyft advising him to obtain alternate methods of transit.  Plaintiff Lowell's friend recounted this experience to Plaintiff thereafter.

101.    Because Lyft does not provide equal service to people with disabilities who need wheelchair-accessible vehicles, such as Plaintiff Lowell, she has been deterred from trying to access Lyft's transportation services, knowing that the attempt would be futile.

102.    Plaintiff Lowell commutes from White Plains, New York, to New York City and back approximately twice each month, including monthly healthcare visits.  Plaintiff Lowell would like to travel to and from New York City more often, but is presently limited by

inadequate transportation options available to her as Westchester County's paratransit service does not extend to New York City and New York City's subways and public transportation options are largely inaccessible to her.  Currently, she is only able to travel to, from, and throughout New York City when her husband is available to drive her in his wheelchair-accessible van.

103.    When Plaintiff Lowell's husband is unavailable to drive her, her ability to travel is significantly reduced.  When her husband was undergoing surgery in New York City, she was unable to visit him.

104.    If Plaintiff Lowell had reliable access to Lyft's transportation services, she would like to travel to, from, and around New York City more often.

105.    Within White Plains and Westchester County, Plaintiff Lowell is also limited in her mobility.  Due to local paratransit's limited availability and long wait times, she is often unable to travel to locations within the region.

106.    As with many scooters and motorized wheelchairs, Plaintiff Lowell's scooter is not waterproof, and its battery can easily short circuit in the rain.  Her assistive device is also not designed for travel over snow or dirt-covered surfaces, where it can skid, sink, or otherwise easily get stuck.  Due to her chair not being waterproof or easy to operate in the snow, Plaintiff Lowell is often unable to travel even relatively short distances when it is raining or snowing.

107.    If Plaintiff Lowell had reliable access to Lyft's transportation services, she would like to travel to locations within Westchester County more often, including at times when inclement weather currently prevents her from traveling even relatively short distances in her motorized wheelchair.

108.    Plaintiff Lowell has not signed up for an account with Lyft.

109.    Plaintiff Lowell is aware that Lyft provides affordable, efficient, and convenient transportation services to individuals who do not use wheelchairs, and she would use Lyft if equal services and benefits were available to her and other individuals with mobility disabilities who require wheelchair accessible vehicles.

110.    The harm to Plaintiff Lowell is on-going as Lyft continues to employ an inherently discriminatory business model that denies disabled passengers, such as Plaintiff, services by refusing to equip its vehicles in a manner to as to make them accessible.

111.    As such, absent Court intervention, Plaintiff Lowell will continue to suffer from Lyft's discriminatory practices indefinitely.

112.    Because Lyft closely controls, monitors, supervises, and manages its drivers and vehicle fleet, Lyft is capable of adopting the policy changes and taking the steps necessary to ensure that its fleet provides equal access to riders who require wheelchair accessible vehicles.

## CLASS ACTION ALLEGATIONS

113.    Plaintiffs bring this action for injunctive and declaratory relief on their own behalf, on behalf of WDOMI's members, and on behalf of all persons similarly situated, including all residents in and visitors to all cities and regions serviced by Defendant with mobility disabilities who have been and are currently being discriminated against by Defendant's actions and omissions as alleged herein.

114.    Plaintiff Lowell also brings this action for injunctive and declaratory relief on her own behalf and on behalf of a subclass consisting of all persons similarly situated and all residents in and visitors to all cities and regions located in New York State serviced by Defendant with mobility disabilities who have been and are currently being discriminated against by Defendant's actions and omissions as alleged herein.  ("New York State Subclass")

115.    Plaintiff Lowell also brings this action for injunctive and declaratory relief on her own behalf and on behalf of a subclass consisting of all persons similarly situated and all residents in and visitors to New York City with mobility disabilities who have been and are currently being discriminated against by Defendant's actions and omissions as alleged herein. ("New York City Subclass")

116.    The class Plaintiffs seek to represent consists of all people with mobility disabilities who are residents in or visitors to any and all cities and regions serviced by Lyft who require wheelchair accessible vehicles for vehicular transportation, and who want to, but have been deterred from, signing up for Lyft's transportation network because it does not provide equal service to people who require wheelchair accessible vehicles.

117.    The New York State Subclass Plaintiff Lowell seeks to represent consists of all people with mobility disabilities who are residents in or visitors to any and all cities and regions located in New York State serviced by Lyft who require wheelchair accessible vehicles for vehicular transportation, and who want to but have been deterred from signing up for Lyft's transportation network because it does not provide equal service to people who require wheelchair accessible vehicles.

118.    The New York City Subclass Plaintiff Lowell seeks to represent consists of all people with mobility disabilities who are residents in or visitors to New York City who require wheelchair accessible vehicles for vehicular transportation, and who want to but have been deterred from signing up for Lyft's transportation network because it does not provide equal service to people who require wheelchair accessible vehicles.

119.    The persons in the class and subclasses are so numerous that joinder of all members of the class is impracticable and the disposition of their claims in a class action is a benefit to the parties and the Court.

120.    There is a well-defined community of interest in the questions of law and fact involved affecting the parties to be represented, in that Plaintiff WDOMI's members and individuals in the class and subclasses will continue to be denied access to Lyft's transportation service because of its lack of accessible riders.

121.    Common questions of law and fact predominate, including the question of whether Defendant's failure to provide accessible vehicles discriminates against individuals with mobility disabilities in violation of the ADA, NYSHRL, and/or NYCHRL.

122.    Plaintiffs' claims, and the claims of WDOMI's members, are typical and are not in conflict with the interests of the class or subclass as a whole.  Defendant's course of conduct and violation of the law as alleged herein has caused Plaintiffs and the class and subclass members to be deprived of their rights under the ADA, NYSHRL, and NYCHRL.  Therefore, all class members and subclass members will suffer the same or similar injuries for the purpose of the injunctive and declaratory relief sought.  Plaintiffs' claims are thereby representative of an co-extensive with the claims of the class and subclasses.  Plaintiffs will fairly and adequately represent and protect the interests of the class.

123.    The attorneys representing the class are well qualified and experienced in class action litigation.  Counsel are qualified to fully prosecute this litigation on behalf of Plaintiffs and the class and subclasses, and possess adequate resources to see this matter through to resolution.

124.    Defendant has acted and failed to act on grounds generally applicable to the class as a whole, thereby making appropriate finale declaratory and injunctive relief with respect to the class as a whole.

## CLAIMS FOR RELIEF

### COUNT I – DISABILITY DISCRIMINATION IN VIOLATION OF TITLE III OF THE AMERICANS WITH DISABILTIES ACT (On Behalf Of Plaintiff And The Nationwide Class)

125.    Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

126.    Title III of the ADA prohibits discrimination on the basis of disability in the full and equal enjoyment of specified public transportation services provided by private entities primarily engaged in the business of transporting people and whose operations affect commerce. 42 U.S.C. § 12184.

127.    Plaintiff Lowell, members of WDOMI, and members of the nationwide class are all persons with disabilities, *i.e.*, physical impairments that substantially limit one or more major life activities.  42 U.S.C. § 12102(1)(A).

128.    Defendant is an entity primarily engaged in the business of transporting people.

129.    Defendant provides specified public transportation services within the meaning of the term under Title III of the ADA on a regular and continuing basis.

130.    Defendant's operations affect interstate commerce, including by providing transportation across state lines from New York to New Jersey and vice versa.

131.    Title III of the ADA also prohibits discrimination on the basis of disability in the full and equal enjoyment of services provided by places of public accommodations.  42 U.S.C. § 12182.  Public accommodations, under the ADA, explicitly include travel services.  42 U.S.C. § 12181(7)(f)

132.    Defendant operates a public accommodation subject to Title III's non-discrimination requirements.  42 U.S.C. §§ 12181, 12182.

133.    Defendant operates a "travel service" as defined by 42 U.S.C. § 12181.

134.    Defendant operates a "demand responsive system" as defined by 42 U.S.C. § 12181(3).

135.    Through its ongoing policies and procedures, the opportunities that Lyft offers people with mobility disabilities to participate in or benefit from it services, advantages, and accommodations are not equal to the opportunities that Lyft provides to other individuals.  49 U.S.C. § 12182(b)(1)(A)(ii).

136.    By failing to make wheelchair accessible vehicles adequately available through its transportation services, Defendant denies individual who use motorized and other non-folding wheelchairs, including Plaintiff Lowell, WDOMI members, and class members, full and equal enjoyment of Defendant's services in violation of Title III of the ADA.

137.    By forcing users of motorized and other non-folding wheelchairs to wait significantly longer to obtain rides from wheelchair-accessible vehicles than other users wait to obtain rides through its transportation services, Defendant denies such individuals, including Plaintiff Lowell, WDOMI members, and class members, full and equal enjoyment of Defendant's services in violation of Title III of the ADA.

138.    By failing to make reasonable modifications to its policies, practices, and procedures to make wheelchair accessible vehicles available with equivalent reliability and similar wait times as inaccessible vehicles, Defendant denies users of motorized and other non-folding wheelchairs, including Plaintiff Plaintiff Lowell, WDOMI members, and class members,

full and equal enjoyment of Defendant's transportation service in violation of Title III of the ADA.

139.    Plaintiffs, WDOMI members, and members of the nationwide class have been injured by Defendant's unlawful conduct in violation of Title III of the ADA.

140.    Defendant's conduct constitutes an ongoing and continuing violation of the ADA and, unless restrained from doing so, Defendant will continue to violate the ADA.  Said conduct has injured Plaintiff and members of the nationwide class, and, unless enjoined, will continue to inflict injuries for which Plaintiff and class members have no adequate remedy at law.

### COUNT II – DISABILITY DISCRIMINATION IN VIOLATION OF THE NEW YORK STATE HUMAN RIGHTS LAW
### (On Behalf Of Plaintiff Lowell And The New York State Subclass)

141.    Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

142.    The NYSHRL provides that "[i]t shall be an unlawful discriminatory practice for any person being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation . . . [b]ecause of the . . . disability . . . of any person, directly or indirectly to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof."  N.Y. Exec. Law § 296(2)(a).

143.    Plaintiff Lowell and all members of the New York State subclass are all "persons," as defined under N.Y. Exec. Law § 292(1), with "disabilities," as defined under N.Y. Exec. Law § 292(21).

144.    The term "place of public accommodation" encompasses "all public conveyances operated on land or water or in the air."  N.Y. Exec. Law § 292(9).

145.    Defendant is an "owner" or "proprietor" of Lyft's transportation services.

146.    Defendant also acts as a "manager" of Lyft's transportation services.

147.    Defendant is a "person" within N.Y. Exec. Law § 292(1).

148.    Through its pervasive operations in providing on-demand transportation services to the general public and to residents and visitors of cities and regions throughout New York State, Defendant provides public conveyances to the public as defined in N.Y. Exec. Law § 292 (9).

149.    Defendant's deliberate failure to equip its vehicles and/or to require its drivers to operate accessible vehicles for the benefit of persons with disabilities requesting its services is an unlawful and prohibited discriminatory practice.

150.    As a direct and proximate result of Defendant's violations of the NYSHRL, Plaintiff and members of the New York State Subclass have been injured as set forth herein.

### COUNT III – DENIAL OF FULL AND EQUAL ENJOYMENT IN VIOLATION OF THE NEW YORK CITY HUMAN RIGHTS LAW
### (On Behalf Of Plaintiff Lowell And The New York City Subclass)

151.    Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

152.    The NYCHRL provides that "[i]t shall be an unlawful discriminatory practice for any person who is the owner, franchisor, franchisee, lessor, lessee, proprietor, manager, superintendent, agent or employee of any place or provider of public accommodation . . . [b]ecause of any person's actual or perceived . . . disability . . . directly or indirectly . . . [t]o refuse, withhold from or deny to such person the full and equal enjoyment, on equal terms and conditions, of any of the accommodations, advantages, services, facilities or privileges of the place or provider of public accommodation."  N.Y.C. Admin. Code § 8-107(4)(a).  The NYCHRL further prohibits any form of communication that services are not fully and equally available on account of disability.

153.    Plaintiff Lowell and all members of the New York City subclass are all "persons," as defined under N.Y.C. Admin. Code § 8-102(1), with "disabilities," as defined under N.Y.C. Admin. Code § 8-102(16)(a).

154.    The term "place or provider of public accommodation" encompasses "providers, whether licensed or unlicensed, of goods, services, facilities, accommodations, advantages or privileges of any kind, and places whether licensed or unlicensed, where goods services, facilities, accommodations, advantages or privileges of any kind are extended, offered, sold or otherwise made available."  N.Y.C. Admin. Code § 8-102(9).

155.    Transportation services that are provided to the public, including Lyft, constitute a service, accommodation, advantage, or privilege that is offered to the general public within the meaning of N.Y.C. Admin. Code § 8-102(9).

156.    Defendant is an "owner" or "proprietor" of Lyft's transportation services.

157.    Defendant also acts as a "manager" of Lyft's transportation services.

158.    Defendant is a "person" within N.Y.C. Admin. Code § 8-102(1).

159.    The services, accommodations, advantages, and privileges that Defendant makes available to the general public are such that Defendant, in its role as the Lyft transportation system's owner, proprietor, and/or manager, violates N.Y.C. Admin. Code § 8-107(4)(a).

160.    Defendant's violations of the NYCHRL are particularly grave in light of the uniquely remedial purpose behind the NYCHRL, which provides that each section must be "construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York state civil and human rights laws, including those laws with provisions worded comparably to provisions of this title, have been so construed."  N.Y.C. Admin. Code § 8-130.

161.    As a direct and proximate result of Defendant's violations of the NYCHRL, Plaintiff Lowell and members of the New York City Subclass have been injured as set forth herein.

**COUNT IV – DISPARATE IMPACT IN**
**VIOLATION OF THE NEW YORK CITY HUMAN RIGHTS LAW**
**(On Behalf Of Plaintiff Lowell And The New York City Subclass)**

162.    Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

163.    Defendant's conduct also violates N.Y.C. Admin. Code § 8-107(17), which states that "an unlawful discriminatory practice . . . is established . . . [when a plaintiff] demonstrates that a policy or practice of a covered entity or group of policies or practices of a covered entity results in a disparate impact to the detriment of any group protected by the provisions of this chapter."

164.    By failing to operate its transportation service so that it is readily accessible and usable by people who use wheelchairs when viewed in its entirety, Defendant has demonstrated a policy or practice that has a disproportionately negative impact on Plaintiff Lowell and members of the proposed class, each of whom qualifies as a member of a protected group under the provisions of the NYCHRL.

165.    In particular, as described herein, Lyft's use of a separate Access Mode for its smartphone application ensures that customers who require wheelchair accessible vehicles are either denied service from Lyft altogether, and instead directed to other, less-convenient providers, or are subjected to significantly longer wait times given the lack of wheelchair accessible vehicles in Lyft's own fleet.

166.    As a direct and proximate result of Defendant's violations of the NYCHRL, Plaintiff Lowell and members of the New York City Subclass have been injured as set forth herein.

### COUNT V – DECLARATORY RELIEF
### (On Behalf Of Plaintiffs And Nationwide Class)

167.    Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

168.    An actual controversy has arisen and now exists between the Parties in that Plaintiffs contend, and are informed and believe that Defendant denies, that Defendant has discriminated against the class by failing to adopt policies and procedures that would provide people with mobility disabilities who require wheelchair accessible vehicles with full and equal enjoyment, on equal terms and conditions, of the services, facilities, privileges, advantages, and accommodations of Lyft's transportation services.

169.    Defendant fails to comply with applicable laws, including but not limited to the ADA, NYSHRL, and NYCHRL.

170.    A judicial declaration is necessary and appropriate at this time in order that each of the Parties may know their respective rights and duties and act accordingly.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for an Order:

A.    Certifying this matter to proceed as a class action;

B.    Approving Plaintiffs Harriet Lowell and Westchester Disabled on the Move, Inc. as adequate representatives of the nationwide class;

C.    Approving Plaintiff Harriet Lowell as an adequate representative of the New York State Subclass;

D.    Approving Plaintiff Harriet Lowell as an adequate representative of the New York City Subclass;

E.    Appointing Finkelstein, Blankinship, Frei-Pearson & Garber, LLP and Michael Hellman of the Westchester Independent Living Center to serve as Class Counsel;

F.    Granting judgment in favor of the Plaintiffs, class members, and subclass members on all Counts;

G.    Declaring that Defendant is a public accommodation within the meaning of the Americans with Disabilities Act, 42 U.S.C. § 12181, *et seq.*, the New York State Human Rights Law, N.Y. Exec. Law § 290, *et seq.*, and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq.*;

H.    Declaring that Defendant's policies and practices herein violate the Americans with Disabilities Act, 42 U.S.C. § 12181, *et seq.*, the New York State Human Rights Law, N.Y. Exec. Law § 290, *et seq.*, and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq.*;

I.    Enjoining Defendant and its agents, subsidiaries, affiliates, employees, successors, and all other persons in active concert of participation with Defendant from violating the Americans with Disabilities Act, 42 U.S.C. § 12181, *et seq.*, the New York State Human Rights Law, N.Y. Exec. Law § 290, *et seq.*, and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq.*;

J.    Requiring Defendant and its agents, subsidiaries, affiliates, employees, successors, and all other persons in active concert of participation with Defendant to develop and implement a remedial plan to ensure full and equal access to its services for riders who require accessible transportation;

K.    Awarding Plaintiffs' reasonable attorneys' fees and reimbursement of all costs

and expenses incurred in litigating this action;

L.    Granting any further relief the Court deems just, necessary, and proper; and

M.    Maintaining jurisdiction over this action to ensure Defendant's compliance with

the foregoing.

## DEMAND FOR JURY TRIAL

Plaintiffs, by and through their undersigned counsel, hereby demands a jury trial in the

above-captioned matter.


Dated: December 6, 2017                          Respectfully submitted,


Jeremiah Frei-Pearson
Bradley F. Silverman
Chantal Khalil
**FINKELSTEIN, BLANKINSHIP,**
**FREI-PEARSON & GARBER, LLP**
445 Hamilton Avenue, Suite 605
White Plains, New York 10601
Telephone: (914) 298-3281
Facsimile:  (914) 824-1561
Email:  jfrei-pearson@fbfglaw.com

Michael Hellmann
**WESTCHESTER INDEPENDENT**
**LIVING CENTER**
10 County Center Road, Suite 203
White Plains, NY 10607
Telephone:  (845) 228-7457
Facsimile:  (745) 933-5390