**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HARRIET LOWELL and WESTCHESTER DISABLED ON THE MOVE, INC., individually and on behalf of all other similarly situated,<br><br>                       Plaintiffs,<br><br>      v.<br><br>LYFT, INC.,<br><br>                      Defendant. | 7:17-CV-06251 (NSR) |

BRIEF FOR AMICI CURIAE NATIONAL COUNCIL ON INDEPENDENT LIVING AND
THE CENTER FOR DISABILITY RIGHTS IN SUPPORT OF THE PLAINTIFFS

Kathryn Carroll
Center for Disability Rights, Inc.
99 Washington Avenue, Ste. 806B
Albany, NY 12210
kcarroll@cdrnys.org
Counsel for Amici Curiae

## TABLE OF CONTENTS

CORPORATE DISCLOSUE STATEMENT……………………………………………………… 2

STATEMENT REGARDING RULE 29(C)(5)……………………………………………… 2

LEGAL AUTHORITIES REFERENCED…………………………………………………… 3

INTEREST OF THE AMICI CURIAE…………………………………………………….. 3

INTRODUCTION…………………………………………………………………………….. 4

ARGUMENT………………………………………………………………………………….. 4

CONCLUSION………………………………………………………………………………. 13

**FEDERAL RULE OF CIVIL PROCEDURE RULE 7.1 DISCLOSURE STATEMENT**

*Amicus N*ational Council on Independent Living ("NCIL") is a nonprofit corporation. NCIL has no parent corporations and no publicly held corporation owns more than 10 percent of its stock.

*Amicus* Center for Disability Rights ("CDR") is a nonprofit corporation. CDR has no parent corporations and no publicly held corporation owns more than 10 percent of its stock. CDR is affiliated with another nonprofit, the Regional Center for Independent Living, by a common board of directors. CDR is also affiliated with nonprofit corporation All About You, a home health care agency.

**CERTIFICATION**

*Amici* certify that:

**(A)** No party's counsel authored the brief in whole or in part;

**(B)** No party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and

**(C)** No person, other than *amici curiae*, their members, and their counsel, contributed money that was intended to fund preparing or submitting the brief.

**LEGAL AUTHORITIES REFERENCED**

34 CFR 364.4(b)

Americans with Disabilities Act (42 U.S.C. § 12181, 42 U.S.C. § 12181(7)(f ), 42 U.S.C. § 12182, 42 U.S.C. § 12184,), 42 U.S.C. § 12188(a)(1)

*Anderson v. Rochester-Genesee Regional Transit Authority*, 206 F.R.D 56, 59 (W.D.N.Y. 2001).

*Andrews v. Blick Arts Materials, LLC.* 268 F. Supp. 3d 381 (E.D.N.Y. 2017).

*Crawford v. Uber Technologies, Inc.* No. 17-2664, 2018 WL 1116725, at *4 (N.D. Cal. Mar. 1, 2018).

*Doran v. 7–Eleven, Inc.,* 524 F.3d 1034, 1039 (9th Cir. 2008) (quoting *Trafficante v. Metro. Life Ins. Co.,* 409 U.S. 205, 209 (1972)).

*National Federation of the Blind v. Target Corp.* 452 F. Supp. 2d 946 (N.D.C.A. 2006).

*The Taxis For All Campaign, et al. v. New York City Taxi and Limousine Commission, et al.*, No. 11-237, ECF No. 220-1 (S.D.N.Y. 2014).

**INTEREST OF THE AMICI CURIAE**

The National Council on Independent Living ("NCIL") is the longest-running national, cross-disability, grassroots organization run by and for people with disabilities. NCIL works to advance independent living and the rights of people with disabilities. NCIL's members include individuals with disabilities, Centers for Independent Living, Statewide Independent Living Councils, and other organizations that advocate for the civil rights of disabled people.

The Center for Disability Rights, Inc. ("CDR") is a center for independent living within the meaning of 34 CFR 364.4(b) and is a community-based advocacy and service organization that advocates for disability rights throughout New York State. CDR and its members were at the forefront of advocacy efforts to get lifts on public buses.

NCIL and CDR share an interest in protecting the right of disabled people to equal access in transportation options offered to the general public. *Amici* are not simply advocates; both

organizations are led and staffed by people who rely on accessible forms of transportation, and who are unable to utilize Lyft, Inc.'s ("Lyft") services.

## INTRODUCTION

Lyft's failure to provide equal service to people with disabilities makes it noncompliant with the Americans with Disabilities Act ("ADA") and numerous state, county, and municipal laws, including those of New York City and State. The ADA demands more of Lyft as a public accommodation and provider of public transportation services. Other transportation systems are coming into compliance with the ADA because disabled people have struggled for decades to create a more inclusive society. Lyft is a business that provides unique services and advantages to nondisabled people; without equal access to these services, disabled people suffer tremendous harm. They are systematically discriminated against, excluded from equal participation in society, and are humiliated by blatant disregard of their access needs. In this brief, *amici* help explain why the Plaintiff's suit should not be dismissed for want of standing, but be allowed to proceed because of the widespread impact of Lyft's policies, practices, and procedures on disabled people

## ARGUMENT

### I.  Plaintiffs Have Adequately Alleged Standing.

Standing in suits alleging ADA violations should be viewed broadly. Lyft's lack of accessible service is a matter of common knowledge within the disability community and furthermore disabled people need not try to use Lyft's discriminatory service because it would be a futile gesture. For these reasons, plaintiffs have standing.

### A.  Standing Must Be Viewed Broadly to Create Opportunities for Enforcement of the ADA.

Disabled people did not receive the protection of a comprehensive civil rights law until 1990 with the signing of the ADA. In the 1970s and 1980s, people with disabilities protested bus lines to force them to install wheelchair lifts, making some public transportation actually usable by many disabled people.[1] They literally put their bodies on the line to physically block buses while demanding equal access to ride.[2] More than 27 years after the signing of the ADA, disabled people are still demanding equal access to transportation systems. This is because enforcement of the ADA is typically achieved through private suits.[3] Recognizing this, "[t]he Supreme Court has instructed us to take a broad view of constitutional standing in civil rights cases, especially where, as under the ADA, private enforcement suits 'are the primary method of obtaining compliance with the Act.'"[4]

## B. Disabled People Are Deterred From Lyft By Widespread Actual Knowledge of Its Failure to Provide Equal Service, and Need Not Engage in Futile Gestures.

The average person does not need to go far to obtain actual knowledge of Lyft's exclusionary practices. Organizations of people with disabilities have officially taken note that ridesharing transportation network companies ("TNCs") including Lyft will not serve their members.[5]

---

[1] *See* Gina McDonald and Mike Oxford, *History of Independent Living*, ILRU, http://www.ilru.org/sites/default/files/History_of_Independent_Living.pdf. The protests took place nationally. *See, e.g.,* Laurie Becklund, *Disabled Protest Greyhound Policies*, LOS ANGELES TIMES (Sept. 6, 1988), http://articles.latimes.com/1988-09-06/local/me-1712_1_greyhound-bus; *Wheelchair Protests Get Support but Not Bus Lifts*, LOS ANGELES TIMES (Sept. 27, 1989), http://articles.latimes.com/1989-09-27/news/mn-148_1_wheelchair-lifts; *25 Disabled People Held in Atlanta Bus Protests*, NEW YORK TIMES (Sept. 29, 1989), https://www.nytimes.com/1989 /09/29/us/25-disabled-people-held-in-atlanta-bus-protest.html.

[2] Kate Rudolph, *"We Will Ride!" The Origin of the Disability Rights Movement in Denver*, DENVER PUBLIC LIBRARY (May 18, 2015), https://history.denverlibrary.org/news/we-will-ride-origin-disability-rights-movement-denver-0.

[3] The U.S. Department of Justice is not required to enforce individual complaints against public accommodations, but is only authorized to bring lawsuits in certain situations. U.S. Dept. of Justice, *Federal Civil Rights Laws – Civil Enforcement*, https://www.justice.gov/usao-sc/civil-rights-laws-affirmative-civil-enforcement.

[4] *Doran v. 7–Eleven, Inc.,* 524 F.3d 1034, 1039 (9th Cir. 2008) (quoting *Trafficante v. Metro. Life Ins. Co.,* 409 U.S. 205, 209 (1972)); *Harty v. Spring Valley Marketplace LLC*, No. 15-8190, 2017 WL 108062, at *6 (S.D.N.Y. Jan. 9, 2017) (Román, J.) (same).

[5] These organizations include, for example, the American Association of People with Disabilities ("AAPD") and NCIL, in the nationwide RevUp Campaign, as well as United Spinal. *See Presidential Candidate Questionnaire*, AAPD,  https://www.aapd.com/advocacy/voting/election/presidential-candidate-questionnaire/trump-campaign-

*Amicus* NCIL's leadership has continually made educating the public about the lack of wheelchair-accessible service a priority, given the experiences of its members.[6]   Not only are *amici* and keenly aware of Lyft's discriminatory practices in their role as advocates, they are aware for practical reasons as well. *Amici* must plan events and arrange transportation for and among employees and clients. They avoid ridesharing TNCs like Lyft out of hand because no service is expected. *Amicus* CDR actively opposed sanctioned operations of TNCs in New York State, knowing many of its employees, consumers, and other disabled New Yorkers would not be able to use their services.[7]

Because people with disabilities have to navigate a minefield of barriers in their daily lives, information about barriers is disseminated quickly. Disabled people share stories on social media and listservs. The stories spread to blogs and publications covering disability rights news.[8] The issues become local, then national, news stories.[9] The disability community collects its own data,[10] holds community fora,[11] and makes removal of the barrier a political priority for its

---

response-rev-questionnaire/; Josie Byzek, *United Spinal: Leading the Transportation Fight*, NEW MOBILITY (May 2, 2016), http://newmobility.com/2016/05/accessible -transportation-fight/.

[6] *See* Board Reports for 2016 and 2017, NICL, https://www.ncil.org/reports/; *Federal Transportation 2017: What to Watch For and How to Take Action*, ADVOCACY MONITOR (Jan. 19, 2017), http://www.advocacymonitor.com/federal-transportation-2017-what-to-watch-for-and-how-to-take-action/.

[7] *Call Your Legislators to Say NO to Uber*, CDR (Dec. 19, 2016), http://cdrnys.org/blog/advocacy/call-your-legislators-to-say-no-to-uber/.

[8] For example, coverage of Lyft was picked up by the popular blog Rooted in Rights. *See* Lyft issue tag, ROOTED IN RIGHTS, http://www.rootedinrights.org/tag/lyft/. New Mobility, the magazine publication of the United Spinal Association, and the AbleNews publication covering disability issues nationally and in New York both covered the lack of access to TNC services. *See* Josie Byzek, *United Spinal: Leading the Transportation Fight*, NEW MOBILITY (May 2, 2016), http://www.newmobility.com/2016/05/accessible-transportation-fight/; *Lyft Will Improve Access for Blind*, ABLENEWS VOL. 22, NO. 11 (May 2017), http://ablenews.com/wp-content/uploads/2017/05/MAY-2017-NY.pdf.

[9] There are many examples of national coverage on this issue.  *See, e.g.*, Laura Nelson, *Uber and Lyft must improve access for disabled riders, advocates say*, LOS ANGELES TIMES (Sept. 9, 2015), http://www.latimes.com/local/cityhall/la-me-uber-disabled-20150909-story.html (covering the individual story of Andy Arias); Issie Lapowsky, *Uber's Business isn't Built to Help Disabled People*, WIRED (Aug. 14, 2015), https://www.wired.com/2015/08/uber-disability/ (covering the barriers faced by disability activist Nadina Laspina).

[10] For example, the Independent Living Resource Center of San Francisco collected data on ridesharing last year in its "Take ILRCSF's Ride Share Advocacy" survey (https://www.ilrcsf.org/blog/2017/11/take-ilrcsfs-ride-share-advocacy-survey/) and the National Federation of the Blind is undertaking ongoing user testing of Uber and Lyft

national organizations.[12] Launched in 2012, Lyft has been around long enough for disabled people nationally to know what little they can expect from hailing a ride with Lyft. The documentation of Lyft's exclusion of disabled people on the internet and social media would deter any disabled person needing wheelchair access from even attempting to use Lyft.

Furthermore, a physically disabled person needing a wheelchair accessible vehicle and attempting to use Lyft would be a futile gesture; individuals are not required to make such futile gestures just to further demonstrate discrimination.[13] They only serve to humiliate and burden disabled people, forcing them to suffer through not being connected with a ride at all, waiting an unusually long time to be connected with a ride, or to be denied service by a driver who is unprepared to serve a disabled passenger.

## II. The ADA Demands that Public Transportation Services Not Discriminate against People with Disabilities; Lyft is Not an Exception.

The ADA requires equal access for disabled people in public accommodations and in specified transportation services.[14] The ADA has been interpreted to cover new types of public accommodations to account for new technology. Lyft's business practices have also indicated that it is a public transportation service, not just a technology company and public accommodation. And as other transportation systems are becoming more accessible, Lyft should not be an exception to this trend.

---

regarding past discrimination against users of service animals. *See Uber and Lyft Testing Program*, NFB, https://nfb.org/rideshare.
[11] For example the Washington Metro Disabled Students Collective sought to address transportation issues faced by disabled people at its July 25, 2014 Community Forum on Accessible Transportation. *See* https://disabledstudentsdc.org/events/.
[12] *See supra* fn. 4; Kaitlyn Meuser, *Facing the Day with Dignity*, UNITED CEREBRAL PALSY (Jul. 24, 2015), http://ucp.org/facing-the-day-with-dignity/.
[13] 42 U.S.C. § 12188(a)(1).
[14] Title III of the ADA prohibits discrimination on the basis of disability in the full and equal enjoyment of specified public transportation services provided by private entities primarily engaged in the business of transporting people and whose operations affect commerce. 42 U.S.C. § 12184. Title III of the ADA also prohibits discrimination on the basis of disability in the full and equal enjoyment of services provided by places of public accommodations. 42 U.S.C. § 12182. Public accommodations, under the ADA, explicitly include travel services. 42 U.S.C. § 12181(7)(f)

**A. New and Innovative Forms of Public Accommodations Are Covered by the ADA.**

Lyft is part of a wave of new companies that use technology to offer services in new ways. Meanwhile, courts have interpreted the ADA to cover new types of public accommodations. In *National Federation of the Blind v. Target Corp.*, the court found that inaccessibility of a website constitutes unequal access to goods and services.[15] The court found that "[the ADA] applies to the services *of* a place of public accommodation, not services *in* a place of public accommodation.[16] Thus, obligations under the ADA were extended to websites as public accommodations. The federal district court for the Eastern District of New York adopted this reasoning in a similar case, *Andrews v. Blick Arts Materials, LLC.,* finding that a retailer's website was a place of public accommodation under the ADA.[17] Just as online retail was not a place of public accommodation that existed when Congress passed the ADA, the new and innovative app-based service offered by Lyft is a new public accommodation that still must provide its services in a nondiscriminatory way.

**B. Lyft is a Public Transportation System.**

Lyft is not just a public accommodation; its business practices show it is also a private entity providing a public transportation service and is consequently covered by Title III of the ADA.[18] Firstly, Lyft has partnered with other organizations in order to provide transportation services to certain populations. For instance, Lyft recently partnered with a non-emergency medical transportation company to provide rides to patients.[19] Lyft has also partnered with the Boston

---

[15] 452 F. Supp. 2d 946 (N.D.C.A. 2006).
[16] *Id.* at 953 (emphasis in original; citing 42 U.S.C. § 12182(a)).
[17] 268 F. Supp. 3d 381 (E.D.N.Y. 2017).
[18] 42 USCA § 12182.
[19] *See Allscripts, Lyft partner to off non-emergency transportation to patients*, METRO MAGAZINE (Mar. 5, 2018), http://www.metro-magazine.com/accessibility/news/728766/allscripts-lyft-partner-to-off-non-emergency-transportation-to-patients?utm_source=email&utm_medium=enewsletter&utm_campaign=20180305-NL-MET-Express-BOBCD180227005&omdt=NL-MET-Express&omid=1000928264; Joe Fitzgerald Rodriguez, *Ride-hail*

Transit Agency and Massachusetts Bay Transportation Authority to provide paratransit rides to presumably ambulatory individuals.[20] By seeking and engaging in these partnerships, it is clear that Lyft intends to be a provider of transportation, not just the purveyor of an app.

Secondly, Lyft is a public transportation service because it did more than provide a way for drivers and passengers to find one another in an existing market. As Judge Seeborg recently wrote in *Crawford v. Uber Technologies, Inc.*:

> [W]ithout Uber and its competitors, non-professional drivers would find it difficult — if not impossible — to locate a rider and transport her to the destination of her choice for monetary compensation. To say that Uber merely *facilitates* connections between "both sides of the two-sided ridesharing market" obscures the fact that Uber arguably *created* a market for this type of transportation. … Here, because plaintiffs have plausibly alleged that Uber is "primarily engaged in the business of transporting people" within the meaning of Section 12184, Uber cannot defeat ADA liability on the grounds that it is not a covered entity." [21]

Lyft operates in substantially the same way as Uber, so the reasoning applies here as well. Lyft does not just provide an app; it creates a market for transportation and meets the needs of that market- for ambulatory individuals at least- by providing rides.

### C.  Lyft Must Follow the Example of Other Transportation Systems.

Due to the efforts of disabled people in the courts, other methods of transportation are being held accountable for their inaccessibility and are taking corrective steps to offer equal and nondiscriminatory service. The MTA subway system is notably inaccessible to people with mobility disabilities, with only about a third of subway stations being wheelchair accessible and

---

companies introduce health care transportation days after Uber lawsuit, SAN FRANCISCO EXAMINER (Mar. 5, 2018), http://www.sfexaminer.com/ride-hail-companies-introduce-health-care-transportation-days-uber-lawsuit/.
[20] *See* Amy MacMillan Bankson, *Uber and Lyft partner with Boston Transit Agency to Provide On-Demand Rides to Disabled Residents*, MIT Sloan School of Management Newsroom (Mar. 14, 2017), http://mitsloan.mit.edu/newsroom/articles/uber-and-lyft-partner-with-boston-transit-agency-to-provide-on-demand-rides-to-disabled-residents/; Michal Addady, *Uber and Lyft are giving Subsidized Rides to Customers with Disabilities*, FORTUNE (Sept. 18, 2016), http://fortune.com/2016/09/18/uber-lyft-accessible/.
The perversity of touting service that is beneficial for seniors, medical patients, and people with disabilities while not actually providing service to people with mobility disabilities needing accessible vehicles was noted by disability advocates in each situation.  *See supra.* fn. 22, 23.
[21] No. 17-2664, 2018 WL 1116725, at *4 (N.D. Cal. Mar. 1, 2018).

frequent elevator outages where elevators exist at all.[22] However, these conditions are being challenged in a lawsuit brought by disability rights advocates.[23]New York City's taxis have historically provided virtually no wheelchair-accessible vehicles. However, it has agreed to have a 50% wheelchair-accessible fleet by 2020.[24] Over-the-road bus companies including Greyhound, Megabus, and Peter Pan have agreed to operate vehicles that are wheelchair-accessible.[25] TNCs like Lyft are being held accountable as well. Both Uber and Lyft are implementing agreements to offer rides on an equal basis to passengers with service animals.[26] A case against Uber for not offering wheelchair accessible transportation was recently allowed to proceed in the Northern District of California, and other cases have been filed in Washington, D.C., New York, Chicago, and Texas.[27] TNCs' lack of equal service for disabled people is

---

[22] Eli Rosenber, *New York City's Subway System Violates Local and federal Laws, Disability Groups Say*, NEW YORK TIMES (Apr. 25, 2017).

[23] *US Department of Justice Joins DRA Suit Against MTA*. DISABILITY RIGHTS ADVOCATES. (MAR. 3, 2018), http://dralegal.org/press/us-department-of-justice-joins-dra-suit-against-the-mta/.

[24] *See The Taxis For All Campaign v. New York City Taxi and Limousine Commission*, No. 11-237, ECF No. 220-1 (S.D.N.Y. 2014).

[25] *See Greyhound Lines to Resolve Americans with Disabilities Violations*, U.S. DEPT. OF JUSTICE (Feb. 8, 2016), https://www.justice.gov/opa/pr/greyhound-lines-resolve-americans-disabilities-violations; *Justice Department Announces ADA Settlement with Intercity Bus Company, Megabus*, U.S. DEPT. OF JUSTICE (May 16, 2011), https://www.justice.gov/opa/pr/justice-department-announces-ada-settlement-intercity-bus-company-megabus; *U.S. Attorney's Office Enters into Agreement with Peter Pan Bus Lines to Ensure Full Accessibility of Buses*, U.S. DEPT. OF JUSTICE (Aug. 16, 2017), https://www.justice.gov/usao-ma/pr/us-attorney-s-office-enters-agreement-peter-pan-bus-lines-ensure-full-accessibility-buses.

[26] *National Federation of the Blind of California, et al. v. Uber Technologies, Inc., et al.*, DISABILITY RIGHTS ADVOCATES, http://dralegal.org/case/national-federation-of-the-blind-of-california-et-al-v-uber-technologies-inc-et-al/#settlement; *Lyft Access for Riders with Service Animals*, DISABILITY RIGHTS ADVOCATES, http://dralegal.org/case/lyft-access-riders-service-animals/.

[27] *See, generally,* Jen Wieczner, *Why the disabled are suing Uber and Lyft*, FORTUNE (May 22, 2015), http://fortune.com/2015/05/22/uber-lyft-disabled/; *see also* Megan Rose Dickey, *Uber gets sued over lack of services available to people with disabilities*, TECHCRUNCH (May 9, 2017), https://techcrunch.com/2017/05/09/uber-lawsuit-people-with-disabilities/?_ga=2.130640463.1303061911.1520969001-581904868.1520969001; Megan Rose Dickey, *Equal Rights Center sues Uber for denying equal access to people who use wheelchairs*, TECHCRUNCH (Jun. 28, 2017), https://techcrunch.com/2017/06/28/equal-rights-center-sues-uber-for-denying-equal-access-to-people-who-use-wheelchairs/?_ga=2.130640463.1303061911.1520969001-581904868.1520969001;  Michael Tarm, *Disability rights group sues Uber over wheelchair access*, U.S. NEWS (Oct. 13, 2016), https://www.usnews.com/news/business/articles/2016-10-13/disability-rights-groups-sues-uber-over-wheelchair-access; Carolyn Said, *Lyft sued by disability advocates over wheelchair access*, San Francisco Chronicle (Mar. 13, 2018), https://www.sfchronicle.com/business/article/Lyft-sued-by-disabled-advocates-over-lack-of-12750101.php.

prompting antidiscrimination suits across the country. This is hardly surprising given the popularity and convenience of TNCs and the numbers of people with physical disabilities.

These changes are slowly creating a reality of accessible transportation denied to disabled people. While Lyft would have us believe it is unlike other transportation providers, it should not be exempt from obligations to provide inclusive services.[28]

### III. Disabled People Suffer Tremendous Harm from Unequal Access, and Granting Defendant's Motion would deny Justice for All.

The District Court for the Western District of New York noted that "Congress firmly intended to see to it that the disabled be free from discrimination in the area of transportation, in order to enable them to be fully integrated into the fabric of society at all levels."[29] Without accessible transportation, disabled people are prevented from getting jobs, visiting family and friends, attending school, recreating, attending civic events, and engaging in all other activities of life. Plaintiff Lowell's, for example, she wants adequate and specialized healthcare, but is unable to travel to New York City without requiring her husband to clear his schedule and serve as her driver. Lyft would be one of her only options for independently traveling to NYC, but she cannot use it.

Improvements in other transportation systems, however, do not excuse Lyft's discriminatory practices. Lyft has disrupted the transportation market by providing a different, flexible and convenient service. Lyft is able to provide service in areas currently not served by other transportation methods. Even as compared to traditional taxi companies, Lyft offers service unlimited by geography (as many cab companies are), and at less expensive rates.

---

[28] *See* Joy Borkholder, et al., *Uber State Interference*, PARTNERSHIP FOR WORKING FAMILIES (Jan. 2018), http://www.forworkingfamilies.org/sites/pwf/files/publications/Uber%20State%20Interference%20Jan%202018.pdf, at 14.
[29] *Anderson v. Rochester-Genesee Regional Transit Authority*, 206 F.R.D 56, 59 (W.D.N.Y. 2001).

Even if all other transportation methods became 100% accessible tomorrow, there would still be a value to ridesharing for disabled people, just as there is for nondisabled people who already have access to other forms of transportation. The study *Shared Mobility and the Transformation of Public Transit* found that ridesharing is a complement to, not necessarily a substitute for, public transportation.[30] It found that among people who use Uber and Lyft, 50% and 45% report frequently using trains and buses, respectively.[31] Uber and Lyft themselves have highlighted their service as providing complementary service to public transit, in what is called the "first mile, last mile gap" between other transit systems stops and passengers' final destinations.[32] Because of the unique benefits Lyft offers, other transit systems may partner with it to increase mobility, as indeed some systems have already, as mentioned above. Tellingly, in a white paper published by the New York Public Transit Association, New York transit systems reported seeing an opportunity to improve mobility by partnership with TNCs in the area, but more than 80% of the systems surveyed reported seeing ADA requirements as a barrier to coordinating with TNCs.[33] Clearly, New York's other transit services are aware of problems posed by Lyft's discriminatory practices.

At the same time, Lyft's operation negatively impacts disabled people's use of other systems that would be more accessible to them. For instance, the NYC taxi fleet must be 50% wheelchair-accessible by 2020. However, with competition from Lyft, the fleet is shrinking and

---

[30] *Shared Mobility and the Transformation of Public Transit*, AMERICAN PUBLIC TRANSPORTATION ASSOCIATION (Mar. 2016), https://www.apta.com/resources/reportsandpublications/Documents/APTA-Shared-Mobility.pdf, at 7.
[31] Mantill Williams, *Uber and Lyft Users More Likely to Use Public Transit Frequently, Own Fewer Cars and Spend Less on Transportation*, AMERICAN PUBLIC TRANSPORTATION ASSOCIATION (Mar. 15, 2016) http://www.apta.com/mediacenter/pressreleases/2016/Pages/160315_Shared-Use-Mobility.aspx.
[32] Michaela Kwoka-Coleman, *Mobility On-Demand: The Future of Transportation*, METRO MAGAZINE (Dec. 26, 2017), http://www.metro-magazine.com/management-operations/article/726862/mobility-on-demand-the-future-of-transportation.
[33] *White Paper on Transportation Network Company (TNC) Issues*, NEW YORK PUBLIC TRANSIT ASSOCIATION, https://nytransit.org/images/NYPTA_TNC_issues_White_Paper.pdf.

not being replaced with accessible vehicles by Lyft. If Lyft does not offer equivalent accessibility, the disability community suffers.[34]

## IV. Private Suits and Arbitration are Insufficient to Give Justice to Disabled People.

Lyft argues that plaintiffs should have to arbitrate their claims and challenges plaintiffs' class standing. Neither private, non-class suits nor arbitration are sufficient to address the large problem of discrimination and unequal service for people with disabilities. People are being systematically denied the opportunity to use Lyft's services. Efforts to make bus lines, taxi companies, and train lines more accessible have been successful because the widespread effect on all people with disabilities was acknowledged. According to the U.S. Census about 20% of Americans have disabilities.[35] 11.5% of New Yorkers have disabilities, and 6.7% of New Yorkers of all ages have an ambulatory disability.[36] The right to equal access of the large number of individuals represented by these percentages needs to be protected, and cannot be served by arbitration, or protracted individual suits.

## CONCLUSION

For all of the foregoing reasons, *amici* ask that the plaintiff's case be allowed to proceed.

Respectfully Submitted,

Kathryn Carroll
Center for Disability Rights
99 Washington Avenue, Suite 806B
Albany, NY 12210
Counsel for Amici Curiae

---

[34] *See* Josie Byzek, *Uber: Does the Transportation Revolution Include Us?*, NEW MOBILITY (May 2, 2016), http://www.newmobility.com/2016/05/uber-transportation-access/.
[35] *Nearly 1 in 5 People Have Disability in the U.S.*, *Census Bureau Reports*, U.S. CENSUS BUREAU (Jul. 25, 2012), https://www.census.gov/newsroom/releases/archives/miscellaneous/cb12-134.html.
[36] *2016 Disability Status Report New York*, CORNELL UNIVERSITY (2018), http://www.disabilitystatistics.org/StatusReports/2016-PDF/2016-StatusReport_NY.pdf?CFID=7032472&CFTOKEN=98f69d382585a24a-AD03503C-B32E-5EF7-06B9E2C5B7A066CF.