**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

HARRIET LOWELL and WESTCHESTER
DISABLED ON THE MOVE, INC.,
individually and on behalf of all other
similarly situated,

                Plaintiffs,

                v.

      LYFT, INC.,

                Defendant.

---

Case No.  7:17-cv-06251-PMH-AEK

**Joint Proposed Findings of Fact and
Conclusions of Law**

## Table Of Contents

PLAINTIFFS' PROPOSED FINDINGS OF FACT....................................................................1

    I.   Parties .....................................................................................................................1

    II.   Procedural Background...........................................................................................9

    III.   Lyft's Business Model Is To Aggressively Expand And  Provide Services To Able-Bodied People Everywhere That Regulations Allow. ...............................................9

    IV.   Lyft Provides Standard Mode All Across The Country, Regardless Of The Quality Of Service It Is Able To Provide In A Given Region. ..........................................14

    V.   Lyft Has Never Stopped Providing Standard Mode In Any Region, Regardless Of Low Population Density Or Poor Service Metrics...........................................15

    VI.   Lyft's Standard Mode Data Underscores That Lyft Provides Standard Mode Everywhere, Regardless Of Service Levels. ..........................................................17

    VII.  Lyft Refuses To Provide Access Mode Except In Regions Where It Is Required Or Incentivized To Do So; In The Regions Where Lyft Is Forced To Provide Access Mode, It Intentionally Inhibits Service.................................37

          A.  Lyft Refuses To Offer Access Mode Unless Required Or Subsidized.................39

          B.  Lyft's National WAV Team Is Under Resourced And Grossly Ineffective. ........42

          C.  The Access Mode Toggle Suppresses Service. .................................................53

          D.  Lyft's Onboarding Process Fails To Ask Whether Drivers Have WAVs. ............54

          E.  Lyft Uniquely Prevents Partner WAV Drivers From Cross-Dispatching.............55

          F.  Lyft Refuses To Effectively Advertise And Market Access Mode......................60

          G.  Lyft Refuses To Adequately Use Incentives And Bonuses For Access Mode.....66

          H.  Lyft Uniquely Restricts WAVs From Express Drive And FlexDrive...................69

          I.  Lyft Can Expand WAV Partnerships Nationwide...............................................73

    VIII. Due To Regulatory Requirements,  Lyft Provides Its Best WAV Service In New York City.......................................................................................75

    IX.   Because Regulators Outside Of New York City Are Less Demanding, Lyft Provides Markedly Worse WAV Service In The Access Regions Other Than New York City. ...81

A.  In Phoenix, Portland, Philadelphia, Chicago, and Dallas, Lyft Provides The Bare Minimum Of Service Necessary To Meet Regulatory Requirements. ..........82

B.  In San Francisco, Los Angeles, and Boston, Lyft Only Provides Service To Receive Government Subsidies. ...................................................................................92

X.  Lyft Refuses To Provide Any WAV Service In 96% Of Lyft's Service Regions. ......... 102

A.  Lyft Refuses To Provide WAV Service In Westchester County,  Despite Having More WAV Vehicles On Lyft's System In  Westchester Than In Any Access Region Other Than New York City .................................................... 108

XI.  Plaintiffs Propose Reasonable Modifications To Address Lyft's Discrimination......... 115

A.  Lyft Must Stop Blocking WAV Service In  The 96% Of Its Regions Where It Currently Blocks All WAV Service. ....................................................... 115

B.  Lyft Must Ask Drivers Whether They Have WAVs During The Onboarding Process. ................................................................................................. 118

C.  Lyft Must Remove The Toggle, Which Suppresses Demand For WAV Service. ......................................................................................................... 119

D.  Lyft Must Allow WAVs To Cross-Dispatch. ......................................................... 121

E.  Lyft Must Implement Prioritization Logic For Access Mode............................. 123

F.  Lyft Must Seriously Advertise And Market Access Mode................................... 126

G.  Lyft Should Offer WAV Drivers  Bonuses And Incentives For Guaranteed Periods Of Time......................................................................... 128

H.  Lyft Should Include WAVs As An Option Within The  Fleets Of Vehicles That It Owns And/Or Operates Through Subsidiaries. ..................... 129

I.  Lyft Should Form  Partnerships With Transportation Companies That Have WAVs. ................................................................................................. 131

J.  Lyft Should Implement A Nationwide 10 Cent Accessibility Surcharge. .......... 133

PLAINTIFFS' PROPOSED CONCLUSIONS OF LAW ................................................................ 138

XII. Plaintiffs And Proposed Class Representatives Have Standing....................................... 138

A.  Plaintiffs Have The Burden Of Proving Standing By A Preponderance Of The Evidence. ................................................. 138

  B. Plaintiffs Meet Their Burden To Demonstrate Standing......................................... 143

XIII. Lyft Violates The Americans with Disabilities Act............................................... 147

  A. Lyft Violates Section 12182(a) Of The ADA......................................... 150

    1. Under Section 12182, Which Is A Remedial Provision,
      Plaintiffs Have The Burden Of Showing That
      Lyft Is A Public Accommodation That Discriminates........................... 150

    2. Lyft Is A Public Accommodation.................................................. 155

    3. Lyft's Policies And Practices Are Discriminatory. ................................... 160

      i. Lyft Discriminates In The Non-Access Regions........................ 162

      ii. Lyft Discriminates In  The Access Regions Other
        Than New York City................................................................. 173

      iii. Lyft Discriminates In New York City. ......................................... 186

  B. Lyft Violates Section 12184(a) Of The ADA......................................... 189

    1. Under Section 1284(a), Which Is A Remedial Provision,
      Plaintiffs Have The Burden Of Showing That Lyft Is A
      Specified Public Transportation Service That Discriminates. ................. 189

    2. Lyft Is A "Specified Public Transportation.".................................... 191

    3. Lyft's Policies And Practices Are Discriminatory. .................................. 191

XIV. Lyft Violates The New York State Human Rights Law................................... 192

  A. Under The NYSHRL, Which Is A Remedial  Statute, Plaintiffs
    Have The Burden Of Showing  That Lyft Is A
    Public Accommodation That Discriminates............................................ 192

  B. Lyft Is A Public Accommodation. .......................................................... 195

  C. Lyft's WAV Service In New York City Is Discriminatory. ................... 195

XV. Lyft Violates The New York City Human Rights Law..................................... 195

  A. Under The NYCHRL,  Which Is A Remedial Statute,
    Plaintiffs Have The Burden Of Showing That Lyft Is A
    Public Accommodation That Discriminates............................................ 195

B.  Lyft Is A Public Accommodation. .................................................................. 197

C.  Lyft's WAV Service In New York City Is Discriminatory. ................................. 197

XVI. Lyft Must Remedy Its Discrimination.................................................................. 199

A.  Plaintiffs Bear A Light Burden To Establish A Reasonable Modification
And Lyft Then Bears The Burden To Show That The Modifications Are
Unreasonable, Cause An Undue Burden, Or Fundamentally Alter Lyft's
Business................................................................................................................ 200

B.  Plaintiffs Proposed Modifications Are Reasonable And Lyft Cannot
Meet Its Burden To Invalidate Any Of The Modifications. ............................... 206

C.  Plaintiffs Need Only Articulate A Plausible Barrier Removal Proposal,
At Which Time The Burden Shifts To Defendant. ............................................. 225

D.  Plaintiffs Have Articulated A Plausible Proposal For Barrier Removal,
Which Defendant Has Failed To Prove Is Not Readily Achievable.................... 226

E.  Plaintiffs Are Entitled To Attorneys' Fees And Costs...................................... 231

XVII. The Court Issues The Following Order .......................................................... 232

LYFT'S PROPOSED FINDINGS OF FACT IN SUPPORT OF ITS AFFIRMATIVE
DEFENSE OF FUNDAMENTAL ALTERATION.......................................................... 234

I.    Lyft's Technology Platform .......................................................................... 234

II.   Lyft Offers Specialty Ride Modes In Select Regions Only............................. 237

III.  Wheelchair Accessible Vehicles Are Expensive And Rare............................. 239

IV.   Demand For Access Mode Is Far Less Than 1% Of The Demand
For Standard Mode....................................................................................... 247

V.    Lyft Continues Its Work To Find The Most Efficient And Cost-Effective
Way To Offer Access Mode .......................................................................... 249

LYFT'S PROPOSED CONCLUSIONS OF LAW .......................................................... 251

VI.   Plaintiffs' Proposal To Have Lyft Offer Access Mode Everywhere Would
Fundamentally Alter The Nature Of Lyft's Business........................................ 251

## PLAINTIFFS' PROPOSED FINDINGS OF FACT

**I.    Parties**

1.    Plaintiff Harriet Lowell ("Ms. Lowell") is a citizen of Westchester County and a resident of White Plains, New York, who relies on a motorized scooter for travel.   Proposed Joint Pretrial Order, ECF No. 312, Stipulated Fact ¶ 1, 3.

> **Lyft's Response**:  Lyft has no response or objection to this proposed fact.

2.    Plaintiff Westchester Disabled on the Move, Inc. ("WDOMI") is a non-profit community-based organization headquartered in Yonkers, New York.  *Id.*, ¶ 2.

> **Lyft's Response**:  Lyft has no response or objection to this proposed fact.

3.    Plaintiff Harriet Lowell is an individual with a disability under the Americans with Disabilities Act.  42 U.S.C. § 12102(1)(A).  Proposed Joint Pretrial Order, ECF No. 312, Stipulation ¶ 1.

> **Lyft's Response**:  Lyft has no response or objection to this proposed fact.

4.    Plaintiff Harriet Lowell is an individual with a disability under the New York State Human Rights Law and the New York City Human Rights Law.  N.Y.C. Admin. Code § 8-102(16)(a).  Stipulation ¶ 2.

> **Lyft's Response**:  Lyft has no response or objection to this proposed fact.

5.    Putative class member Kenneth Burr ("Mr. Burr") is a citizen of White Plains in Westchester County, New York.  Stipulated Fact ¶ 4.

> **Lyft's Response**:  Lyft has no response or objection to this proposed fact.

6.    Putative class member Pauline Scudieri ("Ms. Scudieri") is a citizen of Decatur, Texas.  *Id.*, ¶ 5.

> **Lyft's Response**:  Lyft has no response or objection to this proposed fact.

7.    Ms. Scudieri regularly travels to Niagara Falls, New York to see her family and

travels to New York, New York for leisure.

      **Lyft's Response**:  The evidence contradicts this proposed fact. At her deposition, Ms. Scudieri testified that she could not remember her last trip to New York City, which had been at least five years ago.

- Deposition of Pauline Scudieri ("Scudieri Depo.") 64:1-8.

8.     Mr. Burr and Ms. Scudieri are individuals with a disability under the Americans with Disabilities Act.  42 U.S.C. § 12102(1)(A).  Stipulation ¶¶ 3-4.

      **Lyft's Response**:  Lyft has no response or objection to this proposed fact.

9.     Mr. Burr is an individual with a disability under the New York State Human Rights Law and the New York City Human Rights Law.  N.Y.C. Admin. Code § 8-102(16)(a).  *Id.*, ¶ 3.

      **Lyft's Response**:  Lyft has no response or objection to this proposed fact.

10.     Ms. Lowell, Mr. Burr, and Ms. Scudieri have never downloaded Lyft, Inc.'s ("Lyft") mobile-based application (the "App").  Stipulated Fact ¶ 6.

      **Lyft's Response**:  Lyft has no response or objection to this proposed fact.

11.     A significant percentage of WDOMI's constituents, clients, and staff are persons with disabilities, including mobility-related disabilities.  WDOMI is staffed, directed, and driven by the individuals with disabilities that it seeks to serve, including wheelchair-users.  *Id.*, ¶ 7.

      **Lyft's Response**:  Lyft has no response or objection to this proposed fact.

12.     Ms. Lowell knows that Lyft refuses to serve her and other people who use motorized scooters or wheelchairs except in regions where regulators force it to provide service.

      **Lyft's Response**:  The evidence establishes that Lyft has implemented WAV programs in various regions, including regions in which regulators do not require ride sharing companies to provide WAV services, including Boston, San Francisco, and Los Angeles.

13.     Not having access to Lyft WAVs prevents Ms. Lowell from many aspects of life, including assisting with her husband's medical needs.  For example, when her husband was hospitalized at White Plains Hospital and the weather was inclement, she could not visit him because her power scooter is not useable in such weather.  Similarly, when her husband was hospitalized in Greenwich, Connecticut, she was sometimes unable to visit him.  On some occasions, her friend, who also owns a WAV, would drive her to visit my husband; but this was an imposition.  She was unable to call a Lyft to visit her husband as would any able-bodied person.

**Lyft's Response**:  Lyft has no response or objection to this proposed fact.

14.     Lyft's refusal to serve people who use motorized scooters or wheelchairs is common knowledge in the disabled community.  Ms. Lowell has discussed Lyft's discrimination with her friends, advocates, and people with mobility-impairments.  Prior to filing this lawsuit, one of Ms. Lowell's friends tried to call a WAV in White Plains and informed Ms. Lowell that Lyft does not provide WAV service in White Plains.  Ms. Lowell has directly been informed of Lyft's widespread discriminatory practices from other mobility-impaired individuals who have personally experienced discrimination.  Ms. Lowell heard from a young wheelchair user in White Plains who recounted his embarrassment when his friends were able to take Lyft home at the end of a night out and he had to wait until his mother arrived to pick him up in her WAV.  Ms. Lowell has also read countless articles about Lyft's failure to serve people with disabilities nationwide.

**Lyft's Response**:  The evidence does not establish that the nature and quality of Lyft's Access mode service in the greater New York City area is "common knowledge." At deposition, Ms. Lowell testified that she was "not sure" if she had discussed Lyft's WAV service in New York City with anyone. She was also not aware whether she could take a Lyft WAV from New York City to White Plains. Plaintiffs' own expert witness analysis showed that Ms. Lowell could get a WAV ride in 10.8 minutes in New York City.

3

- Deposition of Harriet Lowell ("Lowell Depo.") 109:6-8, 110:24-111:1.

15.    Ms. Lowell seeks to use Lyft to go out for celebrations with family and friends in White Plains.  Ms. Lowell intends to regularly use Lyft to get to appointments, run errands, go to restaurants, and visit friends.  Ms. Lowell intends to use Lyft to travel to and from the hair salon every three weeks, which currently requires her husband to drive her.

> **Lyft's Response**:  The evidence establishes that Ms. Lowell would only use Lyft under specific conditions. To use Lyft, she would "have to know that Lyft had reliable service," which means that she would "have to be certain that [she] could get a Lyft" so she would not "strand" herself.

> Moreover, the evidence does not support that Ms. Lowell would "regularly" use Lyft. Currently, Ms. Lowell's mode of transportation is her family's WAV. Lowell does not use any other mode of transportation. She does not travel by train or airplane. Lowell has never used a WAV taxi. Lowell has never used accessible public transportation in any city, and she does not use paratransit.

> - Lowell Depo. 24:3-7, 30:1-4, 34:13-16, 36:1-4, 43:16-18, 46:2-4, 115:18-117:1, 121:25-122:5, 123:6-8.

16.    Prior to the pandemic, Ms. Lowell travelled to New York City once or twice a month for medical reasons, and will likely have to attend medical appointments in person in the future.  Ms. Lowell also has many friends in the City and enjoys going to restaurants, visiting museums, and attending events such as advocacy events in New York City and across New York.  Right now, Ms. Lowell's husband has to drive her on each of these trips.  Ms. Lowell would regularly use Lyft to travel to and from the City without the need for her husband to drive her.

> **Lyft's Response**:  The evidence does not support Ms. Lowell's statement that she would use Lyft regularly to go to and from New York City if Access mode were offered.

Lyft currently offers Access mode within New York City and from New York City to surrounding areas and Ms. Lowell has not downloaded or used Lyft and is unaware of Lyft's available services.

- Lowell Depo. 109:6-8, 110:24-111:1.

17.    Ms. Lowell will also travel more regularly once she knows that Lyft provides WAV service across the country.  For example, she would like to visit her good friends and family in the Maryland and Washington, D.C. areas.

**Lyft's Response**:  The evidence establishes that Ms. Lowell does not have any "specific plans" to travel anywhere else in the country if Lyft were to offer Access mode in additional locations. Ms. Lowell also testified that she does not travel by train or airplane.

- Lowell Depo. 118:22-119:9.

18.    Without WAV service, many of WDOMI's constituents cannot access Lyft's transportation services.

**Lyft's Response**:  There is no evidentiary basis offered for this proposed fact. There is no evidence of specific constituents who cannot access Lyft's platform.

19.    WDOMI's constituents would like to use Lyft to travel throughout New York State, Boston, Massachusetts, and Philadelphia, Pennsylvania.

**Lyft's Response**:  There is no evidentiary basis offered for this proposed fact. There is no evidence of specific constituents who "would like to" use Lyft to travel "throughout" the various locations listed or under what conditions they would actually do so.

20.    WDOMI's constituents cannot use Lyft for transportation in New York State outside of New York City and in Washington, D.C., because Lyft does not offer WAV service in these regions.

**Lyft's Response**:  There is no evidentiary basis offered for this proposed fact. There is no evidence of specific constituents who cannot access Lyft's platform.

21.    Prior to filing this lawsuit, WDOMI made multiple public statements requesting modifications to Lyft's policies, practices, or procedures, at the New York State Legislature and in the presence of Lyft employees at Listening Sessions for the New York State Transportation Network Company Accessibility Task Force.

**Lyft's Response**:  There is no evidentiary basis offered for this proposed fact. WDOMI's corporate representative testified that WDOMI "made it quite clear at hearings where Lyft was present that what we are asking for is a fleet of wheelchair-accessible vehicles that could provide service that's reasonably on par with those received by non-disabled individuals."  As discussed below, purchasing a "fleet" of WAVs is not a reasonable modification to a policy, practice, or procedure. *See* 42 U.S.C. § 12184(b)(3).

- 30(b)(6) Deposition Melvyn Tanzman ("Tanzman Depo.") 163:11-17.

22.    Ms. Scudieri is aware that the WAV service that Lyft provides in Dallas and its other Access Regions is entirely inadequate when compared to its services for non-WAV vehicles.  Ms. Scudieri does not use Lyft's WAV service because she has heard from fellow members of the disabled community that Lyft offers deficient WAV service.  Ms. Scudieri also believes there is a complete lack of advertising by Lyft for its WAV service, in contrast to its service for able-bodied customers.

**Lyft's Response**:  The evidence contradicts this proposed fact. At her deposition, Ms. Scudieri testified that she has never taken steps to investigate whether Lyft offers WAV service anywhere and had never even spoken with anyone regarding Lyft.

- Scudieri Depo. 13:20-14:3, 62:14-63:10.

6

23.    Ms. Scudieri would like to use Lyft to travel to the airport, to a bar, and to other places where she does not want to drive.  Because Lyft does not provide equal service for wheelchair users in Dallas, Ms. Scudieri does not access Lyft's services.

**Lyft's Response**:  The evidence contradicts this proposed fact. Ms. Scudieri relies on her own personal WAV for transportation. She does not know if WAV taxis are available in her area, because she has never needed one. Ms. Scudieri does not know anyone who uses Lyft in Standard mode, or what the service levels in Standard mode are in her area. The evidence shows that, in Decatur, Texas, where she lives, Lyft's standard mode has low reliability. Ms. Scudieri may not use a service if it is not "reliable," because she cannot take the risk that she and her "450-pound wheelchair" might be "stuck somewhere."

- Scudieri Depo. 18:15-20, 24:10-19, 25:1-8, 25:20- 27:19, 43:4-8, 52:7-10, 62:14-63:10.

- Testimony of Richard Zhou and Exhibit D-13 (showing that in February 2020 less than 15% of Standard mode rides that were requested in Decatur, Texas were completed).

24.    Mr. Burr is aware of Lyft's deficient WAV service in New York City because it is well known among members of the disabled community.  Over the past several years, Mr. Burr has seen numerous news articles and reports regarding Lyft's inadequate WAV service.

**Lyft's Response**:  That Mr. Burr is "aware" Lyft's services are "deficient" in New York City is not supported by the evidence. Mr. Burr testified that he has downloaded and used Uber although he does not know how its WAV service compares to non-WAV.  Mr. Burr has also never compared Lyft's performance against Uber's in New York City. He has never taken steps to find out how Lyft's Access mode performs in New York City.

7

- Deposition of Kenneth Burr ("Burr Depo.") 33:19-34:1, 36:14-37:1, 41:10-23.

25.     Mr. Burr seeks to use Lyft to travel to throughout New York City, for instance, to visit his brother, attend appointments, travel for work, and for leisure (such as going to bars and restaurants, and attending movies, museums, and Broadway performances).  However, because Mr. Burr knows that Lyft does not provide equal service for wheelchair users in New York City, he does not use Lyft's services.

**Lyft's Response**:  The evidence does not support the fact that Mr. Burr does not use Lyft because it does not provide "equal service." Mr. Burr previously testified that he would use Lyft if it was "reasonably reliable." He has downloaded and used Uber even though he did not know if it offered WAV service similar service to non-WAV service. Mr. Burr does not know how long it takes someone to get a non-WAV ride through the Lyft App in New York City.

- Burr Depo. 37:20-38:13, 38:22-39:3, 41:10-23.

26.     Lyft is incorporated under the laws of the State of Delaware, with its principal place of business in San Francisco, California.  Stipulated Fact ¶ 8.

**Lyft's Response**:  Lyft has no response or objection to this proposed fact.

27.     Lyft is an entity that is engaged in "specified public transportation" under the Americans with Disabilities Act.  42 U.S.C. § 12184.  Stipulation ¶ 5.

**Lyft's Response**:  Lyft has no response or objection to this proposed fact.

28.     Lyft is a "public accommodation" under the New York State Human Rights Law. N.Y. Exec. Law § 292(9).  *Id.*, ¶ 6.

**Lyft's Response**:  Lyft has no response or objection to this proposed fact.

29.     Lyft is a "provider of public accommodation" under the New York City Human Rights

Law.  N.Y.C. Admin. Code § 8-102(9); 8-107(4)(a).  *Id.*, ¶ 7.

> **Lyft's Response**:  Lyft has no response or objection to this proposed fact.

## II.     Procedural Background.

30.     Ms. Lowell filed her original Complaint against Lyft on August 17, 2017.  ECF No. 1.

Plaintiffs filed their Amended Complaint on December 6, 2017, alleging violations of the Americans

with Disabilities Act, 42 U.S.C. § 12181, *et seq.*, the New York State Human Rights Law, N.Y. Exec.

Law § 290, *et seq.*, ("NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code §

8-101, *et seq.*, ("NYCHRL").  ECF No. 20.

> **Lyft's Response**:  Lyft has no response or objection to this proposed fact.

31.     On November 29, 2018, the Court issued an Opinion and Order dismissing

WDOMI's NYSHRL claim and Plaintiffs' NYCHRL claims.  ECF No. 49, at 22.

> **Lyft's Response**:  The Court also determined that WDOMI could not satisfy all of
>
> the elements for organizational standing.

32.     On November 1, 2021, the Court granted Plaintiffs' motion for reconsideration and

reinstated Ms. Lowell's NYCHRL claim.  ECF No. 155.

> **Lyft's Response**:  Lyft has no response or objection to this proposed fact.

## III.     Lyft's Business Model Is To Aggressively Expand And
##          Provide Services To Able-Bodied People Everywhere That Regulations Allow.

33.     Lyft launched its peer-to-peer marketplace for on-demand ridesharing in or about

2012.  Stipulated Fact ¶ 9.

> **Lyft's Response**:  Lyft has no response or objection to this proposed fact.

34.     Lyft operates multimodal transportation networks in the United States that offer

access to a variety of transportation options through Lyft's platform and App.  *Id.*, ¶ 10.

> **Lyft's Response**:  Lyft has no response or objection to this proposed fact.

35.     Lyft's transportation network is designed to address a wide range of mobility needs.

The Lyft network spans rideshare, car rentals, bikes, scooters, transit, and vehicle services. *Id.*, ¶ 11.

**Lyft's Response**: Lyft has no response or objection to this proposed fact.

36.    Lyft's stated mission is to "improve people's lives with the world's best transportation." *Id.*, ¶ 12.

**Lyft's Response**: Lyft has no response or objection to this proposed fact.

37.    Lyft's business has experienced rapid growth since 2012 and prior to the COVID-19 pandemic, including "rapid growth in [its] business, the number of users of [its] platform, and [its] geographic reach[.]"[1]

**Lyft's Response**: This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.

The admissible evidence does not establish the scope of Lyft's business growth, before or after the pandemic, or to what extent such growth was attributable to certain modes or regions. The evidence shows that Lyft's growth, and the success of its platform, is dependent on establishing a sufficient scale of supply and demand in a given region.

- Testimony of Dr. Marc Rysman and supporting figures.

- Testimony of Asaf Bar Selinger.

- Testimony of Richard Zhou.

38.    Lyft "expect[s] to continue to experience growth in the future following the recovery of the world economy from the pandemic."[2]

**Lyft's Response**: *See* Lyft's Response to Proposed Fact ("LRPF") No. 37.

39.    Lyft's growth strategy includes expanding geographic access to the App and increasing the number of users on the App to gain a larger market share in the ridesharing market.

---

[1] Lyft, Inc., Form 10-K (Annual Report), Feb. 28, 2022, at 29.
[2] *Id.*

**Lyft's Response**: No evidence is cited in support of this proposed fact. *See* LRFP

No. 37.

40.    As part of its growth strategy, Lyft has incurred annual net losses since 2016 that have

ranged between $682.8 million and $2.6 billion.[3]

**Lyft's Response**: The opinions of Plaintiffs' experts are unhelpful, unreliable, and

not based on the application of discernable principles or methods. Fed. R. Evid. 702. This

proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.

The admissible evidence does not support a finding that Lyft's net losses since 2016

have been part of its growth strategy.

41.    Lyft's annual revenue was approximately $3.2 billion in 2021, $2.4 billion in 2020, and

$3.6 billion in 2019.[4]

**Lyft's Response**:  *See* LRFP No. 37.

42.    Lyft spent $803.8 million, $814.1 million, and $416.3 million, in 2018, 2019, and 2020,

respectively, on sales and marketing.[5]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the

trier of fact, and not based on the application of discernable principles or methods. Fed. R.

Evid. 702.

Plaintiffs' principal expert, Alex Elegudin, testified that he is "not a marketing

expert." No witness testified to what extent Lyft's growth or revenues was attributable to

marketing efforts, where those marketing efforts were targeted, or the impact that they had.

---

[3] Corrected Expert Report of Alex Elegudin and Claudia J. Stern, CPA/ABV/CFF ("Corrected Expert Report"), at 12.
[4] Lyft, Inc., Annual Report (Form 10-K) (Feb. 28, 2022), at 63.
[5] Lyft, Inc., Registration Statement (Form S-1) (Mar. 1, 2019), at 97; Lyft, Inc., Annual Report (Form 10-K) (Mar. 1, 2021), at 67; Corrected Expert Report, at 14.

The admissible evidence establishes that the success of Lyft's platform is dependent on establishing a sufficient scale of supply and demand in a given region.

- Deposition of Alex Elegudin ("Elegudin Depo.") 190:17.

- Testimony of Dr. Marc Rysman and supporting figures.

43.    In 2019 and 2020, Lyft spent approximately $1 million and $2.2 million, respectively, on lobbying.[6]  When regulators make it difficult to provide standard service, Lyft lobbies aggressively to cut through regulation.[7]

Lyft's Response: The materials relied on are inadmissible hearsay. Fed. R. Evid. 801-803.  Moreover, this alleged fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.

The admissible evidence does not establish the purpose or effect of any lobbying efforts. One inadmissible email from a Lyft employee written five years prior to trial does not establish that "Lyft lobbies aggressively to cut though regulation."

No witnesses presented evidence regarding the purpose or impact of Lyft's lobbying efforts.

44.    Members of the general public may download the App and must agree to Lyft's Terms of Service.  Stipulated Fact ¶ 13.

Lyft's Response:  Lyft has no response or objection to this proposed fact.

45.    Drivers on the Lyft ridesharing platform must agree to Lyft's Terms of Service and Driver Addendum, and meet applicable state and/or local regulatory vehicle, driver, and documentation requirements that vary by region.  *Id.*, ¶ 14.

---

[6] Victor Reklaitis, *Uber and Lyft set records in annual spending on Washington lobbying*, MARKETWATCH (Jan. 22, 2021), https://www.marketwatch.com/story/uber-and-lyft-set-records-inannual-spending-on-washington-lobbying-11611350508.
[7] LYFT_ILRC00004509.

**Lyft's Response**:  Lyft has no response or objection to this proposed fact.

46.    Charges, fares, and payments are governed by Lyft's Terms of Service and the Driver Addendum.  *Id.*, ¶ 15.

**Lyft's Response**:  Lyft has no response or objection to this proposed fact.

47.    Lyft organizes its coverage areas into more than 300 geographic regions ("Regions") nationwide.  *Id.*, ¶ 16.

**Lyft's Response**:  Lyft has no response or objection to this proposed fact.

48.    Lyft offers a variety of ride modes on its App, but does not offer every ride mode in every Region.  *Id.*, ¶ 17.

**Lyft's Response**:  Lyft has no response or objection to this proposed fact.

49.    Depending on a user's location, the App displays information specific to that location, such as available ride modes, price, and availability.  In addition to ridesharing options, the App may show local information such as public transportation options, bike share, or rental car offerings.  *Id.*, ¶ 21.

**Lyft's Response**:  Lyft has no response or objection to this proposed fact.

50.    Wait times (*i.e.,* the amount of time between the time a ride is requested and the time when the driver arrives) and completion rates (*i.e.,* the percentage of requested rides that are completed) on the Lyft platform vary by location and by mode.  *Id.*, ¶ 22.

**Lyft's Response**:  Lyft has no response or objection to this proposed fact.

51.    Lyft does not guarantee any service levels or outcomes to its users, including wait times, completion rates, or that a requested ride will be completed.  *Id.*, ¶ 23.

**Lyft's Response**:  Lyft has no response or objection to this proposed fact.

52.    Lyft's Terms of Service also state that Lyft "do[es] not guarantee and do[es] not promise any specific results from use of the Lyft Platform and/or the Rideshare Services, including

the ability to provide or receive Rideshare Services at any given location or time."[8]

> **Lyft's Response**:  Lyft's Terms of Service continue: "Lyft reserves the right, for example, to limit or eliminate access to the Lyft Platform for Rideshare Services in specific geographic areas and/or at specific times based on commercial viability, public health concerns, or changes in law."
>
> - Testimony of Isabella Gerundio and Exhibit D-1 (Terms of Service).

## IV.    Lyft Provides Standard Mode All Across The Country, Regardless Of The Quality Of Service It Is Able To Provide In A Given Region.

53.    Lyft offers its standard mode service ("Standard mode") for able-bodied passengers in all fifty states.  Stipulated Fact ¶ 18.

> **Lyft's Response**:  Plaintiffs misstate the stipulated fact, which reads that "Lyft offers its standard mode service ("Standard mode") in all 50 states." (Stipulated Fact ¶ 18.)
>
> Many individuals with mobility disabilities, including those who use foldable-wheelchairs, can use Standard or other non-WAV modes on the Lyft platform.
>
> - Testimony of Isabella Gerundio and Exhibit D-3 (Lyft Foldable Wheelchair Policy)

54.    Lyft makes Standard mode available in all regions where it operates, regardless of population density, wait time, number of available vehicles, or any other considerations or metrics. *Id.*, ¶ 19.

> **Lyft's Response**:  It is true that where Lyft operates, Standard mode is available, however Lyft's Terms of Service specifies: "Lyft reserves the right, for example, to limit or eliminate access to the Lyft Platform for Rideshare Services in specific geographic areas

---

[8] Lyft Terms of Service (Apr. 1, 2021), https://www.lyft.com/terms.

and/or at specific times based on commercial viability, public health concerns, or changes in law."

55.    Lyft offers Standard mode through an independent contractor model (the "IC model").  *Id.*, ¶ 25.

> **Lyft's Response**:  Lyft has no response or objection to this proposed fact.

56.    The IC model depends on drivers who personally own or rent a car.  These drivers set their own hours and drive where they want to drive.  *Id.*, ¶ 26.

> **Lyft's Response**:  Lyft has no response or objection to this proposed fact.

57.    Lyft does not restrict its Standard mode in any Region based upon the level of service, including wait times and completion rates.  *Id.*, ¶ 24.

> **Lyft's Response**:  Lyft has no response or objection to this proposed fact.

58.    When a non-Access mode is available on the Lyft platform in a region, riders are able to request a ride in that "mode" at any time, 24 hours a day, but Lyft makes no guarantee that the ride request will be matched or that a driver will be available or accept the ride request.  *Id.*, ¶ 20.

> **Lyft's Response**:  Lyft has no response or objection to this proposed fact.

## V.    Lyft Has Never Stopped Providing Standard Mode In Any Region, Regardless Of Low Population Density Or Poor Service Metrics.

59.    Lyft allows for riders to request a ride and for drivers to appear on the platform in areas where a vehicle is rarely, if ever, available, including all parts of New York State and areas as sparsely populated as Wyoming.[9]

---

[9] Highly Confidential – Subject to Protective Order – Demand 2021-09-20.csv ("Demand 2021-09-20"); Highly Confidential – Subject to Protective Order – Supply 2021-02-26.csv ("Supply 2021-02-26").

**Lyft's Response**: The materials relied on are uninterpreted data reports constituting five years of Lyft's internal ride data, for which Plaintiffs do not offer a witness to lay a foundation for the interpretation set forth above. Fed. R. Evid. 401-403, 602.

The evidence shows that both drivers and riders can download and open the app in any location where it is operational. Riders may see that there is "limited availability" for rides when they open the app.

- Testimony of Asaf Bar Selinger.

- Testimony of Dr. Marc Rysman.

60.    When Lyft expanded Standard mode to be available in all parts of New York State outside of New York City, Jaime Raczka, Lyft's former regional director of new markets, stated that users "can expect longer ETAs or, potentially at very non-peak times, it will be more difficult to get a ride in the rural areas."[10]

**Lyft's Response**: The materials relied on are inadmissible hearsay. Fed. R. Evid. 801-803.  The document was not identified on Plaintiffs' Exhibit List. [Dkt. 312-2]. This proposed "fact" has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.

The admissible evidence does not support this proposed fact. A hearsay statement from a newspaper article written more than five years before trial does not establish the impact of Standard mode.

61.    Lyft does not prevent riders and drivers from using the App in markets that have poor wait times, such as longer than 20 minutes, or very low completion rates.

---

[10] Jon Campbell, *Lyft To Launch Statewide In New York On June 29*, DEMOCRAT & CHRONICLE (June 8, 2017), https://www.democratandchronicle.com/story/news/politics/albany/2017/06/08/lyft-launch-statewide-june-29/102633650/ (last visited Oct. 12, 2022)

**Lyft's Response**: Plaintiffs' have not identified evidentiary support for this proposed fact.

The evidence establishes that the wait times and performance of the Lyft platform, in any mode, depends on the interaction between the supply of drivers using that mode and the demand from riders that are looking for rides. Standard and XL modes are offered everywhere that Lyft "operates," regardless of service levels, while specialized modes (like Lux, Lux Black, Premium or Access), are offered in limited markets.

- Testimony of Dr. Marc Rysman and supporting figures.

- Testimony of Richard Zhou.

62.    Lyft has never restricted, blocked, or withdrawn its Standard mode from a Region after beginning operations in that Region.

**Lyft's Response**: Plaintiffs' have not identified evidentiary support for this purported fact.  No evidence supports this proposed fact. Lyft's Terms of Service state that "Lyft reserves the right, for example, to limit or eliminate access to the Lyft Platform for Rideshare Services in specific geographic areas and/or at specific times based on commercial viability, public health concerns, or changes in law.")

- Exhibit D-1 (Terms of Service).

## VI.    Lyft's Standard Mode Data Underscores That Lyft Provides Standard Mode Everywhere, Regardless Of Service Levels.

63.    In 2019 and 2020, Lyft completed approximately ▉▉▉▉▉ total trips per month in the 96% of its regions where it refuses to serve people with disabilities who require wheelchair-accessible vehicle ("WAV") service ("non-Access Regions"), with an average cost per trip of $▉▉▉ and an average price per trip of $▉▉▉[11]

---

[11] Corrected Expert Report, at 24; Demand 2021-09-20.

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. No expert will testify that Standard mode service can be replicated for Access mode.

The evidence does not support a finding that Lyft "refuses" to serve people with disabilities in these regions. Lyft has continued to attempt to identify scalable ways to provide WAV service that meets user needs and is not unreasonably costly. However, Lyft has not, to date, identified an approach that would enable it to meet those goals in most areas of the country.

The evidence establishes that a high number of rides occurs in Standard mode on the Lyft platform, particularly in urban areas with high population density.

The evidence establishes that the average cost to a rider in Standard mode is under $15. The amount that Access mode riders pay for rides is the same as the amount that any rider would pay for that ride in Standard mode.

- Testimony of Dr. Marc Rysman and supporting figures.
- Testimony of Richard Zhou.
- Testimony of Isabella Gerundio.

64.    In 2019 and 2020, Lyft completed approximately ███████ total trips per month in the Access Regions, with an average cost per trip of ████ and an average price per trip of ████.[12]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R.

---

[12] Corrected Expert Report, at 25; Demand 2021-09-20.

Evid. 702. No expert will testify that Standard mode service can be replicated for Access mode.

> *See* LRPF No. 63.

65.     Between January 1, 2017, and January 31, 2021, in New York State, excluding New York City, Lyft's completion rates for Standard mode Regions ranged from a low of █ percent to a high of █ percent.[13]

> **Lyft's Response:** The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. No expert will testify that Standard mode service can be replicated for Access mode.

> There is no evidence that Lyft could deliver the same rate of performance in Access mode, or evidence of the cost Lyft would incur to achieve that level of performance in Access mode. The evidence establishes that the "completion rates" for ride requests in Standard mode vary widely, and that the differences in completion rates correlate strongly to the population density of an area. As for Access mode, the uncontroverted testimony is that it is not feasible for Lyft to rely on its platform model to provide Access mode service in New York State.

> • Testimony of Dr. Marc Rysman and supporting figures.

66.     Between January 1, 2017, and January 31, 2021, in New York State, excluding New York City, Lyft's wait times for Standard mode Regions ranged from a low of █ minutes to a high of █ minutes.[14]

---

[13] Corrected Expert Report, at 25; Demand 2021-09-20.
[14] Corrected Expert Report, at 25; Demand 2021-09-20.

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. No expert will testify that Standard mode service can be replicated for Access mode. *See* LRPF No. 65.

The evidence establishes that the "wait times" for ride requests in Standard mode vary widely, and this variation correlates strongly to the population density of an area.

- Testimony of Dr. Marc Rysman and supporting figures.

67.    Between January 1, 2017, and January 31, 2021, Lyft operated Standard mode in the Elmira, New York Region with ▇ trips completed per month, an average wait time of ▇ minutes, and a completion rate of ▇ percent.[15]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. No expert will testify that Standard mode service can be replicated for Access mode.

*See* LRPF Nos. 65-66.

There is no evidence that Lyft could offer a comparable service via Access mode in any region. The evidence establishes that ride volume for Standard mode varies widely, and that this variation correlates strongly to the population density of an area. There is no evidence of any WAV drivers who want to drive on the Lyft platform in any region and have been denied access to the platform.

Moreover, the evidence confirms that Plaintiffs in this action would not be satisfied with these levels of service. Ms. Lowell admitted that to use the Lyft app she would "have to

---

[15] Corrected Expert Report, at 26; Demand 2021-09-20.

know that Lyft had reliable service," which means that she would "have to be certain that [she] could get a Lyft," thus confirming that she would find these service levels unacceptable.

The evidence likewise establishes that there are low incremental costs involved in offering Standard and XL modes in areas with low ride volume. Lyft is selective about the regions in which it will devote resources, such as incentives, to attempt to stimulate the organic supply-and-demand in a region.  Lyft is also selective about which regions to offer specialized modes, such as Lux Black, based on the available supply and demand in the area. For example, it offers Lux Black in New York City but not Westchester County.

Lyft chooses where to invest in incentives, and where to offer specialized modes, based on the likely success of the platform, which would lead to revenue generation for the company.

In contrast to any non-WAV mode, for Access mode, to provide any functional level of service, Lyft must manually manage the supply of vehicles on its platform and incur significant financial losses. *See also* Lyft's Proposed Facts In Support of Its Affirmative Defense.

Lyft's expert testified that if Lyft were to show Access mode in the App without any functional WAV service, fixed frame wheelchair users would be frustrated by the non-existent service, which would lead to a degraded brand image for Lyft, as well as increased customer complaints and customer service needs. If such users can never find a ride, or find themselves stranded with their wheelchair, this may create significant problems and costs for Lyft, including negative publicity, degraded image, and potential lawsuits. Such users also might give up using the App altogether.

- Lowell Depo. 121:25-122:5, 123:6-8

21

- Testimony of Dr. Marc Rysman and supporting figures.

- Testimony of Asaf Bar Selinger.

- Testimony of Richard Zhou.

- Testimony of Isabella Gerundio.

68.     Between January 1, 2017, and January 31, 2021, Lyft operated Standard mode in the Southampton, New York Region with ███ trips completed per month, an average wait time of ███ minutes, and a completion rate of ██ percent.[16]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. No expert will testify that Standard mode service can be replicated for Access mode. *See* LRPF No. 67.

69.     Between January 1, 2017, and January 31, 2021, approximately ██ percent of the months of Lyft's Standard mode operations reported a completion rate of below ██ percent.[17]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. No expert will testify that Standard mode service can be replicated for Access mode. *See* LRPF No. 67.

70.     Between January 1, 2017, and January 31, 2021, approximately ██ percent of the months of Lyft's Standard mode operations reported a completion rate of below ██ percent.[18]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R.

---

[16] Corrected Expert Report, at 26; Demand 2021-09-20.
[17] Rebuttal Expert Report, at 31, Table 2; Demand 2021-09-20.
[18] Rebuttal Expert Report, at 31, Table 2; Demand 2021-09-20.

Evid. 702. No expert will testify that Standard mode service can be replicated for Access

mode. *See* LRPF No. 67.

71.     Between January 1, 2017, and January 31, 2021, approximately ▮ percent of the

months of Lyft's Standard mode operations reported a completion rate of below ▮ percent.[19]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the

trier of fact, and not based on the application of discernable principles or methods. Fed. R.

Evid. 702. No expert will testify that Standard mode service can be replicated for Access

mode. *See* LRPF No. 67.

72.     Between January 1, 2017, and January 31, 2021, approximately ▮ percent of the

months of Lyft's Standard mode operations reported a wait time of greater than five minutes.[20]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the

trier of fact, and not based on the application of discernable principles or methods. Fed. R.

Evid. 702. No expert will testify that Standard mode service can be replicated for Access

mode. *See* LRPF No. 67.

73.     Between January 1, 2017, and January 31, 2021, approximately ▮ percent of the

months of Lyft's Standard mode operations reported a wait time of greater than ten minutes.[21]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the

trier of fact, and not based on the application of discernable principles or methods. Fed. R.

Evid. 702. No expert will testify that Standard mode service can be replicated for Access

mode. *See* LRPF No. 67.

---

[19] Rebuttal Expert Report, at 31, Table 2; Demand 2021-09-20.
[20] Rebuttal Expert Report, at 31, Table 2; Demand 2021-09-20.
[21] Rebuttal Expert Report, at 31, Table 2; Demand 2021-09-20.

74.     In February 2020, approximately 99 percent of the ZIP Codes that Lyft had a ride requested had a population density of less than ███ people per square mile.[22]

      **Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. No expert will testify that Standard mode service can be replicated for Access mode. *See* LRPF No. 67.

      There is no evidence of a comparable population density of potential Access mode users. To the contrary, the population density of potential Access mode users is likely less than 1% of the population at large.

- Testimony of Dr. Marc Rysman and supporting figures.
- Testimony of Isabella Gerundio.
- Testimony of Richard Zhou.

75.     In February 2020, approximately 64 percent of the ZIP Codes that Lyft had a ride requested had a population density of less than ██ people per square mile.[23]

      **Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. No expert will testify that Standard mode service can be replicated for Access mode. *See* LRPF No. 67, 74.

76.     In February 2020, in ZIP Code 10518 in Cross River, New York, Lyft operated Standard mode where the population density is 311 people per square mile, █ trips were completed, the average wait time was ████ minutes, and the completion rate was █ percent.[24]

---

[22] Rebuttal Expert Report, at 37, Figure 3; Lowell-demand-2020-09-18.csv.
[23] Rebuttal Expert Report, at 37, Figure 3; Lowell-demand-2020-09-18.csv.
[24] Rebuttal Expert Report, at 5, Table 1; Lowell-demand-2020-09-18.csv.

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. No expert will testify that Standard mode service can be replicated for Access mode. *See* LRPF No. 67, 74.

77.     In February 2020, in ZIP Code 10576 in Pound Ridge, New York, Lyft operated Standard mode where the population density is 218 people per square mile, ██ trips were completed, the average wait time was ████ minutes, and the completion rate was █ percent.[25]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. No expert will testify that Standard mode service can be replicated for Access mode. *See* LRPF No. 67, 74.

78.     In February 2020, in ZIP Code 10590 in South Salem, New York, Lyft operated Standard mode where the population density is 524 people per square mile, ██ trips were completed, the average wait time was ████ minutes, and the completion rate was █ percent.[26]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. No expert will testify that Standard mode service can be replicated for Access mode. *See* LRPF No. 67, 74.

79.     During February 2020 in New York State, Lyft offered Standard mode in 284 ZIP Codes where Lyft received ████ requests for a ride.[27]

---

[25] Expert Rebuttal Report, at 5, Table 1; Lowell-demand-2020-09-18.csv.
[26] Expert Rebuttal Report, at 5, Table 1; Lowell-demand-2020-09-18.csv.
[27] Expert Rebuttal Report, at 4; Lowell-demand-2020-09-18.csv.

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. No expert will testify that Standard mode service can be replicated for Access mode. *See* LRPF No. 67, 74.

80.     During February 2020 in New York State, Lyft offered Standard mode in 297 ZIP Codes where ██ ride requests were completed.[28]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. No expert will testify that Standard mode service can be replicated for Access mode. *See* LRPF No. 67, 74.

81.     Based on Lyft's data, there were ██ Regions where the average number of drivers per month on Standard mode was ██ or fewer drivers for at least one year between 2017 and 2021.[29]

**Lyft's Response**: Lack of foundation for a witness with personal knowledge regarding the cited materials, which consist of several years of uninterpreted Lyft ride data. Fed. R. Evid. 401-403, 602. No expert will testify that Standard mode service can be replicated for Access mode. *See* LRPF No. 67, 74.

The evidence demonstrates that there are low incremental costs involved in offering Standard and XL modes in areas with low ride volume. The number of active drivers on the platform varies widely depending on time and location, due to the supply-and-demand nature of the Lyft platform.  Lyft is selective about the regions in which it will devote resources, such as incentives, to attempt to stimulate the organic supply-and-demand in a

---

[28] Expert Rebuttal Report, at 4; Lowell-demand-2020-09-18.csv.
[29] Supply 2021-02-26.

region.  Lyft is also selective about which regions to offer specialized modes, such as Lux or Premium, based on the available supply and demand in the area.

In contrast to any non-WAV mode, for Access mode, to provide any functional level of service, Lyft must manually manage the supply of vehicles on its platform and incur significant financial losses. *See also* Lyft's Proposed Facts In Support of Its Affirmative Defense.

- Testimony of Dr. Marc Rysman and supporting figures

- Testimony of Asaf Bar Selinger

- Testimony of Richard Zhou

82.    Based on Lyft's data, there were 182 Regions where the average number of drivers per month on Standard mode was fewer than ▮ drivers for at least one year between 2017 and 2021.[30]

**Lyft's Response**: Lack of foundation for a witness with personal knowledge regarding the cited materials, which consist of several years of uninterpreted Lyft ride data. Fed. R. Evid. 401-403, 602. No expert will testify that Standard mode service can be replicated for Access mode. *See* LRPF No. 67, 74, 81.

83.    Based on Lyft's data, in August 2017, Lyft began offering Standard mode in the Greater Alaska Region, "AKA", with ▮ drivers.[31]

**Lyft's Response**: Lack of foundation for a witness with personal knowledge regarding the cited materials, which consist of several years of uninterpreted Lyft ride data. Fed. R. Evid. 401-403, 602. No expert will testify that Standard mode service can be

---

[30] Supply 2021-02-26.
[31] Supply 2021-02-26.

replicated for Access mode. *See* LRPF No. 81. There is no evidence that there are ▉ WAV drivers who want to drive on the Lyft platform in the Greater Alaska Region.

84.     Based on Lyft's data, in June 2017, Lyft began offering Standard mode in Juneau, Alaska with ▉ drivers.[32]

**Lyft's Response**: Lack of foundation for a witness with personal knowledge regarding the cited materials, which consist of several years of uninterpreted Lyft ride data. Fed. R. Evid. 401-403, 602. No expert will testify that Standard mode service can be replicated for Access mode. *See* LRPF No. 81. There is no evidence that there are ▉ WAV drivers who want to drive on the Lyft platform in Juneau, Alaska.

85.     Based on Lyft's data, in March 2018, Lyft began offering Standard mode in Aberdeen, South Dakota, with ▉ drivers.  In January 2021, Lyft continued offering Standard mode in Aberdeen, South Dakota, with ▉ drivers.[33]

**Lyft's Response**: Lack of foundation for a witness with personal knowledge regarding the cited materials, which consist of several years of uninterpreted Lyft ride data. Fed. R. Evid. 401-403, 602. No expert will testify that Standard mode service can be replicated for Access mode. *See* LRPF No. 81. There is no evidence that there are ▉ WAV drivers who want to drive on the Lyft platform in Aberdeen, South Dakota.

86.     Based on Lyft's data, in August 2017, Lyft began offering Standard mode in Humboldt County, California, Region "ACV", with ▉ drivers.  In January 2021, Lyft continued offering Standard mode in the ACV Region with ▉ drivers.[34]

---

[32] Supply 2021-02-26.
[33] Supply 2021-02-26.
[34] Supply 2021-02-26.

**Lyft's Response**: Lack of foundation for a witness with personal knowledge regarding the cited materials, which consist of several years of uninterpreted Lyft ride data. Fed. R. Evid. 401-403, 602. No expert will testify that Standard mode service can be replicated for Access mode. *See* LRPF No. 81. There is no evidence that there are ■ WAV drivers who want to drive on the Lyft platform in Humboldt County.

The evidence demonstrates that there was significant increase in the number of standard mode drivers in this region, such that in January 2020, prior to the pandemic, there were ■ drivers in this region.

- Testimony of Richard Zhou.

87.    Based on Lyft's data, in January 2018, Lyft began offering Standard mode in Alexandria, Louisiana, with ■ drivers.  Lyft has offered Standard mode in Alexandria for six months with fewer than ■ drivers on the App each month.[35]

**Lyft's Response**: Lack of foundation for a witness with personal knowledge regarding the cited materials, which consist of several years of uninterpreted Lyft ride data. Fed. R. Evid. 401-403, 602. No expert will testify that Standard mode service can be replicated for Access mode. *See* LRPF No. 81. There is no evidence that there are ■ WAV drivers who want to drive on the Lyft platform in Alexandria, Louisiana.

88.    Based on Lyft's data, in June 2017, Lyft began offering Standard mode in Watertown, New York, Region "ART", with ■ drivers.  In January 2021, Lyft continued offering Standard mode in the ART Region with ■ drivers.[36]

**Lyft's Response**: Lack of foundation for a witness with personal knowledge regarding the cited materials, which consist of several years of uninterpreted Lyft ride data.

---

[35] Supply 2021-02-26.
[36] Supply 2021-02-26.

Fed. R. Evid. 401-403, 602. No expert will testify that Standard mode service can be replicated for Access mode. *See* LRPF No. 81. There is no evidence that there are █ WAV drivers who want to drive on the Lyft platform in Watertown, New York.

The evidence demonstrates that there was significant change in the volume of riders in this ART region over time, such that in January 2020, prior to the pandemic, there were █ drivers in this region.

- Testimony of Richard Zhou.

89.    Based on Lyft's data, in March 2017, Lyft began offering Standard mode in Wyoming with █ drivers.[37]  In January 2021, Lyft continued offering Standard mode in Wyoming with █ drivers.[38]

**Lyft's Response**: Lack of foundation for a witness with personal knowledge regarding the cited materials, which consist of several years of uninterpreted Lyft ride data. Fed. R. Evid. 401-403, 602. No expert will testify that Standard mode service can be replicated for Access mode. *See* LRPF No. 81. There is no evidence that there are █ WAV drivers who want to drive on the Lyft platform in Wyoming.

90.    Based on Lyft's data, in February 2017, Lyft began offering Standard mode in Dubuque, Iowa, with █ drivers.  In January 2021, Lyft continued offering Standard mode in Dubuque, Iowa, with █ drivers.[39]

**Lyft's Response**: Lack of foundation for a witness with personal knowledge regarding the cited materials, which consist of several years of uninterpreted Lyft ride data. Fed. R. Evid. 401-403, 602. No expert will testify that Standard mode service can be

---

[37] Supply 2021-02-26.
[38] Supply 2021-02-26.
[39] Supply 2021-02-26.

replicated for Access mode. *See* LRPF No. 81. There is no evidence that there are ▮ WAV drivers who want to drive on the Lyft platform in Dubuque, Iowa.

91.    Based on Lyft's data, in June 2017, Lyft began offering Standard mode in Elmhurst, New York, with ▮ drivers.  In January 2021, Lyft continued offering Standard mode in Elmhurst, New York, with ▮ drivers.[40]

> **Lyft's Response**: Lack of foundation for a witness with personal knowledge regarding the cited materials, which consist of several years of uninterpreted Lyft ride data. Fed. R. Evid. 401-403, 602. No expert will testify that Standard mode service can be replicated for Access mode. *See* LRPF No. 81. There is no evidence that there are ▮ WAV drivers who want to drive on the Lyft platform in Elmhurst, New York.

92.    Based on Lyft's data, in March 2017, Lyft began offering Standard mode in Kauai, Hawaii, Region "LIH", with ▮ drivers.  In January 2021, Lyft continued offering Standard mode in Kauai, Hawaii, with ▮ drivers.[41]

> **Lyft's Response**: Lack of foundation for a witness with personal knowledge regarding the cited materials, which consist of several years of uninterpreted Lyft ride data. Fed. R. Evid. 401-403, 602. No expert will testify that Standard mode service can be replicated for Access mode. *See* LRPF No. 81. There is no evidence that there are ▮ WAV drivers who want to drive on the Lyft platform in Kauai, Hawaii.
>
> The evidence demonstrates that there was significant change in the volume of riders in this LIH region, such that in January 2020, prior to the pandemic, there were ▮ drivers in this region.
>
> - Testimony of Richard Zhou.

---

[40] Supply 2021-02-26.
[41] Supply 2021-02-26.

93.     Based on Lyft's data, in February 2017, Lyft began offering Standard mode in Waterloo, Iowa, Region "ALO", with █ drivers.  In January 2021, Lyft continued offering Standard mode in Waterloo, Iowa, with █ drivers.[42]

**Lyft's Response**: Lack of foundation for a witness with personal knowledge regarding the cited materials, which consist of several years of uninterpreted Lyft ride data. Fed. R. Evid. 401-403, 602. No expert will testify that Standard mode service can be replicated for Access mode. *See* LRPF No. 81. There is no evidence that there are █ WAV drivers who want to drive on the Lyft platform in Waterloo, Iowa.

The evidence demonstrates that there was significant change in the volume of riders in this ALO region over time, such that in January 2020, prior to the pandemic, there were █ drivers in this region.

- Testimony of Richard Zhou.

94.     Based on Lyft's data, in March 2018, Lyft began offering Standard mode in Dickinson, North Dakota, with █ drivers.  In January 2021, Lyft continued offering Standard mode in Dickinson, North Dakota, with █ drivers.[43]

**Lyft's Response**: Lack of foundation for a witness with personal knowledge regarding the cited materials, which consist of several years of uninterpreted Lyft ride data. Fed. R. Evid. 401-403, 602. No expert will testify that Standard mode service can be replicated for Access mode. *See* LRPF No. 81. There is no evidence that there are █ WAV drivers who want to drive on the Lyft platform in Dickinson, North Dakota.

---

[42] Supply 2021-02-26.
[43] Supply 2021-02-26.

32

95.     Based on Lyft's data, in August 2017, Lyft began offering Standard mode in the Western Nebraska Region, "WNE", with ▮ drivers.  In January 2021, Lyft continued offering Standard mode in the Western Nebraska Region with ▮ drivers.[44]

**Lyft's Response**: Lack of foundation for a witness with personal knowledge regarding the cited materials, which consist of several years of uninterpreted Lyft ride data. Fed. R. Evid. 401-403, 602. No expert will testify that Standard mode service can be replicated for Access mode. *See* LRPF No. 81. There is no evidence that there are ▮ WAV drivers who want to drive on the Lyft platform in Western Nebraska.

The evidence demonstrates that there was significant change in the volume of riders in this WNE region over time, such that, in January 2020, prior to the pandemic, there were ▮ drivers in this region.

- Testimony of Richard Zhou.

96.     Based on Lyft's data, in January 2017, Lyft offered Standard mode in Gallup, New Mexico with ▮ driver.  In January 2021, Lyft continued offering Standard mode in Gallup, New Mexico with ▮ drivers.[45]

**Lyft's Response**: Lack of foundation for a witness with personal knowledge regarding the cited materials, which consist of several years of uninterpreted Lyft ride data. Fed. R. Evid. 401-403, 602. No expert will testify that Standard mode service can be replicated for Access mode. *See* LRPF No. 81. There is no evidence that there is ▮ WAV driver who wants to drive on the Lyft platform in Gallup, New Mexico.

---

[44] Supply 2021-02-26.
[45] Supply 2021-02-26.

97.     Based on Lyft's data, in August 2017, Lyft began offering Standard mode in Roswell, New Mexico, with ▮ driver.  In January 2021, Lyft continued offering Standard mode in Roswell, New Mexico, with ▮ drivers.[46]

    **Lyft's Response**: Lack of foundation for a witness with personal knowledge regarding the cited materials, which consist of several years of uninterpreted Lyft ride data. Fed. R. Evid. 401-403, 602. No expert will testify that Standard mode service can be replicated for Access mode. *See* LRPF No. 81. There is no evidence that there is ▮ WAV driver who wants to drive on the Lyft platform in Roswell, New Mexico.

98.     Based on Lyft's data, in January 2017, Lyft offered Standard mode in Taos, New Mexico with ▮ drivers.  In January 2021, Lyft continued offering Standard mode in Taos, New Mexico with ▮ drivers.[47]

    **Lyft's Response**: Lack of foundation for a witness with personal knowledge regarding the cited materials, which consist of several years of uninterpreted Lyft ride data. Fed. R. Evid. 401-403, 602. No expert will testify that Standard mode service can be replicated for Access mode. *See* LRPF No. 81. There is no evidence that there are ▮ WAV drivers who want to drive on the Lyft platform in Taos, New Mexico.

99.     Based on Lyft's data, in August 2017, Lyft began offering Standard mode in the Eastern Nevada Region, "ENV", with ▮ drivers.  In January 2021, Lyft continued offering Standard mode in the Eastern Nevada Region with ▮ drivers.[48]

    **Lyft's Response**: Lack of foundation for a witness with personal knowledge regarding the cited materials, which consist of several years of uninterpreted Lyft ride data.

---

[46] Supply 2021-02-26.
[47] Supply 2021-02-26.
[48] Supply 2021-02-26.

Fed. R. Evid. 401-403, 602. No expert will testify that Standard mode service can be

replicated for Access mode. *See* LRPF No. 81. There is no evidence that there are ▮ WAV

drivers who want to drive on the Lyft platform in Eastern Nevada.

 The evidence demonstrates that there was significant change in the volume of riders

in this ENV region over time, such that in January 2020, prior to the pandemic, there were

▮ drivers in this region.

   •  Testimony of Richard Zhou.

100. Based on Lyft's data, in June 2017, Lyft began offering Standard mode in

Plattsburgh, New York with ▮drivers.  In January 2021, Lyft continued offering Standard mode in

Plattsburgh, New York with ▮drivers.[49]

 **Lyft's Response**: Lack of foundation for a witness with personal knowledge

regarding the cited materials, which consist of several years of uninterpreted Lyft ride data.

Fed. R. Evid. 401-403, 602. No expert will testify that Standard mode service can be

replicated for Access mode. *See* LRPF No. 81. There is no evidence that there are ▮ WAV

drivers who want to drive on the Lyft platform in Plattsburg, New York.

101. Based on Lyft's data, in September 2017, Lyft began offering Standard mode in

Woodward, Oklahoma with ▮ drivers.  In January 2021, Lyft continued offering Standard mode in

Woodward, Oklahoma with ▮ drivers.[50]

 **Lyft's Response**: Lack of foundation for a witness with personal knowledge

regarding the cited materials, which consist of several years of uninterpreted Lyft ride data.

Fed. R. Evid. 401-403, 602. No expert will testify that Standard mode service can be

---

[49] Supply 2021-02-26.
[50] Supply 2021-02-26.

replicated for Access mode. *See* LRPF No. 81. There is no evidence that there are ■ WAV drivers who want to drive on the Lyft platform in Woodward, Oklahoma.

102.    Based on Lyft's data, in April 2019, Lyft began offering Standard mode in Grants Pass, Oregon with ■ drivers.  In January 2021, Lyft continued offering Standard mode in Grants Pass, Oregon with ■ drivers.[51]

**Lyft's Response**: Lack of foundation for a witness with personal knowledge regarding the cited materials, which consist of several years of uninterpreted Lyft ride data. Fed. R. Evid. 401-403, 602. No expert will testify that Standard mode service can be replicated for Access mode. *See* LRPF No. 81. There is no evidence that there are ■ WAV drivers who want to drive on the Lyft platform in Grants Pass, Oregon.

103.    Based on Lyft's data, in October 2019, Lyft began offering Standard mode in the "SCG" Region in Washington with ■ drivers.  In January 2021, Lyft continued offering Standard mode in the "SCG" Region with ■ drivers.[52]

**Lyft's Response**: Lack of foundation for a witness with personal knowledge regarding the cited materials, which consist of several years of uninterpreted Lyft ride data. Fed. R. Evid. 401-403, 602. No expert will testify that Standard mode service can be replicated for Access mode. *See* LRPF No. 81. There is no evidence that there are ■ WAV drivers who want to drive on the Lyft platform in the SCG region.

The evidence establishes that there was significant change in the volume of riders in the SGC region over time, such that in January 2020, prior to the pandemic, there were ■ drivers in this region.

- Testimony of Richard Zhou.

---

[51] Supply 2021-02-26.
[52] Supply 2021-02-26.

104.    The available supply of drivers does not influence whether Lyft offers Standard mode in a Region.

**Lyft's Response**: No evidence is cited in support of this proposed fact.

Evidence at trial confirms that the available supply of drivers has a huge influence on the success of the Lyft platform, due to the influence of network effect and economies of density. For Standard mode, it costs Lyft very little to remain nominally "operational" in areas with a low supply of drivers.

- Testimony of Asaf Bar Selinger.

- Testimony of Dr. Marc Rysman and supporting figures.

**VII.    Lyft Refuses To Provide Access Mode Except In Regions Where It Is Required Or Incentivized To Do So; In The Regions Where Lyft Is Forced To Provide Access Mode, It Intentionally Inhibits Service.**

105.    WAVs are vehicles built to accommodate fixed-frame wheelchairs, and typically feature a wheelchair ramp or lift, a lowered floor to accommodate the equipment, and a securement device to keep the wheelchair in place when the vehicle is in motion. Stipulated Fact ¶ 31.

**Lyft's Response**: Lyft has no response or objection to this proposed fact.

106.    Plaintiffs Ms. Lowell and WDOMI seek to use Lyft's WAV service ("Access mode"), but do not currently use Lyft and have not downloaded the App because Lyft does not offer Access mode in Westchester County and New York State outside of New York City.

**Lyft's Response**: There is no evidence cited in support of this proposed fact. Ms. Lowell frequently travels to New York City, where Lyft offers Access mode, but has not downloaded the App to use Lyft there.

107.    Proposed class representative Mr. Burr seeks to use Lyft's Access mode in New York City, but does not currently use Lyft and has not downloaded the App because Lyft

discriminates against WAV users and does not offer reasonably equivalent service to people with disabilities in New York City.

**Lyft's Response**: *See* LRPF No. 24-25.

108.    Proposed class representative Ms. Scudieri seeks to use Lyft's Access mode, but does not use Lyft and has not downloaded the App because Lyft does not offer Access mode in Decatur, Texas, and because Lyft discriminates against WAV users and does not offer reasonably equivalent service to people with disabilities in the Access Regions other than New York City.

**Lyft's Response**: *See* LRPF No. 22-23.

109.    Plaintiffs, proposed class representatives, and individuals who use wheelchairs are unable to use Lyft in a reasonably equivalent manner to individuals who do not use wheelchairs.

**Lyft's Response**:  This proposed fact is not supported by specific evidence and calls for a legal conclusion.

110.    Plaintiffs, proposed class representatives, and individuals who use wheelchairs seek to use Lyft in a reasonably equivalent manner to individuals who do not use wheelchairs.

**Lyft's Response**:  This proposed fact is not supported by specific evidence and calls for a legal conclusion.

111.    Plaintiffs, proposed class representatives, and individuals who use wheelchairs do not seek perfect service or specific wait times, completion rates, or other specified service levels.

**Lyft's Response**:  This proposed fact is not supported by the evidence. Numerous witnesses have testified that they demand WAV service that has specific performance standards.

For example, Ms. Lowell wants "reasonably equivalent [WAV] service," meaning a "straightforward equivalent to what people who are non-disabled have."  She also needs service to be "reliable," which means she would "have to be certain that [she] could get a

Lyft" and that it "wouldn't leave [her] stranded." She would never want a Lyft to "get her someplace and then not get [her] back."

- Lowell Depo. 122:11-123:7, 124:9-12, 132:22-24.

Ms. Scudieri testified that she wants "reliable" access to WAVs on the Lyft platform to pick her up at home and take her to the surrounding area. She could not say what "reliable" means to her because "it would depend on the situation." However, having only a 50 percent chance of getting a ride was "a risk" for her, because she "can't afford to be stranded with a 450-pound wheelchair."

- Scudieri Depo. 52:23-53:10, 55:18-22, 56:7-10, 59:2-5.

Mr. Burr testified, when asked what levels of service he wanted from Lyft before he would download the app, "disabled people want something that is similar to the standard use of service that able-bodied people get." Mr. Burr does not know the level of service Lyft offers users of its Standard mode in New York City. He also testified that he wanted "reasonably reliable" transportation.

- Burr Depo. 37:14-38:13, 38:22-40:23.

**A.    Lyft Refuses To Offer Access Mode Unless Required Or Subsidized.**

112.    Lyft has consistently taken the position that it has no obligation to provide service to people with disabilities who require WAVs.

**Lyft's Response**: There is no evidentiary support cited for this purported fact. Evidence at trial confirms that Lyft complies with regulatory obligations in various markets to provide WAV service to individuals with disabilities who require WAVs. The ADA does not require Lyft to offer a specialized or accessible service, and the lack of WAV service on the Lyft platform does not constitute "discrimination" as defined by the ADA. *See* Lyft's Response to Proposed Conclusions of Law ("LRPCL") Nos. 410-411.

113.    Prior to 2016 when regulators required Lyft to provide WAV service in Portland, Oregon, Lyft did not offer WAV service in any Region.  Stipulated Fact ¶ 27.

**Lyft's Response**: Plaintiffs have misstated the stipulated fact.  Prior to 2016, when it began offering WAV service in Portland, Oregon, Lyft did not offer WAV service in any Region.  Stipulated Fact ¶ 27.   No witness at trial offered testimony about the regulatory history in Portland.

114.    In response to regulatory requirements, financial incentives, or a partnership with a transit agency, Lyft has launched Access mode in nine cities in the United States: Boston, Massachusetts; Chicago, Illinois; Dallas, Texas; Los Angeles, California; New York, New York; Philadelphia, Pennsylvania; Portland, Oregon; Phoenix, Arizona; and San Francisco, California (collectively, the "Access Regions").  *Id.*, ¶¶ 28-29.

**Lyft's Response**:  Lyft has no response or objection to this proposed fact.

115.    Lyft does not offer Access mode in Regions other than the Access Regions ("the non-Access Regions").  *Id.*, ¶ 32.

**Lyft's Response**:  Lyft has no response or objection to this proposed fact.

116.    The non-Access Regions include Westchester County and all of New York State outside of New York City.  *Id.*, ¶ 33.

**Lyft's Response**:  Lyft has no response or objection to this proposed fact.

117.    Lyft's provision of Access mode is primarily guided by meeting regulatory requirements.  Thus, Lyft consistently provides the lowest level of service that it can provide in Access Regions while satisfying regulators.

**Lyft's Response**: There is no evidentiary support cited for this proposed fact. Evidence confirms that Lyft's WAV program is guided by several goals, including meeting regulatory requirements, providing quality service to riders, limiting financial losses, and

40

attempting to identify innovative solutions to offer on-demand WAV service in a scalable manner.

- Testimony of Asaf Bar Selinger.

- Testimony of Isabella Gerundio.

- Testimony of Richard Zhou.

118.    Christopher Wu ("Mr. Wu"), the former head of Lyft's national WAV team, stated that Lyft's WAV program is "incentivized to keep WAV programs as small as possible while meeting regulatory requirements" and "will do as little as possible unless forced[.]"[53]

**Lyft's Response**: This alleged fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. Chris Wu has not worked for Lyft since August 2019. He testified at deposition that "I mean I think at this time with the appetite the company had this was probably true not related to health care transit university opportunities like in Austin, in Boston, but that was, you know, that was at that time," but he is "unaware" of any changes because he hasn't "been there in so long."

Evidence at trial confirms that Lyft has goals for its WAV program beyond the minimum regulatory requirements, for example, by offering WAV service in San Francisco and Los Angeles where WAV service is not mandated, but financial offsets are available.

- Deposition of Christopher Wu ("Wu Depo.") 183:21-25, 184:2-3.

- Testimony of Asaf Bar Selinger.

- Testimony of Isabella Gerundio.

- Testimony of Richard Zhou.

---

[53] LYFT_ILRC00022617.

119.     Instead of working to expand Access mode or provide better service, Lyft's employees work to "impair service levels" and "suppress performance" for WAVs so that Lyft can point to the unsuccessful nature of Access mode to convince regulators and courts that it should not have to provide more or better service to people with disabilities.[54]

**Lyft's Response**: The materials relied on are inadmissible hearsay. Fed. R. Evid. 801-803.  The proposed finding is based on an inadmissible email; and, in any event, one out of context email from one Lyft employee from over three years ago discussing Access mode in one city (New York City) for one point in time, cannot support the proposed statement of fact.

Evidence shows that Lyft has invested tens of millions of dollars and thousands of hours of employee time to offer and improve WAV service, while attempting to minimize financial losses and meet regulatory requirements. Lyft conducts frequent experiments to make its WAV service more efficient and effective.

- Testimony of Asaf Bar Selinger.

- Testimony of Isabella Gerundio.

- Testimony of Richard Zhou.

**B.     Lyft's National WAV Team Is Under Resourced And Grossly Ineffective.**

120.     For many years, Lyft employees have recognized that the current method of operating Lyft's WAV program involves reactionary market-by-market responses to regulatory requirements and pressures.[55]

---

[54] LYFT0031721.
[55] LYFT_ILRC00004167; LYFT0240819.

**Lyft's Response**: The materials relied on are inadmissible hearsay. Fed. R. Evid. 801-803.  This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.

The proposed finding is based on two inadmissible documents; moreover, two documents from over three years ago cannot support the proposed statement of fact.

Lyft's WAV program launched in 2016. Witness testimony established that Lyft has centralized its WAV program. National staff work with local operations to meet regulatory requirements and find opportunities to offer WAV service if there are transit partnerships or incentives available.

- Testimony of Asaf Bar Selinger.

- Testimony of Isabella Gerundio.

- Testimony of Richard Zhou.

121.    As former Lyft employee Hadar Dor ("Mr. Dor") stated, "Leadership is aligned on keeping WAV decentralized – we just have to make sure various teams are accountable to prioritize WAV asks whenever regulator-mandated ones come up."[56]

**Lyft's Response**: The materials relied on are inadmissible hearsay. Fed. R. Evid. 801-803.   This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.  The proposed finding is based on an inadmissible email; moreover, one email from over three years ago cannot support the proposed statement of fact.

No witness at trial offered testimony that there is a current policy at Lyft to keep WAV "decentralized." Witnesses testified that WAV is now managed centrally.

- Testimony of Asaf Bar Selinger.

---

[56] LYFT_ILRC00004167.

- Testimony of Isabella Gerundio.

- Testimony of Richard Zhou.

122.    Despite offering Access mode in multiple major cities across the country, Lyft did not maintain a structured system of central operations or budget until 2020.  Rather, Access mode was operated and funded at a purely local level.[57]

> **Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.  *See* LRPF Nos. 120-21.

123.    Isabella Gerundio ("Ms. Gerundio"), Mr. Wu's successor and the current head of Lyft's national WAV team, is unable to identify what the budgets of the WAV program were prior to 2020.[58]

> **Lyft's Response**: This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. Isabella Gerundio testified that she believed that, prior to 2018, the budget process was not "structured as it is today."

> - Gerundio Dep. Tr. 67:4-7.

124.    Prior to Ms. Gerundio's tenure as the head of Lyft's national WAV team, she did not have any professional disability or accessibility experience or experience in the transportation sector.[59]

---

[57] Corrected Expert Report, at 18.
[58] Transcript of Oct. 28, 2021 Deposition of Isabella Gerundio ("Gerundio Dep. Tr.") 60:2-7; 67:4-7.
[59] Gerundio Dep. Tr. 42:6-20.

**Lyft's Response**: This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. Plaintiffs are not asking the Court to take responsibility for hiring decisions of a private company.

Witness testimony confirmed Ms. Gerundio's capability in managing WAV service. She has worked on Lyft's WAV program exclusively since 2019. Her skill and expertise in this field is confirmed by Judge William Alsup's reliance on Ms. Gerundio's testimony in his September 1, 2021 Order in the matter of *Independent Living Resource Center S.F. v. Lyft, Inc.*, No. C 19-01438 WHA, 2021 U.S. Dist. LEXIS 166229 (N.D. Cal. Sep. 1, 2021).

- Testimony of Isabella Gerundio.

125.     Lyft's Access mode offerings are often negatively affected by a lack of funding and resources.[60]

**Lyft's Response**: The materials relied on are inadmissible hearsay. Fed. R. Evid. 801-803. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.

Evidence confirms that Lyft commits millions of dollars annually to offering WAV service. Lyft employees have worked and are working to find solutions to offering on-demand WAV service in a cost-efficient, reliable, and scalable manner, but have not yet found such a solution. There is no evidence that such a solution exists.

- Testimony of Asaf Bar Selinger.

- Testimony of Isabella Gerundio.

- Testimony of Richard Zhou.

---

[60] LYFT_ILRC00002983; LYFT_ILRC00009598; LYFT0002739; LYFT0194886; LYFT_ILRC00004167; LYFT0117386; LYFT002531.

126.    On multiple occasions, Mr. Wu and Lyft employees have stated that a WAV program has been rejected due to an inability to receive approval for engineering resources, despite many of these programs being projected to allow Lyft to offer Access mode more efficiently or reduce the cost of Access mode.[61]

**Lyft's Response**: The materials relied on are inadmissible hearsay. Fed. R. Evid. 801-803.  This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.

The proposed "fact" is speculative. Mr. Wu has not worked at Lyft since August 2019. The proposed finding is based on inadmissible presentations and emails from three or more years ago. No witness offered testimony that any of these "programs" would have been effective or explained how much they would have cost to implement.

Mr. Wu testified at deposition that his proposals were "the beginning of strategy work" with "assumptions, upon assumptions, upon assumptions" that would "be required to be validated."  Evidence confirms that, since Mr. Wu left Lyft, Lyft's WAV team has continued to work to find ways to lower the cost and improve the effectiveness of its WAV service.

- Wu Depo. 186:11-23.

- Testimony of Asaf Bar Selinger.

- Testimony of Isabella Gerundio.

- Testimony of Richard Zhou.

---

[61] LYFT_ILRC00002983; LYFT_ILRC00009598; LYFT0002739; LYFT0194886; LYFT_ILRC00004167; LYFT0117386; LYFT002531.

127.    One of Lyft's WAV program's "challenges" was described as having "no engineering resources[.]"[62]

     **Lyft's Response**: The materials relied on are inadmissible hearsay. Fed. R. Evid. 801-803.  This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.

     The proposed "fact" is speculative. At trial, there was no testimony that increasing "engineering resources" would solve the problem of a lack of supply of WAVs to drive on the Lyft platform, or other structural challenges to offering WAV service. Evidence at trial confirms that Lyft is a private company which must make decisions about how to efficiently allocate resources.

- Testimony of Asaf Bar Selinger.

128.    As Mr. Wu described, "typically WAV eng[ineering] work is not prioritized over other efforts."[63]

     **Lyft's Response**: The materials relied on are inadmissible hearsay. Fed. R. Evid. 801-803.  This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.  *See* LRPF No. 127.

129.    During negotiations for a national WAV partnership, Mr. Wu asked his superior "Is it fair to say the only reason we don't do this is due to lack of engineering resources?  But not that it's not technically possible, nor technically not a good idea?"[64]

---

[62] LYFT0194886.
[63] LYFT0002739.
[64] LYFT0117386.

> **Lyft's Response**: The materials relied on are inadmissible hearsay. Fed. R. Evid. 801-803. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. *See* LRPF No. 127.

130.    Mr. Wu's national WAV partnership was rejected because "WAV [operations] did not get engineering resources approved[.]"[65]

> **Lyft's Response**: The materials relied on are inadmissible hearsay. Fed. R. Evid. 801-803. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.

> *See* LRPF No. 126-27. The inadmissible email from May 2018 states that the following text was part of "proposed messaging" to a third-party transportation company: "WAV Ops did not get engineering resources approved in H2 for this API buildout as we could not build conviction that the integration justified the heavy engineering ask."

131.    Lyft employees have, on repeated occasions, stated that a nationwide offering of WAV service was a more efficient and effective method to offer WAV service.[66]

> **Lyft's Response**: The materials relied on are inadmissible hearsay. Fed. R. Evid. 801-803. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. *See* LRPF No. 126.

> No witness testified that Lyft has identified a way to offer "nationwide" WAV service in a manner that is "more efficient and effective" than its current methods of offering WAV service.

---

[65] LYFT0002532.
[66] LYFT_ILRC00021644; LYFT_ILRC00005109.

132.    Mr. Wu previously proposed an initiative called NewCo and LyftSub, which was designed to expand Lyft's supply of WAVs and offer a nationwide WAV program.[67]

   **Lyft's Response**: The materials relied on are inadmissible hearsay. Fed. R. Evid. 801-803.  This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. *See* LRPF No. 126.

133.    LyftSub was a program to engage a staffing agency to provide contracted drivers and lease WAVs through a third-party, LyftSub, to those drivers.[68]

   **Lyft's Response**: The materials relied on are inadmissible hearsay. Fed. R. Evid. 801-803.  This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. *See* LRPF No. 126.

134.    LyftSub would be a wholly-owned subsidiary of Lyft.[69]

   **Lyft's Response**: The materials relied on are inadmissible hearsay. Fed. R. Evid. 801-803.  This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. *See* LRPF No. 126.

135.    LyftSub was projected to offer a nationwide WAV solution for Lyft.  Mr. Wu anticipated that giving three rides a day through LyftSub would be more cost-efficient than the way Lyft currently offers Access mode.[70]

   **Lyft's Response**: The materials relied on are inadmissible hearsay. Fed. R. Evid. 801-803.  This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. *See* LRPF No. 126.

---

[67] LYFT_ILRC00021945; LYFT_ILRC00021946; LYFT_ILRC0022617; LYFT0120393; LYFT_ILRC00009550; Transcript of October 26, 2021 Transcript of Christopher Wu ("Wu Dep. Tr."), 176:2-5.
[68] LYFT_ILRC00021945; LYFT_ILRC00009550.
[69] LYFT_ILRC00021945; LYFT_ILRC00009550.
[70] LYFT_ILRC00022650; LYFT_ILRC00009550; Wu Dep. Tr. 188:21-25.

136.     Mr. Wu projected that LyftSub would allow Lyft to profitably offer a nationwide WAV program at eight to eleven rides per day.[71]

**Lyft's Response**: The materials relied on are inadmissible hearsay. Fed. R. Evid. 801-803.  This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. *See* LRPF No. 126.

137.     The projections of the LyftSub program would allow Lyft to provide more WAV rides per year than it is currently offering at a lower cost per ride and lower total cost than Lyft's current WAV offerings.

**Lyft's Response**: There is no evidentiary support cited for this purported fact. *See* LRPF No. 126.

138.     Following Mr. Wu's presentation of LyftSub to Lyft's executive team for implementation, Mr. Wu was directed to revise the program to ensure there was a "good passenger experience."[72]

**Lyft's Response**: This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.

The deposition testimony cited does not support this proposed fact. Mr. Wu's testimony did not concern "LyftSub" nor that that there was ever a presentation to executives "for implementation" of LyftSub. Mr. Wu was discussing a January 2018 presentation which predated that specific proposal. Moreover, Mr. Wu testified that "he got the impression" that a Lyft executive was "was focused on a good passenger experience."

139.     After Mr. Wu made further improvements to the passenger experience, his supervisor presented LyftSub to Lyft's executive team again.  Lyft executives did not approve

---

[71] LYFT_ILRC00022650.
[72] Wu Dep. Tr. 169:1-14.

LyftSub and none of Lyft's 30(b)(6) witnesses, who were obligated to explain why Lyft did not go forward with LyftSub, could explain why Lyft did not go forward with LyftSub.[73]

**Lyft's Response**: This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. The deposition testimony cited does not support this proposed fact.

140.    After Mr. Wu's departure from Lyft, Ms. Gerundio attempted to create a WAV partnership program which "was almost exactly like the LyftSub."[74] Ms. Gerundio did not pursue LyftSub any further.[75] Despite two heads of the national WAV team each designing a virtually identically pilot WAV partnership program, none was ever implemented.

**Lyft's Response**: This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. *See* LRPF No. 127. Moreover, Ms. Gerundio explained that "From the experience" her team had "trying out this insourcing and outsourcing model," which was similar to LyftSub, "one of the reasons why we didn't ... pursue it at that point in the last year is that the hourly model is actually almost the same as a W2 model but with a lot more operations work, a lot more operational work." That is, the model would have resulted in similar final costs, for much more work. In summary, she explained that "the math didn't work out and we couldn't find the vendors for it."

- Gerundio Dep. Tr. 172:4-12, 173:2-9.

141.    Despite repeated attempts by Lyft's employees to offer nationwide programs or improve the efficiency of Lyft's WAV offerings, Lyft continues to operate Access mode in response to regulatory requirements.

---

[73] Wu Dep. Tr. 170:9-23; Transcript of November 16, 2021 Deposition of Dong Won Lee ("Lee Dep. Tr."), 133:21-25.
[74] Gerundio Dep. Tr. 197:2-15.
[75] Gerundio Dep. Tr. 167:9-168:17.

> **Lyft's Response**: There is no evidentiary support cited for this purported fact. *See* LRPF No. 125-126.

142.    Lyft offers Access mode in the Access Regions using two models: the IC model and the "Partner model." Stipulated Fact ¶ 34.

> **Lyft's Response**: Lyft has no response or objection to this proposed fact.

143.    As is the case of Standard mode, the IC model for WAV depends on drivers who personally own or rent WAVs. These drivers ("IC WAV drivers"), like other independent drivers on the Lyft platform, set their own hours and drive where they want to drive. *Id.*, ¶ 35.

> **Lyft's Response**: Lyft has no response or objection to this proposed fact.

144.    The second method, the Partner model, relies on third-party transportation companies with whom Lyft contracts. *Id.*, ¶ 36.

> **Lyft's Response**: Lyft has no response or objection to this proposed fact.

145.    Under the Partner model, Lyft pays the third-party companies a negotiated hourly rate that varies by city and by company. In exchange for the hourly rate, the third-party companies provide the contracted-for number of WAVs and drivers to drive the WAVs on the Lyft platform. *Id.*, ¶ 37.

> **Lyft's Response**: Lyft has no response or objection to this proposed fact.

146.    Prior to 2019, Lyft spent approximately $2.6 million on its WAV programs annually.[76]

> **Lyft's Response**: The materials relied on are inadmissible hearsay. Fed. R. Evid. 801-803. The cited evidentiary support for this proposition, an email from January 2018, is inadmissible.

---

[76] LYFT0002253.

Evidence confirms that Lyft spent, and continues to spend, millions of dollars annually offering WAV service.

147.    Lyft spent approximately $10-13 million on its WAV programs in 2019.[77]

**Lyft's Response**: Lyft has no response or objection to this proposed fact.

148.    Lyft spent approximately $13-15 million on its WAV programs in 2020.[78]

**Lyft's Response**: Lyft has no response or objection to this proposed fact.

149.    Lyft's WAV budget for 2021 was $20 million.[79]

**Lyft's Response**: Lyft has no response or objection to this proposed fact.

150.    Lyft's projected WAV budget for 2022 is $25 million.[80]

**Lyft's Response**: Lyft has no response or objection to this proposed fact.

151.    Lyft's WAV programs and infrastructure has remained fragmented and inefficient.[81]

**Lyft's Response**: The materials relied on are inadmissible hearsay. Fed. R. Evid. 801-803. *See* LRPF Nos. 120, 125.

**C.    The Access Mode Toggle Suppresses Service.**

152.    In the Access Regions other than New York City, Lyft does not automatically list the WAV option on its home screen. Instead, Lyft requires users to enable the toggle by navigating to a separate settings page, activate the Access mode toggle, then return to the main screen where WAVs will appear below other ride modes.[82]

---

[77] Gerundio Dep. Tr. 67:8-12.
[78] Gerundio Dep. Tr. 67:8-12.
[79] Gerundio Dep. Tr. 67:4-13.
[80] Gerundio Dep. Tr. 91:1-8.
[81] LYFT_ILRC00004167; LYFT0240819; LYFT_ILRC00030483; LYFT_ILRC00021644; LYFT_ILRC00005109.
[82] Corrected Expert Report, at 21, 43-44, 67; Gerundio Dep. Tr. 243:21-244:5.

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702.

The proposed fact is incomplete. Witness testimony established that riders need only navigate to the settings page to activate Access mode once, and it will remain activated, for all regions, going forward.

- Testimony of Isabella Gerundio.

153.    In the Access Regions other than New York City, nowhere on Lyft's home screen does Lyft notify users about their ability to request a WAV or how to enable Access mode.[83]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702.

Witness testified that there are clear instructions for turning on the Access mode toggle on the Lyft web site.

- Testimony of Isabella Gerundio.

**D.    Lyft's Onboarding Process Fails To Ask Whether Drivers Have WAVs.**

154.    When a driver applies to drive for Lyft, Lyft asks the drivers a series of questions about the driver and their vehicle in an "onboarding process."[84]

**Lyft's Response**:  Lyft has no response or objection to this proposed fact.

155.    The onboarding process includes a survey that asks for basic information about the driver, including license information, a background check, Social Security number, and vehicle

---

[83] Corrected Expert Report, at 21, 43-44, 67.
[84] Corrected Expert Report, at 69; Transcript of August 18, 2021 Deposition of Joyce Hong-Chol Chan ("Chan Dep. Tr.") 83:8-84:22.

information.  In some markets, drivers' vehicles must pass an inspection, the driver must take a defensive driving course, or undergo a medical exam.[85]

> **Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. Lyft has no further response or objection to this proposed fact.

156.    Lyft asks prospective drivers all necessary information to determine whether a driver's vehicle meets Lyft's requirements to drive on Standard mode.[86]

> **Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. Lyft has no further response or objection to this proposed fact.

**E.     Lyft Uniquely Prevents Partner WAV Drivers From Cross-Dispatching.**

157.    Lyft has a policy of uniquely preventing Partner WAV drivers from being allowed to cross-dispatch, except in experimental pilots.[87]

> **Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702.
>
> The evidence establishes that WAV Partner drivers serve a discrete purpose: allowing Lyft to offer Access mode. Richard Zhou testified that Lyft does not cross-dispatch all Partner WAV drivers because it can cause an increase in wait times for Access mode. There is a trade-off between increased revenue and availability of the WAVs. The more Lyft cross-

---

[85] Corrected Expert Report, at 69; Chan Dep. Tr. 83:8-84:22; Gerundio Dep. Tr. 204:2-11.
[86] Corrected Expert Report, at 69; Chan Dep. Tr. 83:8-84:22.
[87] Corrected Expert Report, at 77; Chan Dep. Tr. 114:5-10.

dispatches Partner WAVs, the less likely they are going to be available for a WAV ride if a request comes in.

- Testimony of Richard Zhou.

158.    Cross-dispatching means that if a vehicle meets the requirements of more than one mode (*e.g.*, Standard and XL, or Standard and Access), the driver may accept ride requests in both modes.

**Lyft's Response**:  Lyft has no response or objection to this proposed fact.

159.    For example, a Lyft driver in a luxury vehicle can offer "Lux" rides to riders who select Lyft's luxury vehicle option and can also accept Standard mode requests from riders who select a standard vehicle.  As a result, when no riders request "Lux" rides, but there are riders requesting Standard mode rides, the luxury vehicle driver can continue generating revenue for himself and Lyft.

**Lyft's Response**:  The proposed fact is incomplete. There is a significant difference between Lux and Access modes from the rider's perspective. In Lux mode, if a Lux driver is not available, the rider has the option to choose "Standard" or another mode. But an Access mode rider does not have that same option. For this reason, the unavailability of a Partner WAV driver will have a more significant impact on the Access mode rider than a Lux rider.

- Testimony of Richard Zhou**.**

160.    Lyft allows all independent contractors, including IC WAV drivers, who drive on Lyft in any mode to cross-dispatch.

**Lyft's Response**:  The evidence establishes that Lyft allows all independent contractors, including IC WAV drivers, who qualify to drive in more than one mode to elect to drive in any of those modes on the Lyft platform.

- Testimony of Richard Zhou.

- Testimony of Asaf Bar Selinger.

161.    Lyft does not allow Partner drivers who drive on Access mode to cross-dispatch their WAVs.

**Lyft's Response**: No evidence is cited in support of this proposed fact. Evidence establishes that Lyft has experimented with cross-dispatching Partner WAV drivers, and has found that, in general, the benefits in cost-savings are outweighed by the negative impacts on service levels.

- Testimony of Richard Zhou.

162.    Mr. Wu previously described allowing Partner drivers to cross-dispatch as "low hanging fruit" for increasing profitability of Access mode.[88]

**Lyft's Response**: The materials relied on are inadmissible hearsay. Fed. R. Evid. 801-803.  One email from December 2018 does not confirm that "cross-dispatch" would be effective. Mr. Wu explained in his deposition that: "The context that's not called out in this document is that this would not have worked if there was performance requirements in that market."

At trial, Lyft witnesses testified that they have experimented with cross-dispatching Partner WAV drivers, but have found that, in general, the benefits in cost-savings are outweighed by the negative impacts on service levels.

- Wu Depo. 78:11-14.

- Testimony of Richard Zhou.

163.    Richard Zhou, a Senior Analyst at Lyft, stated that cross-dispatching drivers yielded "driver benefits" and "at the market level, of course, incremental, but small benefit there."[89]

---

[88] LYFT_ILRC00016900.
[89] Transcript of November 5, 2021 Deposition of Richard Zhou ("Zhou Dep. Tr."), 95:8-25.

**Lyft's Response**: Mr. Zhou also testified that "when we experimented" with cross-dispatching Partner WAVs in New York City, "the negative effects of the experimentation caused [wait times] to get close to" the regulatory maximum, causing Lyft to cease the experiment.

- Zhou Depo. 94:15-18.

164.    Lyft has implemented a series of cross-dispatching pilot programs in multiple Access Regions to test the effects of cross-dispatching Partner WAV drivers.

**Lyft's Response**: No evidence is cited in support of this proposed fact. Lyft witnesses establish that Lyft has experimented with cross-dispatching Partner WAVs.

- Testimony of Richard Zhou.

165.    In Phoenix, Partner drivers were allowed to cross-dispatch in 27 of the 49 months for which Lyft provided data.  During the months where cross-dispatching was allowed, the average wait time for WAV service was two minutes less than months where no cross-dispatching was allowed. The completion rate for Access mode was fourteen percent higher in months with cross-dispatching than months without cross-dispatching.  Lyft calculates that the average cost of providing WAV service was $187 per ride in months with cross-dispatching and $316 in months without cross-dispatching.[90]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702.

The evidence does not support the proposed fact. Lyft's expert, Dr. Marc Rysman, testified that Plaintiffs' expert "misunderstands the data." Partner WAV drivers were not

---

[90] Corrected Expert Report, at 78-79; Demand 2021-09-20; Highly Confidential – Subject to Protective Order – WAV 2021-02-26.csv ("WAV 2021-02-26").

cross-dispatched in Phoenix; rather, a third-party firm (VMI) made WAVs available to IC drivers for a subsidized rate. The calculation of the cost per ride did not include "the cost of the WAVs that were part of the pilot."

- Testimony of Dr. Marc Rysman regarding his rebuttal report and Exhibit D-54 (Rebuttal Expert Report – Figure 2).

166.    Lyft was able to profitably offer Access mode in Phoenix during December of 2019, one of the months in which Lyft allowed its Partner WAV drivers to cross-dispatch.[91]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702.

The evidence does not support the proposed fact. Dr. Rysman explained "this calculation did not account for the cost of the WAVs that were part of [an IC] pilot" and "during December 2019, Lyft covered this cost for five WAVs provided by VMI," which means that in December 2019, "Lyft did not earn a profit and in fact incurred a loss of $4,861 in that month."

- Testimony of Dr. Marc Rysman regarding his rebuttal report.

167.    In Portland, Partner drivers were allowed to cross-dispatch in nine of the 49 months for which Lyft provided data.  During the months where cross-dispatching was allowed, the average wait time for WAV service was one minute longer than months where no cross-dispatching was allowed.  The completion rate for Access mode was thirteen percent higher in months with cross-dispatching than months without cross-dispatching.  Lyft calculates that the average cost of providing WAV service was $60 per ride in months with cross-dispatching and $129 in months without cross-

---

[91] Corrected Expert Report, at 36; Demand 2021-09-20; WAV 2021-02-26.

dispatching.[92]

> **Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702.
>
> The proposed fact is misleading. There is no evidence to establish a causal relationship between cross-dispatch of Partner drivers and higher completion rates. In fact, witnesses testified that allowing WAV Partner drivers to cross-dispatch generally has a negative impact on service levels.
>
> Lyft witnesses establish that Lyft has experimented with cross-dispatching Partner WAVs. In general, the benefits in cost-savings are outweighed by the negative impacts on service levels.
>
> •      Testimony of Richard Zhou.

**F.      Lyft Refuses To Effectively Advertise And Market Access Mode.**

168.   Lyft spends hundreds of millions of dollars a year advertising and marketing its brand and Standard mode.[93]

> **Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. Plaintiffs' principal expert, Alex Elegudin, testified that he is "not a marketing exert." No witness offered reliable testimony regarding the impact of advertising and marketing on Lyft's business.
>
> The evidence shows that Lyft's growth, and the success of its online platform, is dependent on a sufficient scale of supply and demand in a given region.

---

[92] Corrected Expert Report, at 79-80; Demand 2021-09-20; WAV 2021-02-26.
[93] Lyft, Inc., Annual Report (Form 10-K), Feb. 28, 2022, at 47; Corrected Expert Report, at 47.

- Elegudin Depo. 190:17.

- Testimony of Dr. Marc Rysman.

- Testimony of Asaf Bar Selinger.

- Testimony of Richard Zhou.

- Testimony of Isabella Gerundio.

169.    Lyft "believe[s] that much of the growth in [its] rider base and the number of drivers on [its] platform is attributable to [its] paid marketing initiatives."[94]

**Lyft's Response**: This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. No reliable witnesses offered testimony regarding the impact of advertising and marketing on Lyft's business.

170.    Lyft's "marketing efforts currently include referrals, affiliate programs, free or discount trials, partnerships, display advertising, television, billboards, radio, video, content, direct mail, social media, email, hiring and classified advertisement websites, mobile 'push' communications, search engine optimization and keyword search campaigns."[95]

**Lyft's Response**: This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. *See* LRPF No. 169.

171.    Lyft employees characterized Lyft's model for marketing WAVs as "do not promote WAV demand beyond offering Access Mode" where Lyft is required to do so.[96]

**Lyft's Response**: The materials relied on are inadmissible hearsay. Fed. R. Evid. 801-803.  This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. One inadmissible, undated document does not support the proposed fact.

---

[94] Lyft, Inc., Annual Report (Form 10-K), Feb. 28, 2022, at 35.
[95] Lyft, Inc., Annual Report (Form 10-K), Feb. 28, 2022, at 38; Corrected Expert Report, at 47.
[96] LYFT_ILRC00031902.

The evidence shows that ensuring that there is an adequate supply of WAVs to meet rider demand is extremely difficult. If WAV demand increases, Lyft may have to locate additional WAV supply, which can be expensive and take time. In addition, service levels for existing WAV riders may be negatively impacted.

- Testimony of Isabella Gerundio.

172.    Mr. Wu affirmed that an increase in demand for Access mode through advertising would be "problematic."[97]

**Lyft's Response**: This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.  One former employees' opinion on the difficulties that advertising could present in offering Access mode on the Lyft platform is irrelevant.

Moreover, Mr. Wu also testified: "I do think that if you advertise WAV rides, you're going to temporarily boost demand and, therefore, you don't get an accurate picture of what steady state supply looks like;" "WAVS are subscale and because of that like the demand is wildly different;" and: "[WAV demand is] very different because in the Classic ride they can scale their marketplace by matching supply and demand, whereas in WAV, you can't match the supply to demand as easily as you can in Classic."

- Wu Depo. 152:17-20, 153:2-3, and 154:6-10.

173.    For WAV-specific marketing in 2021, Lyft made available approximately $100,000 in coupons to disability rights organizations in certain Access Regions.[98]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702.

---

[97] Wu Dep. Tr. 153:12-17.
[98] Corrected Expert Report, at 18-19; Gerundio Dep. Tr. 77:1-23

The proposed fact is not supported by the deposition testimony. Ms. Gerundio testified that $100,000 was Lyft's projected budget in San Francisco and New York for just "the last couple of quarters" and that she did not know "if we are going to go over or under that budget."

- Gerundio Dep. Tr. 77:1-23

174.    Under Ms. Gerundio, Lyft's marketing and advertising for Access mode consists of giving ride coupons to disability rights organizations in San Francisco, Los Angeles, Dallas, and New York City in the hopes that those organizations would distribute the coupons to users.[99]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702.

The proposed fact is not supported by the cited deposition testimony. Ms. Gerundio testified that, in addition to coupons, Lyft's "market teams and policy teams do outreach specific to WAV" and that "Lyft markets the brand not specific to each mode type and we market it to all potential users."

- Gerundio Dep. Tr. 77:1-23

175.    Lyft's coupon campaign for Access mode was a strategy designed to grow demand of WAV rides in order to "impair service levels at current supply."[100]  As one Lyft employee stated, "We've been thinking through how to suppress performance via supply levers, but we can instead take the alternate approach via demand. . . . IE, contact an accessibility org and offer them a coupon to distribute to all their members for the end of the month."[101]

---

[99] Corrected Expert Report, at 18-19; Gerundio Dep. Tr. 77:1-23, 108:13-24, 129:19-130:4.
[100] LYFT0031721.
[101] *Id.*

**Lyft's Response**: The materials relied on are inadmissible hearsay. Fed. R. Evid. 801-803.  This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. The proposed finding is based on an inadmissible email; moreover, one email from over three years ago cannot support the proposed statement of fact. *See* LRPF No. 171. The proposed finding is based on an inadmissible email; moreover, one email from over three years ago cannot support the proposed statement of fact.

No witness testified that this is the "purpose" of Lyft's distribution of coupons for free WAV rides.

176.    Lyft's marketing and advertising for Access mode did not involve direct engagement or communication with users.

**Lyft's Response**:  There is no evidence to support this proposed fact.

177.    Lyft's coupons for Access mode were not used by any users in San Francisco or New York.[102]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.

The proposed fact is not supported by the cited deposition testimony. Ms. Gerundio testified that, as to San Francisco, "The last time I talked to the local teams almost no coupon codes were used and the last time I checked the data, we only had about one new user in the last month or so in San Francisco." However, Ms. Gerundio stated that the team would "go back to the drawing board and see what else we can do there."

---

[102] Corrected Expert Report, at 18-19; Gerundio Dep. Tr. 108:13-24.

The cited text does not discuss New York. Ms. Gerundio in fact testified at deposition that "In New York, I don't know the exact figures. I haven't looked at it directly yet."

- Gerundio Dep. Tr. 108:13-109:2.

178.    In Dallas, Lyft did not have a very high success rate for use of the coupons.[103]

**Lyft's Response**: This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. Lyft has no further response or objection to this proposed fact.

179.     The actual amount of spending on marketing and advertising for Access mode was far below the $100,000 budgeted in 2021.

**Lyft's Response**: This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. No evidence is cited in support of this proposed fact.

180.    Lyft engages in no other marketing or advertising that is specific to Access mode.[104]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702.

The proposed fact is not supported by the cited deposition testimony. Ms. Gerundio testified that "Our market teams and policy teams do outreach specific to WAV" and that "Lyft markets the brand not specific to each mode type and we market it to all potential users." In addition, she explained that "we are working on a [new WAV] product" and "it will probably include a discount." At the time, Lyft was "piloting all of these initiatives to see what works and what does drive potential demand and get people to take Lyft Access." This

---

[103] Gerundio Dep. Tr. 110:22-25.
[104] Corrected Expert Report, at 18-19; Gerundio Dep. Tr. 77:1-23, 108:13-24, 129:19-130:4.

took time, and "[w]hile we are waiting for that data, we don't – we don't know what else we can do because we don't know what data."

- Gerundio Dep. Tr. 77:1-23,  129:19-130:13.

**G.     Lyft Refuses To Adequately Use Incentives And Bonuses For Access Mode.**

181.     Lyft uses incentives and bonuses across different ride modes to increase the supply of vehicles on the App.[105]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702.

Evidence establishes that Lyft uses pricing and incentives to balance supply and demand on the Lyft platform. Driver incentives are used both for driver "generation," getting a greater supply of drivers on the road (e.g., through referral bonuses); and for driver "shaping," encouraging drivers to drive in a certain area (*e.g.* "bonus zones," or "ride streaks"). Other than unique subsidies that were intended to incentivize drivers to rent WAVs in New York City, Lyft does not offer incentives so that drivers can fund the acquisition of vehicles.

- Testimony of Asaf Bar Selinger

182.     In 2021, Lyft recorded more than $1.3 billion in driver incentives, which included "minimum guaranteed payments, volume-based discounts and performance-based bonus payments."[106]

---

[105] Corrected Expert Report, at 73-74.
[106] Lyft, Inc., Annual Report (Form 10-K), Feb. 28, 2022, at 88-89; Corrected Expert Report, at 47; Brian Sozzi, *Lyft Is on Track To Shell Out $1 Billion in Incentives To Lure Drivers*, YAHOO! NEWS (Aug. 4, 2021), https://news.yahoo.com/lyft-is-on-track-to-shell-out-1-billion-in-incentives-to-lure-drivers-171137108.html.

**Lyft's Response**: The materials relied on are inadmissible hearsay. Fed. R. Evid. 801-803. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. *See* LRPF No. 181.

183.    Lyft does not offer consistent bonuses or incentives for Access mode drivers.[107]

**Lyft's Response**: The proposed fact misstates the witness's testimony. Ms. Gerundio testified that "Bonuses and incentives can change any time with the sole purpose of trying to engage drivers." The evidence establishes that Lyft does offer consistent per-ride bonuses to IC WAV drivers and changes the size of those bonuses to maximize driver engagement.

Driver incentives also change in non-WAV modes in order to balance supply and demand on the Lyft platform.

- Deposition of Isabella Gerundio ("Gerundio Depo.") 144:23-145:2.

- Testimony of Asaf Bar Selinger.

- Testimony of Isabella Gerundio

184.    Lyft no longer offers bonuses and incentives to WAV drivers in Dallas or San Francisco.[108]

**Lyft's Response**: This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.

In Dallas and San Francisco "there are no current active IC drivers. So there is no incentive or...bonus." Lyft uses the Partner model in Dallas and San Francisco. It does not rely on "bonuses" or "incentives" to influence rider behavior there, as the drivers are

---

[107] Gerundio Dep. Tr. 144:23-145:2.
[108] Gerundio Dep. Tr. 141:6-13.

employed by a third-party company. Lyft can contractually specify locations for the vehicles and ask Partners to instruct drivers solely to drive in Access mode.

- Gerundio Depo. 141:6-13.

- Testimony of Isabella Gerundio and Exhibit D-7 ("Lyft Wheelchair Accessible Vehicle Overview").

185.     Lyft reduced the per ride bonus available to WAV drivers in New York City from $30 per ride to $15 per ride.[109]

**Lyft's Response**: This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.

The proposed fact is incomplete. Leon Treger testified at his deposition that, to determine the adjustments to specialty ride bonuses for IC WAV drivers in New York City Lyft employees "look at the competitive landscape, ...and also we look at our service levels. We also hold focus groups and speak to drivers and ask them.  All of those factor into pricing changes."

Paying $15 per ride as a Specialty Ride Bonus still means that Lyft will lose money on nearly every single WAV ride completed.

- Treger Depo. 30:18-25.

- Testimony of Asaf Bar Selinger.

186.     Lyft could increase or offer consistent bonuses or incentives for Access mode drivers to increase the supply of WAVs on the App.

---

[109] Corrected Expert Report, at 73-74; Transcript of October 25, 2021 Deposition of Leon Abraham Treger ("Treger Dep. Tr."), 29:15-22; Transcript of November 12, 2021 Deposition of Asaf Bar Selinger ("Selinger Dep. Tr."), 65:2-10.

**Lyft's Response**: No evidence is cited in support of this proposed fact. There is no evidence to support a finding that changes to Lyft's incentive structure for IC WAV drivers would "increase the supply of WAVs on the App."

There is likewise no evidence to establish by how much supply would increase, what the impact of that increase in supply would be for riders who need WAVs, or how much such a change would cost.

**H.    Lyft Uniquely Restricts WAVs From Express Drive And FlexDrive.**

187.    Express Drive is Lyft's flexible car rentals program for drivers who want to drive for Lyft.[110]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. No witnesses offered testimony regarding Express Drive's structure or acquisition of vehicles for rent or lease.

Lyft's 10-K from 2021 states "Express Drive. Our flexible car rentals program for drivers who want to drive using our platform but do not have access to a vehicle that meets our requirements. Through our Express Drive program, drivers can enter into short-term rental agreements for vehicles that may be used to provide ridesharing services on the Lyft Platform." It also states that Express Drive is only available in "30 cities nationwide."

188.    FlexDrive is a wholly-owned subsidiary of Lyft and a partner in the Express Drive program, which rents and leases vehicles to drivers for use on the App.[111]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R.

---

[110] Corrected Expert Report, at 57; Lyft, Inc., Annual Report (Form 10-K) (Mar. 1, 2021), at 7.
[111] Corrected Expert Report, at 12; Lyft, Inc., Annual Report (Form 10-K) (Mar. 1, 2021), at 5.

Evid. 702. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. No witnesses offer testimony regarding Lyft's corporate relationship with FlexDrive or FlexDrive's acquisition of vehicles for rent or lease.

Lyft's 10-K from 2021 states "[I]n the first quarter of 2020, we acquired Flexdrive, LLC ("Flexdrive"), one of our longstanding partners in the Express Drive program. Through our Express Drive program, drivers can enter into short-term rental agreements for vehicles that may be used to provide ridesharing services on the Lyft Platform. Flexdrive will continue to operate as an independent partner to Lyft and we expect this acquisition to contribute to the growth of our business and help us expand the range of our use cases."

189.    Express Drive and FlexDrive offer vehicles that drivers can use on Standard mode and other ride modes on the App.[112]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. *See* LRPF Nos. 187-88.

190.    Lyft can and does request or dictate the particular types of vehicles available to drivers through Express Drive and FlexDrive.

**Lyft's Response**: No evidence is cited in support of this proposed fact. The evidence cited in support of the identical proposed fact 361, below (Transcript of November 30, 2021 Deposition of Karim Bousta ("Bousta Dep. Tr."), 25:19-26:10, 72:5-76:4.), also does not support this fact.

---

[112] Corrected Expert Report, at 12; Lyft, Inc., Annual Report (Form 10-K) (Mar. 1, 2021), at 5, 7.

Mr. Bousta testified that Lyft had limited control over vehicles available for Express Drive. Because Lyft "did not provide vehicles," it "would give the information to the car rental companies of what drivers were telling [Lyft] they were interested in driving and then it was the car rental company's decision to decide which car they would provide." That was likewise true for FlexDrive, where "Lyft did not have direct control on the vehicles. The vehicles to be rented were the decision of the rental company."

The evidence establishes that Lyft had a rental program under which it procured WAVs for rent to independent contractor drivers, which involved the procurement of new WAVs that were not already in the providers' fleet. Lyft decided not to renew the program due to high costs and limited effectiveness.

- Deposition of Karim Bousta ("Bousta Depo.") 25:19-26:10, 73:9-15.

- Testimony of Isabella Gerundio.

191.    Express Drive and FlexDrive do not offer WAVs as part of the rental programs.[113]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. The cited deposition testimony does not support the proposed fact.

No witness offered testimony that car rental providers have WAVs available in their existing fleets. To the contrary, witness testimony confirmed that major rental providers, like Hertz, do not maintain WAVs in their rental fleets.

Witness testimony established that Lyft had a separate WAV rental program in New York City and decided not to renew the program because data showed that IC drivers who

---

[113] Corrected Expert Report, at 57-58; Lee Dep. Tr. 47:4-6.

rented WAVs through Lyft's WAV rental program spent just 2% of their time driving in Access mode.

- Testimony of Asaf Bar Selinger.

- Testimony of Richard Zhou and Exhibit D-12 (Chart of Rental Utilization)

- Testimony of Isabella Gerundio.

192.    Lyft employees previously proposed an initiative called Perseus, which would integrate WAVs into Express Drive and allow independent contractor drivers to rent WAVs at a similar price to renting non-WAVs.[114]

    **Lyft's Response**: The materials relied on are inadmissible hearsay. Fed. R. Evid. 801-803.  This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.

    The proposed "fact" is speculative. No witness offered testimony that "Perseus," a program that was never piloted, would have been effective or explained how much it would have cost to implement.

193.    The Perseus program was projected to cost Lyft less than $5 million and allow Lyft to provide more than 500,000 rides in the United States at approximately $10.25 per ride.[115]

    **Lyft's Response**: The materials relied on are inadmissible hearsay. Fed. R. Evid. 801-803.  This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. *See* LRPF No. 191-92.

    There is no evidence to support a finding that the "Perseus program" would have had the stated results. There is likewise no evidence to establish what changes would be

---

[114] Corrected Expert Report, at 57; LYFT0120393; LYFT_ILRC00009550.
[115] LYFT_ILRC00009550; LYFT0120393.

needed to implement "Perseus" in practice, what the impact of that program would be for riders who need WAVs, or how much such a program would cost.

194.     Lyft did not pursue or attempt to pursue the Perseus program.[116]

> **Lyft's Response**:  Lyft has no response or objection to this proposed fact.

195.     The projections of the Perseus program would allow Lyft to provide more WAV rides per year than it is currently offering at a lower cost per ride and lower total cost than Lyft's current WAV offerings.

> **Lyft's Response**: No evidence is cited in support of this proposed fact. The proposed "fact" is speculative. There is no evidence to support a finding that the "Perseus program" would have had the stated results. There is likewise no evidence to establish what changes would be needed to implement "Perseus" in practice, what the impact of that program would be for riders who need WAVs, or how much such a program would cost.

**I.     Lyft Can Expand WAV Partnerships Nationwide.**

196.     Currently, Lyft engages in partnerships with transportation companies to increase the available supply of WAVs in Access Regions.[117]

> **Lyft's Response**: The proposed fact is incomplete. The evidence shows that Lyft uses the "Partner" model to create a supply of WAVs in certain Access Regions. Under it, Lyft contracts with a third-party company to provide both the WAVs and the drivers to drive them at an hourly cost per vehicle that ranges from approximately $40-$65. That means, for a single vehicle under the Partner model, Lyft may pay in excess of $300,000 (assuming $50 per hour and just 18 hours per day of coverage) each year.

---

[116] Lee Dep. Tr., 47:4-6.
[117] Treger Dep. Tr. 59:3-10; Chan Dep. Tr. 50:25-51:4.

Lyft no longer uses the "Rental" model, under which Lyft contracted with a rental car company to procure WAVs for rental to independent drivers.

- Testimony of Isabella Gerundio.

197.    In New York City, Lyft partners with three transportation companies who supply WAVs to drivers to use on the App.[118]

**Lyft's Response**:  The proposed fact does not address that transportation partners are subject to change over time. Evidence shows that since 2019, Lyft has contracted with several third-parties to provide rental vehicles or Partner WAVs in New York City at significant expense.

- Testimony of Asaf Bar Selinger.

- Testimony of Isabella Gerundio.

198.    Lyft's website identifies approximately 208 transportation companies with WAVs across the United States.

**Lyft's Response**: No evidence is cited in support of this proposed fact. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. The proposed fact is vague. If the proposed fact is referring to "Local WAV options" listed on the Lyft website, https://help.lyft.com/hc/en-us/all/articles/115013081668#local , no witness testified as to whether any of the providers on this list, which includes paratransit, "dial-a-ride," and taxi companies, would agree to a "partnership" with Lyft, as to the price, or as to what the terms would be.

---

[118] Treger Dep. Tr. 59:3-10.

## VIII.    Due To Regulatory Requirements,
## Lyft Provides Its Best WAV Service In New York City.

199.    Lyft did not provide Access mode in New York City until ordered to do so by New York City regulators.

**Lyft's Response**: No evidence is cited in support of this proposed fact. Lyft offers Access mode in New York City pursuant to regulations set by the New York City Taxi and Limousine Commission (TLC).

- Testimony of Asaf Bar Selinger.

200.    In New York City, Lyft is required to meet regulatory requirements set by the New York City Taxi and Limousine Commission ("TLC"), which are much higher than the regulatory requirements of other jurisdictions, and require Lyft to either ensure that 25 percent of all Lyft rides are dispatched by WAVs or meet iterative wait-time requirements.[119]

**Lyft's Response**:  Lyft has no response or objection to this proposed fact.

201.    In 2021, the wait-time requirement obligated Lyft to ensure that 80 percent of all Access mode ride requests had wait times within 10 minutes and 90 percent of all Access mode ride requests had wait times within 15 minutes.[120]

**Lyft's Response**:  Lyft has no response or objection to this proposed fact.

202.    Lyft's Access mode performance in New York City is largely dictated by regulatory requirements, including suppressing performance in order to ensure less rigorous wait time requirements in the future.[121]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R.

---

[119] LYFT00032148; Corrected Expert Report, at 64.
[120] LYFT00032148; Corrected Expert Report, at 64.
[121] LYFT_ILRC00011201; LYFT0042706; Corrected Expert Report, at 64.

Evid. 702. The materials relied on are inadmissible hearsay. Fed. R. Evid. 801-803.  Two inadmissible emails from June 2019 do nothing to establish the performance or objectives of Lyft's WAV program in New York City. No witnesses offered testimony regarding "suppressing performance."

The evidence establishes that Lyft has invested millions of dollars in its WAV program in New York City (more than any other market), in addition to thousands of hours of employee time, in order to meet regulatory requirements and rider needs.

- Testimony of Asaf Bar Selinger.

- Testimony of Isabella Gerundio.

203.     In June 2019, Lyft employees used various levers, including reducing the amount of driver bonuses and preventing some Partner WAV drivers from accepting WAV rides and only allowing them to accept Standard mode rides, to "drastically tank" the performance of WAV rides in order to not be subject to more strict requirements in the future.[122]

**Lyft's Response**: The materials relied on are inadmissible hearsay. Fed. R. Evid. 801-803.  This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. *See* LRPF No. 202.

204.     For instance, Product Manager Hadar Dor recommended that the WAV team conduct "cost-reduction" in New York City, at the expense of WAV riders, to prevent an increase in the TLC's minimum service level requirements.[123]  Mr. Dor explained, "If we truly have to beat our currently-pacing . . . SLAs next cycle, we should go harder on cost-reduction even if it **drastically**

---

[122] LYFT_ILRC00011201; LYFT0042706.
[123] LYFT_ILRC00011201 at LYFT_ILRC00011205.

tanks our remaining [80 WAV rides] we're going to do in July.  If we don't, we may end up with **impossible-to-hit** goals next cycle."[124]

> **Lyft's Response**: The materials relied on are inadmissible hearsay. Fed. R. Evid. 801-803.  This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. *See* LRPF No. 202.

205.     Lyft decreased WAV service levels[125] even though a Lyft employee warned that, with this action, "[w]e are likely to cause some very bad rider experiences."[126]

> **Lyft's Response**: The materials relied on are inadmissible hearsay. Fed. R. Evid. 801-803.  This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. *See* LRPF No. 202.

206.     As one of Lyft's senior employees stated, the WAV team was "consciously (though implicitly) trying NOT to hit 100% [service level requirements].  They know they will be charged by regulator to show improvement over time, so they are trying to leave opportunity for that improvement."[127]

> **Lyft's Response**: The materials relied on are inadmissible hearsay. Fed. R. Evid. 801-803.  This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. *See* LRPF No. 202.

207.     Despite Lyft's own attempts to reduce performance levels, Lyft's WAV service in New York City is markedly better than in other jurisdictions due to the rigorous regulatory requirements.[128]

---

[124] LYFT_ILRC00011201 at LYFT_ILRC00011205 (emphasis in original).
[125] LYFT_ILRC00011201 (emphasis in original).
[126] LYFT_ILRC00011201 at LYFT_ILRC00011205.
[127] LYFT0042706.
[128] Corrected Expert Report, at 64-65.

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. There is no admissible evidence that establishes any "attempts to reduce performance levels."

The evidence shows that Lyft has invested more resources in New York City than any other Access Region in order to meet strict regulatory mandates.

- Testimony of Asaf Bar Selinger.
- Testimony of Isabella Gerundio.

208.    In New York City, Lyft uses a combination of the IC model, the Partner model, and provides WAVs for rental through a third-party, which results in more than 1,300 WAV drivers being available on the App on a weekly basis.[129]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702.

The evidence shows that Lyft uses the "Partner" model and "IC" model in New York City. It no longer provides WAVs for rental through a third-party. The supply of WAV drivers in New York City is subject to change.

- Testimony of Asaf Bar Selinger.
- Testimony of Isabella Gerundio.

209.    New York City is the only Access Region in which Lyft does not use the Access mode "toggle" to enable WAV service.[130]

---

[129] Corrected Expert Report, at 64-65; Supply 2021-02-26.
[130] Corrected Expert Report, at 67.

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. Lyft has no further response or objection to this proposed fact.

210.    New York City regulators ordered Lyft to remove the toggle because it "creates a barrier to knowing that a WAV option exists" and could "suppress[] trip demand."[131]

**Lyft's Response**: The materials relied on are inadmissible hearsay. Fed. R. Evid. 801-803.  This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. The reasons that New York City regulators gave to justify an order does not make those reasons accurate or prudent, and has no relevance to this case.

211.    In or around September and October 2019, Lyft removed the toggle in New York City.[132]

**Lyft's Response**:  Lyft has no response or objection to the proposed fact.

212.    Between August 2019 and December 2019, rides on Access mode increased by approximately 500 percent in New York City.[133]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702.

The evidence confirms that a significant portion of the increase in ridership in Access mode in New York City was due to riders who did not need WAVs for transportation. Lyft estimates that after the toggle was removed, 45% of riders who requested Access mode in New York City were riders who did not require a WAV for

---

[131] FHV Compliance with Wheelchair Accessibility Requirements, New York City Taxi and Limousine Commission (Sept. 2019) at 12-13.
[132] Corrected Expert Report, at 67-68; Demand 2021-09-20.
[133] Corrected Expert Report, at 67-68; Demand 2021-09-20.

transportation. Before the toggle was removed, Lyft estimated 20% of riders who requested Access mode in New York City were riders who did not require a WAV for transportation. In other markets, Lyft estimates the number to be 15%.

The misuse of Access mode was also reported by Partner drivers who sent photographic evidence to Lyft. For example, Lyft received a photograph showing a rider who was using Access mode to transport his motorcycle by WAV.

- Testimony of Isabella Gerundio and Exhibit D-5 (images of misuse of WAVs).

- Testimony of Richard Zhou.

213.    The average wait time for Access mode rides in New York City between January 2017 and January 2021 was 10.8 minutes.[134]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.

214.    The average completion rate for Access mode rides in New York City between January 2017 and January 2021 was 72 percent.[135]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.

---

[134] Corrected Expert Report, at 27; Demand 2021-09-20.
[135] Corrected Expert Report, at 27; Demand 2021-09-20.

The evidence shows that Lyft meets current regulatory requirements in New York City.

- Testimony of Isabella Gerundio.

215.    Based on Lyft's data, the average number of drivers per month on Access Mode in New York City was 7 in 2017, 6 in 2018, 279 in 2019, 926 in 2020, and 1,227 in 2021.[136]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.

The witness testimony established that a large part of the increase in drivers on the Lyft platform in New York City was due to unique local regulations and conditions.

- Testimony of Asaf Bar Selinger.

## IX.    Because Regulators Outside Of New York City Are Less Demanding, Lyft Provides Markedly Worse WAV Service In The Access Regions Other Than New York City.

216.    In each of the Access Regions outside of New York City, Lyft requires users to enable the Access mode toggle to request a WAV.

**Lyft's Response**:  Witness testimony explained that riders need only navigate to the setting page to activate Access mode once, and it will remain activated, for all regions, going forward.

- Testimony of Isabella Gerundio.

217.    Despite Lyft's knowledge that removing the toggle in New York City increased ridership in New York City, Lyft has not removed the toggle in any other Access Region.

---

[136] Supply 2021-02-26.

**Lyft's Response**: No evidence is cited in support of this proposed fact. The proposed fact does not accurately reflect Lyft's analysis of the "toggle."

The evidence establishes that Lyft has not removed the "toggle" in other Access regions for several valid reasons, including that Lyft saw an increase in the number of people who do not need WAVs request Access mode after the toggle's removal in New York City, and that the removal would have an adverse impact on the availability of supply of WAVs in other Access Regions. Access mode misuse means that riders who need a WAV for transportation end up waiting longer for a ride or not getting a ride at all.

- Testimony of Isabella Gerundio.

218.    Ms. Gerundio acknowledged that Lyft has no reason to believe that a similar increase in ridership would not happen in other Access Regions.[137]

**Lyft's Response**: This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. *See* LRPF No. 217.

A.    **In Phoenix, Portland, Philadelphia, Chicago, and Dallas, Lyft Provides The Bare Minimum Of Service Necessary To Meet Regulatory Requirements.**

219.    In Phoenix, Lyft is required to offer WAV pickups at the Phoenix Sky Harbor airport to offer service in the area.[138]

**Lyft's Response**:  The proposed fact misstates the May 2020 document on which it relies. That document states Lyft goes beyond regulatory requirements in Phoenix, where there was "originally an airport compliance obligation to provide WAV pickups at PHX Sky Harbor airport," but that Lyft voluntarily "expanded to rides in all of Maricopa County" in order to improve rider experience.

---

[137] Gerundio Dep. Tr. 139:13-23.
[138] LYFT00032148.

220.     Lyft is required to ensure WAV rides have a wait time of 30 minutes or under.[139]

**Lyft's Response**:  The proposed fact misstates the May 2020 document on which it relies. The document states that the compliance element (related to the airport, as set forth above) requires 30-minute wait times, service "24/7," 90% completion rates, and that "service must mirror airport hours of operation."

221.     The average wait time for Access mode rides in Phoenix between January 2017 and January 2021 was 31.8 minutes.[140]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. Lyft has no further response or objection to this proposed fact.

222.     The average completion rate for Access mode rides in Phoenix between January 2017 and January 2021 was 27 percent.[141]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.

223.     Based on Lyft's data, the average number of drivers per month on Access Mode in Phoenix, Arizona was 10 in 2017, 12 in 2018, 21 in 2019, 9 in 2020, and 7 in 2021.[142]

**Lyft's Response**: Lack of foundation for a witness with personal knowledge regarding the cited materials, which consist of several years of uninterpreted Lyft ride data.

---

[139] LYFT00032148.
[140] Corrected Expert Report, at 27; Demand 2021-09-20.
[141] Corrected Expert Report, at 27; Demand 2021-09-20.
[142] WAV 2021-02-26.

Fed. R. Evid. 401-403, 602. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.

224.    In Phoenix, Lyft uses the Partner model.

   **Lyft's Response**:  The evidence establishes that, for a period of time in 2019 and 2020, Lyft also had a pilot program with IC drivers, who procured WAVs through a third-party rental provider. The costs of acquisition of those vehicles were born by the third-party.

   • Testimony of Dr. Marc Rysman regarding his rebuttal report.

225.    In Phoenix, Partner drivers were allowed to cross-dispatch in 27 of the 49 months for which Lyft provided data.  During the months where cross-dispatching was allowed, the average wait time for WAV service was two minutes less than months where no cross-dispatching was allowed.  The completion rate for Access mode was fourteen percent higher in months with cross-dispatching than months without cross-dispatching.  Lyft's calculated average cost of providing WAV service was $187 per ride in months with cross-dispatching and $316 in months without cross-dispatching.[143]

   **Lyft's Response**:  *See* LRPF No. 165.

   The evidence does not support the proposed fact. Lyft's expert, Dr. Marc Rysman, testified that Plaintiffs' expert "misunderstands the data." Partner drivers were not cross-dispatched in Phoenix, rather, a third-party firm (VMI) made WAVs available to IC drivers for a subsidized rate. The calculation of the cost per ride did not include "the cost of the WAVs that were part of the pilot."

   • Testimony of Dr. Marc Rysman regarding his rebuttal report and Exhibit D-54 (Expert Rebuttal Report – Figure 2).

_____

[143] Corrected Expert Report, at 78; Demand 2021-09-20; WAV 2021-02-26.

226.    Lyft was able to profitably offer Access mode in Phoenix during December of 2019, one of the months in which Lyft allowed its Partner WAV drivers to cross-dispatch.[144]

    **Lyft's Response**:  *See* LRPF No. 166. The evidence does not support the proposed fact. Dr. Rysman testified that "this calculation did not account for the cost of the WAVs that were part of [an IC] pilot" and "during December 2019, Lyft covered this cost for five WAVs provided by VMI," which means that in December 2019, "Lyft did not earn a profit and in fact incurred a loss of $4,861 in that month."

        • Testimony of Dr. Marc Rysman regarding his rebuttal report.

227.    In Portland, Oregon, regulators require Lyft to meet a 30-minute wait time for every WAV ride requested and receives a subsidy of $15 per ride under 30 minutes.[145]

    **Lyft's Response**:  The proposed fact does not accurately reflect the May 2020 document on which it relies. That document explains that, in Portland, in addition to "100% of all rides from city of Portland" being performed "within 30 minutes" that there must be service "24/7," and "fares cannot exceed [that of] non-WAV rides."

228.    Lyft utilizes the Partner model in Portland.[146]

    **Lyft's Response**:  Lyft has no response or objection to this proposed fact.

229.    The average wait time for Access mode rides in Portland between January 2017 and January 2021 was 28.8 minutes.[147]

    **Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R.

---

[144] Corrected Expert Report, at 78; Demand 2021-09-20; WAV 2021-02-26.
[145] LYFT00032148.
[146] LYFT00032148.
[147] Corrected Expert Report, at 27; Demand 2021-09-20.

Evid. 702. This proposed fact has no relevance to the legal issues discussed below. Fed. R.

Evid. 401-403.

230.    The average completion rate for Access mode rides in Portland between January

2017 and January 2021 was 71 percent.[148]

> **Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the

> trier of fact, and not based on the application of discernable principles or methods. Fed. R.

> Evid. 702. This proposed fact has no relevance to the legal issues discussed below. Fed. R.

> Evid. 401-403.

231.    Based on Lyft's data, the average number of drivers per month on Access Mode in

Portland, Oregon was 6 in 2017, 9 in 2018, 14 in 2019, 14 in 2020, and 16 in 2021.[149]

> **Lyft's Response**: Lack of foundation for a witness with personal knowledge

> regarding the cited materials, which consist of several years of uninterpreted Lyft ride data.

> Fed. R. Evid. 401-403, 602. This proposed fact has no relevance to the legal issues discussed

> below. Fed. R. Evid. 401-403.

232.    Portland is one of the few Access Regions where Lyft experimented with a cross-

dispatch program.[150]

> **Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the

> trier of fact, and not based on the application of discernable principles or methods. Fed. R.

> Evid. 702. Lyft has no further response or objection to this proposed fact.

233.    In Portland, Partner drivers were allowed to cross-dispatch in nine of the 49 months

for which Lyft provided data.  During the months where cross-dispatching was allowed, the average

---

[148] Corrected Expert Report, at 27; Demand 2021-09-20.
[149] Supply 2021-02-26.
[150] Corrected Expert Report, at 79-80.

wait time for WAV service was one minute longer than months where no cross-dispatching was allowed. The completion rate for Access mode was thirteen percent higher in months with cross-dispatching than months without cross-dispatching. Lyft calculates that the average cost of providing WAV service was $60 per ride in months with cross-dispatching and $129 in months without cross-dispatching.[151]

> **Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. *See* LRPF No. 167.

234.    In Philadelphia, TNCs, including Lyft and Uber, are required to have an aggregate number of 70 WAV drivers.[152]

> **Lyft's Response**: Lyft has no response or objection to this proposed fact.

235.    Based on Lyft's data, the average number of drivers per month on Access Mode in Philadelphia was 20 in 2017, 18 in 2018, 23 in 2019, 27 in 2020, and 26 in 2021.[153]

> **Lyft's Response**: Lack of foundation for a witness with personal knowledge regarding the cited materials, which consist of several years of uninterpreted Lyft ride data. Fed. R. Evid. 401-403, 602. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.

236.    In Philadelphia, Lyft uses the IC model and pays its drivers a per-ride bonus of $30 per completed ride.[154]

---

[151] Corrected Expert Report, at 78; Demand 2021-09-20; WAV 2021-02-26.
[152] LYFT00032148.
[153] WAV 2021-02-26.
[154] LYFT00032148.

**Lyft's Response**:  The proposed fact is misleading and incomplete. The May 2020 document states that, in Philadelphia, there was a "$30/ride bonus + $80 for 20 hours online, $200 for 40 hours, hourly bonus only valid if driver has < 2 lapses." However, ride incentives are subject to change over time.

237.     The average wait time for Access mode rides in Philadelphia between January 2017 and January 2021 was 15.9 minutes.[155]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.

238.     The average completion rate for Access mode rides in Philadelphia between January 2017 and January 2021 was 44 percent.[156]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.

239.     In Chicago, Lyft is required to provide WAV service through its own independent contractor drivers or through a service agreement with a WAV dispatcher.[157]

**Lyft's Response**:  The proposed fact misstates the May 2020 document on which it relies. The document states that, in Chicago, there is a "loose regulatory requirement to 'enhance service' for individuals with disabilities," and that Lyft has received "feedback

---

[155] Corrected Expert Report, at 27; Demand 2021-09-20.
[156] Corrected Expert Report, at 27; Demand 2021-09-20.
[157] LYFT00032148.

about ETA from City regarding < 15 minutes ETAs." Lyft has elected to use "organic driver supply + Open Door Organization (ODO) taxis" which "provides drivers & training" to provide a supply of WAVs on the platform.

240.    Lyft allows WAV taxi drivers to be included as IC WAV drivers in Chicago.[158]

**Lyft's Response**:  *See* LRPF No. 239.

The proposed fact is incomplete. The May 2020 document on which it relies states that: "ODO [taxi] drivers are NOT cross-dispatched (90%); non-ODO drivers are only paid the per-ride fee and are cross-dispatched (10%)." Thus, these IC taxi WAV drivers act differently than other IC WAV drivers, in that they are not cross-dispatched, and pick up exclusively WAV rides.

241.    Based on Lyft's data, the average number of drivers per month on Access Mode in Chicago, Illinois was 20 in 2017, 23 in 2018, 28 in 2019, 24 in 2020, and 23 in 2021.[159]

**Lyft's Response**: Lack of foundation for a witness with personal knowledge regarding the cited materials, which consist of several years of uninterpreted Lyft ride data. Fed. R. Evid. 401-403, 602. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. Lyft has no further response or objection to this proposed fact.

242.    Lyft receives a subsidy from the City of Chicago of $30 per completed WAV ride with a wait time of 20 minutes or less or $15 per completed WAV ride with a wait time between 21 and 35 minutes.[160]

---

[158] LYFT00032148.
[159] WAV 2021-02-26.
[160] LYFT00032148.

**Lyft's Response**:  The proposed fact is based on a document dated May 2020, which provides that the subsidy Lyft received from the City of Chicago was $30 per ride. The document does not reflect how long that subsidy was to continue.

243.    The average wait time for Access mode rides in Chicago between January 2017 and January 2021 was 17.6 minutes.[161]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.

244.    The average completion rate for Access mode rides in Chicago between January 2017 and January 2021 was 43 percent.[162]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.

245.    In Dallas, Lyft began offering Access Mode because the state of Texas required TNCs to offer WAV service in one of Texas' largest markets.[163]

**Lyft's Response**:  The document relied on does not support this proposed fact. Texas regulations set forth the specific regulatory requirement. The May 2020 document simply states "that there was no compliance requirement as of June 2020."

---

[161] Corrected Expert Report, at 27; Demand 2021-09-20.
[162] Corrected Expert Report, at 27; Demand 2021-09-20.
[163] LYFT00032148.

246.    During Lyft's initial efforts of offering Access mode in Dallas, Mr. Wu expressed concern that if Lyft were to "run a successful WAV program in Dallas," the "price of success" could be that the Texas legislature may require Lyft to "replicate this model across other cities."[164]

Lyft's Response: The materials relied on are inadmissible hearsay. Fed. R. Evid. 801-803. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. One inadmissible email from February 2018, speculating about the Texas legislature's response to Lyft's WAV program, is irrelevant to this matter.

247.    Lyft offers Access mode in Dallas using the Partner model.

Lyft's Response:  Lyft has no response or objection to this proposed fact.

248.    Lyft offers no incentives or bonuses for drivers in Dallas.[165]

Lyft's Response: This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. In Dallas "there are no current active IC drivers. So there is no incentive or...bonus." Lyft uses the Partner model in Dallas. It does not rely on "bonuses" or "incentives" to influence rider behavior there, as the drivers are employed by a third-party company. Lyft can contractually specify locations for the vehicles and ask the Partner to instruct drivers solely to drive in Access mode.

- Gerundio Depo. 141:6-13.

- Testimony of Isabella Gerundio and Trial Exhibit 7.

249.    The average wait time for Access mode rides in Dallas between January 2017 and January 2021 was 22.2 minutes.[166]

---

[164] LYFT_ILRC00011992.
[165] Gerundio Dep. Tr. 141:6-13.
[166] Corrected Expert Report, at 27; Demand 2021-09-20.

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.

250.    The average completion rate for Access mode rides in Dallas between January 2017 and January 2021 was 47 percent.[167]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.

251.    Based on Lyft's data, the average number of drivers per month on Access Mode in Dallas, Texas was 4 in 2017, 4 in 2018, 4 in 2019, 5 in 2020, and 4 in 2021.[168]

**Lyft's Response**: Lack of foundation for a witness with personal knowledge regarding the cited materials, which consist of several years of uninterpreted Lyft ride data. Fed. R. Evid. 401-403, 602. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.

**B.    In San Francisco, Los Angeles, and Boston, Lyft Only Provides Service To Receive Government Subsidies.**

252.    In California, Lyft only offers Access mode in San Francisco County and Los Angeles County.

**Lyft's Response**:  Lyft has no response or objection to this proposed fact.

---

[167] Corrected Expert Report, at 27; Demand 2021-09-20.
[168] WAV 2021-02-26.

253.    In San Francisco and Los Angeles, Lyft receives financial incentives from the California Public Utilities Commission ("CPUC") to offer WAV service.

**Lyft's Response**:  Testimony established that the "incentives" Lyft receives are in the form of offsets for the amounts spent on its WAV program.

- Testimony of Isabella Gerundio.

- Testimony of Richard Zhou.

254.    The CPUC requires Lyft to collect a ten-cent "Access fee" on every ride on the App in California.  Lyft is allowed to recoup the Access fee, up to the amount expended on WAV service, collected in a particular county if Lyft offers WAV service in that county and meets wait time, trip completion, and other standards set by the CPUC.

**Lyft's Response**:  Lyft has no response or objection to this proposed fact.

255.    As of the second quarter of 2022, Lyft was required to meet the standard of 50 percent of its Access mode rides under a 15-minute wait time and 80 percent of its Access mode rides under a 30-minute wait time in San Francisco.[169]

**Lyft's Response**: The document relied on in support of this proposed fact states that those are the service levels which Lyft must meet to qualify for offsets; they are not "requirements." Lyft is permitted to elect not to provide Access mode in California.

256.    As of the second quarter of 2022, Lyft was required to meet the standard of 50 percent of its Access mode rides under a 25-minute wait time and 80 percent of its Access mode rides under a 50-minute wait time in Los Angeles.[170]

---

[169] Public Utilities Commission of the State of California, Decision 21-11-004, Order Instituting Rulemaking to Implement Senate Bill 1376 Requiring Transportation Network Companies to Provide Access for Persons with Disabilities, Including Wheelchair Users who need a Wheelchair Accessible Vehicle, at 56-57 (Nov. 4, 2021).
[170] *Id.*

**Lyft's Response**: The document relied on in support of this proposed fact states that those are the service levels which Lyft must meet to qualify for offsets; they are not "requirements." Lyft is permitted to elect not to provide Access mode in California.

257.    Each quarter, the requirements increase by a few percentage points (*e.g.*, 50% and 80% in Q2 of 2022, 54% and 81% in Q3 of 2022).[171]

**Lyft's Response**: The document relied on in support of this proposed fact states that those are the service levels which Lyft must meet to qualify for offsets. Lyft is permitted to elect not to provide Access mode in California.

258.    All Lyft rides taken in every other California county are subject to the "Access fee." However, Lyft refuses to offer WAV service outside of San Francisco County and Los Angeles County and is unable to recoup the ten-cent "Access fee" collected on every ride outside of those counties.

**Lyft's Response**: No evidence is cited in support of this proposed fact.

The evidence does not support a finding that Lyft "refuses" to offer WAV service outside of San Francisco County and Los Angeles County.

Witness testimony established that Lyft analyzed the amount of offsets that were available in additional counties and the cost to provide Access mode service that would meet the standards for offset and determined that it would not be feasible to offer qualifying service in other areas of the state.

- Testimony of Isabella Gerundio.

259.    Lyft utilizes the Partner model in San Francisco and Los Angeles Counties.

**Lyft's Response**: Lyft has no response or objection to this proposed fact.

---

[171] *Id.*

260.    Lyft does not allow IC WAV drivers to operate on Access mode in San Francisco or Los Angeles.

**Lyft's Response**:  There is no evidence cited in support of this proposed fact. In reality, the testimony of Lyft witnesses established that Lyft does not allow IC WAV drivers on the platform in San Francisco and Los Angeles for two reasons: (1) CPUC training and inspections requirements made it difficult for Lyft to "onboard" WAV drivers in those areas and (2) due to strict, and often changing, regulatory standards in California, Lyft prefers to have greater control of the drivers that provide WAV service in those areas through the Partner model.

- Testimony of Isabella Gerundio.

261.    Rather, Lyft sometimes operates in the entire county of San Francisco with two WAV vehicles.  Because these vehicles are not allowed to cross-dispatch and, due to Lyft's suppression of demand via the toggle and other mechanisms, Lyft often receives as few as one or two requests for WAV trips in San Francisco.  Lyft's WAV drivers may be online for 17 hours a day and only provide one or two rides.  As a result, in San Francisco, Lyft is often paying its WAV partners approximately $60 per hour per driver to sit in a WAV and not provide any rides.  Lyft's practices in San Francisco demonstrate why Lyft reports its cost per WAV ride in San Francisco as $1,186.66,[172] which is more than three times more expensive than any other Access Region.  For instance, if a driver was online for 17 hours a day and only provided one WAV trip, Lyft's cost for the driver would be approximately $1,020, while that driver gave a single WAV ride yielding an average of $15.  The astronomical and inefficient cost that Lyft endures in San Francisco is not present anywhere else.

---

[172] Corrected Expert Report, at 27.

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702.

The evidence does not support this proposed fact. Witness testimony confirmed that Lyft has experimented with cross-dispatching Partner WAVs but has determined that the benefits in cost-savings are often outweighed by the negative impacts on service levels. In San Francisco and Los Angeles, in order to qualify for financial offsets, it must meet strict wait time and improvement standards. In Quarter 4, 2019, Lyft missed the standard for offsets in Los Angeles by less than forty seconds. It has missed the standard for offsets in San Francisco by just a few percentage points on multiple occasions. Because small increases in wait times can have high financial costs, Lyft does not cross-dispatch its Partner WAVs in San Francisco.

There is no evidentiary support for the argument that Lyft's practices have resulted in high costs in San Francisco. Witnesses testified that Lyft launched WAV service in San Francisco and Los Angeles at the same time, in June 2019. In all respects, the steps Lyft took to launch Access mode in these two cities were the same: it used the Partner model, contracting with First Transit to provide WAV rides in both cities, and engaging in the same type of community outreach in both cities. But demand for Lyft's Access mode in the two cities was very different. In San Francisco, demand remained flat, resulting in a very high cost-per-ride, whereas in Los Angeles, demand increased steadily over time.

Lyft has increased the number of vehicles in Los Angeles as a result, so the overall amount Lyft has spent is approximately 2.5 times higher in Los Angeles than San Francisco. However, the cost per ride in Los Angeles is generally less than one third of what Lyft spends per ride in San Francisco.

San Francisco is not the only market where providing WAV rides is expensive. According to the analysis of Plaintiffs' own expert, the amount Lyft loses, on average, for every WAV ride is $157.35. In Los Angeles, it is $264.34.

- Testimony of Isabella Gerundio.

262.    The average wait time for Access mode rides in San Francisco between January 2017 and January 2021 was 16.2 minutes.[173]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.

263.    The average completion rate for Access mode rides in San Francisco between January 2017 and January 2021 was 81 percent.[174]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.

264.    The average wait time for Access mode rides in Los Angeles is between January 2017 and January 2021 was 27.6 minutes.[175]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R.

---

[173] Corrected Expert Report, at 27; Demand 2021-09-20.
[174] Corrected Expert Report, at 27; Demand 2021-09-20.
[175] Corrected Expert Report, at 27; Demand 2021-09-20.

Evid. 702. This proposed fact has no relevance to the legal issues discussed below. Fed. R.

Evid. 401-403.

265.    The average completion rate for Access mode rides in Los Angeles is between

January 2017 and January 2021 was 48 percent.[176]

        **Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the

trier of fact, and not based on the application of discernable principles or methods. Fed. R.

Evid. 702. This proposed fact has no relevance to the legal issues discussed below. Fed. R.

Evid. 401-403.

266.    Based on Lyft's data, the average number of drivers per month on Access Mode in

Los Angeles, California was 11 in 2019, 19 in 2020, and 19 in 2021.[177]

        **Lyft's Response**: Lack of foundation for a witness with personal knowledge

regarding the cited materials, which consist of several years of uninterpreted Lyft ride data.

Fed. R. Evid. 401-403, 602. This proposed fact has no relevance to the legal issues discussed

below. Fed. R. Evid. 401-403.

267.    Based on Lyft's data, the average number of drivers per month on Access Mode in

San Francisco, California was 10 in 2019, 12 in 2020, and 6 in 2021.[178]

        **Lyft's Response**: Lack of foundation for a witness with personal knowledge

regarding the cited materials, which consist of several years of uninterpreted Lyft ride data.

Fed. R. Evid. 401-403, 602. This proposed fact has no relevance to the legal issues discussed

below. Fed. R. Evid. 401-403.

---

[176] Corrected Expert Report, at 27; Demand 2021-09-20.
[177] Supply 2021-02-26.
[178] Supply 2021-02-26.

268.    In Boston, Lyft receives financial incentives from the Massachusetts Bay Transportation Authority ("MBTA") to offer WAV service for the MBTA's paratransit program.[179]

**Lyft's Response**:  Lyft has no response or objection to this proposed fact.

269.    In Boston, Lyft received subsidies, of up to $30 per hour, for paratransit and consumer WAV rides.[180]

**Lyft's Response**:  The proposed fact is incomplete. The document indicates that the subsidy was eliminated as of May 2020.

270.    Lyft offers Access mode service in Boston through a combination of the Partner model and approximately 10-12 independent contractor drivers.[181]

**Lyft's Response**:  The proposed fact is not supported by the May 2020 document on which it relies. The document states that Lyft uses the Partner and IC model, but the underlying document does not confirm the number of IC drivers operating in Boston, which may change over time.

271.    Lyft is required to offer 900 hours of WAV service a week.[182]

**Lyft's Response**:  Lyft witnesses testified that, while the May 2020 document reflected a "requirement" of 900 hrs per week, that was an internal target drawn from the contractual requirement of 500 to 1500 hours of weekly WAV supply hours, to be set at Lyft's discretion.

- Testimony of Isabella Gerundio

---

[179] LYFT00032148.
[180] *Id.*
[181] *Id.*
[182] *Id.*

272.     Based on Lyft's data, in 2018, it averaged approximately 872 hours of WAV service a month, or approximately 203 hours of WAV service a week.[183]

**Lyft's Response**: Lack of foundation for a witness with personal knowledge regarding the cited materials, which consist of several years of uninterpreted Lyft ride data. Fed. R. Evid. 401-403, 602. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.

273.     Based on Lyft's data, in 2019, it averaged approximately 2,673 hours of WAV service a month, or approximately 621 hours of WAV service a week.[184]

**Lyft's Response**: Lack of foundation for a witness with personal knowledge regarding the cited materials, which consist of several years of uninterpreted Lyft ride data. Fed. R. Evid. 401-403, 602. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.

274.     Based on Lyft's data, in 2020, it averaged approximately 2,738 hours of WAV service a month, or approximately 636 hours of WAV service a week.[185]

**Lyft's Response**: Lack of foundation for a witness with personal knowledge regarding the cited materials, which consist of several years of uninterpreted Lyft ride data. Fed. R. Evid. 401-403, 602. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.

275.     Based on Lyft's data, between January 2017 and January 2021, it operated three total months (October 2019, January 2020, and March 2020) where it averaged more than 900 hours of WAV service per week.[186]

---

[183] Supply 2021-02-26.
[184] Supply 2021-02-26.
[185] Supply 2021-02-26.
[186] Supply 2021-02-26.

**Lyft's Response**: Lack of foundation for a witness with personal knowledge regarding the cited materials, which consist of several years of uninterpreted Lyft ride data. Fed. R. Evid. 401-403, 602. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.

276.     The average wait time for Access mode rides in Boston between January 2017 and January 2021 was 19.2 minutes.[187]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.

277.     The average completion rate for Access mode rides in Boston between January 2017 and January 2021 was 62 percent.[188]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.

278.     Based on Lyft's data, the average number of drivers per month on Access Mode in Boston, Massachusetts was 4 in 2017, 10 in 2018, 21 in 2019, 24 in 2020, and 18 in 2021.

**Lyft's Response**: No evidence is cited in support of this proposed fact. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.

---

[187] Corrected Expert Report, at 27; Demand 2021-09-20.
[188] Corrected Expert Report, at 27; Demand 2021-09-20.

**X.**    **Lyft Refuses To Provide Any WAV Service In 96% Of Lyft's Service Regions.**

279.    Lyft uniquely and categorically precludes WAVs from appearing on the App outside of Lyft's nine Access Regions (where Lyft only provides WAV services because of local regulations). Instead of facilitating a reasonable number of WAVs, Lyft's policies impose vehicle-type restrictions that actively discourage its drivers from acquiring and operating WAVs on its app.

**Lyft's Response**:  This is not a "fact," it is legal argument.

There is no evidence supporting a conclusion that Lyft "uniquely" or "categorically" precludes WAVs from appearing on the App in non-Access regions. Lyft witnesses testified that there are several specialized modes which Lyft does not make available in every region. In evaluating where to offer specialized modes, Lyft considers the likely available supply and demand for the mode in that region.

There is no evidence that establishes that there is any policy which would "facilitate" a "reasonable number of WAVs," or that any "vehicle-type" restrictions "discourage" drivers from acquiring WAVs.

To the contrary, the evidence shows that WAVs are very expensive and rare. WAVs are not mass-produced to be sold at car dealerships, but instead are created by taking an existing vehicle (such as a Toyota Sienna or a Chrysler Pacifica) and modifying them to lower the floor and add specialized equipment, such as a wheelchair ramp and wheelchair securement device. The modifications needed to create WAVs can add tens of thousands of dollars to the overall cost of the vehicle, which means that most people are not likely to incur these additional costs unless they or their family members need a WAV.

- Testimony of Richard Zhou.

- Testimony of Asaf Bar Selinger.

- Testimony of Isabella Gerundio.

280.    Lyft's employees have not performed studies or analyses to determine whether Lyft could offer Access mode in any of the non-Access Regions.[189]

**Lyft's Response**: This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.  The cited evidentiary support, deposition testimony regarding advertising for drivers out of the Access regions, does not support the proposed fact. There is no evidence to establish that any "studies or analyses" to determine whether Lyft could offer Access mode in any particular non-Access Region would have resulted in the discovery of a reliable method to offer WAV service on the Lyft platform there, which was not unreasonably costly.

Lyft witnesses testified that they have extensive experience, in Access mode regions, of attempting to find WAV supply for the platform. Based on that experience Lyft has concluded that the supply for a ridesharing platform is inherently local and that procuring a reliable WAV supply is difficult and expensive.

- Testimony of Isabella Gerundio.

281.    Lyft's employees have not performed a study of the supply of WAVs in the non-Access Regions.[190]

**Lyft's Response**: This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.

 This proposed fact is misleading and irrelevant. Plaintiffs' expert, Claudia Stern, testified that she did not "do research on the prevalence of WAVs in the U.S." There is no evidence to establish that any "study" of the "supply of WAVs in the non-Access Regions" would have resulted in the discovery of any WAV supply owned by or otherwise available to

---

[189] Chan Dep. Tr. 134:2-7.
[190] Gerundio Dep. Tr. 116:11-22, 199:21-200:1, 200:8-24.

drivers interested in driving on the Lyft platform. Indeed, Plaintiffs' expert Alex Elegudin confirmed that there is no readily available information regarding the supply of individually-owned WAVs nationwide, and that he does not know how many WAVs are owned by individuals with disabilities or by drivers who want to drive WAVs on a ride-sharing platform.

- Deposition of Claudia Stern ("Stern Depo.") 138:6-7.

- Elegudin Depo. at 181:10-25, 184:19-186:8.

282.    Ms. Gerundio's only "vague research" for a WAV supply involved searching for WAVs on "Cars.com".[191]  Notably, "Cars.com" does not have a WAV search feature.

**Lyft's Response**: This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.  *See* LRFP No. 281. There is no evidence to establish that there is another, better way for investigating WAV supply or that such other method would lead to the identification of a significant supply of WAVs that could be used to give rides on the Lyft platform.

The proposed fact is not supported by the deposition testimony. Specifically, Ms. Gerundio testified that the example of the search she did on "Cars.com" was an "oversimplification." She went on to testify that she tried looking up the number but was unsuccessful. She also testified to speaking with vendors on multiple occasions to understand the exact type and number of vehicles that they had but, in every instance, the number was low.

Ms. Gerundio testified at trial that she has investigated WAV supply in many locations, and is not aware of any independent WAV supply (that is, drivers with WAVs

---

[191] Gerundio Dep. Tr. 116:21-117:9.

willing to drive on the Lyft platform) even in the largest of cities, including San Francisco, Los Angeles, Atlanta, and Miami.

- Gerundio Depo. at 118:22-120:9

- Testimony of Isabella Gerundio.

283.    Lyft's employees have not performed a study of the demand for WAV service in the non-Access Regions.[192]

> **Lyft's Response**: This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.  This proposed fact is misleading and irrelevant. There is no evidence to establish that any "study" of the "demand for WAV service in the non-Access Regions" would have resulted in high numbers of potential WAV users.

> Witnesses testified that estimates of the demand for WAV service among the general population constitutes far less than 1% of the demand for Standard mode service. In Lyft's highest-demand region, New York City, WAV rides constitute only approximately 1 in every 1,000 rides on the Lyft platform. In Los Angeles, WAV rides constitute just 1 in every 5,000 rides on the platform.

- Testimony of Dr. Marc Rysman and supporting figures.

- Testimony of Isabella Gerundio.

- Testimony of Richard Zhou and Exhibit D-8 (Pivot Tables of Lyft Ride Data).

284.    Lyft's employees have admitted that Lyft will implement a nationwide WAV program if ordered by a Court.[193]

---

[192] Gerundio Dep. Tr. 121:12-23.
[193] Corrected Expert Report, at 45-46; Highly Confidential – Subject to Protective Order – Toggle Report 2021-02-26.csv ("Toggle 2021-02-26").

**Lyft's Response**: This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.

285.   Plaintiffs' experts project that Lyft is currently providing Access mode to approximately 36 percent of the individuals who attempt to turn on the Access mode toggle.[194]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. This is not a "fact." The experts' projections are not reliable.

286.   Plaintiffs' experts' projections indicate substantial unmet demand for Access mode.[195]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. This is not a "fact." The experts' projections are not reliable. *See* LRPF 283.

287.   Plaintiffs' experts project that approximately 1,862 drivers, or 6 drivers per Region, is necessary to offer Access mode in the non-Access Regions.[196]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. Moreover, this is not a "fact." The experts' projections are not reliable.

That six IC WAV drivers would be woefully inadequate to provide functional WAV service in regions hundreds of square miles large is evidenced by the testimony of Lyft witnesses, Lyft's expert, and common sense.

- Testimony of Dr. Marc Rysman and supporting figures.

- Testimony of Isabella Gerundio.

---

[194] Corrected Expert Report, at 45-46; Highly Confidential – Subject to Protective Order – Toggle Report 2021-02-26.csv ("Toggle 2021-02-26").
[195] Corrected Expert Report, at 45-46; Toggle 2021-02-26.
[196] Corrected Expert Report, at 37-38; Supply 2021-02-26.

- Testimony of Richard Zhou.

288.    Based on Lyft's data, WAV drivers attempted to drive in Access mode in 165 non-Access Regions in 2019 and 145 non-Access regions in 2020.[197]

**Lyft's Response**: Lack of foundation for a witness with personal knowledge regarding the cited materials, which consist of several years of uninterpreted Lyft ride data. Fed. R. Evid. 401-403, 602.

There is no evidence to support this proposed fact. No driver testified that he has a WAV and wants to drive his WAV on the Lyft platform in Westchester County. Witness testimony established that WAV drivers might appear in supply data in non-WAV regions for a variety of reasons, primarily due to the fact that they are driving a passenger from an Access region and crossing into a non-Access region. For example, a WAV driver in New York City may drive a passenger to White Plains and thus appear in the data as driving in Westchester County. There is no evidence from which to conclude that these drivers "attempted to drive" in Access mode in these regions, or that there is a supply of WAVs available to drive in these regions.

- Testimony of Richard Zhou.

289.    Based on Lyft's data, in 2019, WAV drivers attempted to drive in Access mode in non-Access Regions 7,006 times and, in 2020, WAV drivers attempted to drive in Access mode in non-Access Regions 18,032 times.[198]

**Lyft's Response**: Lack of foundation for a witness with personal knowledge regarding the cited materials, which consist of several years of uninterpreted Lyft ride data. Fed. R. Evid. 401-403, 602. *See* LRPF No. 288.

---

[197] Supply 2021-02-26.
[198] Supply 2021-02-26.

290.    Based on Lyft's data, in 2019 and 2020, the total number of attempts to drive in Access mode was higher in non-Access Regions than in Access Regions.[199]

**Lyft's Response**: Lack of foundation for a witness with personal knowledge regarding the cited materials, which consist of several years of uninterpreted Lyft ride data. Fed. R. Evid. 401-403, 602. *See* LRPF No. 288.

291.    Lyft's employees have admitted that Lyft will implement a nationwide WAV program if ordered by a Court.[200]

**Lyft's Response**: This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. That one former Lyft employee stated in response to an incomplete hypothetical that Lyft would comply with a Court order has no bearing on this case.

A.    **Lyft Refuses To Provide WAV Service In Westchester County, Despite Having More WAV Vehicles On Lyft's System In Westchester Than In Any Access Region Other Than New York City**.

292.    Vehicles driving for Lyft, including its WAVs, often start a ride in one Region with a destination in another Region.  For instance, if a user requested a ride with a pick-up location in Greenwich, Connecticut, and a destination in White Plains, New York, that user would begin their ride in the Bridgeport Region, "BDR" and end their ride in the Westchester County Region, "WES.".  As a result, many WAV drivers, who only pick up rides for Lyft in New York City, commonly drop off passengers in Westchester County, the Bridgeport Region, or other Regions nearby New York City.

---

[199] Supply 2021-02-26.
[200] *See* Chan Dep. Tr. 108:17- 109:9 ("If ordered by a Court to do so, will Lyft implement a nationwide WAVs program? . . .  I think that I would - - we would implement a program if legally required to.")

**Lyft's Response**: No evidence is cited in support of this proposed fact. Lyft has no further response or objection to this proposed fact.

293.     Based on Lyft's data, an average of 331 WAV drivers per month dropped off Access mode rides in Westchester County in 2020 which originated in New York City.[201]

**Lyft's Response**: Lack of foundation for a witness with personal knowledge regarding the cited materials, which consist of several years of uninterpreted Lyft ride data. Fed. R. Evid. 401-403, 602. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.

Evidence showed that New York City drivers licensed by the Taxi and Limousine Commission (TLC) are not permitted to pick up riders in Westchester County. Lyft applies this rule across the board, across all modes, including Standard, XL, and Access modes.

294.     Based on Lyft's data, in 2020, the monthly average of the number of drivers with Access mode destinations in Westchester County was greater than the number of Standard mode drivers in 115 of Lyft's 331 Regions.[202]

**Lyft's Response**: Lack of foundation for a witness with personal knowledge regarding the cited materials, which consist of several years of uninterpreted Lyft ride data. Fed. R. Evid. 401-403, 602. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.

295.     Based on Lyft's data, in 2019 and 2020, WAV drivers had Access mode destinations in ten Regions in New York State outside of New York City.[203]

---

[201] Supply 2021-02-26.
[202] Supply 2021-02-26.
[203] Supply 2021-02-26.

**Lyft's Response**: Lack of foundation for a witness with personal knowledge regarding the cited materials, which consist of several years of uninterpreted Lyft ride data. Fed. R. Evid. 401-403, 602. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.

296.     Based on Lyft's data, in 2020, five different non-Access Regions in New York, New Jersey, and Connecticut had a higher per-month average of Access mode drivers than each Access Region other than New York City.[204]

**Lyft's Response**: Lack of foundation for a witness with personal knowledge regarding the cited materials, which consist of several years of uninterpreted Lyft ride data. Fed. R. Evid. 401-403, 602. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.

297.     Lyft drivers in New York City who are licensed by the TLC are not permitted to start and end a ride in their TLC-licensed vehicle outside of New York City.  For instance, a TLC-licensed vehicle must either begin or end the ride in New York City; the TLC-licensed vehicle is not allowed to begin and end the ride in Westchester County.

**Lyft's Response**: No evidence is cited in support of this proposed fact.

While evidence shows that drivers in New York City, all of whom are licensed by the TLC, are not permitted to start and end a ride outside of New York City, it is not correct that drivers on the Lyft platform "must either begin or end the ride in New York City." For example, on the Lyft platform, drivers in any mode who end rides in Westchester County are not permitted to pick up rides in Westchester County. This is true for Access mode, Standard mode, and all other modes.

---

[204] Supply 2021-02-26.

- Testimony of Asaf Bar Selinger.

298.    When Lyft's Standard mode drivers originate rides in New York City with a destination in Westchester County, Lyft enables these drivers to pick up their next Standard mode ride in Westchester County as long as the destination of the ride is in New York City.

**Lyft's Response**: No evidence is cited in support of this proposed fact. The evidence does not support this proposed fact. *See* LRPF No. 297.

299.    However, Lyft does not allow its Access mode drivers to operate in the same manner.  Each of the 331 Lyft Access mode drivers each month who complete WAV rides in Westchester County are uniquely prohibited from offering an Access mode ride to an individual with a wheelchair whose desired destination is in New York City.

**Lyft's Response**: No evidence is cited in support of this proposed fact. The evidence does not support this proposed fact. *See* LRPF No. 297.

300.    Despite the large number of drivers who complete Access mode rides outside of New York City, Lyft prohibits these drivers from offering Access mode rides.

**Lyft's Response**:  *See* LRPF No. 297.

301.    To be clear, there were more WAVs on Access mode in Westchester County in January 2021 (the last month of Lyft's data) than the combined number of WAVs on Lyft's platform in all of the Access Regions, excluding New York City, which includes Boston (18), Chicago (23), Dallas (4), Los Angeles (19), Portland (16), Philadelphia (26), Phoenix (7), and San Francisco (6).[205]

**Lyft's Response**: Lack of foundation for a witness with personal knowledge regarding the cited materials, which consist of several years of uninterpreted Lyft ride data.

---

[205] Supply 2021-02-26.

Fed. R. Evid. 401-403, 602. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.

There is no logical basis for comparing the supply of IC WAV drivers driving from New York City into neighboring regions to drop off passengers to the supply of contracted Partner WAV drivers or IC WAV drivers in other regions.

In addition to being the largest city in the United States, New York City has unique regulations that lead to a much higher supply of WAVs on the platform there than in any other market.

- Testimony of Asaf Bar Selinger.

302.    Despite more than 500 WAV drivers being available to offer Access mode rides to residents of Westchester County in January 2021, Lyft prohibited these drivers from doing so.

**Lyft's Response**: No evidence is cited in support of this proposed fact. *See* LRPF No. 297.

There is no evidence that these drivers would be interested in providing WAV service in Westchester County. That is, there is no evidence that dropping off a passenger in one location is indicative of an interest in picking up additional passengers there.

To the contrary, the testimony confirms that IC WAV drivers tend to behave like drivers in Standard Mode, preferring to drive in areas of high ride demand, such as dense urban areas like New York City.

- Testimony of Richard Zhou.

303.    Based on Lyft's data, in 2019 and 2020, WAV drivers attempted to drive in Access mode in ten Regions in New York State outside of New York City.[206]

---

[206] Supply 2021-02-26.

**Lyft's Response**: Lack of foundation for a witness with personal knowledge regarding the cited materials, which consist of several years of uninterpreted Lyft ride data. Fed. R. Evid. 401-403, 602. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. *See* LRPF No. 288.

There is no evidence to support this proposed fact. Witness testimony established that WAV drivers might appear in supply data in non-WAV regions for a variety of reasons, primarily due to the fact that they are driving a passenger from a WAV region into a non-WAV region. There is no evidence from which to conclude that these drivers "attempted to drive" in Access mode in these regions, or that there is a supply of drivers with WAVs willing to pick up rides in these regions.

- Testimony of Richard Zhou.

304.    Based on Lyft's data, in 2020, five different non-Access Regions in New York, New Jersey, and Connecticut had a higher per-month average of WAV drivers on Access mode than each Access Region other than New York City.[207]

**Lyft's Response**: Lack of foundation for a witness with personal knowledge regarding the cited materials, which consist of several years of uninterpreted Lyft ride data. Fed. R. Evid. 401-403, 602. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. This statistic does nothing to establish an available supply of WAVs to drive on the Lyft platform.

Witness testimony established that WAV rides sometimes begin in Access Regions, but end outside of the boundaries of those regions, leading to WAVs appearing in data reports outside of Access Regions.

---

[207] Supply 2021-02-26.

- Testimony of Richard Zhou.

305.    Based on Lyft's data, there was an average number of drivers per month on Access Mode of more than 4 drivers for at least one year between 2017 and 2021 in the following Regions: Gary, Indiana; Orlando, Florida; Orange County, Florida; Manchester, New Hampshire; Allentown, Pennsylvania; Dutchess County, New York; Reading, Pennsylvania; New Haven, Connecticut; Elkhart, New York; the state of New Jersey; Suffolk County, New York; Bridgeport, Connecticut; Westchester County, New York; Nassau County, New York.[208]

> **Lyft's Response**: Lack of foundation for a witness with personal knowledge regarding the cited materials, which consist of several years of uninterpreted Lyft ride data. Fed. R. Evid. 401-403, 602. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. This statistic does nothing to establish an available supply of WAVs to drive on the Lyft platform.

> Witness testimony established that WAV rides sometimes begin in Access Regions, but end outside of those regions, leading to WAVs appearing in data reports outside of Access Regions. In addition, witness testimony established that small number of vehicles may appear in Access mode in non-Access Regions due to human error, where "Access mode" was erroneously activated outside of Access Regions.

- Testimony of Richard Zhou.

306.    Based on Lyft's data, outside of the Access Regions, there were 226 regions encompassing 49 states where drivers were identified as being on Access Mode between 2017 and 2021.[209]

---

[208] Supply 2021-02-26.
[209] Supply 2021-02-26.

**Lyft's Response**: Lack of foundation for a witness with personal knowledge regarding the cited materials, which consist of several years of uninterpreted Lyft ride data. Fed. R. Evid. 401-403, 602. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. *See* LRPF No. 305.

## XI.    Plaintiffs Propose Reasonable Modifications To Address Lyft's Discrimination.

### A.    Lyft Must Stop Blocking WAV Service In The 96% Of Its Regions Where It Currently Blocks All WAV Service.

307.    Plaintiffs' first proposed modification is to remove the current block in place on the App in the non-Access Regions, which prohibits Access mode from being available for drivers or riders.[210]

**Lyft's Response:** The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. Moreover, this is not a "fact."

The evidence confirms that this proposed modification is not sufficiently concrete and specific. Moreover, there is no evidence that this proposed modification would be effective in creating access to WAVs on the Lyft platform, or would create service that is sufficiently reliable to satisfy Plaintiffs. Finally, there is no evidence of the cost of this proposed modification.

Lyft will further respond to this proposal below in its response to Plaintiffs' Proposed Conclusions of Law.

308.    The effect of the block prevents WAV drivers from identifying as WAVs on the App and precludes riders from having the option to select WAVs, even when they are available.

---

[210] Corrected Expert Report, at 66.

115

**Lyft's Response**: No evidence is cited in support of this proposed fact. There is no evidence to establish that a "block" exists on the Lyft platform.

Lyft witnesses testified that there are several specialized modes which Lyft does not make available in every region. In evaluating where to offer specialized modes, Lyft considers the likely available supply and demand for the mode in that region. There is no evidence that any WAV driver was actually "blocked" from driving in Access mode on the Lyft platform.

- Testimony of Richard Zhou.

309.    In every Region where Lyft operates, Standard mode appears as an available ride mode when a user inserts their destination address.

**Lyft's Response**:  Lyft has no response or objection to this proposed fact.

310.    Lyft allows all drivers who meet Lyft's vehicle requirements to drive on Standard mode in the non-Access Regions.

**Lyft's Response**:  There is no evidence cited in support of this proposed fact. There are requirements for the driver in addition to vehicle requirements. *See* Proposed Fact ("PF") 154-155.

311.    Lyft allows all users to view available Standard mode vehicles on the App in the non-Access Regions.

**Lyft's Response**:  There is no evidence to support this proposed fact, specifically, no witness testified that when a user opens the App they can "view available Standard mode vehicles." Lyft witnesses testified that mode availability is presented after a rider enters their pick-up and drop-off locations. Riders are matched with one driver, they do not see all available drivers in an area.

- Testimony of Richard Zhou.

116

312.     Lyft does not restrict, alter, or remove Standard mode's availability in any Region where Lyft operates.

**Lyft's Response**:  This proposed fact is ambiguous. Lyft's Terms of Service specify that "Lyft reserves the right . . . to limit or eliminate access to the Lyft Platform for Rideshare Services in specific geographic areas and/or at specific times based on commercial viability, public health concerns, or changes in law."

- Testimony of Isabella Gerundio and Exhibit D-1 (Terms of Service).

313.     Lyft does not allow drivers with WAVs to drive on Access mode in the non-Access Regions.

**Lyft's Response**:  This proposed fact is circular and irrelevant. There is no Access-mode in non-Access regions.

Lyft admits it does not offer Access mode in non-Access regions. There is no evidence of a supply of drivers with WAVs who would drive on the Lyft platform in the non-Access regions in sufficient volumes to support functional service if Lyft were to allow Access mode to appear on its App in additional regions.

314.     Lyft does not allow passengers who require WAVs to request WAVs in non-Access Regions.

**Lyft's Response**:  This proposed fact is circular and irrelevant. There is no Access-mode in non-Access regions.

Lyft admits it does not offer Access mode in non-Access regions. There is no evidence of demand from riders who rely on WAVs who would regularly take rides in the non-Access regions in sufficient volumes to support functional service if Lyft were to allow Access mode to appear on its App in additional regions.

117

315.    If a driver with a WAV is in the same location as a rider who requires a WAV in a non-Access Region, there is no mechanism for the rider to request a WAV on the App.

**Lyft's Response**: This is true. Lyft does not offer Access mode in non-Access Regions. *See* LRPF Nos. 313-314.

**B.    Lyft Must Ask Drivers
Whether They Have WAVs During The Onboarding Process.**

316.    Plaintiffs' second proposed modification is to ask all drivers on Lyft's platform and those onboarding whether they have access to WAVs.

**Lyft's Response**:  This is not a "fact."  However, the evidence confirms that this proposed modification is not sufficiently concrete and specific. Moreover, there is no evidence that this proposed modification would be effective in creating access to WAVs on the Lyft platform, or would create service that is sufficiently reliable to satisfy Plaintiffs. Finally, there is no evidence of the cost of this proposed modification.

Lyft will further respond to this proposal below in its response to Plaintiffs' Proposed Conclusions of Law.

317.    When a driver applies to drive for Lyft, Lyft asks the drivers a series of questions about the driver and their vehicle in an "onboarding process."

**Lyft's Response**:  There is no evidence cited in support of this proposed fact. *See* LRPF No. 154.

318.    The onboarding process includes a survey that asks for basic information about the driver, including license information, a background check, Social Security number, and vehicle information.  In some markets, drivers' vehicles must pass an inspection, the driver must take a defensive driving course, or undergo a medical exam.

**Lyft's Response**:  There is no evidence cited in support of this proposed fact. *See* LRPF No. 155.

319.    Lyft asks prospective drivers all necessary information to determine whether a driver's vehicle meets Lyft's requirements to drive on Standard mode.

**Lyft's Response**:  There is no evidence cited in support of this proposed fact. *See* LRPF No. 156.

320.    Lyft does not currently ask its drivers whether their vehicle is a WAV or whether they have access to a WAV.

**Lyft's Response**:  This proposed fact is misleading. There is no evidence if Lyft asked drivers these questions, it would result in any WAVs on Lyft's platform, or would create service that is sufficiently reliable to satisfy Plaintiffs.

Lyft witnesses testified that they have surveyed drivers regarding WAV ownership in the past. One survey in the Philadelphia area sent a promotional text and in-app console card to over 26,000 drivers and resulted in just one additional WAV to drive on Lyft's platform.

- Testimony of Isabella Gerundio.

### C.    Lyft Must Remove The Toggle, Which Suppresses Demand For WAV Service.

321.    Plaintiffs' third proposed modification is to remove the toggle requirement in the Access Regions other than New York City to display WAVs on the App and automatically display Access mode on the App alongside other vehicle options.[211]

**Lyft's Response**:  This is not a "fact." However, the evidence confirms that this proposed modification is not sufficiently concrete and specific. Moreover, there is no evidence that this proposed modification would be effective in creating access to WAVs on the Lyft platform, or would create service that is sufficiently reliable to satisfy Plaintiffs. Finally, there is no evidence of the cost of this proposed modification.

---

[211] Corrected Expert Report, at 67-68.

Lyft will further respond to this proposal below in its response to Plaintiffs' Proposed Conclusions of Law.

322. The only step required for a user on the App to identify whether a Standard mode vehicle is available is to type in the address of their destination. Once a user inserts their destination address, any available Standard mode vehicle will automatically be displayed on the App.

**Lyft's Response**: There is no evidence to support this proposed fact, specifically, no witness testified that when a user "inserts their destination address, any available Standard mode vehicle will automatically be displayed on the App." Lyft witnesses testified that mode availability is presented after a rider enters their pick-up and drop-off locations. Riders are matched with one driver, they do not see all available drivers in an area.

- Testimony of Richard Zhou.

323. A user on the App is not required to engage in any additional steps on the App or to navigate to other screens on the App to request a Standard mode vehicle.

**Lyft's Response**: There is no evidence cited in support of this proposed fact. *See* LRPF No. 152.

324. In the Access Regions other than New York City, Lyft does not automatically list the WAV option on its home screen. Instead, Lyft requires users to enable the toggle by navigating to a separate settings page, activate the Access mode toggle, then return to the main screen where WAVs will appear below other ride modes.

**Lyft's Response**: There is no evidence cited in support of this proposed fact. *See* LRPF No. 152.

325. In the Access Regions other than New York City, nowhere on Lyft's home screen does Lyft notify users about their ability to request a WAV or how to enable Access mode.

120

**Lyft's Response**: There is no evidence cited in support of this proposed fact. *See* LRPF No. 153.

326.    New York City regulators ordered Lyft to remove the toggle because it "creates a barrier to knowing that a WAV option exists" and could "suppress[] trip demand."[212]

**Lyft's Response**: *See* LRPF No. 210.

327.    In or around September and October 2019, Lyft removed the toggle in New York City. Between August 2019 and December 2019, rides on Access mode increased by approximately 500 percent in New York City.[213]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. *See* LRPF No. 211-212.

**D.    Lyft Must Allow WAVs To Cross-Dispatch.**

328.    Plaintiffs' fourth proposed reasonable modification is to utilize cross-dispatching for all drivers.

**Lyft's Response**: This is not a "fact." However, the evidence confirms that this proposed modification is not sufficiently concrete and specific. Moreover, there is no evidence that this proposed modification would be effective in creating access to WAVs on the Lyft platform, or would create service that is sufficiently reliable to satisfy Plaintiffs. Finally, there is no evidence of the cost of this proposed modification.

Lyft will further respond to this proposal below in its response to Plaintiffs' Proposed Conclusions of Law.

---

[212] NYC Taxi and Limousine Commission, FHV COMPLIANCE WITH WHEELCHAIR ACCESSIBILITY REQUIREMENTS (Sept. 2019) at 12-13.
[213] Corrected Expert Report, at 67-68; Demand 2021-09-20.

329.    Lyft allows all independent contractors who drive on Lyft in any mode to cross-dispatch.

**Lyft's Response**:  There is no evidence cited in support of this proposed fact. *See* LRPF No. 160.

330.    Lyft allows IC WAV drivers to cross-dispatch on Access mode and Standard mode.

**Lyft's Response**:  There is no evidence cited in support of this proposed fact. *See* LRPF No. 160.

331.    Lyft does not allow Partner WAV drivers who drive on Access mode to cross-dispatch.

**Lyft's Response**:  There is no evidence cited in support of this proposed fact. *See* LRPF No. 161.

332.    In Phoenix, Partner drivers were allowed to cross-dispatch in 27 of the 49 months for which Lyft provided data.  During the months where cross-dispatching was allowed, the average wait time for WAV service was two minutes less than months where no cross-dispatching was allowed. The completion rate for Access mode was fourteen percent higher in months with cross-dispatching than months without cross-dispatching.  Lyft's calculated average cost of providing WAV service was $187 per ride in months with cross-dispatching and $316 in months without cross-dispatching.[214]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.

The evidence does not support the proposed fact. Lyft's expert, Dr. Marc Rysman, testified that Plaintiffs' expert "misunderstands the data." Partner drivers were not cross-

---

[214] Corrected Expert Report, at 78; Demand 2021-09-20; WAV 2021-02-26.

dispatched in Phoenix, rather, a third-party firm (VMI) made WAVs available to IC drivers for a subsidized rate. The calculation of the cost per ride did not include "the cost of the WAVs that were part of the pilot."

- Testimony of Dr. Marc Rysman regarding his rebuttal report and Exhibit D-54 (Rebuttal Report Figure 2)

333.    Lyft was able to profitably offer Access mode in Phoenix during December of 2019, one of the months in which Lyft allowed its Partner WAV drivers to cross-dispatch.

**Lyft's Response**:  There is no evidence cited in support of this proposed fact. *See* LRPF No. 166.

334.    In Portland, Partner drivers were allowed to cross-dispatch in nine of the 49 months for which Lyft provided data.  During the months where cross-dispatching was allowed, the average wait time for WAV service was one minute longer than months where no cross-dispatching was allowed.  The completion rate for Access mode was thirteen percent higher in months with cross-dispatching than months without cross-dispatching.  Lyft's calculated cost of providing WAV service was $60 per ride in months with cross-dispatching and $129 in months without cross-dispatching.[215]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. Lack of foundation for a witness with personal knowledge regarding the cited materials, which consist of several years of uninterpreted Lyft ride data. Fed. R. Evid. 401-403, 602. *See* LRPF No. 167.

**E.    Lyft Must Implement Prioritization Logic For Access Mode.**

335.    Plaintiffs' fifth proposed reasonable modification is that Lyft should implement

---

[215] Corrected Expert Report, at 78; Demand 2021-09-20; WAV 2021-02-26.

123

prioritization logic for Access mode.

**Lyft's Response**:  This is not a "fact."  However, the evidence confirms that this proposed modification is not sufficiently concrete and specific. Moreover, there is no evidence that this proposed modification would be effective in creating access to WAVs on the Lyft platform, or would create service that is sufficiently reliable to satisfy Plaintiffs. Finally, there is no evidence of the cost of this proposed modification.

Lyft will further respond to this proposal below in its response to Plaintiffs' Proposed Conclusions of Law.

336.    Prioritization logic directs Lyft's ride-matching algorithm to give priority to trip requests received for a particular ride mode.[216]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702.

This proposed fact is vague as to the meaning of "prioritization logic." Lyft witnesses testified that "prioritization logic" is a complicated set of rules and criteria used to match riders and drivers, that takes into account the location and availability of other drivers, what modes they are offering, and demand from other riders.

- Testimony of Richard Zhou.

337.    Ride requests that receive priority are serviced or assigned over other rides that are pending assignment on the App.

**Lyft's Response**: No evidence is cited in support of this proposed fact. This proposed fact is vague. *See* LRPF No. 336.

---

[216] Corrected Expert Report, at 81.

338.    Currently, Lyft only uses prioritization logic for Access mode in limited circumstances. In New York City, Lyft implemented prioritization logic for IC WAV drivers.  When a WAV driver is en route to a Standard mode request and an Access mode request is made within one minute of the Standard mode request, Lyft's algorithm reroutes the WAV driver to the Access mode request if the driver is the closest available WAV.[217]

      **Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. The evidence contradicts this proposed fact.

      For all Access Regions, Lyft witnesses testified that they have attempted to make Access mode rides the highest priority possible compared to other modes, assigning IC WAV drivers a WAV ride, even if the WAV passenger is farther away than a standard mode ride when the requests come in.

- Testimony of Richard Zhou.

339.    Prioritization logic enables substantial benefits for Access mode requests, with minimal effects on Standard mode requests.

      **Lyft's Response**:  There is no evidence cited in support of this proposed fact. In fact, the evidence establishes that changes to prioritization logic had a small impact on service levels in New York City.

- Testimony of Richard Zhou.

340.    Lyft has not implemented prioritization logic in a similar manner outside of New York City IC WAV drivers.

      **Lyft's Response**:  *See* LRFP No. 338.

---

[217] Corrected Expert Report, at 81.

**F.    Lyft Must Seriously Advertise And Market Access Mode.**

341.    Plaintiffs' sixth proposed modification is to increase marketing for Access mode and WAV service, including targeted advertising, to attract potential WAV drivers, as well as to increase awareness of WAVs on Lyft's platform among potential riders.

**Lyft's Response**:  This is not a "fact."  However, the evidence confirms that this proposed modification is not sufficiently concrete and specific. Moreover, there is no evidence that this proposed modification would be effective in creating access to WAVs on the Lyft platform, or would create service that is sufficiently reliable to satisfy Plaintiffs. Finally, there is no evidence of the cost of this proposed modification.

Lyft will further respond to this proposal below in its response to Plaintiffs' Proposed Conclusions of Law.

342.    Lyft spends hundreds of millions of dollars a year advertising and marketing its brand and Standard mode.[218]

**Lyft's Response**:  *See* LRPF No. 168.

343.    Lyft "believe[s] that much of the growth in [its] rider base and the number of drivers on [its] platform is attributable to [its] paid marketing initiatives."[219]

**Lyft's Response**:  *See* LRPF No. 169.

344.    Lyft's "marketing efforts currently include referrals, affiliate programs, free or discount trials, partnerships, display advertising, television, billboards, radio, video, content, direct mail, social media, email, hiring and classified advertisement websites, mobile 'push' communications, search engine optimization and keyword search campaigns."[220]

---

[218] Lyft, Inc., Annual Report (Form 10-K), Feb. 28, 2022, at 47; Corrected Expert Report, at 47.
[219] Lyft, Inc., Annual Report (Form 10-K), Feb. 28, 2022, at 35.
[220] Lyft, Inc., Annual Report (Form 10-K), Feb. 28, 2022, at 38; Corrected Expert Report, at 47.

Lyft's Response:  *See* LRPF No. 170.

345.    Lyft employees characterized Lyft's model for marketing WAVs as "do not promote WAV demand beyond offering Access Mode[.]"[221]

Lyft's Response:  *See* LRPF No. 171.

346.    For WAV-specific marketing in 2021, Lyft made available approximately $100,000 in coupons to disability rights organizations in certain Access Regions.

Lyft's Response:  There is no evidence cited in support of this proposed fact. *See* LRPF No. 173.

347.    Lyft's marketing and advertising for Access mode consists of giving ride coupons to disability rights organizations in San Francisco, Los Angeles, Dallas, and New York City in the hopes that those organizations would distribute the coupons to users.

Lyft's Response:  There is no evidence cited in support of this proposed fact. *See* LRPF No. 174.

348.    Lyft's marketing and advertising for Access mode did not involve in direct engagement or communication with users.

Lyft's Response:  There is no evidence cited in support of this proposed fact. *See* LRPF No. 176.

349.    Lyft's coupons for Access mode were not used by any users in San Francisco or New York City.

Lyft's Response:  There is no evidence cited in support of this proposed fact. *See* LRPF No. 177.

350.    In Dallas, Lyft did not have a very high success rate for use of the coupons.

---

[221] LYFT_ILRC00031902.

**Lyft's Response**:  There is no evidence cited in support of this proposed fact. *See* LRPF No. 178.

351.    The actual amount of spending on marketing and advertising for Access mode was far below the $100,000 budgeted in 2021.

**Lyft's Response**:  There is no evidence cited in support of this proposed fact. *See* LRPF No. 179.

352.    Lyft engages in no other marketing or advertising that is specific to Access mode**.**

**Lyft's Response**:  There is no evidence cited in support of this proposed fact. *See* LRPF No. 180.

**G.    Lyft Should Offer WAV Drivers
Bonuses And Incentives For Guaranteed Periods Of Time.**

353.    Plaintiffs' seventh proposed modification is to increase the supply of WAVs on its platform by offering potential drivers baseline bonuses and incentives for guaranteed periods of time

**Lyft's Response**:  This is not a "fact." However, the evidence confirms that this proposed modification is not sufficiently concrete and specific. Moreover, there is no evidence that this proposed modification would be effective in creating access to WAVs on the Lyft platform, or would create service that is sufficiently reliable to satisfy Plaintiffs. Finally, there is no evidence of the cost of this proposed modification.

Lyft will further respond to this proposal below in its response to Plaintiffs' Proposed Conclusions of Law.

354.     In 2021, Lyft recorded more than $1.3 billion in driver incentives, which included "minimum guaranteed payments, volume-based discounts and performance-based bonus payments."[222]

**Lyft's Response**:  *See* LRPF No. 182.

355.     Lyft does not offer consistent bonuses or incentives for Access mode drivers.[223]

**Lyft's Response**:  *See* LRPF No. 183.

356.     Lyft no longer offers bonuses and incentives to WAV drivers in Dallas or San Francisco.[224]

**Lyft's Response**:  *See* LRPF No. 184.

357.     Lyft reduced the per ride bonus available to WAV drivers in New York City from $30 per ride to $15 per ride.[225]

**Lyft's Response**:  *See* LRPF No. 185.

358.     Lyft could increase or offer consistent bonuses or incentives for Access mode drivers to increase the supply of WAVs on the App.

**Lyft's Response**:  There is no evidence cited in support of this proposed fact. *See* LRPF No. 186.

**H.     Lyft Should Include WAVs As An Option Within The Fleets Of Vehicles That It Owns And/Or Operates Through Subsidiaries.**

359.     Plaintiffs' seventh proposed modification is to include WAVs as an option in Lyft's Express Drive and FlexDrive programs.

---

[222] Lyft, Inc., Annual Report (Form 10-K), Feb. 28, 2022, at 88-89; Corrected Expert Report, at 47; Brian Sozzi, *Lyft Is on Track To Shell Out $1 Billion in Incentives To Lure Drivers*, YAHOO! NEWS (Aug. 4, 2021), https://news.yahoo.com/lyft-is-on-track-to-shell-out-1-billion-in-incentives-to-lure-drivers-171137108.html.

[223] Gerundio Dep. Tr. 144:23-145:2.

[224] Gerundio Dep. Tr. 141:6-13.

[225] Corrected Expert Report, at 73-74; Treger Dep. Tr. 29:15-22; Selinger Dep. Tr. 65:2-10.

**Lyft's Response**: This is not a "fact." In addition, this is Plaintiffs' second "seventh" proposed modification. The evidence confirms that this proposed modification is not sufficiently concrete and specific. Moreover, there is no evidence that this proposed modification would be effective in creating access to WAVs on the Lyft platform, or would create service that is sufficiently reliable to satisfy Plaintiffs. Finally, there is no evidence of the cost of this proposed modification.

Lyft will further respond to this proposal below in its response to Plaintiffs' Proposed Conclusions of Law.

360.    Express Drive and FlexDrive offer vehicles that drivers can use on Standard mode and other ride modes on the App.

**Lyft's Response**: There is no evidence cited in support of this proposed fact. *See* LRPF No. 189.

361.    Lyft can and does request or dictate the particular types of vehicles available to drivers through Express Drive and FlexDrive.[226]

**Lyft's Response**: *See* LRPF No. 190.

362.    Express Drive and FlexDrive do not offer WAVs as part of the rental programs.

**Lyft's Response**: There is no evidence cited in support of this proposed fact. *See* LRPF No. 191.

363.    Lyft employees previously proposed an initiative called Perseus, which would integrate WAVs into Express Drive and allow independent contractor drivers to rent WAVs at a similar price to renting non-WAVs.[227]

---

[226] Transcript of November 30, 2021 Deposition of Karim Bousta ("Bousta Dep. Tr."), 25:19-26:10, 72:5-76:4.
[227] Corrected Expert Report, at 57; LYFT0120393; LYFT_ILRC00009550.

**Lyft's Response**:  *See* LRPF No. 192.

364.    The Perseus program was projected to cost Lyft less than $5 million and allow Lyft to provide more than 500,000 rides in the United States at approximately $10.25 per ride.[228]

**Lyft's Response**:  *See* LRPF No. 193.

365.    Lyft did not pursue or attempt to pursue the Perseus program.[229]

**Lyft's Response**:  *See* LRPF No. 194.

366.    The projections of the Perseus program would allow Lyft to provide more WAV rides per year than it is currently offering at a lower cost per ride and lower total cost than Lyft's current WAV offerings.

**Lyft's Response**:  *See* LRPF No. 195.

**I.    Lyft Should Form
Partnerships With Transportation Companies That Have WAVs.**

367.    Plaintiffs' eighth proposed modification is to form partnerships with car rental, taxi, and other transportation companies that have WAVs.

**Lyft's Response**:  This is not a "fact."  However, the evidence confirms that this proposed modification is not sufficiently concrete and specific. Moreover, there is no evidence that this proposed modification would be effective in creating access to WAVs on the Lyft platform, or would create service that is sufficiently reliable to satisfy Plaintiffs. Finally, there is no evidence of the cost of this proposed modification.

Lyft will further respond to this proposal below in its response to Plaintiffs' Proposed Conclusions of Law.

368.    Currently, Lyft engages in partnerships with transportation companies to increase the

---

[228] LYFT_ILRC00009550; LYFT0120393.
[229] Lee Dep. Tr., 47:4-6.

available supply of WAVs in Access Regions.[230]

       **Lyft's Response**:  *See* LRPF No. 196.

369.    In New York City, Lyft partners with three transportation companies who supply WAVs to drivers to use on the App.[231]

       **Lyft's Response**:  *See* LRPF No. 197.

370.    Lyft's website identifies approximately 208 transportation companies with WAVs across the United States.

       **Lyft's Response**:  *See* LRPF No. 198.

371.    Lyft employees previously proposed an initiative called NewCo and LyftSub, which was designed to expand Lyft's supply of WAVs and offer a nationwide WAV program.[232]

       **Lyft's Response**:  *See* LRPF No. 132.

372.    LyftSub was a program to engage a staffing agency to provide contracted drivers and lease WAVs through a third-party, LyftSub, to those drivers.[233]

       **Lyft's Response**:  *See* LRPF No. 133.

373.    LyftSub would be a wholly-owned subsidiary of Lyft.[234]

       **Lyft's Response**:  *See* LRPF No. 134.

374.    LyftSub was projected to offer a nationwide scale WAV solution for Lyft.  The employees who modeled the program anticipated that giving three rides a day through LyftSub would be more cost-efficient than the way Lyft currently offers Access mode.[235]

---

[230] Treger Dep. Tr. 59:3-10; Chan Dep. Tr. 50:25-51:4.
[231] Treger Dep. Tr. 59:3-10.
[232] LYFT_ILRC00021945; LYFT_ILRC00021946; LYFT_ILRC0022617; LYFT0120393; LYFT_ILRC00009550; Wu Dep. Tr. 176:2-5.
[233] LYFT_ILRC00021945; LYFT_ILRC00009550.
[234] LYFT_ILRC00021945; LYFT_ILRC00009550.
[235] LYFT_ILRC00022650; LYFT_ILRC00009550; Wu Dep. Tr. 188:21-25.

**Lyft's Response**: *See* LRPF No. 135.

375.    Lyft's employees projected that LyftSub would allow Lyft to profitably offer a nationwide WAV program at eight to eleven rides per day.[236]

**Lyft's Response**: *See* LRPF No. 136.

376.    Lyft did not pursue or attempt to pursue the LyftSub program**.**

**Lyft's Response**: *See* LRPF No. 194.

377.    The projections of the LyftSub program would allow Lyft to provide more WAV rides per year than it is currently offering at a lower cost per ride and lower total cost than Lyft's current WAV offerings.

**Lyft's Response**: *See* LRPF No. 137.

**J.    Lyft Should Implement A Nationwide 10 Cent Accessibility Surcharge.**

378.    Plaintiffs' ninth proposed reasonable modification is to implement a ten-cent accessibility surcharge on all rides in order to fund Access mode.[237]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. This is not a "fact."  However, the evidence confirms that this proposed modification is not sufficiently concrete and specific. Moreover, there is no evidence that this proposed modification would be effective in creating access to WAVs on the Lyft platform, or would create service that is sufficiently reliable to satisfy Plaintiffs. Finally, there is no evidence of the cost of this proposed modification.

Lyft will further respond to this proposal below in its response to Plaintiffs' Proposed Conclusions of Law.

---

[236] LYFT_ILRC00022650.
[237] Corrected Expert Report, at 82.

379.    Lyft and other ridesharing companies impose various surcharges across the country, some of which are imposed at the discretion of Lyft and some of which are required by local regulators or municipalities.[238]

       **Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.

380.    Lyft has imposed surcharges of 30 cents, 55 cents, and 75 cents in different regions of the United States.[239]

       **Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.

381.    Lyft has tested price elasticity and has not found that its consumers are affected by price changes of less than 15 cents.[240]

       **Lyft's Response**: There is no evidence to confirm this proposed fact. Joyce Chan testified that: "I don't know what the price increases were on those experiments. I'm not responsible for running them. I'm just up to date on the key take-aways."

       Moreover, Dr. Rysman testified that a 10-cent surcharge on the price of Lyft rides would have an adverse impact on the number of overall rides on the Lyft platform,

---

[238] Corrected Expert Report, at 82.
[239] Corrected Expert Report, at 82.
[240] Chan Dep. Tr. 229:10-231:16.

particularly if the surcharge were not imposed on Lyft's competitors, and the reduction in ride volume will reduce Lyft's revenues and profitability.

- Chan Depo. 230:10-13.

- Testimony of Dr. Marc Rysman and supporting figures.

382.    A ten-cent surcharge would be smaller than a one percent increase to the average price of a Lyft ride.[241]

Lyft's Response: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.

See LRPF No. 381.

383.    Plaintiffs' experts project that a ten-cent surcharge on all Lyft rides would have raised approximately $76 million in 2019 and $42 million in 2020.[242]

Lyft's Response: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702.  The experts' projections are not reliable.

Plaintiffs' projections do not take into account the impact of the 10-cent price increase on the overall number of rides on the Lyft platform.

384.    Plaintiffs' experts project that the ten-cent surcharge would have funded 487,518 WAV rides in 2019 and 268,784 rides in 2020.[243]

---

[241] Corrected Expert Report, at 82; Chan Dep. Tr. 230:7-20.
[242] Corrected Expert Report, at 83.
[243] Corrected Expert Report, at 83.

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. The experts' projections are not reliable.

Plaintiffs' projections do not take into account the impact of the 10-cent price increase on the overall number of rides on the Lyft platform.

385.    Plaintiffs' experts project that implementation of the ten-cent surcharge in Westchester County would enable Lyft to operate Access mode at a profit of $185,907 in Year 1, $188,966 in Year 2, and $215,189 in Year 3.[244]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. The experts' projections are not reliable.

As Dr. Rysman's calculations showed, when realistic assumptions are used, the accessibility surcharge will not cover the cost of Access mode in Westchester County.

- Testimony of Dr. Marc Rysman and supporting figures.

386.    Plaintiffs' experts project that implementation of the ten-cent surcharge in New York State outside of New York City would enable Lyft to operate Access mode at a profit of $1.1 million in Year 1, $1.1 million in Year 2, and $1.3 million in Year 3.[245]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. The experts' projections are not reliable.

As Dr. Rysman's calculations showed, when realistic assumptions are used, the accessibility surcharge will not cover the cost of Access mode in New York State.

---

[244] Corrected Expert Report, at 95.
[245] Corrected Expert Report, at 102.

- Testimony of Dr. Marc Rysman and supporting figures.

387. Plaintiffs' experts project that implementation of the ten-cent surcharge in all of the non-Access Regions would enable Lyft to operate Access mode at a profit of $50 million in Year 1, $50 million in Year 2, and $55 million in Year 3.[246]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. The experts' projections are not reliable.

As Dr. Rysman's calculations showed, when realistic assumptions are used, the accessibility surcharge will not cover the cost of Access mode in all of the non-Access regions.

- Testimony of Dr. Marc Rysman and supporting figures.

388. Implementation of the ten-cent surcharge on all Lyft rides would provide funds larger than Lyft's historical budget for Access mode.[247]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. The experts' projections are not reliable.

389. Implementation of the ten-cent surcharge would enable Lyft to expand the availability of Access mode to all of the Regions in which Lyft operates.

**Lyft's Response**: No evidence is cited in support of this proposed fact. The experts' projections are not reliable.

---

[246] Corrected Expert Report, at 109.
[247] Corrected Expert Report, at 110.

390.     Any reduction in the number of rides or revenue by the implementation of the ten-cent surcharge would not outweigh the benefit to individuals who use wheelchairs and requires WAVs across the country who would benefit from increased availability of Access mode.

**Lyft's Response**: No evidence is cited in support of this proposed fact. This is not a "fact." This proposed finding calls for a legal conclusion and is not supported by the evidence at trial.

## PLAINTIFFS' PROPOSED CONCLUSIONS OF LAW

**XII.    Plaintiffs And Proposed Class Representatives Have Standing.**

**A.    Plaintiffs Have The Burden Of Proving
Standing By A Preponderance Of The Evidence.**

391.     "The existence of standing need only be proven 'by a preponderance of the evidence.'" *Zink v. First Niagara Bank, N.A.*, 206 F. Supp. 3d 810, 817 (W.D.N.Y. 2016) (quoting *Perry v. Village of Arlington Heights*, 186 F.3d 826, 829 (7th Cir.1999); *cf., e.g., Shaywitz v. Am. Bd. Of Psychiatry & Neurology*, 675 F. Supp. 2d 376, 382 (S.D.N.Y. 2009).

**Lyft's Response**:  "At all stages of litigation, 'the party invoking federal jurisdiction bears the burden of establishing the elements of Article III standing." *Calcano v. Swarovski N. Am. Ltd.*, 36 F.4th 68, 74 (2d Cir. 2022), *quoting Carter v. HealthPort Techs., LLC,* 822 F.3d 47, 56 (2d Cir. 2016); *see also Lewis v. Casey*, 518 U.S. 343, 358 (1996) ("each element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation."), *quoting Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

Plaintiffs' claims under the New York State Human Rights Law ("NYSHRL") and the New York City Human Rights Law ("NYCHRL") are "'governed by the same standing requirements as the ADA.'" *Gannon v. JBJ Holdings LLC,* Case No. 22-cv-1674 (LJL), 2022 U.S. Dist. LEXIS 185922, *8 (S.D.N.Y., Oct. 11, 2022), *quoting Mendez v. Apple, Inc.,* 2019

U.S. Dist. LEXIS 110640, *9 (S.D.N.Y., Mar. 28, 2019). If Plaintiffs lack standing to sue under the ADA, then they also lack standing under Article III to pursue their claims under the NYSHRL and the NYCHRL. *Id.*

392.    "To satisfy constitutional standing requirements, a plaintiff must prove: (1) injury in fact, which must be (a) concrete and particularized, and (b) actual or imminent; (2) a causal connection between the injury and the defendant's conduct; and (3) that the injury is likely to be redressed by a favorable decision." *Kreisler v. Second Ave. Diner Corp.*, 731 F.3d 184, 187 (2d Cir. 2013) (citing *Field Day, LLC v. County of Suffolk*, 463 F.3d 167, 175 (2d Cir. 2006)).

393.    "In the ADA context, [the Second Circuit] ha[s] previously found standing (and therefore an injury in fact) where (1) the plaintiff alleged past injury under the ADA; (2) it was reasonable to infer that the discriminatory treatment would continue; and (3) it was reasonable to infer, based on the past frequency of plaintiff's visits and the proximity of defendants' restaurants to plaintiff's home, that plaintiff intended to return to the subject location." *Kreisler*, 731 F.3d at 187-88 (citing *Camarillo v. Carrols Corp.*, 518 F.3d 153, 158 (2d Cir. 2008)).

394.    "'The ADA's remedial scheme is not limited to orders for the removal of encountered barriers, but instead dictates that injunctive relief shall include an order to alter facilities to make such facilities readily accessible to and usable by individuals with disabilities.'" *Kreisler*, 731 F.3d at 188-89 (quoting *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 950-51 (9th Cir. 2011)).  As such, plaintiffs are not obligated to engage in the futile gesture of personally encountering the discrimination at issue if the plaintiffs have actual notice that the defendant will not comply with the ADA.  42 U.S.C. § 12188(a)(1); *see Lowell v. Lyft, Inc.*, 352 F. Supp. 3d 248, 255-56 (S.D.N.Y. 2018) (collecting cases); *Disabled in Action v. Bd. Of Elections in City of New York*, 752 F.3d 189, 200 (2d Cir. 2014) ("[D]eterrence constitutes an injury under the ADA.") (quoting *Kreisler*, 731 F.3d at 188); *Kreisler*, 731 F.3d at188 ("In the context of the ADA, the fact that the wheelchair-inaccessible

139

entrance deterred Kreisler from accessing the Diner established a concrete and particularized injury; Kreisler need not attempt to overcome an obvious barrier."); *Access 4 All, Inc. v. Trump Int'l Hotel & Tower Condo.*, 458 F. Supp. 2d 160, 167 (S.D.N.Y. 2006) (Karas, J.) ("awareness of discriminatory conditions, and the avoidance of a public accommodation because of that awareness, is injury in fact") (collecting cases).

395.    A "present intention to return" that "depends only upon [the plaintiff's] own volition," rather than "contingent upon events whose occurrence was speculative and beyond her control," "and the likelihood of which finds some support in professional and family reasons" is sufficient to establish future harm.  *Harty v. Simon Prop. Grp., L.P.*, 428 F. App'x 69, 72 (2d Cir. 2011); *Access 4 All, Inc.*, 458 F. Supp. 2d, 168 (S.D.N.Y. 2006) ("Standing to bring claims for injunctive relief for an ADA claim is established if a plaintiff can 'show a plausible intention or desire to return to the place [of the injury] but for the barriers to access.'") (quoting *Disabled in Action of Metro. New York v. Trump Int'l Hotel & Tower*, No. 01-5518, 2003 WL 1751785, at *7 (S.D.N.Y. Apr. 2, 2003)).

> **Lyft's Response**: To establish standing under the ADA, Plaintiffs must show not only that they encountered the barriers before filing their complaint, but also that they have "a plausible intention or desire" to return to the place or to use the service there "but for the barriers to access." *Small v. Gen. Nutrition Co.*, 388 F. Supp. 2d 83, 86-87 (E.D.N.Y. 2005). "[C]onclusory allegations of intent to return and proximity are not enough—in order to 'satisfy the concrete-harm requirement' and to 'pursue forward-looking, injunctive relief,' Plaintiffs must establish a 'material risk of future harm' that is 'sufficiently imminent and substantial.'" *Calcano*, 36 F.4th at 72, *quoting TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2210 (2021). "'[S]ome day' intentions — without any description of concrete plans, or indeed even

any specification of when the some day will be — do not support a finding of the 'actual or imminent' injury that" Article III requires. *Lujan*, 504 U.S. at 564.

To establish standing in New York City or any of the "Access Regions" where Lyft already provides WAV service, Plaintiffs must actually have used the Lyft app to evaluate the service. *See Access Living of Metro. Chi. V. Uber Techs., Inc.*, 958 F.3d 604, 614 (7th Cir. 2020) (plaintiff, by not downloading the Uber app and evaluating its services in an area where its WAV mode was offered, was "without any personalized experience on which to rest her claim for injunctive relief based on Uber's failure to provide her with a WAV on equivalent terms of service."); *Namisnak v. Uber Techs.*, 971 F.3d 1088, 1093 (9th Cir. 2020) (the presence of some form of WAV service in a region is a "dispositive distinction" in evaluating standing).

396.    An organization may establish associational standing by showing that at least one of its members has standing, that the interests at stake are germane to the organization's purpose, and that neither the claim nor the relief requires participation of the organization's individual members. *Bronx Indep. Living Servs. V. Metro. Transportation Auth.*, No. 16-5023, 2021 WL 1177740, at *12 (S.D.N.Y. Mar. 29, 2021) (citing *Nat. Res. Def. Council v. Dep't of Interior*, 410 F. Supp. 3d 582, 592 (S.D.N.Y. 2019)). For an organization "[t]o establish associational standing '[w]here an association is not a traditional voluntary membership organization, its constituents must nevertheless possess sufficient 'indicia of membership.'" *Westchester Indep. Living Ctr., Inc. ("WILC") v. State Univ. of New York, Purchase Coll.*, 331 F.R.D. 279, 296 (S.D.N.Y. 2019) (Seibel, J.) (quoting *Mental Hygiene Legal Serv. V. Cuomo*, 609 F. App'x 693, 695 (2d Cir. 2015)).

397.    Courts in the Second Circuit and elsewhere routinely find that independent living centers such as WDOMI have associational standing to represent people with disabilities. *See, e.g.*, *Bronx Indep. Living Servs.*, 2021 WL 1177740, at *12 ("[The plaintiff] is an independent living center

141

that provides services and advocacy for persons with disabilities and disabled individuals make up more than half of its leadership and staff. Courts in this District have found similar centers have sufficient indicia of membership to support associational standing."); *WILC*, 331 F.R.D. at 297 (holding that the plaintiff has associational standing because "WILC is staffed, directed, and driven by the individuals with disabilities that it seeks to serve . . . while WILC is not a traditional membership organization, I find that its constituents have sufficient indicia of membership in the organization, and therefore WILC has associational standing"); *Brooklyn Ctr. For Indep. Of the Disabled v. Bloomberg*, 290 F.R.D. 409, 417 (S.D.N.Y. 2012) ("CIDNY is a 'service provider[ ] managed and directed by persons with disabilities for the purpose of serving persons with disabilities'" and thus "has sufficient 'indicia of membership' to 'function effectively as a membership organization' for the purposes of associational standing.") (quoting *Disability Advocs., Inc. v. New York Coal. For Quality Assisted Living, Inc.*, 675 F.3d 149, 157 (2d Cir. 2012)).

> **Lyft's Response**: Even if WDOMI could establish "indicia of membership," it would also have to prove that its members would "otherwise have standing to sue in their own right." *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343 (1977). That is, WDOMI's members must have suffered a concrete injury, caused by Lyft's conduct, which may be redressed by a favorable decision. WDOMI must also show that this litigation is germane to its purpose. *Hunt*, 432 U.S. at 343. This factor supports the "'modest yet important' goal of preventing litigious organizations from forcing the federal courts to resolve numerous issues as to which the organizations themselves enjoy little expertise and about which few of their members demonstrably care." *Bldg. & Constr. Trades Council of Buffalo v. Downtown Dev., Inc.*, 448 F.3d 138, 149 (2d Cir. 2006) (quoting *Humane Soc'y of United States v. Hodel*, 268 U.S. App. D.C. 165, 840 F.2d 45, 57 (1988)).

398.     The ADA defines "disability" as including "a physical or mental impairment that substantially limits one or more major life activities of such individual[.]"  42 U.S.C. § 12102(1)(A). "Major life activities" include "walking, standing, lifting, [and] bending[.]"  42 U.S.C. § 12102(2)(A).

399.     The NYSHRL similarly defines "disability" as including "a physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function."  N.Y. Exec. Law § 292(21).

400.     The NYCHRL defines "disability" even more broadly than its federal and state counterparts, including "any physical, medical, mental or psychological impairment."  N.Y.C. Admin. Code § 8-102.

### B.     Plaintiffs Meet Their Burden To Demonstrate Standing.

401.     Ms. Lowell, Ms. Scudieri, and Mr. Burr suffer from medical conditions that impair their ability to walk, stand, and lift, and require them to use motorized wheelchairs or scooters for mobility.[248]  The Parties agree that Ms. Lowell, Ms. Scudieri, and Mr. Burr are all persons with disabilities under the applicable statutes.  Stipulated Facts ¶¶ 1-4.

402.     Ms. Lowell has demonstrated that she is unable to use Lyft in Westchester County, that she is deterred from using Lyft due to its refusal to serve WAV users in Westchester County, and that she will use Lyft if it stops discriminating against people who require WAVs.[249]

---

[248] *See* Transcript of Feb. 22, 2021, Deposition of Harriet Lowell ("Lowell Dep. Tr."), 29:15-25; Declaration of Harriet Lowell in Opposition to Defendant Lyft, Inc.'s Motion to Dismiss, ECF No. 36 ("Lowell Motion to Dismiss Decl."), ¶¶ 3-5.; Declaration of Pauline Scudieri in Support of Plaintiffs' Motion for Class Certification ("Scudieri Decl."), ¶ 6; Transcript of April 22, 2022, Deposition of Pauline Scudieri ("Scudieri Dep. Tr."), 22:15-23:8; Transcript of April 29, 2022, Deposition of Kenneth Burr ("Burr Dep. Tr."), 17:14-19:4; Declaration of Kenneth Burr in Support of Plaintiffs' Motion for Class Certification ("Burr Decl."), ¶¶ 4-6.

[249] *See Lowell*, 352 F. Supp. 3d at 256. *See also* Lowell Decl., ¶¶ 8-18; Declaration of Harriet Lowell in Opposition to Defendant Lyft, Inc.'s Motion to Dismiss, ECF No. 36 ("Lowell Decl."), ¶¶ 6-14.

**Lyft's Response**: Ms. Lowell failed to prove that she has standing to pursue any of her claims in this lawsuit. Ms. Lowell testified that she does not use any form of transportation other than her family WAV. Ms. Lowell does not take trains, planes, or busses. Just as she has never used Lyft, Ms. Lowell has not used WAV taxis in *any* city, including in White Plains and New York City. *See* LRPF No. 15. Moreover, she testified she would use Lyft's Access mode only if Lyft provided "equivalent" service, meaning a "straightforward equivalent to what people who are non-disabled have." Consistent with that testimony, Ms. Lowell has never used Lyft's Access mode in New York City, despite her own expert witness's analysis showing that she can get a WAV ride in 10.8 minutes. LRPF Nos. 10, 14. (Having never used the Lyft app in New York City, Ms. Lowell does not have standing to pursue her claims in New York City. *See Access Living of Metro. Chi. V. Uber Techs., Inc.*, 958 F.3d 604, 614.) Under the circumstances, her testimony that she would use Lyft's Access mode to go to her hairdresser, or that she would like to use Lyft's Access mode in Boston or Washington, D.C., adds up to nothing more than "some day" intentions to use Lyft. *See Lujan,* 504 U.S. at 564; *see also Harty v. West Point Realty,* 28 F.4th 435, 443 (2d Cir. 2022) (allegation that plaintiff intended to utilize the website to reserve a guestroom "'in the near future'" was not sufficiently imminent to establish injury in fact). Finally, Ms. Lowell lacks standing because she cannot show that her injury is redressable anywhere, including in White Plains, New York. Article III requires a plaintiff to show that a favorable decision could redress her injuries, demonstrating a "non-speculative likelihood that the injury can be remedied by the requested relief." *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 106-07 (2d Cir. 2008). But Ms. Lowell's demand is exacting: she does not want just an icon in her App showing "Access mode," she wants a WAV service that would not

leave her stranded. LFPF No. 67. Absent evidence that Lyft could meet her demand, Lowell cannot establish redressability, and therefore cannot establish standing.

403.     Class Representatives Scudieri and Burr have both been deterred from using Lyft's services on many occasions due to Lyft's failure to offer WAVs, and would use Lyft if it stops discriminating against people who require WAVs.

**Lyft's Response**: Ms. Scudieri and Mr. Burr, who are not named plaintiffs in this action and have not been appointed "class representatives," failed to prove they have standing. Both claim to represent Access mode regions where Lyft offers WAV service, but neither has downloaded the Lyft app to request a ride, compare wait times, and evaluate their experience. LRPF Nos. 10. As they have not taken the opportunity to evaluate the Access mode services offered by Lyft in any of the Access regions, they cannot establish standing. *Access Living,* 958 F.3d at 614.

As to Ms. Scudieri specifically, she only found out about this case because she met Plaintiffs' counsel at the Abilities Expo in December 2021. As she testified, she has never taken steps to investigate whether Lyft offers WAV service anywhere, or even spoken with anyone regarding Lyft. Ms. Scudieri does not even know if WAV taxis are available in her area, because she has never needed one. LRPF No. 23. Her testimony confirms that, if anything, she has suffered an "injury in law," not an "injury in fact." *TransUnion,* 141 S. Ct. at 2205 (that a plaintiff may have cause of action because she suffered an "injury in law" does not relieve courts of their responsibility to independently decide whether she suffered a concrete harm, *i.e.,* an "injury in fact"); *Feltzin v. Triangle Props. #1, LLC,* No. 14-cv-5131 (JMA) (ARL), 2016 U.S. Dist. LEXIS 192861, at *12 (E.D.N.Y. Dec. 15, 2016) (a plaintiff who has not had a personal encounter with the allegedly discriminatory condition has not

145

alleged a direct injury). Ms. Scudieri has not been concretely harmed and does not have standing to sue. *Id.*

As for Mr. Burr, he, too, testified that he became involved in this lawsuit based on Lyft's alleged refusal to provide "equal access." But he has had no trouble downloading Uber and using Uber WAV even though Uber, like Lyft, does not offer WAV service in Westchester County. LRPF No. 24. Like Ms. Scudieri, Mr. Burr also has not suffered a direct injury. *TransUnion,* 141 S. Ct. at 2205.

404.    Similarly, WDOMI has associational standing because its employees, members, and constituents are people with disabilities, including mobility-related disabilities; these people have acquired knowledge of Lyft's ongoing discrimination; Lyft has refused to serve some of WDOMI's members and other WDOMI members have been deterred from even attempting to use Lyft.; and Lyft has rejected WDOMI's requests that Lyft change its policies and serve people with disabilities.[250] Indeed, WDOMI "is staffed, directed, and driven by the individuals with disabilities that it seeks to serve," including wheelchair-users.[251] *WILC,* 331 F.R.D. at 297.

**Lyft's Response**: WDOMI also failed to prove that it has associational standing. At trial, WDOMI presented no testimony from any "member" who claims to have been injured by Lyft's conduct. Vague hearsay statements by its former Executive Director does not suffice. *See, e.g., Summers v. Earth Island Inst.,* 555 U.S. 488, 496 (2009) (vague desire expressed

---

[250] *See*  Declaration of Melvyn R. Tanzman in Opposition to Defendant Lyft, Inc.'s Motion to Dismiss, ECF No. 39 ("Tanzman Decl."), ¶¶ 2-4; Declaration of Ed Sperling in Opposition to Defendant Lyft, Inc.'s Motion to Dismiss, ECF No. 35 ("Sperling Decl."), ¶¶ 2-4; Declaration of Jesse Sahagun in Opposition to Defendant Lyft, Inc.'s Motion to Dismiss, ECF No. 37 ("Sahagun Decl."), ¶¶ 2-4; Declaration of John Strothenke in Opposition to Defendant Lyft, Inc.'s Motion to Dismiss, ECF No. 38 ("Strothenke Decl."), ¶¶ 2-4; Transcript of August 17, 2021 Deposition of Ansel Lurio ("Lurio Dep. Tr."), 21:15-22:25, 30:25-31:4; Burr Decl., ¶¶ 4-6.
[251] *See* Tanzman Decl., ¶¶ 2-4; Sperling Decl., ECF No. 35, ¶¶ 2-4; Sahagun Decl., ECF No. 37, ¶¶ 2-4; Strothenke Decl., ECF No. 38, ¶¶ 2-4; Lurio Dep. Tr., 21:15-22:25, 30:25-31:4; Burr Decl., ¶¶ 4-6.

by one member to return is insufficient to satisfy the requirement of imminent injury); *Sierra Club v. SCM Corp.*, 747 F.2d 99, 102, 107-08 (2d Cir. 1984) (affirming dismissal after plaintiff organization failed to "identify any of its members who might have been harmed by the alleged violation"). WDOMI also failed to show that this litigation is germane to its purpose. While transportation generally might be an issue on which WDOMI works, WDOMI presented no evidence on which this Court could conclude that any of its members were harmed by the lack of Access mode on the Lyft app. LRPF Nos. 11, 18-20; *see also Hunt,* 432 U.S. at 343.

405.    Thus, Ms. Lowell, Ms. Scudieri, and Mr. Burr are protected individuals and WDOMI has associational standing under the pleaded statutes.  *See, e.g.*, *Kreisler*, 731 F.3d at 188-89; *Bronx Indep. Living Servs.*, 2021 WL 1177740, at *12.

**Lyft's Response**: Plaintiffs thus failed to prove that they have standing to proceed.

**XIII.    Lyft Violates The Americans with Disabilities Act.**

406.    "To prevail on their claims, Plaintiffs must prove a violation of Title III of the ADA by a preponderance of the evidence."  *U.S. v. Asare*, 476 F. Supp. 3d 20, 26 (S.D.N.Y. 2020) (citing *Krist v. Kolombos Rest. Inc.*, 688 F.3d 89, 96 (2d Cir. 2012)).

407.    "[T]he ADA must be interpreted in the context of how expansive, remedial statutes like the ADA have historically been interpreted.  It is a familiar tenet that Congress need not perpetually refresh and update legislation where a broad but textually fair construction achieves the statute's explicit aims."  *Del-Orden v. Bonobos, Inc.*, No. 17-2744, 2017 WL 6547902, at *9 (S.D.N.Y. Dec. 20, 2017).  As such, "[t]he ADA, like other broadly worded statutes, ought to be read to 'reflect[] an intentional effort to confer the flexibility necessary to forestall . . . obsolescence.'"  *Jaquez v. Dermpoint, Inc.*, No. 20-7589, 2021 WL 2012512, at *3 (S.D.N.Y. May 20, 2021) (quoting *Del-Orden*, 2017 WL 6547902, at *10).

408.    Both the Supreme Court and the Second Circuit have relied upon interpretations of
Title II and Title III interchangeably.  *See, e.g.*, *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 677 (2001) ("It
would therefore appear that Title III of the ADA, by its plain terms, prohibits petitioner from
denying Martin equal access to its tours on the basis of his disability.  *Cf. Pa. Dept. of Corrections v.
Yeskey*, 524 U.S. 206, 209 (1998) (holding that text of Title II's prohibition of discrimination by
'public entities' against disabled individuals 'unmistakably includes State prisons and prisoners within
its coverage')"); *Mary Jo C. v. N.Y. State & Loc. Ret. Sys.*, 707 F.3d 144, 159 n.6 (2d Cir. 2013) ("Courts
have read the requirements of Title II and Title III as being consistent with each other . . . 'Congress
clearly did not intend to give public entities more latitude than private parties to discriminate against
the disabled.'") (quoting *Theriault v. Flynn*, 162 F.3d 46, 53 n.10 (1ˢᵗ Cir. 1998)); *Bartlett v. N.Y. State Bd.
Of Law Examiners*, 226 F.3d 69, 78 n.2 (2d Cir. 2000) ("In the context of this case, title II and title III
of the ADA impose largely the same requirements[.]"); *Noel v. N.Y.C. Taxi & Limousine Comm'n*, 687
F.3d 63, 73 (2d Cir. 2012) (relying upon Title III of the ADA to analyze the requirements of Title
II); *Staron v. McDonald's Corp.*, 51 F.3d 353, 356 (2d Cir. 1995) (citing ADA cases against private and
public entities to evaluate an accommodation's reasonableness); *see also Theriault v. Flynn*, 162 F.3d 46,
53 n.10 (1ˢᵗ Cir. 1998) ("Congress clearly did not intend to give public entities more latitude than
private parties to discriminate against the disabled."); *Kinney v. Yerusalim*, 9 F.3d 1067, 1073 n.6 (3d
Cir.1993) (ADA's legislative history indicates that Titles II and III are to be read consistently);
*American Council of Blind of N.Y., Inc. v. City of N.Y.*, 495 F. Supp. 3d 211, 250 n.16 (S.D.N.Y. 2020)
(relying upon ADA Title III cases to evaluate a requested alteration under Title II); *Vahidallah v.
Professional Examination Service*, No. 03-1800, 2005 WL 8173028, at *5 (S.D. Cal. June 24, 2005)
("Within the context of the present action, the requirements for establishing a claim under Title II
and Title III of the ADA are functionally similar.").

409.     Lyft refuses to provide any service to WAV users in 96% of its service regions and

provides the bare minimum level of service it is required to provide in the Access Regions.  As set

forth below, Plaintiffs have proposed ten reasonable modifications that Lyft could make to serve or

better serve the people with disabilities whom it currently discriminates against.  *See infra* § XIII.

> **Lyft's Response**: While Plaintiffs attempt to frame this case as one of intentional
>
> discrimination by arguing that "Lyft refuses to provide" WAV service, the definition of
>
> discrimination in this case is whether Lyft has failed to make a requested reasonable
>
> modification in its policies, practices, or procedures which, if made, would lead to reliable
>
> WAV service. 42 U.S.C. §§ 12184(b)(2)(A), *citing* 12182(b)(2)(A)(ii). While Plaintiffs pointedly
>
> avoid this point, two Circuit Courts of Appeal, including the Second Circuit, have ruled that
>
> private entities need not provide service by WAVs. Indeed, the Second Circuit clearly stated
>
> that under Title III of the ADA, individuals could not bring an action against taxi companies
>
> for "a failure to provide meaningful access to" WAV taxis. *Noel v. N.Y.C. Taxi & Limousine*
>
> *Comm'n*, 687 F.3d 63, 73 (2d Cir. 2012); *see also Toomer v. City Cab*, 443 F.3d 1191, 1195 (10th
>
> Cir. 2006) ("a taxi fleet consisting entirely of non-accessible vehicles would be in accord with
>
> the ADA.").
>
> *Noel* should be dispositive here. But even if *Noel* is not dispositive, no
>
> "discrimination" exists unless Plaintiffs can prove that Lyft failed to make a requested
>
> reasonable modification in policies, practices, or procedures. 42 U.S.C. § 12184(b)(2)(A)
>
> (defining "discrimination" as the failure to make a reasonable modification).
>
> ADA Title III prohibits "discrimination." *See* 42 U.S.C. §§ 12182(a), 12184(a),
>
> Consistent with the statutory language, Second Circuit law is that to prevail on a claim of
>
> discrimination under the ADA, Plaintiffs must prove "discrimination" within the meaning of
>
> the statute. *See Roberts v. Royal Atl. Corp.,* 542 F.3d 363, 368 (2d Cir. 2008); *see also Indep. Living*

*Res. Ctr. San Francisco v. Lyft, Inc.*, No. C 19-01438 WHA, 2021 U.S. Dist. LEXIS 166229, *25 (N.D. Cal., Sept. 1, 2021) ("*ILRC* Trial Decision*")* ("no discrimination exists unless the evidence shows that Lyft has failed to implement a requested – and reasonable – modification"). Here, Plaintiffs cannot prove discrimination.

**A.      Lyft Violates Section 12182(a) Of The ADA.**

      **1.      Under Section 12182, Which Is A Remedial Provision,
              Plaintiffs Have The Burden Of Showing That
              Lyft Is A Public Accommodation That Discriminates.**

410.      Section 12182(a) of the ADA provides: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."

      **Lyft's Response**: Lyft denies it is a "place of public accommodation" subject to Section 12182. *See* LRPCL No. 413, 415. But even if it were, Lyft does not discriminate against Plaintiffs because Section 12182(a) prohibits discrimination "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations *of* any place of public accommodation." (Emphasis added.) "The ordinary meaning of this language is that whatever goods or services the place provides, it cannot discriminate on the basis of disability in providing enjoyment of those goods and services. This language does not require provision of different goods or services, just nondiscriminatory enjoyment of those that are provided." *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1115 (9th Cir. 2000) (holding that Title III does not require an insurance office to provide insurance that treats the disabled equally as the non-disabled). *See also McNeil v. Time Ins. Co.,* 205 F.3d 179, 186-87 (5th Cir. 2000) (Title III does not regulate the content of goods or services offered); *Doe v. Mut. Of Omaha Ins. Co.,* 179 F.3d 557, 560

150

(7th Cir.1999) ("A camera store may not refuse to sell cameras to a disabled person, but it is not required to stock cameras specially designed for such persons").

Numerous judges in this district have agreed with the Fifth, Seventh, and Ninth Circuits, holding that Title III does not regulate the goods or services provided by a private entity. *See, e.g., Thorne v. Boston Mkt. Corp.,* 469 F.Supp.3d 130, 142-43 (S.D.N.Y. 2020) (restaurant need not sell Braille gift cards); *Dominguez v. Banana Republic, LLC,* No. 19-CV-10171-GHW, 2020 U.S. Dist. LEXIS 72193, *14 (S.D.N.Y., April 23, 2020) *aff'd. on other grounds, Calcano v. Swarovski N. Am. Ltd.,* 36 F.4th 68 (2d Cir. 2022) ("a plain reading of [the ADA] makes clear that Title III prohibits a place of public accommodation from discriminating on the basis of disability when providing access to whatever goods and services [are] *ordinarily provided* at that place of public accommodation") (emphasis added); *Funches v. Barra,* 2016 U.S. Dist. LEXIS 66589 (S.D.N.Y., May 17, 2016) (car manufacturers do not have an obligation to manufacture vehicles with hand-controls).

What this means is that if Section 12182 applies to Lyft, the plain language of the ADA dictates that Lyft must allow nondiscriminatory enjoyment of services that it already provides. That is why Lyft accommodates riders who travel with service animals or use foldable wheelchairs that will fit into the trunk of an ordinary car. But Lyft need not alter its services to offer service by WAV. See also 28 C.F.R. § 36.307 (private entities need not alter their inventory "to include accessible or special goods that are designed for . . . individuals with disabilities.").

411.    Section 12182 prohibits the following specified forms of discrimination:

a.    denying people with disabilities the opportunity to participate in its services; affording people with disabilities unequal services, § 12182(b)(1)(A)(i);
b.    providing people with disabilities with a different or separate service, which are neither necessary nor as effective, § 12182(b)(1)(A)(iii);
c.    failing to afford services to people with disabilities in the most integrated setting appropriate to the needs of the individuals, § 12182(b)(1)(B);

151

  d.  denying people with disabilities the opportunity to participate in programs or activities that are not separate or different, § 12182(b)(1)(C);

  e.  using standards or criteria that have the effect of discriminating based on disability, § 12182(b)(1)(D);

  f.  imposing eligibility criteria, which are not necessary for the provision of services, that screen out or tend to screen out people with disabilities from fully and equally enjoying its services, § 12182(b)(2)(A)(i);

  g.  failing to remove barriers where such removal is readily achievable, § 12182(b)(2)(A)(iv); and

  h.  where removal of a barrier is not readily achievable, failing to make services available through alternative methods if such methods are readily achievable, § 12182(b)(2)(A)(v).

**Lyft's Response**: None of these provisions applies in this case because Lyft is not a "place of public accommodation," and the ADA does not require Lyft to provide specialized or accessible services. *See* LRPCL Nos. 410, 413-18.

Moreover, based on the plain language of the statute, Plaintiffs are not entitled a finding of "discrimination" for purported violations of any of the subsections of Section 12182(b)(1) (identified above in Paragraphs 411.a-e) unless they can prove that Lyft engaged in "discrimination" as defined in Section 12182(b)(2). As the plain language of the statute shows, Section 12182(b)(1) lays out "general prohibitions," whereas Section 12182(b)(2) defines "discrimination." *See PGA Tour, Inc. v. Martin*, 532 U.S. 661, 681-82 (2001) (the question of whether a defendant has violated Title III's general rule against discrimination "depends on a proper construction of the term 'discrimination,' which is defined by Title III" in Section 12182(b)(2)).

The Second Circuit agrees: a key element of a Title III claim is whether the defendant "discriminated against the plaintiff within the meaning of the ADA." *Roberts v. Royal Atl. Corp.,* 542 F.3d 363, 368 (2d Cir.2008); *see also Staron v. McDonald's Corp.,* 51 F.3d 353, 355 (2d Cir. 1995) (analyzing the merits of plaintiff's claim by focusing on the definition of "discrimination" under Section 12182(b)(2)(A)(ii)); *Thorne v. Boston Mkt. Corp.,* 469 F. Supp. 3d 130, 144 (S.D.N.Y. 2020) (same, under Section 12182(b)(2)(A)(iii)).

The reason why courts in the Second Circuit focus on the various definitions of "discrimination" found in Section 12182(b)(2)(A), rather than on the broad statements of activities that are "generally prohibited" as set forth in Section 12182(b)(1), can be illustrated by the following example. A plaintiff sues a building owner under ADA Title III for the alleged failure to remove an architectural barrier. A logical extension of Plaintiffs' argument in this case would mean that the plaintiff in the barrier removal case could march into court and seek a declaration that the building owner discriminates by denying him the opportunity to benefit from the goods or services offered in the building as generally prohibited under Section 12182(b)(1)(A)(i). This is true even if the plaintiff is ultimately unable to prove the elements of a claim of "discrimination" for the failure to remove architectural barriers, as defined by Congress in Section 12182(b)(2)(A)(iv). *See, e.g., Antolini v. Thurman*, No. 19-CV-9674 (JMF) (KNF), 2021 U.S. Dist. LEXIS 135989, at *10-12 (S.D.N.Y. July 21, 2021) (granting summary judgment based on plaintiffs' failure to provide a "plausible" barrier removal proposal, including its cost). This Court would be overrun by similarly meritless claims by plaintiffs seeking a declaration of "discrimination," whose only burden would be to show that they cannot enter a building, regardless of whether they can come forward with a plausible proposal for removing the barrier. That is the case here: Plaintiffs seek a finding of discrimination based purely on not having access to the platform, without regard to whether they can actually prove the elements of a cause of action for discrimination as defined by the ADA.

In order to obtain a finding that Lyft engages in "discrimination," Plaintiffs must prove the necessary elements of "discrimination" as defined in Section 12182(b)(2).

412.    The ADA explicitly provides that Plaintiffs are not required to request a reasonable modification prior to initiating a lawsuit when they have actual notice that doing so would be futile, for instance, given the defendant's policies and practices.

Section 12188(a) of the ADA states: "Nothing in this section shall require a person with a disability to engage in a futile gesture if such person has actual notice that a person or organization covered by this subchapter does not intend to comply with its provisions." *See also, e.g.*, *Fair Hous. Just. Ctr., Inc. v. Cuomo*, No. 18-3196, 2019 WL 4805550, at *14 (S.D.N.Y. Sept. 30, 2019) ("Plaintiffs have adequately alleged that the ACF Defendants had categorical policies against wheelchairs and that any request for a reasonable accommodation would have been futile.  Accordingly, their failure to specifically ask for an accommodation does not render their allegations insufficient, and the ACF Defendants' motions to dismiss the reasonable accommodation claim are denied."); *Hampson v. State Farm Mut. Auto Ins. Co.*, No. 12-00258, 2015 WL 12733387, at *12-13 (N.D.N.Y. Mar. 26, 2015) (futile gesture doctrine applies where an entity "has essentially foreclosed the interactive process through its policies or explicit actions"); *Davoll v. Webb*, 194 F.3d 1116, 1132-33 (10th Cir. 1999) ("If a disabled employee actually knows of an employer's discriminatory policy against reasonable accommodation, he need not ignore the policy and subject himself 'to personal rebuffs' by making a request that will surely be denied."); *Louiseged v. Akzo Nobel Inc.*, 178 F.3d 731, 739 (5th Cir. 1999) (same); *Robertson v. Las Animas Cnty. Sheriff's Dep't*, 500 F.3d 1185, 1197 (10th Cir. 2007) ("When a disabled individual's need for an accommodation is obvious, the individual's failure to expressly 'request' one is not fatal.") (collecting cases); *Bultemeyer v. Fort Wayne Cmty. Sch.*, 100 F.3d 1281, 1285-86 (7th Cir. 1996) (excusing plaintiff's failure to request accommodation after supervisor told him that he "would not receive any more special treatment").

**Lyft's Response**: None of the cases cited by Plaintiffs arise under the reasonable modification provision of ADA Title III, 42 U.S.C. §§ 12184(b)(2)(A), 12182(b)(2)(A)(ii). A

154

key element of Plaintiffs' reasonable modification claim is that they must have requested a "reasonable modification" of a policy or practice "which, if granted, would have afforded [them] access" to the service they desired. *Dudley v. Hannaford Bros. Co.,* 333 F.3d 299, 307 (1st Cir. 2003); *see also PGA Tour, Inc. v. Martin,* 532 U.S. 661, 683 n.38 (2001) (plaintiff must prove that defendant failed to make a "requested reasonable modification").

Here, Plaintiffs did not request a modification before filing this lawsuit. This fact is dispositive. *Castillo v. Hudson Theatre, LLC,* 412 F. Supp. 3d 447, 451 (S.D.N.Y. 2019) ("A plaintiff's request for a reasonable modification is necessary to determine whether the defendant could reasonably provide such modification and whether the defendant's subsequent failure to do so constitutes discrimination."); *see also Johnson v. Gambrinus Company/Spoetzl Brewery,* 116 F.3d 1052, 1059 (5th Cir. 1997) ("[t]he Plaintiff has the burden of proving that a modification was requested").

### 2.    Lyft Is A Public Accommodation.

413.    The ADA includes "travel service" among its categories of entities that qualify as "public accommodations." 42 U.S.C. § 12181(7).

**Lyft's Response**: For purposes of this lawsuit, Lyft does not contest that it is a "private entity" that provides "specified public transportation services" for purposes of Section 12184 of ADA Title III. However, Section 12182 does not apply to Lyft. Section 12184 sets out "Prohibition of discrimination in specified public transportation services provided by private entities," whereas Section 12182 of ADA Title III sets out "Prohibition of discrimination by public accommodation." *Compare* 42 U.S.C. § 12184 *with* 42 U.S.C. § 12182. Congress defined "specified public transportation" as "transportation by bus, rail, or any other conveyance (other than by aircraft)." 42 U.S.C. § 12181(10). "Public accommodation," on the other hand, is defined in 42 U.S.C. § 12181(7) to include physical

places, including "a terminal, depot, or other station used for specified public

transportation." *Id.*, § 12181(7)(G); *see also id.*, § 12181(7)(F) (defining "public

accommodation" to include "a laundromat, dry-cleaner, bank, barber shop, beauty shop,

travel service . . . or other service establishment"). Lyft is not a public accommodation

because it is a technology platform and not a physical place.

414.    According to Lyft's own registration statement, its stated mission is to "[i]mprove

people's lives with the world's best transportation."[252]

415.    Lyft, through its App, is a place of public accommodation.  *See, e.g.*, *Ramos v. Uber

Techs., Inc.*, 77 N.Y.S.3d 296, 297 (N.Y. Sup. Ct. 2018) ("Within the meaning of the Executive Law,

Uber is a public accommodation because it[] provides public conveyance services."); *Comm'n on

Human Rights ex rel. Jordan v. Raza*, OATH Index No. 716/15 (July 27, 2015), 2015 WL 4776127, at

*3-4 (finding that a taxi medallion owner and taxi driver provide public accommodations and may be

held liable for under § 8-107(4)(a)); *Comm'n on Human Rights ex rel. Alvarez v. Gerardo's Transportation*,

OATH Index No. 2045/09 (May 22, 2009), *aff'd,* Comm'n Dec. & Order (Aug. 12, 2009) (finding a

private bus company liable as a public accommodation under § 8-107(4)(a) for failing to

accommodate a wheelchair user); *Comm'n on Human Rights ex rel. Gardner v. I.J.K. Service, Inc.*, OATH

Index No. 1921/08 at 4 (Oct. 10, 2008), *aff'd in part, rev'd in part*, Comm'n Dec. & Order (Feb. 19,

2009) (finding that the livery service owner, the base, and the for-hire vehicle driver provide public

accommodations).  Although the question of whether ridesharing companies qualify as "public

accommodations" under section 12182 has only been considered at the motion to dismiss stage,

virtually every court has held that ridesharing companies are at least plausibly "travel services" and

subject to section 12182.  *See, e.g.*, *O'Hanlon v. Uber Techs., Inc.*, No. 19-00675, 2021 WL 2415073, at

---

[252] Lyft, Inc., Registration Statement (Form S-1) (March 1, 2019) at 1; *see also* Stipulated Fact ¶12.

*6 (W.D. Pa. June 14, 2021) (plaintiffs plausibly alleged that Uber is a "travel service" under § 12182, "and Uber has fallen short of its burden of establishing that Uber vehicles are excluded by either the statutory language of Section 12182 or the interpretive law"); *Nat'l Fed'n of the Blind of California v. Uber Techs., Inc.*, 103 F. Supp. 3d 1073, 1083 (N.D. Cal. 2015) (Uber plausibly constitutes a "travel service" and therefore a "public accommodation" under § 12182))

**Lyft's Response**: The first four cases cited by Plaintiffs in Paragraph 415 arise under the NYSHRL or the NYCHRL, and the definition of "public accommodation" is different, and more narrow, in the ADA than it is under those statutes. Unlike the ADA, neither the NYSHRL nor the NYCHRL distinguishes between "public accommodations" and "specified public transportation" as Congress did in the ADA. *See* N.Y. Exec. L § 292, para. 9 (defining "place of public accommodation, resort or amusement" to include "all public conveyances operated on land or water or in the air"); N.Y.C. Admin. Code § 8-102 (defining "place or provider of public accommodation" to include "providers" of "goods, services . . . of any kind"). The cases involving the NYSHRL or the NYCHRL are thus inapplicable.

The other two cases are ADA cases decided at the motion to dismiss stage. At the summary judgment or trial stage, courts have not found Lyft or Uber to be "public accommodations." Instead, courts have found that the companies are subject to Section 12184 of ADA Title III as private entities who are primarily engaged in transportation. *See, e.g., ILRC* Trial Decision, 2021 U.S. Dist. LEXIS 166229, *23-24 (noting that at summary judgment, the court found Section 12184 applied to Lyft after Lyft did not contest that finding for purposes of summary judgment); *Crawford v. Uber Techs., Inc.,* Case No. 17-cv-02664-RS, 2021 U.S. Dist. LEXIS 161969 (N.D. Cal., Aug. 26, 2021) (on summary

157

judgment, finding that Uber is a private entity "engaged in the business of transporting people" and thus subject to Section 12184).

416.    Congress affirmatively chose to guarantee access to goods and services "*of* any place of public accommodation," rather than "*in*" such a place; "[t]he term 'of' generally does not mean 'in,' and there is no indication that Congress intended to employ the term in such an unorthodox manner in Section 302(a) of Title III." *Pallozzi v. Allstate Life Insurance Co.*, 198 F.3d 28, 33 (2d Cir. 1999); *accord, e.g.*, *Jaquez*, 2021 WL 2012512, at *3 (affirming *Pallozzi*); *Del-Orden*, 2017 WL 6547902, at *11 (same). For instance, "[i]t is unambiguous that under Title III of the ADA, [a website] is a place of public accommodation." *Andrews v. Blick Art Materials, LLC*, 268 F. Supp. 3d 381, 393 (E.D.N.Y. 2017) (collecting cases); *accord Jaquez*, 2021 WL 2012512, at *3 ("websites qualify as places of public accommodation, even when they are not attached to a traditional brick-and-mortar store").

> **Lyft's Response**: That some courts have elected to find websites to be "places of public accommodation" is not persuasive. If websites are not deemed to be "places of public accommodation," then they are not subject to the ADA. Here, there is a specific provision, Section 12184, that applies to entities who are primarily engaged in the business of transporting people. Lyft's position in this case is *not* that it is not subject to the ADA; instead, Lyft's position is that it is not a place of public accommodation. For purposes of this lawsuit, Lyft does not contest that it is subject to Section 12184.

417.    A public accommodation's mobile application is likewise bound by Title III. *See, e.g.*, *Robles v. Domino's Pizza, LLC*, 913 F.3d 898, 905 (9th Cir. 2019), *cert. denied*, 140 S. Ct. 122 (2019) (Title III's non-discrimination "requirement applies to [a public accommodations]'s website and app" because "website[s] and app[s] facilitate access to the goods and services of a place of public accommodation"). This is because "[t]he 'broad mandate' of the ADA and its 'comprehensive character' are resilient enough to keep pace with the fact that the virtual reality of the Internet is

almost as important now as physical reality alone was when the statute was signed into law.  That the meteoric rise of virtual reality through the Internet and its impact on communal and commercial affairs could not have been anticipated by Congress does not mean the law's application to the Internet and website is ambiguous; 'the fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity.  It demonstrates breadth.'" *Andrews*, 268 F. Supp. 3d at 395–96 (quoting *Pennsylvania Dep't of Corr. V. Yeskey*, 524 U.S. 206, 212 (1998)) (collecting cases).  "[T]his construction vindicates Congress's intent that the ADA remedy discrimination against the disabled in 'all aspects of society.'" *Del-Orden*, 2017 WL 6547902, at *10; *accord Nat'l Fed'n of the Blind v. Scribd Inc.*, 97 F. Supp. 3d 565, 575 (D. Vt. 2015) ("Now that the Internet plays such a critical role in the personal and professional lives of Americans, excluding disabled persons from access to covered entities that use it as their principal means of reaching the public would defeat the purpose of this important civil rights legislation.").

> **Lyft's Response**: Cases regarding websites and apps do not apply here for the reasons described in Lyft's Response to Paragraph 416. Lyft does not contest that it is subject to Section 12184 for purposes of this case, and that should end the matter.

418.     Lyft facilitates travel for its consumers through its app, rendering it a modern-day travel service.  *See Jaquez*, 2021 WL 2012512, at *3 ("The ADA, like other broadly worded statutes, ought to be read to "reflect[ ] an intentional effort to confer the flexibility necessary to forestall . . . obsolescence.") (quoting *Del-Orden*, 2017 WL 6547902, at *10); *Carparts Distribution Ctr., Inc. v. Auto. Wholesaler's Ass'n of New England, Inc.*, 37 F.3d 12, 19 (1st Cir. 1994) ("Many travel services conduct business by telephone or correspondence[.]").

> **Lyft's Response**: The phrase "travel service" appears in Section 12181(7)(F), which includes the following list of "private entities [that] are considered public accommodations": "a laundromat, dry-cleaner, bank, barber shop, beauty shop, travel service, shoe repair

159

service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, insurance office, professional office of a health care provider, hospital, or other service establishment." All are clearly physical places. See Winegard v. Newsday LLC, 556 F. Supp. 3d 173, 177 (E.D.N.Y. 2021) ("if Congress had wanted to capture business operations rather than places, it would have said 'accounting firm or law firm,' rather using the clunkier phrase 'office of an accountant or lawyer'"); but see Romero v. 88 Acres Foods, Inc., 580 F. Supp. 3d 9, 17, 19 (S.D.N.Y. 2022) (website is a "public accommodation").

"Travel service," moreover, refers to travel agencies. Lyft is not a travel agency. There is no basis on which this Court could conclude that at the time of the ADA's passage in 1990, Congress envisioned ridesharing platforms or that it intended such platforms to fall within the definition of a "travel service." If Congress did contemplate a ridesharing platform, it would have said that such a platform is a "specified public transportation service" subject to Section 12184. Lyft is not a "travel service," and it is not a "public accommodation."

### 3.    Lyft's Policies And Practices Are Discriminatory.

419.    Lyft's policies with respect to WAVs are deliberately discriminatory.  *See, e.g.*, *cf. ILRC*, 2020 WL 6462390, at *2 (characterizing Lyft's policies, practices, and procedures as discriminatory, and noting that Lyft has effectively admitted as much); 42 U.S.C. §§ 12182(b)(1)(A)(i)-(iii), (b)(1)(B), (b)(1)(C), (b)(1)(D), (b)(2)(A)(i)- (v), (b)(2)(C)(i).

**Lyft's Response**: As a preliminary matter, the *ILRC* court never held that Lyft's policies are "deliberately discriminatory." To the contrary, at summary judgment, the *ILRC* court merely stated that Lyft's practices or procedures were different for WAV than for Standard, and thus Plaintiffs had identified "discriminatory" policies. However, the *ILRC* court reversed itself on this point after trial and concluded that "no discrimination exists

unless the evidence shows that Lyft has failed to implement a requested – and reasonable –
modification," and ultimately ruled Lyft did not engage in any discrimination. *Compare Indep.
Living Res. Ctr. San Francisco v. Lyft, Inc.*, No. C 19-01438 WHA, 2020 U.S. Dist. LEXIS
205519, \*6-7 (N.D. Cal., Nov. 3, 2020) ("*ILRC* MSJ Order") *with ILRC* Trial Decision, 2021
U.S. Dist. LEXIS 166229 at \*25, 51. In other words, as shown by Lyft in its LRPCL No. 411
above, the *ILRC* court concluded that the plaintiff in that case was not entitled to a finding
of "discrimination" without first proving that Lyft had failed to make a requested and
reasonable modification under Section 12184(b)(2)(A), which incorporates the language of
Section 12182(b)(2)(A)(ii). *Id.*

Additionally, Plaintiffs' contention that Lyft is engaged in "deliberate discrimination"
is flatly contrary to the law of this Circuit and this district. *See, e.g., Noel,* 687 F.3d at 73
(plaintiffs could not bring an action against taxi companies under ADA Title III for failing to
provide WAVs); *Dominguez v. Banana Republic, LLC*, No. 19-CV-10171-GHW, 2020 U.S.
Dist. LEXIS 72193, \*14 (S.D.N.Y., April 23, 2020) *aff'd. on other grounds, Calcano v. Swarovski
N. Am. Ltd.,* 36 F.4th 68 (2d Cir. 2022) ("a plain reading of [the ADA] makes clear that Title
III prohibits a place of public accommodation from discriminating on the basis of disability
when providing access to whatever goods and services [are] *ordinarily provided* at that place of
public accommodation") (emphasis added).

As discussed above, in order to prove that Lyft violated the ADA, Plaintiffs must
prove that Lyft engaged in "discrimination" as defined by the statute. *See* LRPCL No. 411.

420.    Lyft exclusively permits wheelchair-accessible services in its nine Access Regions (*i.e.*,
Boston, Chicago, Dallas, Los Angeles, New York City, Philadelphia, Phoenix, Portland, and San
Francisco), and only allows WAVs in the Access Regions because it is explicitly required to do so by

local regulations or because of available local financial incentives.[253]  Lyft categorically blocks WAV service on its App in its remaining Regions, which constitute over 96 percent of Lyft's service regions.  In each region where regulators require Lyft to provide WAV service, Lyft intentionally provides the worst possible level of service that will satisfy the local regulators.

**Lyft's Response**: Plaintiffs' argument that Lyft "exclusively permits" WAV services in Access Regions only and "categorically blocks" WAVs elsewhere is simply an argumentative and misleading way of saying that Lyft does not offer WAV service everywhere. Lyft does not dispute that it only offers WAV service in certain cities due to the high cost of WAV supply and numerous other challenges, and Plaintiffs have not shown that Lyft has an obligation to expand WAV service to other regions. Additionally, Plaintiffs have not shown that Lyft "intentionally provides the worst possible level of service that will satisfy the local regulators." *See* LRPF No. 119; *see also* LRPCL No. 411.

### i.    Lyft Discriminates In The Non-Access Regions.

421.    In Lyft's non-Access Regions, which include Westchester County and account for over 96% of Lyft's over 300 service regions nationwide, Lyft uniquely and categorically precludes WAVs from appearing on its app.[254]  *See, e.g.*, Gerundio Dep. Tr. 87:8-15 ("Q:  Lyft doesn't provide WAVS in any markets except those markets where it has been required to do so by the government or where it has been required to do so by the university partner or where the government has offered its subsidies?  A:  That's correct[.]"); Wu Dep. Tr. 183:16-23: ("Q. Is it true that the correct assumption is that Lyft will do as little as possible with regard to WAVS unless forced? . . .  A. Is it

---

[253] Gerundio Dep. Tr. 87:8-15 ("Q: So the answer then is that Lyft isn't in any markets except those where it has been required to do so by -- Lyft doesn't provide WAV[s] in any markets except those markets where it has been required to do so by the government or where it has been required to do so by the university partner or where the government has offered its subsidies? A: That's correct[.]")
[254] Gerundio Dep. Tr. 87:8-15, 243:1-5; Wu Dep. Tr. 183:16-23; Chan Dep. Tr. 118:16-21.

true that Lyft will do as little as possible unless forced? I mean I think at this time with the appetite the company had this was probably true[.]"); Chan Dep. Tr. 118:16-21 ("Q:  So that means for a Lyft driver in White Plains who has an accessible WAV, there would be no way for that person to connect with someone who needs a WAV, because the Access Mode is turned off, correct?  A:  That is correct."); Gerundio Dep. Tr. 243:1-5 ("Q:  So in Westchester County New York a person who requires a WAV to travel cannot use the Lyft platform?  A:  If they are in a fixed frame wheelchair that can't be folded, yes, I guess so.").

> **Lyft's Response**: Lyft has stipulated that it does not offer WAV service outside of its Access Regions. This is not a "categorical block"; Lyft's decision not to offer WAV service is no different than that of a restaurant's decision not to offer gift cards in Braille, *see Thorne v. Boston Mkt. Corp.,* 469 F.Supp.3d 130, 142-43 (S.D.N.Y. 2020) (restaurant need not sell Braille gift cards because Title III does not require an entity to alter its inventory to include accessible goods), or that of a car manufacturer not to manufacture vehicles with hand controls, *see Funches v. Barra*, 2016 U.S. Dist. LEXIS 66589 (S.D.N.Y., May 17, 2016) (because the ADA does not require a business to alter its inventory, car manufacturers do not have an obligation to manufacture vehicles with hand-controls).

> Just as a restaurant or retailer does not "categorically block" Braille gift cards, Lyft does not "categorically block" Access mode. *See also* LRPCL No. 411.

422.     Lyft has an open policy of categorically blocking WAV service outside of is Access Regions.

> **Lyft's Response**: Lyft has stipulated that it does not offer WAV service outside of its Access Regions. This is a perfectly lawful business decision, and Plaintiffs have not come forward with any evidence that Lyft is taking affirmative steps to "block" service that would exist but for Lyft's actions. *See also* LRPCL Nos. 411, 421.

423.     Because Lyft was on notice of the demand for WAV service nationwide, Lyft recommends over 200 local WAV transportation providers across the country on its website that WAV users could independently contact.[255]

> **Lyft's Response**: No evidence was presented that "Lyft was on notice of the demand for WAV service nationwide." To the contrary, the evidence showed that Lyft lists local transportation providers on its website due to requests by local regulators. *See* LRPF No. 198; *see also* Minneapolis Code of Ordinances, Title 13, § 343.150(j); Seattle Municipal Code § 6.310.270.

424.     Lyft's WAV-specific restriction actively discourages drivers from acquiring and operating WAVs on its app, and precludes WAV service by WAVs on its platform where it would otherwise be available.

> **Lyft's Response**: The evidence presented was that WAVs are expensive vehicles. *See* LRPF No. 279. No evidence was presented that any action by Lyft was "actively discouraging drivers from acquiring and operating" these expensive vehicles on its platform, or that any steps taken by Lyft was "precluding WAV service" "where it would otherwise be available." No driver came forward to testify that he had been discouraged from purchasing these expensive vehicles by Lyft's "WAV-specific restriction" or any other action or inaction by Lyft. No fact or expert witness testified that but for some action or inaction on Lyft's part, WAV service would exist on the Lyft platform. *See also* LRPCL No. 411.

425.     For example, Lyft's data shows that WAV drivers on Lyft's App attempted to offer WAV rides in Westchester Country an average of 331 times a month in 2020, but Lyft prohibited these drivers from appearing as WAVs and picking-up WAV riders.[256]

---

[255] *See Local WAV Options*, Lyft, Inc., https://help.lyft.com/hc/ru/all/articles/115013081668-wav-rides#local (last accessed Aug. 22, 2022).
[256] WAV 2021-02-26.

**Lyft's Response**: There was no evidence that WAV drivers "attempted to offer WAV rides in Westchester Country an average of 331 times a month in 2020." Rather, the evidence was that WAV drivers on the Lyft platform often ended up in Westchester County because they were dropping off riders whose rides originated in New York City. LRPF No. 288. No WAV driver testified that he had "attempted to offer WAV rides in Westchester County." *See also* LRPCL No. 411.

426.    Lyft blocked WAV drivers who attempted to offer WAV rides in non-Access Regions 18,032 times in 2020.[257]

**Lyft's Response**: Similarly, there was no admissible evidence that WAV drivers "attempted to offer WAV rides" in any of the non-Access Regions. *See* LRPF No. 289. Without evidence that such drivers existed, Lyft could not have "blocked" them. *See also* LRPCL No. 411.

427.    The only justification Lyft has provided for Lyft's unique categorical preclusion of WAVs in non-Access Regions is its stated assumption that people with disabilities would prefer no service to imperfect service. *See* Gerundio Dep. Tr. 253:13-17 ("some service is not good service"); Gerundio Dep. Tr. 255:8-15 (testifying that, although there may be WAVs in non-Access Region, and "no one has explicitly told me that they would rather have no service," Lyft blocks WAVs from its platform in non-Access Regions because of Lyft's internal, arbitrary reliability standards); Gerundio Dep. Tr. 258:1-9 (testifying that she personally prefers reliable service to no service); Chan Dep. Tr. 125:25-126:4 ("Q:  So Lyft's position is that it might not be able to provide ride share reliably in the non-Access Regions, therefore it doesn't require them at all?  A:  Yes."); Chan Dep. Tr. 124:9-15 ("Q:  Did WAV users ever say that they'd prefer to have no option at all, rather than have an option that might involve a long [] wait time? . . .  A:  I don't know if a survey has ever been

---

[257] WAV 2021-02-26.

run about Access Mode."); Wu Dep. Tr. 100:20-101:1 ("Q:  Has Lyft done any survey of the

disability community to justify the belief that people with disabilities would rather have no rides

available on Lyft than have imperfect service?  A:  I have not done a survey like that."); Chan Dep.

Tr. 120:7-22 (explaining that Lyft blocks all WAV access in non-Access Regions because longer wait

times would "creat[e] poor user experiences").  Lyft provides no evidence to support this claim.

> **Lyft's Response**: No witness explained Lyft's decision not to provide WAV service
> by stating that it was because they assumed "that people with disabilities would prefer no
> service to imperfect service." To the contrary, every Lyft witness was consistent that the
> challenge with WAV service is the high cost of WAV supply, the relatively low demand for
> WAV service, and the associated challenges in providing reliable WAV service. *See* LRPF
> Nos. 279-280. *See also* LRPCL No. 411.

428.    Conversely, Lyft does not impose the same restrictions on Standard mode service

where such service is imperfect or even virtually non-existent.  *See* Transcript of March 18, 2021

Deposition of Marc Rysman 119: 1-120:17 (admitting that Lyft provides service in Pound Ridge,

New York, and other regions in New York State where it provides inconsistent service").

> **Lyft's Response**: That Lyft chooses to allow Standard mode in areas where service
> is "imperfect or even virtually non-existent" is not a reason to compel Lyft to offer WAV
> service everywhere. As Plaintiffs themselves state, Lyft generates tens of millions of trips
> every month in the non-Access Regions. Plaintiffs' Proposed Findings of Fact ("PFOF")
> No. 63. Under the circumstances, if Lyft chooses to allow its app to operate everywhere, that
> is a perfectly appropriate business decision for Lyft to make. Indeed, Lyft's decision is no
> different than a retailer who decides that while it will offer regular gift cards, it will not offer
> Braille gift cards. Both decisions are lawful.

There is no basis to conclude that WAV service would be as successful as Standard mode. The evidence was that WAV service, even if allowed, would result in substantially less than the volume of Standard mode trips. In some of the Access Regions, the evidence showed that WAV rides comprised less than 0.02% of Standard rides. Even in New York City, WAV rides comprised just 0.1% of Standard rides. LRPF No. 283. That Lyft chooses not to offer WAV service everywhere is a perfectly appropriate business decision that Lyft should be allowed to make. The ADA does not require Lyft to offer a specialized or accessible service, and the lack of WAV service on the Lyft platform does not constitute "discrimination" as defined by the ADA. *See* LRPCL Nos. 410-11.

429.    Rather, Lyft's own performance data metrics (*e.g.*, ride acceptance rates, wait times) and expert testimony demonstrate that the service Lyft provides to able-bodied people fails to meet the standards for service that Lyft imposes to serve people with disabilities in most of the country – including in Westchester County.  *See* Transcript of March 18, 2021 Deposition of Marc Rysman 59:9-22 (stating that the Lyft platform does not provide "viable standard service everywhere in New York State" and "the Lyft platform does not generate a viable platform model everywhere in the United States."); 119:5-120:17 ("Q:  Do you see the population in Pound Ridge [New York]?  A: Yes.  Q:  218 people per square mile.  According to your metrics, can Lyft provide viable standard service in a town with the population density of 218 people per square mile?  A:  On average, zip codes with population density like that generate platform service that's not viable. . . . A: According to my – the results of my model, density levels this low generate outcomes that are not viable and not satisfactory to customers.  Q:  But Lyft does, in fact, provide service in all of these [Westchester County] towns, right?  A:  I agree that the app is available in all these towns."); 254:20-22 ("My prediction is that the Lyft platform will not create a viable platform in large parts of Wyoming.").

**Lyft's Response**: Plaintiffs mischaracterize the testimony of Lyft's expert witness, Dr. Marc Rysman. Dr. Rysman never testified that Lyft has some "standard for service" that it imposes on Access mode but not on Standard mode. Instead, his opinion was that based on his analysis of Lyft data, it is not feasible for Lyft to rely on its platform model to provide Access mode service. LRPF No. 65. That Lyft makes Standard mode available in Pound Ridge, New York, or in the State of Wyoming does not mean that it must offer Access mode in those places. If the ADA were interpreted to require such parity, then a clothing store would need to offer Braille gift cards, bookstores would need to stock every book in Braille, and bakeries must offer a gluten-free alternative for every item they sell. Lyft is not required to offer a specialized or accessible service. *See* LRPCL Nos. 410-11.

430.    Nonetheless, and contrary to its policy for accessible service, Lyft Standard mode nationwide – even where service is extremely poor.  Thus, by imposing restrictions unique to WAVs and categorically blocking WAVs from appearing as such on Lyft's app, Lyft necessarily and discriminatorily prevents people with disabilities from using its services.  *See, e.g., Crawford*, 2022 WL 74161, at *2 ("A policy that does not allow WAVs to operate on the Uber platform has the direct result of preventing people who use WAVs from using the platform[.]"); *ILRC*, 2020 WL 6462390, at *2 ("Lyft's failure to extend some of the policies, practices, and procedures it uses for non-WAV services (and certain WAV services in other cities) to include WAV services in the Bay Area counties is discriminatory").

**Lyft's Response**: The problem with Plaintiffs' theory is that under the ADA, Lyft is not required to offer WAV service just because it offers Standard mode. Not only have the Second and the Tenth Circuit Court of Appeal so held in the context of taxi companies, *see, e.g., Noel*, 687 F.3d at 73 ("Title III expressly exempts taxi providers from purchasing or leasing 'accessible automobiles'"), and *Toomer*, 443 F.3d at 1195 ("a taxi fleet consisting

entirely of non-accessible vehicles would be in accord with the ADA"), but other Circuit Courts of Appeal and judges in this district have held that the ADA does not require private entities to provide specialized or accessible goods. *See, e.g., McNeil v. Time Ins. Co.,* 205 F.3d 179, 186-87 (5th Cir. 2000); *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1115 (9th Cir. 2000); *Doe v. Mut. Of Omaha Ins. Co.,* 179 F.3d 557, 560 (7th Cir. 1999); *Thorne v. Boston Mkt. Corp.,* 469 F.Supp.3d 130, 142-43 (S.D.N.Y. 2020); *Dominguez v. Banana Republic, LLC*, No. 19-CV-10171-GHW, 2020 U.S. Dist. LEXIS 72193, *14 (S.D.N.Y., April 23, 2020) *aff'd. on other grounds, Calcano v. Swarovski N. Am. Ltd.,* 36 F.4th 68 (2d Cir. 2022).

Neither of the sentences excerpted by Plaintiffs from the *Crawford* and *ILRC* cases dictate a different result. Afterall, both courts ultimately concluded that Lyft's and Uber's refusal to offer WAV service was not discrimination under the ADA. *See ILRC* Trial Decision, 2021 U.S. Dist. LEXIS 166229, at *49 (annual cost of $2.29 million for a WAV program in three California counties is an unreasonable modification); *Crawford v. Uber Techs., Inc.,* No. 17-CV-02664-RS, 2022 U.S. Dist. LEXIS 131670, *32 (N.D. Cal., Jul. 25, 2022) (the proposed modifications are unreasonable because the anticipated annual cost of $800,000 for New Orleans and $550,000 for Jackson "is too high for the limited service that would result"). *See also* LRPCL Nos. 410-11.

431.    Lyft blocked more WAV drivers in Westchester County monthly than the number of standard vehicles available in each of 115 regions in 2020 – where Lyft still offers standard rides.[258] Lyft's unique WAV restrictions necessarily and discriminatorily deny people with disabilities access to Lyft.  *See, e,g., Crawford*, 2022 WL 74161, at *2 ("A policy that does not allow WAVs to operate on the Uber platform has the direct result of preventing people who use WAVs from using the

---

[258] Supply 2021-02-26.

platform[.]"); *ILRC*, 2020 WL 6462390, at *2 (Lyft's failure to extend some of its non-WAV and Access Region WAV policies to WAV services in the Bay Area counties is discriminatory).

> **Lyft's Response**: Again, there is no evidence that any WAV drivers were "blocked" in Westchester County or anywhere else. As discussed above, Lyft is not required to provide WAV service in Westchester County, and no WAV driver testified that they were "blocked." As explained by Lyft employee Richard Zhou, the fact these WAV drivers are recorded in the data does not mean they were there to offer WAV rides in Westchester County. LRPF No. 288-89. The evidence showed that other modes, such as Lux Black and Lux Black XL, are offered in New York City but not in Westchester County. LRPF No. 67. There is no "blocking" of WAV, nor is there any "unique WAV restriction." Lyft simply does not offer WAV service (or Lux Black and Lux Black XL) in Westchester County, and absent Plaintiffs' ability to prove that this constitutes "discrimination" as defined under the ADA, the absence of WAV service in Westchester County does not violate the law. *See* LRPCL Nos. 410-411.

432.    To comply with the ADA, "[p]ublic accommodations must start by considering how their facilities are used by non-disabled guests and then take reasonable steps to provide disabled guests with a like experience." *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1135 (9th Cir. 2012) (citing *Spector v. Norwegian Cruise Line Ltd.*, 545 U.S. 119, 128-29 (2005) and *Oregon Paralyzed Veterans of America v. Regal Cinemas, Inc.*, 339 F.3d 1126, 1127-28 (9th Cir. 2003)).  Lyft's unequal standards for offering Standard mode and Access mode services fail to meet this basic requirement.

> **Lyft's Response**: None of the above-cited cases stand for the proposition that the mere failure to offer a "like experience" constitutes "discrimination" as defined by the ADA. Instead, the cases focus on specific definitions of discrimination in the statute. *See Spector v. Norwegian Cruise Line Ltd.*, 545 U.S. 119, 128-29, 135-36 (2005) (listing the definitions of "discrimination" and focusing on "readily achievable barrier removal" under Section

12182(b)(2)(A)(ii)); *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1134, 1135 (9th Cir.

2012) (noting the definition of "discrimination" in Section 12182(b)(2)(A)(ii), and stating:

"[f]acilities are not required to make any and all possible accommodations that would

provide full and equal access to disabled patrons; they need only make accommodations that

are reasonable."); *Oregon Paralyzed Veterans of America v. Regal Cinemas, Inc.*, 339 F.3d 1126,

1127-28 (9th Cir. 2003) (analyzing specific requirements of regulation setting forth building

standards). *See also* LRPCL Nos. 410-411.

433.    Lyft's vehicle-type restrictions in its non-Access Regions, *i.e.*, permitting Standard

mode vehicles to operate irrespective of performance metrics but categorically blocking WAVs, has

a discriminatory impact on people with disabilities because it wholly precludes their access to Lyft's

services.  42 USCA § 12182(b)(1)(A)(ii)).

> **Lyft's Response**: To prove that Lyft's actions are having a discriminatory impact,
> Plaintiffs were required to come forward with evidence of a causal connection between
> Lyft's actions and the lack of WAVs on the Lyft platform. Plaintiffs have not made this
> showing because they have not produced any competent evidence of WAV drivers who
> want to drive their WAVs on the Lyft platform but were allegedly "blocked" from doing so.
> *See also* LRPCL Nos. 410-411.

434.    Lyft's policy and practice also constitutes unlawfully using standards or criteria that

have the effect of discriminating based on disability.  42 USCA § 12182(b)(1)(D).

> **Lyft's Response**: It is not clear what Plaintiffs mean by "standards or criteria" in
> this sentence, or what "policy and practice" results in the alleged "effect of discriminating
> based on disability." But as noted above, the ADA does not require Lyft to provide
> specialized or accessible services. *See* LRPCL Nos. 410-411.

435.    Under the ADA, Lyft cannot exclude people with disabilities based "on mere speculation, stereotypes, or generalizations about individuals with disabilities." *Baughman*, 685 F.3d at 1137 (quoting 28 C.F.R. § 36.301(b)).

    **Lyft's Response**: *Baughman* does not stand for the proposition that individuals with disabilities must always be granted equal participation. To the contrary, *Baughman* holds: "[f]acilities are not required to make any and all possible accommodations that would provide full and equal access to disabled patrons; they need only make accommodations that are reasonable." 685 F.3d at 1135.

    Moreover, there is no evidence that Lyft excludes people with disabilities based on "speculation, stereotypes, or generalizations." To the contrary, the evidence is that Lyft does not offer WAV service because the supply of WAVs is scarce and expensive and Lyft, in its business judgment, does not want to offer service that is unreliable. LRPF No. 279-280. *See also* LRPCL Nos. 410-411.

436.    *Celano v. Marriott Int'l, Inc.* is particularly instructive. As Judge Hamilton explained in granting summary judgment and holding that Marriott discriminates under Title III by its policy of refusing to provide accessible carts to mobility-impaired golfers:

> Marriott's current policy does not provide plaintiffs, mobility-impaired golfers, with an experience that is functionally equivalent to that of other non-disabled golfers. Plaintiffs here have presented overwhelming evidence that they are unable to golf at Marriott's courses under the current policy. By contrast, non-disabled golfers can simply show up at the course and Marriott will provide them with a functional cart as part of the cost of their round of golf. Accordingly, Marriott provides golf carts for able-bodied golfers, but does not provide accessible carts for mobility-impaired golfers like plaintiffs. Because Marriott's policy places plaintiffs in a distinctly unequal situation, as compared to their able-bodied counterparts, it is discriminatory under the ADA.

*Celano v. Marriott Int'l, Inc.*, No. 05-4004, 2008 WL 239306, at *14 (N.D. Cal. Jan. 28, 2008).

    **Lyft's Response**: There are three key differences between providing an accessible golf cart at a resort hotel and WAVs for an on-demand ridesharing platform. First, in the

ADA, Congress explicitly exempted private entities from purchasing or leasing WAVs, *see* 42 U.S.C. § 12184(b)(3), but did not include a similar exemption for golf carts. Second, providing an accessible golf cart is an effective modification for golfers with disabilities who nonetheless want to use golf carts, whereas Plaintiffs produced no evidence that any of their proposed modifications would be effective in creating WAV service on the Lyft platform. *See Staron v. McDonald's Corp.*, 51 F.3d 353, 356 (2d Cir. 1995) (establishing that a modification is "reasonable" requires evidence of effectiveness and cost). Third, in *Celano*, counsel for the defendant conceded that the cost of proposed modification was "minimal." *Celano v. Marriott Int'l, Inc.*, No. 05-4004, 2008 U.S. Dist. LEXIS 6172, at *41 (N.D. Cal. Jan. 28, 2008). Here, the evidence is that the on-going cost of ensuring a supply of WAVs on the Lyft platform is likely to be astronomical. *See, e.g.,* LRPF Nos. 125, 196.

437.    Lyft's policy with respect to blocking WAV services in non-Access Regions is distinctly unequal to its policy for able-bodied riders, and is therefore discriminatory.

**Lyft's Response**: This is not correct. Borrowing Plaintiffs' language, Lyft also "blocks" Lux Black, Lux Black XL, "Car seat" mode, Citi Bike, and other options in addition to WAV in Westchester County. LRPF No. 67. Lyft's policy is not "distinctly unequal to its policy for able-bodied riders," and thus is not discriminatory. *See also* LRPCL Nos. 410-11.

### ii.    Lyft Discriminates In The Access Regions Other Than New York City.

438.    Lyft's policies and practices with respect to WAVs are crafted based on Lyft's concern that, if Lyft provides WAV services too well or efficiently, Lyft may be forced to increase the scope of its WAV services or improve its service levels.  For instance, in an email, Mr. Wu expressed concern that if Lyft were to "run a successful WAV program in Dallas," the "price of success" could be that the legislature would require Lyft to "replicate this model across other

cities."[259]  Conversely, Mr. Wu posited, "[i]s it likely we would have to host an improved WAV

program if we didn't have a good showing?"[260]  *See also* Lyft_ILRC00022617 at

LYFT_ILRC00022626 (describing Lyft's strategy "to keep WAV programs as small as possible while

meeting regulatory requirements" to avoid "our big risk" of "being forced to scale" nationwide);

Treger Dep. Tr. 56:11-14 ("Q:  And so Lyft engaged in partnerships to meet the minimum

requirements related to the laws that were passed, the law that was passed?  A:  Yes.  I think.  Yes.").

Lyft's practice is unique to its WAV service and harms service levels for people with disabilities.

> **Lyft's Response**: As a preliminary matter, Plaintiffs lack standing to pursue any

claims in any Access Region, including New York City, for three reasons.

> *First*, as to all of the Access Regions, Plaintiffs' allegation is that Lyft's policies and

practices in those regions create an unequal experience for those individuals who use Access

mode. Here, the parties have stipulated that none of the Plaintiffs or putative class

representatives have downloaded the Lyft app. Proposed Fact No. 10. Plaintiffs and putative

class representatives thus have not been injured and lack standing to complain about the

level of service in any of the Access Regions. *See Kreisler v. Second Ave. Diner Corp.*, 731 F.3d

184, 187 (2d Cir. 2013) (to establish standing, a plaintiff must prove an injury in fact and a

causal connection between the injury and the defendant's conduct).

> *Second,* other Circuit Courts agree that Plaintiffs lack standing to pursue any claims

regarding the Access Regions. In the specific context of ride-sharing apps in regions that

already provide WAV service, a plaintiff may establish standing only if she actually used the

app to evaluate the service. *See Access Living of Metro. Chi. V. Uber Techs., Inc.*, 958 F.3d 604,

614 (7th Cir. 2020) (plaintiff, by not downloading the Uber app and evaluating its services in

---

[259] LYFT_ILRC00011992.
[260] LYFT_ILRC00011992.

an area where its WAV mode was offered, was "without any personalized experience on which to rest her claim for injunctive relief based on Uber's failure to provide her with a WAV on equivalent terms of service."); *see also Namisnak v. Uber Techs.*, 971 F.3d 1088, 1093 (9th Cir. 2020) (the presence of some form of WAV service in a region is a "dispositive distinction" in evaluating standing). Plaintiffs and the putative class representatives lack standing to pursue claims regarding the Access Regions.

*Third,* each Plaintiff (or putative class representative, if a class is certified with these individuals designated as a class representative) was required to present concrete evidence that she has a clear and definite intention to go to each of the Access Regions. *See Calcano*, 36 F.4th at 72, 74-75. Here, none of them presented concrete evidence of an intent to travel to any of the Access Regions, including New York City. *See* LRPF Nos. 14-25; *see also* LRPCL Nos. 395, 402-03.

As for Plaintiffs' allegations in this paragraph, Mr. Wu has not worked at Lyft since approximately July 2019. Yet Plaintiffs ask the Court to rely on his words to assume that what he wrote in emails in 2019 constitutes Lyft policy today. *See, e.g.,* LRPF No. 118, 126. Moreover, having to meet regulatory wait time or other service level requirements is unique to WAV. Assuming Mr. Wu's statements are true, it is possible that Lyft would behave exactly the same way to meet regulatory requirements for its Standard modes. Moreover, there is no evidence that this alleged "practice" actually resulted in lowering "service levels for people with disabilities," or what it may have cost Lyft to improve service levels in any Access region. Finally, it is not clear what statutory definition of "discrimination" is being invoked by Plaintiffs. *See* LRPCL No. 411.

439.    Unlike every single other vehicle option available on Lyft's App (including public transit and rentals), even in its Access Regions, Lyft does not automatically list WAVs as an option

on its home screen.  Rather, Lyft uniquely requires that riders enable the Access Mode toggle – a hidden, multi-step process – to see the WAV option listed alongside the other transportation options and to ascertain whether WAVs are available.[261]  Lyft intentionally hides this requirement to suppress demand for WAVs.  *See, e.g.*, Wu Dep. Tr. 67:24-625; 89:1-6.

> **Lyft's Response**: Plaintiffs contend that the Access Mode toggle is "intentionally hidden" – but the toggle is explained on Lyft's website. LRPF No. 153. As explained by Lyft employees, the toggle has different uses, and one of them is to ensure that the limited and costly supply of WAVs is reserved for individuals who truly need a WAV. *Id.*, No. 217.
>
> When Lyft made Access mode an option for all of its users in New York City, it saw a significant amount of Access mode "misuse" by riders who do not need WAVs. *Id.*, No. 212. In Access regions such as San Francisco or Los Angeles, listing Access mode as an option alongside other modes could result in a significant increase in costs to Lyft because it would need to increase its contracted supply of WAVs to meet the increase in demand including from people who do not actually need a WAV. At the same time, listing Access mode as an option for everyone is likely to result in a higher wait times for individuals who truly need a WAV. LRPF No. 217.

---

[261] *See also* NYC Taxi and Limousine Commission, FHV COMPLIANCE WITH WHEELCHAIR ACCESSIBILITY REQUIREMENTS 12, (Sept. 2019) ("One significant concern is the Lyft app does not present a WAV option in the same manner as non-WAV options. Users have to navigate to a settings screen to locate and activate the WAV option. . . . At the May 21st meeting, Lyft representatives explained that requesting WAV service was similar to requesting specialized equipment, such as a child seat. Upon closer review, however, the child seat option is clearly an option on the main screen, and a user does not need to change their settings in order to request the service.").

440.    Indeed, in New York City, regulators ordered Lyft to remove the Access Mode toggle requirement because it creates a barrier and suppresses demand, and "creates a barrier to knowing that a WAV option exists and could have the effect of suppressing trip demand."[262]

441.    Even though removing this barrier to access in New York City caused demand for WAVs to double immediately,[263] and increased demand for WAVs by 500% within four months,[264] the toggle, which is a barrier that actively discourages WAV requests, remains in place in all eight of Lyft's other Access Regions.[265]

**Lyft's Response**: Lyft does not deny that the toggle remains in place in all Access Regions outside of New York City, or that removing the toggle resulted in a significant increase in demand for Access mode in New York City. But no witnesses testified that the toggle prevented them from using Access mode in the Access Regions, or that the toggle created a lack of WAV supply. Moreover, Lyft's internal analysis showed that following the removal of the toggle in New York City, 45% of Access mode usage came from individuals who do not need WAVs, including those who wanted to use WAVs to move their furniture and motorcycle. LRPF No. 212.

---

[262] New York City Taxi and Limousine Commission, FHV COMPLIANCE WITH WHEELCHAIR ACCESSIBILITY REQUIREMENTS 12, (Sept. 2019) (further ordering that "Lyft must ensure that it can accept trips from passengers requesting WAVs in the same manner as they accept trips from passengers requesting non-wheelchair accessible vehicles.").

[263] Gerundio Dep. Tr. 139:6-12 ("Q: What happened when Lyft got rid of the toggle in New York City? A: When we [removed] the toggle in New York City, we saw the ridership increased. Q: Increased by what percent? A: I believe it was around a hundred percent.").

[264] Findings of Fact at ¶335.

[265] The TLC further rejected Lyft's allegation that increased public visibility of Access mode on its App would lead to abuse of the WAV feature by able-bodied users. NYC Taxi and Limousine Commission, FHV COMPLIANCE WITH WHEELCHAIR ACCESSIBILITY REQUIREMENTS 12, (Sept. 2019) ("Lyft raised more concern about limiting trips that it claimed might be fraudulent (a concern not expressed by the other participating dispatchers).").

442.    Lyft's hidden, multi-step process to enable the Access mode toggle and request a ride on its App constitutes an unlawful barrier to access. *See, e.g.*, *Walters v. Fischer Skis U.S., LLC*, No. 21-1115, 2022 WL 3226352, at *7 (N.D.N.Y. Aug. 10, 2022) (holding that digital barriers constitute "specific barriers to accessibility" in violation of Title III); *Duncan v. Skin Bar NYC, LLC*, No. 19-5188, 2021 WL 9204082, at *4 (S.D.N.Y. May 18, 2021) (holding that the defendant's failure to make "modifications to its website that would allow plaintiff and other visually impaired individuals to have 'equal access'" constitutes a violation of the ADA) (collecting cases); *Robles v. Domino's Pizza, LLC*, 913 F.3d 898, 905 (9th Cir. 2019), *cert. denied*, 140 S. Ct. 122 (2019) (Title III's non-discrimination "requirement applies to [a public accommodations]'s website and app"). That the barrier interferes with access is sufficient. *See, e.g.*, *Farr v. Hobby Lobby Stores, Inc.*, No. 19-5949, 2020 WL 3978078, at *3-4 (C.D. Cal. Apr. 29, 2020) (Title III injury exists where "web-based accessibility barriers" "interfere[d] with [the plaintiff's] access to [the d]efendant's goods and services") (citing *Chapman*, 631 F.3d at 949-50); *Reed v. CVS Pharmacy, Inc.*, No. 17-3877, 2017 WL 4457508, at *1 (C.D. Cal. Oct. 3, 2017) ("that plaintiff is "unable to fully access the website and app's offerings . . . due to a number of access barriers" is a violation of the ADA).

**Lyft's Response**: The toggle is not hidden but explained on Lyft's website. The evidence showed that the principal reason Lyft keeps the toggle in place is *not* because it wants to prevent individuals with disabilities from using Access mode, but rather, to prevent misuse of Access mode by riders who do not need a WAV from requesting a WAV. LRPF No. 212, 217. The toggle, moreover, is not akin to a website or app that is inaccessible to individuals who are visually impaired. First of all, the toggle only needs to be turned on once; after that, Access mode will be shown as an option every other time the rider uses the App. Moreover, no evidence was presented that the toggle is inaccessible. The toggle is merely a design feature of the Lyft app, and it is equally available to be enabled by individuals with

disabilities, as well as those without disabilities. Perhaps most importantly, no Plaintiff testified that he or she was precluded from accessing the Lyft ridesharing platform as a result of the toggle.

The legal definition of "discrimination" at issue in the cases alleging inaccessible websites and apps is the alleged failure to provide auxiliary aids and services under Section 12182(b)(2)(A)(ii) and the alleged failure to remove barriers under Section 12182(b)(2)(A)(iv). *See, e.g., Walters v. Fischer Skis U.S., LLC*, No. 21-1115, 2022 U.S. Dist. LEXIS 142148, at *13-14 (N.D.N.Y. Aug. 10, 2022); *Duncan v. Skin Bar NYC, LLC*, No. 19-5188, 2021 U.S. Dist. LEXIS 97827, at *10 (S.D.N.Y. May 18, 2021).

The term "auxiliary aids and services" is defined by the ADA and interpreting regulations as communication devices and services, including qualified interpreters, taped texts, and "other similar services and actions." 42 U.S.C. § 12103(1); 28 C.F.R. § 36.303(b) (listing examples of "auxiliary aids and services," such as video remote interpreting services, real-time computer-aided transcription, audio recordings, and Brailled materials). Here, the toggle is not an "auxiliary aid and service"; it is a design feature of the app. Plaintiffs' claim for discrimination under Section 12182(b)(2)(A)(iii) fails.

As for any claim for barrier removal under Section 12182(b)(2)(A)(iv), that section defines "discrimination" as the failure to remove an architectural, communication, or transportation barrier. The toggle is none of these things.

In this case, Plaintiffs complain about the lack of WAV service on Lyft's platform. There was no evidence that the toggle causes the lack of WAV service on the Lyft platform, or that anyone with a disability (in particular, any of the Plaintiffs) was harmed by the toggle. Indeed, none of the Plaintiffs or putative class members can trace any injury to the toggle because none of them has downloaded the Lyft app. Moreover, Plaintiffs, who now know

179

about the toggle, cannot establish any "material risk of future harm" from the toggle, should

they download the Lyft app in the future. *See, e.g., Calcano*, 36 F.4th at 72. Not only have

Plaintiffs failed to show that the toggle results in discrimination, but they lack standing to

pursue a claim based on the toggle. *See* LRPCL No. 438.

443.    Lyft refuses to cross-dispatch WAVs on its platform despite permitting drivers in

other modes to cross-dispatch.  For non-WAV drivers, Lyft encourages drivers to cross-dispatch,

meaning that Lyft allows drivers to receive and accept ride requests for different ride modes.  Cross-

dispatching in the WAV-context would allow WAV drivers to accept WAV and standard rides (at

the very least) to maximize productivity and revenue.  But because Lyft does not allow most WAV

drivers to cross-dispatch, WAVs on Lyft's platform are underutilized, which causes inefficiencies, is

a financial disincentive for WAV drivers to drive on Lyft's platform, and inflates Lyft's WAV-related

costs.[266]  This disparate treatment has a discriminatory impact on people with disabilities and their

ability to obtain a ride.

> **Lyft's Response**: The undisputed evidence is that IC WAV drivers on the Lyft
>
> platform are cross-dispatched. LRPF No. 160. There is no causal connection between, on
>
> the one hand, whether Lyft cross-dispatches its Partner WAV drivers or not, and on the
>
> other hand, whether more IC WAV drivers will be incentivized to drive on the Lyft
>
> platform. Plaintiffs' claim that not cross-dispatching Partner WAV drivers somehow has a

---

[266] Because Lyft pays its W-2 WAV drivers on a fixed hourly basis and does not allow them to cross-dispatch, Lyft's WAVs are underutilized and its WAV costs are currently hyper-inflated.  *See, e.g.*, LYFT_ILRC00022617 at LYFT_ILRC00022634 (acknowledging that Lyft is "currently paying [WAV] drivers to sit in parking lots and only do WAV rides (no cross-dispatch)" and only assigns WAV trips to these drivers, which is inefficient and inflate costs); Transcript of Oct. 25, 2021 Deposition of Leon Treger (New York City Market Operations Manager) ("Treger Dep. Tr.") 114:17-22 (testifying with respect to Lyft's W-2 drivers in New York City that "90 percent of the time [they] are not moving, because they're not getting rides.  So they're sitting there only being utilized about 10 to 13 percent of the time.  So the majority are just sitting there to be paid, to just sit there and do nothing.").

"discriminatory impact on people with disabilities" thus makes no sense. *See also* LRPCL No. 438 (Plaintiffs lack standing in Access Regions).

444.    Lyft's refusal to cross-dispatch WAVs creates a separate systemic of service for people with disabilities and thus constitutes a failure to afford services to people with disabilities in the most integrated setting appropriate to the needs of the individuals.  Lyft's refusal to cross-dispatch WAVs likewise denies people with disabilities the opportunity to participate in programs or activities that are not separate or different.  *See Kalani v. Stabucks Coffee Co.*, 698 F. App'x 883, 886-87 (9th Cir. 2017) (finding that Starbucks exclusively offering exterior facing accessible seating, while offering inaccessible interior and exterior seating, violated the ADA and "deprived its wheelchair-bound customers of the opportunity to participate, to the same extent as non-disabled patrons"); *Mortland v. Local Cantina Dublin LLC*, No. 19-01123, 2021 WL 3033355, at *11 (S.D. Ohio July 19, 2021) (finding that a restaurant with seating at a bar and at tables, yet only provided accessible seating at the tables, violated the ADA's integration mandate because it offered a distinctly alternative experienced for disabled customers)

> **Lyft's Response**: As noted above, Lyft does cross-dispatch IC WAV drivers. No evidence was presented to show that cross-dispatching, as opposed to the scarcity and high cost of WAV supply, caused a different experience for individuals with disabilities in any of the Access Regions. *See also* LRPCL No. 438 (Plaintiffs lack standing in Access Regions).

445.    While Lyft might claim that cross-dispatching would reduce WAV availability for people with disabilities who require them, that claim is belied by Lyft's data and by best practices by companies that are serious about serving people with disabilities.  Notably, in New York City, where

the TLC has established minimum service level requirements, Lyft permits WAVs to cross-dispatch and manages to provide far better WAV service than anywhere else.[267]

> **Lyft's Response**: As the evidence showed, Lyft's ability to provide far better service in New York City is due to the unique market conditions, including TLC regulations. To meet TLC regulations, Lyft has spent more money in New York City than elsewhere to provide WAV service. LRPF No. 202.
>
> No witness testified that the number of vehicles or the level of service in New York City was the result of cross-dispatching. Finally, to the extent Plaintiffs are claiming that cross-dispatching somehow impacts the experience of WAV users on the platform, Plaintiffs lack standing to seek injunctive relief because having never downloaded the Lyft app, they were not injured. *See, e.g., Kreisler v. Second Ave. Diner Corp.,* 731 F.3d 184, 187 (2d Cir. 2013). *See also* LRPCL No. 438.

446.    Additionally, Lyft can implement prioritization logic, which allows Lyft to prioritize dispatching certain types of vehicles to certain types of ride requests to ensure efficient vehicle allocation.  Lyft uses prioritization logic in New York City to satisfy local regulations while also optimizing efficiencies and maximizing revenues.

> **Lyft's Response**: There was no evidence that using prioritization logic would increase the number of WAVs on Lyft's platform, or that not using prioritization logic resulted in a decrease in the level of service being provided to any individual WAV user on the Lyft platform. To the extent Plaintiffs are claiming that prioritization logic somehow impacts the experience of WAV users on the platform, Plaintiffs lack standing to seek injunctive relief because having never downloaded the Lyft app, they were not injured. *See,*

---

[267] Corrected Expert Report at 86.

*e.g., Kreisler v. Second Ave. Diner Corp.,* 731 F.3d 184, 187 (2d Cir. 2013). *See also* LRPCL No. 438 (Plaintiffs lack standing in Access Regions).

447.    Lyft does not make WAVs available to independent contractors via its fleet of vehicles that it rents to its independent contractors drivers who drive on the Lyft platform through a subsidiary called Express Drive.[268]  None of the vehicles currently in Lyft's Express Drive fleet are WAVs.[269]  Lyft also rents vehicles to potential drivers on its platform through its FlexDrive program, which works through third-parties.

**Lyft's Response**: No law, including the ADA, requires Lyft to make WAVs available for rental. The larger, well-known rental car companies do not have WAVs in its rental car fleets, as a result of Department of Justice guidance issued in 1994 advising that rental car companies need not retrofit vehicles or acquire or lease lift-equipped vehicles. *See* Letter No. 150 at https://www.justice.gov/crt/core-letters-0 (last visited October 7, 2022); *see also Dahlberg v. Avis Rent a Car Sys.*, 92 F. Supp. 2d 1091, 1094-1095 (D. Colo. 2000) (summarizing DOJ investigation of Avis and resulting settlement agreements, which did not require Avis to make WAVs available for rental). *See also* LRPCL No. 438 (Plaintiffs lack standing in Access Regions).

448.    Lyft has authority to determine the types vehicles available to its riders via Express Drive and FlexDrive.[270]  Notwithstanding, Lyft does not request that WAVs be made available to potential drivers.

---

[268] Lyft Express Drive, Lyft, Inc. (https://www.lyft.com/expressdrive) (last visited Nov. 21, 2021) ("Your keys to earning" "Drive and earn by renting a car through Lyft's Express Drive program. Using cars from our partners at Flexdrive and Hertz, it's never been easier to drive with Lyft.").
[269] Lee Dep. Tr. 47:4-6 ("Q:  So was Perseus with regard to WAVs ever implemented?  A.  No.").
[270] Bousta Dep. Tr. 25:19-26:10 (Lyft informs rental car partners for its Express Drive program of the types of vehicles Lyft drivers prefer to rent), 72:5-76:4 (Lyft chooses the types of vehicles available through its Flex Drive rental program; could not call requesting or offering WAVs).

**Lyft's Response**: To the extent Plaintiffs are asking the Court to order Lyft to purchase or lease WAVs so that they can be made available for rental through Express Drive or FlexDrive, such a remedy is precluded by the ADA, which explicitly exempts private entities like Lyft from having to purchase or lease WAVs. *See* 42 U.S.C. § 12184(b)(3); *see also Noel*, 687 F.3d at 74 ("Title III expressly exempts taxi providers from purchasing or leasing 'accessible automobiles'"); *Toomer*, 443 F.3d at 1195 ("a taxi fleet consisting entirely of non-accessible vehicles would be in accord with the ADA").

Simply suggesting that Lyft "work through third-parties" is not a magic bullet. Evidence showed that rental car companies like Hertz do not have WAVs in their fleet. LRPF No. 191; *see also* https://www.enterprise.com/en/help/customers-with-disabilities.html; https://www.avis.com/en/customer-service/disability-services. Whether Lyft can find a rental partner, and if so, how much such a WAV rental partnership might cost Lyft, were questions that were not answered by Plaintiffs.

To the extent Plaintiffs suggest Lyft should make WAVs available for rental in its Access Regions, Plaintiffs lack standing to pursue this claim. *See also* LRPCL No. 438 (Plaintiffs lack standing in Access Regions).

449.    In contrast to its marketing for its standard services, Lyft deliberately avoids marketing and otherwise promoting its WAV services on both the driver- and rider-side. Lyft's "Current Operating Model" with respect to marketing WAVs is "do not promote WAV demand beyond offering Access Mode" where Lyft is required to offer Access Mode.[271] While Lyft spends hundreds of millions of dollars on marketing its standard and other non-WAV transportation modes to drivers and riders each year, Lyft's WAV-specific marketing over approximately 2021 was limited

---

[271] LYFT_ILRC00031902.

to making less than $100,000 worth of coupons available to riders in four of its Access Regions, San Francisco, New York City, Dallas, and Los Angeles. This marketing, which took place primarily in San Francisco, where Lyft was facing a trial, and in New York City, where Lyft was ordered to do so by the TLC, was ineffective and did virtually nothing to increase WAV awareness and demand. Lyft's WAV-specific marketing spend in 2021 is less than 0.2 percent of the total Lyft spent on marketing its brand in 2020 (which is approximately half as much as Lyft spent on marketing its brand the prior year, *i.e.*, before the pandemic). Lyft's refusal to market its WAV services artificially suppresses potential demand and revenue, thus limiting Lyft's ability to provide efficient and effective accessible service.[272]

> **Lyft's Response**: Plaintiffs' expert, who testified about marketing, admitted that he is not a marketing expert. LRPF No. 42. No marketing professional or expert testified to address questions such as whether marketing or advertising could be effective in generating a sufficient supply-and-demand for WAVs on Lyft's on-demand ridesharing platform in any geographic area; what such marketing or advertising would look like; and, how much it would cost. While Plaintiffs complain that Lyft spent less than 0.2% of what it spent marketing its brand in 2020, no knowledgeable person testified as to whether that is an appropriate percentage of spending given the current volume of WAV rides being generated on the Lyft platform. *Cf.* LRPF No. 283. To the extent Plaintiffs suggest Lyft should engage in more marketing and advertising in its Access Regions, Plaintiffs lack standing to pursue this claim. *See also* LRPCL No. 438 (Plaintiffs lack standing in Access Regions).

---

[272] Muñoz June 11, 2020, *ILRC* Dep. Tr. 128:11-129:11 ("So if the question is did you -- did I spend any money on a marketing campaign to recruit WAV drivers, then the answer would be no."); Muñoz Oct. 31, 2019, *ILRC* Dep. Tr. 47:7-48:21 (describing the bulk of Lyft's advertising to prospective drivers from "ad and such on Google and Facebook[,]" "online job platforms[,]" referrals from existing drivers, media campaigns through "radio, television, newspaper[,]" among other methods).

### iii. Lyft Discriminates In New York City.

450.    Although Lyft's WAV service in New York City is significantly better than its WAV service in the other Access Regions, it is not equivalent to non-accessible service in both service levels and method of operations.[273]

**Lyft's Response**: Plaintiffs and putative class representatives lack standing to bring any claims against Lyft in New York City. *See also* LRPCL No. 438 (Plaintiffs lack standing in Access Regions).

In New York City, riders who need WAVs can request one 24-hours a day, 7-days a week, and expect that 8 out of 10 times, they will be picked up within 10 minutes. LRPF No. 201. As Plaintiffs themselves admit in Paragraph 483 below, "modifications need not generate perfectly equal service to be reasonable." *See* Plaintiffs' Proposed Conclusions of Law No. 483, *quoting* 28 C.F.R. Pt. 36, App. C (analyzing § 36.201). It is thus not clear what Plaintiffs mean when they say Lyft's WAV service is "not equivalent to non-accessible service in both service levels and method of operations." But to provide this level of service, Lyft currently *loses* money on every ride. LRPF No. 185. Plaintiffs' experts did not estimate how much more Lyft would have to spend (or lose) in order to bring Access mode into parity with Standard mode in New York City.

451.    Lyft monitors its WAV service levels and deliberately suppresses WAV supply and demand in New York City to avoid surpassing the TLC's minimum service level requirements. Even though Lyft knows this policy will lead to "bad rider experiences",[274] Lyft explicitly suppresses

---

[273] *See, e.g.*, FHV COMPLIANCE WITH WHEELCHAIR ACCESSIBILITY REQUIREMENTS, New York City Taxi and Limousine Commission (Sept. 2019) at 12-13; FOR-HIRE VEHICLE WHEELCHAIR ACCESSIBILITY EVALUATION REPORT YEAR 2, New York City Taxi and Limousine Commission (May 2021) at 12.
[274] LYFT_ILRC00011201 at LYFT_ILRC00011205.

WAV supply and demand in New York City to avoid heightened standards for WAV service and being forced to expand its existing WAV services. Lyft's practice is unique to its WAV service and harms service levels for people with disabilities.

**Lyft's Response**: While Plaintiffs continue to emphasize outdated emails, there was no evidence that Lyft "deliberately suppresses WAV supply and demand in New York City to avoid surpassing" TLC's requirements. To the contrary, Lyft witnesses testified regarding the difficulty of Access mode and balancing supply and demand. Lyft witnesses also spoke of the significant sums spent to date in New York City to achieve compliance with TLC requirements. LRPF No. 202.

As Plaintiffs themselves admit in Paragraph 483 below, "modifications need not generate perfectly equal service to be reasonable." *See* Plaintiffs' Proposed Conclusions of Law No. 483, *quoting* 28 C.F.R. Pt. 36, App. C (analyzing § 36.201). 90% of WAV requests are met within 15 minutes. LRPF No. 201. Lyft need not do any more. *See also* LRPCL No. 438 (Plaintiffs lack standing in Access Regions).

452.    Additionally, unlike Standard mode, Lyft avoids marketing and publicizing its WAV services to suppress WAV demand. Despite being reprimanded by the TLC in both its 2019 and 2020 reports for failing to publicize its WAV services and engage in outreach,[275] Lyft continues to avoid engaging in any meaningful marketing or outreach, and instead offered coupons specifically

---

[275] FHV COMPLIANCE WITH WHEELCHAIR ACCESSIBILITY REQUIREMENTS, New York City Taxi and Limousine Commission (Sept. 2019) at 12 ("Recommendations . . . Expand marketing efforts to notify the existing Lyft user base and the general public of the availability of this service while continuing to engage with the community of people with disabilities in targeted marketing efforts."); FOR-HIRE VEHICLE WHEELCHAIR ACCESSIBILITY EVALUATION REPORT YEAR 2, New York City Taxi and Limousine Commission (May 2021) at 12 ("Recommendations . . . Lyft should continue marketing efforts to notify the general public of the availability of this service while continuing to engage with the community of people with disabilities in targeted marketing efforts.").

for rides that were scheduled in advance (*i.e.*, not its standard on-demand services, but rather a lesser service) and occasionally posts about its WAV services on its blog.[276]  Lyft's employees could not describe the readership statistics associated with Lyft's blog posts.[277]

> **Lyft's Response**: Because Plaintiffs' experts are not marketing experts, they could not explain whether there was any relationship between marketing and WAV demand in New York City, including whether marketing would increase WAV demand on the Lyft platform and by how much, whether the increase in WAV demand would lead to a corresponding WAV supply, whether the increase in WAV supply-and-demand will reduce wait times on the Lyft platform, what such marketing would look like, and how much such marketing would cost. *See also* LRPCL No. 438 (Plaintiffs lack standing in Access Regions).

453.    Lyft also persists in minimizing WAV visibility by listing WAVs after virtually every other option on its platform, including daily vehicle rentals – which is not ridesharing – and public transit options – which is completely independent from Lyft's services and offerings.

> **Lyft's Response**: The undisputed evidence is that Access mode is shown as an option on the Lyft app for every rider in New York City. There was no evidence that the

---

[276] Gerundio Dep. Tr. 106:16-23 (the coupons Lyft offered in New York City were specifically for rides that are scheduled in advance); Gerundio Dep. Tr. 108:18-24 ("The last time I talked to the local teams almost no coupon codes were used and the last time I checked the data, we only had about one new user in the last month or so in San Francisco.  So the coupons in San Francisco we have to go back to the drawing board and see what else we can do there."); Gerundio Dep. Tr. 110:22-25 (when similar coupons were previously tried in Dallas, Lyft "didn't have a very high success rate."); Gerundio Dep. Tr. 238:19-35 ("Q:  Are you aware of the TLC recommending that Lyft actually markets its WAV platform?  A:  I remember vaguely.  Q:  What has Lyft done to comply with that recommendation?  A:  If we're talking about the exact same recommendation, I believe we released a blog post."); Treger Dep. Tr. 96:9-23 (testifying that Lyft posts about WAV services in New York City because it was required to do so by the TLC, explaining, "I think the TLC actually requires us to do at least once a year or twice a year some type of passenger outreach and we do it.").
[277] Gerundio Dep. Tr. 219:8-13 ("I don't have the engagement numbers on our blog" and could not approximate).

placement of Access mode in the Lyft app leads to a reduction in supply or demand, or to a diminution in service levels. *See also* LRPCL No. 438 (Plaintiffs lack standing in Access Regions).

454.    Lyft's lack of marketing and recruitment of passengers for its WAV service is evidenced by the fact that its competitor Uber, for instance, during the months of June 2020 through September 2020 served more than double the number of WAV rides as Lyft.

**Lyft's Response**: No evidence was presented that "lack of marketing and recruitment of passengers for its WAV services" by Lyft resulted in Uber serving more WAV rides than Lyft during the months of June through September 2020. No evidence was presented, for example, regarding whether there is parity in the number of Standard mode rides between Uber and Lyft in New York City. Absent such evidence, it is not possible to conclude that it was Lyft's lack of marketing that caused Uber to serve more WAV rides. *See also* LRPCL No. 438 (Plaintiffs lack standing in Access Regions).

**B.    Lyft Violates Section 12184(a) Of The ADA**

**1.    Under Section 1284(a), Which Is A Remedial Provision, Plaintiffs Have The Burden Of Showing That Lyft Is A Specified Public Transportation Service That Discriminates.**

455.    Section 12184(a) of the ADA provides: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of specified public transportation services provided by a private entity that is primarily engaged in the business of transporting people and whose operations affect commerce."  42 U.S.C. § 12184(a).

**Lyft's Response**: Like Section 12182, what Section 12184 prohibits is discrimination "in the full and equal enjoyment of specified public transportation services provided by a private entity." Under this language, while Lyft cannot discriminate in providing any service it ordinarily provides, it is not required to provide a different, accessible service. *See* 49

C.F.R. § 37.5(b) (an entity shall not "deny to any individual with a disability the opportunity

to use the entity's transportation service for the general public, *if the individual is capable of using*

*that service*") (emphasis added).

Moreover, Congress explicitly exempted private entities like Lyft from having to

purchase or lease WAVs. *See* 42 U.S.C. § 12184(b)(3) (no obligation to purchase or lease

WAVs for a "demand responsive" system, except for vans with seating capacity of more

than eight); *see also Noel v. N.Y.C. Taxi & Limousine Comm'n*, 687 F.3d 63, 74 (2d Cir. 2012);

*Toomer v. City Cab*, 443 F.3d 1191, 1195 (10th Cir. 2006).

456.    Section 12184 likewise delineates types of discrimination prohibited under the

provision.  In relevant part, section 12184 prohibits the following specified forms of discrimination:

    a.    imposing eligibility criteria, none of which are necessary for the provision of
          Lyft's services, that screen out or tend to screen out people with disabilities
          from fully enjoying Lyft's transportation services, § 12184(b)(1);
    b.    failing to make reasonable modifications consistent with those required under
          section 12182(b)(2)(A)(ii), § 12184(b)(2)(A);
    c.    failing to provide auxiliary aids and services consistent with the requirements
          of section 12182(b)(2)(A)(iii), § 12184(B)(2)(B); and
    d.    failing to remove barriers consistent with the requirements of section
          12182(b)(2)(A), § 12184(B)(2)(C).

**Lyft's Response**: None of these subsections requires Lyft to provide a specialized

or accessible service that it does not already provide. *See* LRPCL No. 455. In addition,

Congress made clear that while a private entity should remove transportation barriers, the

types of barriers to be removed did not include those "that can only be removed through the

retrofitting of vehicles or rail passenger cars by the installation of a hydraulic or other lift,"

*i.e.,* by modifying it to make it wheelchair accessible. *See* 42 U.S.C. § 12184(b)(2)(C),

incorporating § 12182(b)(2)(A)(iv).

457.    Section 12184's discrimination prohibitions apply to any "specified public

transportation services provided by a private entity that is primarily engaged in the business of

transporting people and whose operations affect commerce." A "specified public transportation" is

any "conveyance . . . that provides the general public with general or special service . . . on a regular

and continuing basis." 42 U.S.C. § 12181(10). Furthermore, "Title III's implementing regulations

explicitly make section 12184's anti-discrimination principles applicable to private '[p]roviders of taxi

service[,]' 49 C.F.R. § 37.29, which the regulations broadly define as 'transportation services that

involve calling for a car and a driver to take one places[,]' *id.* pt. 37 app. D." *Equal Rts. Ctr. v. Uber*

*Techs., Inc.*, 525 F. Supp. 3d 62, 82-83 (D.D.C. 2021).

> **Lyft's Response**: The Title III implementing regulations cited by Plaintiffs also
>
> exempt private entities providing taxi service from having to purchase or lease accessible
>
> vehicles. 49 C.F.R. § 37.29(b). Moreover, the same regulations make clear that no private
>
> entity is required to provide a specialized or accessible service. *See also* 49 C.F.R. § 37.5(b) (an
>
> entity shall not "deny to any individual with a disability the opportunity to use the entity's
>
> transportation service for the general public, *if the individual is capable of using that service*")
>
> (emphasis added).

### 2.    Lyft Is A "Specified Public Transportation."

458.    Lyft stipulated that it is engaged in "specified public transportation" under the ADA,

42 U.S.C. § 12184. Stipulation ¶ 5.

> **Lyft's Response**: For purposes of this lawsuit, Lyft does not contest that it is
>
> engaged in "specified public transportation" under the ADA.

### 3.    Lyft's Policies And Practices Are Discriminatory.

459.    Given that section 12184 explicitly adopts the discrimination prohibitions articulated

in section 12182 (*i.e.*, imposing eligibility criteria, none of which are necessary for the provision of

Lyft's services, that screen out or tend to screen out people with disabilities from fully enjoying

Lyft's transportation services; failing to make reasonable modifications consistent with those

required under section 12182(b)(2)(A)(ii); failing to provide auxiliary aids and services consistent

with the requirements of section 12182(b)(2)(A)(iii); and failing to remove barriers consistent with

the requirements of section 12182(b)(2)(A)), for the purpose of brevity, the reasoning set forth in

paragraphs 430-465 of this document explains why Lyft's policies and practices are discriminatory.

**Lyft's Response**: In order to establish their claim under any of the subsections of

Section 12184, Plaintiffs must identify and prove each of the elements of "discrimination" as

defined in the statute. Here, Plaintiffs have not met their burden of proving any of these

claims. *See also* LRPCL Nos. 430-465.

## XIV.   Lyft Violates The New York State Human Rights Law.

### A.     Under The NYSHRL, Which Is A Remedial Statute, Plaintiffs Have The Burden Of Showing That Lyft Is A Public Accommodation That Discriminates.

460.    The NYSHRL provides that "[i]t shall be an unlawful discriminatory practice for any

person being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place

of public accommodation . . . because of the . . . disability . . . of any person, directly or indirectly to

refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or

privileges thereof[.]"  N.Y. Exec. Law § 296(2)(a).

461.    Under the NYSHRL, a "public accommodation" includes "all public conveyances

operated on land."  N.Y. Exec. Law § 292(9).

462.    The NYSHRL provides a non-exhaustive list of discriminatory practices, which

includes the following discriminatory practices applicable here: refusing to make reasonable

modifications in policies, practices, or procedures, when such modifications are necessary to afford

accommodations to people with disabilities, none of which would fundamentally alter the nature of

such accommodations; refusing to take steps necessary to ensure that no individual with a disability

is excluded or denied services due to the absence of auxiliary aids and services, none of which would

fundamentally alter the nature of the accommodation offered nor would result in an undue burden; refusing to remove barriers where such removal is readily achievable.  N.Y. Exec. Law § 296(2)(c)(i)-(iii).

463.    "Because '[a] claim of disability discrimination under the [NYSHRL] is governed by the same legal standards as . . . federal ADA claims,' [] by demonstrating an ADA violation, [the plaintiff] [] also establish[s] a violation of the NYSHRL."  *Cox v. Anjin LLC*, No. 19-4315, 2020 WL 5027864, at *7 (S.D.N.Y. July 24, 2020), report and recommendation adopted, 2020 WL 5018255 (S.D.N.Y. Aug. 25, 2020) (quoting *Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 184 n.3 (2d Cir. 2006); citing *Thorne v. Formula 1 Motorsports, Inc.*, No. 19-1077, 2019 WL 6916098, at *3 (S.D.N.Y. Dec. 19, 2019)).

> **Lyft's Response**: Lyft agrees that Plaintiffs' claim under the NYSHRL rises or falls
> with their claims under the ADA. Because Plaintiffs failed to prove their claims under the
> ADA, Plaintiffs cannot prove their claims under the NYSHRL. *See generally* LRPCL Nos.
> 410-459, 488-514.

464.    Additionally, the NYSHRL permits this Court to order the provision of accessible vehicles without exception by requiring "auxiliary aids and services," which the statute defines as including "the acquisition or modification of equipment or devices."  N.Y. Exec. Law § 296(2)(d)(ii)(C).  Thus, to the extent that the Court agrees that § 12184 does not require the acquisition of accessible vehicles, the ADA standard is based on different statutory language and is not applicable in the context of the NYSHRL.  Additionally, the statutory retrofitting exemption only applies to "*existing* vehicles," meaning Lyft can be Ordered to retrofit vehicles new to its fleet. N.Y. Exec. Law. § 296(c)(2)(iii) (emphasis added).

> **Lyft's Response**: Plaintiffs misstate the law: nothing in the NYSHRL "permits this
> Court to order the provision of accessible vehicles without exception by requiring 'auxiliary

aids and services.'" As Plaintiffs admit in Paragraph 463 above, "[a] claim of disability discrimination under the [NYSHRL] is governed by the same legal standards as . . . federal ADA claims." (Citation omitted.) The definition of "auxiliary aids and services" under the NYSHRL is *identical* to the definition of "auxiliary aids and services" under the ADA, and refers to communication aids and services. *Compare* N.Y. Exec. Law § 296(2)(d)(ii) *with* 42 U.S.C. § 12103(1). Specifically, the definition of "auxiliary aids and services" include examples such as qualified interpreters, taped texts, and other methods for delivering information to individuals with hearing or visual impairments. N.Y. Exec. Law § 296(2)(d)(ii)(A) and (B); 42 U.S.C. § 12103(1)(A) and (B). The language quoted by Plaintiffs – "the acquisition or modification of equipment or devices," which appears in N.Y. Exec. Law § 296(2)(d)(ii)(C) – also appears in the ADA (*see* 42 U.S.C. § 12103(1)(C)), and refers to the acquisition or modification of communication equipment, not wheelchair accessible vehicles.

Nothing in N.Y. Exec. Law § 296(2)(d)(ii) evidences the New York State legislature's intention to require private entities, including ridesharing platforms and taxi companies, to acquire and/or modify vehicles, whether existing or new, to make them wheelchair accessible. As Plaintiffs admit, their claims under NYSHRL are governed by the same standards as their ADA claims. *Rodal v. Anesthesia Group of Onondaga, P.C.,* 369 F.3d 113, 117 n. 1 (2d Cir. 2004), *citing Parker v. Columbia Pictures Indus.,* 204 F.3d 326, 332 n.1 (2d Cir. 2000). Just as the ADA does not require the purchase, lease, or retrofitting of WAVs, neither does the NYSHRL.

465.    Plaintiffs must prove their NYSHRL claims by a "preponderance of the evidence." *Mugavero v. Arms Acres, Inc.*, 680 F. Supp. 2d 544, 559 (S.D.N.Y. 2010).

**B.      Lyft Is A Public Accommodation.**

466.    Lyft stipulates it is a public accommodation under the NYSHRL.  Stipulation ¶ 7.

**C.      Lyft's WAV Service In New York City Is Discriminatory.**

467.    Lyft's policies and practices in New York State outside of New York City are discriminatory under the NYSHRL for the same reason that they are discriminatory under the ADA's higher burden.  *See supra* at ¶¶430-465.

> **Lyft's Response**: Just as Plaintiffs failed to prove their claims against Lyft in New York State, Plaintiffs also failed to prove their claims against Lyft in New York City under the NYSHRL. *See* LRPCL Nos. 450-454, 460-464.

**XV.    Lyft Violates The New York City Human Rights Law.**

**A.      Under The NYCHRL,
Which Is A Remedial Statute, Plaintiffs Have The Burden
Of Showing That Lyft Is A Public Accommodation That Discriminates.**

468.    The NYCHRL provides that "[i]t shall be an unlawful discriminatory practice for any person who is the owner, franchisor, franchisee, lessor, lessee, proprietor, manager, superintendent, agent or employee of any place or provider of public accommodation . . . [b]ecause of any person's actual or perceived . . . disability . . . directly or indirectly . . . [t]o refuse, withhold from or deny to such person the full and equal enjoyment, on equal terms and conditions, of any of the accommodations, advantages, services, facilities or privileges of the place or provider of public accommodation; or [t]o represent to any person that any accommodation, advantage, facility or privilege of any such place or provider of public accommodation is not available when in fact it is available." N.Y.C. Admin. Code § 8-107(4)(a)-(b).  The NYCHRL further specifies that policies and practices which result in a disparate impact to the detriment of people with disabilities are unlawful. N.Y.C. Admin. Code § 8-107(17).

**Lyft's Response**: As discussed above, Plaintiffs lack standing to pursue claims in New York City. *See* LRPCL No. 438.

The elements of a claim for disparate treatment under N.Y.C. Admin. Code § 8-107(4) are: (1) that Plaintiff is disabled under the NYCHRL; (2) that Lyft "directly or indirectly refused, withheld from, or denied an accommodation, advantage, facility, or privilege thereof based, in whole or in part," based on Plaintiff's disability, and (3) that Lyft "acted in such a manner and circumstances as to gives rise to the inference that its actions constituted discrimination" in violation of the statute. *Roberman v. Alamo Drafthouse Cinemas Holdings, LLC,* 67 Misc. 3d 182, 187 (Sup Ct, Kings County, Jan. 13, 2020) (citation omitted). A claim for disparate impact under N.Y.C. Admin. Code § 8-107(17) requires proof of policies or practices "that are facially neutral, but disproportionately or more harshly impacts one group." *Roberman,* 67 Misc. 3d at 187.

469.    "The NYCHRL is 'construed liberally for the accomplishment of [its] uniquely broad and remedial purposes thereof.'" *Brooklyn Ctr. for Indep. of the Disabled v. Metro. Transportation Auth.*, 11 F.4th 55, 68 (2d Cir. 2021) (quoting *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 75 (2d Cir. 2015)). "'[F]ederal civil rights statutes can serve only as a floor below which the [NYCHRL] cannot fall.'" *BCID*, 11 F.4th at 68 (quoting *Ya-Chen Chen*, 805 F.3d at 75). "Accordingly, 'courts must analyze NYCHRL claims separately and independently from any federal and state law claims, construing [the NYCHRL's] provisions broadly in favor of discrimination plaintiffs to the extent that such a construction is reasonably possible.'" *BCID*, 11 F.4th at 68 (quoting *Ya-Chen Chen*, 805 F.3d at 75).

**Lyft's Response**: While the NYCHRL is to be "construed liberally," this does not negate Plaintiffs' responsibility to identify and prove every element of their claim under the statute.

B.    **Lyft Is A Public Accommodation.**

470.    Lyft stipulated that it is a "provider of public accommodation" under the NYCHRL. Stipulation ¶ 7.

C.    **Lyft's WAV Service In New York City Is Discriminatory.**

471.    In *Brooklyn Center for Independence of the Disabled v. Metropolitan Transportation Authority*, the Second Circuit clarified that the NYCHRL does not require that a public accommodation "entirely exclude" people with disabilities or that "they must have had no access at all" to the accommodation for the entity's actions to be unlawful. 11 F.4th 55, 67-68 (2d Cir. 2021) (reversing and vacating the district court's decision granting summary judgment on behalf of the defendants).

**Lyft's Response**: Plaintiffs' reference to the holding of the Second Circuit in *Brooklyn Center for Independence of the Disabled v. Metropolitan Transportation Authority*, 11 F.4th 55, 67-68 (2d Cir. 2021), is insufficient to prove that Lyft discriminated in violation of the NYCHRL.

The relevant facts are that in New York City where Lyft has been subject to stringent performance metrics since 2019, including wait-time requirements established by the New York City Taxi & Limousine Commission ("TLC"), Lyft has met those metrics at an enormous cost. Specifically, the evidence showed that since June 2021, the TLC rules have required Lyft to meet 80% of all WAV requests in under 10 minutes and 90% in under 15 minutes, *see* The Rules of the City of New York, Title 35, § 59B-17(f)(3)(iii), and that Lyft meets these requirements. This means that nearly everyone who wants a WAV on the Lyft platform in New York City can get one in under 15, if not 10, minutes. LRPF No. 201.

Plaintiffs complain that this is not "equal" to Standard mode service in New York City. The relevant inquiry under the NYCHRL, then, is whether this alleged lack of equality

is the result of "disparate treatment" or "disparate impact." *See, e.g., Roberman,* 67 Misc. 3d at 187. Plaintiffs have not proven discrimination under either theory.

First, Plaintiff's theory appears to be that Lyft "intentionally suppresses" WAV service in New York City. The evidence presented, however, showed that any "intentional suppression" that occurred (if it occurred) was because Lyft employees were concerned their over-performance would make it difficult to meet TLC requirements in the future, because the TLC required Lyft to show improvement over time. *See* PFOF No. 206. In other words, the alleged "intentional suppression" was not caused by any discriminatory animus but business and economic realities and the desire to remain compliant with regulations. Plaintiffs thus failed to prove their claim of disparate treatment.

Second, Plaintiffs' theory of "intentional suppression" contradicts their claim of disparate impact, which requires proof of a policy or practice "that is facially neutral." Plaintiffs do not claim that there is a uniform policy of "intentional suppression" across both WAV and Standard modes. The disparate impact claim also fails. *Roberman,* 67 Misc. 3d at 187.

Third, Plaintiffs failed to show any causal connection between the alleged inequality in WAV service and the alleged disparate treatment or any "facially neutral" policy as required under the NYCHRL. The overwhelming evidence was that WAVs are expensive, and the supply-and-demand for WAVs in New York City is scant, in comparison to the standard ridesharing volume. There was no evidence that any discriminatory animus was the cause of the unequal outcomes in service levels, or that any facially neutral policy or practice caused the unequal outcomes in service levels. Plaintiffs thus failed to prove a violation of the NYCHRL.

472.    Lyft violates the NYCHRL by intentionally suppressing WAV service in New York City and by providing WAV service that is inferior to its Standard mode service.

      **Lyft's Response**: *See* LRPCL No. 471.

## XVI.  Lyft Must Remedy Its Discrimination.

473.    "The ADA provides a private right of action for injunctive relief." *Dominguez v. New York Equestrian Ctr., Ltd.*, No. 18-9799, 2020 WL 5796275, at *3 (S.D.N.Y. Sept. 28, 2020) (citing 42 U.S.C. § 12188(a)).

474.    Courts in this Circuit routinely issue remedial orders to ensure a defendant's compliance with statutory obligations providing for accessibility. *See, e.g.*, *Disabled in Action*, 752 F.3d at 205; *Thorne*, 2019 WL 6916098, at *3; *Shariff v. Alsaydi*, No. 11-6377, 2013 WL 4432218, at *4 (E.D.N.Y. Aug. 15, 2013); *New York ex rel. Spitzer v. County of Delaware*, 82 F. Supp. 2d 12, 18 (N.D.N.Y. 2000).

      **Lyft's Response**: In order to prevail on their claim for injunctive relief and obtain a remedial order, Plaintiffs must first establish that they have standing to pursue injunctive relief, and then prove that Lyft engages in "discrimination" as defined by the ADA. *See* LRPCL Nos. 391-405, 410-411. Here, Plaintiffs have not proven any claim of discrimination.

475.    When the plaintiff seeks a reasonable modification, "the determination of whether a particular modification is 'reasonable' involves a fact-specific, case-by-case inquiry that considers, among other factors, the effectiveness of the modification in light of the nature of the disability in question and the cost to the organization that would implement it." *Staron*., 51 F.3d at 356.

      **Lyft's Response**: The "fact-specific, case-by-case" inquiry demanded by *Staron* requires answers to the following questions with respect to each "modification" sought: (1) What is the particular modification being proposed? (2) Would the proposed modification

be effective in creating equal access to WAVs on the Lyft platform? (3) What is the cost of the proposed modification?

First, Plaintiffs should identify each particular modification being proposed so that the Court can evaluate whether it is "concrete and specific," "straightforward and simple." *ILRC* Trial Decision, 2021 U.S. Dist. LEXIS 166229, at *28. The need for particularity is also required by Rule 65(d) of the Federal Rules of Civil Procedure, which provides that "[e]very order granting an injunction must . . . state its terms specifically" and "describe in reasonable detail . . . the act or acts restrained or required." Fed. R. Civ. Pro. 65(d)(1).

Second, Plaintiffs must prove that each of their proposed modifications will be effective, meaning that each modification, on a "standalone" basis, will result in reliable WAV service on the Lyft platform. *See Staron*, 51 F.3d at 356 (the fact-specific inquiry of whether a particular modification is "reasonable" includes consideration of its effectiveness); *see also Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, 804 F.3d 178, 189 (2d Cir. 2015) ("The hallmark of a reasonable accommodation is effectiveness") (citation omitted).

Third, with respect to each modification, Plaintiffs must come forward with a plausible cost estimate to show that the cost of the modification would be reasonable. *See, e.g., Staron*, 51 F.3d at 356 (the fact-specific inquiry of "reasonableness" includes an assessment of its cost); *Roberts v. Royal Atl. Corp.*, 542 F.3d 368, 373 (2d Cir. 2008) (in an architectural barrier removal case, a plaintiff must articulate a plausible proposal for barrier removal in which the cost does not clearly exceed its benefits).

A.   **Plaintiffs Bear A Light Burden To Establish A Reasonable Modification And Lyft Then Bears The Burden To Show That The Modifications Are Unreasonable, Cause An Undue Burden, Or Fundamentally Alter Lyft's Business.**

476.    "To establish a 'reasonable accommodation,' a plaintiff 'bears only a burden of production' that 'is not a heavy one.' That is, it would be 'enough for the plaintiff to suggest the

200

existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits. Once the plaintiff has done this, she has made out a *prima facie* showing that a reasonable accommodation is available, and the risk of nonpersuasion falls on the defendant.'" *Roberts v. Royal Atl. Corp.*, 542 F.3d 363, 370 (2d Cir. 2008) (quoting *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 138 (2d Cir. 1995)).

> **Lyft's Response**: While Plaintiffs accurately quoted from *Roberts v. Royal Atl. Corp.*, 542 F.3d 363, 370 (2d Cir. 2008), *Roberts* was an architectural barrier removal case and not a case involving a claim for a reasonable modification or accommodation. *Roberts* omitted a key holding from *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 138 (2d Cir. 1995), establishing that "the plaintiff bears the burden of production and persuasion" on the question of whether an effective accommodation or modification exist. *Id.,* at 137-38.
>
> Under Second Circuit law, therefore, Plaintiffs bear the burden of production and persuasion on the issue of effectiveness of their proposed modifications. *See also Jackan v. N.Y. State DOL*, 205 F.3d 562, 567 (2d Cir. 2000) (at trial, a plaintiff bears the burden of persuasion that a suitable accommodation, in the form of a vacant position into which he could have been transferred, exists); *Stevens v. Rite Aid Corp.,* 851 F.3d 224, 230-31 (2d Cir. 2017) (affirming dismissal of failure to accommodate claim and reversing denial of employer's motion for judgment as a matter of law on wrongful termination claims, because even though the employer had failed to engage in an interactive process, the plaintiff failed, at trial, to present evidence of a reasonable accommodation).
>
> That Plaintiffs should bear the burden of persuasion as to the existence of an effective modification makes sense under Second Circuit authority. As in the case of an employee alleging the failure to provide a reasonable accommodation, Plaintiffs' claim in this case is that Lyft discriminates against them by failing to make the reasonable modification

requested. If the modification being requested would not result in the desired outcome (here, equal access to WAVs on Lyft's ridesharing platform), Lyft cannot have engaged in "discrimination." *See, e.g., Stevens,* 851 F.3d at 231 ("an employee may not recover based on his employer's failure to engage in an interactive process if he cannot show that a reasonable accommodation existed at the time of his dismissal"), *quoting McElwee v. County of Orange,* 700 F.3d 635, 642 (2d Cir. 2012). Similarly, Plaintiffs cannot prove that Lyft discriminates if they cannot show that an effective modification exists. Therefore, as to each modification that Plaintiffs contend Lyft should have made to provide "equal access" to WAV service, they must prove a causal connection by showing that the modification would be effective.

477.    "[T]he plaintiff's burden does not require him or her to furnish exact or highly detailed cost estimates." *Id.* at 371.

    **Lyft's Response**: As to the cost of the proposed modification, under *Borkowski* and *Roberts,* Plaintiffs have the burden to produce a cost estimate. *Borkowski,* 63 F.3d at 138; *Roberts,* 542 F.3d at 370-371. While the estimate need not be "exact or highly detailed," Plaintiffs nonetheless must produce an estimate of cost. *See, e.g., Antolini v. Thurman*, No. 19-CV-9674 (JMF) (KNF), 2021 U.S. Dist. LEXIS 135989, at *10-12 (S.D.N.Y. July 21, 2021) (granting summary judgment based on plaintiffs' failure to provide a "plausible" barrier removal proposal, including its cost); *Range v. 230 W. 41st St. LLC*, No. 17-CIV-149 (LAP), 2020 U.S. Dist. LEXIS 99045, at *17, 20 (S.D.N.Y. June 5, 2020) (submission of incomplete architectural designs unaccompanied by a general cost estimate is insufficient to meet plaintiff's prima facie burden at summary judgment). The Court can therefore summarily deny any proposed modification for which Plaintiffs failed to produce a cost estimate.

478.    "Because '[a] claim of disability discrimination under the [NYSHRL] is governed by the same legal standards as . . . federal ADA claims,' [] by demonstrating an ADA violation, [the

plaintiff] [] also establish[s] a violation of the NYSHRL." *Cox*, 2020 WL 5027864, at *7 (quoting *Graves*, 457 F.3d at 184 n.3.

       **Lyft's Response**: This means that if Plaintiffs fail to prove an ADA violation, their claims under the NYSHRL also fail.

479.     Under the NYCHRL, a "reasonable accommodation" is an "accommodation that can be made that shall not cause undue hardship in the conduct of the covered entity's business. The covered entity shall have the burden of proving undue hardship." *Kreisler v. Second Ave. Diner Corp.*, No. 10-7592, 2012 WL 3961304, at *13 (S.D.N.Y. Sept. 11, 2012) (emphasis removed from original) (quoting N.Y.C. Admin. Code § 8-102), *aff'd*, 731 F.3d 184 (2d Cir. 2013). The NYCHRL embodies "a broader notion of which accommodations are reasonable" than the ADA. *Brooklyn Ctr. For Indep.*, 980 F. Supp. 2d at 642 (citing *Phillips v. New York*, 64 A.D.3d 1051, 883 N.Y.S.2d 369, 378 (1st Dep't 2009)).

480.     "Under the NYCHRL, a requested accommodation is presumed to be reasonable and the covered entity has the burden of establishing that the proposed accommodation is unreasonable." *Comm'n on Human Rights ex rel. Rodriguez, Petitioner v. A Plus Worldwide Limo, Inc.*, OATH Index No. 905/15, 2019 WL 3225764, at *6 (Mar. 7, 2019) (citing *Comm'n on Human Rights ex rel. Stamm v. E&E Bagels, Inc.*, OATH Index No. 803/14, 2016 WL 1644879, at *7 (Apr. 20, 2016)).

       **Lyft's Response**: In New York City, Lyft not only offers WAV service but it does so in compliance with TLC requirements, meaning that 90% of riders can expect to be picked up within 15 minutes, and 80% of riders can expect to be picked up within 10 minutes. In other words, Lyft already offers the accommodation that Plaintiffs want, that of reliable WAV service.

       It is not clear what additional "accommodation" is sought by Plaintiffs. The elements of a reasonable accommodation claim under the NYCHRL are (1) the plaintiff is disabled,

(2) the defendant knew or should have known of the disability, (3) an accommodation would enable the plaintiff to use or enjoy the public accommodation, and (4) the defendant refused to provide an accommodation. *Comm'n on Human Rights ex rel. Stamm v. E&E Bagels, Inc.*, OATH Index No. 803/14, 2016 WL 1644879, at *6 (Apr. 20, 2016). Here, if they download the Lyft app, Plaintiffs will be able to "use or enjoy" Lyft's ridesharing platform.

No other accommodation is required under the law. "A covered entity need not provide the specific accommodation sought; rather, a covered entity may propose reasonable alternatives that meet the specific needs of the person with the disability or that specifically address the limitation at issue." NYC Commission on Human Rights, Legal Enforcement Guidance on Discrimination on the Basis of Disability (April 2019) at 81 (citations omitted). Lyft already offers reliable WAV service in New York City that meets the needs of Plaintiffs. All Plaintiffs have to do is download the Lyft app and request a ride. Plaintiffs have failed to prove their claim for reasonable accommodation under the NYCHRL.

481.    In addition to being "required to modify [their] policies, practices, or procedures to mitigate any disparate impact upon persons with disabilities[,] [p]ublic accommodations must also take affirmative measures to ensure that such persons have an equal opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations that are available from that public accommodation." *Celano*, 2008 WL 239306, at *13 (citing 42 U.S.C. § 12182; 28 C.F.R. §§ 36.302(a), 36.202(b), 36.201(a)).

**Lyft's Response**: In the Second Circuit, to prove that Lyft violated ADA Title III, Plaintiffs must prove "discrimination" as defined by the statute. *See Roberts v. Royal Atl. Corp.*, 542 F.3d 363, 368 (2d Cir.2008).

482.    "In deciding what's reasonable, facilities may consider the costs of such accommodations, disruption of their business and safety.  But they must also take into account

evolving technology that might make it cheaper and easier to ameliorate the plight of the disabled. . . . As new devices become available, public accommodations must consider using or adapting them to help disabled guests have an experience more akin to that of non-disabled guests." *Baughman*, 685 F.3d at 1135.

483.    Modifications need not generate perfectly equal service to be reasonable:

> Full and equal enjoyment means the right to participate and to have an equal opportunity to obtain the same results as others to the extent possible with such accommodations as may be required by the Act and these regulations.  It does not mean that an individual with a disability must achieve an identical result or level of achievement as persons without a disability.  For example, an exercise class cannot exclude a person who uses a wheelchair because he or she cannot do all of the exercises and derive the same result from the class as persons without a disability.

28 C.F.R. § Pt. 36, App. C (analyzing § 36.201).  "If [a public accommodation] can make [a person with disabilities'] experience less onerous and more akin to that enjoyed by its able-bodied patrons, it must take reasonable steps to do so." *Baughman*, 685 F.3d at 1136 (citing *Regal Cinemas*, 339 F.3d at 1133)

484.    Modifications a defendant has implemented in the past to accommodate people with disabilities are material to determining whether the requested modification is reasonable. *See, e.g.*, *Rogers v. W. Univ. of Health Scis.*, 787 F. App'x 932, 935 (9th Cir. 2019); *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 508 (4th Cir. 2016); *Smith v. McCarthy*, No. 20-419, 2021 WL 4034193, at \*21 (D. Md. Sept. 3, 2021); *Wong v. Regents of the Univ. of Cal*, 192 F.3d 807, 820 (9th Cir. 1999); *Taylor v. Gilbert & Bennett*, No. 95-7228, 1997 WL 30948, at \*2 (N.D. Ill. Jan. 15, 1997).

485.    Modifications required under state and local laws "provide[] powerful evidence that such modifications are reasonable, and that they certainly would not fundamentally alter the nature of defendants' programs." *Henrietta D. v. Giuliani*, 119 F. Supp. 2d 181, 209 (E.D.N.Y. 2000), *aff'd sub nom. Henrietta D. v. Bloomberg*, 331 F.3d 261 (2d Cir. 2003).

**Lyft's Response**: None of the authorities cited by Plaintiffs in Paragraphs 482-485 negates Plaintiffs burden to prove that each modification would be effective in creating reliable WAV service on the Lyft platform, and to come forward with evidence of the cost of such modification. *See* LRPCL Nos. 411, 474-76.

486.     Once the plaintiffs make a *prima facie* showing, "the defendant's burden of persuading the factfinder that the plaintiff's proposed accommodation is unreasonable merges, in effect, with its burden of showing, as an affirmative defense, that the proposed accommodation would cause it to suffer an undue hardship." *Borkowski*, 63 F.3d at 138; *see also Kreisler*, 731 F.3d at 189.

**Lyft's Response**: Under the plain language of the statute, 42 U.S.C. § 12184(b)(2)(A), the applicable affirmative defense is fundamental alteration. The Court need not reach Lyft's affirmative defense because Plaintiffs failed to prove the elements of their claims.

487.     "[B]udgetary constraints alone are insufficient to establish a fundamental alteration defense." *Anderson v. Franklin Inst.*, 185 F. Supp. 3d 628, 650 (E.D. Pa. 2016) (citing *Pennsylvania Prot. & Advocacy, Inc. v. Pennsylvania Dep't of Pub. Welfare*, 402 F.3d 374, 380 (3d Cir. 2005)); *accord Pashby v. Delia*, 709 F.3d 307, 324 (4th Cir. 2013); *Fisher v. Oklahoma Health Care Auth.*, 335 F.3d 1175, 1183 (10th Cir. 2003).

### B.     Plaintiffs Proposed Modifications Are Reasonable And Lyft Cannot Meet Its Burden To Invalidate Any Of The Modifications.

488.     Plaintiffs have demonstrated that Lyft can make reasonable modifications to its practices to provide Access mode in Westchester County, New York State, and the non-Access Regions, and improve Access mode in the Access Regions.  Lyft has failed to meet its burden of proof to show that making such modifications would cause an undue burden or present a fundamental alteration to Lyft's business.

**Lyft's Response**: Here, Plaintiffs have failed to prove that they have standing to pursue these claims, and have also failed to prove that they can satisfy the elements of "discrimination" as defined by the ADA. Additionally, as demonstrated below, Plaintiffs failed to prove that any of their proposed modifications would be effective in creating access to WAVs on the Lyft platform, or that the proposed modifications would be "reasonable" in cost as required by *Staron*. *See* LRPCL Nos. 391, 395, 397, 402-405, 409-411, 475, and 489-508.

489.     Plaintiffs' first proposed modification to remove the current block in place on the App in the non-Access Regions is reasonable.  Lyft prohibits individuals who use wheelchairs from accessing rides through Lyft in the same manner as able-bodied individuals.  Lyft's policy in its non-Access Regions prevents WAVs drivers from identifying their vehicles as WAVs and riders from having the option to select WAVs, even when they may be available.  Plaintiffs have met their burden to establish that this modification is reasonable and is not outweighed by any cost to Lyft.

**Lyft's Response**: Plaintiffs have not met their burden to establish that this modification is reasonable under the three-part, fact-specific inquiry required under *Staron,* 51 F.3d at 356.

First, the modification lacks specificity. Plaintiffs fail to describe what the "block" is or how it should removed. Is it a physical block, a software block, or something else? What does it mean that "Lyft prohibits individuals who use wheelchairs from accessing rides through Lyft in the same manner as able-bodied individuals"? What if Lyft puts Access mode on the app but there are no WAVs available – would that be considered "the same manner"? What is the policy that "prevents WAV drivers from identifying their vehicles as WAVs"? Is that the same policy that also prevents "riders from having the option to select WAVs, even when they may be available," or is it different? Under what circumstances

should "riders have the option to select WAVs"? Should they have this option when zero drivers have signed up to provide WAV rides? What if there are just two drivers – is that sufficient if the region is 200 square miles or 2,000 square miles? What happens if the two drivers stop driving and no one else signs up? Absent specificity, any injunction entered based on this modification will not meet Federal Rule of Civil Procedure 65(d)'s requirements for specificity. *See S.C. Johnson & Son, Inc. v. Clorox Co.,* 241 F.3d 232, 240-41 (2d Cir. 2001) (Rule 65(d) requires every injunction to "be specific enough to apprise those within its scope of the conduct that is being proscribed.") (internal quotation marks omitted).

Second, Plaintiffs offered no evidence that this modification would be effective in creating *any* functional WAV service on Lyft's ridesharing platform. Among other things, Plaintiffs offered no evidence of WAV owners who are willing to drive their WAVs on Lyft's platform in any of the non-Access Regions, including Westchester County. Their speculation that Lyft's data report reveals the existence of WAV drivers who "attempted to drive in Access mode" in non-Access Regions is merely that, speculation. Plaintiffs have the burden of production and persuasion on the issue of effectiveness, and speculation will not suffice. *See, e.g., Cayetano v. Fed. Express Corp.*, 2022 U.S. Dist. LEXIS 119102, at *12 n.3 (S.D.N.Y. July 6, 2022) (speculation that plaintiff's employer FedEx could have provided an accommodation of "mechanical assistance" was insufficient without actually "demonstrat[ing] that such a device existed and was available to FedEx.").

Lyft, on the other hand, has come forward with evidence demonstrating that Plaintiffs' proposed modification would not be effective. Specifically, Lyft presented the testimony of its expert, Dr. Marc Rysman, who opined that Lyft cannot rely on its platform model to provide Access mode service in New York State or throughout the nation.

According to Dr. Rysman, his modeling of a hypothetical ridesharing platform for WAVs showed that there is a greater than 99% chance of observing zero WAV rides in one month for half of all ZIP Codes in New York State. Even in more populous areas, Dr. Rysman's model shows that there is a greater than 20% chance of observing zero rides in one month in many places. In Westchester County, Dr. Rysman's model showed that 35% of ZIP codes in Westchester County are predicted to have less than one WAV ride in the entire month, and 93% are predicted to have fewer than 25 rides in one month (*i.e.,* less than one ride a day). LRPF No. 65. Because a successful platform requires sufficient supply and demand, it is not possible to offer WAV service using a platform model. Plaintiffs offered no competent testimony in rebuttal. The evidence thus showed that Plaintiffs' proposed modification of simply showing "Access mode" in the App would not be effective.

Third, Plaintiffs' proposal presents a real risk of a cost to Lyft in the form of additional lawsuits. Here, Plaintiffs have sued Lyft for alleged unequal access not only in the non-Access Regions, but also in the Access Regions including New York City, where Lyft currently responds to 90% of all WAV ride requests within 15 minutes. If Lyft were compelled to make Access mode available everywhere without any supply, Lyft will be sued, including potentially by these very same Plaintiffs, for failing to provide "equal access." Plaintiffs have not made any effort to quantify any of the potential costs to Lyft as a result of this proposed modification, including the costs of potential future lawsuits.

As Harriet Lowell has made clear, she brought this lawsuit because she wants reliable on-demand WAV service on Lyft's ridesharing platform. *See* LRPF No. 111. Plaintiffs have produced no evidence that this modification would yield *any* service, never mind reliable service. Ms. Lowell does not want just an icon for "Access mode" on the Lyft app. Plaintiffs have failed to prove that this modification is reasonable.

490.     Lyft has not met its burden to demonstrate that Plaintiffs' proposed modification would subject Lyft to an undue burden or that it would fundamentally alter Lyft's business. Currently, Lyft enables Access mode in the Access Regions.  Thus, enabling Access mode in the non-Access Regions would not fundamentally alter its business.  Lyft has not established that turning on Access mode in the non-Access Regions would require substantial cost to outweigh the benefits of offering Access mode.  Lyft's defense that enabling Access mode in the non-Access Regions does not guarantee identical wait times, completion rates, or vehicle supply to Standard mode in the non-Access Regions does not rise to the standard of an undue burden.  Lyft does not guarantee certain service level or vehicle supply requirements for Access mode in the non-Access Regions.

**Lyft's Response**: Because Plaintiffs failed to meet their burden of proving that their proposed modification would be effective, the Court need not reach Lyft's affirmative defense of fundamental alteration.

However, this particular proposed modification – of having Lyft show Access mode in its App everywhere – would fundamentally alter Lyft's business by requiring Lyft to offer a specialized service in regions where it currently does not offer it. As a private entity, Lyft has the right to decide when it will offer a new service and in what location, as well as the right to decide when it will stop offering that service. Plaintiffs' request that the Court bar Lyft from exercising its business judgment is a request to have this Court "fundamentally alter" the "essential nature" of Lyft as a private entity. *See, e.g., PGA Tour, Inc. v. Martin,* 532 U.S. 661, 689 (2001); *Doe v. Mut. of Omaha Ins. Co.*, 179 F.3d 557, 560 (7th Cir. 1999). *See* Lyft's Proposed Findings of Fact and Conclusions of Law in Support of its Affirmative Defense.

210

491.     Plaintiffs' second proposed modification to ask all drivers on Lyft's platform and those onboarding whether they have access to WAVs is reasonable.  Currently, Lyft asks drivers all necessary questions during its onboarding survey to ensure the driver and their vehicle meets Lyft's requirements to drive on a particular ride mode.  Lyft does not ask its drivers whether they have a WAV or have access to a WAV as part of the onboarding process in any of its Regions.  For a driver to be able to drive on Access mode, it is necessary for Lyft to know whether the driver's vehicle is a WAV.  Asking a driver whether they have a WAV or have access to a WAV will also enable Lyft to better understand its organic WAV supply.  Plaintiffs have met their burden to establish that this modification is reasonable and is not outweighed by any cost to Lyft.

      **Lyft's Response**: Plaintiffs lack standing to pursue this modification. *See* LRPCL Nos. 402-404, 438. Plaintiffs also have not met their burden to establish that this modification is reasonable under the three-part, fact-specific inquiry required under *Staron*, 51 F.3d at 356.

      Plaintiffs presented no evidence that this modification would be effective in creating WAV supply. Whenever Lyft has reached out to its drivers to find out if anyone has a WAV, it has received very few, if any, responses. LRPF No. 320. There was no evidence that there is a large number of WAVs out on the streets, or of potential WAV drivers who want to drive their WAVs on the Lyft platform. An injunction should be "no broader than necessary to cure the effects of the harm" allegedly caused by the legal violation. *City of New York v. Mickalis Pawn Shop, LLC,* 645 F.3d 114, 144 (2d Cir. 2011), *citing Forschner Grp., Inc. v. Arrow Trading Co.,* 124 F.3d 402, 406 (2d Cir. 1997). Absent evidence that a modification would be effective, Lyft has not engaged in discrimination and the Court cannot restrain Lyft from engaging in lawful conduct. *See Mickalis Pawn Shop,* 645 F.3d at 145 ("An injunction is

overbroad when it seeks to restrain the defendants from engaging in legal conduct") (citation omitted).

492.    Lyft has not met its burden to demonstrate that Plaintiffs' proposed modification would subject Lyft to an undue burden or that it would fundamentally alter Lyft's business. Lyft currently includes numerous questions on its onboarding survey regarding a driver's vehicle. Lyft has not met its burden to establish that inclusion of one additional question during the onboarding survey would deter drivers from driving for Lyft or impose a substantial cost on Lyft to outweigh the benefits of this modification.

**Lyft's Response**: Plaintiffs failed to meet their burden of proving that their proposed modification would be reasonable. That ends the inquiry as to this modification.

493.    Plaintiffs' third proposed modification to remove the Access mode toggle in the Access Regions other than New York City and automatically display Access mode on the App alongside other vehicle options is reasonable. Lyft does not require any users who do not seek to use Access mode to proceed through a similar series of navigational steps to see available vehicles. The Access mode toggle acts as a barrier to users to request a WAV through Access mode. Plaintiffs have met their burden to establish that this modification is reasonable and is not outweighed by any cost to Lyft.

**Lyft's Response**: Plaintiffs lack standing to pursue this modification. *See* LRPCL Nos. 402-404, 438. Plaintiffs also have not met their burden to establish that this modification is reasonable under the three-part, fact-specific inquiry required under *Staron*, 51 F.3d at 356.

Plaintiffs presented no evidence that this modification would be effective in creating WAV supply. While removing the Access mode toggle did increase the demand for Access mode in New York City, there was no evidence that the increase in demand caused an

increase in WAVs on the Lyft platform. To the contrary, the evidence was that the increase in the number of IC WAVs on the Lyft platform was caused by the TLC's regulations. LRPF No. 215. Lyft also showed that given the high cost of WAV supply, its goal is to limit the use of Access mode to riders who truly need a WAV. LRPF Nos. 212, 217. Plaintiffs have not proved that Lyft's use of the Access mode toggle violates the ADA. The Court cannot restrain Lyft from engaging in lawful conduct. *See Mickalis Pawn Shop,* 645 F.3d at 145.

494.    Lyft has not met its burden to demonstrate that Plaintiffs' proposed modification would subject Lyft to an undue burden or that it would fundamentally alter Lyft's business.  Lyft does not require a toggle-like feature for other users and Lyft does not require users in New York City to turn on the toggle in order to use Access mode.  Lyft has not demonstrated that removal of the toggle would subject Lyft to a substantial burden sufficient to outweigh the benefits.  Lyft has not met its burden to demonstrate that removing the toggle will subject Lyft's Access mode drivers to "fraudulent" able-bodied users and diminish the efficiency of Access mode.  Furthermore, as described below, cross-dispatching all WAV vehicles is a reasonable modification and such use of WAVs on Standard mode by able-bodied users should be allowed.

**Lyft's Response**: Plaintiffs failed to meet their burden of proving that their proposed modification would be reasonable. That ends the inquiry as to this modification.

495.    Plaintiffs' fourth proposed modification to utilize cross-dispatching for all drivers, including Partner WAV drivers, is reasonable.  Lyft allows all non-WAV drivers and IC WAV drivers to cross-dispatch on different ride modes if their vehicles meet the requirements for different ride modes.  Partner WAV drivers are the only drivers prevented from cross-dispatching.  Allowing Partner WAV drivers to cross-dispatch would allow Lyft to offer Access mode at a lower cost and improve the service levels of Access mode.  Plaintiffs have met their burden to establish that this modification is reasonable and is not outweighed by any cost to Lyft.

213

**Lyft's Response**: Plaintiffs lack standing to pursue this modification. *See* LRPCL Nos. 402-404, 438. Plaintiffs also have not met their burden to establish that this modification is reasonable under the three-part, fact-specific inquiry required under *Staron,* 51 F.3d at 356.

Plaintiffs presented no evidence that cross-dispatching Partner WAV drivers would be effective in creating WAV supply on the Lyft platform. Lyft pays enormous sums of money to ensure that Partner WAV drivers are on its platform in selected cities. LRPF No. 196. In managing those drivers, Lyft must balance its obligations to shareholders to minimize losses with meeting regulatory requirements. How it manages those drivers, including by cross-dispatching, is a decision that Lyft should be allowed to make, based on the circumstances that exist in each location at any given time, without the Court's interference. *See Mickalis Pawn Shop,* 645 F.3d at 144-45.

496.    Lyft has not met its burden to demonstrate that Plaintiffs' proposed modification would subject Lyft to an undue burden or that it would fundamentally alter Lyft's business.  Lyft already allows many drivers to cross-dispatch.  Lyft allows IC WAV drivers to cross-dispatch and has performed pilot programs enabling Partner WAV drivers to cross-dispatch.  Lyft's defense that allowing Partner WAV drivers to cross-dispatch in some Access Regions has increased the wait time or completion rate is not sufficient to meet its burden.  Plaintiffs and Lyft present competing evidence of the effects of cross-dispatching on service levels.  Plaintiffs present evidence that cross-dispatching improved service levels in some Access Regions and improved the economics of offering Access mode.  Lyft presented evidence that cross-dispatching decreased wait times by one or two minutes in some Access Regions.  Lyft has not met its burden to show that cross-dispatching Partner WAV drivers would subject Lyft to an undue burden that outweighs the benefits of this modification.

**Lyft's Response**: Plaintiffs failed to meet their burden of proving that their

proposed modification would be reasonable. That ends the inquiry as to this modification.

497.    Plaintiffs' fifth proposed modification that Lyft should implement prioritization logic

for Access mode is reasonable.  Lyft previously enabled prioritization logic for IC WAV drivers in

New York City to improve service for Access mode.  The burden to implement prioritization logic

in other cities and for Partner WAV drivers is diminished by Lyft already doing so before.  Plaintiffs

have met their burden to establish that this modification is reasonable and is not outweighed by any

cost to Lyft.

**Lyft's Response**: Plaintiffs have not met their burden to establish that this

modification is reasonable under the three-part, fact-specific inquiry required under *Staron*,

51 F.3d at 356. Plaintiffs also lack standing to pursue this modification. *See* LRPCL Nos.

402-404, 438.

Plaintiffs presented no evidence that implementing prioritization logic would be

effective in creating WAV supply on the Lyft platform. How Lyft manages Access mode,

including by using prioritization logic, should be left to Lyft to decide. *See Mickalis Pawn Shop,*

645 F.3d at 144-45.

498.    Lyft has not met its burden to demonstrate that Plaintiffs' proposed modification

would subject Lyft to an undue burden or that it would fundamentally alter Lyft's business.  Lyft has

previously implemented prioritization logic in Access mode and in other ride modes.  Lyft has not

established that any cost of implementing prioritization logic outweighs the substantial benefit to

Access mode.

**Lyft's Response**: Plaintiffs failed to meet their burden of proving that their

proposed modification would be reasonable. That ends the inquiry as to this modification.

499.    Plaintiffs' sixth proposed modification to increase marketing for Access mode and WAV service, including targeted advertising, to attract potential WAV drivers, as well as to increase awareness of WAVs on Lyft's platform among potential riders is reasonable.  Plaintiffs establish that Lyft does not implement similar marketing and advertising strategies for Access mode as it does for Standard mode or its general brand.  Plaintiffs establish that Lyft does not use many of the typical methods of advertising and communications to drivers and users for Access mode that Lyft relies on for Standard mode.  Plaintiffs establish that Lyft effectively advertises and markets for Standard mode to increase the supply of drivers and increase the demand of rides.  Plaintiffs establish that the benefit of an increased supply of WAVs and increased number of users for Access mode outweighs the cost of marketing and advertising for Access mode.

**Lyft's Response**: Plaintiffs lack standing to pursue this modification. *See* LRPCL Nos. 402-404, 438. Plaintiffs also have not met their burden to establish that this modification is reasonable under the three-part, fact-specific inquiry required under *Staron,* 51 F.3d at 356.

First, the modification lacks specificity. Plaintiffs fail to describe what they mean by "similar marketing and advertising strategies," or what they mean by "typical methods of advertising and communications to drivers and users." Absent specificity, any injunction entered based on this modification will not meet Federal Rule of Civil Procedure 65(d)'s requirements for specificity. *See S.C. Johnson & Son,* 241 F.3d at 240-41 (Rule 65(d) requires every injunction to "be specific enough to apprise those within its scope of the conduct that is being proscribed.") (internal quotation marks omitted).

Second, Plaintiffs offered no evidence that marketing and advertising would be effective in creating equal access to WAVs on Lyft's ridesharing platform. The sole basis for this claim is the testimony of Plaintiffs' expert, who admits that he is not a marketing expert.

LRPF No. 42. Plaintiffs have the burden of production and persuasion on the issue of effectiveness, and speculation will not suffice. *See, e.g., Cayetano*, 2022 U.S. Dist. LEXIS 119102, at *12 n.3 (speculation that employer could have provided an accommodation of "mechanical assistance" was insufficient without proof that such a device existed).

Third, Plaintiffs presented no estimate of the cost that would be involved. Because they failed to present a plausible proposal including cost, Plaintiffs failed to meet their burden of proof. *See Antolini*, 2021 U.S. Dist. LEXIS 135989, at *10-12 (granting summary judgment based on plaintiffs' failure to provide a "plausible" proposal, including its cost); *Range,* 2020 U.S. Dist. LEXIS 99045, at *17, 20 (incomplete architectural designs unaccompanied by a cost estimate is insufficient to meet plaintiff's *prima facie* burden at summary judgment).

Plaintiffs have thus failed to prove that this modification is reasonable.

500.    Lyft has not met its burden to demonstrate that Plaintiffs' proposed modification would subject Lyft to an undue burden or that it would fundamentally alter Lyft's business.  Lyft spends heavily on advertising and marketing and routinely advertises for its Standard mode and general brand.  Lyft has not established that its advertising or marketing is ineffective nor that Access mode is uniquely unresponsive to advertising or marketing.  Lyft has not established that the cost of advertising and marketing for Access mode outweighs the substantial benefit to Access mode.

**Lyft's Response**: Plaintiffs failed to meet their burden of proving that their proposed modification would be reasonable. That ends the inquiry as to this modification.

501.    Plaintiffs' seventh proposed modification that Lyft offer potential WAV drivers baseline bonuses and incentives for guaranteed periods of time is reasonable.  Plaintiffs establish that Lyft typically offers drivers bonuses and incentives when Lyft determines that the supply of

vehicles is insufficient to meet demand. Plaintiffs establish that Lyft has offered bonuses and incentives to Access mode drivers in many of the Access Regions to increase the available supply of WAVs. Plaintiffs establish that offering baseline bonuses and incentives for guaranteed periods of time will alleviate Lyft's concern that there is an insufficient supply of WAV drivers available to provide Access mode. Plaintiffs demonstrate that the cost of offering bonuses and incentives is outweighed by the benefit of increasing the supply of WAVs, allowing Lyft to increase the number of Access mode rides, and reduce the cost of Access mode over time. Plaintiffs have met their burden to establish that this modification is reasonable and is not outweighed by any cost to Lyft.

**Lyft's Response**: Plaintiffs lack standing to pursue this modification. *See* LRPCL Nos. 402-404, 438. Plaintiffs also have not met their burden to establish that this modification is reasonable under the three-part, fact-specific inquiry required under *Staron,* 51 F.3d at 356.

First, the modification lacks specificity. Plaintiffs fail to describe what they mean by "baseline bonuses and incentives for guaranteed periods of time," including the amounts or the "periods of time" for which these "baseline bonuses and incentives" should be "guaranteed." Among the questions that Plaintiffs' expert failed to answer was the amount of the bonus that would be required to incentivize a driver to purchase a WAV to be driven on the Lyft platform. Absent specificity, any injunction entered based on this modification will not meet Federal Rule of Civil Procedure 65(d)'s requirements for specificity. *See S.C. Johnson & Son,* 241 F.3d at 240-41 (Rule 65(d) requires every injunction to "be specific enough to apprise those within its scope of the conduct that is being proscribed.") (internal quotation marks omitted).

Second, Plaintiffs offered no evidence that baseline bonuses and incentives would be effective in creating any WAV service on Lyft's ridesharing platform, never mind one that is

reliable. While Lyft may offer incentives to stimulate supply, Lyft's platform depends on a sufficient existing supply of vehicles and drivers in a particular region – it does not offer incentives to stimulate the purchase of vehicles. *See* LRPF No. 181. Plaintiffs have the burden of production and persuasion on the issue of effectiveness, and they failed to meet that burden.

Third, Plaintiffs presented no estimate of the cost that would be involved. Because they failed to present a plausible proposal including cost, Plaintiffs failed to meet their burden of proof. *See Antolini*, 2021 U.S. Dist. LEXIS 135989, at *10-12 (granting summary judgment based on plaintiffs' failure to provide a "plausible" proposal, including its cost); *Range,* 2020 U.S. Dist. LEXIS 99045, at *17, 20 (incomplete architectural designs unaccompanied by a cost estimate is insufficient to meet plaintiff's *prima facie* burden at summary judgment).

Plaintiffs have thus failed to prove that this modification is reasonable.

502.    Lyft has not met its burden to demonstrate that Plaintiffs' proposed modification would subject Lyft to an undue burden or that it would fundamentally alter Lyft's business.  Lyft routinely employs different incentives and bonuses for Access mode drivers and drivers on other ride modes in order to increase the available supply of vehicles.  Lyft has not demonstrated that the cost of offering incentives and bonuses is outweighed by improved Access mode service and increased supply of WAVs.  Lyft has not established that the cost of incentives and bonuses for Access mode drivers outweighs the substantial benefit to Access mode service.

**Lyft's Response**: Plaintiffs failed to meet their burden of proving that their proposed modification would be reasonable. That ends the inquiry as to this modification.

503.    Plaintiffs' eighth proposed modification that Lyft should include WAVs as an option in Lyft's Express Drive and FlexDrive programs is reasonable.  Plaintiffs establish that Lyft has

control over the types of vehicles available in Express Drive and FlexDrive. Plaintiffs establish that Lyft offers Standard mode vehicles through Express Drive and FlexDrive that are responsive to Lyft's drivers' needs. Plaintiffs establish that Express Drive and FlexDrive offer an important option for drivers to rent vehicles for use on Lyft that can be effective in increasing the supply of WAVs for Access mode. Plaintiffs establish that the cost of adding WAVs to Express Drive and FlexDrive is outweighed by the benefit of increasing the supply of WAVs for Access mode and enhancing the economics of Access mode. Plaintiffs have met their burden to establish that this modification is reasonable and is not outweighed by any cost to Lyft.

> **Lyft's Response**: Plaintiffs lack standing to pursue this modification. *See* LRPCL Nos. 402-404, 438. Plaintiffs also have not met their burden to establish that this modification is reasonable under the three-part, fact-specific inquiry required under *Staron,* 51 F.3d at 356.

> First, the modification lacks specificity. For example, the evidence showed that Lyft does not offer Express Drive and FlexDrive in all areas. LRPF No. 187. It is not clear whether Plaintiffs believe Lyft must offer WAVs for rental in every location where Express Drive and FlexDrive are offered, or just some. It is also not clear how much Plaintiffs think Lyft should charge for the rental of the WAVs. Can Lyft pass on the cost differential between a WAV and a standard sedan to drivers? The proposal also does not specify what is to be done if Lyft cannot find a supplier, or if Lyft cannot find willing drivers to rent the vehicles. Who should bear the financial risk? Absent specificity, any injunction entered based on this modification will not meet Federal Rule of Civil Procedure 65(d)'s requirements for specificity. *See S.C. Johnson & Son,* 241 F.3d at 240-41 (Rule 65(d) requires every injunction to "be specific enough to apprise those within its scope of the conduct that is being proscribed.") (internal quotation marks omitted).

Second, Plaintiffs offered no evidence that drivers would be willing to rent WAVs through Express Drive and FlexDrive. While Lyft was able to find willing renters in New York City, evidence showed that New York City is a unique market. LRPF No. 215. Lyft has also determined, based on its experience in New York City, that the rental model does not result in a reliable supply of WAVs and has stopped pursuing that model. LRPF No. 191. No evidence was presented to show that Lyft would, in fact, be able to create a sufficient WAV supply by this method in any particular location. Plaintiffs have the burden of production and persuasion on the issue of effectiveness, and they failed to meet that burden.

Third, Plaintiffs presented no estimate of the cost that would be involved. Because they failed to present a plausible proposal including cost, Plaintiffs failed to meet their burden of proof. *See Antolini*, 2021 U.S. Dist. LEXIS 135989, at *10-12 (granting summary judgment based on plaintiffs' failure to provide a "plausible" proposal, including its cost); *Range,* 2020 U.S. Dist. LEXIS 99045, at *17, 20 (incomplete architectural designs unaccompanied by a cost estimate is insufficient to meet plaintiff's *prima facie* burden at summary judgment).

Plaintiffs have thus failed to prove that this modification is reasonable.

504.    Lyft has not met its burden to demonstrate that Plaintiffs' proposed modification would subject Lyft to an undue burden or that it would fundamentally alter Lyft's business. Lyft has not established that any cost of including WAVs as an option in Lyft's Express Drive and FlexDrive programs outweighs the substantial benefit to Access mode service.

**Lyft's Response**: Plaintiffs failed to meet their burden of proving that their proposed modification would be reasonable. That ends the inquiry as to this modification.

505.    Plaintiffs' ninth proposed modification that Lyft form partnerships with car rental, taxi, and other transportation companies that have WAVs is reasonable. Plaintiffs have established

221

that Lyft currently engages in partnerships with transportation companies in order to increase the supply of WAVs.  Plaintiffs have established that engaging in partnerships may allow Lyft to feasibly offer Access mode nationwide profitably or at little cost.  Plaintiffs have established that transportation companies who may be available partners are situated across much of the country and that Lyft has knowledge of many of these companies.  Plaintiffs have met their burden to establish that this modification is reasonable and is not outweighed by any cost to Lyft.

> **Lyft's Response**: Plaintiffs lack standing to pursue this modification. *See* LRPCL Nos. 402-404, 438. Plaintiffs also have not met their burden to establish that this modification is reasonable under the three-part, fact-specific inquiry required under *Staron,* 51 F.3d at 356.

> First, the modification lacks specificity. Plaintiffs fail to identify any actual transportation companies willing to partner with Lyft, the terms of such partnerships, or the cost. Any injunction entered based on this modification will not meet Federal Rule of Civil Procedure 65(d)'s requirements for specificity. *See S.C. Johnson & Son, Inc. v. Clorox Co.,* 241 F.3d 232, 240-41 (2d Cir. 2001) (Rule 65(d) requires every injunction to "be specific enough to apprise those within its scope of the conduct that is being proscribed.") (internal quotation marks omitted).

> Second, Plaintiffs offered no evidence that this modification would be effective in creating equal access to WAVs on Lyft's ridesharing platform. Even as to Westchester County, Plaintiffs offered no evidence of effectiveness, or any projection of the number of partner vehicles that would be needed to achieve effectiveness. Plaintiffs have the burden of production and persuasion on the issue of effectiveness, and they did not meet this burden.

> Third, Plaintiffs presented no estimate of the cost that would be involved. The only costs presented showed that the cost would be on-going, and they would be astronomical.

Other courts who weighed evidence of costs specific to a geographic region concluded that the costs of relying on third-party partners to provide a supply of WAVs were not reasonable. *See ILRC* Trial Decision, 2021 U.S. Dist. LEXIS 166229, at *49 (annual cost of $2.29 million for a WAV program in three California counties is an unreasonable modification); *Crawford v. Uber Techs., Inc.,* No. 17-CV-02664-RS, 2022 U.S. Dist. LEXIS 131670, *32 (N.D. Cal., Jul. 25, 2022) (the proposed modifications are unreasonable because the anticipated annual cost of $800,000 for New Orleans and $550,000 for Jackson "is too high for the limited service that would result"). Plaintiffs made no effort to distinguish those cases by offering alternative calculations. Because they failed to present a plausible proposal including cost, Plaintiffs failed to meet their burden of proof. *See Antolini*, 2021 U.S. Dist. LEXIS 135989, at *10-12 (granting summary judgment based on plaintiffs' failure to provide a "plausible" proposal, including its cost); *Range,* 2020 U.S. Dist. LEXIS 99045, at *17, 20 (incomplete architectural designs unaccompanied by a cost estimate is insufficient to meet plaintiff's *prima facie* burden at summary judgment).

Plaintiffs have thus failed to prove that this modification is reasonable.

506.    Lyft has not met its burden to demonstrate that Plaintiffs' proposed modification would subject Lyft to an undue burden or that it would fundamentally alter Lyft's business. This modification would not alter Lyft's business because it currently engages in this practice in some of the Access Regions. The cost of entering into partnerships does not outweigh the benefit of increasing the supply of WAVs, enabling Lyft to expand Access mode, and increasing the economics of offering Access mode over time. Lyft has not established that any cost of forming partnerships with car rental, taxi, and other transportation companies that have WAVs outweighs the substantial benefit to Access mode service.

**Lyft's Response**: Plaintiffs failed to meet their burden of proving that their proposed modification would be reasonable. That ends the inquiry as to this modification.

507.    Plaintiffs' tenth proposed modification that Lyft should implement a ten-cent accessibility surcharge on all rides in order to fund Access mode is reasonable.  Plaintiffs offer a detailed and reasonable estimate of how the surcharge would enable Lyft to increase the funding and budget for Access mode without a substantial cost to Lyft.  Plaintiffs establish that the increase in funding available for Access mode would allow Lyft to increase the supply of WAVs, increase the number of rides, and improve Access mode.  Plaintiffs have met their burden to establish that this modification is reasonable and is not outweighed by any cost to Lyft.

**Lyft's Response**: Plaintiffs lack standing to pursue this modification. *See* LRPCL Nos. 402-404, 438. Plaintiffs also have not met their burden to establish that this modification is reasonable under the three-part, fact-specific inquiry required under *Staron*, 51 F.3d at 356.

It goes without saying that a blanket proposal to impose a ten-cent surcharge will not, standing alone, be effective in creating a WAV supply. Plaintiffs bear the burden of persuasion on effectiveness, and on this basis their proposed modification fails.

In addition, this proposed modification is wholly unrelated to any violation of law asserted in this lawsuit. On its face, this request exceeds the power of this Court "to grant relief no broader than necessary to cure the effects of the harm caused by the violation." *Mickalis Pawn Shop,* 645 F.3d at 144, *quoting Forschner Grp.,* 124 F.3d at 406. While reasonable persons may disagree as to what may or may not constitute a "reasonable modification" of a policy, practice, or procedure under ADA Title III, no reasonable person could conclude that compelling a private entity (and only that private entity) to increase its prices is a modification of "policies, practices, or procedures."

Plaintiffs have thus failed to prove that this modification is reasonable.

508.    Lyft has not met its burden to demonstrate that Plaintiffs' proposed modification would subject Lyft to an undue burden or that it would fundamentally alter Lyft's business.  Lyft has implemented surcharges in different areas of the country, including ten-cent surcharges for accessibility purposes.  This accessibility surcharge would be more cost-effective for Lyft because it retains the proceeds of the surcharge.  Lyft has not established that implementing this surcharge would reduce the total number of rides or revenue in a manner that outweighs the benefits of increased funding for Access mode.  Lyft has not established that any cost of implementing a ten-cent accessibility surcharge outweighs the substantial benefit to Access mode service.

**Lyft's Response**: Plaintiffs failed to meet their burden of proving that their proposed modification would be reasonable. That ends the inquiry as to this modification.

### C.    Plaintiffs Need Only Articulate A Plausible Barrier Removal Proposal, At Which Time The Burden Shifts To Defendant.

509.    To evaluate whether barrier removal is readily achievable, "once a plaintiff 'articulates a plausible proposal for barrier removal, the costs of which, facially, do not clearly exceed its benefits,' the burden shifts to the defendant to 'prove that the proposals were not readily achievable.'"  *Kreisler*, 731 F.3d at 189 (quoting *Roberts*, 542 F.3d at 373, 378).

510.    "Neither the estimates nor the proposal are required to be exact or detailed, for the defendant may counter the plaintiff's showing by meeting its own burden of persuasion and establishing that the costs of a plaintiff's proposal would in fact exceed the benefits.  Because the concept of 'readily achievable' is a broad one, either party may include in its analysis, as costs or benefits, both monetary and non-monetary considerations."  *Roberts*, 542 F.3d at 373.

**Lyft's Response**: While the above paragraphs accurately summarize the law, the relevant question is whether Plaintiffs have, in fact, come forward with a plausible proposal

accompanied by a cost estimate. As discussed below, Plaintiffs have failed to meet their burden of producing a plausible proposal.

**D.    Plaintiffs Have Articulated A Plausible Proposal For Barrier Removal, Which Defendant Has Failed To Prove Is Not Readily Achievable.**

511.    First, Defendant should remove its technological barrier to WAV service in the non-Access Regions.  Lyft currently imposes a barrier in its non-Access Regions that prevents WAVs drivers from identifying their vehicles as WAVs and riders from having the option to request WAVs, even when they may otherwise be available.  Lyft has already removed this barrier in its Access Regions, which demonstrates that removal is readily achievable elsewhere.

**Lyft's Response**: As a preliminary matter, the ADA does not require the removal of "technological barriers." The ADA requires the removal of three types of barriers if the elements for such barrier removal are met: architectural, communication, and transportation barriers. *See* 42 U.S.C. §§ 12184(b)(2)(C), 12182(b)(2)(A)(iv). Transportation barriers, moreover, need not be removed if the barrier removal would require the retrofitting the vehicles to create WAVs, *id.,* § 12182(b)(2)(A)(iv), or, in the cases of private entities like Lyft, the purchase or lease of WAVs, *id.,* § 12184(b)(3). Because the removal of "technological barriers" is not required under the ADA, Plaintiffs' claim fails as a matter of law.

If Plaintiffs are claiming that "technological barrier" in fact means a "transportation barrier," then Plaintiffs' claim of barrier removal fails for the reason that they have failed to articulate a plausible proposal. *See Roberts v. Royal Atl. Corp.,* 542 F.3d 363, 373 (2d Cir. 2008). As the Second Circuit explained in *Roberts* and *Borkowski,* a "plausible" proposal of barrier removal means the proposal would be beneficial, because at least facially, the costs of such proposal would not exceed its benefits. *See Roberts,* 542 F.3d at 373, *quoting Borkowski,* 63 F.3d at 138. Here, there was no evidence that the proposal would yield any benefit. Indeed, there is no evidence that there is an actual "barrier," because there is no evidence there are WAV

drivers who are actually being barred by the alleged "technological barrier" Plaintiffs claim exists. Moreover, as the U.S. Supreme Court explained in *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009), a claim has "facial plausibility" for purposes of a motion to dismiss when the plaintiff has pled "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This "plausibility" standard is "not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.'" *Id.* The Supreme Court's standard for "plausibility" is consistent with the common definitions of the word "plausible," meaning "reasonable" or "appearing worthy of belief." *See* https://www.merriam-webster.com/dictionary/plausible.

Here, borrowing from the Supreme Court's standard for "plausibility" articulated in *Ashcroft,* Plaintiffs offered no "factual content that allows the court to draw the reasonable inference" that if the alleged "technological barrier" were to be removed, access to WAVs will be achieved. "[T]o meet the burden of demonstrating that removal of a barrier is readily achievable, plaintiff must 'proffer evidence, including expert testimony, as to the ease and inexpensiveness of their proposed method of barrier removal.'" *Hurley v. Tozzer, Ltd.,* No. 15 Civ 2785 (GBD)(HBP), 2018 U.S. Dist. LEXIS 18808, *18 (S.D.N.Y., Feb. 2, 2018), *quoting Panzica v. Ms-Maz, Inc.,* CV 05-2595 (ARL), 2007 U.S. Dist. LEXIS 42171, *15 (E.D.N.Y., June 11, 2007). In contrast, Lyft offered the uncontradicted testimony of its expert, Dr. Marc Rysman, who explained that a supply-and-demand based platform for WAV service was not feasible. LRPF Nos. 65.

Simply put, a proposal that has zero chance of working is not "plausible." The very notion of "barrier removal" assumes that access will be achieved if the barrier is removed. Plaintiffs have thus failed their burden to come forward with a plausible proposal. *See, e.g., Antolini*, 2021 U.S. Dist. LEXIS 135989, at *7-9 (at summary judgment, rejecting expert's

proposal to install lifts because it was "shockingly short on details"; the proposal did not include any architectural renderings or information regarding the feasibility of designing and orienting the lifts to provide access); *Range,* 2020 U.S. Dist. LEXIS 99045, at *17, 20 (at summary judgment, rejecting claim that proposals were readily achievable as "rank speculation" because plaintiff failed to offer sufficient evidence to evaluate the plausibility and cost of his proposals).

512.     Lyft has failed to demonstrate that, despite its ability to remove this barrier to WAV service in its nine Access Regions, doing so in its current non-Access Regions would not be readily achievable.  Lyft has not established that enabling Access mode in the non-Access Regions would require substantial cost to outweigh the benefits of offering Access mode.  Lyft's defense that enabling Access mode in the non-Access Regions does not guarantee identical wait times, completion rates, or vehicle supply to Standard mode in the non-Access Regions does not rise to the standard of proving the barrier removal is not readily achievable.  Lyft does not guarantee certain service level or vehicle supply requirements for Access mode in the non-Access Regions.

**Lyft's Response**: Because Plaintiffs failed to meet their burden of presenting a plausible proposal for barrier removal, Lyft need not produce any evidence. Nonetheless, Lyft has produced the following evidence demonstrating that Plaintiffs' proposal would not yield any benefit and would impose unreasonable costs on Lyft.

First, Lyft presented evidence that merely "enabling Access mode" in its app – that is, merely showing "Access mode" as an option – in the non-Access Regions would not result in any Access mode service being offered. Dr. Rysman's analysis showed that based on the lack of density of supply-and-demand, a platform model will not work. LRPF No. 65.

Second, while Plaintiffs focused on areas of non-Access Regions where even Standard mode service is scant (and sometimes non-existent), Lyft employees testified that

228

they were not aware of any independent WAV supply (that is, drivers with WAVs willing to drive on the Lyft platform) even in the largest of cities, including San Francisco, Los Angeles, Atlanta, and Miami. LRPF No. 282.

Third, Dr. Rysman testified that simply showing "Access mode" as an option in the app without any supply of WAVs will result in costs to Lyft. As Dr. Rysman testified, wheelchair users would be frustrated by the non-existent service, which would lead to a degraded brand image for Lyft, as well as increased customer complaints and customer service needs. Riders who can never find a ride, or worse yet, find themselves stranded away from home in their wheelchair, may create significant problems and costs for Lyft, including adverse publicity, degraded image, and potential lawsuits. LRPF No. 67. As Pauline Scudieri testified, she cannot afford to be stranded with a 450-pound wheelchair. LRPF No. 23. There is no doubt that Lyft would face adverse publicity – or worse – if Ms. Scudieri or another wheelchair user found themselves stranded because Lyft had no actual WAV supply despite showing "Access mode" in its app.

Plaintiffs produced no evidence of a benefit to be gained from this proposal. Lyft's evidence showed the proposal would have no benefit, but would result in costs to Lyft.

513.    Second, Lyft should remove its Access mode toggle requirement in the Access Regions other than New York City, which serves as a barrier to wheelchair users seeking to request a WAV.  Lyft does not require any users other than wheelchair users to proceed through a similar series of navigational steps to see available vehicles.  As regulators in New York City explained and Mr. Wu confirmed, the Access mode toggle acts as a barrier to users to request a WAV through Access mode.  Instead of maintaining this barrier, Lyft should automatically display Access mode on the App home-screen alongside other vehicle options.  Lyft already removed this barrier in New York City after being required to do so in New York City, at which point demand for WAVs

229

dramatically increased.  Plaintiffs have met their burden to establish that this barrier removal is readily achievable and is not outweighed by any cost to Lyft.

**Lyft's Response**: As described above, Plaintiffs do not have standing to pursue any claim based on the Access mode toggle because none of them has downloaded the Lyft app and thus have not been injured. Moreover, they do not have standing to pursue injunctive relief because they know about the toggle and thus do not face any risk of future harm, never mind harm that is "imminent and substantial." *See* LRPCL No. 442.

The toggle, moreover, is not an "architectural," "communication," or "transportation" barrier. It is merely an element of Lyft's app design. *See* LRPCL Nos. 439, 442, 511. There was no evidence that removing the toggle would lead to a greater supply of WAVs on the Lyft platform. Lyft, on the other hand, demonstrated that removing the toggle would present significant costs in at least two ways. First, the cost of procuring WAV supply is substantial. According to the analysis of Plaintiffs' own expert, the amount Lyft loses, on average, for every WAV ride is $157.35. In some markets, according to Plaintiffs' expert, the amount is far greater: in Los Angeles, it is $264.34, and in San Francisco, it is $1,169.72. LRPF No. 261. Every Access mode taken by an individual who does not need a WAV, therefore, will impose a cost on Lyft. The second cost to Lyft of removing the toggle is that if demand is increased, including as a result of demand by riders who do not need WAVs, Lyft may not meet regulatory requirements in markets such as Chicago, Los Angeles, Portland, and San Francisco. Lyft would lose valuable subsidies totaling hundreds of thousands of dollars per quarter.

Even assuming the toggle is a transportation barrier, Plaintiffs have failed to show that removing it is "readily achievable."

514.    Lyft has failed to demonstrate that, despite its ability to automatically other available modes on its home-screen and remove this barrier to WAV service in New York City, doing so in other Access Regions would not be readily achievable.  Scattered circumstantial evidence that able-bodied users may improperly request a Access mode vehicle is not sufficient to demonstrate that barrier removal is not readily achievable, particularly where Lyft could implement verification procedures to prevent or punish misuse, or where Lyft could profitably allow able-bodied people to use WAVs, just as virtually every other modern company allows able-bodied people to use services intended for people with disabilities (e.g. restaurants allow able-bodied people to walk up ramps; when people with disabilities are not using handicapped seating, theaters allow able-bodied people to use the seats etc.).

> **Lyft's Response**: As shown in LRPCL No. 513 above, Lyft demonstrated that there are real costs to removing the toggle. There is no evidence that Lyft can "profitably allow able-bodied people to use WAVs" as Plaintiffs claim. The analysis of Lyft's data by Plaintiffs' own expert confirmed this. WAV service on the Lyft platform is not like installing a ramp or seating for individuals with disabilities; those are one-time costs. WAV service, in contrast, is an on-going cost, and there was no evidence from which this Court can conclude that WAV service can be profitable, or even break-even. The unrefuted evidence confirms that Lyft incurs greater losses, the greater number of WAV rides performed.

### E.    Plaintiffs Are Entitled To Attorneys' Fees And Costs.

515.    The ADA, the NYSHRL, and the NYCHRL allow prevailing plaintiffs in an action to recover reasonable attorneys' fees and costs.  *See* 42 U.S.C. § 12205; N.Y. Exec. Law § 297(10); N.Y.C. Admin. Code § 8-502(f); *see also Dominguez v. New York Equestrian Ctr., Ltd.*, No. 18-9799, 2020 WL 5796275, at *4 (S.D.N.Y. Sept. 28, 2020); *Thorne*, 2019 WL 6916098, at *4.

**Lyft's Response**: Plaintiffs have not carried their burden to prove that Lyft discriminated against them in violation of the ADA. They have therefore established no entitlement to relief on their claim. Lyft is the prevailing party, and judgment will be entered for Lyft.

516.    Plaintiffs are entitled to an award of reasonable attorneys' fees and reimbursement of all costs and expenses reasonably incurred in litigation this action.

517.    Plaintiffs and Class Representatives may also apply for a service award.

## XVII.  The Court Issues The Following Order

518.    This Court hereby issues an Order:

    a.  Declaring that Lyft is a public accommodation within the meaning of the Americans with Disabilities Act, 42 U.S.C. § 12181, *et seq.*, the New York State Human Rights Law, N.Y. Exec. Law § 290, *et seq.*, and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq.*;

    b.  Declaring that Lyft's policies and practices discussed above violate the Americans with Disabilities Act, 42 U.S.C. § 12182(b)(1)(A)(i)-(iii), (b)(1)(B), (b)(1)(C), (b)(1)(D), (b)(2)(A)(i)- (v), (b)(2)(C)(i), and 42 U.S.C. § 12184(b)(1), (b)(2)(A)-(C); the New York State Human Rights Law, N.Y. Exec. Law § 296(2)(a), and § 296(2)(c)(i)-(iii); and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107(4)(a)-(b) and § 8-107(17);

    c.  Requiring Lyft to implement the reasonable modifications addressed above and finding that a failure to implement the reasonable modifications addressed above constitutes violation of the Americans with Disabilities Act, 42 U.S.C. § 12181, *et seq.*, the New York State Human Rights Law, N.Y. Exec. Law § 290, *et seq.*, and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq.*; and

d.  Enjoining Lyft and its agents, subsidiaries, affiliates, employees, successors, and all other persons in active concert of participation with Defendant from violating the Americans with Disabilities Act, 42 U.S.C. § 12181, *et seq.*, the New York State Human Rights Law, N.Y. Exec. Law § 290, *et seq.*, and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq.*

**Lyft's Response**: Plaintiffs are no entitled to the entry of this Order because Lyft is the prevailing party. Moreover, Plaintiffs' proposed injunction violates Rule 65(d) of the Federal Rules of Civil Procedure.

519.    The Court also find that Plaintiffs are entitled to an award of reasonable attorneys' fees and reimbursement of all costs and expenses reasonably incurred in connection with this action and that Plaintiffs and Class Representatives may apply receive a service award.

**Lyft's Response**: As the losing party, Plaintiffs are not entitled to recover any fees or costs.

520.    This Court directs the Parties to mediate the issue of attorneys' fees and costs within 45 days of the issuance of this Order.  Plaintiffs shall submit their application for reasonably attorneys' fees, costs, and service awards within 30 days of the mediation.

**Lyft's Response**: The Court hereby directs the Clerk to enter judgment for Lyft.

**LYFT'S PROPOSED FINDINGS OF FACT**
**IN SUPPORT OF ITS AFFIRMATIVE DEFENSE OF FUNDAMENTAL**
**ALTERATION**

I.     **Lyft's Technology Platform**

1.     Lyft launched its on-demand ridesharing platform just ten years ago, in 2012. (Stip. Fact No. 9.)

**Plaintiffs' Response:**  Plaintiffs have no response or objection to this proposed fact.

2.     Lyft's ridesharing platform is a two-sided technology platform that connects people looking for a driver with people who have access to a vehicle and are willing to provide rides. The platform is premised on fundamental principles of supply and demand. To function effectively, there must be an available supply of drivers who can be connected with riders who demand a ride at any given time, in a given location. (Testimony of Asaf Selinger; Testimony of Dr. Marc Rysman.)

**Plaintiffs' Response:**  The opinions of Lyft's expert are unreliable, do not assist the trier of fact, and are contrary to Lyft's business practices.  Fed. R. Evid. 702.  Lyft provides Standard mode in every region in which it operates, regardless of whether Lyft "functions effectively."  Lyft does not make decisions about where to offer, alter, or restrict Standard mode based upon whether it functions effectively or whether there is an available supply of drivers.  Stipulated Facts ¶¶ 19, 24.

Mr. Selinger is not qualified to testify about where and how Lyft can function effectively and is not proffered as an expert on the market dynamics of how Lyft operates.  Fed. R. Evid. 702.

3.     The supply and demand required of the platform is inherently local. The supply of drivers in New York City, for example, is of no use to riders in Des Moine, Iowa. As the number of drivers increase in a particular area, the platform becomes more attractive to riders in that area because wait times will decrease. In turn, as the number of riders increase, the platform becomes

more attractive to drivers who can expect to earn more money. The platform thus works best in areas of high population density. (Testimony of Asaf Selinger; Testimony of Dr. Marc Rysman.)

      **Plaintiffs' Response:** The opinions of Lyft's expert are unreliable, do not assist the trier of fact, and are contrary to Lyft's business practices. Fed. R. Evid. 702.

      Mr. Selinger is not qualified to testify about where and how Lyft can function effectively and is not proffered as an expert on the market dynamics of how Lyft operates. Fed. R. Evid. 702.

      The supply of drivers and demand of riders in nearby or neighboring regions can influence the supply of local drivers. Drivers, including WAV drives, commonly begin or end rides in different regions. For example, in January 2021, many drivers, including more than 500 WAV drivers, began or ended rides in either New York City or Westchester County. Plaintiffs' Proposed Finding of Fact ¶ 302; (Testimony of Claudia Stern).

4. The balance between supply and demand is also important for a well-functioning platform, and one way Lyft achieves balance is by using incentives. For example, Lyft may direct incentives to drivers to encourage them to drive in a certain area at a certain time (*e.g.*, bonus zones or ride streaks). (Testimony of Asaf Selinger.)

      **Plaintiffs' Response:** Mr. Selinger is not qualified to testify about the conditions necessary for a well-functioning platform or how to properly balance supply and demand. Mr. Selinger is not proffered as an expert on the market dynamics of how Lyft operates. Fed. R. Evid. 702.

      Lyft routinely uses incentives to increase driver supply in Standard mode when driver supply is insufficient. However, Lyft does not offer incentives in the same manner to WAV drivers. *See* Plaintiffs' Proposed Findings of Fact ¶¶ 181-182.

5.   Lyft's platform is a technology platform. What this means is that much of the platform's operation is handled by technology, without human intervention. Computer algorithms not only match independent drivers and riders who use the Lyft app, but also help balance supply and demand through pricing and incentives, all in "real-time." Lyft's algorithms use large amounts of data generated by rides in the Lyft app ("App") to adapt and learn. (Testimony of Asaf Selinger.)

> **Plaintiffs' Response:** Lyft is a transportation company that offers a multimodal transportation network across the United States.  Lyft, Inc., Annual Report, (Form 10-K) (Feb. 28, 2022) ("Lyft 2021 Annual Report), at 85.
>
> Lyft's employees create the computer algorithms that Lyft uses and routinely adapt and adjust these algorithms, including to sabotage WAV service.  *See* LYFT_ILRC00011201.

6.   Lyft organizes its coverage areas into more than 300 geographic regions ("Regions") nationwide. Stip. Fact No. 16. Lyft was able to expand quickly throughout the country because the operation of the platform is largely driven by technology. While the platform would not generate high ride volume in some locations, from its experience in other regions, Lyft knew that the platform could function effectively in many areas covered by its expansion, particularly dense urban areas. Lyft is also able to maintain its operations throughout the country because its technology platform does much of the "work" by algorithm. Even in low- or no-use areas, Lyft's reliance on technology means it incurs little incremental financial or operational costs. (Testimony of Asaf Selinger.)

> **Plaintiffs' Response:** Lyft makes Standard mode available in all regions where it operates, regardless of population density, wait time, number of available vehicles, or any other considerations or metrics.  Stipulated Fact ¶ 19.

The evidence does not establish that Lyft considered the ride volume or potential effectiveness of service when it expanded Standard mode to a new region.

## II.   Lyft Offers Specialty Ride Modes In Select Regions Only

7.   In most Regions, Lyft offers just two ride modes, "Standard" and "XL," on its App. "Standard" mode is Lyft's basic ridesharing option. In that mode, a rider will be paired with a standard car for up to 4 passengers. If a rider needs extra seats, there is Lyft XL. XL costs more than Standard but will match a rider with a driver who has an SUV for up to 6 passengers. (Testimony of Asaf Selinger; Testimony of Richard Zhou.)

**Plaintiffs' Response:**  Plaintiffs have no response or objection to this proposed fact.

8.   Standard and XL are available in 346 Regions nationwide. This means that a rider who opens her App will see the current wait times for Standard and XL modes in her local area. (Testimony of Asaf Selinger; Testimony of Richard Zhou.)

**Plaintiffs' Response:**  Plaintiffs have no response or objection to this proposed fact.

9.   In selected Regions, Lyft offers more specialized modes, such as "High Value Modes" or HVMs. In those Regions where HVMs are offered, a rider may see modes such as "Lux," "Lux Black," or "Lux Black XL" listed in the App. For example, Lyft offers the "Lux" mode in Westchester County. In contrast, it offers "Lux Black" and "Lux Black XL" in New York City. What this means is that a rider in Westchester County will see just three modes listed when she opens the App: Standard, XL, and Lux. In contrast, a rider who opens the App in New York City will see Standard, XL, Lux Black, and Lux Black XL, but not Lux. (Testimony of Asaf Selinger; Testimony of Richard Zhou.)

**Plaintiffs' Response:**  This alleged fact has no relevance to the legal issues discussed.  Fed. R. Evid. 401-403.  Lyft's specialized modes for its premium offerings are not relevant to whether it is reasonable for Lyft to implement Plaintiffs' modifications.

A rider in New York City will also see "Access Mode", which serves people with disabilities, while a rider in Westchester County will not.  (Testimony of Donna Drumm).

10. Any rider can select these Luxury modes. The rider pays a premium, but gets a more specialized vehicle.  Having multiple vehicle modes can be good for Lyft's business, because it can lead to a more appealing product for users overall, and greater revenue generation for the higher-priced modes. Even so, Lyft is strategic about where to offer specialized modes to ensure that they function well, to promote a good user experience, and to maximize revenue. (Testimony of Richard Zhou.)

**Plaintiffs' Response:**  This alleged fact has no relevance to the legal issues discussed.  Fed. R. Evid. 401-403.  Lyft's specialized modes for its premium offerings are not relevant to whether it is reasonable for Lyft to implement Plaintiffs' modifications.

When Lyft chooses to expand or offer Standard mode, it does not ensure that it will function well, promote a good user experience, or maximize revenue.  Stipulated Fact ¶ 19.

11. In order to determine where to offer these specialized modes, Lyft analyzes the potential available supply and demand for the mode by Region. Among other factors, it considers existing drivers in the Region who already own vehicles of the qualifying type. It then evaluates whether it believes it would be able to balance the supply of qualifying vehicles with the expected demand for the mode in that Region, to justify launching the specialized mode in the Region. (Testimony of Richard Zhou.)

        **Plaintiffs' Response:** This alleged fact has no relevance to the legal issues

discussed. Fed. R. Evid. 401-403. Lyft's specialized modes for its premium offerings are

not relevant to whether it is reasonable for Lyft to implement Plaintiffs' modifications.

        When Lyft chooses to expand or offer Standard mode, it does not analyze the

available supply and demand. Stipulated Fact ¶ 19.

        12. Out of 346 U.S. regions where Lyft offers Standard & XL, Lyft currently offers Lux

Black and Lux Black XL in just 68 Regions. In all of these Regions, Lyft depends on an "organic"

supply of drivers for all ride modes (not including Access mode). "Organic" supply means drivers

who already have access to qualifying vehicles in the Region. (Testimony of Richard Zhou,

Testimony of Asaf Selinger.)

        **Plaintiffs' Response:** Lyft implements a number of driver outreach, advertising,

and marketing initiatives to identify and engage this "organic" supply of drivers in each

of its ride modes. Zhou Dep. Tr. 67:25-68:8; 68:25-69:8. Lyft does not implement

similar outreach and advertising initiatives to engage Access mode drivers.

**III.**   **Wheelchair Accessible Vehicles Are Expensive And Rare**

        13. Since 2016, Lyft has offered wheelchair-accessible vehicle ("Access") mode in the

following cities: Boston, Massachusetts; Chicago, Illinois; Dallas, Texas; Los Angeles, California;

New York, New York; Philadelphia, Pennsylvania; Portland, Oregon; Phoenix, Arizona; and San

Francisco, California (the "Access Regions"). (Testimony of Isabella Gerundio.)

        **Plaintiffs' Response:** Plaintiffs have no response or objection to this proposed

fact.

        14. Wheelchair accessible vehicles ("WAVs") exist in many forms, such as microbuses or

large vans. The type of WAV that is used on the Lyft platform is one that is created by modifying an

existing minivan, such as a Chrysler Pacifica or a Toyota Siena. (Testimony of Isabella Gerundio.)

**Plaintiffs' Response:**  Plaintiffs have no response or objection to this proposed fact.

15.  These vehicles are not manufactured in factories like standard cars. Instead, to create a WAV, the floor of an existing minivan is typically lowered, and equipment such as a wheelchair ramp and securement device are added. The cost of creating a WAV can add $15,000-$25,000 (or more) on top of the cost of purchasing the minivan. WAVs are rare in part because of the high cost: most people are not likely to incur the cost of creating a WAV unless they (or their family member) need one. (Testimony of Isabella Gerundio.)

**Plaintiffs' Response:** Ms. Gerundio is not qualified to testify about the WAV manufacturing process, the average cost of modifying a vehicle to become a WAV, or the average individual's decision regarding the purchase of a WAV.  Ms. Gerundio is not proffered as an expert on the WAV manufacturing process, the cost of a WAV, or the purchasing practices of individuals.  Furthermore, Ms. Gerundio has not performed any research into the availability of WAVs and the evidence does not establish that she has any specialized knowledge of the WAV manufacturing process.  Fed. R. Evid. 702; Gerundio Dep. Tr. 116:11-117:9, 199:21-200:1, 200:8-24.  WAVs can be purchased for as little as $16,000 (Testimony of Peter Ruprecht) and local governments often completely subsidize the cost of converting vehicles into WAVs (Testimony of Pauline Scudieri).

In any event, there are ample WAVs for Lyft to have a sufficient supply, with more than 15,000 WAVs being manufactured on an annual basis in the United States, and, in particular, a relatively large quantity of WAVs in Westchester County.  (Testimony of Alex Elegudin; Testimony of Peter Ruprecht; Testimony of Daniel Bussani).

16. Lyft launched Access mode in the Access Regions due to local regulatory requirements, financial incentives offered by State or local regulators, or, in the case of Boston, a partnership with a transit agency. (Testimony of Isabella Gerundio.)

**Plaintiffs' Response:** Plaintiffs have no response or objection to this proposed fact.

17. The biggest challenge in offering Access Mode is lack of supply. Unlike other modes, for which Lyft relies on an organic supply of drivers in a particular area, Lyft has found that an organic WAV supply needed to support a functioning platform does not exist. This is no doubt due to the fact that WAVs are expensive to create and only a very small percentage of the general population needs a WAV. (Testimony of Isabella Gerundio.)

**Plaintiffs' Response:** Ms. Gerundio has not performed any research into the availability of WAVs to determine whether Lyft is adequately engaging the available supply of WAVs. Gerundio Dep. Tr. 116:11-117:9, 199:21-200:1, 200:8-24. Moreover, Lyft has refused to ask its drivers whether they have WAVs during Lyft's onboarding process or use outreach and marketing to identify available WAV drivers, like it does in other ride modes. (Testimony of Isabella Gerundio; Testimony of Alex Elegudin).

Ms. Gerundio is not qualified to testify about the average cost of modifying a vehicle to become a WAV, or the average individual's decision regarding the purchase of a WAV. Ms. Gerundio is not proffered as an expert on the cost of a WAV, or the purchasing practices of individuals. Fed. R. Evid. 702. Ms. Gerundio has not performed any research into the availability of WAVs to determine whether Lyft is adequately engaging the available supply of WAVs. Fed. R. Evid. 702; Gerundio Dep. Tr. 116:11-117:9, 199:21-200:1, 200:8-24.

There is a sufficient supply of WAVs for Lyft to provide Access mode in the non-Access Regions.  (Testimony of Alex Elegudin)

18.  To overcome the lack of supply, Lyft has incurred significant cost to artificially create a supply of WAVs on its platform through incentives and partnerships with third parties who have access to these vehicles. In 2019, the total amount Lyft spent to create WAV supply in its Access Regions was $11.6 million; in 2020, the total amount was $13.1 million; and in 2021, the total amount was $13.8 million. (Testimony of Isabella Gerundio.)

**Plaintiffs' Response:**  Lyft implements a number of driver outreach, advertising, and marketing initiatives to identify and engage a supply of drivers in each of its ride modes. Zhou Dep. Tr. 67:25-68:8; 68:25-69:8.  Lyft does not implement similar outreach and advertising initiatives to engage Access mode drivers.

Ms. Gerundio is not qualified to testify about whether there is a sufficient supply of WAVs on Lyft.  Ms. Gerundio is not proffered as an expert on the available supply of WAVs or the purchasing practices of individuals.  Furthermore, Ms. Gerundio has not performed any research into the availability of WAVs to determine whether Lyft is adequately engaging the available supply of WAVs.  Fed. R. Evid. 702; Gerundio Dep. Tr. 116:11-117:9, 199:21-200:1, 200:8-24.

Lyft operates its WAV program grossly inefficiently, with its only goal being to appease regulators while providing as little service as possible.  As a result, Lyft's WAV program is far less economically efficient than a properly functioning WAV program. (Testimony of Alex Elegudin).

19.  There are two ways in which Lyft currently creates a supply of WAVs in the Access Regions. The first model is the "IC" model. Similar to Lyft's standard ridesharing platform, this model utilizes drivers with their own personally owned or rented WAVs. Under this model, WAV

drivers are treated like all other drivers on the Lyft platform: they can drive when they want, where they want. They can accept ride requests not only in Access mode but also in other modes, including Standard mode (this switching between modes is called "cross-dispatching"). (Testimony of Isabella Gerundio.)

> **Plaintiffs' Response:**  Plaintiffs have no response or objection to this proposed fact.

20.  Because IC WAV drivers can pick up Standard mode rides, and because there is a much higher volume of Standard mode ride requests than Access mode ride requests, IC WAV drivers tend to spend the vast majority of their time giving Standard rides instead of Access rides. As a result, Lyft incentivizes IC WAV drivers to accept WAV rides by paying an additional per-ride bonus. For example, Lyft currently pays IC WAV drivers in New York City $15 for each WAV ride completed, on top of their regular per-ride earnings. (Testimony of Isabella Gerundio.)

> **Plaintiffs' Response**: WAV drivers can receive incentives in a similar manner to other Lyft drivers, but Lyft does not guarantee consistent or specialized incentives to WAV drivers.  Gerundio Depo.  148:2-11.  Lyft's failure to incentivize WAV drivers in low performing Access Regions is markedly different than its approach to increase supply in Standard mode and makes Lyft's WAV service less effective than it could be. (Testimony of Alex Elegudin).

21.  Based on Lyft's experience, IC WAV drivers on their own are not a reliable source of supply for Access mode. Not only are IC WAV drivers rare, but even when they do sign up to drive on the Lyft platform, Lyft cannot control when or where they drive. The result is there may be significant periods of time when there is no IC WAV driver in the vicinity of a given ride request. In addition, as discussed above, IC WAV drivers can pick up Standard mode rides and there is a significantly larger number of Standard mode rides requested on the Lyft platform. Thus, when a

WAV request does come in, there is a good chance that the driver will be busy giving a Standard ride. Moreover, it is more economically advantageous for the IC WAV driver to pick up a nearby Standard mode rider than to travel a longer distance to pick up an Access mode rider. This is why Lyft must pay IC WAV drivers a per-ride bonus for every Access mode ride. (Testimony of Isabella Gerundio; Testimony of Richard Zhou.)

> **Plaintiffs' Response:** Ms. Gerundio and Mr. Zhou are not qualified to testify about what is economically advantageous for the average IC WAV driver. Ms. Gerundio and Mr. Zhou are not proffered as experts in economics or the specific behavior of IC WAV drivers. Fed. R. Evid. 702;
>
> Lyft does not know whether or not IC drivers with WAVs are rare, as they do not ask their drivers whether or not they have access to a WAV during the onboarding process, have not conducted a survey or analysis of the availability of WAVs, and refuse to implement similar practices to engage WAV drivers as it does for other ride modes. Gerundio Depo. 201:5-9, 243:21-244:5; Chan Depo. 84:23-85:1; Zhou Dep. Tr. 67:25-68:8; 68:25-69:8.

22. The amount of the incentive paid to IC WAV drivers presently means that, for every WAV ride completed by an IC WAV driver, Lyft loses money. To illustrate, the amount that a rider pays for a ride is usually around $15-20, of which Lyft retains just a portion, with the majority being paid to the driver. Incentives paid to IC WAV drivers per ride are typically $15 or more. The effect is that Lyft loses money on almost every WAV ride. Unlike other modes that become more profitable as the business scales, the more rides that are completed by IC WAV drivers, the more money that Lyft loses. (Testimony of Isabella Gerundio; Testimony of Asaf Selinger.)

> **Plaintiffs' Response**: Lyft employees previously proposed two different initiatives that were projected to allow Lyft to offer WAV service more efficiently and at a lower

cost per ride than Lyft currently offers.  In fact, Mr. Wu's LyftSub projections showed Lyft could offer WAV service at a profit and at nationwide scale.  Lyft is capable of efficiently and profitably offering WAV service.  See Plaintiffs' Proposed Findings of Fact ¶¶ 131-40, 192-95.

Lyft loses money operating WAVs because it intentionally suppresses demand and provides service in a grossly economically inefficient manner.  Plaintiffs' expert projects that Lyft could profitably provide quality WAV service throughout the country in three years, and Lyft could profitably provide some WAV service throughout the country almost immediately.  (Testimony of Alex Elegudin; Corrected Expert Report at 84-110)

23.  The second supply model Lyft uses for Access mode is the "Partner" model. Under the Partner model, Lyft contracts with a third-party company to provide both the WAVs and the drivers to drive them. The third-party company employs the drivers and is responsible for training them in the proper use of the equipment and in providing assistance to riders. Lyft can specify locations for the vehicles and can instruct the partner to require drivers to drive only in Access mode. (Testimony of Isabella Gerundio.)

**Plaintiffs' Response:**  Plaintiffs have no response or objection to this proposed fact.

24.  The Partner model is expensive because Lyft pays the third-party company on a per-hour, per-vehicle basis, regardless of the number of WAV ride requests received. For example, at the time of the *ILRC* trial in June 2021, Lyft was paying $58.62 per hour, per vehicle to its third-party partner in San Francisco, meaning that the annualized cost per vehicle, at 17-hours per day, was approximately $365,000. But Lyft sees very little demand for Access mode in San Francisco: in 2020, on average, there were fewer than 16 Access mode rides per week. Thus, Lyft received almost no

money in the form of ride fares to offset the high cost of creating the WAV supply in San Francisco. (Testimony of Isabella Gerundio.)

> **Plaintiffs' Response:** Lyft's methodology in San Francisco is grossly inefficient. Lyft often operates in the entire county of San Francisco with two WAV vehicles and refuses to let its IC drivers give WAV rides. Because these two vehicles are not allowed to cross-dispatch and, due to Lyft's suppression of demand via the toggle and other mechanisms, Lyft receives an artificially low number of WAV ride requests per day. Lyft's WAV drivers may be online for 17 hours a day and only provide one or two rides. As a result, in San Francisco, Lyft is often paying its WAV partners approximately $60 per hour per driver to sit in a WAV and not provide any rides. Lyft's practices in San Francisco demonstrate why Lyft reports its cost per WAV ride in San Francisco as $1,186.66, which is three times more expensive than even the next highest cost access region. If Lyft implemented Plaintiffs' modifications, Lyft would provide more WAV rides in San Francisco at a far lower cost per ride than it currently does. (Testimony of Alex Elegudin; Testimony of Claudia Stern; Plaintiffs' Proposed Finding of Fact ¶ 261).

25. Notwithstanding its high cost, Lyft uses the Partner model in the majority of its Access Regions because it offers greater reliability than the IC model by guaranteeing a supply of available WAV drivers. This is important for Lyft in those markets where it is subject to regulatory requirements (*e.g.,* requirement that Lyft meet 80% of Access mode ride requests within 30 minutes). But the Partner model is also important for Lyft in cities where there is no or a low independent, existing supply of IC WAV drivers. For example, Lyft relies on the IC WAV model in Chicago because Lyft has unique access to WAV taxis there, and in New York City because local regulations have incentivized a large supply of IC WAVs. In contrast, Lyft used the Partner model to launch

Access mode in Portland, Dallas, Phoenix, Los Angeles, and San Francisco, where there was no existing supply of IC WAV drivers. (Testimony of Isabella Gerundio; Testimony of Richard Zhou.)

> **Plaintiffs' Response:** Lyft does not know whether or not there is a supply of IC drivers in these areas, as they do not ask their drivers whether or not they have access to a WAV.  Gerundio Dep. Tr. 201:5-9, 243:21-244:5; Chan Dep. Tr. 84:23-85:1.  Lyft also fails to engage a supply of IC drivers because it refuses to implement a number of driver outreach, advertising, and marketing initiatives to identify and engage IC WAV drivers in a similar manner to its other ride modes. Zhou Dep. Tr. 67:25-68:8; 68:25-69:8.

26.  Although Lyft loses money on Access mode in every Access Region, Lyft does not pass on its costs to Access mode riders. Instead, the amount that Access mode riders pay for those rides is the same as the amount that any rider would pay for the same ride in Standard mode. (Testimony of Isabella Gerundio.)

> **Plaintiffs' Response:**  Lyft is not a profitable company and has never reported a profit in any quarter while it has been operating.  Lyft lost money operating standard mode for seven consecutive years.  Lyft generally loses money in markets as a strategy to expand its market share.  Corrected Expert Report, at 12.

## IV.    Demand For Access Mode Is Far Less Than 1% Of The Demand For Standard Mode

27.  Lyft's experience is that the demand for Access mode is very small. This may be due to many factors, but the biggest one is that the percentage of individuals who need WAVs for transportation is a small percentage of the population at large: estimates range from .5% to 1% of the general population. Another factor may be the availability of subsidized transportation options, including paratransit, as well as non-emergency medical transportation subsidized or paid for by insurance. (Testimony of Isabella Gerundio; Testimony of Dr. Marc Rysman.)

**Plaintiffs' Response:** The opinions of Lyft's expert are unreliable, do not assist the trier of fact, and are contrary to Lyft's business practices. Dr. Rysman has no experience designing or implementing accessible transportation and has no specialized knowledge regarding the demand for Access mode or the demand for WAVs. Dr. Rysman is not qualified to testify regarding the availability of accessible transportation options. Fed. R. Evid. 702.

Lyft did not perform any study of the demand for Access mode in the non-Access Regions and does not know what the demand for Access mode is in the non-Access Regions. *See* Plaintiffs' Proposed Finding of Fact ¶ 283.

28. Actual demand for Access mode on Lyft's ridesharing platform as a percentage of total rides is incredibly low. Even in Lyft's biggest WAV market – New York City – WAV rides comprise approximately 1 in 1,000 of all rides on the platform. In Los Angeles, the demand is even less: WAV rides comprise approximately 1 in 5,000 of all rides on the platform. (Testimony of Isabella Gerundio; Testimony of Richard Zhou.)

**Plaintiffs' Response:** In every Access region but New York City, Lyft deliberately suppresses WAV demand through the use of a hidden toggle to activate Access Mode. When Lyft removed the toggle in New York City, WAV rides on Access Mode increased by approximately 500 percent. See Plaintiffs' Proposed Findings of Fact ¶¶ 209-212. The same would likely happen if Lyft removed the toggle in other regions. (Testimony of Alex Elegudin).

29. After analyzing data provided by Lyft, Dr. Marc Rysman, Professor of Economics at Boston University, opined that based on the population density of potential WAV riders, it is not feasible for Lyft to rely on its platform model to provide Access mode service. (Testimony of Dr. Marc Rysman.)

**Plaintiffs' Response:** The opinions of Lyft's expert are unreliable, do not assist the trier of fact, and are contrary to Lyft's business practices. Fed. R. Evid. 702.

Dr. Rysman admitted that Lyft offers Standard mode in many areas that he would find infeasible. Rysman Dep. Tr. 119: 1-120:17. Furthermore, Lyft does not make decisions about where to offer, alter, or restrict Standard mode based upon the population density, supply of drivers, demand of riders, or any other considerations or metrics. Stipulated Facts ¶¶ 19, 24

## V.    Lyft Continues Its Work To Find The Most Efficient And Cost-Effective Way To Offer Access Mode

30. Lyft has not yet identified a way to operate Access mode profitably. Lyft is not aware of any other company that has figured out how to operate an on-demand ridesharing service for WAVs efficiently and effectively. (Testimony of Isabella Gerundio; Testimony of Richard Zhou; Testimony of Asaf Selinger.)

**Plaintiffs' Response**: Lyft has never operated Access mode with the goal of doing so profitably. As Joyce Chan, Lyft's 30(b)(6) witness stated, "the primary goal of WAV is actually not today to be profitable. It's to meet our regulatory requirements. . . . I think Lyft's primary goal is to make WAVs as efficient as possible. It isn't to minimize spend. It's to make every effort we can to meet our regulatory requirements." Chan Dep. Tr. 110:18-111:14.

Many companies and car-service operators offer efficient and profitable WAV service throughout the United States and have experienced consistent and long-term success. Plaintiffs' experts also propose modifications that would allow Lyft to operate Access mode profitably. (Testimony of Alex Elegudin)

31. Lyft believes additional experimentation is needed to find more efficient ways to offer WAV service. The last several years have shown that Access mode is different in each Region, due to factors such as local regulations, population density, availability of alternate transit options, and community demographics. In addition, the COVID-19 pandemic showed how transportation patterns, supply and demand, and economic conditions in a given community can change almost overnight, requiring the ability to adapt and change quickly and efficiently. Lyft also learned a great deal during the COVID-19 pandemic regarding the behavior of IC WAV drivers. The outcome is that Lyft decided it would not renew its partnership with a rental provider in New York City and would not launch a similar rental program in the San Francisco Bay Area. Lyft employees continue exploring alternate supply options for Access mode and strategies for reducing cost. (Testimony of Isabella Gerundio; Testimony of Richard Zhou; Testimony of Asaf Selinger.)

> **Plaintiffs' Response**: Lyft repeatedly refuses to experiment with internally proposed programs designed to improve Access mode and allow Lyft to profitably offer Access mode. See Plaintiffs' Proposed Findings of Fact ¶¶ 131-40, 192-95. Lyft's contention that it simply needs to experiment further to find a solution contradicts all evidence about how Lyft operates Access mode. Lyft exclusively offers Access mode when subject to regulatory requirements or financial incentives. There is no evidence that Lyft has started offering Access mode voluntarily or to perform an experiment for better service.

**LYFT'S PROPOSED CONCLUSIONS OF LAW**

**VI.**    **Plaintiffs' Proposal To Have Lyft Offer Access Mode Everywhere Would Fundamentally Alter The Nature Of Lyft's Business**

32. Plaintiffs' proposed modification to have Lyft offer Access mode everywhere, including in every non-Access Region including Westchester County, would fundamentally alter the nature of Lyft's business.

**Plaintiffs' Response**:  "WAV services would not fundamentally alter Lyft's business because WAVs are not a 'new transportation service.'  Lyft already provides WAV services where compelled to do so by local governments and voluntarily in Los Angeles and San Francisco (on a pilot basis)."  Findings of Fact and Conclusions of Law, *Independent Living Resource Center San Francisco v. Lyft, Inc.*, No. 19-01438, 2021 WL 3910719, at *8 (N.D. Cal. Sept. 1, 2021) (hereinafter "*ILRC*").  Lyft "cannot argue that something it is already doing would fundamentally alter its business[.]"  Order Re Motions for Summary Judgment, *ILRC*, 2020 WL 6462390, at *6 (N.D. Cal. Nov. 3, 2020).

In the only instances where a rideshare company argued that a proposed modification of offering WAV programs in an area where it does not currently offer WAV programs constituted a fundamental alteration, both courts swiftly rejected Lyft's position.  As stated in *Crawford v. Uber Technologies, Inc.*, __ F. Supp. 3d __, 2022 WL 2913836, at *5 (N.D. Cal. July 25, 2022) (hereinafter "*Crawford*"), "[p]roviding no authority in support of this argument, Uber apparently contends that any requested modification of its services is a fundamental alteration, which would allow it to escape ADA liability for any requested modification.  This argument is therefore rejected."

251

As every other court to have considered Lyft's argument in this context has found, Plaintiffs' proposed modification to have Lyft offer Access mode in the non-Access Regions where Lyft does not currently offer Access mode is not a fundamental alteration of Lyft's business because Lyft currently offers Access mode in the Access Regions.

33. As a matter of law, a request to have Lyft offer a specialized service is a fundamental alteration. Plaintiffs' proposal to have Lyft offer Access mode everywhere would mandate that it offer a service that it otherwise does not offer in the non-Access Regions based on the exercise of its business judgment. Consistent with the intent of Congress in passing the ADA, a private entity like Lyft should be left alone to decide whether it will launch a service, and if so, where, based on its weighing of factors such as regulatory requirements, cost, supply-and-demand, opportunity for profit, and operational complexity, among other things.

**Plaintiffs' Response**:  Plaintiffs' proposal requests this Court to require Lyft to exercise the same business judgment for Access mode that Lyft currently and historically exercises for Standard mode, namely to offer Standard mode virtually everywhere in the United States regardless of the cost, supply-and-demand, opportunity for profit, or operational complexity.  Plaintiffs' modification does not require Lyft to offer a specialized service.  Rather, Plaintiffs' request that Lyft be required to operate Access mode in the non-Access Regions in a similar, if not identical, manner to Standard mode. Lyft does not establish that Plaintiffs' modification is a fundamental alteration

34. Plaintiffs' proposed modification to have Lyft offer Access mode everywhere fundamentally alters Lyft's "goods, services, facilities, privileges, advantages, or accommodations," by requiring Lyft to offer a specialized service. 42 U.S.C. § 12184(b)(2)(A), which incorporates § 12182(b)(2)(A)(ii), defines "discrimination" to include:

> a failure to make reasonable modifications in policies, practices, or
> procedures, when such modifications are necessary to afford such

goods, services, facilities, privileges, advantages, or accommodations
to individuals with disabilities, unless the entity can demonstrate that
making such modifications would fundamentally alter the nature of
such goods, services, facilities, privileges, advantages, or
accommodations.

**Plaintiffs' Response**:  Plaintiffs incorporate by reference their response to ¶¶ 32-33.

35.  "The text thus distinguishes between two categories" of things: "(1) rules, policies, or practices, which are subject to the requirement of reasonable modification, and (2) [the goods, services, facilities, privileges, advantages, or accommodations], which are not." *Mary Jo C. v. N.Y. State & Local Ret. Sys.,* 707 F.3d 144, 156 (2d Cir 2013). The fact that Congress used different language to describe these two categories "within the same sentence suggests Congress meant these categories to have different meanings." *Id.*

**Plaintiffs' Response**:  Lyft's haphazard misquotation and alteration of the Second

Circuit's finding in *Mary Jo C.* does not demonstrate that Plaintiffs' modification is a

fundamental alteration.  Rather, in *Mary Jo C.*, the Second Circuit stated that the text of

42 U.S.C. § 12131(2), which is not at issue in this action, "distinguishes between two

categories of requirements: (1) rules, policies, or practices, which are subject to the

requirement of reasonable modification, and (2) *essential eligibility requirements*, which are

not.  The fact that Congress provided that "rules, policies, or practices" would be subject

to reasonable modification, and contrasted this flexibility with the requirement that a

qualified individual meet the "essential eligibility requirements" of a program within the

same sentence suggests that Congress meant these categories to have different

meanings." *Mary Jo C.*, 707 F.3d at 155-56 (emphasis added).

Lyft is correct that the essential eligibility requirements and reasonable modification

standards are different categories.  Yet, Lyft's argument has no bearing on whether

Plaintiffs' modification is a fundamental alteration because Lyft does not argue (and

cannot credibly do so) that requiring a non-WAV is an essential eligibility requirement. Indeed, the Second Circuit noted that the standard for a reasonable modification involves "flexibility[.]" *Id.*

Rather, the Second Circuit in *Mary Jo C.* found that the plaintiff's requested modification to submit a late application for state pension benefits because of the plaintiff's mental illness was not a fundamental alteration, despite the fact that implementation of the modification violated state law. *Id.* at 155-60. In doing so, the Second Circuit noted that the ADA and its Congressional mandate strike broadly:

> In the ADA, Congress provided [a] broad mandate to 'effectuate its sweeping purpose [to] . . . forbid[] discrimination against disabled individuals in major areas of public life, [including] . . . public services. . . .' 'Congress found that 'individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, [and] failure to make modifications to existing facilities and practices. . . .' The ADA aims 'to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.'

*Id.* at 162 (quoting *PGA Tour, Inc. v. Martin,* 532 U.S. 661, 675 (2001); *Crowder v. Kitagawa,* 81 F.3d 1480, 1483 (9th Cir. 1996); 42 U.S.C. § 12101(b)(1) (alterations and ellipses in original).

Plaintiffs' modification does not request Lyft to alter the goods, services, facilities, privileges, advantages, or accommodations that it provides. Rather, Plaintiffs' modification requests that Lyft alter its policies and practices of refusing to allow Access mode to be available in the non-Access Regions

*36.* Here, in the Non-Access Regions including Westchester County, Plaintiffs want Lyft to offer WAV service. While Plaintiffs claim that they are merely seeking modifications in Lyft's "policies, practices, or procedures," what they actually seek is a modification of the "goods, services, facilities, privileges, advantages, or accommodations" that Lyft offers. *See, e.g., Olmstead v. L.C. ex rel.*

*Zimring,* 527 U.S. 581, 603 (1999) (under ADA Title II, observing that States may resist modifications that entail a "fundamental alteration" of their services and programs); *Powell v. Nat'l Bd. Of Medical Examiners,* 364 F.3d 79, 88 (2d Cir. 2004) ("a defendant may not make an accommodation at all if the requested accommodation 'would fundamentally alter the nature of the service, program, or activity.'").

      **Plaintiffs' Response**:  Plaintiffs incorporate by reference their response to ¶¶ 32-33. Lyft's reliance on *Olmstead* and *Powell* fail to demonstrate that Plaintiffs' modification constitutes a fundamental alteration.  In *Olmstead*, the Supreme Court found that a modification for an individual with disabilities to be placed in a community-based treatment setting rather than in an institution was reasonable because the state offered community-based treatment settings for other individuals.  527 U.S. at 604-07.

      *Powell* also does not support Lyft's argument.  Lyft once again misquotes the Second Circuit in *Powell*, using the incorrect language of "may not" instead of the correct language that "a defendant *need not* make an accommodation . . ." 364 F.3d at 88 (emphasis added).  In *Powell*, the Second Circuit found that a medical school was not required to alter its core competency requirements to be a practicing physician because such a modification would fundamentally alter the medical school's "responsib[ility] for producing competent physicians[.]"  *Id.* at 88.  This consideration was only after the school made the following modifications for the student: "The school supplied tutors for her, excused an honor code violation ostensibly because of its sympathy for her high level of stress, allowed her to remain matriculated without paying tuition, and gave her multiple opportunities to remediate classes that she had previously failed."  *Id.* at 87-88. Lyft's invocation of *Powell* and *Olmstead* fails to demonstrate that Plaintiffs' modification

is a fundamental alteration or that Plaintiffs do not seek to alter Lyft's policies, practices, or procedures.

37.   Put differently, the only possible "modification" that will satisfy Plaintiffs is not a modification in "policy, practice, or procedure," but a modification in the "goods or services" that it offers. But the ADA does not require Lyft to provide an accessible "good or service." *See, e.g., Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1115 (9th Cir. 2000) (Title III "does not require provision of different goods or services, just nondiscriminatory enjoyment of those that are provided."); *Thorne v. Boston Mkt. Corp.,* 469 F. Supp. 3d 130, 143 (S.D.N.Y. 2020) ("Because the Court concludes that gift cards are goods sold by a public accommodation under the ADA, Defendant cannot be required to sell accessible gift cards."). Plaintiffs' requested modification is thus a request for a fundamental alteration. *See Pottgen v. Missouri State High School Activities Ass'n,* 40 F.3d 926, 930 (8th Cir. 1994) (under ADA Title II, where an individual cannot meet an eligibility requirement determined to be essential, "the only possible accommodation is to waive the essential requirement itself … [But] [w]aiving an essential eligibility standard would constitute a fundamental alteration in the nature of the program"); *see also PGA Tour, Inc. v. Martin,* 532 U.S. 661, 689 (2001) (the waiver of an essential rule of golf would be a fundamental alteration).

> **Plaintiffs' Response**:  Plaintiffs' modification does not alter the goods or services that Lyft offers.  As Lyft states, it "connects people looking for a driver with people who have access to a vehicle and are willing to provide rides."  Lyft's Proposed Finding of Fact ¶ 2.  However, in the non-Access Regions, Lyft prevents connections on its App by individuals who require WAVs with people who have a WAV and are willing to provide rides.  Plaintiffs' request is not an alteration of the goods or services that Lyft offers.  Rather, Plaintiffs' request that individuals who require WAVs be given the opportunity

to use Lyft's App in the same manner that individuals who do not require WAVs use Standard mode.

The court in *Weyer* further supports the reasonableness of Plaintiffs' modification. There, the court stated that "[t]he ordinary meaning of this [goods or services] language is that whatever goods or services the place provides, it cannot discriminate on the basis of disability in providing enjoyment of those goods and services." *Weyer*, 198 F.3d at 1115. Here, Plaintiffs do not request a different good or service from Lyft. Plaintiffs request a similar opportunity to access a ride in the same manner as users do for Standard mode.

*Thorne* also does not support Lyft's defense. In *Thorne*, the court found that the "most natural reading of [a good] was 'wares; merchandise.'" 469 F. Supp. 3d at 142 (quoting *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 31 (2003)). Because a gift card is an item of merchandise that can be tangibly offered for sale and purchase, the court found that accessible gift cards were a distinct good and were not a reasonable modification. *Id.* Once again, Lyft's App connects riders and drivers, rather than disbursing merchandise like gift cards. Access mode would connect riders and drivers in the non-Access Regions in a similar manner to Standard mode. Plaintiffs' modifications would not require a new good or service.

Lyft's reliance on *Pottgen* does not establish that offering Access mode in the non-Access Regions is a fundamental alteration. In *Pottgen*, the court found that waiving the maximum age requirement for a high school baseball program for the plaintiff would constitute a fundamental alteration because the age requirement was an essential eligibility requirement. 40 F.3d at 930. Lyft has not and does not claim that requiring a non-WAV is an essential eligibility requirement for using the App, likely because doing

257

so would violate the ADA. As a result, the holding in *Pottgen* has no bearing on whether Plaintiffs' modification is a fundamental alteration.

Finally, the Supreme Court in *Martin* quite distinctly repudiates Lyft's argument. In *Martin*, the Supreme Court held that the PGA Tour discriminated against a disabled golfer who sought to play in the PGA Tour's qualifying tournament, "Q-School," when the PGA Tour refused to allow the golfer to use a golf cart, rather than walk the course. 532 U.S. at 665. In doing so, the court found that the "use of carts is not itself inconsistent with the fundamental character of the game of golf" and "the walking rule is not an indispensable feature of tournament gold either." *Id.* at 683-86. Here, Lyft has not made use of a WAV a condition of accessing its App or an essential eligibility requirement. Plaintiffs' modification seeks the same service for Access mode that Lyft currently offers for Standard mode.

38. Regulations issued by the Department of Transportation ("DOT"), the entity charged by Congress with promulgating regulations to carry out the transportation provisions of Title III (see 42 U.S.C. § 12186(a)), confirm this. DOT guidance, published at 49 C.F.R. Part 37, Appendix E, states that a passenger's request for service outside the service area or outside regular operating hours may be denied as fundamental alterations. *Id.*, Example 11. Similarly, a passenger's request for special equipment (*e.g.*, the installation of specific handrails), for a dedicated vehicle so that a rider can avoid certain odors, or for an exclusive paratransit trip, also constitute fundamental alterations. *Id.*, Examples 9 and 10. Requiring Lyft to offer WAV service in the non-Access Regions thus constitutes a fundamental alteration.

**Plaintiffs' Response**: Examples 9, 10, and 11 fail to demonstrate that requiring Lyft to offer WAV service in the non-Access Regions constitutes a fundamental

alteration.  First, each of these examples relate to the specific vehicle design and make and service offerings of paratransit and fixed route services.

In Example 9, a request for a dedicated vehicle for a passenger or special equipment "can be denied so long as the requested equipment is not required by the Americans with Disabilities Act or the Department's rules."  49 C.F.R. Part 37, Appendix E. Similarly, in Example 10, seeking to make Paratransit, which is "by nature a shared-ride service," an exclusive service would be a fundamental alteration.  However, neither instance is present for Lyft.  Rather, a WAV on Access mode in the non-Access Regions, in the same manner as a vehicle on Standard mode, would be available for use by all users of the Lyft App and the user has no ability to request a dedicated personal vehicle or special equipment beyond requirements set by Lyft for each ride mode.

Example 11 also demonstrates that these particular examples are not applicable to the current analysis.  Example 11 prevents a request for a service outside of the entity's service area or operating areas.  49 C.F.R. Part 37, Appendix E.  Lyft's service area for Standard mode is all the regions in which Lyft currently offers service.  Lyft has not presented evidence that it does not offer service 24 hours a day on Standard mode in these regions.  Plaintiffs' modification requests that Lyft offer Access mode in the non-Access Regions and for the same time period in which Lyft currently offers Standard mode.  Thus, this modification is not a fundamental alteration of Lyft's service.

39. That Lyft may offer Access mode in the Access Regions does not change the fact that requiring Lyft to offer it in the non-Access regions is a fundamental alteration. *See id.,* Example 11 (requests for service outside the service area is a fundamental alteration). First, by asking the Court to order Lyft to offer Access mode everywhere, Plaintiffs ask the Court to ignore an "essential attribute" of Lyft's ridesharing platform, which is that the platform's operation depends on *local*

supply and demand. *See PGA Tour,* 532 U.S. at 682-83. WAVs, unlike standard sedans or SUVs, are not ubiquitous. The evidence is that Lyft makes decisions regarding specialized modes such as Lux or Lux Black based on local conditions, and asking the Court to ignore the availability of local supply-and-demand on a ridesharing platform is a fundamental alteration. Second, it would be bad policy and contrary to the interests of individuals with disabilities to interpret the ADA to hold that because Lyft offers Access mode in New York City, it would not be a fundamental alteration to require Lyft to offer it in Westchester County. Such a holding would discourage private entities from taking actions, either in response to local laws or otherwise, that are intended to create greater options for individuals with disabilities. *See, e.g., Holbrook v. City of Alpharetta,* 112 F.3d 1522, 1528 (11th Cir. 1997) ("We do not seek to discourage other employers from undertaking" accommodations that may exceed the requirements of the law); *Ragusa v. UPS,* No. 05 Civ. 6187 (WHP), 2009 U.S. Dist. LEXIS 25152, *12 (S.D.N.Y., Mar. 3, 2009) ("To hold that an employer cannot eliminate or alter essential functions in order to accommodate an employee's disability would discourage employers who wished to do more than the ADA requires.").

> **Plaintiffs' Response**: That Lyft offers Access mode in the Access Regions does, in fact, demonstrate that offering Access mode in the non-Access Regions is not a fundamental alteration. Indeed, every court to consider this defense has agreed. *ILRC,* 2021 WL 3910719, at *8 ("WAV services would not fundamentally alter Lyft's business because WAVs are not a 'new transportation service.' Lyft already provides WAV services where compelled to do so by local governments and voluntarily in Los Angeles and San Francisco (on a pilot basis)." *ILRC,* 2020 WL 6462390, at *6 (Lyft "cannot argue that something it is already doing would fundamentally alter its business"); *see also Crawford*, 2022 WL 2913836, at *5.

Lyft now contends that this Court should impose standards that Lyft claims to apply only for its luxury ride mode, but does not apply for Standard mode, to Access mode. This Court should refuse to compare Access mode, which is the standard mode for people who require wheelchairs, to Lyft's luxury ride modes. Lyft makes Standard mode available in all regions where it operates, regardless of population density, wait time, number of available vehicles, or any other considerations or metrics. Stipulated Fact ¶ 19. Lyft does not determine whether to offer Standard mode based on Lyft's supposed "essential attribute" of local supply and demand. This Court should not impose Lyft's artificial standard on Access mode.

Lyft's second argument that "it would be bad policy and contrary to the interests of individuals with disabilities to interpret the ADA to hold that because Lyft offers Access mode in New York City, it would not be a fundamental alteration to require Lyft to offer it in Westchester County" is frankly absurd. Lyft's claim that requiring Lyft to comply with the ADA may deter it and other private entities from taking initial steps to provide service for people with disabilities seeks to present a revisionist history of why Lyft currently offers Access mode. The only reason that Lyft began offering Access mode in 2016 was due to regulatory requirements. Currently, Lyft only offers Access mode in markets where it is required or financially incentivized to do so. That Lyft has somehow been graciously offering Access mode to "create greater options for individuals with disabilities" is wrong.

Notably, Uber made a similar argument that it should not be "punished" for offering WAV service because it previously did so in other cities. *Uber*, 2022 WL 2913836, at *10. Judge Seeborg stated:

> Complying with the ADA and providing access to people with disabilities
> is not a punishment, it is the law. Further, the argument that Uber has

261

> done its 'fair share' in providing WAV access in other cities
> mischaracterizes the purpose and design of the ADA. . . . WAV service
> must be provided whenever a plaintiff meets the burden of proving an
> ADA violation, regardless of whether the defendant already provides more
> or less WAV service than others.

*Id.*, at *10.

Lyft's claimed support from *Holbrook* and *Ragusa* is lacking.  In *Holbrook*, the court found that the plaintiff was unable to perform essential functions of the job as a police detective due to his disability, namely being able to fully collect evidence and perform a complete investigation at a crime scene.  112 F.3d at 1527.  In *Ragusa*, the court found that the plaintiff was unable to perform essential functions of heavy lifting as a UPS employee due to his disability.  *Ragusa*, 2009 WL 637100, at *2-3.  Both *Holbrook* and *Ragusa* emphasize the importance of essential functions of an employee's job.  However, as discussed above, Lyft has never argued that the local supply and demand is an "essential function" that Lyft uses to determine whether it offers, alters, or restricts Standard mode.

40.  Requiring Lyft to offer Access mode everywhere thus contravenes Congressional intent of allowing private companies like Lyft to exercise its own business judgment as to what services it will offer in what locations. As a private entity, Lyft is subject to both ordinary and extraordinary market events, including things such as pandemics, interest rates, gas prices, and labor shortages. Like any other business, as it makes business decisions, Lyft must weigh factors such as local regulatory requirements, supply-and-demand, costs, opportunities for profit, operational complexity, and budget constraints.

**Plaintiffs' Response**:  If Lyft were able to cite any case law or authority demonstrating that Congress favors business judgment over compliance with the ADA,

Lyft would do so.  Lyft offers no support that "business judgment" supports its fundamental alteration defense.

Furthermore, Lyft has presented no evidence that it exercises business judgment, including consideration of such extraordinary market events as "gas prices," when it decides to offer, alter, or restrict Standard mode.  Stipulated Fact ¶ 19.  Lyft does not apply its purported "business judgment" considerations to Standard mode and they are not relevant to determining whether Lyft can reasonably offer Access mode in the non-Access Regions

41. By asking that the Court order Lyft to launch Access mode everywhere, Plaintiffs effectively ask this Court to bar Lyft from exercising its business judgment. That is a fundamental alteration of the very essence of Lyft as a private entity. As the Seventh Circuit Court of Appeals observed in *Doe v. Mut. of Omaha Ins. Co.*, 179 F.3d 557, 560 (7th Cir. 1999):

> The common sense of the [ADA] is that the content of the goods or services offered by a place of public accommodation is not regulated. A camera store may not refuse to sell cameras to a disabled person, but it is not required to stock cameras specially designed for such persons. Had Congress purposed to impose so enormous a burden on the retail sector of the economy and so vast a supervisory responsibility on the federal courts, we think it would have made its intention clearer and would at least have imposed some standards.

**Plaintiffs' Response**:  Plaintiffs incorporate by reference to their Response to ¶ 40.

In addition, *Doe* fails to support Lyft's fundamental alteration defense.  Rather, as Judge Posner stated:

> The core meaning of [42 U.S.C. § 12182(a)], plainly enough, is that the owner or operator of a store, hotel, restaurant, dentist's office, travel agency, theater, Web site, or other facility (whether in physical space or in electronic space) that is open to the public cannot exclude disabled persons from entering the facility and, once in, from using the facility in the same way that the nondisabled do.  The owner or operator of, say, a camera store can neither bar the door to the disabled nor let them in but then refuse to sell its cameras to them on the same terms as to other customers.

*Doe*, 179 F.3d at 559.  Currently, Lyft allows users who requires WAVs to access its App in the non-Access Regions, but then refuses to provide any WAV service on the same terms as other users.  *Doe* plainly demonstrates that Lyft's refusal to offer Access mode in the non-Access Regions is discriminatory within the meaning of the ADA.

42.  As a private entity, Lyft should not only have the right to decide when it will offer a new service, but also when it will stop offering that service. This Court declines Plaintiffs' invitation to assume the role of the regulator of Lyft's business under the guise of applying the ADA.

**Plaintiffs' Response**:  Lyft's arguments that Access mode is a "specialized service" and that the supply-and-demand nature of Lyft's luxury modes is an "essential function" of Standard mode misinterpret what constitutes a "fundamental alteration" under the ADA, and fails to meet its burden to sustain its affirmative defense

Respectfully submitted,


*s/ Jeremiah Frei-Pearson*
Andrew Finkelstein
Jeremiah Frei-Pearson
Joshua Cottle
**Finkelstein, Blankinship,**
**Frei-Pearson & Garber, LLP**
1 North Broadway, Suite 900
White Plains, New York 10601
Tel: (914) 298-3281
Fax: (914) 824-1561
afinkelstein@lawampm.com
jfrei-pearson@fbfglaw.com
jcottle@fbfglaw.com


Michael F. Ram (*Pro Hac Vice*)
Marie Appel (*pro hac vice* application
forthcoming)
**Morgan and Morgan**
**Complex Litigation Group**
711 Van Ness Avenue, Suite 500
San Francisco, CA 94102
Tel:  415-358-6913
mram@forthepeople.com
mappel@forthepeople.com


Michael T. Hellmann (*pro hac vice*)
**ADA Compliance Service**
27 Fieldstone Drive, Suite 209
Hartsdale, NY 10530
adatty@aol.com
Tel. 646-662-1335
Fax. (914) 682-8518


*Attorneys for Plaintiffs*
*and the Putative Classes*

By:  */s/ Jiyun Cameron Lee*

Jiyun Cameron Lee (Admitted *Pro Hac Vice*)
Marie Jonas (Admitted *Pro Hac Vice*)
FOLGER LEVIN LLP
199 Fremont Street, 20th Floor
San Francisco, CA  94105
Telephone: 415.625.1050
Facsimile:  415.625.1091
jlee@folgerlevin.com
mjonas@folgerlevin.com

Attorneys for Defendant Lyft, Inc.