# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

HARRIET LOWELL and WESTCHESTER
DISABLED ON THE MOVE, INC.,
individually and on behalf of all other
similarly situated,

                Plaintiffs,

                v.

LYFT, INC.,

                Defendant.

Case No.  7:17-cv-06251-PMH-AEK

**Joint Proposed Findings of Fact and
Conclusions of Law**

# Table Of Contents

PLAINTIFFS' PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW .........................1

I.    Lyft Provides Standard Mode Service Wherever
      Regulations Allow, Regardless Of Service Levels Or Available Vehicle Supply. .............1

II.   Lyft Refuses To Provide Access Mode Except In Regions
      Where It Is Required Or Incentivized To Do So; In The Regions
      Where Lyft Is Forced To Provide Access Mode, It Intentionally Inhibits Service..........9

III.  In New York City, Phoenix, Portland,
      Philadelphia, Chicago, and Dallas, Lyft Provides The
      Bare Minimum Of Service Necessary To Meet Regulatory Requirements. ....................13

IV.   In San Francisco, Los Angeles, and Boston,
      Lyft Only Provides Service To Receive Government Subsidies.....................................18

V.    Lyft Refuses To Provide Any WAV Service In 96% Of Lyft's Service Regions. ..........20

      A.  Lyft Refuses To Provide WAV Service In Westchester County,
          Despite Having A Larger Available Supply Of WAVs In
          Westchester Than In Any Access Region Other Than New York City...............29

VI.   Plaintiffs Have Standing..............................................................................................33

      A.  Legal Standard ................................................................................................33

      B.  Findings of Fact Relevant To Standing ...........................................................37

      C.  Conclusions of Law Related To Standing.........................................................42

VII.  PLAINTIFFS' FIRST THREE CLAIMS FOR RELIEF:
      Lyft Discriminates In Violation Of The Americans with Disabilities Act, The
      New York State Human Rights Law, And The New York City Human Rights Law. ..46

      A.  Legal Standard Under The ADA.......................................................................46

      B.  Legal Standard Under The NYSHRL................................................................49

      C.  Legal Standard Under The NYCHRL ...............................................................50

      D.  Plaintiffs Satisfy The Disability Prong Of All Three Statutes. ..............................50

      E.  Plaintiffs Satisfy The Public Accommodation Prongs Of All Three Statutes. .....51

i.    Findings Of Fact Related To Lyft Being A Public Accommodation Under The ADA. ..................................................................................51

ii.   Conclusions Of Law Related To Lyft Being A Public Accommodation Under The ADA. .........................51

F.   Lyft Engages In Specified Public Transportation Under The ADA.....................54

G.   Plaintiffs Meet Their Burden To Propose Reasonable Modifications.................55

i.    Legal Standard For Reasonable Modifications Under The ADA, NYSHRL, And NYCHRL..................55

ii.   Findings Of Fact Related To Plaintiffs' Reasonable Modifications. ........62

1.   Lyft Must Stop Blocking WAV Service In The 96% Of Its Regions Where It Currently Prohibits All WAV Service. ..............................................................................62

2.   Lyft Must Ask Drivers Whether They Have WAVs During The Onboarding Process...65

3.   Lyft Must Remove The Toggle, Which Suppresses Demand For WAV Service..............................67

4.   Lyft Must Allow WAVs To Cross-Dispatch. ................................71

5.   Lyft Must Implement Prioritization Logic For Access Mode. ....76

6.   Lyft Must Seriously Advertise And Market Access Mode............78

7.   Lyft Should Offer WAV Drivers Bonuses And Incentives For Guaranteed Periods Of Time........82

8.   Lyft Should Include WAVs In Express Drive & FlexDrive.........84

9.   Lyft Should Form Partnerships With Transportation Companies That Have WAVs..............................88

10.  Lyft Should Implement A Nationwide 10 Cent Accessibility Surcharge. ..............................................................................93

iii.  Conclusions Of Law Related To Plaintiffs' Reasonable Modifications...97

H.   Plaintiffs Meet Their Burden To Articulate A Plausible Proposal For Barrier Removal.......................................... 119

i.    Legal Standard. ............................................................................. 119

ii.   Conclusions Of Law Related To Barrier Removal.................................. 120

VIII. PLAINTIFFS' FOURTH CLAIM FOR RELIEF:
Lyft's Policies In New York City Have A
Disparate Impact On People With Disabilities And Violate The NYCHRL.............. 127

A. Legal Standard. ............................................................................. 127

B. Findings Of Fact Related To The Disparate Impact On
WAV Users In New York City As A Result Of Lyft's Policies & Practices...... 127

C. Conclusions Of Law Related To The Disparate Impact On
WAV Users In New York City As A Result Of Lyft's Policies & Practices...... 130

IX.   Plaintiffs Are Entitled To Attorneys' Fees And Costs. .................................... 132

X.    The Court Issues The Following Order ........................................................ 133

LYFT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
IN SUPPORT OF ITS AFFIRMATIVE DEFENSE OF FUNDAMENTAL
ALTERATION TO PLAINTIFFS' FIRST AND SECOND CLAIMS FOR RELIEF
UNDER THE ADA AND THE NYSHRL........................................................ 135

I.    FACTS RELEVANT TO AFFIRMATIVE DEFENSE ............................................. 135

LYFT'S PROPOSED CONCLUSIONS OF LAW ........................................................ 142

I.    PLAINTIFFS' PROPOSAL TO HAVE LYFT OFFER ACCESS MODE
EVERYWHERE WOULD FUNDAMENTALLY ALTER THE NATURE OF
LYFT'S BUSINESS ........................................................................ 142

**PLAINTIFFS' PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW**

**I.      Lyft Provides Standard Mode Service Wherever
         Regulations Allow, Regardless Of Service Levels Or Available Vehicle Supply.**

1.      Lyft launched its peer-to-peer marketplace for on-demand ridesharing in or about 2012.  Stip. Fact ¶ 9.

2.      When Standard mode or other non-Access modes are available on the Lyft platform in a Region, riders are able to request a ride in that "mode" at any time, 24 hours a day, but Lyft makes no guarantee that the ride request will be matched or that a driver will be available or accept the ride request.  Stip. Fact ¶ 21.

3.      Lyft offers its standard mode service ("Standard mode") in all 50 states. Standard mode is offered in all regions where Lyft operates, regardless of population density, wait time, number of available vehicles, or any other considerations or metrics.  Stip. Fact ¶¶ 18-19.

4.      Lyft does not guarantee any service levels or outcomes to its users, including wait times, completion rates, or that a requested ride will be completed, nor does it restrict its Standard mode in any Region based upon the level of service, including wait times and completion rates.  Stip. Fact ¶¶ 23-25.

5.      Wait times (*i.e.,* the amount of time between the time a ride is requested and the time when the driver arrives) and completion rates (*i.e.,* the percentage of requested rides that are completed) on the Lyft platform vary by location and by mode.  Stip. Fact ¶ 23.

6.      Lyft allows for riders to request a ride and for drivers to appear on the platform in areas where a vehicle is rarely, if ever, available, including all parts of New York State and areas as sparsely populated as Wyoming.[1]

---

[1] Highly Confidential – Subject to Protective Order – Demand 2021-09-20.csv ("Demand 2021-09-20"); Highly Confidential – Subject to Protective Order – Supply 2021-02-26.csv ("Supply 2021-02-26").

**Lyft's Response**: The materials relied on are uninterpreted data reports constituting five years of Lyft's internal ride data, for which Plaintiffs do not offer a witness to lay a foundation for the interpretation set forth above. Fed. R. Evid. 401-403, 602.

The evidence shows that both drivers and riders can download and open the app in any location where it is operational. Riders may see that there is "limited availability" for rides when they open the app.

- Testimony of Asaf Bar Selinger.

- Testimony of Dr. Marc Rysman.

7.    Lyft does not restrict its Standard mode in any Region based upon the level of service, including wait times and completion rates.  Stip. Fact ¶ 25.

8.    Lyft has never restricted, blocked, or withdrawn its Standard mode from a Region after beginning operations in that Region.[2]

**Lyft's Response**: The testimony does not support the proposed fact and falls outside the scope of the expert witness's opinions. Lyft's Terms of Service state that "Lyft reserves the right, for example, to limit or eliminate access to the Lyft Platform for Rideshare Services in specific geographic areas and/or at specific times based on commercial viability, public health concerns, or changes in law.")

- Exhibit A (Terms of Service).

9.    Lyft makes Standard mode available in all regions where it operates, regardless of population density, wait time, number of available vehicles, or any other considerations or metrics. Stip. Fact ¶ 19.

---

[2] Transcript of March 18, 2022 Deposition of Marc Rysman ("Rysman Dep. Tr."), 71:16-21 ("Lyft is not preventing riders and drivers from using the app in markets that have say 20-minute wait times and very low completion rates and that sort of – those sort of metrics."), 119:1-120:17, 145:16-146:1, 254:20-255:10.

**Lyft's Response**:  It is true that where Lyft operates, Standard mode is available, however Lyft's Terms of Service specifies: "Lyft reserves the right, for example, to limit or eliminate access to the Lyft Platform for Rideshare Services in specific geographic areas and/or at specific times based on commercial viability, public health concerns, or changes in law."

10.     For example, in February 2020, in ZIP Code 10518 in Cross River, New York, Lyft operated Standard mode where the population density is 311 people per square mile, ▇ trips were completed, the average wait time was ▇▇ minutes, and the completion rate was ▇ percent.  In ZIP Code 10576 in Pound Ridge, New York, Lyft operated Standard mode where the population density is 218 people per square mile, ▇ trips were completed, the average wait time was ▇▇ minutes, and the completion rate was ▇ percent.  In ZIP Code 10590 in South Salem, New York, Lyft operated Standard mode where the population density is 524 people per square mile, ▇ trips were completed, the average wait time was ▇▇ minutes, and the completion rate was ▇ percent.[3]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. No expert will testify that Standard mode service can be replicated for Access mode.

There is no evidence that Lyft could deliver the same rate of performance in Access mode, or evidence of the cost Lyft would incur to achieve that level of performance in Access mode. The evidence establishes that the "completion rates" and "wait times" for ride

---

[3] Expert Rebuttal Report, at 5, Table 1; Lowell-demand-2020-09-18.csv.

requests in Standard mode vary widely, and that the differences in completion rates and wait times correlate strongly to the population density of an area.

For example, there is no evidence that Lyft could offer comparable service to Standard mode via Access mode anywhere, including in any of the cities or towns identified in this fact. There is no evidence of any WAV drivers who want to drive on the Lyft platform in any region who were denied access to the platform, nor evidence of demand for WAV rides by riders, in sufficient volumes to support functional service if Lyft were to try to provide Access mode via a platform model. The population of individuals who rely on WAVs is estimated at less than 1% of the population at large. This means the functional density of potential WAV users in Pound Ridge (a location with 218 people per square mile) would be approximately 2 people per square mile.

Thus, the uncontroverted testimony is that it is not feasible for Lyft to rely on its platform model to provide Access mode service. Lyft's expert, Dr. Marc Rysman, testified that his modeling of a hypothetical ridesharing platform for WAVs shows there is a greater than 99% chance of observing zero WAV rides in one month for half of all ZIP Codes in New York State. Even in more populous areas, Dr. Rysman's model shows that there is a greater than 20% chance of observing zero rides in one month in many places. In Westchester County, Dr. Rysman's model shows that 35% of ZIP codes are predicted to have less than one WAV ride in the entire month, and 93% are predicted to have fewer than 25 rides in one month (*i.e.*, less than one ride a day).

Moreover, the evidence confirms that Plaintiffs in this action would not be satisfied with the levels of service described in the proposed fact above (*e.g.,* less than one in three ride requests being completed on Standard mode in Pound Ridge or South Salem, New York). Ms. Lowell admitted that to use the Lyft app she would "have to know that Lyft had

4

reliable service," which means that she would "have to be certain that [she] could get a Lyft," thus confirming that she would find these service levels unacceptable.

As to why Lyft offers Standard and XL modes in far-flung regions, the evidence establishes that there are low incremental costs involved in offering Standard and XL modes in areas with low ride volume, and this limited ride volume can still generate revenue. Lyft is selective about the regions in which it will devote resources, such as incentives, to attempt to stimulate the organic supply-and-demand in a region. Lyft is also selective about which regions to offer specialized modes, such as Lux Black, based on the available supply and demand in the area. For example, it offers Lux Black in New York City but not Westchester County. Lyft chooses where to invest in incentives, and where to offer specialized modes, based on the likely success of the platform, which would lead to revenue generation for the company.

In contrast to any non-WAV mode, for Access mode, to provide any functional level of service, Lyft must manually manage the supply of vehicles on its platform and incur significant financial losses.

Lyft's expert testified that if Lyft were to show Access mode in the App without any functional WAV service, fixed frame wheelchair users would be frustrated by the non-existent service, which would lead to a degraded brand image for Lyft, as well as increased customer complaints and customer service needs. If such users can never find a ride, or find themselves stranded with their wheelchair, this may create significant problems and costs for Lyft, including negative publicity, degraded image, and potential lawsuits. Such users also might give up using the App altogether.

- Deposition of Harriet Lowell ("Lowell Depo.") 121:25-122:5, 123:6-8

- Testimony of Dr. Marc Rysman and supporting figures.

- Testimony of Asaf Bar Selinger.

- Testimony of Richard Zhou.

- Testimony of Isabella Gerundio.

11.     Between January 1, 2017, and January 31, 2021, approximately ▮ percent of the months of Lyft's Standard mode operations reported a completion rate of below 50 percent and approximately ▮ percent of the months of Lyft's Standard mode operations reported a completion rate of below 80 percent.[4]

> **Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. No expert will testify that Standard mode service can be replicated for Access mode. *See* Lyft Response to Proposed Finding ("LRPF") No. 10.

12.     Between January 1, 2017, and January 31, 2021, approximately ▮ percent of the months of Lyft's Standard mode operations reported a wait time of greater than five minutes and approximately ▮ percent of the months of Lyft's Standard mode operations reported a wait time of greater than ten minutes.[5]

> **Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. No expert will testify that Standard mode service can be replicated for Access mode. *See* LRPF No. 10.

13.     In February 2020, approximately 99 percent of the ZIP Codes that Lyft had a ride requested had a population density of less than ▮ people per square mile and approximately 64

---

[4] Rebuttal Expert Report, at 31, Table 2; Demand 2021-09-20.
[5] Rebuttal Expert Report, at 31, Table 2; Demand 2021-09-20.

percent of the ZIP Codes that Lyft had a ride requested had a population density of less than ███

people per square mile.[6]

        **Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the

trier of fact, and not based on the application of discernable principles or methods. Fed. R.

Evid. 702. No expert will testify that Standard mode service can be replicated for Access

mode. *See* LRPF No. 10.

        There is no evidence of a comparable population density of potential Access mode

users. To the contrary, the population density of potential Access mode users is likely less

than 1% of the population at large.

- Testimony of Dr. Marc Rysman and supporting figures.

- Testimony of Richard Zhou.

14.     During February 2020 in New York State, Lyft offered Standard mode in ███ ZIP

Codes where Lyft received zero requests for a ride and in ███ ZIP Codes where no ride requests

were completed.[7]

        **Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the

trier of fact, and not based on the application of discernable principles or methods. Fed. R.

Evid. 702. No expert will testify that Standard mode service can be replicated for Access

mode. *See* LRPF No. 10, 13.

15.     Based on Lyft's data, there were ███ Regions where the average number of drivers per

month on Standard mode was 4 or fewer drivers for at least one year between 2017 and 2021.[8]

---

[6] Rebuttal Expert Report, at 37, Figure 3; Lowell-demand-2020-09-18.csv.
[7] Expert Rebuttal Report, at 4; Lowell-demand-2020-09-18.csv.
[8] Supply 2021-02-26.

**Lyft's Response**: Lack of foundation for a witness with personal knowledge regarding the cited materials, which consist of several years of uninterpreted Lyft ride data. Fed. R. Evid. 401-403, 602. No expert will testify that Standard mode service can be replicated for Access mode. *See* LRPF No. 10, 13.

The evidence demonstrates that there are low incremental costs involved in offering Standard and XL modes in areas with low ride volume. The number of active drivers on the platform varies widely depending on time and location, due to the supply-and-demand nature of the Lyft platform.  Lyft is selective about the regions in which it will devote resources, such as incentives, to attempt to stimulate the organic supply-and-demand in a region.  Lyft is also selective about which regions to offer specialized modes, such as Lux or Premium, based on the available supply and demand in the area.

In contrast to any non-WAV mode, for Access mode, to provide any functional level of service, Lyft must manually manage the supply of vehicles on its platform and incur significant financial losses.

- Testimony of Dr. Marc Rysman and supporting figures

- Testimony of Asaf Bar Selinger

- Testimony of Richard Zhou

16.     Based on Lyft's data, in at least ██ Regions between January 2017 and January 2021, Lyft began offering Standard mode where the supply of drivers available in the first month of service was fewer than ██ drivers.  In ██ Regions, Lyft began offering Standard mode where the supply of drivers available in the first month of service was fewer than ██ drivers.  In these ██ Regions, the average number of drivers on Standard mode in the first month was ██.  In each of these ██ Regions, Lyft continued to operate Standard mode in January 2021 with varying levels of driver supply.  Lyft continued to operate in ██ of these Regions where the supply of drivers on

Standard mode was fewer than ██.  In January 2021, the average number of drivers on Standard mode in these Regions was ██.[9]  (Testimony of Claudia Stern).

> **Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. The opinions set forth in this paragraph were not disclosed in Plaintiffs' expert reports, but revealed through proposed trial exhibits on November 24, 2022. Fed. R. Civ. Proc. 26. No expert will testify that Standard mode service can be replicated for Access mode. *See* LRPF No. 15. There is no evidence that there are 10 WAV drivers who want to drive on the Lyft platform in any non-Access region.

17.     Lyft offers Standard mode through an independent contractor model (the "IC model"). The IC model depends on drivers who personally own or rent a car.  These drivers set their own hours and drive where they want to drive.  Stip. Fact ¶¶ 26-27.

## II.    Lyft Refuses To Provide Access Mode Except In Regions Where It Is Required Or Incentivized To Do So; In The Regions <u>Where Lyft Is Forced To Provide Access Mode, It Intentionally Inhibits Service.</u>

18.     Prior to 2016 when it began offering WAV service in Portland, Oregon, Lyft did not offer WAV service in any Region.  To date, Lyft has launched WAV service (called "Access" mode) in nine cities in the United States: Boston, Massachusetts; Chicago, Illinois; Dallas, Texas; Los Angeles, California; New York, New York; Philadelphia, Pennsylvania; Portland, Oregon; Phoenix, Arizona; and San Francisco, California ("Access Regions").  Lyft does not offer Access mode in Regions other than the Access Regions ("the non-Access Regions"). Stip. Fact ¶¶ 28, 34, 37.

19.     Lyft launched Access mode in these nine markets in response to regulatory requirements, financial incentives, or a partnership with a transit agency.  Stip. Fact ¶ 35.

---

[9] Supply 2021-02-26.

20.    WAVs are vehicles built to accommodate fixed-frame wheelchairs, and typically feature a wheelchair ramp or lift, a lowered floor to accommodate the equipment, and a securement device to keep the wheelchair in place when the vehicle is in motion.  Stip. Fact ¶ 29.

21.    Lyft's provision of Access mode is primarily guided by meeting regulatory requirements.[10]

**Lyft's Response**: This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.

22.    Christopher Wu ("Mr. Wu"), the former head of Lyft's national WAV team, stated that Lyft's WAV program is "incentivized to keep WAV programs as small as possible while meeting regulatory requirements" and "will do as little as possible unless forced[.]"[11]

**Lyft's Response**: This alleged fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. Chris Wu has not worked for Lyft since August 2019. He testified at deposition that "I mean I think at this time with the appetite the company had this was probably true not related to health care transit university opportunities like in Austin, in Boston, but that was, you know, that was at that time," but he is "unaware" of any changes because he hasn't "been there in so long."

Evidence at trial confirms that Lyft has goals for its WAV program beyond the minimum regulatory requirements, for example, by offering WAV service in San Francisco and Los Angeles where WAV service is not mandated, but financial offsets are available.

- Deposition of Christopher Wu ("Wu Depo.") 183:21-25, 184:2-3.

- Testimony of Isabella Gerundio.

---

[10] Zhou Dep. Tr. 165:21-166:1.
[11] LYFT_ILRC00022617; Wu Dep. Tr. 183:8-25.

23.     Instead of working to expand Access mode or provide better service, Lyft's employees work to "impair service levels" and "suppress performance" for WAVs so that Lyft can point to the unsuccessful nature of Access mode to convince regulators and courts that it should not have to provide more or better service to people with disabilities.[12]

**Lyft's Response**: The materials relied on are inadmissible hearsay. Fed. R. Evid. 801-803.  The proposed finding is based on an inadmissible email; and, in any event, one out of context email from one Lyft employee from over three years ago discussing Access mode in one city (New York City) for one point in time, cannot support the proposed statement of fact.

Evidence shows that Lyft has invested tens of millions of dollars and thousands of hours of employee time to offer and improve WAV service, while attempting to minimize financial losses and meet regulatory requirements. Lyft conducts frequent experiments to make its WAV service more efficient and effective.

- Testimony of Asaf Bar Selinger.

- Testimony of Isabella Gerundio.

- Testimony of Richard Zhou.

24.     For many years, Lyft employees have recognized that the current method of operating Lyft's WAV program involves reactionary market-by-market responses to regulatory requirements and pressures.  As former Lyft employee Hadar Dor ("Mr. Dor") stated, "Leadership is aligned on keeping WAV decentralized – we just have to make sure various teams are accountable to prioritize WAV asks whenever regulator-mandated ones come up."[13]

---

[12] LYFT0031721.
[13] LYFT_ILRC00004167.

**Lyft's Response**: The materials relied on are inadmissible hearsay. Fed. R. Evid. 801-803.   This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.  The proposed finding is based on an inadmissible email; moreover, one email from over three years ago cannot support the proposed statement of fact.

No witness at trial offered testimony that there is a current policy at Lyft to keep WAV "decentralized." Witnesses testified that WAV is now managed centrally.

- Testimony of Isabella Gerundio.

25.    Despite offering Access mode in multiple major cities across the country, Lyft did not maintain a structured system of central operations or budget until 2020.  Rather, Access mode was operated and funded at a purely local level.[14]

**Lyft's Response**: This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.  *See* LRPF Nos. 23-24.

26.    Lyft spent approximately $10-13 million on its WAV programs in 2019, approximately $13-15 million in 2020, approximately $20 million in 2021, and its projected WAV budget for 2022 was $25 million.[15]  Stip. Fact ¶¶ 30-33.

27.    Lyft offers Access mode in the Access Regions using two models: the IC model and the "Partner model."  The IC model for WAV depends on drivers who personally own or rent WAVs. These drivers ("IC WAV drivers"), like other independent drivers on the Lyft platform, set their own hours and drive where they want to drive.  Stip. Fact ¶¶ 39-40.

28.    The second method, the Partner model, relies on third-party transportation companies with whom Lyft contracts.  Under the Partner model, Lyft pays the third-party companies a negotiated hourly rate that varies by city and by company.  In exchange for the hourly

---

[14] Gerundio Dep. Tr. 60:2-7, 67:4-7; Wu Dep. Tr. 55:22-56:3.
[15] Gerundio Dep. Tr. 67:4-13, 91:1-8.

rate, the third-party companies provide the contracted-for number of WAVs and drivers to drive the WAVs on the Lyft platform. Stip. Fact ¶¶ 41-42.

### III. In New York City, Phoenix, Portland, Philadelphia, Chicago, and Dallas, Lyft Provides The Bare Minimum Of Service Necessary To Meet Regulatory Requirements.

29.    In New York City ("NYC"), Lyft began offering Access mode due to regulations set by the NYC Taxi and Limousine Commission ("TLC"). Lyft is required to meet regulatory requirements set by the TLC, which are much higher than the regulatory requirements of other jurisdictions, and require Lyft to either ensure that 25 percent of all Lyft rides are dispatched by WAVs or meet iterative wait-time requirements.   In NYC, Lyft uses a combination of the IC model, the Partner model, and provides WAVs for rental through a third-party, which results in more than 1,300 WAV drivers being available on the App on a weekly basis.[16]

> **Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. Lyft offers Access mode in New York City pursuant to regulations set by the New York City Taxi and Limousine Commission (TLC).
>
> The evidence shows that Lyft uses the "Partner" model and "IC" model in New York City. It no longer provides WAVs for rental through a third-party. The supply of WAV drivers in New York City is subject to change.
>
> - Testimony of Asaf Bar Selinger.
>
> - Testimony of Isabella Gerundio.

30.    Lyft's Access mode performance in NYC is largely dictated by regulatory requirements, including suppressing performance in order to ensure less rigorous wait time

---

[16] Corrected Expert Report, at 64-65; Supply 2021-02-26.

requirements in the future. As one of Lyft's senior employees stated, the WAV team was "consciously (though implicitly) trying NOT to hit 100% [service level requirements]. They know they will be charged by regulator to show improvement over time, so they are trying to leave opportunity for that improvement."[17] (Testimony of Alex Elegudin.).

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. The materials relied on are inadmissible hearsay. Fed. R. Evid. 801-803. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. An inadmissible email from June 2019 does nothing to establish the performance or objectives of Lyft's WAV program in New York City. No witnesses offered testimony regarding "suppressing performance."

The evidence establishes that Lyft has invested millions of dollars in its WAV program in New York City (more than any other market), in addition to thousands of hours of employee time, in order to meet regulatory requirements and rider needs.

- Testimony of Asaf Bar Selinger.
- Testimony of Isabella Gerundio.

31. In Phoenix, Lyft is required to offer WAV pickups at the Phoenix Sky Harbor airport to offer service in the area. Lyft is required to ensure WAV rides have a wait time of 30 minutes or under. In Phoenix, Lyft uses the Partner model.[18]

**Lyft's Response**: The proposed fact misstates the May 2020 document on which it relies. That document states Lyft goes beyond regulatory requirements in Phoenix, where there was "originally an airport compliance obligation to provide WAV pickups at PHX Sky

---

[17] LYFT0042706.
[18] LYFT00032148.

Harbor airport," but that Lyft voluntarily "expanded to rides in all of Maricopa County" in order to improve rider experience.

The evidence establishes that, for a period of time in 2019 and 2020, Lyft also had a pilot program with IC drivers, who procured WAVs through a third-party rental provider. The costs of acquisition of those vehicles were born by the third-party.

- Testimony of Dr. Marc Rysman regarding his rebuttal report.

32.     In Portland, Oregon, regulators require Lyft to meet a 30-minute wait time for every WAV ride requested and Lyft receives a subsidy of $15 per ride under 30 minutes.  Lyft utilizes the Partner model in Portland.[19]

Lyft's Response: The proposed fact does not accurately reflect the May 2020 document on which it relies. That document explains that, in Portland, in addition to "100% of all rides from city of Portland" being performed "within 30 minutes" that there must be service "24/7," and "fares cannot exceed [that of] non-WAV rides."

33.     In Philadelphia, TNCs, including Lyft and Uber, are required to have an aggregate number of 70 WAV drivers.  In Philadelphia, Lyft uses the IC model and pays its drivers a per-ride bonus of $30 per completed ride.[20]

Lyft's Response: The proposed fact is misleading and incomplete. The May 2020 document states that, in Philadelphia, there was a "$30/ride bonus + $80 for 20 hours online, $200 for 40 hours, hourly bonus only valid if driver has < 2 lapses." However, ride incentives are subject to change over time.

34.     In Chicago, Lyft is required to provide WAV service through its own independent contractor drivers or through a service agreement with a WAV dispatcher.  Lyft allows WAV taxi

---

[19] LYFT00032148.
[20] LYFT00032148.

drivers to be included as IC WAV drivers in Chicago. Lyft receives a subsidy from the City of Chicago of $30 per completed WAV ride with a wait time of 20 minutes or less or $15 per completed WAV ride with a wait time between 21 and 35 minutes.[21]

> **Lyft's Response**: The proposed fact misstates the May 2020 document on which it relies. The document states that, in Chicago, there is a "loose regulatory requirement to 'enhance service' for individuals with disabilities," and that Lyft has received "feedback about ETA from City regarding < 15 minutes ETAs." Lyft has elected to use "organic driver supply + Open Door Organization (ODO) taxis" which "provides drivers & training" to provide a supply of WAVs on the platform. In addition, the document explains that: "ODO [taxi] drivers are NOT cross-dispatched (90%); non-ODO drivers are only paid the per-ride fee and are cross-dispatched (10%)." Thus, these IC taxi WAV drivers act differently than other IC WAV drivers, in that they are not cross-dispatched, and pick up exclusively WAV rides. Finally, the document states that the subsidy Lyft received from the City of Chicago was $30 per ride. The document does not reflect how long that subsidy was to continue.

35.    In Dallas, Lyft began offering Access Mode because the state of Texas required TNCs to offer WAV service in one of Texas' largest markets. Lyft offers Access mode in Dallas using the Partner model. Lyft offers no incentives or bonuses for drivers in Dallas.[22]

> **Lyft's Response**: This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. The document relied on does not support this proposed fact. Texas regulations set forth the specific regulatory requirement. The May 2020 document simply states "that there was no compliance requirement as of June 2020."

---

[21] LYFT00032148.
[22] LYFT00032148; Gerundio Dep. Tr. 141:6-13.

In Dallas "there are no current active IC drivers. So there is no incentive or...bonus." Lyft uses the Partner model in Dallas. It does not rely on "bonuses" or "incentives" to influence rider behavior there, as the drivers are employed by a third-party company. Lyft can contractually specify locations for the vehicles and ask the Partner to instruct drivers solely to drive in Access mode.

- Deposition of Isabelle Gerundio ("Gerundio Depo.") 141:6-13.
- Testimony of Isabella Gerundio and Trial Exhibit G.

36.     Lyft's policies and practices with respect to WAVs are crafted based on Lyft's concern that, if Lyft provides WAV services too well or efficiently, Lyft may be forced to increase the scope of its WAV services or improve its service levels.  For instance, in an email, Mr. Wu expressed concern that if Lyft were to "run a successful WAV program in Dallas," the "price of success" could be that the legislature would require Lyft to "replicate this model across other cities."[23]  Conversely, Mr. Wu posited, "[i]s it likely we would have to host an improved WAV program if we didn't have a good showing?"  Lyft's practice is unique to its WAV service and harms service levels for people with disabilities. [24]

> **Lyft's Response**: Mr. Wu has not worked at Lyft since approximately July 2019. Yet Plaintiffs ask the Court to rely on his words to assume that what he wrote in emails in 2019 constitutes Lyft policy today. *See, e.g.,* LRPF No. 22. Moreover, having to meet regulatory wait time or other service level requirements is unique to WAV. Assuming Mr. Wu's statements are true, it is possible that Lyft would behave exactly the same way to meet regulatory requirements for its Standard modes. Moreover, there is no evidence that this

---

[23] LYFT_ILRC00011992; *See also* Lyft_ILRC00022617 at LYFT_ILRC00022626 (describing Lyft's strategy "to keep WAV programs as small as possible while meeting regulatory requirements" to avoid "our big risk" of "being forced to scale" nationwide).
[24] LYFT_ILRC00011992.

alleged "practice" actually resulted in lowering "service levels for people with disabilities," or what it may have cost Lyft to improve service levels in any Access region.

IV.    **In San Francisco, Los Angeles, and Boston,**
       **Lyft Only Provides Service To Receive Government Subsidies.**

37.    In California, Lyft only offers Access mode in San Francisco County and Los Angeles County.  In San Francisco and Los Angeles, Lyft receives financial incentives from the California Public Utilities Commission ("CPUC") to offer WAV service.  The CPUC requires Lyft to collect a ten-cent "Access fee" on every ride on the App in California.  Lyft is allowed to recoup the Access fee, up to the amount expended on WAV service, collected in a particular county if Lyft offers WAV service in that county and meets wait time, trip completion, and other standards set by the CPUC.  Lyft utilizes the Partner model in San Francisco and Los Angeles Counties.[25]

38.    Lyft sometimes operates in the entire county of San Francisco with two WAV vehicles.  Because these vehicles are not allowed to cross-dispatch and, due to Lyft's suppression of demand via the toggle and other mechanisms, Lyft often receives as few as one or two requests for WAV trips in San Francisco.  Lyft's WAV drivers may be online for 17 hours a day and only provide one or two rides.  As a result, in San Francisco, Lyft is often paying its WAV partners approximately $60 per hour per driver to sit in a WAV and not provide any rides.  Lyft's practices in San Francisco demonstrate why Lyft reports its cost per WAV ride in San Francisco as $1,186.66,[26] which is more than three times more expensive than any other Access Region.  For instance, if a driver was online for 17 hours a day and only provided one WAV trip, Lyft's cost for the driver would be approximately $1,020, while that driver gave a single WAV ride yielding an average of $15.  The

---

[25] LYFT00032148.
[26] Corrected Expert Report, at 27.

astronomical and inefficient cost that Lyft endures in San Francisco is not present anywhere else. (Testimony of Alex Elegudin; Testimony of Claudia Stern.).

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702.

The evidence does not support this proposed fact. Witness testimony confirmed that Lyft has experimented with cross-dispatching Partner WAVs but has determined that the benefits in cost-savings are often outweighed by the negative impacts on service levels. In San Francisco and Los Angeles, in order to qualify for financial offsets, it must meet strict wait time and improvement standards. In Quarter 4, 2019, Lyft missed the standard for offsets in Los Angeles by less than forty seconds. It has missed the standard for offsets in San Francisco by just a few percentage points on multiple occasions. Because small increases in wait times can have high financial costs, Lyft does not cross-dispatch its Partner WAVs in San Francisco.

There is no evidentiary support for the argument that Lyft's practices have resulted in high costs in San Francisco. Witnesses testified that Lyft launched WAV service in San Francisco and Los Angeles at the same time, in June 2019. In all respects, the steps Lyft took to launch Access mode in these two cities were the same: it used the Partner model, contracting with First Transit to provide WAV rides in both cities, and engaging in the same type of community outreach in both cities. But demand for Lyft's Access mode in the two cities was very different. In San Francisco, demand remained flat, resulting in a very high cost-per-ride, whereas in Los Angeles, demand increased steadily over time.

Lyft has increased the number of vehicles in Los Angeles as a result, so the overall amount Lyft has spent is approximately 2.5 times higher in Los Angeles than San Francisco.

19

However, the cost per ride in Los Angeles is generally less than one third of what Lyft spends per ride in San Francisco.

San Francisco is not the only market where providing WAV rides is expensive. According to the analysis of Plaintiffs' own expert, the amount Lyft loses, on average, for every WAV ride is $157.35. In Los Angeles, it is $264.34.

- Testimony of Isabella Gerundio.

39.     In Boston, Lyft receives financial incentives from the Massachusetts Bay Transportation Authority ("MBTA") to offer WAV service for the MBTA's paratransit program.  In Boston, Lyft previously received subsidies, of up to $30 per hour, for paratransit and consumer WAV rides.  Lyft offers Access mode service in Boston through a combination of the Partner model and IC model.[27]

## V.     Lyft Refuses To Provide Any WAV Service In 96% Of Lyft's Service Regions.

40.     Lyft uniquely and categorically precludes WAVs from appearing on the App in the regions outside of Lyft's nine Access Regions (the "non-Access Regions").[28]  (Testimony of Alex Elegudin).

**Lyft's Response**: This is not a "fact," it is legal argument. There is no evidence supporting a conclusion that Lyft "uniquely" or "categorically" precludes WAVs from appearing on the App in non-Access regions. Lyft witnesses testified that there are several specialized modes which Lyft does not make available in every region. In evaluating where to offer specialized modes, Lyft considers the likely available supply and demand for the mode in that region.

- Testimony of Richard Zhou.

---

[27] LYFT00032148.
[28] Gerundio Dep. Tr. 88:8-15; Chan Dep. Tr. 119:14-19; Zhou Dep. Tr. 165:21-166:2.

41.    The only justification Lyft has provided for Lyft's unique categorical preclusion of WAVs in non-Access Regions is its stated assumption that people with disabilities would prefer no service to imperfect service. This stated assumption is false.[29] (Testimony of Alex Elegudin).

Lyft's Response: No witness explained Lyft's decision not to provide WAV service by stating that it was because they assumed "that people with disabilities would prefer no service to imperfect service." To the contrary, every Lyft witness was consistent that the challenge with WAV service is the high cost of WAV supply, the relatively low demand for WAV service, and the associated challenges in providing reliable WAV service. Moreover, Ms. Lowell herself has testified that to use Lyft, she would "have to know that Lyft had reliable service," which means that she would "have to be certain that [she] could get a Lyft" so she would not "strand" herself. *See* LRPF Nos. 40, 44, 75, 88.

- Lowell Depo. 123:6-8.

42.    Conversely, Lyft does not impose the same restrictions on Standard mode service where such service is imperfect or even virtually non-existent.[30]

Lyft's Response: That Lyft chooses to allow Standard mode in areas where service is "imperfect or even virtually non-existent" is not a reason to compel Lyft to offer WAV service everywhere. Lyft generates millions of trips every month in the non-Access Regions.

---

[29] Gerundio Dep. Tr. 255:8-15 (testifying that, although there may be WAVs in non-Access Region, and "no one has explicitly told me that they would rather have no service," Lyft blocks WAVs from its platform in non-Access Regions because of Lyft's internal, arbitrary reliability standards); Chan Dep. Tr. 125:25-126:4 ("Q:  So Lyft's position is that it might not be able to provide ride share reliably in the non-Access Regions, therefore it doesn't require them at all?  A:  Yes."); Chan Dep. Tr. 124:9-15 ("Q:  Did WAV users ever say that they'd prefer to have no option at all, rather than have an option that might involve a long [] wait time? . . .  A:  I don't know if a survey has ever been run about Access Mode."); Affidavit of Harriet Lowell at ¶¶ 30-34; Affidavit of Melvyn Tanzman at ¶¶ 50-52; Affidavit of Penny Wolfson at ¶¶ 34-36; (Testimony of Alex Elegudin).

[30] Stip. Fact ¶¶ 19, 24-25; Transcript of March 18, 2021 Deposition of Marc Rysman 119: 1-120:17 (admitting that Lyft provides service in Pound Ridge, New York, and other regions in New York State where it provides inconsistent service")

Under the circumstances, if Lyft chooses to allow its app to operate everywhere, that is a perfectly appropriate business decision for Lyft to make. Indeed, Lyft's decision is no different than a retailer who decides that while it will offer regular gift cards, it will not offer Braille gift cards. Both decisions are lawful.

There is no basis to conclude that WAV service would be as successful as Standard mode. The evidence was that WAV service, even if allowed, would result in substantially less than the volume of Standard mode trips. In some of the Access Regions, the evidence showed that WAV rides comprised less than 0.02% of Standard rides. Even in New York City, WAV rides comprised just 0.1% of Standard rides. LRPF No. 46. That Lyft chooses not to offer WAV service everywhere is a perfectly appropriate business decision that Lyft should be allowed to make. The ADA does not require Lyft to offer a specialized or accessible service, and the lack of WAV service on the Lyft platform does not constitute "discrimination" as defined by the ADA. *See* LRPF No. 91-92.

43.     Rather, Lyft's own performance data metrics (*e.g.*, ride acceptance rates, wait times) and expert testimony demonstrate that the service Lyft provides to able-bodied people fails to meet the standards for service that Lyft imposes to serve people with disabilities in most of the country – including in Westchester.[31]

**Lyft's Response**: Plaintiffs mischaracterize the testimony of Lyft's expert witness, Dr. Marc Rysman. Dr. Rysman never testified that Lyft has some "standard for service" that it imposes on Access mode but not on Standard mode. Instead, his opinion was that based on his analysis of Lyft data, it is not feasible for Lyft to rely on its platform model to provide

---

[31] Rysman Dep. Tr. 59:9-22 (stating that the Lyft platform does not provide "viable standard service everywhere in New York State" and "the Lyft platform does not generate a viable platform model everywhere in the United States."); 119:5-120:17; 254:20-22.

Access mode service. LRPF No. 10. That Lyft makes Standard mode available in Pound Ridge, New York, or in the State of Wyoming does not mean that it must offer Access mode in those places. If the ADA were interpreted to require such parity, then a clothing store would need to offer Braille gift cards, bookstores would need to stock every book in Braille, and bakeries must offer a gluten-free alternative for every item they sell. Lyft is not required to offer a specialized or accessible service. *See* LRPF No. 91-92.

44.     Lyft's employees have not performed studies or analyses to determine whether Lyft could offer Access mode in any of the non-Access Regions.[32]

**Lyft's Response**: This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.  The cited evidentiary support, deposition testimony regarding advertising for drivers out of the Access regions, does not support the proposed fact. There is no evidence to establish that any "studies or analyses" to determine whether Lyft could offer Access mode in any particular non-Access Region would have resulted in the discovery of a reliable method to offer WAV service on the Lyft platform there, which was not unreasonably costly.

Lyft witnesses testified that they have extensive experience, in Access mode regions, of attempting to find WAV supply for the platform. Based on that experience Lyft has concluded that the supply for a ridesharing platform is inherently local and that procuring a reliable WAV supply is difficult and expensive

- Testimony of Isabella Gerundio.

45.     Lyft's employees have not performed a study of the supply of WAVs in the non-Access Regions.  Ms. Gerundio's only "vague research" for a WAV supply involved searching for

---

[32] Chan Dep. Tr. 133:19-23, 134:2-7.

WAVs on "Cars.com"[33], which does not have a feature to search for WAVs.

      **Lyft's Response**: This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.

      This proposed fact is misleading and irrelevant. Plaintiffs' expert, Claudia Stern, testified that she did not "do research on the prevalence of WAVs in the U.S." There is no evidence to establish that any "study" of the "supply of WAVs in the non-Access Regions" would have resulted in the discovery of any WAV supply owned by or otherwise available to drivers interested in driving on the Lyft platform. Indeed, Plaintiffs' expert Alex Elegudin confirmed that there is no readily available information regarding the supply of individually-owned WAVs nationwide, and that he does not know how many WAVs are owned by individuals with disabilities or by drivers who want to drive WAVs on a ride-sharing platform.

      Further, the proposed fact is not supported by the deposition testimony. Specifically, Ms. Gerundio testified that the example of the search she did on "Cars.com" was an "oversimplification." She went on to testify that she tried looking up the number but was unsuccessful. She also testified to speaking with vendors on multiple occasions to understand the exact type and number of vehicles that they had but, in every instance, the number was low.

- Gerundio Depo. at 118:22-120:9

- Deposition of Claudia Stern ("Stern Depo.") 138:6-7.

- Deposition of Alex Elegudin ("Elegudin Depo.") 181:10-25, 184:19-186:8.

46.    Lyft's employees have not performed a study of the demand for WAV service in the

---

[33] Gerundio Dep. Tr. 116:21-117:9, 199:21-200:1, 200:8-24.

non-Access Regions.[34]

      **Lyft's Response**: This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.  This proposed fact is misleading and irrelevant. There is no evidence to establish that any "study" of the "demand for WAV service in the non-Access Regions" would have resulted in high numbers of potential WAV users.

      Witnesses testified that estimates of the demand for WAV service among the general population constitutes far less than 1% of the demand for Standard mode service. In Lyft's highest-demand region, New York City, WAV rides constitute only approximately 1 in every 1,000 rides on the Lyft platform. In Los Angeles, WAV rides constitute just 1 in every 5,000 rides on the platform.

- Testimony of Dr. Marc Rysman and supporting figures.

- Testimony of Isabella Gerundio.

- Testimony of Richard Zhou and Exhibit H (Pivot Tables of Lyft Ride Data).

      47.    Plaintiffs' experts project that Lyft is currently providing Access mode to approximately 36 percent of the individuals who attempt to turn on the Access mode toggle (which requires users to navigate to a different page of Lyft's app and enable the Access mode setting of Lyft's app, which is not required for any other users).  As a result, the number of people who enable the toggle is only a fraction of the people who would use Access mode.  Plaintiffs' experts' projections indicate substantial unmet demand for Access mode.[35]  (Testimony of Alex Elegudin.).

---

[34] Gerundio Dep. Tr. 121:12-23; Chan Dep. Tr. 133:19-23.
[35] Corrected Expert Report, at 45-46; Highly Confidential – Subject to Protective Order – Toggle Report 2021-02-26.csv ("Toggle 2021-02-26").

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. This is not a "fact." The experts' projections are not reliable.

48.     Plaintiffs' experts project that approximately 1,862 drivers, or 6 drivers per Region, are necessary to offer Access mode in the non-Access Regions.[36]  (Testimony of Alex Elegudin).

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. Moreover, this is not a "fact." The experts' projections are not reliable.

That six IC WAV drivers would be woefully inadequate to provide functional WAV service in regions hundreds of square miles large is evidenced by the testimony of Lyft witnesses, Lyft's expert, and common sense.

- Testimony of Dr. Marc Rysman and supporting figures.

- Testimony of Isabella Gerundio.

- Testimony of Richard Zhou.

49.     Based on Lyft's data, WAV drivers attempted to drive in Access mode in 165 non-Access Regions in 2019 and 145 non-Access regions in 2020.  In 2019, WAV drivers attempted to drive in Access mode in non-Access Regions 7,006 times and, in 2020, WAV drivers attempted to drive in Access mode in non-Access Regions 18,032 times.[37]

**Lyft's Response**: Lack of foundation for a witness with personal knowledge regarding the cited materials, which consist of several years of uninterpreted Lyft ride data. Fed. R. Evid. 401-403, 602.

---

[36] Corrected Expert Report, at 37-38; Supply 2021-02-26.
[37] Supply 2021-02-26.

There is no evidence to support this proposed fact. No driver testified that he has a WAV and wants to drive his WAV on the Lyft platform. Witness testimony established that WAV drivers might appear in supply data in non-WAV regions for a variety of reasons, primarily due to the fact that they are driving a passenger from an Access region and crossing into a non-Access region. For example, a WAV driver in New York City may drive a passenger to White Plains and thus appear in the data as driving in Westchester County. There is no evidence from which to conclude that these drivers "attempted to drive" in Access mode in these regions, or that there is a supply of WAVs available to drive in these regions.

- Testimony of Richard Zhou.

50.    Based on Lyft's data, there was an average of 4 drivers per month on Access Mode for at least one year between 2017 and 2021 in the following non-Access Regions: Gary, Indiana; Orlando, Florida; Orange County, Florida; Manchester, New Hampshire; Allentown, Pennsylvania; Dutchess County, New York; Reading, Pennsylvania; New Haven, Connecticut; Elkhart, New York; the state of New Jersey; Suffolk County, New York; Bridgeport, Connecticut; Westchester County, New York; Nassau County, New York.[38]

**Lyft's Response**: Lack of foundation for a witness with personal knowledge regarding the cited materials, which consist of several years of uninterpreted Lyft ride data. Fed. R. Evid. 401-403, 602. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. This statistic does nothing to establish an available supply of WAVs to drive on the Lyft platform.

---

[38] Supply 2021-02-26.

Witness testimony established that WAV rides sometimes begin in Access Regions, but end outside of those regions, leading to WAVs appearing in data reports outside of Access Regions.

- Testimony of Richard Zhou.

51.     Based on Lyft's data, in 2020, five different non-Access Regions in New York, New Jersey, and Connecticut had a higher per-month average of Access mode drivers than each Access Region other than NYC.[39]

**Lyft's Response**: Lack of foundation for a witness with personal knowledge regarding the cited materials, which consist of several years of uninterpreted Lyft ride data. Fed. R. Evid. 401-403, 602. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.

52.     Based on Lyft's data, in 2019 and 2020, WAV drivers were registered on Access mode in ten Regions in New York State outside of NYC.[40]

**Lyft's Response**: Lack of foundation for a witness with personal knowledge regarding the cited materials, which consist of several years of uninterpreted Lyft ride data. Fed. R. Evid. 401-403, 602. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.

53.     Lyft's employees have admitted that Lyft will implement a nationwide WAV program if ordered by a Court.[41]

---

[39] Supply 2021-02-26.
[40] Supply 2021-02-26.
[41] *See* Chan Dep. Tr. 108:17- 109:9 ("If ordered by a Court to do so, will Lyft implement a nationwide WAVs program? . . . I think that I would - - we would implement a program if legally required to.")

28

**Lyft's Response**: This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. That one former Lyft employee stated in response to an incomplete hypothetical that Lyft would comply with a Court order has no bearing on this case.

### A.    Lyft Refuses To Provide WAV Service In Westchester County, Despite Having A Larger Available Supply Of WAVs In Westchester Than In Any Access Region Other Than New York City.

54.    Vehicles driving for Lyft, including its WAVs, often start a ride in one Region with a destination in another Region.  For instance, if a user requested a ride with a pick-up location in Greenwich, Connecticut, and a destination in White Plains, New York, that user would begin their ride in the Bridgeport Region, "BDR" and end their ride in the Westchester County ("Westchester") Region, "WES."  As a result, many WAV drivers, who only pick up rides for Lyft in NYC, commonly drop off passengers in Westchester, the Bridgeport Region, or other Regions nearby NYC.

55.    Based on Lyft's data, an average of 331 WAV drivers per month were registered on Access mode in Westchester in 2020.  This amount is greater than the number of Standard mode drivers in 115 of Lyft's 331 Regions.[42]  To be clear, Lyft blocks more WAV drivers from operating in Westchester than the total number of standard drivers that operate in over 1/3 of Lyft's Regions.

**Lyft's Response**: Lack of foundation for a witness with personal knowledge regarding the cited materials, which consist of several years of uninterpreted Lyft ride data. Fed. R. Evid. 401-403, 602. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.

---

[42] Supply 2021-02-26.

Evidence showed that New York City Lyft drivers licensed by the Taxi and Limousine Commission (TLC) are not permitted to pick up riders in Westchester County. Lyft applies this rule across the board, across all modes, including Standard, XL, and Access modes.

56.　　Regulations prevent Lyft drivers in NYC who are licensed by the TLC from starting and ending a ride in their TLC-licensed vehicle outside of NYC.  For instance, a TLC-licensed vehicle must either begin or end the ride in NYC; the TLC-licensed vehicle is not allowed to begin and end the ride in Westchester.  (Testimony of Alex Elegudin).

**Lyft's Response**: While evidence shows that drivers in New York City, all of whom are licensed by the TLC, are not permitted to start and end a ride outside of New York City, it is not correct that drivers on the Lyft platform "must either begin or end the ride in New York City." For example, on the Lyft platform, drivers in any mode who end rides in Westchester County are not permitted to pick up rides in Westchester County. This is true for Access mode, Standard mode, and all other modes.

- Testimony of Asaf Bar Selinger.

57.　　However, regulations allow Lyft's drivers that originate rides in NYC with a destination in Westchester to pick up their next Standard mode ride in Westchester as long as the destination of the ride is in NYC.  (Testimony of Alex Elegudin).

**Lyft's Response**: The evidence does not support this proposed fact. Lyft does not allow TLC licensed drivers, regardless of mode, who end a ride in Westchester County to pick up a new ride in Westchester County. *See* LRPF No. 56.

58.　　Thus, Lyft prohibits each of the 331 Lyft Access mode drivers each month who complete WAV rides in Westchester from offering an Access mode ride to an individual with a wheelchair whose desired destination is in NYC.  (Testimony of Alex Elegudin).

30

**Lyft's Response** The evidence does not support this proposed fact. *See* LRPF No. 56.

59.    To be clear, there were more WAVs on Access mode in Westchester in January 2021 (the last month of Lyft's data) than the combined number of WAVs on Lyft's platform in all of the Access Regions, excluding NYC, which includes Boston (18), Chicago (23), Dallas (4), Los Angeles (19), Portland (16), Philadelphia (26), Phoenix (7), and San Francisco (6).[43]  Despite more than 500 WAV drivers being available to offer Access mode rides to residents of Westchester in January 2021, Lyft prohibited these drivers from doing so.  (Testimony of Alex Elegudin).

**Lyft's Response**: Lack of foundation for a witness with personal knowledge regarding the cited materials, which consist of several years of uninterpreted Lyft ride data. Fed. R. Evid. 401-403, 602. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.

There is no logical basis for comparing the supply of IC WAV drivers driving from New York City into neighboring regions to drop off passengers to the supply of contracted Partner WAV drivers or IC WAV drivers in other regions.

In addition to being the largest city in the United States, New York City has unique regulations that lead to a much higher supply of WAVs on the platform there than in any other market.

Moreover, there is no evidence that these drivers would be interested in providing WAV service in Westchester County. That is, there is no evidence that dropping off a passenger in one location is indicative of an interest in picking up additional passengers there.

---

[43] Supply 2021-02-26.

To the contrary, the testimony confirms that IC WAV drivers tend to behave like drivers in Standard Mode, preferring to drive in areas of high ride demand, such as dense urban areas like New York City.

- Testimony of Asaf Bar Selinger.
- **Testimony of Richard Zhou.**

60.    In addition, dealerships provide WAVs in Westchester and the nearby area.[44] (Testimony of Alex Elegudin).

**Lyft's Response**: This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. Lack of personal knowledge. Fed. R. Evid. 602.

That two dealerships in the Westchester County area "provide WAVs" is irrelevant to the legal issues in this case. There is no information regarding the total supply of WAVs available, for what cost, or how many individuals would be interested in driving the vehicles purchased from those dealerships on the Lyft platform. Indeed, uncontroverted testimony confirms that WAVs are very expensive. Mr. Bussani testified that "In the last several years, the average cost to make a vehicle wheelchair-accessible begins around $17,000-$18,000 (Almost all automotive costs have increased recently due to supply chain issues; accordingly, the cost to convert a vehicle has increased in the last six months to approximately $25,000)."

- Affidavit of Daniel Bussani ¶ 13.

61.    Although Uber has contacted these dealers to increase the supply of WAVs on its platform, it appears that Lyft has not even attempted to do so.  Uber drivers regularly rent WAVs

---

[44] Affidavit of Daniel Bussani at ¶¶ 2, 6-11; Affidavit of Peter Ruprecht at ¶¶ 2, 4-7; Affidavit of Penny Wolfson at ¶ 38.

from a dealership servicing Westchester; that same dealership is not aware of any similar attempts by Lyft drivers.[45]

>**Lyft's Response**: This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. Lack of personal knowledge. Fed. R. Evid. 602. Hearsay. Fed. R. Evid. 802.

## VI.    **Plaintiffs Have Standing**

### A.    **Legal Standard**

62.    "To satisfy constitutional standing requirements, a plaintiff must prove: (1) injury in fact, which must be (a) concrete and particularized, and (b) actual or imminent; (2) a causal connection between the injury and the defendant's conduct; and (3) that the injury is likely to be redressed by a favorable decision." *Kreisler v. Second Ave. Diner Corp.*, 731 F.3d 184, 187 (2d Cir. 2013) (citing *Field Day, LLC v. County of Suffolk*, 463 F.3d 167, 175 (2d Cir. 2006)).

63.    "In the ADA context, [the Second Circuit] ha[s] previously found standing (and therefore an injury in fact) where (1) the plaintiff alleged past injury under the ADA; (2) it was reasonable to infer that the discriminatory treatment would continue; and (3) it was reasonable to infer, based on the past frequency of plaintiff's visits and the proximity of defendants' restaurants to plaintiff's home, that plaintiff intended to return to the subject location." *Kreisler*, 731 F.3d at 187-88 (citing *Camarillo v. Carrols Corp.*, 518 F.3d 153, 158 (2d Cir. 2008)).

64.    "The existence of standing need only be proven 'by a preponderance of the evidence.'" *Zink v. First Niagara Bank, N.A.*, 206 F. Supp. 3d 810, 817 (W.D.N.Y. 2016) (quoting *Perry v. Village of Arlington Heights*, 186 F.3d 826, 829 (7th Cir.1999); *cf., e.g., Shaywitz v. Am. Bd. of Psychiatry & Neurology*, 675 F. Supp. 2d 376, 382 (S.D.N.Y. 2009).

---

[45] Affidavit of Daniel Bussani, ¶¶ 19-24.

**Lyft's Response**: "At all stages of litigation, 'the party invoking federal jurisdiction bears the burden of establishing the elements of Article III standing." *Calcano v. Swarovski N. Am. Ltd.*, 36 F.4th 68, 74 (2d Cir. 2022), *quoting Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016); *see also Lewis v. Casey*, 518 U.S. 343, 358 (1996) ("each element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation."), *quoting Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

Plaintiffs' claims under the New York State Human Rights Law ("NYSHRL") and the New York City Human Rights Law ("NYCHRL") are "'governed by the same standing requirements as the ADA.'" *Gannon v. JBJ Holdings LLC*, Case No. 22-cv-1674 (LJL), 2022 U.S. Dist. LEXIS 185922, *8 (S.D.N.Y., Oct. 11, 2022), *quoting Mendez v. Apple, Inc.*, 2019 U.S. Dist. LEXIS 110640, *9 (S.D.N.Y., Mar. 28, 2019). If Plaintiffs lack standing to sue under the ADA, then they also lack standing under Article III to pursue their claims under the NYSHRL and the NYCHRL. *Id.*

65.    "[D]eterrence constitutes an injury under the ADA." *Disabled in Action v. Bd. of Elections in City of New York*, 752 F.3d 189, 200 (2d Cir. 2014) (quoting *Kreisler*, 731 F.3d at 188). Plaintiffs are not obligated to engage in the futile gesture of personally encountering the discrimination at issue if the plaintiffs have actual notice that the defendant will not comply with the ADA.  42 U.S.C. § 12188(a)(1); *see Kreisler*, 731 F.3d at 188 ("In the context of the ADA, the fact that the wheelchair-inaccessible entrance deterred Kreisler from accessing the Diner established a concrete and particularized injury; Kreisler need not attempt to overcome an obvious barrier."); *Access 4 All, Inc. v. Trump Int'l Hotel & Tower Condo.*, 458 F. Supp. 2d 160, 167 (S.D.N.Y. 2006) (Karas, J.) ("awareness of discriminatory conditions, and the avoidance of a public accommodation because of that awareness, is injury in fact") (collecting cases); *Lowell v. Lyft, Inc.*, 352 F. Supp. 3d

248, 255-56 (S.D.N.Y. 2018) (collecting cases).  A "present intention to return" that "depends only upon [the plaintiff's] own volition," rather than "contingent upon events whose occurrence was speculative and beyond her control," "and the likelihood of which finds some support in professional and family reasons" is sufficient to establish future harm.  *Harty v. Simon Prop. Grp., L.P.*, 428 F. App'x 69, 72 (2d Cir. 2011); *Access 4 All, Inc.*, 458 F. Supp. 2d, 168 (S.D.N.Y. 2006) ("Standing to bring claims for injunctive relief for an ADA claim is established if a plaintiff can 'show a plausible intention or desire to return to the place [of the injury] but for the barriers to access.'") (quoting *Disabled in Action of Metro. New York v. Trump Int'l Hotel & Tower*, No. 01-5518, 2003 WL 1751785, at *7 (S.D.N.Y. Apr. 2, 2003)).

      **Lyft's Response**: To establish standing under the ADA, Plaintiffs must show not only that they encountered the barriers before filing their complaint, but also that they have "a plausible intention or desire" to return to the place or to use the service there "but for the barriers to access." *Small v. Gen. Nutrition Co.*, 388 F. Supp. 2d 83, 86-87 (E.D.N.Y. 2005). "[C]onclusory allegations of intent to return and proximity are not enough—in order to 'satisfy the concrete-harm requirement' and to 'pursue forward-looking, injunctive relief,' Plaintiffs must establish a 'material risk of future harm' that is 'sufficiently imminent and substantial.'" *Calcano*, 36 F.4th at 72, *quoting TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2210 (2021). "'[S]ome day' intentions — without any description of concrete plans, or indeed even any specification of when the some day will be — do not support a finding of the 'actual or imminent' injury that" Article III requires. *Lujan*, 504 U.S. at 564.

      To establish standing in New York City or any of the "Access Regions" where Lyft already provides WAV service, Plaintiffs must actually have used the Lyft app to evaluate the service. *See Access Living of Metro. Chi. V. Uber Techs., Inc.*, 958 F.3d 604, 614 (7ᵗʰ Cir. 2020) (plaintiff, by not downloading the Uber app and evaluating its services in an area where its

WAV mode was offered, was "without any personalized experience on which to rest her claim for injunctive relief based on Uber's failure to provide her with a WAV on equivalent terms of service."); *Namisnak v. Uber Techs.*, 971 F.3d 1088, 1093 (9th Cir. 2020) (the presence of some form of WAV service in a region is a "dispositive distinction" in evaluating standing).

66.    An organization may establish associational standing by showing that at least one of its members has standing, that the interests at stake are germane to the organization's purpose, and that neither the claim nor the relief requires participation of the organization's individual members. *Bronx Indep. Living Servs. v. Metro. Transportation Auth.*, No. 16-5023, 2021 WL 1177740, at *12 (S.D.N.Y. Mar. 29, 2021) (citing *Nat. Res. Def. Council v. Dep't of Interior*, 410 F. Supp. 3d 582, 592 (S.D.N.Y. 2019)).  For an organization "[t]o establish associational standing '[w]here an association is not a traditional voluntary membership organization, its constituents must nevertheless possess sufficient 'indicia of membership.'"  *Westchester Indep. Living Ctr., Inc. ("WILC") v. State Univ. of New York, Purchase Coll.*, 331 F.R.D. 279, 296 (S.D.N.Y. 2019) (Seibel, J.) (quoting *Mental Hygiene Legal Serv. v. Cuomo*, 609 F. App'x 693, 695 (2d Cir. 2015)).

**Lyft's Response**: Even if WDOMI could establish "indicia of membership," it would also have to prove that its members would "otherwise have standing to sue in their own right." *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343 (1977). That is, WDOMI's members must have suffered a concrete injury, caused by Lyft's conduct, which may be redressed by a favorable decision. WDOMI must also show that this litigation is germane to its purpose. *Hunt*, 432 U.S. at 343. This factor supports the "'modest yet important' goal of preventing litigious organizations from forcing the federal courts to resolve numerous issues as to which the organizations themselves enjoy little expertise and about which few of their members demonstrably care." *Bldg. & Constr. Trades Council of*

*Buffalo v. Downtown Dev., Inc.*, 448 F.3d 138, 149 (2d Cir. 2006) (quoting *Humane Soc'y of United States v. Hodel*, 268 U.S. App. D.C. 165, 840 F.2d 45, 57 (1988)).

**B.     Findings of Fact Relevant To Standing**

67.     Plaintiff Harriet Lowell ("Ms. Lowell") is a citizen of White Plains, New York, who relies on a motorized scooter for travel.  Stip. Fact. ¶ 1.

68.     Plaintiff Westchester Disabled on the Move, Inc. ("WDOMI") is a non-profit community-based organization headquartered in Yonkers, New York.  Stip. Fact. ¶ 2.

69.     Ms. Lowell has never downloaded Lyft's mobile-based application (the "App").  Stip. Fact. ¶ 6.

70.     A significant percentage of WDOMI's constituents, clients, and staff are persons with disabilities, including mobility-related disabilities.  WDOMI is staffed, directed, and driven by the individuals with disabilities that it seeks to serve, including wheelchair-users.  Stip. Fact. ¶ 7.

71.     Plaintiffs Ms. Lowell and WDOMI seek to use Access mode, but do not currently use Lyft and have not downloaded the App because Lyft does not offer Access mode in Westchester and New York State outside of NYC.[46]

> **Lyft's Response**: Ms. Lowell frequently travels to New York City, where Lyft offers Access mode, but has not downloaded the App to use Lyft there.

72.     Ms. Lowell knows that Lyft refuses to serve her and other people who use motorized scooters or wheelchairs except in regions where regulators force it to provide service.[47]

> **Lyft's Response**:  The evidence establishes that Lyft has implemented WAV programs in various regions, including regions in which regulators do not require ride

---

[46] Affidavit of Harriet Lowell at ¶¶ 14-20, 28-45; Affidavit of Melvyn Tanzman at ¶¶ 29-45.
[47] Affidavit of Harriet Lowell at ¶¶ 19-20.

sharing companies to provide WAV services, including Boston, San Francisco, and Los Angeles.

73.    Not having access to Lyft WAVs prevents Ms. Lowell from fully enjoying many aspects of life, including assisting with her husband's medical needs.  For example, when her husband was hospitalized at WestMed in White Plains, she could not visit him because it was too far to travel without a WAV.  Similarly, when her husband was hospitalized in Greenwich, Connecticut, she was sometimes unable to visit him.  On some occasions, her friend, who also owns a WAV, would drive her to visit her husband; but this was an imposition.  She was unable to call a Lyft to visit her husband as would any able-bodied person.[48]

> **Lyft's Response**: Ms. Lowell does not use any other mode of transportation besides her family's WAV. Ms. Lowell has never used a WAV taxi, accessible public transportation, Uber, or paratransit.
>
> - Lowell Depo. 24:3-7, 30:1-4, 34:13-16, 36:1-4, 43:16-18, 46:2-4, 115:18-117:1, 121:25-122:5, 123:6-8.

74.    Lyft's refusal to serve people who use motorized scooters or wheelchairs is common knowledge in the disabled community.  Ms. Lowell has discussed Lyft's discrimination with her friends, advocates, and people with mobility-impairments.  Prior to filing this lawsuit, one of Ms. Lowell's friends tried to call a WAV in White Plains and informed Ms. Lowell that Lyft does not provide WAV service in White Plains.  Ms. Lowell has directly been informed of Lyft's widespread discriminatory practices from other mobility-impaired individuals who have personally experienced discrimination.  Ms. Lowell heard from a young wheelchair user in White Plains who recounted his embarrassment when his friends were able to take Lyft home at the end of a night out and he had to

---

[48] Affidavit of Harriet Lowell at ¶¶ 14-16.

wait until his mother arrived to pick him up in her WAV.  Ms. Lowell has also read countless articles about Lyft's failure to serve people with disabilities nationwide.[49]

> **Lyft's Response**:  The evidence does not establish that the nature and quality of Lyft's Access mode service in the greater New York City area is "common knowledge." At deposition, Ms. Lowell testified that she was "not sure" if she had discussed Lyft's WAV service in New York City with anyone. She was also not aware whether she could take a Lyft WAV from New York City to White Plains. Plaintiffs' own expert witness analysis showed that Ms. Lowell could get a WAV ride in 10.8 minutes in New York City.
>
> • Lowell Depo. 109:6-8, 110:24-111:1.

75.    Ms. Lowell seeks to use Lyft to go out for celebrations with family and friends in White Plains.  Ms. Lowell intends to regularly use Lyft to get to appointments, run errands, go to restaurants, and visit friends.  Ms. Lowell intends to use Lyft to travel to and from the hair salon every three weeks, which currently requires her husband to drive her.[50]

> **Lyft's Response**: The evidence establishes that Ms. Lowell would only use Lyft under specific conditions. To use Lyft, she would "have to know that Lyft had reliable service," which means that she would "have to be certain that [she] could get a Lyft" so she would not "strand" herself.
>
> Moreover, the evidence does not support that Ms. Lowell would "regularly" use Lyft. Currently, Ms. Lowell's mode of transportation is her family's WAV. Lowell does not use any other mode of transportation. She does not travel by train or airplane. Lowell has never used a WAV taxi, to go to the hair dresser or even when she is in New York City. Lowell has never used accessible public transportation in any city, and she does not use paratransit.

---

[49] Affidavit of Harriet Lowell at ¶¶ 18-19
[50] Affidavit of Harriet Lowell at ¶¶ 19-20.

- Lowell Depo. 24:3-7, 30:1-4, 34:13-16, 36:1-4, 43:16-18, 46:2-4, 115:18-117:1, 121:25-122:5, 123:6-8.

76.    Prior to the pandemic, Ms. Lowell travelled to NYC once or twice a month for medical reasons, and will likely have to attend medical appointments in person in the future.  Ms. Lowell also has many friends in NYC and enjoys going to restaurants, visiting museums, and attending events such as advocacy events in NYC and across New York.  Right now, Ms. Lowell's husband has to drive her on each of these trips.  Ms. Lowell would regularly use Lyft to travel to and from NYC without the need for her husband to drive her.[51]

**Lyft's Response**: The evidence does not support Ms. Lowell's statement that she would use Lyft regularly to go to and from New York City if Access mode were offered. Lyft currently offers Access mode within New York City and from New York City to surrounding areas and Ms. Lowell has not downloaded or used Lyft and is unaware of Lyft's available services.

- Lowell Depo. 109:6-8, 110:24-111:1.

77.    Ms. Lowell will also travel more regularly once she knows that Lyft provides WAV service across the country.  For example, she would like to visit her good friends and family in the Maryland and Washington, D.C. areas.[52]

**Lyft's Response**: The evidence establishes that Ms. Lowell does not have any "specific plans" to travel anywhere else in the country if Lyft were to offer Access mode in additional locations. Ms. Lowell also testified that she does not travel by train or airplane.

- Lowell Depo. 118:22-119:9.

- Affidavit of Harriet Lowell  ¶ 42.

---

[51] Affidavit of Harriet Lowell at ¶ 10.
[52] Affidavit of Harriet Lowell at ¶¶ 41-43.

78.    Without WAV service, many of WDOMI's constituents cannot access Lyft's transportation services.[53]

**Lyft's Response**: The testimony relied on constitutes inadmissible hearsay. Fed. R. Evid. 801-803.  There is no admissible evidence of specific constituents who cannot access Lyft's platform.

79.    For example, Ansel Lurio was stranded in a snow storm in Westchester because he could not call a WAV through Lyft.  Due to the snow, he was unable to use his wheelchair.  Lyft directed Ansel to call paratransit, which requires 24-hour advance notice to schedule a ride.  After searching all options, Ansel was forced to call a local ambulance to pick him up and spent the night in the hospital, despite no medical need.[54]

**Lyft's Response**: The testimony relied on constitutes inadmissible hearsay. Fed. R. Evid. 801-803.  Even if the testimony were accepted, it would not support standing for WDOMI to seek future injunctive relief. There is no admissible evidence of specific constituents who cannot access Lyft's platform.

80.    WDOMI's constituents would like to use Lyft to travel throughout New York State, Boston, Massachusetts, and Philadelphia, Pennsylvania.[55]

**Lyft's Response**: The testimony relied on constitutes inadmissible hearsay. Fed. R. Evid. 801-803.  There is no evidence of specific constituents who "would like to" use Lyft to travel "throughout" the various locations listed or under what conditions they would actually do so.

---

[53] Affidavit of Melvyn Tanzman ¶¶ 29-32; Affidavit of Penny Wolfson at ¶¶ 27-32.
[54] Transcript of Aug. 17, 2021 Deposition of Ansel Lurio at 128:21-130:12; Affidavit of Penny Wolfson at ¶¶ 27-32; Affidavit of Melvyn Tanzman at ¶¶ 40-44.
[55] Affidavit of Melvyn Tanzman at ¶¶ 29-32.; Affidavit of Penny Wolfson at ¶ 35.

81.     WDOMI's constituents cannot use Lyft for transportation in New York State outside of NYC and in Washington, D.C., because Lyft does not offer WAV service in these regions.[56]

> **Lyft's Response**: The testimony relied on constitutes inadmissible hearsay. Fed. R. Evid. 801-803. It is undisputed that Lyft does not offer WAV service in New York State outside of New York City.

82.     Prior to filing this lawsuit, WDOMI made multiple public statements requesting modifications to Lyft's policies, practices, or procedures, at the New York State Legislature and in the presence of Lyft employees at Listening Sessions for the New York State Transportation Network Company Accessibility Task Force.[57]

> **Lyft's Response**: WDOMI's corporate representative testified that WDOMI "made it quite clear at hearings where Lyft was present that what we are asking for is a fleet of wheelchair-accessible vehicles that could provide service that's reasonably on par with those received by non-disabled individuals."  As discussed below, purchasing a "fleet" of WAVs is not a reasonable modification to a policy, practice, or procedure. See 42 U.S.C. § 12184(b)(3).
>
> • 30(b)(6) Deposition Melvyn Tanzman ("Tanzman Depo.") 163:11-17.

## C.     Conclusions of Law Related To Standing

83.     Ms. Lowell has demonstrated that she is unable to use Lyft in Westchester, that she is deterred from using Lyft due to its refusal to serve WAV users in Westchester, and that she will use Lyft if it stops discriminating against people who require WAVs.[58]

---

[56] Affidavit of Melvyn Tanzman at ¶¶ 29-32.; Affidavit of Penny Wolfson at ¶ 35.
[57] Affidavit of Melyvn Tanzman ¶¶ 16-21.
[58] *See Lowell*, 352 F. Supp. 3d at 256. *See also* Lowell Decl., ¶¶ 8-18; Declaration of Harriet Lowell in Opposition to Defendant Lyft, Inc.'s Motion to Dismiss, ECF No. 36 ("Lowell Decl."), ¶¶ 6-14.

**Lyft's Response**: Ms. Lowell failed to prove that she has standing to pursue any of her claims in this lawsuit. Ms. Lowell testified that she does not use any form of transportation other than her family WAV. Ms. Lowell does not take trains, planes, or busses. Just as she has never used Lyft, Ms. Lowell has not used WAV taxis in *any* city, including in White Plains and New York City. *See* LRPF No. 75. Moreover, she testified she would use Lyft's Access mode only if Lyft provided "equivalent" service, meaning a "straightforward equivalent to what people who are non-disabled have." Consistent with that testimony, Ms. Lowell has never used Lyft's Access mode in New York City, despite her own expert witness's analysis showing that she can get a WAV ride in 10.8 minutes. LRPF Nos. 74, 76. (Having never used the Lyft app in New York City, Ms. Lowell does not have standing to pursue her claims in New York City. *See Access Living of Metro. Chi. V. Uber Techs., Inc.*, 958 F.3d 604, 614.) Under the circumstances, her testimony that she would use Lyft's Access mode to go to her hairdresser, or that she would like to use Lyft's Access mode in Boston or Washington, D.C., adds up to nothing more than "some day" intentions to use Lyft. *See Lujan*, 504 U.S. at 564; see also *Harty v. West Point Realty*, 28 F.4th 435, 443 (2d Cir. 2022) (allegation that plaintiff intended to utilize the website to reserve a guestroom "'in the near future'" was not sufficiently imminent to establish injury in fact). Finally, Ms. Lowell lacks standing because she cannot show that her injury is redressable anywhere, including in White Plains, New York. Article III requires a plaintiff to show that a favorable decision could redress her injuries, demonstrating a "non-speculative likelihood that the injury can be remedied by the requested relief." *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 106-07 (2d Cir. 2008). But Ms. Lowell's demand is exacting: she does not want just an icon in her App showing "Access mode," she wants a WAV service that would not

43

leave her stranded. LFPF No. 75. Absent evidence that Lyft could meet her demand, Lowell

cannot establish redressability, and therefore cannot establish standing.

84.     Class Representatives Scudieri and Burr have both been deterred from using Lyft's

services on many occasions due to Lyft's failure to offer WAVs, and would use Lyft if it stops

discriminating against people who require WAVs.

> **Lyft's Response**: This conclusion of law is irrelevant because Plaintiffs have not
>
> presented any evidence regarding Ms. Scudieri and Mr. Burr, who are not named plaintiffs in
>
> this action and have not been appointed "class representatives."

85.     Courts in the Second Circuit and elsewhere routinely find that independent living

centers such as WDOMI have associational standing to represent people with disabilities. *See, e.g.,*

*Bronx Indep. Living Servs.*, 2021 WL 1177740, at *12 ("[The plaintiff] is an independent living center

that provides services and advocacy for persons with disabilities and disabled individuals make up

more than half of its leadership and staff.  Courts in this District have found similar centers have

sufficient indicia of membership to support associational standing."); *WILC*, 331 F.R.D. at 297

(holding that the plaintiff has associational standing because "WILC is staffed, directed, and driven

by the individuals with disabilities that it seeks to serve . . . while WILC is not a traditional

membership organization, I find that its constituents have sufficient indicia of membership in the

organization, and therefore WILC has associational standing"); *Brooklyn Ctr. for Indep. of the Disabled v.*

*Bloomberg*, 290 F.R.D. 409, 417 (S.D.N.Y. 2012) ("CIDNY is a 'service provider[ ] managed and

directed by persons with disabilities for the purpose of serving persons with disabilities'" and thus

"has sufficient 'indicia of membership' to 'function effectively as a membership organization' for the

purposes of associational standing.") (quoting *Disability Advocs., Inc. v. New York Coal. for Quality*

*Assisted Living, Inc.*, 675 F.3d 149, 157 (2d Cir. 2012)).

44

**Lyft's Response**: That other independent living centers have been found to have standing is not relevant to whether WDOMI has standing in this case. Even if WDOMI could establish "indicia of membership," it has the burden to prove that its members would "otherwise have standing to sue in their own right." *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343 (1977). That is, WDOMI's members must have suffered a concrete injury, caused by Lyft's conduct, which may be redressed by a favorable decision. WDOMI must also show that this litigation is germane to its purpose. *Hunt,* 432 U.S. at 343. This factor supports the "'modest yet important' goal of preventing litigious organizations from forcing the federal courts to resolve numerous issues as to which the organizations themselves enjoy little expertise and about which few of their members demonstrably care." *Bldg. & Constr. Trades Council of Buffalo v. Downtown Dev., Inc.*, 448 F.3d 138, 149 (2d Cir. 2006) (quoting *Humane Soc'y of United States v. Hodel*, 268 U.S. App. D.C. 165, 840 F.2d 45, 57 (1988)).

86.    Similarly, WDOMI has associational standing because its employees, members, and constituents are people with disabilities, including mobility-related disabilities; these people have acquired knowledge of Lyft's ongoing discrimination; Lyft has refused to serve some of WDOMI's members and other WDOMI members have been deterred from even attempting to use Lyft; and Lyft has rejected WDOMI's requests that Lyft change its policies and serve people with disabilities. Indeed, WDOMI "is staffed, directed, and driven by the individuals with disabilities that it seeks to serve," including wheelchair-users. *WILC*, 331 F.R.D. at 297.

**Lyft's Response**: WDOMI also failed to prove that it has associational standing. At trial, WDOMI presented no testimony from any "member" who claims to have been injured by Lyft's conduct. Vague hearsay statements by its former Executive Director does not suffice. *See, e.g.*, *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) (vague desire expressed

by one member to return is insufficient to satisfy the requirement of imminent injury); *Sierra Club v. SCM Corp.*, 747 F.2d 99, 102, 107-08 (2d Cir. 1984) (affirming dismissal after plaintiff organization failed to "identify any of its members who might have been harmed by the alleged violation"). WDOMI also failed to show that this litigation is germane to its purpose. While transportation generally might be an issue on which WDOMI works, WDOMI presented no evidence on which this Court could conclude that any of its members were harmed by the lack of Access mode on the Lyft app. LRPF Nos. 78-81; *see also Hunt*, 432 U.S. at 343.

87.     Thus, Ms. Lowell, Ms. Scudieri, and Mr. Burr have standing and WDOMI has associational standing under the pleaded statutes.

**Lyft's Response**: Plaintiffs thus failed to prove that Plaintiffs Lowell and WDOMI have standing to proceed. Whether Ms. Scudieri and Mr. Burr, who are not plaintiffs in this lawsuit nor have been appointed class representatives, have standing is irrelevant.

## VII.  PLAINTIFFS' FIRST THREE CLAIMS FOR RELIEF:
### Lyft Discriminates In Violation Of The Americans with Disabilities Act, The <u>New York State Human Rights Law, And The New York City Human Rights Law.</u>

### A.  Legal Standard Under The ADA.

88.     To state a claim under Title III of the ADA, Plaintiffs must prove "(1) that [they] are disabled within the meaning of the ADA; (2) that defendant[] own[s], lease[s], or operate[s] a place of public accommodation; and (3) that defendant[] discriminated against [them] by denying [them] a full an equal opportunity to enjoy the services defendant[] provide[s]." *Camarillo v. Carrols Corp.*, 518 F.3d 153, 156 (2d Cir. 2008).

**Lyft's Response**: To prevail on their claim of discrimination, Plaintiffs must prove that Lyft discriminated "within the meaning of the ADA." *Roberts v. Royal Atl. Corp.,* 542 F.3d 363, 368 (2d Cir. 2008). *See also PGA Tour, Inc. v. Martin,* 532 U.S. 661, 681-82 (2001)

(the question of whether a defendant has violated Title III's general rule against discrimination "depends on a proper construction of the term 'discrimination,' which is defined by Title III" in Section 12182(b)(2)).

89.    To establish discrimination under § 12182(a) of the ADA, Plaintiffs must establish that Defendant "operates a place of public accommodation." 42 U.S.C. § 12182(a).

90.    To establish discrimination under § 12184(a) of the ADA, Plaintiffs must establish that Defendant is a "specified public transportation service." 42 U.S.C. § 12184(a).

91.    "Title III of the ADA prohibits discrimination against the disabled in the full and equal enjoyment of public accommodations, 42 U.S.C. § 12182(a), and public transportation services, § 12184(a). The general prohibitions are supplemented by various, more specific requirements. Entities that provide public accommodations or public transportation: (1) may not impose "eligibility criteria" that tend to screen out disabled individuals, §§ 12182(b)(2)(A)(i), 12184(b)(1); (2) must make "reasonable modifications in polices, practices, or procedures, when such modifications are necessary" to provide disabled individuals full and equal enjoyment, §§ 12182(b)(2)(A)(ii), 12184(b)(2)(A); . . . and (4) must remove architectural and structural barriers, or if barrier removal is not readily achievable, must ensure equal access for the disabled through alternative methods, §§ 12182(b)(2)(A)(iv)-(v), 12184(b)(2)(C)." *Spector v. Norwegian Cruise Line Ltd.*, 545 U.S. 119, 128 (2005).

**Lyft's Response**: Consistent with the above quote from *Spector,* the "general prohibitions" are supplemented by "Specific Prohibitions" that define "discrimination" for purposes of the statute. *See* 42 U.S.C. § 12182(b)(2) (defining "discrimination" "[f]or purposes of Section 12182(a)"), § 12184(b) (defining "discrimination" "[f]or purposes of Section 12184(a)"). This means to prove "discrimination" under ADA Title III, Plaintiffs must prove that Lyft engaged in "discrimination" as defined by one of the subsections of

47

Sections 12184(b) or 12182(b)(2). *See, e.g., Krist v. Kolombos Rest. Inc.,* 688 F.3d 89, 94-95 (2d Cir. 2012); *Staron v. McDonald's Corp.*, 51 F.3d 353, 355 (2d Cir. 1995).

92.     Section 12182 also states: "It shall be discriminatory to afford an individual or class of individuals, on the basis of a disability . . . with the opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is not equal to that afforded to other individuals." 42 U.S.C. § 12182(b)(1)(A)(ii).

**Lyft's Response**: Plaintiffs' theory that they can prove "discrimination" by merely showing that Lyft fails to afford individuals with disabilities "with the opportunity to participate in or benefit from" a good or a service because it fails to provide WAV service is contrary to the language of the ADA, U.S. Supreme Court precedent, and Second Circuit authority. *See, e.g., PGA Tour, ,* 532 U.S. at 681-82; *Roberts,* 542 F.3d at 368. The language of the statute explicitly exempts Lyft from having to purchase or lease WAVs. 42 U.S.C. § 12184(b)(3) (private entities need not purchase or lease WAVs). The Second Circuit has explicitly stated that individuals cannot sue private entities for failing to provide WAVs. *Noel v. N.Y.C. Taxi & Limousine Comm'n*, 687 F.3d 63, 73 (2d Cir. 2012) (under Title III of the ADA, individuals could not bring an action against taxi companies for "a failure to provide meaningful access to" WAV taxis). The only way Plaintiffs can prove "discrimination," therefore, is by proving that Lyft engaged in discrimination as that term is defined by the ADA by proving, for example, that Lyft failed to make requested reasonable modifications.

93.     "To prevail on their claims, Plaintiffs must prove a violation of Title III of the ADA by a preponderance of the evidence." *U.S. v. Asare*, 476 F. Supp. 3d 20, 26 (S.D.N.Y. 2020) (citing *Krist v. Kolombos Rest. Inc.*, 688 F.3d 89, 96 (2d Cir. 2012)).

B.     **Legal Standard Under The NYSHRL.**

94.     "A claim of discrimination under the New York State Human Rights Law  is governed by the same legal standards as govern federal ADA claims." *Graves v. Finch Pruyn & Co., Inc.*, 457 F.3d 181, 184 n.3 (2d Cir. 2006).  "[B]y demonstrating an ADA violation, [the plaintiff] [] also establish[es] a violation of the NYSHRL." *Cox*, 2020 WL 5027864, at *7 (quoting *Graves*, 457 F.3d at 184 n.3).

**Lyft's Response**: Lyft agrees that Plaintiffs' claim under the NYSHRL rises or falls with their claims under the ADA.

95.     The NYSHRL prohibits the following specified forms of discrimination:

a.     refusing to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford accommodations to people with disabilities, none of which would fundamentally alter the nature of such accommodations, N.Y. Exec. Law § 296(2)(c)(i);

b.     refusing to take steps necessary to ensure that no individual with a disability is excluded or denied services due to the absence of auxiliary aids and services, none of which would fundamentally alter the nature of the accommodation offered nor would result in an undue burden, N.Y. Exec. Law § 296(2)(c)(ii); and

c.     refusing to remove barriers where such removal is readily achievable, N.Y. Exec. Law § 296(2)(c)(iii).

**Lyft's Response**: This case is not about whether Lyft failed to provide "auxiliary aids and services," which are defined in both the ADA and the NYSHRL as communication devices and services, such as video remote interpreting services and Brailled materials. 42 U.S.C. § 12103(1); 28 C.F.R. § 36.303(b); N.Y. Exec. Law § 296(2)(d)(ii).

96.     Plaintiffs must prove their NYSHRL claims by a "preponderance of the evidence." *Mugavero v. Arms Acres, Inc.*, 680 F. Supp. 2d 544, 559 (S.D.N.Y. 2010).

### C.   Legal Standard Under The NYCHRL.

97.    Under the NYCHRL, "Plaintiff must show that: '(1) [the plaintiff] is a member of a protected class as defined by the NYCHRL; (2) [The defendant] directly or indirectly refused, withheld from, or denied an accommodation, advantage, facility, or privilege thereof based, in whole or in part, on [the plaintiff's] membership in a protected group; and (3) [the defendant] acted in such a manner and circumstances as to give rise to the inference that its actions constituted discrimination in violation of Section 8-107(4)." *Roberman v. Alamo Drafthouse Cinemas Holdings, LLC*, 120 N.Y.S.3d 709, 713 (N.Y. Sup. Ct. Kings Cty. 2020) (quoting *Matter of Commission of Human Rights ex rel. Carlos Rodriguez v. A Plus Worldwide Limo, Inc.* OATH Index No. 905/15, 2019 WL 3225764, at *5).

98.    "The NYCHRL is 'construed liberally for the accomplishment of [its] uniquely broad and remedial purposes thereof.'" *Brooklyn Ctr. for Indep. of the Disabled v. Metro. Transportation Auth.*, 11 F.4th 55, 68 (2d Cir. 2021) (quoting *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 75 (2d Cir. 2015)). "'[F]ederal civil rights statutes can serve only as a floor below which the [NYCHRL] cannot fall.'" *BCID*, 11 F.4th at 68 (quoting *Ya-Chen Chen*, 805 F.3d at 75). "Accordingly, 'courts must analyze NYCHRL claims separately and independently from any federal and state law claims, construing [the NYCHRL's] provisions broadly in favor of discrimination plaintiffs to the extent that such a construction is reasonably possible.'" *BCID*, 11 F.4th at 68 (quoting *Ya-Chen Chen*, 805 F.3d at 75).

### D.   Plaintiffs Satisfy The Disability Prong Of All Three Statutes.

99.    Ms. Lowell, Ms. Scudieri, and Mr. Burr are disabled within the meaning of the ADA, NYSHRL, and NYCHRL.  Stipulation ¶¶ 1-4.

        **Lyft's Response**: Whether Ms. Scudieri and Mr. Burr are disabled is irrelevant as they are not Plaintiffs in this lawsuit.

**E.     Plaintiffs Satisfy The Public Accommodation Prongs Of All Three Statutes.**

100.     Lyft is a public accommodation under the NYSHRL and NYCHRL.  Stipulation ¶¶ 6-7.

    **Lyft's Response**: For purposes of this case, Defendant does not contest that it falls within the definition of "public accommodation" and "provider of public accommodation" under the NYSHRL and NYCHRL, respectively. Lyft denies that it is a "public accommodation" under the ADA.

**i.     Findings Of Fact**
**Related To Lyft Being A Public Accommodation Under The ADA.**

101.     Lyft operates multimodal transportation networks in the United States that offer access to a variety of transportation options through Lyft's platform and App.  Stip. Fact ¶ 10.

102.     Lyft's transportation network is designed to address a wide range of mobility needs. The Lyft network spans rideshare, car rentals, bikes, scooters, and transit.   Stip. Fact ¶ 11.

103.     Lyft's stated mission is to "improve people's lives with the world's best transportation."  Stip. Fact ¶ 12.

104.     Members of the general public may download the App and agree to the Terms of Service.  Stip. Fact ¶ 13.

**ii.     Conclusions Of Law**
**Related To Lyft Being A Public Accommodation Under The ADA.**

105.     The ADA includes "travel service" among its categories of entities that qualify as "public accommodations." 42 U.S.C. § 12181(7).

    **Lyft's Response**: For purposes of this lawsuit, Lyft does not contest that it is a "private entity" that provides "specified public transportation services" for purposes of Section 12184 of ADA Title III. However, Section 12182 does not apply to Lyft. Section 12184 sets out "Prohibition of discrimination in specified public transportation services

51

provided by private entities," whereas Section 12182 of ADA Title III sets out "Prohibition of discrimination by public accommodation." *Compare* 42 U.S.C. § 12184 *with* 42 U.S.C. § 12182. Congress defined "specified public transportation" as "transportation by bus, rail, or any other conveyance (other than by aircraft)." 42 U.S.C. § 12181(10). "Public accommodation," on the other hand, is defined in 42 U.S.C. § 12181(7) to include physical places, including "a terminal, depot, or other station used for specified public transportation." *Id.*, § 12181(7)(G); *see also id.*, § 12181(7)(F) (defining "public accommodation" to include "a laundromat, dry-cleaner, bank, barber shop, beauty shop, travel service . . . or other service establishment"). Lyft is not a public accommodation because it is a technology platform and not a physical place.

106.     A public accommodation's mobile application is bound by Title III. *See, e.g.*, *Robles v. Domino's Pizza, LLC*, 913 F.3d 898, 905 (9th Cir. 2019), *cert. denied*, 140 S. Ct. 122 (2019) (Title III of the "ADA applies to Domino's website and app").

        **Lyft's Response**: This case is not about Lyft's app. These cases are irrelevant.

107.     "Title III's mandate that the disabled be accorded 'full and equal' enjoyment of the goods, [and] services . . . of any place of public accommodation,' suggests to us that the statute was meant to guarantee them more than mere physical access." *Pallozzi v. Allstate Life Ins. Co.*, 198 F.3d 28, 32 (2d Cir. 1999) (alterations and ellipses in original).

108.     "In *Pallozzi's* wake, multiple district courts in this circuit – including this one – have held that websites qualify as places of public accommodation, even when they are not attached to a traditional brick-and-mortar store." *Jaquez v. Dermpoint, Inc.*, No. 20-7589, 2021 WL 2012512, at *3 (S.D.N.Y. May 20, 2021); *see also Andrews v. Blick Art Materials, LLC*, 268 F. Supp. 3d 381, 395–96 (E.D.N.Y. 2017) (The 'broad mandate' of the ADA and its 'comprehensive character' are resilient enough to keep pace with the fact that the virtual reality of the Internet is almost as important now

as physical reality alone was when the statute was signed into law.") (quoting *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998)); *see also Nat'l Fed'n of the Blind v. Scribd Inc.*, 97 F. Supp. 3d 565, 575 (D. Vt. 2015) ("Now that the Internet plays such a critical role in the personal and professional lives of Americans, excluding disabled persons from access to covered entities that use it as their principal means of reaching the public would defeat the purpose of this important civil rights legislation.").

> **Lyft's Response**: These cases are not relevant because this is not a case about Lyft's app or website. This case is about whether Lyft should provide WAV service, a claim that squarely falls under 42 U.S.C. § 12184, which applies to private entities who are primarily engaged in the business of transporting people.

109.    Congress affirmatively chose to guarantee access to goods and services "*of* any place of public accommodation," rather than "*in*" such a place; "[t]he term 'of' generally does not mean 'in,' and there is no indication that Congress intended to employ the term in such an unorthodox manner in Section 302(a) of Title III." *Pallozzi*, 198 F.3d at 33. For instance, "[i]t is unambiguous that under Title III of the ADA, [a website] is a place of public accommodation." *Andrews*, 268 F. Supp. 3d at 393 (collecting cases); *accord Jaquez*, 2021 WL 2012512, at *3 ("websites qualify as places of public accommodation, even when they are not attached to a traditional brick-and-mortar store").

> **Lyft's Response**: That some courts have elected to find websites to be "places of public accommodation" is not persuasive. If websites are not deemed to be "places of public accommodation," then they are not subject to the ADA. Here, there is a specific provision, Section 12184, that applies to entities who are primarily engaged in the business of transporting people.

110.    Lyft facilitates travel for its consumers through its app, rendering it a modern-day travel service.

        **Lyft's** Response: *See* LRPF Nos. 108-109.

111.    Lyft functions as a public accommodation. *See, e.g.*, *O'Hanlon v. Uber Techs., Inc.*, No. 19-00675, 2021 WL 2415073, at *6 (W.D. Pa. June 14, 2021) (plaintiffs plausibly alleged that Uber is a "travel service" under § 12182, "and Uber has fallen short of its burden of establishing that Uber vehicles are excluded by either the statutory language of Section 12182 or the interpretive law"); *Nat'l Fed'n of the Blind of California v. Uber Techs., Inc.*, 103 F. Supp. 3d 1073, 1083 (N.D. Cal. 2015) (Uber plausibly constitutes a "travel service" and therefore a "public accommodation" under § 12182).

        **Lyft's Response**: These cases were decided at the motion to dismiss stage. At the summary judgment or trial stage, courts have not found Lyft or Uber to be "public accommodations." Instead, courts have found that the companies are subject to Section 12184 of ADA Title III as private entities who are primarily engaged in transportation. *See, e.g.*, *Indep. Living Res. Ctr. San Francisco v. Lyft, Inc.*, No. C 19-01438 WHA, 2021 U.S. Dist. LEXIS 166229, *23-24 (N.D. Cal., Sept. 1, 2021) ("*ILRC* Trial Decision*"*) (noting that at summary judgment, the court found Section 12184 applied to Lyft after Lyft did not contest that finding for purposes of summary judgment); *Crawford v. Uber Techs., Inc.*, Case No. 17-cv-02664-RS, 2021 U.S. Dist. LEXIS 161969 (N.D. Cal., Aug. 26, 2021) (on summary judgment, finding that Uber is a private entity "engaged in the business of transporting people" and thus subject to Section 12184).

**F.    Lyft Engages In Specified Public Transportation Under The ADA.**

112.    Lyft is engaged in "specified public transportation" under the Americans with Disabilities Act, 42 U.S.C. § 12184. Stipulation ¶ 5.

### G.    Plaintiffs Meet Their Burden To Propose Reasonable Modifications.

#### i.    Legal Standard For Reasonable Modifications Under The ADA, NYSHRL, And NYCHRL.

113.    Under the ADA, "[t]o establish a 'reasonable accommodation,' a plaintiff 'bears only a burden of production' that 'is not a heavy one.'  That is, it would be 'enough for the plaintiff to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits.  Once the plaintiff has done this, she has made out a *prima facie* showing that a reasonable accommodation is available, and the risk of nonpersuasion falls on the defendant.'" *Roberts v. Royal Atl. Corp.*, 542 F.3d 363, 370 (2d Cir. 2008) (quoting *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 138 (2d Cir. 1995)).

> **Lyft's Response**: Plaintiffs deliberately fail to cite the elements of a claim for the failure to make a "reasonable modification," which are: (a) that they requested a reasonable modification; (b) that the modification they requested would be effective, and; (c) that the modification they requested is reasonable in cost. *See PGA Tour, Inc. v. Martin*, 532 U.S. 661, 683 n.38 (2001) (plaintiff must prove that defendant failed to make a "requested reasonable modification"); *Staron v. McDonald's Corp.*, 51 F.3d 353, 356 (2d Cir. 1995) (establishing that a modification is "reasonable" requires evidence of effectiveness and cost).
>
> Under Second Circuit law, Plaintiffs bear the burden of production and persuasion on the issue of effectiveness of their proposed modifications. *See also Jackan v. N.Y. State DOL*, 205 F.3d 562, 567 (2d Cir. 2000) (at trial, a plaintiff bears the burden of persuasion that a suitable accommodation, in the form of a vacant position into which he could have been transferred, exists); *Stevens v. Rite Aid Corp.*, 851 F.3d 224, 230-31 (2d Cir. 2017) (affirming dismissal of failure to accommodate claim and reversing denial of employer's motion for judgment as a matter of law on wrongful termination claims, because even

though the employer had failed to engage in an interactive process, the plaintiff failed, at trial, to present evidence of a reasonable accommodation).

114.    Once Plaintiffs make a *prima facie* showing, "the defendant's burden of persuading the factfinder that the plaintiff's proposed accommodation is unreasonable merges, in effect, with its burden of showing, as an affirmative defense, that the proposed accommodation would cause it to suffer an undue hardship." *Borkowski*, 63 F.3d at 138; *see also Kreisler*, 731 F.3d at 189.

**Lyft's Response**: Under the plain language of the statute, 42 U.S.C. § 12184(b)(2)(A), the applicable affirmative defense is fundamental alteration. The Court need not reach Lyft's affirmative defense because Plaintiffs failed to prove the elements of their claims.

115.    "[T]he determination of whether a particular modification is 'reasonable' involves a fact-specific, case-by-case inquiry that considers, among other factors, the effectiveness of the modification in light of the nature of the disability in question and the cost to the organization that would implement it." *Staron v. McDonald's Corp.*, 51 F.3d 353, 356 (2d Cir. 1995).

**Lyft's Response**: The "fact-specific, case-by-case" inquiry demanded by *Staron* requires answers to the following questions with respect to each "modification" sought: (1) What is the particular modification being proposed? (2) Would the proposed modification be effective in creating equal access to WAVs on the Lyft platform? (3) What is the cost of the proposed modification?

First, Plaintiffs should identify each particular modification being proposed so that the Court can evaluate whether it is "concrete and specific," "straightforward and simple." *ILRC Trial Decision*, 2021 U.S. Dist. LEXIS 166229, at *28. The need for particularity is also required by Rule 65(d) of the Federal Rules of Civil Procedure, which provides that "[e]very

order granting an injunction must . . . state its terms specifically" and "describe in reasonable detail . . . the act or acts restrained or required." Fed. R. Civ. Pro. 65(d)(1).

Second, Plaintiffs must prove that each of their proposed modifications will be effective, meaning that each modification, on a "standalone" basis, will result in reliable WAV service on the Lyft platform. *See Staron*, 51 F.3d at 356 (the fact-specific inquiry of whether a particular modification is "reasonable" includes consideration of its effectiveness); *see also Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, 804 F.3d 178, 189 (2d Cir. 2015) ("The hallmark of a reasonable accommodation is effectiveness") (citation omitted).

Third, with respect to each modification, Plaintiffs must come forward with a plausible cost estimate to show that the cost of the modification would be reasonable. *See, e.g., Staron*, 51 F.3d at 356 (the fact-specific inquiry of "reasonableness" includes an assessment of its cost); *Roberts v. Royal Atl. Corp.*, 542 F.3d 368, 373 (2d Cir. 2008) (in an architectural barrier removal case, a plaintiff must articulate a plausible proposal for barrier removal in which the cost does not clearly exceed its benefits).

116.    "It is the word 'accommodation,' not the word 'reasonable,' that conveys the need for effectiveness. An *ineffective* 'modification' or 'adjustment' will not *accommodate* a disabled individual's limitations." *US Airways, Inc. v. Barnett*, 535 U.S. 391, 400 (2002) (emphasis in original).

**Lyft's Response**: Lyft agrees. An ineffective modification cannot form the basis of a reasonable modification claim.

117.    "[T]he plaintiff's burden does not require him or her to furnish exact or highly detailed cost estimates." *Roberts*, 542 F.3d at 371.

**Lyft's Response**: While Plaintiffs' cost estimate need not be "exact or highly detailed," Plaintiffs nonetheless must produce an estimate of cost. *See, e.g., Antolini v. Thurman*, No. 19-CV-9674 (JMF) (KNF), 2021 U.S. Dist. LEXIS 135989, at *10-12

(S.D.N.Y. July 21, 2021) (granting summary judgment based on plaintiffs' failure to provide a "plausible" barrier removal proposal, including its cost); *Range v. 230 W. 41st St. LLC*, No. 17-CIV-149 (LAP), 2020 U.S. Dist. LEXIS 99045, at *17, 20 (S.D.N.Y. June 5, 2020) (submission of incomplete architectural designs unaccompanied by a general cost estimate is insufficient to meet plaintiff's prima facie burden at summary judgment). The Court can therefore summarily deny any proposed modification for which Plaintiffs failed to produce a cost estimate.

118.    "In deciding what's reasonable, facilities may consider the costs of such accommodations, disruption of their business and safety.  But they must also take into account evolving technology that might make it cheaper and easier to ameliorate the plight of the disabled.  . . . As new devices become available, public accommodations must consider using or adapting them to help disabled guests have an experience more akin to that of non-disabled guests." *Baughman*, 685 F.3d at 1135.

119.    Modifications need not generate perfectly equal service to be reasonable:

> Full and equal enjoyment means the right to participate and to have an equal opportunity to obtain the same results as others to the extent possible with such accommodations as may be required by the Act and these regulations.  It does not mean that an individual with a disability must achieve an identical result or level of achievement as persons without a disability.  For example, an exercise class cannot exclude a person who uses a wheelchair because he or she cannot do all of the exercises and derive the same result from the class as persons without a disability.

28 C.F.R. § Pt. 36, App. C (analyzing § 36.201).  "If [a public accommodation] can make [a person with disabilities'] experience less onerous and more akin to that enjoyed by its able-bodied patrons, it must take reasonable steps to do so." *Baughman*, 685 F.3d at 1136 (citing *Regal Cinemas*, 339 F.3d at 1133)

120.    Modifications a defendant has implemented in the past to accommodate people with disabilities are material to determining whether the requested modification is reasonable.  *See, e.g.*,

*Rogers v. W. Univ. of Health Scis.*, 787 F. App'x 932, 935 (9th Cir. 2019); *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 508 (4th Cir. 2016); *Smith v. McCarthy*, No. 20-419, 2021 WL 4034193, at *21 (D. Md. Sept. 3, 2021); *Wong v. Regents of the Univ. of Cal*, 192 F.3d 807, 820 (9th Cir. 1999); *Taylor v. Gilbert & Bennett*, No. 95-7228, 1997 WL 30948, at *2 (N.D. Ill. Jan. 15, 1997).

121.    Modifications required under state and local laws "provide[] powerful evidence that such modifications are reasonable, and that they certainly would not fundamentally alter the nature of defendants' programs." *Henrietta D. v. Giuliani*, 119 F. Supp. 2d 181, 209 (E.D.N.Y. 2000), *aff'd sub nom. Henrietta D. v. Bloomberg*, 331 F.3d 261 (2d Cir. 2003).

> **Lyft's Response**: None of the authorities cited by Plaintiffs in Paragraphs 118-121 negates Plaintiffs' burden to prove that each modification would be effective in creating reliable WAV service on the Lyft platform, and to come forward with evidence of the cost of such modification. *See* LRPF Nos. 113, 115-17.

122.    Plaintiffs are not required to request a reasonable modification prior to initiating a lawsuit when they have actual notice that doing so would be futile.  *See also, e.g.*, *Fair Hous. Just. Ctr., Inc. v. Cuomo*, No. 18-3196, 2019 WL 4805550, at *14 (S.D.N.Y. Sept. 30, 2019) ("Plaintiffs have adequately alleged that the ACF Defendants had categorical policies against wheelchairs and that any request for a reasonable accommodation would have been futile.  Accordingly, their failure to specifically ask for an accommodation does not render their allegations insufficient . . ."); *Hampson v. State Farm Mut. Auto Ins. Co.*, No. 12-00258, 2015 WL 12733387, at *13 (N.D.N.Y. Mar. 26, 2015) (futile gesture doctrine applies where an entity "has essentially foreclosed the interactive process through its policies or explicit actions"); *Davoll v. Webb*, 194 F.3d 1116, 1132-33 (10th Cir. 1999) ("If a disabled employee actually knows of an employer's discriminatory policy against reasonable accommodation, he need not ignore the policy and subject himself 'to personal rebuffs' by making a

request that will surely be denied."); *Louiseged v. Akzo Nobel Inc.*, 178 F.3d 731, 739 (5th Cir. 1999) (same).

**Lyft's Response**: None of the cases cited by Plaintiffs arise under the reasonable modification provision of ADA Title III, 42 U.S.C. §§ 12184(b)(2)(A), 12182(b)(2)(A)(ii). A key element of Plaintiffs' reasonable modification claim is that they must have requested a "reasonable modification" of a policy or practice "which, if granted, would have afforded [them] access" to the service they desired. *Dudley v. Hannaford Bros. Co.*, 333 F.3d 299, 307 (1st Cir. 2003); *see also PGA Tour, Inc. v. Martin*, 532 U.S. 661, 683 n.38 (2001) (plaintiff must prove that defendant failed to make a "requested reasonable modification").

Here, Plaintiffs did not request a modification before filing this lawsuit. *See* LRPF No. 82. This fact is dispositive. *Castillo v. Hudson Theatre, LLC*, 412 F. Supp. 3d 447, 451 (S.D.N.Y. 2019) ("A plaintiff's request for a reasonable modification is necessary to determine whether the defendant could reasonably provide such modification and whether the defendant's subsequent failure to do so constitutes discrimination."); *see also Johnson v. Gambrinus Company/Spoetzl Brewery*, 116 F.3d 1052, 1059 (5th Cir. 1997) ("[t]he Plaintiff has the burden of proving that a modification was requested").

123.    "A claim of discrimination under the New York State Human Rights Law, is governed by the same legal standards as govern federal ADA claims." *Graves*, 457 F.3d at 184 n.3.

**Lyft's Response**: Lyft agrees that Plaintiffs' claim under the NYSHRL rises or falls with their claims under the ADA.

This means that if Plaintiffs fail to prove an ADA violation, their claims under the NYSHRL also fail.

124.    The NYCHRL embodies "a broader notion of which accommodations are reasonable" than the ADA. *Brooklyn Ctr. For Indep.*, 980 F. Supp. 2d at 642 (citing *Phillips v. New York*, 64 A.D.3d 1051, 883 N.Y.S.2d 369, 378 (1st Dep't 2009)).

125.    Under the NYCHRL, a "reasonable accommodation" is an "accommodation that can be made that shall not cause undue hardship in the conduct of the covered entity's business. The covered entity shall have the burden of proving undue hardship." *Kreisler v. Second Ave. Diner Corp.*, No. 10-7592, 2012 WL 3961304, at *13 (S.D.N.Y. Sept. 11, 2012) (emphasis removed from original) (quoting N.Y.C. Admin. Code § 8-102), *aff'd*, 731 F.3d 184 (2d Cir. 2013).

126.    "Under the NYCHRL, a requested accommodation is presumed to be reasonable and the covered entity has the burden of establishing that the proposed accommodation is unreasonable." *Comm'n on Human Rights ex rel. Rodriguez, Petitioner v. A Plus Worldwide Limo, Inc.*, OATH Index No. 905/15, 2019 WL 3225764, at *6 (Mar. 7, 2019) (citing *Comm'n on Human Rights ex rel. Stamm v. E&E Bagels, Inc.*, OATH Index No. 803/14, 2016 WL 1644879, at *7 (Apr. 20, 2016))

**Lyft's Response:** In New York City, Lyft not only offers WAV service but it does so in compliance with TLC requirements, meaning that 90% of riders can expect to be picked up within 15 minutes, and 80% of riders can expect to be picked up within 10 minutes. In other words, Lyft already offers the accommodation that Plaintiffs want, that of reliable WAV service. *See* ." NYC Commission on Human Rights, Legal Enforcement Guidance on Discrimination on the Basis of Disability (April 2019) at 81 (citations omitted) ("A covered entity need not provide the specific accommodation sought; rather, a covered entity may propose reasonable alternatives that meet the specific needs of the person with the disability or that specifically address the limitation at issue.").

ii.     **Findings Of Fact Related To Plaintiffs' Reasonable Modifications.**

1.     **Lyft Must Stop Blocking WAV Service In The 96% Of Its Regions Where It Currently Prohibits All WAV Service.**

127.    Plaintiffs' first proposed modification is to remove the current block in place on the App in the non-Access Regions, which prohibits Access mode from being available for drivers or riders.[59]  This modification applies to the Westchester Class, New York State outside of NYC class, and the non-Access Regions class.  (Testimony of Alex Elegudin.).

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. Moreover, this is not a "fact."

The evidence confirms that this proposed modification is not sufficiently concrete and specific. Moreover, there is no evidence that this proposed modification would be effective in creating access to WAVs on the Lyft platform, or would create service that is sufficiently reliable to satisfy Plaintiffs. Finally, there is no evidence of the cost of this proposed modification.

128.    In every Region where Lyft operates, Standard mode appears as an available ride mode when a user inserts their destination address.  Lyft allows all drivers who meet Lyft's vehicle requirements to drive on Standard mode in the non-Access Regions.  Lyft allows all users to view available Standard mode vehicles on the App in the non-Access Regions.  (Testimony of Alex Elegudin.).

**Lyft's Response**: There is no evidence to support this proposed fact, specifically, no witness testified that when a user opens the App they can "view available Standard mode vehicles." Lyft witnesses testified that mode availability is presented after a rider enters their

---

[59] Corrected Expert Report, at 66.

pick-up and drop-off locations. Riders are matched with one driver, they do not see all available drivers in an area.

- Testimony of Richard Zhou

129.    Lyft does not restrict, alter, or remove Standard mode's availability in any Region where Lyft operates, regardless of population density, wait times, completion rates, or other service levels.  Stip. Fact ¶¶ 19, 25.

**Lyft's Response**: The proposed fact misstates the stipulated facts, which do not address whether Lyft "alter[s]" or "remove[s]" the availability of Standard mode for those reasons. Lyft's Terms of Service specify that "Lyft reserves the right . . . to limit or eliminate access to the Lyft Platform for Rideshare Services in specific geographic areas and/or at specific times based on commercial viability, public health concerns, or changes in law."

- Testimony of Isabella Gerundio and Exhibit A (Terms of Service).

130.    The effect of the block prevents WAV drivers from identifying as WAVs on the App and precludes riders from having the option to select WAVs, even when they are available.[60]  Lyft does not allow drivers with WAVs to drive on Access mode in the non-Access Regions.  Lyft does not allow passengers who require WAVs to request WAVs in non-Access Regions.  If a driver with a WAV is in the same location as a rider who requires a WAV in a non-Access Region, there is no mechanism for the rider to request a WAV on the App.[61]  (Testimony of Alex Elegudin.).

**Lyft's Response**: This proposed fact is circular and irrelevant. There is no Access-mode in non-Access regions. There is no evidence to establish that a "block" exists on the Lyft platform.

---

[60] Chan Dep. Tr. 118:12-21, 120:1-6.
[61] Chan Dep. Tr. 118:12-21, 120:1-6; Gerundio Dep. Tr. 242:22-25; 243:1-5.

Lyft witnesses testified that there are several specialized modes which Lyft does not make available in every region. In evaluating where to offer specialized modes, Lyft considers the likely available supply and demand for the mode in that region. There is no evidence that any WAV driver was actually "blocked" from driving in Access mode on the Lyft platform.

This proposed fact is circular and irrelevant. There is no Access-mode in non-Access regions.

Lyft admits it does not offer Access mode in non-Access regions. There is no evidence of a supply of drivers with WAVs who would drive on the Lyft platform in the non-Access regions in sufficient volumes to support functional service if Lyft were to allow Access mode to appear on its App in additional regions. There is also no evidence of demand from riders who rely on WAVs who would regularly take rides in the non-Access regions in sufficient volumes to support functional service if Lyft were to allow Access mode to appear on its App in additional regions.. There is no evidence of demand from riders who rely on WAVs who would regularly take rides in the non-Access regions in sufficient volumes to support functional service if Lyft were to allow Access mode to appear on its App in additional regions.

- Testimony of Richard Zhou.

131.    Lyft has previously enabled Access mode in each of the nine Access Regions.  As a result, the cost to remove the blocker would be *de minimis*.  (Testimony of Alex Elegudin.).

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. *See* LRPF No. 130.

132. Lyft accidentally enabled Access mode in Denver and Lyft employees turned off Access mode within approximately four hours of notifying the WAV team.[62]

**Lyft's Response**: This alleged fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. The materials relied on are inadmissible hearsay. Fed. R. Evid. 801-803.

That it is technically feasible to make Access mode visible in a market does nothing to establish that WAV service would be functional, in that the platform would actually connect riders who needed rides with drivers who wanted to provide them.

### 2. Lyft Must Ask Drivers Whether They Have WAVs During The Onboarding Process.

133. Plaintiffs' second proposed modification is to ask all drivers on Lyft's platform and those onboarding whether they have access to WAVs. This modification applies to all classes. (Testimony of Alex Elegudin.).

**Lyft's Response**: The evidence confirms that this proposed modification is not sufficiently concrete and specific. Moreover, there is no evidence that this proposed modification would be effective in creating access to WAVs on the Lyft platform, or would create service that is sufficiently reliable to satisfy Plaintiffs. Finally, there is no evidence of the cost of this proposed modification.

134. When a driver applies to drive for Lyft, Lyft asks the drivers a series of questions about the driver and their vehicle in an "onboarding process." The onboarding process includes a survey that asks for basic information about the driver, including license information, a background check, Social Security number, and vehicle information. In some markets, drivers' vehicles must pass an inspection, the driver must take a defensive driving course, or undergo a medical exam. Lyft

---

[62] LYFT0012038.

asks prospective drivers all necessary information to determine whether a driver's vehicle meets Lyft's requirements to drive on Standard mode.[63]

> **Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. Lyft has no further response or objection to this proposed fact.

135.    Lyft does not currently ask its drivers whether their vehicle is a WAV or whether they have access to a WAV.[64]

> **Lyft's Response**: This proposed fact is misleading. There is no evidence if Lyft asked drivers these questions, it would result in any WAVs on Lyft's platform, or would create service that is sufficiently reliable to satisfy Plaintiffs.
>
> Lyft witnesses testified that they have surveyed drivers regarding WAV ownership in the past. One survey in the Philadelphia area sent a promotional text and in-app console card to over 26,000 drivers and resulted in just one additional WAV to drive on Lyft's platform.
>
> - Testimony of Isabella Gerundio.

136.    Lyft's current methods of discerning whether a driver drives a WAV are inefficient and require duplicative and iterative processes.  For example, in NYC, Lyft must repeatedly check the TLC database to determine whether a driver has a WAV.[65]

> **Lyft's Response**: The deposition testimony cited does not support this proposed fact. No witness testified that the processes were "inefficient," "duplicative," or "iterative." No witness testified that there existed a more "efficient" process that would have any impact

---

[63] Corrected Expert Report, at 69; Chan Dep. Tr. 83:8-84:22; Gerundio Dep. Tr. 204:2-11.
[64] Gerundio Dep. Tr. 201:5-9.
[65] Selinger Dep. Tr. 56:8-57:21.

on the total supply of WAVs on the platform, or the quality of WAV service. *See* LRPF No. 135.

### 3.    Lyft Must Remove The Toggle, Which Suppresses Demand For WAV Service.

137.    Plaintiffs' third proposed modification is to remove the toggle requirement in the Access Regions other than NYC to display WAVs on the App and automatically display Access mode on the App alongside other vehicle options.[66]  This modification applies to the Access Regions Other Than NYC class.  (Testimony of Alex Elegudin.).

**Lyft's Response**:  The evidence confirms that this proposed modification is not sufficiently concrete and specific. Moreover, there is no evidence that this proposed modification would be effective in creating access to WAVs on the Lyft platform, or would create service that is sufficiently reliable to satisfy Plaintiffs. Finally, there is no evidence of the cost of this proposed modification.

138.    The only step required for a user on the App to identify whether a Standard mode vehicle is available is to type in the address of their destination.  Once a user inserts their destination address, any available Standard mode vehicle will automatically be displayed on the App. (Testimony of Alex Elegudin).

**Lyft's Response**: There is no evidence to support this proposed fact, specifically, no witness testified that when a user "inserts their destination address, any available Standard mode vehicle will automatically be displayed on the App." Lyft witnesses testified that mode availability is presented after a rider enters their pick-up and drop-off locations. Riders are matched with one driver, they do not see all available drivers in an area.

- Testimony of Richard Zhou

---

[66] Corrected Expert Report, at 67-68.

139.    In the Access Regions other than NYC, Lyft does not automatically list the WAV option on its home screen.  Instead, Lyft requires users to enable the toggle by navigating to a separate settings page, activate the Access mode toggle, then return to the main screen where WAVs will appear below other ride modes.  The toggle was created as an "easter egg" with the intention of hiding WAV service from riders.[67]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702.

The proposed fact is incomplete. Witness testimony established that riders need only navigate to the settings page to activate Access mode once, and it will remain activated, for all regions, going forward.

That one former employee referred to the toggle in settings as an "Easter egg," has no conceivable bearing on this case. Even if it did, Mr. Wu, who used the term, explained "If somebody else is taking [rides in WAVs] for 45 minutes . . . that really impacts a person's ability to get a ride. So that's likely why at the time we made that decision to make it more of an Easter egg because we could tell individuals that we worked with or community groups that we worked with how to directly access it.  If individuals don't need wheelchair rides, they don't necessarily need to see the option to get wheelchair rides.  We rather have the people who need wheelchair rides to be able to see the wheelchair rides."

- Wu Depo. 67:17-68:7.

- Testimony of Isabella Gerundio.

---

[67] Corrected Expert Report, at 21, 43-44, 67; Gerundio Dep. Tr. 243:21-244:5; Wu Dep. Tr. 67:24-68:3, 89:1-6, 108:12-25.

140.     NYC is the only Access Region in which Lyft does not use the Access mode toggle to enable WAV service.  NYC regulators ordered Lyft to remove the toggle because it creates a barrier for WAV users and could "suppress[] trip demand."[68]  (Testimony of Alex Elegudin).

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. The materials relied on by the expert are inadmissible hearsay. Fed. R. Evid. 801-803, 805.  This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. The reasons that New York City regulators gave to justify an order does not make those reasons accurate or prudent, and has no relevance to this case.

141.     In or around September and October 2019, Lyft removed the toggle in NYC. Between August 2019 and December 2019, rides on Access mode increased by approximately 500 percent in NYC.[69]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702.

The evidence confirms that a significant portion of the increase in ridership in Access mode in New York City was due to riders who did not need WAVs for transportation. Lyft estimates that after the toggle was removed, 45% of riders who requested Access mode in New York City were riders who did not require a WAV for transportation. Before the toggle was removed, Lyft estimated 20% of riders who requested Access mode in New York City were riders who did not require a WAV for transportation. In other markets, Lyft estimates the number to be 15%.

---

[68] Corrected Expert Report, at 44.
[69] Corrected Expert Report, at 67-68; Demand 2021-09-20.

The misuse of Access mode was also reported by Partner drivers who sent photographic evidence to Lyft. For example, Lyft received a photograph showing a rider who was using Access mode to transport his motorcycle by WAV.

Moreover, New York City is a unique market. The witness testimony established that a large part of the increase in IC drivers on the Lyft platform in New York City overall was due to unique local regulations and conditions.

- Testimony of Isabella Gerundio and Exhibit E (images of misuse of WAVs).

- Testimony of Richard Zhou.

- Testimony of Asaf Selinger.

142.    Ms. Gerundio acknowledged that Lyft has no reason to believe that a similar increase in ridership would not happen in other Access Regions.[70]

**Lyft's Response**: This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. *See* LRPF No. 141.

143.    Despite Lyft's knowledge that removing the toggle in NYC increased ridership in NYC, Lyft has not removed the toggle in any other Access Region.[71]

**Lyft's Response**: The proposed fact does not accurately reflect Lyft's analysis of the "toggle." The evidence established that Lyft has not removed the "toggle" in other Access regions for several valid reasons, including that Lyft saw an increase in the number of people who do not need WAVs request Access mode after the toggle's removal in New York City, and that the removal would have an adverse impact on the availability of supply of WAVs in other Access Regions. Access mode misuse means that riders who need a WAV for transportation end up waiting longer for a ride or not getting a ride at all.

---

[70] Gerundio Dep. Tr. 139:13-23.
[71] Gerundio Dep. Tr. 248:6-18.

• Testimony of Isabella Gerundio.

### 4.      Lyft Must Allow WAVs To Cross-Dispatch.

144.    Plaintiffs' fourth proposed reasonable modification is to utilize cross-dispatching for all drivers.  This modification applies to all classes.  (Testimony of Alex Elegudin).

**Lyft's Response**:  The evidence confirms that this proposed modification is not sufficiently concrete and specific.  Moreover, there is no evidence that this proposed modification would be effective in creating access to WAVs on the Lyft platform, or would create service that is sufficiently reliable to satisfy Plaintiffs.  Finally, there is no evidence of the cost of this proposed modification.

145.    Cross-dispatching means that if a vehicle meets the requirements of more than one mode (*e.g.,* Standard and XL, or Standard and Access), the driver may accept ride requests in both modes.  For example, a Lyft driver in a luxury vehicle can offer "Lux" rides to riders who select Lyft's luxury vehicle option and can also accept Standard mode requests from riders who select a standard vehicle.  As a result, when no riders request "Lux" rides, but there are riders requesting Standard mode rides, the luxury vehicle driver can continue generating revenue for himself and Lyft.[72]

**Lyft's Response**: The proposed fact is incomplete. There is a significant difference between Lux and Access modes from the rider's perspective. In Lux mode, if a Lux driver is not available, the rider has the option to choose "Standard" or another mode. But an Access mode rider does not have that same option. For this reason, the unavailability of a Partner WAV driver will have a more significant impact on the Access mode rider than a Lux rider.

• Testimony of Richard Zhou.

146.    Lyft allows all independent contractors, including IC WAV drivers, who drive on Lyft

---

[72] Chan Dep. Tr. 57:23-58:6.

in any mode to cross-dispatch. Lyft does not allow Partner drivers who drive on Access mode to cross-dispatch their WAVs.[73]

      **Lyft's Response**: The evidence establishes that Lyft allows all independent contractors, including IC WAV drivers, who qualify to drive in more than one mode to elect to drive in any of those modes on the Lyft platform. Evidence establishes that Lyft has experimented with cross-dispatching Partner WAV drivers, and has found that, in general, the benefits in cost-savings are outweighed by the negative impacts on service levels.

- Testimony of Richard Zhou.

147.    Mr. Wu previously described allowing Partner drivers to cross-dispatch as "low hanging fruit" for increasing profitability of Access mode.[74]

      **Lyft's Response**: One email from December 2018 does not confirm that "cross-dispatch" would be effective. Mr. Wu explained in his deposition that: "The context that's not called out in this document is that this would not have worked if there was performance requirements in

that market."

      At trial, Lyft witnesses testified that they have experimented with cross-dispatching Partner WAV drivers, but have found that, in general, the benefits in cost-savings are outweighed by the negative impacts on service levels.

- Wu Depo. 78:11-14.

- Testimony of Richard Zhou.

148.    Richard Zhou, a Senior Analyst at Lyft, stated that cross-dispatching drivers yielded

---

[73] Chan Dep. Tr. 113:25-114:10.
[74] LYFT_ILRC00016900.

"driver benefits" and "at the market level, of course, incremental, but small benefit there."[75]

> **Lyft's Response**: Mr. Zhou also testified that "when we experimented" with cross-dispatching Partner WAVs in New York City, "the negative effects of the experimentation caused [wait times] to get close to" the regulatory maximum, causing Lyft to cease the experiment.
>
> • Deposition of Richard Zhou ("Zhou Depo.") 94:15-18.

149.    Enabling cross-dispatching for Partner WAV drivers "does not require a lot of effort."[76]

> **Lyft's Response**: While it may be relatively easy to implement, at trial, Lyft witnesses testified that the benefits in cost-savings may be outweighed by the negative impacts on service levels.

150.    Lyft has previously experimented with a series of cross-dispatching pilot programs in multiple Access Regions to test the effects of cross-dispatching Partner WAV drivers. (Testimony of Alex Elegudin).

> **Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. Lyft witnesses establish that Lyft has experimented with cross-dispatching Partner WAVs.
>
> • Testimony of Richard Zhou.

151.    In Phoenix, Partner drivers were allowed to cross-dispatch in 27 of the 49 months for which Lyft provided data.  During the months where cross-dispatching was allowed, the average wait time for WAV service was two minutes less than months where no cross-dispatching was allowed.

---

[75] Transcript of November 5, 2021 Deposition of Richard Zhou ("Zhou Dep. Tr."), 95:8-25.
[76] Chan Dep. Tr. 60:20-61:2.

The completion rate for Access mode was fourteen percent higher in months with cross-dispatching than months without cross-dispatching.  Lyft calculates that the average cost of providing WAV service was $187 per ride in months with cross-dispatching and $316 in months without cross-dispatching.[77]

> **Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702.
>
> The evidence does not support the proposed fact. Lyft's expert, Dr. Marc Rysman, testified that Plaintiffs' expert "misunderstands the data." Partner WAV drivers were not cross-dispatched in Phoenix; rather, a third-party firm (VMI) made WAVs available to IC drivers for a subsidized rate. The calculation of the cost per ride did not include "the cost of the WAVs that were part of the pilot."
>
> - Testimony of Dr. Marc Rysman regarding his rebuttal report and Exhibit BB (Rebuttal Expert Report – Figure 2).

152.    Lyft was able to profitably offer Access mode in Phoenix during December of 2019, one of the months in which Lyft allowed its Partner WAV drivers to cross-dispatch.[78]

> **Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702.
>
> The evidence does not support the proposed fact. Dr. Rysman explained "this calculation did not account for the cost of the WAVs that were part of [an IC] pilot" and

---

[77] Corrected Expert Report, at 78-79; Demand 2021-09-20; Highly Confidential – Subject to Protective Order – WAV 2021-02-26.csv ("WAV 2021-02-26").
[78] Corrected Expert Report, at 36; Demand 2021-09-20; WAV 2021-02-26.

"during December 2019, Lyft covered this cost for five WAVs provided by VMI," which means that in December 2019, "Lyft did not earn a profit and in fact incurred a loss of $4,861 in that month."

- Testimony of Dr. Marc Rysman regarding his rebuttal report.

153.   In Portland, Partner drivers were allowed to cross-dispatch in nine of the 49 months for which Lyft provided data.  During the months where cross-dispatching was allowed, the average wait time for WAV service was one minute longer than months where no cross-dispatching was allowed.  The completion rate for Access mode was thirteen percent higher in months with cross-dispatching than months without cross-dispatching.  Lyft calculates that the average cost of providing WAV service was $60 per ride in months with cross-dispatching and $129 in months without cross-dispatching.[79]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702.

The proposed fact is misleading. There is no evidence to establish a causal relationship between cross-dispatch of Partner drivers and higher completion rates. In fact, witnesses testified that allowing WAV Partner drivers to cross-dispatch generally has a negative impact on service levels.

Lyft witnesses establish that Lyft has experimented with cross-dispatching Partner WAVs. In general, the benefits in cost-savings are outweighed by the negative impacts on service levels.

- Testimony of Richard Zhou.

---

[79] Corrected Expert Report, at 79-80; Demand 2021-09-20; WAV 2021-02-26.

5.    **Lyft Must Implement Prioritization Logic For Access Mode.**

154.    Plaintiffs' fifth proposed reasonable modification is that Lyft should implement prioritization logic for Access mode.  This modification applies to all classes.  (Testimony of Alex Elegudin).

> **Lyft's Response**:  The evidence confirms that this proposed modification is not sufficiently concrete and specific. Moreover, there is no evidence that this proposed modification would be effective in creating access to WAVs on the Lyft platform, or would create service that is sufficiently reliable to satisfy Plaintiffs. Finally, there is no evidence of the cost of this proposed modification.

155.    Prioritization logic directs Lyft's ride-matching algorithm to give priority to trip requests received for a particular ride mode.  Ride requests that receive priority are serviced or assigned over other rides that are pending assignment on the App.[80]

> **Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702.
>
> This proposed fact is vague as to the meaning of "prioritization logic." Lyft witnesses testified that "prioritization logic" is a complicated set of rules and criteria used to match riders and drivers, that takes into account the location and availability of other drivers, what modes they are offering, and demand from other riders.
>
> - Testimony of Richard Zhou.

156.    Currently, Lyft only uses prioritization logic for Access mode in limited circumstances. In NYC, Lyft implemented prioritization logic for IC WAV drivers.  When a WAV driver is en route

---

[80] Corrected Expert Report, at 81; Zhou Dep. Tr. 110:6-111:1.

to a Standard mode request and an Access mode request is made within one minute of the Standard mode request, Lyft's algorithm reroutes the WAV driver to the Access mode request if the driver is the closest available WAV.[81]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. The proposed fact is misleading.

For all Access Regions, Lyft witnesses testified that they have attempted to make Access mode rides the highest priority possible compared to other modes, assigning IC WAV drivers a WAV ride, even if the WAV passenger is farther away than a standard mode ride when the requests come in.

- Testimony of Richard Zhou.

157.    Prioritization logic enables substantial benefits for Access mode requests, with minimal effects on Standard mode requests.  (Testimony of Alex Elegudin).

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702.  The evidence does not support the proposed fact. Lyft witnesses testified that changes to prioritization logic had a small impact on service levels in New York City. There is no evidence of the impact changes to prioritization logic could have in other markets where there is a far fewer number of IC WAV drivers than in New York City.

- Testimony of Richard Zhou.

158.    Lyft has not implemented prioritization logic in a similar manner outside of NYC IC WAV drivers.[82]

---

[81] Corrected Expert Report, at 81.
[82] Zhou Dep. Tr. 110:6-111:1.

**Lyft Response**: *See* LRPF No. 156-157.

### 6.    Lyft Must Seriously Advertise And Market Access Mode.

159.    Plaintiffs' sixth proposed modification is to increase marketing for Access mode and WAV service, including targeted advertising, to attract potential WAV drivers, as well as to increase awareness of WAVs on Lyft's platform among potential riders.  This modification applies to all classes. (Testimony of Alex Elegudin).

**Lyft's Response**:  The evidence confirms that this proposed modification is not sufficiently concrete and specific. Moreover, there is no evidence that this proposed modification would be effective in creating access to WAVs on the Lyft platform, or would create service that is sufficiently reliable to satisfy Plaintiffs. Finally, there is no evidence of the cost of this proposed modification.

160.    Lyft spends hundreds of millions of dollars a year advertising and marketing its brand and Standard mode.[83]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. Plaintiffs' principal expert, Alex Elegudin, testified that he is "not a marketing exert." No witness offered reliable testimony regarding the impact of advertising and marketing on Lyft's business.

The evidence shows that Lyft's growth, and the success of its online platform, is dependent on a sufficient scale of supply and demand in a given region.

- Elegudin Depo. 190:17.

- Testimony of Dr. Marc Rysman.

---

[83] Corrected Expert Report, at 47.

- Testimony of Asaf Bar Selinger.

161.    Lyft's marketing efforts include sending communications to users through the App, e-mail campaigns, text message campaigns, posters and physical advertising, and pay media channels.[84]

> **Lyft's Response**: This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. No witnesses offered reliable testimony regarding the impact of advertising and marketing on Lyft's business.

162.    For WAV-specific marketing in 2021, Lyft made available approximately $100,000 in coupons to disability rights organizations in certain Access Regions.  Under Ms. Gerundio, Lyft's marketing and advertising for Access mode consists of giving ride coupons to disability rights organizations in San Francisco, Los Angeles, Dallas, and NYC in the hopes that those organizations would distribute the coupons to users[85]

> **Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702.

> The proposed fact is not supported by the deposition testimony. Ms. Gerundio testified that $100,000 was Lyft's projected budget in San Francisco and New York for just "the last couple of quarters" and that she did not know "if we are going to go over or under that budget." She also testified that, in addition to coupons, Lyft's "market teams and policy teams do outreach specific to WAV" and that "Lyft markets the brand not specific to each mode type and we market it to all potential users."

> - Gerundio Dep. Tr. 77:1-23

---

[84] Zhou Dep. Tr. 39:15-25, 67:25-68:8, 69:25-69:8; Chan Dep. Tr. 81:18-82:4.
[85] Corrected Expert Report, at 18-19; Gerundio Dep. Tr. 77:1-23, 108:13-24, 129:19-130:4.

163.    Lyft's coupons for Access mode were not used by any users in San Francisco or New York.  In Dallas, Lyft did not have a very high success rate for use of the coupons.  The actual amount of spending on marketing and advertising for Access mode was far below the $100,000 budgeted in 2021.[86]

> **Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.
>
> The proposed fact is not supported by the cited deposition testimony. Ms. Gerundio testified that, as to San Francisco, "The last time I talked to the local teams almost no coupon codes were used and the last time I checked the data, we only had about one new user in the last month or so in San Francisco." However, Ms. Gerundio stated that the team would "go back to the drawing board and see what else we can do there."
>
> The cited text does not discuss New York. Ms. Gerundio in fact testified at deposition that "In New York, I don't know the exact figures. I haven't looked at it directly yet."
>
> Gerundio Dep. Tr. 108:13-109:2.

164.    Lyft's coupon campaign for Access mode was a strategy designed to grow demand of WAV rides in order to "impair service levels at current supply."  As one Lyft employee stated, "We've been thinking through how to suppress performance via supply levers, but we can instead take the alternate approach via demand. . . . IE, contact an accessibility org and offer them a coupon to distribute to all their members for the end of the month."[87]

---

[86] Corrected Expert Report, at 18-19; Gerundio Dep. Tr. 108:13-24, 110:22-25.
[87] LYFT0031721.

**Lyft's Response**: The materials relied on are inadmissible hearsay. Fed. R. Evid. 801-803. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. The proposed finding is based on an inadmissible email; moreover, one email from over three years ago cannot support the proposed statement of fact.

No witness testified that this is the "purpose" of Lyft's distribution of coupons for free WAV rides. The evidence shows that ensuring that there is an adequate supply of WAVs to meet rider demand is extremely difficult. If WAV demand increases, Lyft may have to locate additional WAV supply, which can be expensive and take time. In addition, service levels for existing WAV riders may be negatively impacted.

165.    Lyft's marketing and advertising for Access mode did not involve direct engagement or communication with users. Lyft engages in no other marketing or advertising that is specific to Access mode.[88]

**Lyft's Response**: This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. The proposed fact is not supported by the cited deposition testimony. Ms. Gerundio testified that "Our market teams and policy teams do outreach specific to WAV" and that "Lyft markets the brand not specific to each mode type and we market it to all potential users." In addition, she explained that "we are working on a [new WAV] product" and "it will probably include a discount." At the time, Lyft was "piloting all of these initiatives to see what works and what does drive potential demand and get people to take Lyft Access." This took time, and "[w]hile we are waiting for that data, we don't – we don't know what else we can do because we don't know what data."

- Gerundio Dep. Tr. 77:1-23,  129:19-130:13.

---

[88] Gerundio Dep. Tr. 77:1-23, 108:13-24, 129:19-130:4.

### 7. Lyft Should Offer WAV Drivers Bonuses And Incentives For Guaranteed Periods Of Time.

166.    Plaintiffs' seventh proposed modification is to increase the supply of WAVs on its platform by offering potential drivers baseline bonuses and incentives for guaranteed periods of time.  This modification applies to all classes.  (Testimony of Alex Elegudin.).

> **Lyft's Response**:  The evidence confirms that this proposed modification is not sufficiently concrete and specific. Moreover, there is no evidence that this proposed modification would be effective in creating access to WAVs on the Lyft platform, or would create service that is sufficiently reliable to satisfy Plaintiffs. Finally, there is no evidence of the cost of this proposed modification.

167.    In 2021, Lyft recorded more than $1.3 billion in driver incentives, which included "minimum guaranteed payments, volume-based discounts and performance-based bonus payments."[89]  (Testimony of Alex Elegudin.).

> **Lyft's Response**: The materials relied on are inadmissible hearsay. Fed. R. Evid. 801-803.  This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. *See* LRPF No. 168.

168.    Lyft uses incentives and bonuses across different ride modes to increase the supply of vehicles on the App.[90]

> **Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702.

---

[89] Corrected Expert Report, at 47.
[90] Chan Dep. Tr. 85:5-19, 161:6-23; Corrected Expert Report, at 73-74.

Evidence establishes that Lyft uses pricing and incentives to balance supply and demand on the Lyft platform. Driver incentives are used both for driver "generation," getting a greater supply of drivers on the road (e.g., through referral bonuses); and for driver "shaping," encouraging drivers to drive in a certain area (*e.g.* "bonus zones," or "ride streaks"). Other than unique subsidies that were intended to incentivize drivers to rent WAVs in New York City, Lyft does not offer incentives so that drivers can fund the acquisition of vehicles.

- Testimony of Asaf Bar Selinger

169.    Lyft does not offer consistent bonuses or incentives for Access mode drivers.  Lyft no longer offers bonuses and incentives to WAV drivers in Dallas or San Francisco.  Lyft reduced the per ride bonus available to WAV drivers in NYC from $30 per ride to $15 per ride.[91]

**Lyft's Response**: The proposed fact misstates the witness's testimony.  Ms. Gerundio testified that "Bonuses and incentives can change any time with the sole purpose of trying to engage drivers."  The evidence establishes that Lyft does offer consistent per-ride bonuses to IC WAV drivers and changes the size of those bonuses to maximize driver engagement. In Dallas and San Francisco, "there are no current active IC drivers. So there is no incentive or...bonus." Lyft uses the Partner model in Dallas and San Francisco. It does not rely on "bonuses" or "incentives" to influence rider behavior there, as the drivers are employed by a third-party company. Lyft can contractually specify locations for the vehicles and ask Partners to instruct drivers solely to drive in Access mode.

Driver incentives also change in non-WAV modes in order to balance supply and demand on the Lyft platform.

---

[91] Gerundio Dep. Tr. 141:6-13, 144:23-145:2; Treger Dep. Tr. 29:15-22; Selinger Dep. Tr. 65:2-10; Corrected Expert Report at 73-74.

- Gerundio Depo. 141:6-13; 144:23-145:2

- Testimony of Isabella Gerundio and Exhibit G ("Lyft Wheelchair Accessible Vehicle Overview").

- Testimony of Asaf Bar Selinger.

170.    Lyft could increase or offer consistent bonuses or incentives for Access mode drivers to increase the supply of WAVs on the App.  (Testimony of Alex Elegudin).

**Lyft's Response**:  The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. There is no evidence to support a finding that changes to Lyft's incentive structure for IC WAV drivers would "increase the supply of WAVs on the App."

There is likewise no evidence to establish by how much supply would increase, what the impact of that increase in supply would be for riders who need WAVs, or how much such a change would cost.

### 8.    Lyft Should Include WAVs In Express Drive & FlexDrive.

171.    Plaintiffs' eighth proposed modification is to include WAVs as an option in Lyft's Express Drive and FlexDrive programs.  This modification applies to all classes.  (Testimony of Alex Elegudin.).

**Lyft's Response**: The evidence confirms that this proposed modification is not sufficiently concrete and specific. Moreover, there is no evidence that this proposed modification would be effective in creating access to WAVs on the Lyft platform, or would create service that is sufficiently reliable to satisfy Plaintiffs. Finally, there is no evidence of the cost of this proposed modification.

172.    Express Drive is Lyft's flexible car rentals program for drivers who want to drive for Lyft.  FlexDrive is a wholly-owned subsidiary of Lyft and a partner in the Express Drive program.

Express Drive and FlexDrive offer vehicles that drivers can use on Standard mode and other ride modes on the App.[92]

     **Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. Mr. Selinger testified that: "While Express Drive is a Lyft operation, the cars at the time were not owned by Lyft and the rental contract was not generated by Lyft."

     Lyft's 10-K from 2021 states "Express Drive. Our flexible car rentals program for drivers who want to drive using our platform but do not have access to a vehicle that meets our requirements. Through our Express Drive program, drivers can enter into short-term rental agreements for vehicles that may be used to provide ridesharing services on the Lyft Platform." It also states that Express Drive is only available in "30 cities nationwide."

     Lyft's 10-K from 2021 also states "[I]n the first quarter of 2020, we acquired Flexdrive, LLC ("Flexdrive"), one of our longstanding partners in the Express Drive program. Through our Express Drive program, drivers can enter into short-term rental agreements for vehicles that may be used to provide ridesharing services on the Lyft Platform. Flexdrive will continue to operate as an independent partner to Lyft and we expect this acquisition to contribute to the growth of our business and help us expand the range of our use cases."

173.    Lyft can and does request or dictate the particular types of vehicles available to drivers through Express Drive and FlexDrive.[93]

     **Lyft's Response**: The evidence cited does not support this fact.  Mr. Bousta testified that Lyft had limited control over vehicles available for Express Drive.  Because

---

[92] Selinger 201:1-203:14; Corrected Expert Report, at 5, 7, 57.
[93] Bousta Dep. Tr. 25:8-26:10.

Lyft "did not provide vehicles," it "would give the information to the car rental companies of what drivers were telling [Lyft] they were interested in driving and then it was the car rental company's decision to decide which car they would provide." That was likewise true for FlexDrive, where "Lyft did not have direct control on the vehicles. The vehicles to be rented were the decision of the rental company."

The evidence establishes that Lyft had a rental program under which it procured WAVs for rent to independent contractor drivers, which involved the procurement of new WAVs that were not already in the providers' fleet. Lyft decided not to renew the program due to high costs and limited effectiveness.

- Deposition of Karim Bousta ("Bousta Depo.") 25:19-26:10, 73:9-15.

- Testimony of Isabella Gerundio.

174. Express Drive and FlexDrive do not offer WAVs as part of the rental programs.[94]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. The cited deposition testimony does not support the proposed fact.

No witness offered testimony that car rental providers have WAVs available in their existing fleets. To the contrary, witness testimony confirmed that major rental providers, like Hertz, do not maintain WAVs in their rental fleets.

Witness testimony established that Lyft had a separate WAV rental program in New York City and decided not to renew the program because data showed that IC drivers who rented WAVs through Lyft's WAV rental program spent just 2% of their time driving in Access mode.

---

[94] Corrected Expert Report, at 57-58; Lee Dep. Tr. 47:4-6.

- Testimony of Asaf Bar Selinger.

- Testimony of Richard Zhou and Exhibit L (Chart of Rental Utilization)

- Testimony of Isabella Gerundio.

175.    Lyft employees previously proposed an initiative called Perseus, which would integrate WAVs into Express Drive and allow independent contractor drivers to rent WAVs at a similar price to renting non-WAVs.  The Perseus program was projected to cost Lyft less than $5 million and allow Lyft to provide more than 500,000 rides in the United States at approximately $10.25 per ride.  Lyft did not pursue or attempt to pursue the Perseus program.[95]

Lyft's Response: This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.

The proposed "fact" is speculative. No witness offered testimony that "Perseus," a program that was never piloted, would have had the stated results. There is likewise no evidence to establish what changes would be needed to implement "Perseus" in practice, what the impact of that program would be for riders who need WAVs, or how much such a program would cost.

176.    Lyft's own projections for its Perseus program would allow Lyft to provide more WAV rides per year than it is currently offering at a lower cost per ride and lower total cost than Lyft's current WAV offerings.  (Testimony of Alex Elegudin.)

Lyft's Response: This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. The proposed "fact" is speculative. There is no evidence to support a finding

---

[95] Corrected Expert Report, at 57; LYFT0120393; LYFT_ILRC00009589; Lee Dep. Tr. 47:4-6.

that the "Perseus program," which was never piloted, would have had the stated results. There is likewise no evidence to establish what changes would be needed to implement "Perseus" in practice, what the impact of that program would be for riders who need WAVs, or how much such a program would cost.

### 9. Lyft Should Form Partnerships With Transportation Companies That Have WAVs.

177.    Plaintiffs' ninth proposed modification is to form partnerships with car rental, taxi, and other transportation companies that have WAVs.  This modification applies to all classes. (Testimony of Alex Elegudin.).

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. The evidence confirms that this proposed modification is not sufficiently concrete and specific. Moreover, there is no evidence that this proposed modification would be effective in creating access to WAVs on the Lyft platform, or would create service that is sufficiently reliable to satisfy Plaintiffs. Finally, there is no evidence of the cost of this proposed modification.

178.    Currently, Lyft engages in partnerships with transportation companies to increase the available supply of WAVs in Access Regions.  In NYC, Lyft partners with three transportation companies who supply WAVs to drivers to use on the App. [96]

**Lyft's Response**: The proposed fact is incomplete. The evidence shows that Lyft uses the "Partner" model to create a supply of WAVs in certain Access Regions. Under it, Lyft contracts with a third-party company to provide both the WAVs and the drivers to drive them at an hourly cost per vehicle that ranges from approximately $40-$65. That

---

[96] Gerundio Dep. Tr. 102:23-105:5.

means, for a single vehicle under the Partner model, Lyft may pay in excess of $300,000 (assuming $50 per hour and just 18 hours per day of coverage) each year. The proposed fact does not address that transportation partners are subject to change over time. Evidence shows that since 2019, Lyft has contracted with several third-parties to provide rental vehicles or Partner WAVs in New York City at significant expense.

Lyft no longer uses the "Rental" model, under which Lyft contracted with a rental car company to procure WAVs for rental to independent drivers.

- Testimony of Asaf Bar Selinger.

- Testimony of Isabella Gerundio.

179.     Lyft's website identifies approximately 208 transportation companies with WAVs across the United States.  (Testimony of Alex Elegudin.).

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. The proposed fact is vague. If the proposed fact is referring to "Local WAV options" listed on the Lyft website, https://help.lyft.com/hc/en-us/all/articles/115013081668#local , no witness testified as to whether any of the providers on this list, which includes paratransit, "dial-a-ride," and taxi companies, would agree to a "partnership" with Lyft, as to the price, or as to what the terms would be.

180.     Mr. Wu previously proposed an initiative called NewCo or LyftSub, which was designed to expand Lyft's supply of WAVs and offer a nationwide WAV program by expanding Lyft's partnerships.  LyftSub was a program to engage a staffing agency to provide contracted drivers and lease WAVs through a third-party, LyftSub, to those drivers.  LyftSub would be a wholly-owned subsidiary of Lyft.  LyftSub was projected to offer a nationwide WAV solution for

Lyft.  Mr. Wu anticipated that giving three rides a day through LyftSub would be more cost-efficient than the way Lyft currently offers Access mode.[97]

**Lyft's Response**: The materials relied on are inadmissible hearsay. Fed. R. Evid. 801-803.  This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.

The proposed "fact" is speculative. Mr. Wu has not worked at Lyft since August 2019. The proposed finding is based on inadmissible presentations and emails from three or more years ago. No witness offered testimony that any of these "programs" would have been effective or explained how much they would have cost to implement.

Mr. Wu testified at deposition that his proposals were "the beginning of strategy work" with "assumptions, upon assumptions, upon assumptions" that would "be required to be validated."  Evidence confirms that, since Mr. Wu left Lyft, Lyft's WAV team has continued to work to find ways to lower the cost and improve the effectiveness of its WAV service.

- Wu Depo. 186:11-23.

- Testimony of Isabella Gerundio.

181.    LyftSub was projected to offer a nationwide WAV solution for Lyft.  Mr. Wu anticipated that giving three rides a day through LyftSub would be more cost-efficient than the way Lyft currently offers Access mode.  Mr. Wu projected that LyftSub would allow Lyft to profitably offer a nationwide WAV program at eight to eleven rides per day.  Following Mr. Wu's presentation of LyftSub to Lyft's executive team for implementation, Mr. Wu was directed to revise the program to ensure there was a "good passenger experience."[98]

---

[97] LYFT_ILRC0022617; LYFT0120393; LYFT_ILRC00009589; Wu Dep. Tr. 176:2-5.
[98] LYFT_ILRC00022617; LYFT_ILRC00009589; Wu Dep. Tr. 169:1-14, 188:21-25.

**Lyft's Response**: The materials relied on are inadmissible hearsay. Fed. R. Evid. 801-803.  This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. *See* LRPF No. 180.

182.    After Mr. Wu made further improvements to the passenger experience, his supervisor presented LyftSub to Lyft's executive team again.  Lyft executives did not approve LyftSub and none of Lyft's 30(b)(6) witnesses, who were obligated to explain why Lyft did not go forward with LyftSub, could explain why Lyft did not go forward with LyftSub.[99]

**Lyft's Response**: This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. The deposition testimony cited does not support this proposed fact.

183.    After Mr. Wu's departure from Lyft, Ms. Gerundio attempted to create a WAV partnership program which "was almost exactly like the LyftSub."  Ms. Gerundio did not pursue LyftSub any further.  Despite two heads of the national WAV team each designing a virtually identically pilot WAV partnership program, none was ever implemented or piloted.[100]

**Lyft's Response**: This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. The evidence does not support the proposed fact. Ms. Gerundio testified that they "never actually got into the piloting stage because we stopped at the conversations because the math didn't work out and we couldn't find vendors for it." She explained that "From the experience" her team had "trying out this insourcing and outsourcing model," which was similar to LyftSub, "one of the reasons why we didn't ... pursue it at that point in the last year is that the hourly model is actually almost the same as a

---

[99] Wu Dep. Tr. 170:9-23; Lee Dep. Tr. 133:21-25.
[100] Gerundio Dep. Tr. 167:9-168:17, 197:2-15.

W2 model but with a lot more operations work, a lot more operational work." That is, the

model would have resulted in similar final costs, for much more work.

- Gerundio Dep. Tr. 172:4-12, 173:2-9.

184. Despite repeated attempts by Lyft's employees to offer nationwide programs or

improve the efficiency of Lyft's WAV offerings, Lyft continues to operate Access mode solely in

response to regulatory requirements or incentives. (Testimony of Alex Elegudin.).

      **Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the

trier of fact, and not based on the application of discernable principles or methods. Fed. R.

Evid. 702. This proposed fact has no relevance to the legal issues discussed below. Fed. R.

Evid. 401-403.

      Evidence confirms that Lyft commits millions of dollars annually to offering WAV

service. Lyft employees have worked and are working to find solutions to offering on-

demand WAV service in a cost-efficient, reliable, and scalable manner, but have not yet

found such a solution. There is no evidence that such a solution exists.

- Testimony of Isabella Gerundio.

185. The projections of the LyftSub program or a similar partnership would allow Lyft to

provide more WAV rides per year than it is currently offering at a lower cost per ride and lower total

cost than Lyft's current WAV offerings. (Testimony of Alex Elegudin.).

      **Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the

trier of fact, and not based on the application of discernable principles or methods. Fed. R.

Evid. 702. The proposed fact is pure speculation. *See* LRPF No. 180.

### 10.    Lyft Should Implement A Nationwide 10 Cent Accessibility Surcharge.

186.    Plaintiffs' tenth proposed reasonable modification is to implement a ten-cent accessibility surcharge on all rides in order to fund Access mode. This modification applies to all classes. (Testimony of Alex Elegudin.).

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. The evidence confirms that this proposed modification is not sufficiently concrete and specific. Moreover, there is no evidence that this proposed modification would be effective in creating access to WAVs on the Lyft platform, or would create service that is sufficiently reliable to satisfy Plaintiffs. Finally, there is no evidence of the cost of this proposed modification. .

187.    Lyft and other ridesharing companies impose various surcharges across the country, some of which are imposed at the discretion of Lyft and some of which are required by local regulators or municipalities. Lyft has imposed surcharges of 30 cents, 55 cents, and 75 cents in different regions of the United States.[101]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.

188.    Ms. Gerundio stated that Lyft was considering imposing a five-cent accessibility surcharge in 2022 to support its WAV program.[102]

---

[101] Corrected Expert Report, at 82.
[102] Gerundio Dep. Tr. 280:24-282:4.

**Lyft's Response**: This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. The proposed fact also mischaracterizes Ms. Gerundio's testimony: she described it as "just an idea" that "probably won't be more than two sentences," and that "we have not discussed it just beyond that idea."

- Deposition of Isabella Gerundio 281:17-24

189.    Lyft has tested price elasticity and has not found that its consumers are affected by price changes of less than 15 cents.[103]

**Lyft's Response**: There is no evidence to confirm this proposed fact. Joyce Chan testified that: "I don't know what the price increases were on those experiments.  I'm not responsible for running them.  I'm just up to date on the key take-aways."

Moreover, Dr. Rysman testified that a 10-cent surcharge on the price of Lyft rides would have an adverse impact on the number of overall rides on the Lyft platform, particularly if the surcharge were not imposed on Lyft's competitors, and the reduction in ride volume will reduce Lyft's revenues and profitability.

- Deposition of Joyce Chan ("Chan Depo.") 230:10-13.

- Testimony of Dr. Marc Rysman and supporting figures.

190.    A ten-cent surcharge would be smaller than a one percent increase to the average price of a Lyft ride.[104]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403.

---

[103] Chan Dep. Tr. 229:10-231:16.
[104] Corrected Expert Report, at 82; Chan Dep. Tr. 230:7-20.

*See* LRPF No. 189.

191.   Plaintiffs' experts project that a ten-cent surcharge on all Lyft rides would have raised approximately $76 million in 2019 and $42 million in 2020.  Plaintiffs' experts project that the ten-cent surcharge would have funded 487,518 WAV rides in 2019 and 268,784 rides in 2020.[105]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702.  The experts' projections are not reliable.

Plaintiffs' projections do not take into account the impact of the 10-cent price increase on the overall number of rides on the Lyft platform.

192.   Plaintiffs' experts project that implementation of the ten-cent surcharge in Westchester would enable Lyft to operate Access mode at a profit of $185,907 in Year 1, $188,966 in Year 2, and $215,189 in Year 3, even if Lyft did not access the costless WAV supply of over 300 drivers on Lyft's platform that are currently blocked in Westchester.[106]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702.  The experts' projections are not reliable. Moreover, there is no evidence any WAVs in Westchester are currently "blocked." *See* LRPF No. 130.

As Dr. Rysman's calculations showed, when realistic assumptions are used, the accessibility surcharge will not cover the cost of Access mode in Westchester County.

- Testimony of Dr. Marc Rysman and supporting figures.

---

[105] Corrected Expert Report, at 83.
[106] Corrected Expert Report, at 95.

193.    Plaintiffs' experts project that implementation of the ten-cent surcharge in New York State outside of NYC would enable Lyft to operate Access mode at a profit of $1.1 million in Year 1, $1.1 million in Year 2, and $1.3 million in Year 3.[107]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702.  The experts' projections are not reliable.

As Dr. Rysman's calculations showed, when realistic assumptions are used, the accessibility surcharge will not cover the cost of Access mode in New York State.

- Testimony of Dr. Marc Rysman and supporting figures.

194.    Plaintiffs' experts project that implementation of the ten-cent surcharge in all of the non-Access Regions would enable Lyft to operate Access mode at a profit of $50 million in Year 1, $50 million in Year 2, and $55 million in Year 3.[108]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702.  The experts' projections are not reliable.

195.    Implementation of the ten-cent surcharge on all Lyft rides would provide funds larger than Lyft's historical budget for Access mode.[109]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702.  The experts' projections are not reliable.

---

[107] Corrected Expert Report, at 102.
[108] Corrected Expert Report, at 109.
[109] Corrected Expert Report, at 110.

196.    Implementation of the ten-cent surcharge would enable Lyft to expand the availability of Access mode to all of the Regions in which Lyft operates. (Testimony of Alex Elegudin.).

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. The experts' projections are not reliable.

### iii.    Conclusions Of Law Related To Plaintiffs' Reasonable Modifications.

197.    Plaintiffs have demonstrated that Lyft can make reasonable modifications to its practices to provide Access mode in Westchester, New York State, and the non-Access Regions, and improve Access mode in the Access Regions. Lyft has failed to meet its burden of proof to show that making such modifications would cause an undue burden or present a fundamental alteration to Lyft's business.

**Lyft's Response**: Plaintiffs have failed to prove that they have standing to pursue these claims, and have also failed to prove that they can satisfy the elements of "discrimination" as defined by the ADA. Additionally, as demonstrated, Plaintiffs failed to prove that any of their proposed modifications would be effective in creating access to WAVs on the Lyft platform, or that the proposed modifications would be "reasonable" in cost as required by *Staron*. *See* LRPF Nos. 83, 85-86, 113, 115-17, 122, 197-222.

198.    Plaintiffs' first proposed modification to remove the current block in place on the App in the non-Access Regions is reasonable. Lyft prohibits individuals who use wheelchairs from accessing rides through Lyft in the same manner as able-bodied individuals. Lyft's policy in its non-Access Regions prevents WAVs drivers from identifying their vehicles as WAVs and riders from having the option to select WAVs, even when they may be available. Plaintiffs have met their burden to establish that this modification is reasonable and is not outweighed by any cost to Lyft.

**Lyft's Response**: Plaintiffs have not met their burden to establish that this modification is reasonable under the three-part, fact-specific inquiry required under *Staron*, 51 F.3d at 356.

First, the modification lacks specificity. Plaintiffs fail to describe what the "block" is or how it should removed. Is it a physical block, a software block, or something else? What does it mean that "Lyft prohibits individuals who use wheelchairs from accessing rides through Lyft in the same manner as able-bodied individuals"? What if Lyft puts Access mode on the app but there are no WAVs available – would that be considered "the same manner"? What is the policy that "prevents WAV drivers from identifying their vehicles as WAVs"? Is that the same policy that also prevents "riders from having the option to select WAVs, even when they may be available," or is it different? Under what circumstances should "riders have the option to select WAVs"? Should they have this option when zero drivers have signed up to provide WAV rides? What if there are just two drivers – is that sufficient if the region is 200 square miles or 2,000 square miles? What happens if the two drivers stop driving and no one else signs up? Absent specificity, any injunction entered based on this modification will not meet Federal Rule of Civil Procedure 65(d)'s requirements for specificity. *See S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 240-41 (2d Cir. 2001) (Rule 65(d) requires every injunction to "be specific enough to apprise those within its scope of the conduct that is being proscribed.") (internal quotation marks omitted).

Second, Plaintiffs offered no evidence that this modification would be effective in creating any functional WAV service on Lyft's ridesharing platform. Among other things, Plaintiffs offered no evidence of WAV owners who are willing to drive their WAVs on Lyft's platform in any of the non-Access Regions, including Westchester County. Their

speculation that Lyft's data report reveals the existence of WAV drivers who "attempted to drive in Access mode" in non-Access Regions is merely that, speculation. Plaintiffs have the burden of production and persuasion on the issue of effectiveness, and speculation will not suffice. *See, e.g., Cayetano v. Fed. Express Corp.*, 2022 U.S. Dist. LEXIS 119102, at *12 n.3 (S.D.N.Y. July 6, 2022) (speculation that plaintiff's employer FedEx could have provided an accommodation of "mechanical assistance" was insufficient without actually "demonstrat[ing] that such a device existed and was available to FedEx.").

Lyft, on the other hand, has come forward with evidence demonstrating that Plaintiffs' proposed modification would not be effective. Specifically, Lyft presented the testimony of its expert, Dr. Marc Rysman, who opined that Lyft cannot rely on its platform model to provide Access mode service in New York State or throughout the nation. According to Dr. Rysman, his modeling of a hypothetical ridesharing platform for WAVs showed that there is a greater than 99% chance of observing zero WAV rides in one month for half of all ZIP Codes in New York State. Even in more populous areas, Dr. Rysman's model shows that there is a greater than 20% chance of observing zero rides in one month in many places. In Westchester County, Dr. Rysman's model showed that 35% of ZIP codes in Westchester County are predicted to have less than one WAV ride in the entire month, and 93% are predicted to have fewer than 25 rides in one month (*i.e.*, less than one ride a day). LRPF No. 10. Because a successful platform requires sufficient supply and demand, it is not possible to offer WAV service using a platform model. Plaintiffs offered no competent testimony in rebuttal. The evidence thus showed that Plaintiffs' proposed modification of simply showing "Access mode" in the App would not be effective.

Third, Plaintiffs' proposal presents a real risk of a cost to Lyft in the form of additional lawsuits. Here, Plaintiffs have sued Lyft for alleged unequal access not only in the

non-Access Regions, but also in the Access Regions including New York City, where Lyft currently responds to 90% of all WAV ride requests within 15 minutes. If Lyft were compelled to make Access mode available everywhere without any supply, Lyft will be sued, including potentially by these very same Plaintiffs, for failing to provide "equal access." Plaintiffs have not made any effort to quantify any of the potential costs to Lyft as a result of this proposed modification, including the costs of potential future lawsuits.

As Harriet Lowell has made clear, she brought this lawsuit because she wants reliable on-demand WAV service on Lyft's ridesharing platform. See LRPF No. 75. Plaintiffs have produced no evidence that this modification would yield any service, never mind reliable service. Plaintiffs have failed to prove that this modification is reasonable.

199.    By categorically blocking WAVs from appearing as such on Lyft's app, Lyft necessarily and discriminatorily prevents people with disabilities from using its services.  *See, e.g.*, *Crawford*, 2022 WL 74161, at *2 ("A policy that does not allow WAVs to operate on the Uber platform has the direct result of preventing people who use WAVs from using the platform[.]"); *ILRC*, 2020 WL 6462390, at *2 ("Lyft's failure to extend some of the policies, practices, and procedures it uses for non-WAV services (and certain WAV services in other cities) to include WAV services in the Bay Area counties is discriminatory").

**Lyft's Response**: The problem with Plaintiffs' theory is that under the ADA, Lyft is not required to offer WAV service just because it offers Standard mode. Not only have the Second and the Tenth Circuit Court of Appeal so held in the context of taxi companies, *see, e.g., Noel*, 687 F.3d at 73 ("Title III expressly exempts taxi providers from purchasing or leasing 'accessible automobiles'"), and *Toomer v. City Cab*, 443 F.3d 1191, 1195 (10th Cir. 2006) ("a taxi fleet consisting entirely of non-accessible vehicles would be in accord with the ADA"), but other Circuit Courts of Appeal and judges in this district have held that the

ADA does not require private entities to provide specialized or accessible goods. *See, e.g., McNeil v. Time Ins. Co.*, 205 F.3d 179, 186-87 (5th Cir. 2000); *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1115 (9th Cir. 2000); *Doe v. Mut. Of Omaha Ins. Co.*, 179 F.3d 557, 560 (7th Cir. 1999); *Thorne v. Boston Mkt. Corp.*, 469 F.Supp.3d 130, 142-43 (S.D.N.Y. 2020); *Dominguez v. Banana Republic, LLC*, No. 19-CV-10171-GHW, 2020 U.S. Dist. LEXIS 72193, *14 (S.D.N.Y., April 23, 2020), *aff'd. on other grounds, Calcano v. Swarovski N. Am. Ltd.*, 36 F.4th 68 (2d Cir. 2022).

Neither of the sentences excerpted by Plaintiffs from the *Crawford* and *ILRC* cases dictate a different result. Afterall, both courts ultimately concluded that Lyft's and Uber's refusal to offer WAV service was not discrimination under the ADA. *See ILRC Trial Decision*, 2021 U.S. Dist. LEXIS 166229, at *49 (annual cost of $2.29 million for a WAV program in three California counties is an unreasonable modification); *Crawford v. Uber Techs., Inc.*, No. 17-CV-02664-RS, 2022 U.S. Dist. LEXIS 131670, *32 (N.D. Cal., Jul. 25, 2022) (the proposed modifications are unreasonable because the anticipated annual cost of $800,000 for New Orleans and $550,000 for Jackson "is too high for the limited service that would result").

200.    Lyft's unique WAV restrictions deny people with disabilities access to Lyft. *See, e.g., Crawford*, 2022 WL 74161, at *2 ("A policy that does not allow WAVs to operate on the Uber platform has the direct result of preventing people who use WAVs from using the platform[.]"); *ILRC*, 2020 WL 6462390, at *2 (Lyft's failure to extend some of its non-WAV and Access Region WAV policies to WAV services in the Bay Area counties is discriminatory).  Lyft's vehicle-type restrictions in its non-Access Regions has a discriminatory impact on people with disabilities because it wholly precludes their access to Lyft's services.  42 USCA § 12182(b)(1)(A)(ii).

**Lyft's Response**: There is no evidence of any "unique WAV restrictions." The evidence showed that other modes, such as Lux Black and Lux Black XL, are offered in New York City but not in Westchester County. LRPF No. 10. Lyft simply does not offer WAV service (or Lux Black and Lux Black XL) in Westchester County, and absent Plaintiffs' ability to prove that this constitutes "discrimination" as defined under the ADA, the absence of WAV service in Westchester County does not violate the law. *See* LRPF 198-199.

201.    *Celano v. Marriott Int'l, Inc.* is particularly instructive.  As Judge Hamilton explained in granting summary judgment and holding that Marriott discriminates under Title III by its policy of refusing to provide accessible carts to mobility-impaired golfers:

> Marriott's current policy does not provide plaintiffs, mobility-impaired golfers, with an experience that is functionally equivalent to that of other non-disabled golfers. Plaintiffs here have presented overwhelming evidence that they are unable to golf at Marriott's courses under the current policy.  By contrast, non-disabled golfers can simply show up at the course and Marriott will provide them with a functional cart as part of the cost of their round of golf.  Accordingly, Marriott provides golf carts for able-bodied golfers, but does not provide accessible carts for mobility-impaired golfers like plaintiffs.  Because Marriott's policy places plaintiffs in a distinctly unequal situation, as compared to their able-bodied counterparts, it is discriminatory under the ADA.

*Celano v. Marriott Int'l, Inc.*, No. 05-4004, 2008 WL 239306, at *14 (N.D. Cal. Jan. 28, 2008).

**Lyft's Response**: There are three key differences between providing an accessible golf cart at a resort hotel and WAVs for an on-demand ridesharing platform. First, in the ADA, Congress explicitly exempted private entities from purchasing or leasing WAVs, *see* 42 U.S.C. § 12184(b)(3), but did not include a similar exemption for golf carts. Second, providing an accessible golf cart is an effective modification for golfers with disabilities who nonetheless want to use golf carts, whereas Plaintiffs produced no evidence that any of their proposed modifications would be effective in creating WAV service on the Lyft platform. *See Staron v. McDonald's Corp.*, 51 F.3d 353, 356 (2d Cir. 1995) (establishing that a modification is "reasonable" requires evidence of effectiveness and cost). Third, in *Celano,*

counsel for the defendant conceded that the cost of proposed modification was "minimal." *Celano v. Marriott Int'l, Inc.*, No. 05-4004, 2008 U.S. Dist. LEXIS 6172, at *41 (N.D. Cal. Jan. 28, 2008). Here, the evidence is that the on-going cost of ensuring a supply of WAVs on the Lyft platform is likely to be astronomical. *See, e.g.*, Plaintiffs' Proposed Fact No. 26.

202.    Lyft's policy with respect to blocking WAV services in non-Access Regions is distinctly unequal to its policy for able-bodied riders, and is therefore discriminatory.

**Lyft's Response**: This is not correct. Borrowing Plaintiffs' language, Lyft also "blocks" Lux Black, Lux Black XL, "Car seat" mode, Citi Bike, and other options in addition to WAV in Westchester County. LRPF No. 10. Lyft's policy is not "distinctly unequal to its policy for able-bodied riders," and thus is not discriminatory. *See also* LRPF Nos. 91-92.

203.    Lyft has not met its burden to demonstrate that Plaintiffs' proposed modification would subject Lyft to an undue burden or that it would fundamentally alter Lyft's business. Currently, Lyft enables Access mode in the Access Regions. Thus, enabling Access mode in the non-Access Regions would not fundamentally alter its business. Lyft has not established that turning on Access mode in the non-Access Regions would require substantial cost to outweigh the benefits of offering Access mode. Lyft's defense that enabling Access mode in the non-Access Regions does not guarantee identical wait times, completion rates, or vehicle supply to Standard mode in the non-Access Regions does not rise to the standard of an undue burden. Lyft does not guarantee certain service level or vehicle supply requirements for Access mode in the non-Access Regions.

**Lyft's Response**: Because Plaintiffs failed to meet their burden of proving that their proposed modification would be effective, the Court need not reach Lyft's affirmative defense of fundamental alteration.

However, this particular proposed modification – of having Lyft show Access mode in its App everywhere – would fundamentally alter Lyft's business by requiring Lyft to offer a specialized service in regions where it currently does not offer it. As a private entity, Lyft has the right to decide when it will offer a new service and in what location, as well as the right to decide when it will stop offering that service. Plaintiffs' request that the Court bar Lyft from exercising its business judgment is a request to have this Court "fundamentally alter" the "essential nature" of Lyft as a private entity. *See, e.g., PGA Tour, Inc. v. Martin*, 532 U.S. 661, 689 (2001); *Doe v. Mut. of Omaha Ins. Co.*, 179 F.3d 557, 560 (7th Cir. 1999). *See* Lyft's Proposed Findings of Fact and Conclusions of Law in Support of its Affirmative Defense.

204.    Plaintiffs' second proposed modification to ask all drivers on Lyft's platform and those onboarding whether they have access to WAVs is reasonable.  Currently, Lyft asks drivers all necessary questions during its onboarding survey to ensure the driver and their vehicle meets Lyft's requirements to drive on a particular ride mode.  Lyft does not ask its drivers whether they have a WAV or have access to a WAV as part of the onboarding process in any of its Regions.  For a driver to be able to drive on Access mode, it is necessary for Lyft to know whether the driver's vehicle is a WAV.  Asking a driver whether they have a WAV or have access to a WAV will also enable Lyft to better understand its organic WAV supply.  Plaintiffs have met their burden to establish that this modification is reasonable and is not outweighed by any cost to Lyft.

**Lyft's Response**: Plaintiffs lack standing to pursue this modification and failed to prove that they requested this modification before filing this lawsuit. *See* LRPF Nos. 83, 85-87, 113, 122. Plaintiffs also have not met their burden to establish that this modification is reasonable under the three-part, fact-specific inquiry required under *Staron*, 51 F.3d at 356.

Plaintiffs presented no evidence that this modification would be effective in creating WAV supply. There was no evidence that there is a large number of WAVs out on the streets, or of potential WAV drivers who want to drive their WAVs on the Lyft platform. An injunction should be "no broader than necessary to cure the effects of the harm" allegedly caused by the legal violation. *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 144 (2d Cir. 2011), *citing Forschner Grp., Inc. v. Arrow Trading Co.*, 124 F.3d 402, 406 (2d Cir. 1997). Absent evidence that a modification would be effective, Lyft has not engaged in discrimination and the Court cannot restrain Lyft from engaging in lawful conduct. *See Mickalis Pawn Shop*, 645 F.3d at 145 ("An injunction is overbroad when it seeks to restrain the defendants from engaging in legal conduct") (citation omitted).

205.    Lyft has not met its burden to demonstrate that Plaintiffs' proposed modification would subject Lyft to an undue burden or that it would fundamentally alter Lyft's business.  Lyft currently includes numerous questions on its onboarding survey regarding a driver's vehicle.  Lyft has not met its burden to establish that inclusion of one additional question during the onboarding survey would deter drivers from driving for Lyft or impose a substantial cost on Lyft to outweigh the benefits of this modification.

**Lyft's Response**: Plaintiffs failed to meet their burden of proving that their proposed modification would be reasonable. That ends the inquiry as to this modification.

206.    Plaintiffs' third proposed modification to remove the Access mode toggle in the Access Regions other than NYC and automatically display Access mode on the App alongside other vehicle options is reasonable.  Lyft does not require any users who do not seek to use Access mode to proceed through a similar series of navigational steps to see available vehicles.  The Access mode toggle acts as a barrier to users to request a WAV through Access mode.  Plaintiffs have met their burden to establish that this modification is reasonable and is not outweighed by any cost to Lyft.

      **Lyft's Response**: Plaintiffs, who never downloaded the Lyft app and have not attempted to use Lyft's WAV service, lack standing to pursue this modification and failed to prove that they requested this modification before filing this lawsuit. *See* LRPF Nos. 83, 85-87, 113, 122. Plaintiffs also have not met their burden to establish that this modification is reasonable under the three-part, fact-specific inquiry required under *Staron*, 51 F.3d at 356.

      Plaintiffs presented no evidence that this modification would be effective in creating WAV supply. While removing the Access mode toggle did increase the demand for Access mode in New York City, there was no evidence that the increase in demand caused an increase in WAVs on the Lyft platform. To the contrary, the evidence was that the increase in the number of IC WAVs on the Lyft platform was caused by the TLC's regulations. LRPF Nos. 140-41. Lyft also showed that given the high cost of WAV supply, its goal is to limit the use of Access mode to riders who truly need a WAV. LRPF Nos. 141-43. Plaintiffs have not proved that Lyft's use of the Access mode toggle violates the ADA. The Court cannot restrain Lyft from engaging in lawful conduct. *See Mickalis Pawn Shop*, 645 F.3d at 145.

207.    Lyft has not met its burden to demonstrate that Plaintiffs' proposed modification would subject Lyft to an undue burden or that it would fundamentally alter Lyft's business. Lyft does not require a toggle-like feature for other users and Lyft does not require users in NYC to turn on the toggle in order to use Access mode. Lyft has not demonstrated that removal of the toggle would subject Lyft to a substantial burden sufficient to outweigh the benefits. Lyft has not met its burden to demonstrate that removing the toggle will subject Lyft's Access mode drivers to "fraudulent" able-bodied users and diminish the efficiency of Access mode. Furthermore, as described below, cross-dispatching all WAV vehicles is a reasonable modification and such use of WAVs on Standard mode by able-bodied users should be allowed.

**Lyft's Response**: Plaintiffs failed to meet their burden of proving that their proposed modification would be reasonable. That ends the inquiry as to this modification.

208.     Plaintiffs' fourth proposed modification to utilize cross-dispatching for all drivers, including Partner WAV drivers, is reasonable.  Lyft allows all non-WAV drivers and IC WAV drivers to cross-dispatch on different ride modes if their vehicles meet the requirements for different ride modes.  Partner WAV drivers are the only drivers prevented from cross-dispatching.  Allowing Partner WAV drivers to cross-dispatch would allow Lyft to offer Access mode at a lower cost and improve the service levels of Access mode.  Plaintiffs have met their burden to establish that this modification is reasonable and is not outweighed by any cost to Lyft.

**Lyft's Response**: Plaintiffs lack standing to pursue this modification and failed to prove that they requested this modification before filing this lawsuit. *See* LRPF Nos. 83, 85-87, 113, 122. Plaintiffs also have not met their burden to establish that this modification is reasonable under the three-part, fact-specific inquiry required under *Staron,* 51 F.3d at 356.

Plaintiffs presented no evidence that cross-dispatching Partner WAV drivers would be effective in creating WAV supply on the Lyft platform. Lyft pays enormous sums of money to ensure that Partner WAV drivers are on its platform in selected cities. *See* Plaintiffs' Proposed Fact No. 26; LRPF No. 38. In managing those drivers, Lyft must balance its obligations to shareholders to minimize losses with meeting regulatory requirements. How it manages those drivers, including by cross-dispatching, is a decision that Lyft should be allowed to make, based on the circumstances that exist in each location at any given time, without the Court's interference. *See Mickalis Pawn Shop,* 645 F.3d at 144-45.

209.     Lyft's refusal to cross-dispatch WAVs denies people with disabilities the opportunity to participate in programs or activities that are not separate or different.  *See Kalani v. Stabucks Coffee*

*Co.*, 698 F. App'x 883, 886-87 (9th Cir. 2017) (finding that Starbucks exclusively offering exterior facing accessible seating, while offering inaccessible interior and exterior seating, violated the ADA and "deprived its wheelchair-bound customers of the opportunity to participate, to the same extent as non-disabled patrons"); *Mortland v. Local Cantina Dublin LLC*, No. 19-01123, 2021 WL 3033355, at *11 (S.D. Ohio July 19, 2021) (finding that a restaurant with seating at a bar and at tables, yet only provided accessible seating at the tables, violated the ADA's integration mandate because it offered a distinctly alternative experienced for disabled customers).

> **Lyft's Response**: Lyft already cross-dispatches IC WAV drivers. In order to cross-dispatch Partner WAV drivers, Lyft would have to engage Partner WAVs. Plaintiffs offered no evidence to show how much it would cost to engage a sufficient number of Partner WAV drivers and cross-dispatch them while providing reliable WAV service. Moreover, no evidence was presented to show that cross-dispatching, as opposed to the scarcity and high cost of WAV supply, caused a different experience for individuals with disabilities in any of the Access Regions. LRPF No. 150-53.

210.    Lyft has not met its burden to demonstrate that Plaintiffs' proposed modification would subject Lyft to an undue burden or that it would fundamentally alter Lyft's business.  Lyft already allows many drivers to cross-dispatch.  Lyft allows IC WAV drivers to cross-dispatch and has performed pilot programs enabling Partner WAV drivers to cross-dispatch.  Lyft's defense that allowing Partner WAV drivers to cross-dispatch in some Access Regions has increased the wait time or completion rate is not sufficient to meet its burden.  Plaintiffs and Lyft present competing evidence of the effects of cross-dispatching on service levels.  Plaintiffs present evidence that cross-dispatching improved service levels in some Access Regions and improved the economics of offering Access mode.  Lyft presented evidence that cross-dispatching decreased wait times by one or two minutes in some Access Regions.  Lyft has not met its burden to show that cross-dispatching

Partner WAV drivers would subject Lyft to an undue burden that outweighs the benefits of this modification.

> **Lyft's Response**: Plaintiffs failed to meet their burden of proving that their proposed modification would be reasonable. That ends the inquiry as to this modification.

211.    Plaintiffs' fifth proposed modification that Lyft should implement prioritization logic for Access mode is reasonable.  Lyft previously enabled prioritization logic for IC WAV drivers in NYC to improve service for Access mode.  The burden to implement prioritization logic in other cities and for Partner WAV drivers is diminished by Lyft already doing so before.  Plaintiffs have met their burden to establish that this modification is reasonable and is not outweighed by any cost to Lyft.

> **Lyft's Response**: Plaintiffs, who never downloaded the Lyft app and have not attempted to use Lyft's WAV service, lack standing to pursue this modification and failed to prove that they requested this modification before filing this lawsuit. *See* LRPF Nos. 83, 85-87, 113, 122. Plaintiffs also have not met their burden to establish that this modification is reasonable under the three-part, fact-specific inquiry required under *Staron,* 51 F.3d at 356.
>
> Plaintiffs presented no evidence that implementing prioritization logic would be effective in creating WAV supply on the Lyft platform. How Lyft manages Access mode, including by using prioritization logic, should be left to Lyft to decide. *See Mickalis Pawn Shop,* 645 F.3d at 144-45.

212.    Lyft has not met its burden to demonstrate that Plaintiffs' proposed modification would subject Lyft to an undue burden or that it would fundamentally alter Lyft's business.  Lyft has previously implemented prioritization logic in Access mode and in other ride modes.  Lyft has not established that any cost of implementing prioritization logic outweighs the substantial benefit to Access mode.

**Lyft's Response**: Plaintiffs failed to meet their burden of proving that their proposed modification would be reasonable. That ends the inquiry as to this modification.

213.    Plaintiffs' sixth proposed modification to increase marketing for Access mode and WAV service, including targeted advertising, to attract potential WAV drivers, as well as to increase awareness of WAVs on Lyft's platform among potential riders is reasonable.  Plaintiffs establish that Lyft does not implement similar marketing and advertising strategies for Access mode as it does for Standard mode or its general brand.  Plaintiffs establish that Lyft does not use many of the typical methods of advertising and communications to drivers and users for Access mode that Lyft relies on for Standard mode.  Plaintiffs establish that Lyft effectively advertises and markets for Standard mode to increase the supply of drivers and increase the demand of rides.  Plaintiffs establish that the benefit of an increased supply of WAVs and increased number of users for Access mode outweighs the cost of marketing and advertising for Access mode.

**Lyft's Response**: Plaintiffs lack standing to pursue this modification and failed to prove that they requested this modification before filing this lawsuit. *See* LRPF Nos. 83, 85-87, 113, 122. Plaintiffs also have not met their burden to establish that this modification is reasonable under the three-part, fact-specific inquiry required under *Staron*, 51 F.3d at 356.

First, the modification lacks specificity. Plaintiffs fail to describe what they mean by "similar marketing and advertising strategies," or what they mean by "typical methods of advertising and communications to drivers and users." Absent specificity, any injunction entered based on this modification will not meet Federal Rule of Civil Procedure 65(d)'s requirements for specificity. *See S.C. Johnson & Son*, 241 F.3d at 240-41 (Rule 65(d) requires every injunction to "be specific enough to apprise those within its scope of the conduct that is being proscribed.") (internal quotation marks omitted).

110

Second, Plaintiffs offered no evidence that marketing and advertising would be effective in creating equal access to WAVs on Lyft's ridesharing platform. The sole basis for this claim is the testimony of Plaintiffs' expert, who admits that he is not a marketing expert. LRPF No. 160. Plaintiffs have the burden of production and persuasion on the issue of effectiveness, and speculation will not suffice. *See, e.g., Cayetano*, 2022 U.S. Dist. LEXIS 119102, at *12 n.3 (speculation that employer could have provided an accommodation of "mechanical assistance" was insufficient without proof that such a device existed).

Third, Plaintiffs presented no estimate of the cost that would be involved. Because they failed to present a plausible proposal including cost, Plaintiffs failed to meet their burden of proof. *See Antolini*, 2021 U.S. Dist. LEXIS 135989, at *10-12 (granting summary judgment based on plaintiffs' failure to provide a "plausible" proposal, including its cost); *Range*, 2020 U.S. Dist. LEXIS 99045, at *17, 20 (incomplete architectural designs unaccompanied by a cost estimate is insufficient to meet plaintiff's prima facie burden at summary judgment).

214.    Lyft has not met its burden to demonstrate that Plaintiffs' proposed modification would subject Lyft to an undue burden or that it would fundamentally alter Lyft's business.  Lyft spends heavily on advertising and marketing and routinely advertises for its Standard mode and general brand.  Lyft has not established that its advertising or marketing is ineffective nor that Access mode is uniquely unresponsive to advertising or marketing.  Lyft has not established that the cost of advertising and marketing for Access mode outweighs the substantial benefit to Access mode.

**Lyft's Response**: Plaintiffs failed to meet their burden of proving that their proposed modification would be reasonable. That ends the inquiry as to this modification.

215.    Plaintiffs' seventh proposed modification that Lyft offer potential WAV drivers baseline bonuses and incentives for guaranteed periods of time is reasonable.  Plaintiffs establish that Lyft typically offers drivers bonuses and incentives when Lyft determines that the supply of vehicles is insufficient to meet demand.  Plaintiffs establish that Lyft has offered bonuses and incentives to Access mode drivers in many of the Access Regions to increase the available supply of WAVs.  Plaintiffs establish that offering baseline bonuses and incentives for guaranteed periods of time will alleviate Lyft's concern that there is an insufficient supply of WAV drivers available to provide Access mode.  Plaintiffs demonstrate that the cost of offering bonuses and incentives is outweighed by the benefit of increasing the supply of WAVs, allowing Lyft to increase the number of Access mode rides, and reduce the cost of Access mode over time.  Plaintiffs have met their burden to establish that this modification is reasonable and is not outweighed by any cost to Lyft.

**Lyft's Response**: Plaintiffs lack standing to pursue this modification and failed to prove that they requested this modification before filing this lawsuit. *See* LRPF Nos. 83, 85-87, 113, 122. Plaintiffs also have not met their burden to establish that this modification is reasonable under the three-part, fact-specific inquiry required under *Staron*, 51 F.3d at 356.

First, the modification lacks specificity. Plaintiffs fail to describe what they mean by "baseline bonuses and incentives for guaranteed periods of time," including the amounts or the "periods of time" for which these "baseline bonuses and incentives" should be "guaranteed." Among the questions that Plaintiffs' expert failed to answer was the amount of the bonus that would be required to incentivize a driver to purchase a WAV to be driven on the Lyft platform. Absent specificity, any injunction entered based on this modification will not meet Federal Rule of Civil Procedure 65(d)'s requirements for specificity. *See S.C. Johnson & Son*, 241 F.3d at 240-41 (Rule 65(d) requires every injunction to "be specific

enough to apprise those within its scope of the conduct that is being proscribed.") (internal quotation marks omitted).

Second, Plaintiffs offered no evidence that baseline bonuses and incentives would be effective in creating any WAV service on Lyft's ridesharing platform, never mind one that is reliable. While Lyft may offer incentives to stimulate supply, Lyft's platform depends on a sufficient existing supply of vehicles and drivers in a particular region – it does not offer incentives to stimulate the purchase of vehicles. *See* LRPF No. 168. Plaintiffs have the burden of production and persuasion on the issue of effectiveness, and they failed to meet that burden.

Third, Plaintiffs presented no estimate of the cost that would be involved. Because they failed to present a plausible proposal including cost, Plaintiffs failed to meet their burden of proof. *See Antolini*, 2021 U.S. Dist. LEXIS 135989, at *10-12 (granting summary judgment based on plaintiffs' failure to provide a "plausible" proposal, including its cost); *Range*, 2020 U.S. Dist. LEXIS 99045, at *17, 20 (incomplete architectural designs unaccompanied by a cost estimate is insufficient to meet plaintiff's prima facie burden at summary judgment).

Plaintiffs have thus failed to prove that this modification is reasonable.

216.    Lyft has not met its burden to demonstrate that Plaintiffs' proposed modification would subject Lyft to an undue burden or that it would fundamentally alter Lyft's business.  Lyft routinely employs different incentives and bonuses for Access mode drivers and drivers on other ride modes in order to increase the available supply of vehicles.  Lyft has not demonstrated that the cost of offering incentives and bonuses is outweighed by improved Access mode service and increased supply of WAVs.  Lyft has not established that the cost of incentives and bonuses for Access mode drivers outweighs the substantial benefit to Access mode service.

**Lyft's Response**: Plaintiffs failed to meet their burden of proving that their proposed modification would be reasonable. That ends the inquiry as to this modification.

217.     Plaintiffs' eighth proposed modification that Lyft should include WAVs as an option in Lyft's Express Drive and FlexDrive programs is reasonable.  Plaintiffs establish that Lyft has control over the types of vehicles available in Express Drive and FlexDrive.  Plaintiffs establish that Lyft offers Standard mode vehicles through Express Drive and FlexDrive that are responsive to Lyft's drivers' needs.  Plaintiffs establish that Express Drive and FlexDrive offer an important option for drivers to rent vehicles for use on Lyft that can be effective in increasing the supply of WAVs for Access mode.  Plaintiffs establish that the cost of adding WAVs to Express Drive and FlexDrive is outweighed by the benefit of increasing the supply of WAVs for Access mode and enhancing the economics of Access mode.  Plaintiffs have met their burden to establish that this modification is reasonable and is not outweighed by any cost to Lyft.

**Lyft's Response**: Plaintiffs lack standing to pursue this modification and failed to prove that they requested this modification before filing this lawsuit. *See* LRPF Nos. 83, 85-87, 113, 122. Plaintiffs also have not met their burden to establish that this modification is reasonable under the three-part, fact-specific inquiry required under *Staron,* 51 F.3d at 356.

First, the modification lacks specificity. For example, it is not clear whether Plaintiffs believe Lyft must offer WAVs for rental only in those locations where Express Drive and FlexDrive are offered, or in additional locations (such as Westchester County). It is also not clear how much Plaintiffs think Lyft should charge for the rental of the WAVs. Can Lyft pass on the cost differential between a WAV and a standard sedan to drivers? The proposal also does not specify what is to be done if Lyft cannot find a supplier, or if Lyft cannot find willing drivers to rent the vehicles. Who should bear the financial risk? Absent specificity, any injunction entered based on this modification will not meet Federal Rule of Civil

Procedure 65(d)'s requirements for specificity. *See S.C. Johnson & Son,* 241 F.3d at 240-41

(Rule 65(d) requires every injunction to "be specific enough to apprise those within its scope

of the conduct that is being proscribed.") (internal quotation marks omitted).

Second, Plaintiffs offered no evidence that drivers would be willing to rent WAVs

through Express Drive and FlexDrive. While Lyft was able to find willing renters in New

York City, Lyft also determined that the rental model does not result in a reliable supply of

WAVs and has stopped pursuing that model. LRPF No. 174. No evidence was presented to

show that Lyft would, in fact, be able to create a sufficient WAV supply by this method in

any particular location. Plaintiffs have the burden of production and persuasion on the issue

of effectiveness, and they failed to meet that burden.

Third, Plaintiffs presented no estimate of the cost that would be involved. Because

they failed to present a plausible proposal including cost, Plaintiffs failed to meet their

burden of proof. *See Antolini*, 2021 U.S. Dist. LEXIS 135989, at *10-12 (granting summary

judgment based on plaintiffs' failure to provide a "plausible" proposal, including its cost);

*Range,* 2020 U.S. Dist. LEXIS 99045, at *17, 20 (incomplete architectural designs

unaccompanied by a cost estimate is insufficient to meet plaintiff's *prima facie* burden at

summary judgment).

Plaintiffs have thus failed to prove that this modification is reasonable.

218.    Lyft has not met its burden to demonstrate that Plaintiffs' proposed modification

would subject Lyft to an undue burden or that it would fundamentally alter Lyft's business.  Lyft has

not established that any cost of including WAVs as an option in Lyft's Express Drive and FlexDrive

programs outweighs the substantial benefit to Access mode service.

**Lyft's Response**: Plaintiffs failed to meet their burden of proving that their

proposed modification would be reasonable. That ends the inquiry as to this modification.

115

219.    Plaintiffs' ninth proposed modification that Lyft form partnerships with car rental, taxi, and other transportation companies that have WAVs is reasonable.  Plaintiffs have established that Lyft currently engages in partnerships with transportation companies in order to increase the supply of WAVs.  Plaintiffs have established that engaging in partnerships may allow Lyft to feasibly offer Access mode nationwide profitably or at little cost.  Plaintiffs have established that transportation companies who may be available partners are situated across much of the country and that Lyft has knowledge of many of these companies.  Plaintiffs have met their burden to establish that this modification is reasonable and is not outweighed by any cost to Lyft.

**Lyft's Response**: Plaintiffs lack standing to pursue this modification and failed to prove that they requested this modification before filing this lawsuit. *See* LRPF Nos. 83, 85-87, 113, 122. Plaintiffs also have not met their burden to establish that this modification is reasonable under the three-part, fact-specific inquiry required under *Staron,* 51 F.3d at 356.

First, the modification lacks specificity. Plaintiffs fail to identify any actual transportation companies willing to partner with Lyft, the terms of such partnerships, or the cost. Any injunction entered based on this modification will not meet Federal Rule of Civil Procedure 65(d)'s requirements for specificity. *See S.C. Johnson & Son, Inc. v. Clorox Co.,* 241 F.3d 232, 240-41 (2d Cir. 2001) (Rule 65(d) requires every injunction to "be specific enough to apprise those within its scope of the conduct that is being proscribed.") (internal quotation marks omitted).

Second, Plaintiffs offered no evidence that this modification would be effective in creating equal access to WAVs on Lyft's ridesharing platform. Even as to Westchester County, Plaintiffs offered no evidence of effectiveness, or any projection of the number of partner vehicles that would be needed to achieve effectiveness. Plaintiffs have the burden of production and persuasion on the issue of effectiveness, and they did not meet this burden.

Third, Plaintiffs presented no estimate of the cost that would be involved. The only costs presented showed that the cost would be on-going, and they would be astronomical. Other courts who weighed evidence of costs specific to a geographic region concluded that the costs of relying on third-party partners to provide a supply of WAVs were not reasonable. *See ILRC* Trial Decision, 2021 U.S. Dist. LEXIS 166229, at *49 (annual cost of $2.29 million for a WAV program in three California counties is an unreasonable modification); *Crawford v. Uber Techs., Inc.,* No. 17-CV-02664-RS, 2022 U.S. Dist. LEXIS 131670, *32 (N.D. Cal., Jul. 25, 2022) (the proposed modifications are unreasonable because the anticipated annual cost of $800,000 for New Orleans and $550,000 for Jackson "is too high for the limited service that would result"). Plaintiffs made no effort to distinguish those cases by offering alternative calculations. Because they failed to present a plausible proposal including cost, Plaintiffs failed to meet their burden of proof. *See Antolini*, 2021 U.S. Dist. LEXIS 135989, at *10-12 (granting summary judgment based on plaintiffs' failure to provide a "plausible" proposal, including its cost); *Range,* 2020 U.S. Dist. LEXIS 99045, at *17, 20 (incomplete architectural designs unaccompanied by a cost estimate is insufficient to meet plaintiff's *prima facie* burden at summary judgment).

Plaintiffs have thus failed to prove that this modification is reasonable.

220.    Lyft has not met its burden to demonstrate that Plaintiffs' proposed modification would subject Lyft to an undue burden or that it would fundamentally alter Lyft's business. This modification would not alter Lyft's business because it currently engages in this practice in some of the Access Regions. The cost of entering into partnerships does not outweigh the benefit of increasing the supply of WAVs, enabling Lyft to expand Access mode, and increasing the economics of offering Access mode over time. Lyft has not established that any cost of forming partnerships

117

with car rental, taxi, and other transportation companies that have WAVs outweighs the substantial benefit to Access mode service.

       **Lyft's Response**: Plaintiffs failed to meet their burden of proving that their proposed modification would be reasonable. That ends the inquiry as to this modification.

221.    Plaintiffs' tenth proposed modification that Lyft should implement a ten-cent accessibility surcharge on all rides in order to fund Access mode is reasonable. Plaintiffs offer a detailed and reasonable estimate of how the surcharge would enable Lyft to increase the funding and budget for Access mode without a substantial cost to Lyft. Plaintiffs establish that the increase in funding available for Access mode would allow Lyft to increase the supply of WAVs, increase the number of rides, and improve Access mode. Plaintiffs have met their burden to establish that this modification is reasonable and is not outweighed by any cost to Lyft.

       **Lyft's Response**: Plaintiffs lack standing to pursue this modification and failed to prove that they requested this modification before filing this lawsuit. *See* LRPF Nos. 83, 85-87, 113, 122. Plaintiffs also have not met their burden to establish that this modification is reasonable under the three-part, fact-specific inquiry required under *Staron*, 51 F.3d at 356.

       It goes without saying that a blanket proposal to impose a ten-cent surcharge will not, standing alone, be effective in creating a WAV supply. Plaintiffs bear the burden of persuasion on effectiveness, and on this basis their proposed modification fails.

       In addition, this proposed modification is wholly unrelated to any violation of law asserted in this lawsuit. On its face, this request exceeds the power of this Court "to grant relief no broader than necessary to cure the effects of the harm caused by the violation." *Mickalis Pawn Shop*, 645 F.3d at 144, *quoting Forschner Grp.*, 124 F.3d at 406. While reasonable persons may disagree as to what may or may not constitute a "reasonable modification" of a policy, practice, or procedure under ADA Title III, no reasonable person could conclude

that compelling a private entity (and only that private entity) to increase its prices is a modification of "policies, practices, or procedures."

Plaintiffs have thus failed to prove that this modification is reasonable.

222.    Lyft has not met its burden to demonstrate that Plaintiffs' proposed modification would subject Lyft to an undue burden or that it would fundamentally alter Lyft's business. Lyft has implemented surcharges in different areas of the country, including ten-cent surcharges for accessibility purposes. This accessibility surcharge would be more cost-effective for Lyft because it retains the proceeds of the surcharge. Lyft has not established that implementing this surcharge would reduce the total number of rides or revenue in a manner that outweighs the benefits of increased funding for Access mode. Lyft has not established that any cost of implementing a ten-cent accessibility surcharge outweighs the substantial benefit to Access mode service.

**Lyft's Response**: Plaintiffs failed to meet their burden of proving that their proposed modification would be reasonable. That ends the inquiry as to this modification.

## H.    Plaintiffs Meet Their Burden To Articulate A Plausible Proposal For Barrier Removal.

### i.    Legal Standard.

223.    To evaluate whether barrier removal is readily achievable, "once a plaintiff 'articulates a plausible proposal for barrier removal, the costs of which, facially, do not clearly exceed its benefits,' the burden shifts to the defendant to 'prove that the proposals were not readily achievable.'" *Kreisler*, 731 F.3d at 189 (quoting *Roberts*, 542 F.3d at 373, 378).

224.    "Neither the estimates nor the proposal are required to be exact or detailed, for the defendant may counter the plaintiff's showing by meeting its own burden of persuasion and establishing that the costs of a plaintiff's proposal would in fact exceed the benefits. Because the

concept of 'readily achievable' is a broad one, either party may include in its analysis, as costs or benefits, both monetary and non-monetary considerations." *Roberts*, 542 F.3d at 373.

   **ii.**  **Conclusions Of Law Related To Barrier Removal.**

225. First, Lyft currently imposes a barrier in its non-Access Regions by blocking WAV service and not allowing Access mode to be available.  Lyft has already removed this barrier in its Access Regions, which demonstrates that removal is readily achievable elsewhere.

   **Lyft's Response**: The ADA does not require the removal of a transportation barrier if such barrier removal would require the retrofitting vehicles to create WAVs, *see* 42 U.S.C. § 12182(b)(2)(A)(iv), or, in the cases of private entities like Lyft, the purchase or lease of WAVs, *id.,* § 12184(b)(3). The ADA also does not require Lyft to provide different goods or services. *See Dominguez v. Banana Republic, LLC*, No. 19-CV-10171-GHW, 2020 U.S. Dist. LEXIS 72193, *14 (S.D.N.Y., April 23, 2020) *aff'd. on other grounds, Calcano v. Swarovski N. Am. Ltd.,* 36 F.4th 68 (2d Cir. 2022) ("a plain reading of [the ADA] makes clear that Title III prohibits a place of public accommodation from discriminating on the basis of disability when providing access to whatever goods and services [are] *ordinarily provided* at that place of public accommodation") (emphasis added). Because the alleged "barrier" is explicitly permitted under the ADA, Plaintiffs' claim fails as a matter of law.

   Plaintiffs' claim of barrier removal fails for the additional reason that they have failed to articulate a plausible proposal. *See Roberts v. Royal Atl. Corp.,* 542 F.3d 363, 373 (2d Cir. 2008). As the Second Circuit explained in *Roberts* and *Borkowski,* a "plausible" proposal of barrier removal means the proposal would be beneficial, because at least facially, the costs of such proposal would not exceed its benefits. *See Roberts,* 542 F.3d at 373, *quoting Borkowski,* 63 F.3d at 138. Here, there was no evidence that the proposal would yield any benefit. Indeed, there is no evidence that there is an actual "barrier," because there is no evidence that if the

alleged "barrier" were removed, WAV service would suddenly appear. Moreover, as the U.S.
Supreme Court explained in *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), a claim has "facial
plausibility" for purposes of a motion to dismiss when the plaintiff has pled "factual content
that allows the court to draw the reasonable inference that the defendant is liable for the
misconduct alleged." *Id.* This "plausibility" standard is "not akin to a 'probability
requirement,' but it asks for more than a sheer possibility that a defendant has acted
unlawfully.'" *Id.* The Supreme Court's standard for "plausibility" is consistent with the
common definitions of the word "plausible," meaning "reasonable" or "appearing worthy of
belief." *See* https://www.merriam-webster.com/dictionary/plausible.

 Here, borrowing from the Supreme Court's standard for "plausibility" articulated in
*Ashcroft*, Plaintiffs offered no "factual content that allows the court to draw the reasonable
inference" that if the alleged "barrier" were to be removed, access to WAVs will be achieved.
"[T]o meet the burden of demonstrating that removal of a barrier is readily achievable,
plaintiff must 'proffer evidence, including expert testimony, as to the ease and
inexpensiveness of their proposed method of barrier removal.'" *Hurley v. Tozzer, Ltd.,* No. 15
Civ 2785 (GBD)(HBP), 2018 U.S. Dist. LEXIS 18808, *18 (S.D.N.Y., Feb. 2, 2018), *quoting
Panzica v. Ms-Maz, Inc.,* CV 05-2595 (ARL), 2007 U.S. Dist. LEXIS 42171, *15 (E.D.N.Y.,
June 11, 2007). In contrast, Lyft offered the uncontradicted testimony of its expert, Dr. Marc
Rysman, who explained that a supply-and-demand based platform for WAV service was not
feasible. LRPF No. 10.

 Simply put, a proposal that has zero chance of working is not "plausible." The very
notion of "barrier removal" assumes that access will be achieved if the barrier is removed.
Plaintiffs have thus failed their burden to come forward with a plausible proposal. *See, e.g.,
Antolini*, 2021 U.S. Dist. LEXIS 135989, at *7-9 (at summary judgment, rejecting expert's

proposal to install lifts because it was "shockingly short on details"; the proposal did not include any architectural renderings or information regarding the feasibility of designing and orienting the lifts to provide access); *Range,* 2020 U.S. Dist. LEXIS 99045, at *17, 20 (at summary judgment, rejecting claim that proposals were readily achievable as "rank speculation" because plaintiff failed to offer sufficient evidence to evaluate the plausibility and cost of his proposals).

226.    Lyft has failed to demonstrate that, despite its ability to remove this barrier to WAV service in its nine Access Regions, doing so in its current non-Access Regions would not be readily achievable.  Lyft has not established that enabling Access mode in the non-Access Regions would require substantial cost to outweigh the benefits of offering Access mode.  Lyft's defense that enabling Access mode in the non-Access Regions does not guarantee identical wait times, completion rates, or vehicle supply to Standard mode in the non-Access Regions does not rise to the standard of proving the barrier removal is not readily achievable.  Lyft does not guarantee certain service level or vehicle supply requirements for Access mode in the non-Access Regions.

**Lyft's Response**: Because Plaintiffs failed to meet their burden of presenting a plausible proposal for barrier removal, Lyft need not produce any evidence. Nonetheless, Lyft has produced the following evidence demonstrating that Plaintiffs' proposal would not yield any benefit and would impose unreasonable costs on Lyft.

First, Lyft presented evidence that merely "enabling Access mode" in its app – that is, merely showing "Access mode" as an option – in the non-Access Regions would not result in any Access mode service being offered. Dr. Rysman's analysis showed that based on the lack of density of supply-and-demand, a platform model will not work. LRPF No. 10.

Second, while Plaintiffs focused on areas of non-Access Regions where even Standard mode service is scant (and sometimes non-existent), no witness, including

Plaintiffs' expert, testified that an independent WAV supply existed anywhere, including in the largest cities.

Third, Dr. Rysman testified that simply showing "Access mode" as an option in the app without any supply of WAVs will result in costs to Lyft. As Dr. Rysman testified, wheelchair users would be frustrated by the non-existent service, which would lead to a degraded brand image for Lyft, as well as increased customer complaints and customer service needs. Riders who can never find a ride, or worse yet, find themselves stranded away from home in their wheelchair, may create significant problems and costs for Lyft, including adverse publicity, degraded image, and potential lawsuits. LRPF No. 10. There is no doubt that Lyft would face adverse publicity – or worse – if a wheelchair user found themselves stranded because Lyft had no actual WAV supply despite showing "Access mode" in its app.

Plaintiffs produced no evidence of a benefit to be gained from this proposal. Lyft's evidence showed the proposal would have no benefit, but would result in costs to Lyft.

227. Second, Lyft's Access mode toggle requirement in the Access Regions other than NYC serves as a barrier to wheelchair users seeking to request a WAV. Lyft does not require any users other than wheelchair users to proceed through a similar series of navigational steps to see available vehicles. As regulators in NYC explained and Mr. Wu confirmed, the Access mode toggle acts as a barrier to users to request a WAV through Access mode. Instead of maintaining this barrier, Lyft should automatically display Access mode on the App home-screen alongside other vehicle options. Lyft already removed this barrier in NYC after being required to do so in NYC, at which point demand for WAVs dramatically increased. Plaintiffs have met their burden to establish that this barrier removal is readily achievable and is not outweighed by any cost to Lyft.

**Lyft's Response**: Plaintiffs, who never downloaded the Lyft app and have not attempted to use Lyft's WAV service in any Access Region, lack standing to pursue this

claim. *See* LRPF Nos. 83, 85-87; *Access Living of Metro. Chi. V. Uber Techs., Inc.*, 958 F.3d 604,

614 (7th Cir. 2020) (plaintiff, by not downloading the Uber app and evaluating its services in

an area where its WAV mode was offered, was "without any personalized experience on

which to rest her claim for injunctive relief based on Uber's failure to provide her with a

WAV on equivalent terms of service."); *Namisnak v. Uber Techs.*, 971 F.3d 1088, 1093 (9th

Cir. 2020) (the presence of some form of WAV service in a region is a "dispositive

distinction" in evaluating standing).

Plaintiffs also failed to offer any evidence that removing the toggle would result in a

supply of WAVs anywhere, including in any of the Access Regions.

228.    Lyft's hidden, multi-step process to enable the Access mode toggle and request a ride

on its App constitutes an unlawful barrier to access. *See, e.g.*, *Walters v. Fischer Skis U.S., LLC*, No.

21-1115, 2022 WL 3226352, at *7 (N.D.N.Y. Aug. 10, 2022) (holding that digital barriers constitute

"specific barriers to accessibility" in violation of Title III); *Duncan v. Skin Bar NYC, LLC*, No. 19-

5188, 2021 WL 9204082, at *4 (S.D.N.Y. May 18, 2021) (holding that the defendant's failure to

make "modifications to its website that would allow plaintiff and other visually impaired individuals

to have 'equal access'" constitutes a violation of the ADA) (collecting cases); *Robles v. Domino's Pizza,*

*LLC*, 913 F.3d 898, 905 (9th Cir. 2019), *cert. denied*, 140 S. Ct. 122 (2019) (Title III's non-

discrimination "requirement applies to [a public accommodations]'s website and app").

**Lyft's Response**: The toggle is not hidden but explained on Lyft's website. The

evidence showed that the principal reason Lyft keeps the toggle in place is *not* because it

wants to prevent individuals with disabilities from using Access mode, but rather, to prevent

misuse of Access mode by riders who do not need a WAV from requesting a WAV. LRPF

Nos. 139, 141, 143. The toggle, moreover, is not akin to a website or app that is inaccessible

to individuals who are visually impaired. First of all, the toggle only needs to be turned on

once; after that, Access mode will be shown as an option every other time the rider uses the App. Moreover, no evidence was presented that the toggle is inaccessible. The toggle is merely a design feature of the Lyft app, and it is equally available to be enabled by individuals with disabilities, as well as those without disabilities. Perhaps most importantly, no Plaintiff testified that he or she was precluded from accessing the Lyft ridesharing platform as a result of the toggle.

In this case, Plaintiffs complain about the lack of WAV service on Lyft's platform. There was no evidence that the toggle causes the lack of WAV service on the Lyft platform, or that anyone with a disability (in particular, any of the Plaintiffs) was harmed by the toggle. Indeed, none of the Plaintiffs or putative class members can trace any injury to the toggle because none of them has downloaded the Lyft app. Moreover, Plaintiffs, who now know about the toggle, cannot establish any "material risk of future harm" from the toggle, should they download the Lyft app in the future. *See, e.g., Calcano*, 36 F.4th at 72. Not only have Plaintiffs failed to show that the toggle results in discrimination, but they lack standing to pursue a claim based on the toggle.

229.    That the barrier interferes with access is sufficient. *See, e.g., Farr v. Hobby Lobby Stores, Inc.*, No. 19-5949, 2020 WL 3978078, at *3-4 (C.D. Cal. Apr. 29, 2020) (Title III injury exists where "web-based accessibility barriers" "interfere[d] with [the plaintiff's] access to [the d]efendant's goods and services") (citing *Chapman*, 631 F.3d at 949-50); *Reed v. CVS Pharmacy, Inc.*, No. 17-3877, 2017 WL 4457508, at *1 (C.D. Cal. Oct. 3, 2017) ("that plaintiff is unable to fully access the website and app's offerings . . . due to a number of access barriers" is a violation of the ADA).

**Lyft's Response**: *See* LRPF No. 228.

230.    Lyft has failed to demonstrate that, despite its ability to make other modes available automatically on its home-screen and remove this barrier to WAV service in NYC, doing so in other

Access Regions would not be readily achievable.  Scattered circumstantial evidence that able-bodied users may improperly request a Access mode vehicle is not sufficient to demonstrate that barrier removal is not readily achievable, particularly where Lyft could implement verification procedures to prevent or punish misuse, or where Lyft could profitably allow able-bodied people to use WAVs, just as virtually every other modern company allows able-bodied people to use services intended for people with disabilities (e.g. restaurants allow able-bodied people to walk up ramps; when people with disabilities are not using handicapped seating, theaters allow able-bodied people to use the seats etc.).

    **Lyft's Response**: The burden is not Lyft's to disprove Plaintiffs' allegation of barrier removal. Rather, Plaintiffs must first come forward with a plausible barrier removal plan. Here, Plaintiffs produced no evidence to show that removing the toggle would result in the creation of an additional WAV supply. In contrast, as shown in LRPF Nos. 139, 141, and 143 above, Lyft demonstrated that there are real costs to removing the toggle. Plaintiffs presented no analysis or calculation to show that Lyft can "profitably allow able-bodied people to use WAVs" as Plaintiffs claim. *See Roberts*, 542 F.3d at 373 (in an architectural barrier removal case, a plaintiff must articulate a plausible proposal for barrier removal in which the cost does not clearly exceed its benefits).

    Because Plaintiffs have failed to bring forward evidence of a plausible barrier removal plan, and because Plaintiffs lack standing to assert any claims in any of the Access Regions, this claim is denied.

**VIII.    PLAINTIFFS' FOURTH CLAIM FOR RELIEF**:
Lyft's Policies In New York City Have A
Disparate Impact On People With Disabilities And Violate The NYCHRL

**A.    Legal Standard.**

231.    "An unlawful discriminatory practice based upon disparate impact is established

when: (1) [the Plaintiff] demonstrates that a policy or practice of a covered entity . . . results in a

disparate impact to the detriment of any group protected by the provisions of this chapter; and (2)

the covered entity fails to plead and prove as an affirmative defense that . . . such policy or practice

does not contribute to the disparate impact[.]" *Roberman v. Alamo Drafthouse Cinemas Holdings, LLC*,

120 N.Y.S.3d 709, 714 (N.Y. Sup. Ct. Kings Cty. 2020).

> **Lyft's Response**: A claim for disparate impact under N.Y.C. Admin. Code § 8-
>
> 107(17) requires proof of policies or practices "that are facially neutral, but
>
> disproportionately or more harshly impacts one group." *Roberman,* 67 Misc. 3d at 187.

232.    The NYCHRL "goes the additional step of prohibiting policies or practices which,

though neutral on their face and neutral in intent, have an unjustified disparate impact upon one or

more of the covered groups." *Doe v. City of New York*, 976 N.Y.S.2d 360, 363 (N.Y. Sup. Ct. N.Y.

Cty. 2013) (quoting *Levin v. Yeshiva Univ.*, 96 N.Y.2d 484, 489 (2001)).

> **Lyft's Response**: As Plaintiffs admit, a disparate impact claim under the NYCHRL
>
> requires proof of facially neutral policies or practices. *Doe,* 976 N.Y.S.2d at 363.

**B.    Findings Of Fact Related To The Disparate Impact On**
**WAV Users In New York City As A Result Of Lyft's Policies & Practices.**

233.    Lyft did not provide Access mode in NYC until ordered to do so by the TLC.

(Testimony of Alex Elegudin.).

> **Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the
>
> trier of fact, and not based on the application of discernable principles or methods. Fed. R.

Evid. 702.  Lyft offers Access mode in New York City pursuant to regulations set by the

New York City Taxi and Limousine Commission (TLC).

- Testimony of Asaf Bar Selinger.

234.    In NYC, Lyft is required to meet regulatory requirements set by the TLC, which are

more rigorous than the regulatory requirements of other jurisdictions, and require Lyft to either

ensure that 25 percent of all Lyft rides are dispatched by WAVs or meet iterative wait-time

requirements.[110]

235.    In 2021, the wait-time requirement obligated Lyft to ensure that 80 percent of all

Access mode ride requests had wait times within 10 minutes and 90 percent of all Access mode ride

requests had wait times within 15 minutes.[111]

236.    Lyft's Access mode performance in NYC is largely dictated by regulatory

requirements, including suppressing performance in order to ensure less rigorous wait time

requirements in the future.[112]

**Lyft's Response**: The opinions of Plaintiffs' experts are unreliable, unhelpful to the

trier of fact, and not based on the application of discernable principles or methods. Fed. R.

Evid. 702. The materials relied on are inadmissible hearsay. Fed. R. Evid. 801-803.  One

inadmissible email from June 2019 does nothing to establish the performance or objectives

of Lyft's WAV program in New York City. No witnesses offered testimony regarding

"suppressing performance."

---

[110] LYFT00032148; Corrected Expert Report, at 64.
[111] LYFT00032148; Corrected Expert Report, at 64.
[112] LYFT0042706; Corrected Expert Report, at 64.

The evidence establishes that Lyft has invested millions of dollars in its WAV program in New York City (more than any other market), in addition to thousands of hours of employee time, in order to meet regulatory requirements and rider needs

- Testimony of Asaf Bar Selinger.

- Testimony of Isabella Gerundio.

237.    As one of Lyft's senior employees stated, the WAV team was "consciously (though implicitly) trying NOT to hit 100% [service level requirements]. They know they will be charged by regulator to show improvement over time, so they are trying to leave opportunity for that improvement."[113]

**Lyft's Response**: The materials relied on are inadmissible hearsay. Fed. R. Evid. 801-803. This proposed fact has no relevance to the legal issues discussed below. Fed. R. Evid. 401-403. *See* LRPF No. 236.

238.    Additionally, unlike Standard mode, Lyft avoids marketing and publicizing its WAV services to suppress WAV demand. Despite being reprimanded by the TLC in both its 2019 and 2020 reports for failing to publicize its WAV services and engage in outreach, Lyft continues to avoid engaging in any meaningful marketing or outreach, and instead offered coupons specifically for rides that were scheduled in advance (*i.e.*, not its standard on-demand services, but rather a lesser

---

[113] LYFT0042706.

service) and occasionally posts about its WAV services on its blog.[114]  Lyft's employees could not

describe the readership statistics associated with Lyft's blog posts.[115]

      **Lyft's Response**: This proposed fact has no relevance to the legal issues discussed

below. Fed. R. Evid. 401-403. No witnesses offered testimony regarding "suppress[ing]

WAV demand."

      Moreover, because Plaintiffs' experts are not marketing experts, they could not

explain whether there was any relationship between marketing and WAV demand in New

York City, including whether marketing would increase WAV demand on the Lyft platform

and by how much, whether the increase in WAV demand would lead to a corresponding

WAV supply, whether the increase in WAV supply-and-demand will reduce wait times on

the Lyft platform, what such marketing would look like, and how much such marketing

would cost.

### C. Conclusions Of Law Related To The Disparate Impact On WAV Users In New York City As A Result Of Lyft's Policies & Practices.

239.    In *Brooklyn Center for Independence of the Disabled v. Metropolitan Transportation Authority*,

the Second Circuit clarified that the NYCHRL does not require that a public accommodation

---

[114] Gerundio Dep. Tr. 106:16-23 (the coupons Lyft offered in New York City were specifically for rides that are scheduled in advance); Gerundio Dep. Tr. 108:18-24 ("The last time I talked to the local teams almost no coupon codes were used and the last time I checked the data, we only had about one new user in the last month or so in San Francisco.  So the coupons in San Francisco we have to go back to the drawing board and see what else we can do there."); Gerundio Dep. Tr. 110:22-25 (when similar coupons were previously tried in Dallas, Lyft "didn't have a very high success rate."); Gerundio Dep. Tr. 238:19-35 ("Q:  Are you aware of the TLC recommending that Lyft actually markets its WAV platform?  A:  I remember vaguely.  Q:  What has Lyft done to comply with that recommendation?  A:  If we're talking about the exact same recommendation, I believe we released a blog post."); Treger Dep. Tr. 96:9-23 (testifying that Lyft posts about WAV services in New York City because it was required to do so by the TLC, explaining, "I think the TLC actually requires us to do at least once a year or twice a year some type of passenger outreach and we do it.").

[115] Gerundio Dep. Tr. 219:8-13 ("I don't have the engagement numbers on our blog" and could not approximate).

"entirely exclude" people with disabilities or that "they must have had no access at all" to the accommodation for the entity's actions to be unlawful. 11 F.4th 55, 67-68 (2d Cir. 2021) (reversing and vacating the district court's decision granting summary judgment on behalf of the defendants).

**Lyft's Response**: Plaintiffs' reference to the holding of the Second Circuit in *Brooklyn Center for Independence of the Disabled v. Metropolitan Transportation Authority*, 11 F.4th 55, 67-68 (2d Cir. 2021), is insufficient to prove that Lyft discriminated in violation of the NYCHRL.

The relevant facts are that in New York City where Lyft has been subject to stringent performance metrics since 2019, including wait-time requirements established by the New York City Taxi & Limousine Commission ("TLC"), Lyft has met those metrics at an enormous cost. Specifically, the evidence showed that since June 2021, the TLC rules have required Lyft to meet 80% of all WAV requests in under 10 minutes and 90% in under 15 minutes, see The Rules of the City of New York, Title 35, § 59B-17(f)(3)(iii), and that Lyft meets these requirements. This means that nearly everyone who wants a WAV on the Lyft platform in New York City can get one in under 15, if not 10, minutes. Plaintiffs' Proposed Fact No. 235.

Plaintiffs complain that this is not "equal" to Standard mode service in New York City. The relevant inquiry under the NYCHRL, then, is whether this alleged lack of equality is the result of "disparate treatment" or "disparate impact." *See, e.g., Roberman*, 67 Misc. 3d at 187. Plaintiffs have not proven discrimination under either theory.

First, Plaintiff's theory appears to be that Lyft "intentionally suppresses" WAV service in New York City. The evidence presented, however, showed that any "intentional suppression" that occurred (if it occurred) was because Lyft employees were concerned their over-performance would make it difficult to meet TLC requirements in the future, because

the TLC required Lyft to show improvement over time. *See* LRPF No. 236-37. In other words, the alleged "intentional suppression" was not caused by any discriminatory animus but business and economic realities and the desire to remain compliant with regulations. Plaintiffs thus failed to prove their claim of disparate treatment.

Second, Plaintiffs' theory of "intentional suppression" contradicts their claim of disparate impact, which requires proof of a policy or practice "that is facially neutral." Plaintiffs do not claim that there is a uniform policy of "intentional suppression" across both WAV and Standard modes. The disparate impact claim also fails. *Roberman*, 67 Misc. 3d at 187.

Third, Plaintiffs failed to show any causal connection between the alleged inequality in WAV service in New York City and the alleged disparate treatment or the alleged disparate impact resulting from a "facially neutral" policy.

240.     Lyft violates the NYCHRL by intentionally suppressing WAV service in NYC and by providing WAV service that is inferior to its Standard mode service.

**Lyft's Response**: *See* LRPF No. 239.

## IX.    Plaintiffs Are Entitled To Attorneys' Fees And Costs.

241.     The ADA, the NYSHRL, and the NYCHRL allow prevailing plaintiffs in an action to recover reasonable attorneys' fees and costs.  *See* 42 U.S.C. § 12205; N.Y. Exec. Law § 297(10); N.Y.C. Admin. Code § 8-502(f); *see also Dominguez v. New York Equestrian Ctr., Ltd.*, No. 18-9799, 2020 WL 5796275, at *4 (S.D.N.Y. Sept. 28, 2020).

**Lyft's Response**: Plaintiffs have not carried their burden to prove that Lyft discriminated against them in violation of the ADA. They have therefore established no entitlement to relief on their claim. Lyft is the prevailing party, and judgment will be entered for Lyft.

242.     Plaintiffs are entitled to an award of reasonable attorneys' fees and reimbursement of

all costs and expenses reasonably incurred in litigation this action.

>    **Lyft's Response**: *see* LRPF No. 241.

243.     Plaintiffs and Class Representatives may also apply for a service award.

>    **Lyft's Response**: *see* LRPF No. 241.

## X.     The Court Issues The Following Order

244.     This Court hereby orders:

a.   Lyft is hereby enjoined from operating its WAV programs and Access mode in a manner that is discriminatory pursuant to section 12182 of the ADA, including subsections 12182(b)(1)(A)(ii), (b)(2)(A)(i)- (v).

b.   Lyft is hereby enjoined from operating its WAV programs and Access mode in a manner that is discriminatory pursuant to section 12184 of the ADA, including subsections 12184(b)(1), (b)(2)(A)-(C).

c.   Lyft is hereby enjoined from operating its WAV programs and Access mode in a manner that is discriminatory pursuant to section 296(2)(a) of the NYSHRL, including subsections 296(2)(c)(i)-(iii).

d.   Lyft is hereby enjoined from operating its WAV programs and Access mode in a manner that is discriminatory pursuant to sections 8-107(4)(a)-(b) and 8-107(17) of the NYCHRL.

e.   The Court hereby orders Lyft to implement the following remedial measures:

i.   Remove the current categorical preclusion ("blocker") of WAVs on its platform in approximately 96% of its non-Access Regions. Lyft's policies and practices prevent WAV drivers from identifying their vehicles as WAVs and riders from having the option to select WAVs, even when they are available.

ii.  Remove the requirement in the Access Regions that riders with disabilities find and enable Lyft's hidden Access Mode toggle to view WAV options on the app's home screen and instead automatically display WAV options on Lyft's home screen alongside other vehicle options. Relatedly, the Court may enjoin Lyft from implementing a similar requirement in any and all non-Access Regions once Lyft allows WAV service in those areas.

iii. Ask all drivers on its platform and those onboarding whether they have access to WAVs and whether they are interested in driving WAVs on Lyft's platform. Plaintiffs envision that this question would be added to Lyft's mandatory driver onboarding

process, during which Lyft requires drivers to disclose all relevant information about their vehicles, such as makes and models, and insurance information.

iv. Utilize cross-dispatching and prioritization logic to optimize WAV drivers' efficiencies and profitability.

v. Explore and form partnerships with car rental, taxi, non-emergency medical transportation, and other transportation companies that have WAVs, as Lyft's competitors have done to improve WAV service.

vi. Include WAVs as options in Lyft's Express Drive and FlexDrive programs for its existing and potential drivers.

vii. Engage in both WAV driver- and rider-facing marketing to attract potential WAV drivers and to increase awareness of WAVs on Lyft's platform among potential WAV riders, and thereby increase the supply of WAVs and demand for WAV services on Lyft's app. Lyft may do so by employing targeted advertising and advertising campaigns similar to those Lyft uses for its standard and other non-WAV services.

viii. Increase the supply of WAVs on its platform by offering potential drivers baseline bonuses and incentives for guaranteed periods of time, such as six months, one year, or eighteen months.

ix. Implement a ten-cent accessibility surcharge on all rides nationwide to fund robust WAV services.

x. End its policy and practice of suppressing WAV supply and demand in New York City to avoid surpassing local minimum service level requirements, including but not limited to the New York City Taxi and Limousine Commission's minimum service level benchmarks.

245. The Court also find that Plaintiffs are entitled to an award of reasonable attorneys' fees and reimbursement of all costs and expenses reasonably incurred in connection with this action and that Plaintiffs and Class Representatives may apply receive a service award.

**Lyft's Response**: As the losing party, Plaintiffs are not entitled to recover any fees or costs.

246. This Court directs the Parties to mediate the issue of attorneys' fees and costs within 45 days of the issuance of this Order. Plaintiffs shall submit their application for reasonably attorneys' fees, costs, and service awards within 30 days of the mediation.

**Lyft's Response**: The Court hereby directs the Clerk to enter judgment for Lyft.

**LYFT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
IN SUPPORT OF ITS AFFIRMATIVE DEFENSE OF FUNDAMENTAL
ALTERATION TO PLAINTIFFS' FIRST AND SECOND CLAIMS FOR RELIEF
UNDER THE ADA AND THE NYSHRL**

## I.    FACTS RELEVANT TO AFFIRMATIVE DEFENSE

1.    Lyft launched its on-demand ridesharing platform just ten years ago, in 2012. (Stip. Fact No. 9.)

      **Plaintiffs' Response:**  Plaintiffs have no response or objection to this proposed fact.

2.    Lyft's ridesharing platform is a two-sided technology platform that is premised on fundamental principles of supply and demand. The supply and demand required of the platform is inherently local, and the platform works best in areas of high population density. (Testimony of Asaf Selinger; Testimony of Dr. Marc Rysman.)

      **Plaintiffs' Response:**  The opinions of Lyft's expert are unreliable, do not assist the trier of fact, and are contrary to Lyft's business practices.  Fed. R. Evid. 702.  Lyft provides Standard mode in every region in which it operates, regardless of whether there is sufficient supply and demand.  Lyft does not make decisions about where to offer, alter, or restrict Standard mode based upon whether it functions effectively or whether there is an available supply of drivers.  Stip. Fact ¶¶ 19, 24.

      Mr. Selinger is not qualified to testify about where and how Lyft can function best and is not proffered as an expert on the market dynamics of how Lyft operates.  Fed. R. Evid. 702.

3.    Much of the operation of Lyft's platform is handled by technology, without human intervention. Computer algorithms not only match independent drivers and riders who use the Lyft app, but also help balance supply and demand through pricing and incentives, all in "real-time."

Lyft's algorithms use large amounts of data generated by rides in the Lyft app ("App") to adapt and learn. (Testimony of Asaf Selinger.)

> **Plaintiffs' Response:**  Plaintiffs have no response or objection to this proposed fact.

4.      In most Regions, Lyft offers just two ride modes, "Standard" and "XL," on its App. "Standard" mode is Lyft's basic ridesharing option. In that mode, a rider will be paired with a standard car for up to 4 passengers. If a rider needs extra seats, there is Lyft XL. XL costs more than Standard but will match a rider with a driver who has an SUV for up to 6 passengers. (Testimony of Asaf Selinger; Testimony of Richard Zhou.)

> **Plaintiffs' Response:**  Plaintiffs have no response or objection to this proposed fact.

5.      Standard and XL are available in 346 Regions nationwide. This means that a rider who opens her App will see the current wait times for Standard and XL modes in her local area. (Testimony of Asaf Selinger; Testimony of Richard Zhou.)

> **Plaintiffs' Response:**  Plaintiffs have no response or objection to this proposed fact.

6.      In selected Regions, Lyft offers more specialized modes, such as "High Value Modes" or HVMs. In those Regions where HVMs are offered, a rider may see modes such as "Lux," "Lux Black," or "Lux Black XL" listed in the App. (Testimony of Asaf Selinger; Testimony of Richard Zhou.)

> **Plaintiffs' Response:**  This alleged fact has no relevance to the legal issues discussed.  Fed. R. Evid. 401-403.  Lyft's specialized modes for its premium offerings are not relevant to whether it is reasonable for Lyft to implement Plaintiffs' modifications.

7.      Lyft is strategic about where to offer specialized modes to ensure that they function well, to promote a good user experience, and to maximize revenue. Out of 346 U.S. regions where Lyft offers Standard & XL, Lyft currently offers Lux Black and Lux Black XL in just 68 Regions. (Testimony of Richard Zhou.)

**Plaintiffs' Response:**  This alleged fact has no relevance to the legal issues discussed.  Fed. R. Evid. 401-403.  Lyft's specialized modes for its premium offerings are not relevant to whether it is reasonable for Lyft to implement Plaintiffs' modifications.

The "main focus" for expanding Lyft's specialized modes is growth and increasing the number of passengers.  Zhou Dep. 26:11-27:1 ("Q:  And did you find that it would be profitable to expand [specialized mode] access so that there could be airport pickup?  A: Well, I wouldn't use the word 'profitable.'  I would say it would have led to increased adoption of that mode, and I think what we were trying to do was just increase the usage and the word-of-mouth spread of the mode as it being a valuable service.").

8.      Since 2016, Lyft has offered Access mode in nine cities (the "Access Regions"). (Testimony of Isabella Gerundio.)

**Plaintiffs' Response:**  Lyft has not offered Access mode in each of nine cities during the entire duration of 2016 to the present.  Lyft began offering Access mode in Portland in 2016 in response to regulatory requirements.  Since then, Lyft has expanded Access mode to the remaining eight cities at varied intervals in response to regulatory requirements, financial incentives, or a partnership with a transit agency.  Stip. Fact ¶ 35.

9.      Wheelchair accessible vehicles ("WAVs") are rare and expensive. To create a WAV, the floor of an existing minivan (such as a Chrysler Pacifica or a Toyota Siena) is typically lowered, and equipment such as a wheelchair ramp and securement device are added. The cost of creating a WAV can add $15,000-$25,000 (or more) on top of the cost of purchasing the minivan. WAVs are

rare in part because of the high cost: most people are not likely to incur the cost of creating a WAV unless they (or their family member) need one. (Testimony of Isabella Gerundio; Testimony of Daniel Bussani.)

**Plaintiffs' Response:** Ms. Gerundio is not qualified to testify about the WAV manufacturing process, the average cost of modifying a vehicle to become a WAV, or the average individual's decision regarding the purchase of a WAV. Ms. Gerundio is not proffered as an expert on the WAV manufacturing process, the cost of a WAV, or the purchasing practices of individuals. Furthermore, Ms. Gerundio has not performed any competent research into the availability of WAVs and the evidence does not establish that she has any specialized knowledge of the WAV manufacturing process. Fed. R. Evid. 702; Gerundio Dep. Tr. 116:11-117:9, 199:21-200:1, 200:8-24. WAVs can be purchased for as little as $16,000 (Affidavit of Peter Ruprecht, ¶ 12; Affidavit of Daniel Bussani, ¶ 10), and many customers can receive subsidies and grants through health insurance and state-run programs (Affidavit of Daniel Bussani, ¶ 11).

In any event, there are ample WAVs for Lyft to have a sufficient supply, with more than 15,000 WAVs being manufactured on an annual basis in the United States, and, in particular, a relatively large quantity of WAVs in Westchester County. (Testimony of Alex Elegudin; Affidavit of Peter Ruprecht, ¶¶ 9-19; Affidavit of Daniel Bussani, ¶¶ 7-9).

10.     The biggest challenge in offering Access Mode is lack of supply. Unlike other modes, for which Lyft relies on an organic supply of drivers in a particular area, Lyft has found that an organic WAV supply needed to support a functioning platform does not exist. This is no doubt due to the fact that WAVs are expensive to create and only a very small percentage of the general population needs a WAV. (Testimony of Isabella Gerundio.)

**Plaintiffs' Response:** Ms. Gerundio has not performed any competent research into the availability of WAVs to determine whether Lyft is adequately engaging the available supply of WAVs. Gerundio Dep. Tr. 116:11-117:9, 199:21-200:1, 200:8-24. Ms. Gerundio is not qualified to testify about the average cost of a WAV, or the average individual's decision regarding the purchase of a WAV. Ms. Gerundio is not proffered as an expert on the cost of a WAV, or the purchasing practices of individuals. Fed. R. Evid. 702.

Moreover, Lyft has refused to ask its drivers whether they have WAVs during Lyft's onboarding process or use outreach and marketing to identify available WAV drivers, like it does in other ride modes. (Testimony of Isabella Gerundio; Testimony of Alex Elegudin).

There is a sufficient supply of WAVs for Lyft to provide Access mode in the non-Access Regions. (Testimony of Alex Elegudin).

11. To overcome the lack of supply, Lyft has incurred significant cost to artificially create a supply of WAVs on its platform through incentives and partnerships with third parties who have access to these vehicles. In 2019, the total amount Lyft spent to create WAV supply in its nine Access Regions was $11.6 million; in 2020, the total amount was $13.1 million; and in 2021, the total amount was $13.8 million. (Testimony of Isabella Gerundio.)

**Plaintiffs' Response:** Lyft implements a number of driver outreach, advertising, and marketing initiatives to identify and engage a supply of drivers in each of its ride modes, (Zhou Dep. Tr. 67:25-68:8; 68:25-69:8), but does not implement similar outreach and advertising initiatives to engage Access mode drivers.

Ms. Gerundio is not qualified to testify about whether there is a sufficient supply of WAVs on Lyft. Ms. Gerundio is not proffered as an expert on the available supply of WAVs or the purchasing practices of individuals. Furthermore, Ms. Gerundio has not performed any competent research into the availability of WAVs to determine whether Lyft

is adequately engaging the available supply of WAVs.  Fed. R. Evid. 702; Gerundio Dep. Tr. 116:11-117:9, 199:21-200:1, 200:8-24.

Lyft operates its WAV program grossly inefficiently, with its only goal being to appease regulators while providing as little service as possible.  As a result, Lyft's WAV program is far less economically efficient than a properly functioning WAV program. (Testimony of Alex Elegudin).

12.    Lyft's experience is that the demand for Access mode is very small. This may be due to many factors, but the biggest one is that the percentage of individuals who need WAVs for transportation is a small percentage of the population at large: estimates range from .5% to 1% of the general population. Another factor may be the availability of subsidized transportation options, including paratransit, as well as non-emergency medical transportation subsidized or paid for by insurance. (Testimony of Isabella Gerundio; Testimony of Dr. Marc Rysman.)

**Plaintiffs' Response:** The opinions of Lyft's expert are unreliable, do not assist the trier of fact, and are contrary to Lyft's business practices.  Dr. Rysman has no experience designing or implementing accessible transportation and has no specialized knowledge regarding the demand for Access mode or the demand for WAVs.  Dr. Rysman is not qualified to testify regarding the availability of accessible transportation options.  Fed. R. Evid. 702.

Lyft did not perform any study of the demand for Access mode in the non-Access Regions and does not know what the demand for Access mode is in the non-Access Regions.  *See* Plaintiffs' Proposed Findings of Fact ¶¶ 44-46.

13.    Actual demand for Access mode on Lyft's ridesharing platform as a percentage of total rides is incredibly low. Even in Lyft's biggest WAV market – New York City – WAV rides comprise approximately 1 in 1,000 of all rides on the platform. In Los Angeles, the demand is even

140

less: WAV rides comprise approximately 1 in 5,000 of all rides on the platform. (Testimony of

Isabella Gerundio; Testimony of Richard Zhou.)

> **Plaintiffs' Response:** In every Access region but New York City, Lyft deliberately
> suppresses WAV demand through the use of a hidden toggle to activate Access Mode.
> When Lyft removed the toggle in New York City, WAV rides on Access Mode increased by
> approximately 500 percent.  See Plaintiffs' Proposed Findings of Fact ¶¶ 137-43.  The same
> would likely happen if Lyft removed the toggle in other regions.  (Testimony of Alex
> Elegudin).

14.     After analyzing data provided by Lyft, Dr. Marc Rysman, Professor of Economics at

Boston University, opined that based on the population density of potential WAV riders, it is not

feasible for Lyft to rely on its platform model to provide Access mode service. (Testimony of Dr.

Marc Rysman.)

> **Plaintiffs' Response:** The opinions of Lyft's expert are unreliable, do not assist the
> trier of fact, and are contrary to Lyft's business practices.  Fed. R. Evid. 702.

> Dr. Rysman admitted that Lyft offers Standard mode in many areas that he would
> find infeasible.  Rysman Dep. Tr. 119: 1-120:17.  Furthermore, Lyft does not make decisions
> about where to offer, alter, or restrict Standard mode based upon the population density,
> supply of drivers, demand of riders, or any other considerations or metrics.  Stip. Facts ¶¶
> 19, 25.

15.     Lyft has not yet identified a way to operate Access mode profitably. Lyft is not aware

of any other company that has figured out how to operate an on-demand ridesharing service for

WAVs efficiently and effectively. (Testimony of Isabella Gerundio; Testimony of Richard Zhou;

Testimony of Asaf Selinger.)

**Plaintiffs' Response**:  In ten years, Lyft has never operated its standard service profitably, often recording annual losses of billions of dollars while it fought to expand market share.  Lyft has never operated Access mode with the goal of doing so profitably.  As Joyce Chan, Lyft's 30(b)(6) witness stated, "the primary goal of WAV is actually not today to be profitable.  It's to meet our regulatory requirements. . . . I think Lyft's primary goal is to . . . make every effort we can to meet our regulatory requirements."  Chan Dep. Tr. 110:18-111:14.

Many companies and car-service operators offer efficient and profitable WAV service throughout the United States and have experienced consistent and long-term success.  Plaintiffs' experts also propose modifications that would allow Lyft to operate Access mode profitably.  (Testimony of Alex Elegudin).

<u>**LYFT'S PROPOSED CONCLUSIONS OF LAW**</u>

I. <u>**PLAINTIFFS' PROPOSAL TO HAVE LYFT OFFER ACCESS MODE EVERYWHERE WOULD FUNDAMENTALLY ALTER THE NATURE OF LYFT'S BUSINESS**</u>

16. Plaintiffs' proposed modification to have Lyft offer Access mode everywhere, including in every non-Access Region including Westchester County, would fundamentally alter the nature of Lyft's business.

**Plaintiffs' Response**: "WAV services would not fundamentally alter Lyft's business because WAVs are not a 'new transportation service.'  Lyft already provides WAV services where compelled to do so by local governments and voluntarily in Los Angeles and San Francisco (on a pilot basis)."  Findings of Fact and Conclusions of Law, *Independent Living Resource Center San Francisco v. Lyft, Inc.*, No. 19-01438, 2021 WL 3910719, at *8 (N.D. Cal. Sept. 1, 2021) (hereinafter "*ILRC*").  Lyft "cannot argue that something it is already doing

would fundamentally alter its business[.]"  Order Re Motions for Summary Judgment, *ILRC*, 2020 WL 6462390, at *6 (N.D. Cal. Nov. 3, 2020).

      In the only instances where a rideshare company argued that a proposed modification of offering WAV programs in an area where it does not currently offer WAV programs constituted a fundamental alteration, both courts swiftly rejected Lyft's position. As stated in *Crawford v. Uber Technologies, Inc.*, __ F. Supp. 3d __, 2022 WL 2913836, at *5 (N.D. Cal. July 25, 2022) (hereinafter "*Crawford*"), "[p]roviding no authority in support of this argument, Uber apparently contends that any requested modification of its services is a fundamental alteration, which would allow it to escape ADA liability for any requested modification.  This argument is therefore rejected."

      As every other court to have considered Lyft's argument in this context has found, Plaintiffs' proposed modification to have Lyft offer Access mode in the non-Access Regions where Lyft does not currently offer Access mode is not a fundamental alteration of Lyft's business because Lyft currently offers Access mode in the Access Regions.

17.    As a matter of law, a request to have Lyft offer a specialized service is a fundamental alteration. Plaintiffs' proposal to have Lyft offer Access mode everywhere would mandate that it offer a service that it otherwise does not offer in the non-Access Regions based on the exercise of its business judgment. Consistent with the intent of Congress in passing the ADA, a private entity like Lyft should be left alone to decide whether it will launch a service, and if so, where, based on its weighing of factors such as regulatory requirements, cost, supply-and-demand, opportunity for profit, and operational complexity, among other things.

      **Plaintiffs' Response**:  Plaintiffs' proposal requests this Court to require Lyft to exercise the same business judgment for Access mode that Lyft currently and historically exercises for Standard mode, namely to offer Standard mode virtually everywhere in the

United States regardless of the cost, supply-and-demand, opportunity for profit, or operational complexity.  Plaintiffs' modification does not require Lyft to offer a specialized service.  Rather, Plaintiffs request that Lyft be required to operate Access mode in the non-Access Regions in a similar, if not identical, manner to Standard mode.  Lyft does not establish that Plaintiffs' modification is a fundamental alteration.

18.     Plaintiffs' proposed modification to have Lyft offer Access mode everywhere fundamentally alters Lyft's "goods, services, facilities, privileges, advantages, or accommodations," by requiring Lyft to offer a specialized service. 42 U.S.C. § 12184(b)(2)(A), which incorporates § 12182(b)(2)(A)(ii), defines "discrimination" to include:

> a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations.

**Plaintiffs' Response**:  Plaintiffs incorporate by reference their response to ¶¶ 17-18.

19.     The plain language of this section distinguishes between two "categories" of things: (a) "policies, practices, or procedures," and (b) "goods, services, facilities, privileges, advantages, or accommodations." The fact that Congress used different language to describe these two categories "within the same sentence suggests Congress meant these categories to have different meanings." *Mary Jo C. v. N.Y. State & Local Ret. Sys.,* 707 F.3d 144, 156 (2d Cir 2013).

**Plaintiffs' Response**:  The Second Circuit in *Mary Jo. C.* does not compare the category of "policies, practices, or procedures" to "goods, services, facilities, privileges,

advantage, or accommodations" as Lyft claims. 707 F.3d at 155-56. In *Mary Jo C.*, the Second Circuit stated that the text of 42 U.S.C. § 12131(2), which is not at issue in this action, "distinguishes between two categories of requirements: (1) rules, policies, or practices, which are subject to the requirement of reasonable modification, and (2) *essential eligibility requirements*, which are not." *Mary Jo C.*, 707 F.3d at 155-56 (emphasis added).

Lyft's argument that the essential eligibility requirements and reasonable modification standards are different categories has no bearing on whether Plaintiffs' modification is a fundamental alteration because Lyft does not argue (and cannot credibly do so) that requiring a non-WAV is an essential eligibility requirement. Indeed, the Second Circuit noted that the standard for a reasonable modification involves "flexibility[.]" *Id.*

Rather, the Second Circuit in *Mary Jo C.* found that the plaintiff's requested modification to submit a late application for state pension benefits because of the plaintiff's mental illness was not a fundamental alteration, despite the fact that implementation of the modification violated state law. *Id.* at 155-60.

Plaintiffs' modification does not request Lyft to alter the goods, services, facilities, privileges, advantages, or accommodations that it provides. Rather, Plaintiffs' modification requests that Lyft alter its policies and practices of refusing to allow Access mode to be available in the non-Access Regions.

20.    Here, in the Non-Access Regions including Westchester County, Plaintiffs want Lyft to offer WAV service. While Plaintiffs claim that they are merely seeking modifications in Lyft's "policies, practices, or procedures," what they actually seek is a modification of the "goods, services, facilities, privileges, advantages, or accommodations" that Lyft offers. *See, e.g., Olmstead v. L.C. ex rel. Zimring,* 527 U.S. 581, 603 (1999) (under ADA Title II, observing that States may resist modifications that entail a "fundamental alteration" of their services and programs); *Powell v. Nat'l*

*Bd. Of Medical Examiners,* 364 F.3d 79, 88 (2d Cir. 2004) ("a defendant may not make an accommodation at all if the requested accommodation 'would fundamentally alter the nature of the service, program, or activity.'").

   **Plaintiffs' Response**:  Plaintiffs incorporate by reference their response to ¶¶ 16-17. Lyft's reliance on *Olmstead* and *Powell* fail to demonstrate that Plaintiffs' modification constitutes a fundamental alteration.  In *Olmstead*, the Supreme Court found that a modification for an individual with disabilities to be placed in a community-based treatment setting rather than in an institution was reasonable because the state offered community-based treatment settings for other individuals.  527 U.S. at 604-07.

   *Powell* also does not support Lyft's argument.  Lyft misquotes the Second Circuit in *Powell*, using the incorrect language of "may not" instead of the correct language that "a defendant *need not* make an accommodation . . ."  364 F.3d at 88 (emphasis added).  In *Powell*, the Second Circuit found that a medical school was not required to alter its core competency requirements to be a practicing physician because such a modification would fundamentally alter the medical school's "responsib[ility] for producing competent physicians[.]"  *Id.* at 88. This consideration was only after the school made the following modifications for the student: "The school supplied tutors for her, excused an honor code violation ostensibly because of its sympathy for her high level of stress, allowed her to remain matriculated without paying tuition, and gave her multiple opportunities to remediate classes that she had previously failed."  *Id.* at 87-88.  Lyft's invocation of *Powell* and *Olmstead* fails to demonstrate that Plaintiffs' modification is a fundamental alteration or that Plaintiffs do not seek to alter Lyft's policies, practices, or procedures.

21.  Put differently, the only possible "modification" that will satisfy Plaintiffs is not a modification in "policy, practice, or procedure," but a modification in the "goods or services" that it

offers. But the ADA does not require Lyft to provide an accessible "good or service." *See, e.g., Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1115 (9th Cir. 2000) (Title III "does not require provision of different goods or services, just nondiscriminatory enjoyment of those that are provided."); *Thorne v. Boston Mkt. Corp.,* 469 F. Supp. 3d 130, 143 (S.D.N.Y. 2020) ("Because the Court concludes that gift cards are goods sold by a public accommodation under the ADA, Defendant cannot be required to sell accessible gift cards."). Plaintiffs' requested modification is thus a request for a fundamental alteration. *See Pottgen v. Missouri State High School Activities Ass'n,* 40 F.3d 926, 930 (8th Cir. 1994) (under ADA Title II, where an individual cannot meet an eligibility requirement determined to be essential, "the only possible accommodation is to waive the essential requirement itself … [But] [w]aiving an essential eligibility standard would constitute a fundamental alteration in the nature of the program"); *see also PGA Tour, Inc. v. Martin,* 532 U.S. 661, 689 (2001) (the waiver of an essential rule of golf would be a fundamental alteration).

**Plaintiffs' Response**:  Plaintiffs' modification does not fundamentally alter the nature of the goods or services that Lyft offers.  Lyft connects people looking for a driver with people who have access to a vehicle and are willing to provide rides.  However, in the non-Access Regions, Lyft prevents connections on its App by individuals who require WAVs with people who have a WAV and are willing to provide rides.  Plaintiffs' request is not a fundamental alteration to the nature of the goods or services that Lyft offers.  Rather, Plaintiffs request that individuals who require WAVs be given the opportunity to use Lyft's App in the same manner that individuals who do not require WAVs use Standard mode.

The court in *Weyer* further supports the reasonableness of Plaintiffs' modification. There, the court stated that "[t]he ordinary meaning of this [goods or services] language is that whatever goods or services the place provides, it cannot discriminate on the basis of disability in providing enjoyment of those goods and services."  *Weyer*, 198 F.3d at 1115.

147

Here, Plaintiffs do not request a different good or service from Lyft.  Plaintiffs request a similar opportunity to access a ride in the same manner as users do for Standard mode.

*Thorne* also does not support Lyft's defense.  In *Thorne*, the court found that the "most natural reading of [a good] was 'wares; merchandise.'"  469 F. Supp. 3d at 142 (quoting *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 31 (2003)).  Because a gift card is an item of merchandise that can be tangibly offered for sale and purchase, the court found that accessible gift cards were a distinct good and were not a reasonable modification.  *Id.*  Once again, Lyft's App connects riders and drivers, rather than disbursing merchandise like gift cards.  Access mode would connect riders and drivers in the non-Access Regions in a similar manner to Standard mode.  Plaintiffs' modifications would not require a new good or service.

Lyft's reliance on *Pottgen* does not establish that offering Access mode in the non-Access Regions is a fundamental alteration.  In *Pottgen*, the court found that waiving the maximum age requirement for a high school baseball program for the plaintiff would constitute a fundamental alteration because the age requirement was an essential eligibility requirement.  40 F.3d at 930.  Lyft has not and does not claim that requiring a non-WAV is an essential eligibility requirement for using the App, likely because doing so would violate the ADA.  As a result, the holding in *Pottgen* has no bearing on whether Plaintiffs' modification is a fundamental alteration.

Finally, the Supreme Court in *Martin* repudiates Lyft's argument.  In *Martin*, the Supreme Court held that the PGA Tour discriminated against a disabled golfer who sought to play in the PGA Tour's qualifying tournament, "Q-School," when the PGA Tour refused to allow the golfer to use a golf cart, rather than walk the course.  532 U.S. at 665.  In doing so, the court found that the "use of carts is not itself inconsistent with the fundamental

148

character of the game of golf" and "the walking rule is not an indispensable feature of tournament gold either." *Id.* at 683-86. Here, Lyft has not made use of a WAV a condition of accessing its App or an essential eligibility requirement. Plaintiffs' modification seeks the same service for Access mode that Lyft currently offers for Standard mode.

22.     Regulations issued by the Department of Transportation ("DOT"), the entity charged by Congress with promulgating regulations to carry out the transportation provisions of Title III (*see* 42 U.S.C. § 12186(a)), confirm this. DOT guidance, published at 49 C.F.R. Part 37, Appendix E, states that a passenger's request for service outside the service area or outside regular operating hours may be denied as fundamental alterations. *Id.*, Example 11. Similarly, a passenger's request for special equipment (*e.g.*, the installation of specific handrails), for a dedicated vehicle so that a rider can avoid certain odors, or for an exclusive paratransit trip, also constitute fundamental alterations. *Id.*, Examples 9 and 10. Requiring Lyft to offer WAV service in the non-Access Regions thus constitutes a fundamental alteration.

        **Plaintiffs' Response**: Examples 9, 10, and 11 fail to demonstrate that requiring Lyft to offer WAV service in the non-Access Regions constitutes a fundamental alteration. First, each of these examples is inapposite involving alterations to either (a) a specific vehicle's design and make or (b) service offerings of paratransit and fixed route services.

        In Example 9, a request for a dedicated vehicle for a passenger or special equipment "can be denied so long as the requested equipment is not required by the Americans with Disabilities Act or the Department's rules." 49 C.F.R. Part 37, Appendix E. Similarly, in Example 10, seeking to make Paratransit, which is "by nature a shared-ride service," an exclusive service would be a fundamental alteration. However, neither instance is present for Lyft. Rather, a WAV on Access mode in the non-Access Regions, in the same manner as a vehicle on Standard mode, would be available for use by all users of the Lyft App and the

user has no ability to request a dedicated personal vehicle or special equipment beyond requirements set by Lyft for each ride mode.

Example 11 also demonstrates that these particular examples are not applicable to the current analysis. Example 11 prevents a request for a service outside of the entity's service area or operating hours. 49 C.F.R. Part 37, Appendix E. Lyft's service area for Standard mode is all the regions in which Lyft currently offers service. Lyft has not presented evidence that it does not offer service 24 hours a day on Standard mode in these regions. Plaintiffs' modification requests that Lyft offer Access mode in the non-Access Regions and for the same time period in which Lyft currently offers Standard mode. Thus, this modification is not a fundamental alteration of Lyft's service.

23. That Lyft may offer Access mode in the Access Regions does not change the fact that requiring Lyft to offer it in the non-Access regions is a fundamental alteration. *See id.,* Example 11 (requests for service outside the service area is a fundamental alteration). By asking the Court to order Lyft to offer Access mode everywhere, Plaintiffs ask the Court to ignore an "essential attribute" of Lyft's ridesharing platform, which is that the platform's operation depends on *local* supply and demand. *See PGA Tour,* 532 U.S. at 682-83. WAVs, unlike standard sedans or SUVs, are not ubiquitous. The evidence is that Lyft makes decisions regarding specialized modes such as Lux or Lux Black based on local conditions, and asking the Court to ignore the availability of local supply-and-demand on a ridesharing platform is a fundamental alteration.

**Plaintiffs' Response**: That Lyft offers Access mode in the Access Regions does, in fact, demonstrate that offering Access mode in the non-Access Regions is not a fundamental alteration. Indeed, every court to consider this defense has agreed. *ILRC*, 2021 WL 3910719, at *8 ("WAV services would not fundamentally alter Lyft's business because WAVs are not a 'new transportation service.' Lyft already provides WAV services where

compelled to do so by local governments and voluntarily in Los Angeles and San Francisco (on a pilot basis)." *ILRC*, 2020 WL 6462390, at *6 (Lyft "cannot argue that something it is already doing would fundamentally alter its business"); *see also Crawford*, 2022 WL 2913836, at *5.

Lyft now contends that this Court should impose standards that Lyft claims to apply only for its luxury ride mode, but does not apply for Standard mode, to Access mode. This Court should refuse to compare Access mode, which is the standard mode for people who require wheelchairs, to Lyft's luxury ride modes, which are an optional luxury service. Lyft makes Standard mode available in all regions where it operates, regardless of population density, wait time, number of available vehicles, or any other considerations or metrics. Stipulated Fact ¶ 19. Lyft does not determine whether to offer Standard mode based on Lyft's supposed "essential attribute" of local supply and demand. Lyft's argument is akin to a movie theater arguing that wheelchair seating is an optional luxury akin to Imax or 3D Movie theaters, as opposed to the reality that wheelchair seating is necessary for allowing people with disabilities to attend movie theaters. Just as accessible seats are necessary for wheelchair users to go to the movies, WAV vehicles are a necessity for people with disabilities to use Lyft. WAVs are not an optional luxury item. This Court should not impose Lyft's artificial standard on Access mode.

24.     While Plaintiffs point out that two Northern District of California judges previously rejected the fundamental alteration defense in similar cases, *see Indep. Living Res. Ctr. San Francisco v. Lyft, Inc.*, No. C 19-01438 WHA, 2021 U.S. Dist. LEXIS 166229 (N.D. Cal., Sept. 1, 2021) and *Crawford v. Uber Techs., Inc.,* No. 17-CV-02664-RS, 2022 U.S. Dist. LEXIS 131670 (N.D. Cal., Jul. 25, 2022), those cases are not controlling. Moreover, the plaintiffs in *ILRC* and *Crawford* did not ask

those courts to hold that Lyft and Uber must be compelled to open up WAV service on its app everywhere, regardless of whether any supply exists, as Plaintiffs do in this case.

**Plaintiffs' Response**:  Plaintiffs in *ILRC* and *Crawford* requested the courts order Lyft and Uber to offer WAV service in areas where Lyft and Uber did not provide WAV service.  *See ILRC*, 2021 WL 3910719, at *1 ("Plaintiffs seek an expansion of wheelchair access mode to Alameda and Contra Costa Counties"); *Crawford*, 2022 WL 2913836, at *5 ("Plaintiffs' requested modification is for Uber to 'turn on' the UberWAV option in New Orleans and Jackson.").  Plaintiffs incorporate by reference their response to ¶ 24.

25.     It would be bad policy and contrary to the interests of individuals with disabilities to interpret the ADA to hold that because Lyft offers Access mode in New York City, it would not be a fundamental alteration to require Lyft to offer it in Westchester County. Such a holding would discourage private entities from taking actions, either in response to local laws or otherwise, that are intended to create greater options for individuals with disabilities. *See, e.g., Holbrook v. City of Alpharetta,* 112 F.3d 1522, 1528 (11th Cir. 1997) ("We do not seek to discourage other employers from undertaking" accommodations that may exceed the requirements of the law); *Ragusa v. UPS,* No. 05 Civ. 6187 (WHP), 2009 U.S. Dist. LEXIS 25152, *12 (S.D.N.Y., Mar. 3, 2009) ("To hold that an employer cannot eliminate or alter essential functions in order to accommodate an employee's disability would discourage employers who wished to do more than the ADA requires.").

**Plaintiffs' Response**:  Lyft's argument that requiring Lyft to comply with the ADA may deter it and other private entities from taking initial steps to provide service for people with disabilities seeks to present a revisionist history of why Lyft currently offers Access mode.  The only reason that Lyft began offering Access mode in 2016 was due to regulatory requirements.  Currently, Lyft only offers Access mode in markets where it is required or

financially incentivized to do so.  It is false for Lyft to imply that it has voluntarily offered

Access mode to "create greater options for individuals with disabilities."

Notably, Uber made a similar argument that it should not be "punished" for offering

WAV service because it previously did so in other cities.  *Uber*, 2022 WL 2913836, at *10.

Judge Seeborg stated:

> Complying with the ADA and providing access to people with disabilities is
> not a punishment, it is the law.  Further, the argument that Uber has done its
> 'fair share' in providing WAV access in other cities mischaracterizes the
> purpose and design of the ADA. . . .  WAV service must be provided whenever
> a plaintiff meets the burden of proving an ADA violation, regardless of
> whether the defendant already provides more or less WAV service than others.

*Id.*, at *10.

Lyft's claimed support from *Holbrook* and *Ragusa* is lacking.  In *Holbrook*, the court

found that the plaintiff was unable to perform essential functions of the job as a police

detective due to his disability, namely being able to fully collect evidence and perform a

complete investigation at a crime scene.  112 F.3d at 1527.  In *Ragusa*, the court found that

the plaintiff was unable to perform essential functions of heavy lifting as a UPS employee

due to his disability.  *Ragusa*, 2009 WL 637100, at *2-3.  Both *Holbrook* and *Ragusa* emphasize

the importance of essential functions of an employee's job.  However, as discussed above,

Lyft has never argued that the local supply and demand is an "essential function" that Lyft

uses to determine whether it offers, alters, or restricts Standard mode.

26.     Requiring Lyft to offer Access mode everywhere thus contravenes Congressional

intent of allowing private companies like Lyft to exercise its own business judgment as to what

services it will offer in what locations. As a private entity, Lyft is subject to both ordinary and

extraordinary market events, including things such as pandemics, interest rates, gas prices, and labor

shortages. Like any other business, as it makes business decisions, Lyft must weigh factors such as

local regulatory requirements, supply-and-demand, costs, opportunities for profit, operational complexity, and budget constraints.

> **Plaintiffs' Response**:  If Lyft were able to cite any case law or authority demonstrating that Congress favors business judgment over compliance with the ADA, Lyft would do so.  Lyft offers no support that "business judgment" supports its fundamental alteration defense.

> Furthermore, Lyft has presented no evidence that it exercises business judgment, including consideration of such extraordinary market events as "gas prices," when it decides to offer, alter, or restrict Standard mode.  Stip. Fact ¶ 19.  Lyft does not apply its purported "business judgment" considerations to Standard mode and they are not relevant to determining whether Lyft can reasonably offer Access mode in the non-Access Regions.

27.    By asking that the Court order Lyft to launch Access mode everywhere, Plaintiffs effectively ask this Court to bar Lyft from exercising its business judgment. That is a fundamental alteration of the very essence of Lyft as a private entity. As the Seventh Circuit Court of Appeals observed in *Doe v. Mut. of Omaha Ins. Co.*, 179 F.3d 557, 560 (7th Cir. 1999):

> The common sense of the [ADA] is that the content of the goods or services offered by a place of public accommodation is not regulated. A camera store may not refuse to sell cameras to a disabled person, but it is not required to stock cameras specially designed for such persons. Had Congress purposed to impose so enormous a burden on the retail sector of the economy and so vast a supervisory responsibility on the federal courts, we think it would have made its intention clearer and would at least have imposed some standards.

**Plaintiffs' Response**:  Plaintiffs incorporate by reference to their Response to ¶ 27. In addition, *Doe* fails to support Lyft's fundamental alteration defense.  Rather, as Judge Posner stated:

> The core meaning of [42 U.S.C. § 12182(a)], plainly enough, is that the owner or operator of a store, hotel, restaurant, dentist's office, travel agency, theater, Web site, or other facility (whether in physical space or in electronic space) that is open to the public cannot exclude disabled persons from entering the facility and, once in, from using the facility in the same way that the nondisabled do.  The owner or operator of, say, a camera store can neither bar the door to the disabled nor let them in but then refuse to sell its cameras to them on the same terms as to other customers.

*Doe*, 179 F.3d at 559.

Currently, Lyft allows users who requires WAVs to access its App in the non-Access Regions, but then refuses to provide any WAV service on the same terms as other users. *Doe* plainly demonstrates that Lyft's refusal to offer Access mode in the non-Access Regions is discriminatory within the meaning of the ADA.

28.     As a private entity, Lyft should not only have the right to decide when it will offer a new service, but also when it will stop offering that service. This Court declines Plaintiffs' invitation to assume the role of the regulator of Lyft's business under the guise of applying the ADA.

**Plaintiffs' Response**:  Plaintiffs request Lyft apply similar judgment in its offering of Standard mode to its offering of Access mode, namely that Lyft provides Standard mode in every Region where Lyft operates.  Stip. Fact ¶ 20.  Lyft misinterprets what constitutes a "fundamental alteration" under the ADA, and fails to meet its burden to sustain its affirmative defense.

155

Respectfully submitted,


_s/ Jeremiah Frei-Pearson_
Andrew Finkelstein
Jeremiah Frei-Pearson
Joshua Cottle
**Finkelstein, Blankinship,**
**Frei-Pearson & Garber, LLP**
1 North Broadway, Suite 900
White Plains, New York 10601
Tel: (914) 298-3281
Fax: (914) 824-1561
afinkelstein@lawampm.com
jfrei-pearson@fbfglaw.com
jcottle@fbfglaw.com

Michael F. Ram (_Pro Hac Vice_)
Marie Appel (_pro hac vice_ application
forthcoming)
**Morgan and Morgan**
**Complex Litigation Group**
711 Van Ness Avenue, Suite 500
San Francisco, CA 94102
Tel:  415-358-6913
mram@forthepeople.com
mappel@forthepeople.com

Michael T. Hellmann (_pro hac vice_)
**ADA Compliance Service**
27 Fieldstone Drive, Suite 209
Hartsdale, NY 10530
adatty@aol.com
Tel. 646-662-1335
Fax. (914) 682-8518

_Attorneys for Plaintiffs_
_and the Putative Classes_

By:  _/s/ Jiyun Cameron Lee_
Jiyun Cameron Lee (Admitted _Pro Hac Vice_)
Marie Jonas (Admitted _Pro Hac Vice_)
FOLGER LEVIN LLP
199 Fremont Street, 20th Floor
San Francisco, CA  94105
Telephone: 415.625.1050
Facsimile:  415.625.1091
jlee@folgerlevin.com
mjonas@folgerlevin.com

Attorneys for Defendant Lyft, Inc.