UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

HARRIET LOWELL, *individually and on*
*behalf of all others similarly situated*, and
WESTCHESTER DISABLED ON
THE MOVE, INC.,

|  |  |
|---|---|
| Plaintiffs, | **REPORT AND** |
|  | **RECOMMENDATION** |
| -against- |  |
|  | 17 Civ. 6251 (PMH) (AEK) |
| LYFT, INC., |  |
| Defendant. |  |

----------------------------------------------------------------x

**TO:  THE HONORABLE PHILIP M. HALPERN, U.S.D.J.**

Currently before the Court is Plaintiffs' motion for class certification.  ECF No. 282.[1]

Plaintiffs, who assert claims of disability discrimination based on the alleged failure of

Defendant Lyft, Inc. ("Lyft" or "Defendant") to provide wheelchair accessible vehicle ("WAV")

services, seek certification of five different injunctive relief classes pursuant to Rule 23(b)(2) of

the Federal Rules of Civil Procedure.  Lyft opposes the motion on the grounds that: (i) all of the

proposed class representatives lack standing; (ii) the classes as defined include individuals who

lack standing; and (iii) Plaintiffs cannot satisfy the requirements of Rule 23(a) or Rule 23(b)(2)

of the Federal Rules of Civil Procedure.  ECF No. 295 ("Def.'s Opp.").[2]

---

[1] ECF No. 338 is the public version of Plaintiffs' moving brief, and ECF No. 284 is an unredacted version of the brief filed under seal.  Certain information in the public version is redacted because the information comes from documents and other discovery material that have been designated by the parties as confidential pursuant to the amended stipulated protective order filed in this action.  *See* ECF No. 67.

[2] ECF No. 295 is the public version of Lyft's opposition brief, and ECF No. 296 is an unredacted version of the opposition brief filed under seal.

For the reasons that follow, I respectfully recommend that Plaintiffs' motion for class certification be GRANTED IN PART AND DENIED IN PART.

## BACKGROUND[3]

Plaintiff Harriet Lowell resides in White Plains, New York and typically uses a motorized scooter to travel.  ECF No. 20 ("Am. Compl.") ¶¶ 12-13.  Plaintiff Westchester Disabled on the Move, Inc. ("WDOMI") is a non-profit organization based in Yonkers, New York that operates as an independent living center for, and is run largely by, individuals with disabilities.  *Id.* ¶¶ 18-19.  Among other things, WDOMI's mission "is to empower people with disabilities to control their own lives, advocate for civil rights and a society free of barriers to people with disabilities," and "ensure[ ] that people with mobility disabilities are able to effectively use the transportation services they require."  *Id.* ¶¶ 20-21.

Lyft is a ridesharing transportation company that offers services through a ride-hailing application ("app").  *Id.* ¶¶ 24, 32.  By using the app, a customer "can remotely hail a nearby Lyft vehicle, select a destination to which he or she wishes to be driven, and have all payments for this conveyance electronically processed."  *Id.* ¶ 33.  Plaintiffs allege that Lyft discriminates against individuals with mobility disabilities.  They allege that "[i]n Westchester County and many other cities and regions where Lyft provides its transportation service, Lyft does not make [WAVs] available at all."  *Id.* ¶ 46.  As an initial step, individuals with mobility disabilities "must toggle on the 'Access Mode' function in the Lyft smartphone [app] to attempt to be

---

[3] "When considering a motion for class certification, courts accept the allegations in the complaint as true.  And a court may consider material outside the pleadings in determining the appropriateness of class certification."  *Westchester Indep. Living Ctr., Inc. v. SUNY Purchase*, 331 F.R.D. 279, 284 n.1 (S.D.N.Y. 2019) ("*WILC*") (quotation marks omitted).  Accordingly, the facts set forth here are taken from Plaintiffs' Amended Complaint (ECF No. 20) and evidence submitted by both parties in connection with this motion.

matched with a [WAV]." *Id.* ¶ 47. Even then, however, "[i]n the numerous cities and regions where Lyft does not make any [WAVs] available, including Westchester County"—areas that Plaintiffs refer to in their motion papers as the "Non-Access Regions"—"customers with Access Mode enabled who attempt to use the Lyft smartphone [app] to hail a ride are simply sent a text message with information on other transportation services in the area." *Id.* ¶ 48. Indeed, in over 96 percent of Lyft's service regions, Lyft precludes WAV service "on both the driver- and rider-side." ECF No. 285 ("Frei-Pearson Decl.") Ex. 11 ("Pls.' Expert Report") at 29. "Drivers in non-Access Regions are prevented from identifying as WAVs on Lyft's app, and riders do not have the option of selecting a WAV ride in non-Access Regions." *Id.* at 29. This "categorical preclusion" means that "even when a Lyft WAV driver is available, . . . the vehicle would not be able to identify as such on the platform, nor would a user requiring a WAV be able to request a ride from that WAV driver." *Id.* at 29-30. In areas where some number of WAVs are available for hailing through the Lyft app—areas that Plaintiffs refer to in their motion papers as the "Access Regions"—users with mobility disabilities who toggle to the Access Mode function in the app can be matched with a WAV, but they allegedly experience "significantly longer wait times" than users seeking rides in other types of vehicles. Am. Compl. ¶¶ 47, 49.

Lowell was "aware of the ongoing discrimination by Lyft against people with disabilities because she has heard from friends and acquaintances who have mobility disabilities and have witnessed Lyft's failure to provide equivalent, non-discriminatory service." *Id.* ¶ 100; *see* ECF No. 290 ("Lowell Decl.") ¶ 8 ("I have been informed of Lyft's widespread discriminatory practices directly from other mobility-impaired individuals who have personally experienced discrimination."). A friend from White Plains told Lowell that he tried to order an accessible Lyft, was informed that none were available, and received a text message from Lyft telling him

to obtain alternate methods of transit.  Am. Compl. ¶ 100.  Plaintiffs allege that "[b]ecause Lyft does not provide equal service to people with disabilities who need [WAVs], such as Plaintiff Lowell, she has been deterred from trying to access Lyft's transportation services, knowing that the attempt would be futile."  Id. ¶ 101.

Constituents of WDOMI were also aware of Lyft's failure to provide WAV service through their disability rights advocacy and contact with other disability rights advocates in the community, as well as via news articles and WDOMI "Action Alerts."  ECF No. 287 ("Non-Public Frei-Pearson Decl.") Ex. 2 at 2-10 (Declarations of Ed Sperling, Jesse Sahagun, and John Strothenke).[4]  They all assert that they have been deterred from trying to use Lyft's transportation services because they knew that it would be futile for them to attempt to do so.  Id.

Plaintiffs allege that Lyft's conduct violates Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12184; the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 290-97; and the New York City Human Rights Law ("NYCHRL"), N.Y. City Admin. Code §§ 8-101-31.

At the time the Amended Complaint was filed, Lowell and WDOMI sought to serve as class representatives of three putative classes—a nationwide class of "all residents in and visitors to all cities and regions serviced by [Lyft] with mobility disabilities who have been and are currently being discriminated against by [Lyft's] actions and omissions as alleged," Am. Compl. ¶ 113; a "New York State Subclass" of "all residents in and visitors to all cities and regions located in New York State serviced by [Lyft] with mobility disabilities who have been and are currently being discriminated against by [Lyft's] actions and omissions as alleged," id. ¶ 114;

---

[4] Although the Sperling, Sahagun, and Strothenke declarations were filed entirely under seal as part of Plaintiffs' motion for class certification, these particular declarations already have been filed on the public docket.  See ECF Nos. 35, 37, and 38.

and a "New York City Subclass" of "all residents in and visitors to New York City with mobility disabilities who have been and are currently being discriminated against by [Lyft's] actions and omissions as alleged," *id.* ¶ 115.  Over the course of the litigation, Plaintiffs have come to identify what they describe as "three regional variations" in how Lyft offers, or does not offer, WAV service: (1) the Non-Access Regions, which encompass over 96 percent of the regions where Lyft operates and where Lyft allegedly does not offer WAV service at all; (2) the Access Regions other than New York City, which include eight metropolitan regions where local regulations require or incentivize Lyft to provide some WAV service, but where service to those with mobility disabilities allegedly is still deficient; and (3) New York City ("NYC"), where local regulations have required Lyft to make many of the alterations that Plaintiffs seek in the other Access Regions, but where those with mobility disabilities allegedly still cannot get equal service from Lyft.  *See* ECF No. 338 ("Pl.'s Revised Mem.") at 2-3.

Consequently, as part of the motion for class certification, and without further amending the complaint, Plaintiffs seek to add two new class representatives, Pauline Scudieri and Kenneth Burr, and refine the definitions of the putative classes.  At this point, Plaintiffs seek certification of five separate classes, with Lowell and WDOMI as the class representatives for three of the classes, and Scudieri and Burr each as the representative for one of the other two classes.  Plaintiffs' proposed classes are defined as follows:

- All residents of or visitors to any and all regions serviced by Lyft, aside from Lyft's Access Regions or NYC, who require WAVs for vehicular transportation, and who are denied equal access to Lyft's transportation services (the "Non-Access Region Class," which is represented by Lowell and WDOMI and asserts claims under the ADA);

- All residents of or visitors to the Access Regions—Boston, Chicago, Dallas, Los Angeles, Philadelphia, Phoenix, Portland, or San Francisco—who require WAVs for vehicular transportation, and who

5

are denied equal access to Lyft's transportation services (the "Access Regions Other Than NYC Class," which is represented by Scudieri and asserts claims under the ADA);

- All residents of or visitors to NYC who require WAVs for vehicular transportation, and who are denied equal access to Lyft's transportation services (the "NYC Class," which is represented by Burr and asserts claims under the ADA, the NYSHRL, and the NYCHRL);

- All residents of or visitors to any and all regions serviced by Lyft in New York State aside from NYC who require WAVs for vehicular transportation, and who are denied equal access to Lyft's transportation services (the "New York State Other Than NYC Class," which is represented by Lowell and WDOMI and asserts claims under the ADA and NYSHRL); and

- All residents of or visitors to Westchester County who require WAVs for vehicular transportation, and who are denied equal access to Lyft's transportation services (the "Westchester Class," which is represented by Lowell and WDOMI and asserts claims under the ADA and NYSHRL).

Pl.'s Revised Mem. at 3.[5]  The proposed class definitions exclude (i) people who have downloaded the Lyft app; (ii) people who have brought separate litigation against Lyft for its failure to serve people with disabilities; and (iii) residents of Ohio State University and the University of Texas at Austin who do not leave those campuses.  *Id.* at 3-4.[6]

---

[5] In a passing mention on the final page of their 55-page moving brief, Plaintiffs assert that should the Court determine that Scudieri and/or Burr are not proper class representatives, then Lowell and WDOMI have standing to represent all five classes.  Pls.' Revised Mem. at 55; *see also* ECF No. 298 ("Pls.' Reply") at 8-11.  At best, this argument is presented as an afterthought—indeed, it is noteworthy that Plaintiffs' own summary of the putative classes and class representatives, which is reproduced here, does not refer to Lowell or WDOMI as class representatives for the Access Regions Other Than NYC Class or the NYC Class.  Issues of standing for all of the proposed class representatives are addressed in Section I, *infra*.

[6] People who have downloaded the Lyft app are excluded from all class definitions because when users download the app, they must accept Lyft's terms of service, which require them to submit any disputes with Lyft to arbitration and to forego participation in any class action litigation.  *See* ECF No. 295-3 ("Yasay Decl.") ¶¶ 3-5, 9 & Ex. A.  With respect to the university campuses, Plaintiffs explain that while the head of Lyft's National WAV team

# DISCUSSION

## I.     Standing

As an initial matter, Lyft contends that it is not necessary to reach the question of class certification pursuant to Rule 23 of the Federal Rules of Civil Procedure because named Plaintiffs Lowell and WDOMI, as well as newly-named class representatives Scudieri and Burr, lack standing, and the class definitions include individuals who lack standing.  Def.'s Opp. at 22-38.  Lyft therefore maintains that the matter should be dismissed because the Court lacks subject matter jurisdiction to consider Plaintiffs' claims.  *See SM Kids, LLC v. Google LLC*, 963 F.3d 206, 211 (2d Cir. 2020) ("Article III, Section 2 of the Constitution limits the subject-matter jurisdiction of the federal courts to 'Cases' and 'Controversies.'  The standing doctrine, which emerges from Article III, is designed 'to ensure that federal courts do not exceed their authority as it has been traditionally understood.'") (citation omitted) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)).  This is the second time that the Court has been called upon to address the issue of standing.  Lyft previously moved to dismiss the action on this basis, and that motion was denied in a decision issued by the Honorable Nelson S. Román.  *Lowell v. Lyft, Inc.*, 352 F. Supp. 3d 248 (S.D.N.Y. 2018); ECF No. 49.  Judge Román determined that at the motion to dismiss stage of the litigation, the Amended Complaint contained sufficient allegations to

---

testified that Lyft provides WAV services on these two university campuses, Plaintiffs do not have sufficient information about such services to know whether or how individuals in those areas would fit within the proposed class structures in this action.  As a result, individuals who are residents of these two university campuses and who do not leave those campuses are excluded from the classes.  Pls.' Revised Mem. at 4 n.4.  Plaintiffs do not specify why people who have filed other lawsuits are excluded from all of the classes, but the Court sees no reason to disturb Plaintiffs' additional self-imposed limitation.

establish Lowell's standing, and that the allegations were adequate for WDOMI to satisfy the elements for associational standing to pursue its ADA claim.[7]  *Id.* at 256-59.

"It is . . . important not to collapse the standing inquiry into the class certification inquiry. Courts in this District have long made clear that the Article III standing determination should precede that of class certification." *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 862 F. Supp. 2d 322, 333 (S.D.N.Y. 2012) (quotation marks omitted); *see Hyland v. Navient Corp.*, 48 F.4th 110, 117 (2d Cir. 2022) ("Before considering whether the District Court properly certified the class under Rule 23(b)(2), we address the threshold issue of standing."), *petition for cert. filed sub nom. Yeatman v. Hyland* (U.S. Dec. 20, 2022) (No. 22-566).  Therefore, the Court must first address standing before considering whether the proposed classes satisfy the requirements of Rule 23.

## A.    Legal Standards

"[T]he irreducible constitutional minimum of standing contains three elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  First, the plaintiff "must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Id.* (cleaned up). Second, "there must be a causal connection between the injury and the conduct complained of— the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Id.* (cleaned up).  Third, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable

---

[7] Judge Román determined, however, that WDOMI "cannot satisfy all of the elements for organizational standing and cannot satisfy all of the elements for associational standing specifically for its NYCHRL and NYSHRL claims."  *Lowell*, 352 F. Supp. 3d at 259.

decision." *Id.* at 561 (cleaned up).  In the class action context, "[s]tanding is satisfied so long as at least one named plaintiff can demonstrate the requisite injury." *Hyland*, 48 F.4th at 117.

"Although the Article III standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed, the standing issue may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016) (cleaned up).  "At each such stage, the party invoking federal jurisdiction bears the burden of establishing the elements of Article III standing; but the stage at which, and the manner in which, the issue is raised affect (a) the obligation of the plaintiff to respond, (b) the manner in which the district court considers the challenge, and (c) the standard of review applicable to the district court's decision." *Id.* (cleaned up).  Each element of Article III standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation." *Id.*  "Thus, the showing that must be made in order to withstand a dismissal for lack of standing increases as the suit proceeds." *Id.*

Had this standing challenge been raised in the context of a motion for summary judgment, the standard for the Court to apply would have been clear—at the summary judgment stage, "the plaintiff can no longer rest on . . . mere allegations, but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true." *Id.* (quoting *Lujan*, 504 U.S. at 561) (cleaned up).  The present posture is more ambiguous—discovery is complete, the present motion for class certification has been filed, and trial has not yet commenced, but neither party has filed a motion for summary judgment. Helpfully, both parties have proceeded as though a summary judgment-type standard for

evaluating standing should apply, with Plaintiffs relying on multiple affidavits in support of their standing arguments.  On balance, this approach is appropriate, particularly inasmuch as the issue of standing already was considered at the motion to dismiss stage.  Accordingly, the Court will look beyond the pleadings in its assessment of standing in connection with this class certification motion, and will require that Plaintiffs set forth evidence—and not mere allegations—in support of standing.

### B.      Lowell's Standing

#### 1.      Injury in Fact—Non-Access Regions

"Title III of the ADA prohibits discrimination against the disabled in the full and equal enjoyment of public accommodations, 42 U.S.C. § 12182(a), and public transportation services, § 12184(a)."  *Spector v. Norwegian Cruise Line Ltd.*, 545 U.S. 119, 128 (2005).  Under the terms of the ADA, injunctive relief is available "to any person who is being subjected to discrimination on the basis of disability in violation of [Title III]."  42 U.S.C. §§ 12188(a)(1)-(2).  To demonstrate injury in fact, a plaintiff who seeks injunctive relief must ordinarily "establish a real and immediate threat" of having his or her rights violated in the future.  *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983); *accord Kreisler v. Second Ave. Diner Corp.*, 731 F.3d 184, 187 (2d Cir. 2013) (*per curiam*).  But in the context of the ADA, if a plaintiff knows that accessibility barriers exist, the plaintiff need not establish that he or she would have otherwise actually or imminently visited and/or patronized a place with such barriers, because the ADA does not "require a person with a disability to engage in a futile gesture if such person has actual notice that a person or organization covered by [Title III of the ADA] does not intend to comply with its provisions."  42 U.S.C. § 12188(a)(1); *Lowell*, 352 F. Supp. 3d at 255; *see also Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 363, 365-66 (1977) (establishing the futile gesture

doctrine in the context of Title VII).  Thus, "to have standing to sue under Title III of the ADA, a plaintiff must simply allege that he or she has become aware of discriminatory conditions existing at a public accommodation, and is thereby deterred from visiting or patronizing that accommodation." *Equal Rts. Ctr. v. Uber Techs., Inc.*, 525 F. Supp. 3d 62, 76 (D.D.C. 2021) (cleaned up).

Lowell has satisfied this requirement with respect to her claims regarding the availability of WAV service via the Lyft app in the Non-Access Regions, where the Lyft app completely prohibits users from requesting rides in WAVs.  Judge Román determined that requiring Lowell to download the Lyft app to attempt to procure WAV service would amount to a futile gesture, because Lowell sufficiently alleged that she had actual knowledge that it would not be possible to obtain a ride on a WAV using the Lyft app in areas where Lyft provides users with no ability whatsoever to access WAV service.  *See Lowell*, 352 F. Supp. 3d at 256.  And multiple courts have concluded, in cases involving ADA claims against Uber—a direct competitor of Lyft's in the ride-hailing app business—"that knowledge of the inaccessibility of Uber's service is sufficient to demonstrate injury under the ADA, regardless of whether the plaintiff has actually downloaded the Uber app." *Equal Rts. Ctr.*, 525 F. Supp. 3d at 76 (collecting cases); *see also id.* (reaching the same conclusion); *Namisnak v. Uber Techs., Inc.*, 971 F.3d 1088, 1093 (9th Cir. 2020) (plaintiffs did not have to download and use the Uber app in order to establish standing where Uber did not offer WAV service in the geographic region in question (the city of New Orleans)); *Ramos v. Uber Techs., Inc.*, No. SA-14-CA-502-XR, 2015 WL 758087, at *7 (W.D. Tex. Feb. 20, 2015) ("Just like a plaintiff who uses a wheelchair need not engage in the 'futile gesture' of attempting to enter an inaccessible building, an ADA plaintiff need not request services as long as they have actual notice that they would be denied services or treated in a

discriminatory manner and they are being deterred from attempting to obtain the services by such knowledge.").  This Court agrees.  Lowell need not have downloaded and used the Lyft app in order to demonstrate an actual injury for her claims regarding the Non-Access Regions—Lowell has demonstrated actual knowledge of the unavailability of WAV service through the Lyft app in those areas, and downloading the Lyft app merely to confirm this lack of access would have been a futile gesture.[8]

In connection with the motion for class certification, Lowell submitted a declaration that addresses her actual knowledge regarding the unavailability of WAVs via the Lyft app in the Non-Access Regions.  Specifically, Lowell states that she has "known for a long time that Lyft does not provide services for mobility-impaired individuals who require wheelchairs or motorized scooters," and that she has "been informed of Lyft's widespread discriminatory practices directly from other mobility-impaired individuals who have personally experienced discrimination."  Lowell Decl. ¶ 8.  Lowell asserts that "it is common knowledge among people with disabilities that Lyft does not offer wheelchair-accessible vehicles in the vast majority of the country, . . . ."  *Id.* ¶ 9.  According to Lowell, she has "attended multiple public meetings where people with disabilities and advocates discussed Lyft's failure to offer wheelchair-accessible vehicles"; further, she "assisted the city of White Plains in its efforts to ensure that taxicabs in White Plains are accessible," and "[a]s part of that process, [she] spoke to numerous other

_____

[8] A rule that would require an individual to download the app in order to establish standing for an ADA violation would amount to a Catch-22, because to download the app, the user would have to accept Lyft's terms of service, which require the user to relinquish his or her right to litigate any potential ADA claim in court.  *See* footnote 6, *supra*; Yasay Decl. ¶¶ 5, 9 & Ex. A.  "This set of circumstances not only makes little practical sense, but it is also manifestly inconsistent with Congress's express intent to allow plaintiffs to challenge public accommodations that are not in compliance with the ADA *even if* such plaintiffs did not personally encounter the discriminatory barriers themselves."  *Equal Rts. Ctr.*, 525 F. Supp. 3d at 79 n.7 (emphasis in original) (citing 42 U.S.C. § 12188(a)(1)).

mobility-impaired individuals concerning their experiences." *Id.* Lowell specifically added that she "particularly remember[s] hearing from a young wheelchair user in White Plains who recounted his embarrassment when his friends were able to take Lyft home at the end of the night out and he had to wait until his mother arrived to pick him up in her wheelchair-accessible vehicle." *Id.* ¶ 12; *see also* Am. Compl. ¶ 100. This evidence is sufficient to establish Lowell's actual knowledge of the unavailability of WAV vehicles via the Lyft app in those areas where the app prohibits users from hailing WAV vehicles. Establishing actual knowledge of accessibility barriers may be more nuanced and complicated in situations where the allegation is that some level of service is provided but that service is not adequate. But in the context of the Non-Access Regions, where WAV services are completely unavailable—or, analogously, where a building is completely inaccessible to individuals who require a wheelchair—establishing actual knowledge of the barriers to access is more straightforward. Through the evidence submitted in her declaration, Lowell has satisfied her obligation to show actual knowledge of access barriers with respect to unavailability of WAV service via the Lyft app in the Non-Access Regions.

Lyft contends that Lowell has not suffered an injury in fact as to all Non-Access Regions outside of her home in White Plains "because she has not raised a reasonable inference that she intends to visit those locations." Def.'s Opp. at 26. This Court rejects this challenge to the scope of Lowell's standing. In *Hernandez v. AutoZone, Inc.*, 323 F.R.D. 496 (E.D.N.Y. 2018), the plaintiff filed a putative class action claiming ADA violations at AutoZone stores nationwide due to "centralized maintenance policies" that were "inadequate to detect and remedy accessibility barriers in [AutoZone's] parking lots and walkways." *Id.* at 498. There, the court rejected the defendant's argument that the plaintiff "lack[ed] standing because he has visited only the

Brooklyn AutoZone store and not the other AutoZone locations mentioned in his Complaint."

*Id.* at 501.  As the court explained,

> This argument confuses class standing with individual standing.  "In a putative class action, a plaintiff has class standing if he [or she] plausibly alleges (1) that he [or she] personally has suffered some actual injury as a result of the putatively illegal conduct of the defendant, and (2) that such conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants."  A named plaintiff does not require individual standing to bring each class member's claim in order to establish class standing.

*Id.* at 501 (cleaned up) (quoting *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 162 (2d Cir. 2012)).  The court in *Hernandez* held that the plaintiff had class standing because (1) "he has faced access barriers as a result of AutoZone's alleged failure to detect and remedy them"; and (2) "access barriers encountered by other class members at other AutoZone locations implicate the same set of concerns as the ones Hernandez encountered: whether AutoZone's centralized policies are adequate to detect and remedy violations of the ADA."  *Id.* (cleaned up).

Similarly, here, the question is not whether Lowell intends to travel to other Non-Access Regions around the country where she would want to—and not be able to—use the Lyft app to request a WAV, *i.e.*, where she would have to engage in the same "futile gesture" of trying to get WAV service through the Lyft app.  Rather, the question is whether the "access barriers encountered by other class members" in other Non-Access Regions "implicate the same set of concerns" as the access barriers encountered by Lowell in Westchester County, New York— namely, that WAV service is not provided by Lyft at all.  The evidence put forward by Plaintiffs at this stage demonstrates that Lowell has met this burden, because throughout the Non-Access Regions, the Lyft app has the exact same restrictions with respect to WAV service.  Pls.' Expert Report at 29-30.

Lyft also argues that "even as to her home in White Plains or Westchester County, Lowell does not have standing because her 'some day' intentions to use the Lyft app are insufficient to establish 'actual or imminent injury' necessary for injunctive relief." Def.'s Opp. at 27 (citing *Harty v. W. Point Realty Inc.*, 28 F.4th 435 (2d Cir. 2022) and *Calcano v. Swarovski N. Am. Ltd.*, 36 F.4th 68 (2d Cir. 2022)). But the case law cited by Lyft is inapposite. In *Harty*, the disabled plaintiff asserted claims for damages based on the alleged failure of a hotel website to comply with the ADA, which he alleged infringed on his right to travel free from discrimination. The panel decision explained that the plaintiff, who nowhere alleged in his complaint that he was using the hotel's website to arrange for future travel, lacked standing to bring a lawsuit seeking damages. 28 F.4th at 443. Notably, the *Harty* court did not discuss the applicably of the futile gesture doctrine to the standing analysis regarding the use of this website. And in any event, as addressed further below, Lowell's affidavit explains that she would use Lyft for transportation if the app made it possible for her to access WAVs in Westchester County. It is difficult to see how Lowell could do more than this to demonstrate that she would make use of Lyft's services if the known barriers to access that currently deter her from attempting to use the Lyft app were to be removed.

In *Calcano*, visually impaired plaintiffs asserted claims for injunctive relief under the ADA based on the failure of certain retail stores to offer Braille gift cards. In deciding that the plaintiffs lacked standing, the Second Circuit relied on the plaintiffs' failure to plausibly allege an intent to return to the retail stores in question as fatal to their ability to demonstrate that they had suffered an injury in fact. 36 F.4th at 75-76. *Calcano* focuses on whether the plaintiffs demonstrated an "intent to return" to a physical location, but again does not substantively address how the futile gesture doctrine impacts the standing analysis. *See* 36 F.4th at 74 n.4

(majority opinion noted without further discussion that "deterrence constitutes an injury under the ADA" and that the ADA's remedy provision does not require a person to engage in a futile gesture, quoting 42 U.S.C. § 12188(a)(1)); *id.* at 80 (concurring opinion noted that the majority "seems to agree" with Congress's recognition in the ADA that people with disabilities should not be required to engage in futile gestures, but "its reasoning today suggests otherwise").  It would be incongruous to hold here that Plaintiffs were somehow required to evidence an "intent to return" to the Lyft app prior to the removal of access barriers after having demonstrated that they knew it would be a futile gesture to use the app in the Non-Access Regions to attempt to arrange for WAV transportation.  As for Lowell's intentions if such barriers were to be removed, she has made sufficiently clear that she would use Lyft's services.

In this case, since it would have been a "futile gesture" for Lowell to have downloaded and tried to use the Lyft app in the first instance, it is manifest that she never "visited" the app and thus could not have an intent to return to it.  Rather, the risk of imminent future harm to Lowell is based on the continued lack of WAV service available on Lyft's app in the Non-Access Regions and that any attempt to download and use the app remains a futile gesture.  Moreover, Lowell *has* expressed an intention to use the Lyft app once it offers WAV service in Westchester County.  *See, e.g.,* Lowell Decl. ¶¶ 10 ("I would use Lyft for transportation in Westchester County but cannot do so as Lyft does not offer WAV service in Westchester County."); 15 ("I would like to travel to New York City more often but, unfortunately, I am limited by inadequate transportation options because Westchester County's ParaTransit service does not extend to New York City, public transportation options between Westchester and New York City are largely inaccessible, and private taxicabs are significantly more expensive than

Lyft."); 23 ("If Lyft were ADA-compliant and provided reliable access to me and my motorized

scooter, I would be eager to use its services.").

For all of these reasons, Lowell has established that she has suffered an injury in fact

sufficient to satisfy the first element of standing as to her claims regarding the Non-Access

Regions.

**2.      Injury in Fact—Access Regions**

To the extent Plaintiffs contend that Lowell has standing to pursue claims regarding the

Access Regions, including NYC, they have failed to demonstrate that Lowell has standing as to

these claims.  Plaintiffs have offered scant arguments in support of this proposition in their

extensive briefing, *see* footnote 5, *supra*, and notably, even in Lowell's own declaration in

support of Plaintiffs' class certification motion, she does not request to serve as a class

representative for the Access Regions or NYC classes, *see* Lowell Decl. ¶¶ 25, 30.  Ultimately,

the *Hernandez* analysis makes clear that Lowell does not have class standing for purposes of the

Access Regions and NYC.  Lowell has come forward with sufficient evidence of her knowledge

of access barriers in areas like her hometown of White Plains, where the Lyft app does not allow

for any access whatsoever to WAV vehicles.  In contrast, the only statement she makes regarding

access barriers in any of the Access Regions is that "it is common knowledge among people with

disabilities that Lyft . . . provides insufficient and unequal accessible services in the few regions

where it does offer WAVs."  *Id.* ¶ 9.  This conclusory assertion is not enough—it does not

suggest that Lowell has any particular knowledge about the specific access barriers in any of the

Access Regions where at least some level of WAV service is available through the Lyft app.

It is clear from the parties' submissions that the barriers allegedly encountered by

potential members of the Access Regions and NYC classes do not implicate the same set of

concerns as those about which Lowell has knowledge.  *See Hernandez*, 323 F.R.D. at 501.

Rather, Lyft app users in the Access Regions allegedly have other challenges—such as knowing

how to activate Access Mode in the app, *see* Pls.' Expert Report at 43-45—and there is nothing

in Lowell's affidavit or anywhere else in the record to indicate that Lowell has personal

experience or knowledge gained from others about the access barriers that distinctly apply in the

Access Regions or in NYC.  Moreover, despite Plaintiffs' contention that Lowell has standing to

represent the Access Regions and NYC because standing is assessed as of the time the action

was filed, when Lyft "did not offer WAVs in many of the Access Regions . . . and Lyft's WAV

service in NYC . . . [was] but a shadow of its current service," *see* Pls.' Reply at 8, Lowell still

has to demonstrate that she has actual knowledge of the deficiencies in Lyft's WAV service that

she is challenging with respect to the Access Regions and NYC in order to establish her standing

to represent those classes.  Because Lowell has failed to show the requisite actual knowledge,

she cannot satisfy the injury-in-fact requirement for standing to represent the Access Regions

and NYC classes.

### 3.        Traceability and Redressability

Lowell satisfies the traceability requirement for standing—there can be no genuine

dispute that the alleged injury of not being able to access WAVs via the Lyft app in the Non-

Access Regions is caused by Lyft's decisions as to how to design and deploy the app.  Indeed,

prudently, Lyft does not attempt argue that Lowell cannot satisfy the traceability requirement.

Lyft does, however, maintain that Lowell lacks standing because she "cannot show that

her injury is redressable anywhere, including in White Plains, New York."  Def.'s Opp. at 27-28.

This argument is unavailing.  To satisfy the element of redressability, "it must be likely, as

opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Lujan*,

504 U.S. at 561 (quotation marks omitted).  At least certain elements of the injunctive relief that

Plaintiffs seek—for example, removing the categorical block of WAVs on the Lyft platform in

the Non-Access Regions to enable users to access WAVs via the app, *see* Pls.' Expert Report at

6, 66-67—would be redressed if there were to be a favorable decision in this litigation as to that

issue.  *See Namisnak*, 971 F.3d at 1094 ("Uber drivers cannot offer uberWAV services without

Uber first making that option available . . . [a]nd an injunction would redress that injury by

requiring Uber to offer access to its services.").  Whether such relief is required by law is the

merits question in this lawsuit, but the redressability element of standing does not require

Plaintiffs to demonstrate that they will succeed on the merits.  *See Civ. Rts. Educ. & Enf't Ctr. v.*

*Hosp. Props. Tr.*, 867 F.3d 1093, 1102 (9th Cir. 2017) ("The Named Plaintiffs have requested

that the court fashion an injunction mandating that the HPT hotels comply with the ADA.  If the

Named Plaintiffs were to prevail and receive their requested relief, then their injuries would be

redressed.  They have therefore satisfied the redressability requirement, whether or not they are

correct on the merits.").  Accordingly, Lowell has satisfied the redressability requirement as to

her claims regarding the Non-Access Regions.

* * * * * * * * * *

In sum, Plaintiffs have established that Lowell has standing to pursue claims regarding

the Non-Access Regions, but Plaintiffs have failed to establish that Lowell has standing to

pursue claims regarding any of the Access Regions, including NYC.

### C.     WDOMI's Standing

Judge Román previously found that WDOMI had alleged facts sufficient to support

associational standing to pursue its ADA claim, *Lowell*, 352 F. Supp. 3d at 256-59; at this stage,

Lyft again argues that WDOMI lacks associational standing.  "An organization has associational

standing if it can show that (1) its members would have standing to sue in their own right; (2) the interests it seeks to protect relate to the organization's purpose; and (3) neither the asserted claim nor the requested relief require the participation of individual members of the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

Lyft contends that WDOMI fails to satisfy the first element of associational standing because it lacks both members and indicia of membership. Def.'s Opp. at 28-29. "Where an association is not a traditional voluntary membership organization, its constituents must nevertheless possess sufficient 'indicia of membership.'" *Mental Hygiene Legal Serv. v. Cuomo*, 609 F. App'x 693, 695 (2d Cir. 2015) (summary order) (quoting *Hunt*, 432 U.S. at 344). While Plaintiffs concede that WDOMI is not a traditional voluntary membership organization, there are numerous examples of courts finding that independent living centers such as WDOMI have associational standing to represent people with disabilities. In *Bronx Independent Living Services v. Metropolitan Transportation Authority*, No. 16-cv-5023 (ER), 2021 WL 1177740 (S.D.N.Y. Mar. 29, 2021), the court determined that "an independent living center that provides services and advocacy for persons with disabilities [where] disabled individuals make up more than half of its leadership and staff" had associational standing. *Id.* at *12. In *WILC*, the court found associational standing for an organization where 80 percent of the board members and 65 percent of the staff of the independent living center in question had a disability, *i.e.*, it was "staffed, directed, and driven by the individuals with disabilities that it seeks to serve." 331 F.R.D. at 297. And in *Brooklyn Center for Independence of the Disabled v. Bloomberg*, 290 F.R.D. 409 (S.D.N.Y. 2012) ("*BCID*"), the court decided that the Center for the Independence of the Disabled had associational standing where over half of its board members and over 70 percent of its staff were persons with disabilities, *i.e.*, it was "a service provider managed and

directed by persons with disabilities for the purpose of serving persons with disabilities." *Id.* at 416-17 (cleaned up).

Here, WDOMI's by-laws state that it was formed "to promote independence, equality and dignity in employment, housing, educational endeavors, social and recreational opportunities, *transportation* and all other areas of life for persons who have a disability." ECF No. 295-25 (Jonas Decl. Ex. 20) at 2 (Section 3.1) (emphasis added). The by-laws also state that "[n]ot less than 51% of the Board shall consist of persons with disabilities." *Id.* at 5 (Section 5.5). According to WDOMI's former Executive Director, Melvyn R. Tanzman, "WDOMI is run and governed by individuals with disabilities," and "[a] significant percentage of WDOMI's members, staff, and constituents have mobility impairments. Many of these individuals require wheelchairs or motorized scooters to maneuver." ECF No. 300-7 ("Tanzman Decl.") ¶¶ 2-3; *see also* ECF No. 300-6 ("Tanzman Depo.") at 67:8-21 (50 percent to 75 percent of WDOMI staff were individuals with disabilities). Based on the foregoing, this Court concludes that WDOMI has sufficient "indicia of membership" for purposes of associational standing.

WDOMI also satisfies the requirement "that some particular member of the organization would have had standing to bring the suit individually." *N.Y. Civ. Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012). Plaintiffs provide the declarations of several WDOMI constituents which establish those individuals' standing to sue in their own right. *See* Non-Public Frei-Pearson Decl. Ex. 2 at 2-10 (Declarations of Ed Sperling, Jesse Sahagun, and John Strothenke). Each of these declarations demonstrates actual knowledge that it would be a futile gesture to download and try to use Lyft's app in the Non-Access Regions since Lyft fails to offer WAV service in those regions. *See* Sperling Decl. ¶¶ 7-8 ("I learned of Lyft's failure to provide [WAVs] by virtue of my own disability rights advocacy and through other advocates in

the community.  I particularly recall preparing for a trip to Albany, where my fellow advocates

and I travel[led] to meet with and educate New York State legislators.  Prior to our trip, we

discussed the particular issues that we intended to raise with the legislators, at which time I

learned of [*sic*] that Lyft does not offer [WAVs] in New York or throughout the country.");

Sahagun Decl. ¶ 7 ("I first learned about Lyft's lack of wheelchair accessibility when I went on

the internet to look for accessible methods of transportation, and came across several news

articles concerning Lyft's discrimination against wheelchair users nationwide.  I also spoke to

WDOMI's staff about Lyft's failure to provide accessible services in the region and about the

lack of accessible vehicles available in general."); Strothenke Decl. ¶¶ 8-9 ("As a WDOMI

constituent, I regularly participate in WDOMI's work to educate legislators about the need for

legislation to require Lyft to be accessible.  I have also read WDOMI's Action Alerts concerning

Lyft's inaccessibility.  In conversations with other mobility-impaired friends and advocates, I

have heard many unfortunate stories about wheelchair users' failed attempts to use Lyft's

services.").

Lyft challenges these declarations as deficient because they predate WDOMI's deposition

and the modified class definitions, Def.'s Opp. at 29 n.10, but it is not clear why this should

matter, at least with respect to the Non-Access Regions, where Lyft allegedly has consistently

failed to provide WAV service throughout the course of the litigation.  As to Plaintiffs' claims

regarding the Non-Access Regions, the declarations suffice to establish WDOMI's standing.

WDOMI also has sufficiently demonstrated that the interests it seeks to protect in this

litigation relate to the organization's purpose.  As noted above, WDOMI's by-laws state that it

was formed, among other reasons, "to promote independence, equality and dignity in . . .

transportation . . . for persons who have a disability."  Jonas Decl. Ex. 20 at 2 (Section 3.1); *see*

*also* Tanzman Decl. ¶ 4 ("WDOMI's mission is to empower people with disabilities to control their own lives; advocate for civil rights and a barrier[-]free society; encourage people with disabilities to participate in the political process; educate government, business, and other entities, and society as a whole to understand, accept, and accommodate people with disabilities; and create an environment that inspires self-respect.").  The Second Circuit has noted that the "germaneness" requirement for standing is not demanding, and that a court need only decide whether the action would "reasonably tend to further the general interests that individual members sought to vindicate in joining the association and whether the lawsuit bears a reasonable connection to the association's knowledge and experience." *Bldg. & Constr. Trades Council of Buffalo v. Downtown Dev., Inc.*, 448 F.3d 138, 148-49 (2d Cir. 2006).  Although Lyft argues that "there is little to no evidence on which this Court could conclude that WDOMI's Consumers care about Access mode on the Lyft app," Def.'s Opp. at 30, the case law does not require such a narrow reading of germaneness, *Bldg. & Constr. Trades Council of Buffalo*, 448 F.3d at 149 ("We think it significant that the *Hunt* Court used the word 'germane,' rather than the phrase 'at the core of,' or 'central to,' or some word or phrase indicating the need for a closer nexus between the interests sought to be protected by the suit in question and the organization's dominant purpose.").  WDOMI's current Executive Director, Maria Samuels, stated in her declaration that "[a]s an organization dedicated to independence and equal rights for individuals with disabilities, providing adequate access to transportation services such as Lyft is very important to WDOMI's mission."  ECF No. 291 ¶ 13.  Moreover, Tanzman testified at his deposition that WDOMI's decision to serve as a Plaintiff in this litigation was "based upon the real-life experiences and complaints of our consumer members."  Tanzman Depo. at 86:10-17.  WDOMI has thus demonstrated that this litigation is germane to its purpose.

WDOMI also satisfies the third and final requirement for associational standing—that neither the asserted claims nor the requested relief require the participation of individual members of the lawsuit—because "where the organization seeks a purely legal ruling without requesting that the federal court award individualized relief to its members, the *Hunt* test may be satisfied." *Bano v. Union Carbide Corp.*, 361 F.3d 696, 714 (2d Cir. 2004).  Here, WDOMI seeks only injunctive relief on a class-wide basis; none of the relief sought would require individualized proof.

Finally, Lyft argues—without providing any legal basis for the assertion—that WDOMI "does not have standing to represent anyone outside of Westchester County." Def.'s Opp. at 30. But as addressed above in the Court's analysis of Lowell's standing, the appropriate question is whether the "access barriers encountered by other class members" throughout the Non-Access Regions "implicate the same set of concerns" as those encountered by WDOMI in Westchester County, namely, that WAV service is not provided by Lyft at all in those regions.  *See Hernandez*, 323 F.R.D. at 501.  The fact that WDOMI is a non-profit organization does not change the analysis.  Because the accessibility concerns are the same, WDOMI has established that it has standing to assert class claims seeking injunctive relief in the Non-Access Regions as a whole.

As with Lowell, however, to the extent Plaintiffs contend that WDOMI has standing to pursue claims regarding the Access Regions, including, NYC, those arguments fail.[9]  The actual knowledge of access barriers articulated in the declarations of certain WDOMI constituents addresses their knowledge about areas where the Lyft app does not allow for any WAV access at

---

[9] The references in the briefing to WDOMI's standing to pursue claims in the Access Regions, including NYC, are even more sparse than the limited discussion regarding Lowell's purported standing to pursue such claims.  *See* Pls.' Revised Mem. at 55; Pls.' Reply at 8-11.

all, but does not suggest any actual knowledge about the facts and circumstances of access barriers in any of the Access Regions.[10]  *See* Non-Public Frei-Pearson Decl. Ex. 2 at 2-10.  The access barriers encountered by WDOMI in Westchester County do not implicate the same set of concerns as those encountered by putative class members in the Access Regions.  Accordingly, WDOMI does not have class standing to pursue claims against Lyft pertaining to the Access Regions, including NYC.

* * * * * * * * * *

For all of these reasons, Plaintiffs have established that WDOMI has standing to pursue claims regarding the Non-Access Regions, but Plaintiffs have failed to establish that WDOMI has standing to pursue claims regarding any of the Access Regions, including NYC.[11]

### D.   Standing of Proposed Class Representatives Pauline Scudieri and Kenneth Burr

Plaintiffs propose to have Scudieri serve as the class representative for the "Access Regions Other Than NYC Class," and to have Burr serve as the class representative for the "NYC Class."  Pls.' Revised Mem. at 3.  Even though neither Scudieri nor Burr has downloaded the Lyft app, Plaintiffs maintain that they each have standing since they knew of deficiencies in Lyft's WAV service.  Plaintiffs contend that it would have been a futile gesture for Scudieri and Burr to download the Lyft app to explore the extent of service in the relevant Access Regions, much as it would have been a futile gesture for Lowell to download the app to confirm the total

---

[10] In this context, the fact that the declarations in question were prepared before Plaintiffs proposed the revised class definitions is significant, because those declarations did not account for the distinctions among the various potential classes—distinctions that Plaintiffs themselves thought were significant enough to merit proposing that the potential classes be separated in this fashion.

[11] WDOMI satisfies the requirements of traceability and redressability for the same reasons as Lowell.  *See* Section I.B.3, *supra*.

unavailability of WAV service via the Lyft app in the Non-Access Regions.  Pls.' Reply at 11-12.  But an individual can only rely on the futile gesture doctrine if he or she demonstrates actual knowledge of the relevant barriers to access, such that there would have been no functional purpose served by taking further steps to obtain that knowledge directly.  *See* 42 U.S.C. § 12188(a)(1).  Neither Scudieri nor Burr has come forward with sufficient evidence to demonstrate that they had the requisite degree of knowledge here.

As an initial matter, Lyft asserts that the fact that Scudieri and Burr did not download the Lyft app to personally assess the degree of WAV service provided through the Lyft app in the Access Regions is determinative of the standing inquiry for these proposed class representatives. *See Access Living of Metro. Chicago v. Uber Techs., Inc.*, 958 F.3d 604, 614-15 (7th Cir. 2020); *Namisnak*, 971 F.3d at 1093 (drawing a "dispositive distinction" for purposes of the futile gesture doctrine between areas where Uber offered some degree of WAV service and areas where it offered no WAV service at all); *but see Equal Rts. Ctr.*, 525 F. Supp. 3d at 77-79 (disagreeing with the *Access Living* analysis, and concluding that individual demonstrated actual knowledge of access barriers regarding UberWAV service in Washington D.C. even though she had not downloaded the Uber app).  This argument presents only an abstract question in this litigation, and the Court need not resolve it for purposes of this motion.  Even if the Court were to assume—consistent with the holding in *Equal Rights Center*—that downloading the Lyft app is not necessarily required to establish an injury in fact in an Access Region, it would still be necessary for Scudieri and Burr to show that they had the relevant actual knowledge regarding accessibility barriers without having downloaded the app, and they both have failed to demonstrate such actual knowledge regarding the WAV services available through the Lyft app in the Access Regions.

In *Equal Rights Center*, the declaration from Equal Rights Center ("ERC") member Heidi Case "attest[ed] to her knowledge of Uber's inaccessibility based on her 'active engagement on accessibility issues' in the transportation sector, and the fact that she has had 'regular conversations (at least once a month) with people specifically about the accessibility' of Uber's services." 525 F. Supp. 3d at 75.  Case "aver[red] that, before the instant lawsuit was filed, she learned that 'ERC's tests confirmed that accessible taxis hailed through Uber routinely were unavailable or took a very long time to arrive (if at all) and that such rides also were more expensive than Uber-branded rides.'" *Id.*  Regarding her knowledge of Uber's WAV service, "UberWAV," Case "aver[red] that she heard from 'countless friends and contacts' who had attempted to use UberWAV that either no wheelchair accessible vehicles were available or that, after connecting to a driver, they had to wait extended periods of time before the driver ultimately cancelled or failed to show up"; and "'[o]n multiple occasions,' Case was allegedly present while someone attempted to call an UberWAV, which permitted her to 'witness[ ] first-hand [UberWAV's] inaccessibility' and to see how the app frequently reflected that no UberWAVs were available in the area, or how, 'even when a connection is made to an UberWAV, that car does not reliably respond in [a] timely fashion.'" *Id.*

Neither the declarations submitted by Scudieri and Burr in support of the motion for class certification nor their deposition testimony contain anything approaching this level of detail about their knowledge regarding Lyft service in any Access Region.[12]  In her declaration, Scudieri, who lives in a suburb of Dallas, Texas, states, in conclusory fashion, that "Lyft refuses

---

[12] At her deposition, Scudieri was questioned with respect to an earlier declaration that she had signed in December 2021, *see* ECF No. 300-8 ("Scudieri Depo.") at 46:18-22 (marking the declaration for identification as Exhibit 59), but that declaration has not been provided to the Court.

to provide equal access to its transportation services to myself and other individuals with disabilities in Boston, Chicago, Dallas, Los Angeles, Philadelphia, Phoenix, Portland, and San Francisco (collectively, the 'Access Regions')," and that "Lyft's deficient WAV service is well known among members of the disabled community."  ECF No. 292 ("Scudieri Decl.") ¶¶ 5-6. At her deposition, when asked about wheelchair accessible transportation options in Dallas such as public transit, paratransit, and taxis, Scudieri testified that she did not know whether any such options were available, adding, "I do not [know] because I have never had a need to – or never knew that somebody – that there was a Lyft or another service like that available to me in Dallas. I am not in Dallas proper to have a need like that."  Scudieri Depo. at 24:5-25:8.  She later added that she had never downloaded the Lyft app and did not know anyone who had, *id.* at 42:6-10,[13] and with respect to whether she had ever had a conversation with anyone about their experiences with Lyft, she stated that "in fact it doesn't come up in conversation, and I very likely have chatted with individuals that have used the service, but it just doesn't come up in conversation." *Id.* at 80:1-11; *see id.* at 62:14-63:10 (same); *see also id.* at 52:6-13 (she does not know anyone who has tried to request a Lyft WAV in Dallas).  Scudieri also testified that "outside of communications with counsel," she did not have an independent basis for knowing about the service levels for Lyft's Access Mode in any of the Access Regions.  *Id.* at 67:20-69:10.  This evidence does not suffice to establish that Scudieri has actual knowledge about WAV service available through the Lyft app in Dallas, or in any of the Access Regions.  *See Ramos*, 2015 WL

---

[13] Scudieri also testified that Lyft does not "advertise that they have wheelchair accessible vehicles" available through the Lyft app in Dallas.  Scudieri Depo. at 13:12-19.  Even though Lyft's purported lack of advertising is one of the alleged deficiencies targeted by Plaintiffs' requested relief in connection with both the Non-Access and Access Regions, *see* Pls.' Revised Mem. at 24, Scudieri's knowledge about this aspect of Lyft's operations does not establish any actual knowledge on her part about the degree of WAV service available through the Lyft app in Dallas.

758087, at * 2 (court originally determined that allegations based upon "information and belief" were insufficient to demonstrate actual notice; only upon filing of detailed affidavits by plaintiffs did court conclude that they had actual notice of Uber's and Lyft's non-compliance with the ADA).[14]

Burr's declaration in support of the motion for class certification similarly lacks the specificity required to establish that he has actual knowledge of the performance of the Lyft app with respect to WAVs in NYC.  He states in conclusory fashion that "Lyft refuses to provide equal access to its transportation services to myself and other individuals with disabilities in New York City and nationwide," and that "Lyft's deficient WAV service has been well known among members of the disabled community, including myself."  ECF No. 293 ("Burr Decl.") ¶ 5. While he also states that "[o]ver the past several years, I have seen numerous news articles and news reports about Lyft and its inhumane treatment when it comes to not providing accessible

---

[14] In *Ramos*, to demonstrate that the futile gesture doctrine should be applied to them, the three plaintiffs, who all required WAVs for transportation, each filed an affidavit to evidence their actual knowledge of Uber's and Lyft's failures to provide WAV services.  Plaintiff Ramos' affidavit stated that he knew that Uber and Lyft "had made the decision to deny service to mobility-impaired Texans because their refusal to provide service to the disabled had been reported in the news and had been a topic of conversation among mobility-impaired customers who relied on private transportation to go to the doctor or attend to other personal tasks." *Ramos*, 2015 WL 758087, at *8.  Ramos also attached an article to his affidavit about the lack of WAV services and stated that he had "examined the apps used for securing rides, and neither provide[d] a method to identify a mobility-impaired customer or to request an accommodating vehicle." *Id.*  Plaintiffs Posadas' and Williams' affidavits, which were similar to one another, stated that they knew that Uber and Lyft "had made the decision to deny service to mobility-impaired Texans because their refusal to provide service to the disabled had been reported in the news, had been a topic of conversation among mobility-impaired customers who relied on private transportation, and the issue was discussed 'in advance of public hearings for the City of Houston that was considering an ordinance that would allow Uber and Lyft and companies like them to operate legally.'" *Id.*  Like Ramos, they stated that they had "examined the apps used and neither provided a method to identify a mobility-impaired customer or to request an accommodating vehicle." *Id.*  The court concluded that the plaintiffs had "demonstrated that they had actual notice at the time they filed suit sufficient to invoke the futile gestures doctrine." *Id.* at *9.

transportation to people with disabilities," *id.* ¶ 7, Burr provides no detail with respect to any specific deficiencies in the WAV service that Lyft provides in NYC.[15]  He does no more than make the general conclusory statement that the "WAV service that Lyft provides in New York City is entirely inadequate when compared to its services for able-bodied riders."  *Id.* ¶ 8.

At his deposition, Burr again stated, "[I]f Lyft were available, because I've never downloaded the app, I've never used it because I've heard . . . from the news articles and the news reports that Lyft in New York City does not provide enough . . .  you know, you have WAV service, but it could be better."  ECF No. 300-9 ("Burr Depo.") at 18:15-21; *see also id.* at 19:20-20:1 ("I currently don't have access to the app.  I've never downloaded it because I have heard of, through news reports and articles, the inhumane treatment of disabled customers when it comes to people with disabilities.  And so I was – I've been highly discouraged from using and/or downloading the app."), 34:21-35:2 ("I saw from various articles that there were a lot of negative experiences, so, you know, I had thought about using Lyft [in NYC] just to see if there was a difference [from Uber], but then after . . . seeing . . . articles – I decided not to.").  When asked whether he had ever spoken with anyone about their experience using Lyft's Access Mode in NYC, Burr testified that he had not.  *Id.* at 35:16-19.  Burr's declarations and deposition testimony lack the level of specificity required to demonstrate that he has actual knowledge of deficiencies in Lyft's WAV service in NYC sufficient to satisfy the futile gesture doctrine and establish standing.

\* \* \* \* \* \* \* \* \* \*

---

[15] Burr made similar statements in another declaration that he wrote and signed a month earlier.  *See* Non-Public Frei-Pearson Decl. Ex. 2 at 11-14, ¶¶ 6-7.

In sum, with respect to the Access Regions, including NYC, where Lyft provides some level of access to WAV service through its app, satisfying the futile gesture doctrine for standing requires proof of actual knowledge of the particular access barriers being challenged in those areas.  Because Scudieri and Burr failed to provide such proof, they have failed to establish that they have standing to pursue claims on behalf of the "Access Regions Other Than NYC Class" and the "NYC Class," respectively.

### E.    Additional Standing Challenges

Lyft argues at length that the case should not be permitted to proceed because at least some of the members of the purported classes, as defined, lack standing.  *See* Def.'s Opp. at 33-38.  But as previously stated, in the class action context, "[s]tanding is satisfied so long as at least one named plaintiff can demonstrate the requisite injury."  *Hyland*, 48 F.4th at 117; *see Kendall v. Emps. Ret. Plan of Avon Prod.*, 561 F.3d 112, 118 (2d Cir. 2009) ("In a class action, once standing is established for a named plaintiff, standing is established for the entire class."); *Comer v. Cisneros*, 37 F.3d 775, 788 (2d Cir. 1994) (in the context of a class action, "only one named plaintiff need have standing with respect to each claim").  Lyft relies on language from *Denney v. Deutsche Bank AG*, 443 F.3d 253 (2d Cir. 2006), for the proposition that "no class may be certified that contains members lacking Article III standing."  *Id.* at 264; *see* Def.'s Opp. at 34. The Second Circuit, however, has recently addressed and rejected this same interpretation of *Denney*:

> Some may interpret a single sentence in *Denney v. Deutsche Bank AG*, 443 F.3d 253 (2d Cir. 2006), as suggesting that all class members must have standing for the class to proceed.  *See id.* at 264 ("[N]o class may be certified that contains members lacking Article III standing.").  But *Denney* was decided before the Supreme Court in [*Frank v.*] *Gaos*[, 139 S. Ct. 1041 (2019)] clarified the minimal requirement for standing in class actions.  And, in any event, we acknowledged in *Denney* that "[o]nce it is ascertained that there is a named plaintiff with the requisite standing, [ ]

31

> there is no requirement that the members of the class also proffer such
> evidence." *Id.* at 263-64 (quotation marks omitted); *see also* 1 *Newberg*
> *and Rubenstein on Class Actions* § 2:3 (noting that, "[w]hile [*Denney*] did
> contain that sentence, it was embedded in a paragraph that also stated, ...
> [in an explanatory parenthetical] that: '[P]assive members need not make
> any individual showing of standing, because the standing issue focuses on
> whether the plaintiff is properly before the court, not whether represented
> parties or absent class members are properly before the court.' ").

*Hyland*, 48 F.4th at 118 n.1.[16]  There is no requirement that Plaintiffs establish the standing of all

members of each class in order for their proposed classes to be certified.  Lyft's detailed

arguments concerning the standing of certain putative class members based on their deposition

testimony are therefore irrelevant.

Finally, Lyft briefly contends that because Plaintiffs' proposed class definitions expressly

refer to individuals who are "denied equal access to Lyft's transportation services," the class

definitions are "premised on a legal duty that does not exist," and therefore no one can have

standing to sue Lyft on this ground.  Def.'s Opp. at 33 (citing *Noel v. N.Y.C. Taxi & Limousine*

*Comm'n*, 687 F.3d 63, 73 (2d Cir. 2012)).  First, the questions of whether the ADA requires Lyft

to provide "equal access"—or whether a remedy could be fashioned in favor of Plaintiffs here

without expressly providing "equal access"—are merits issues that are not appropriate for

resolution at this stage.  To the extent Lyft is suggesting that Plaintiffs cannot satisfy the

redressability requirement for standing because "equal access" is not available as a remedy, this

Court rejects that argument because, as set forth in Section I.B.3, *supra*, Plaintiffs have

established that at least certain aspects of their claims are redressable.  Second, to the extent Lyft

relies on the Second Circuit decision in *Noel* in support of this point, Lyft appears to interpret the

---

[16] To be clear, the parties did not fail to address the *Hyland* decision in their briefing on
this motion—*Hyland* was issued on September 7, 2022, a short time after the briefing here was
completed on August 26, 2022.

relief sought by Plaintiffs too narrowly.  In *Noel*, the panel noted that "Title III [of the ADA] expressly exempts taxi providers from purchasing or leasing 'accessible automobiles.'"  687 F.3d at 73 (quoting 49 C.F.R. § 37.29(b)).  But Plaintiffs are not demanding that Lyft purchase or lease WAVs.  *See* Pls.' Reply at 13; *Lowell*, 352 F. Supp. 3d at 260 ("[A]s Plaintiffs acknowledge, the Amended Complaint does not include a specific request that Defendant be required to provide WAVs but does request that the Defendant be required to 'develop and implement a remedial plan to ensure full and equal access to its services.'"); *see also O'Hanlon v. Uber Techs., Inc.*, No. 19-cv-00675, 2021 WL 2415073, at *8 (W.D. Pa. June 14, 2021) ("[T]he inclusion of a particularized exemption balancing competing considerations under the ADA—*i.e.*, by providing that transportation service enterprises not be statutorily obligated by enactment of Title III to purchase or lease new accessible fleet vehicles—cannot reasonably be read to negate the over-arching goals and mandate of Section 12184: that a private entity electing to primarily engage in the business of transporting people fully include those with disabilities and provide reasonable accommodations in furtherance of that objective.").  In short, the proposed class definitions—and the remedies sought by Plaintiffs for Lyft's allegedly unlawful practices—cannot be interpreted as narrowly as Lyft might prefer, and Lyft's limited argument that the classes lack standing on this basis is unavailing.

* * * * * * * * * *

Accordingly, because this Court has determined that Lowell and WDOMI have standing as to their claims regarding the Non-Access Regions, the classes they seek to represent—the Non-Access Region Class, the New York State Other Than NYC Class, and the Westchester Class, all of which consist entirely of Non-Access Regions—have standing, and this Court will proceed to consider whether those putative classes should be certified.

Because this Court has determined that Scudieri, Burr, Lowell, and WDOMI do not have standing as to their claims regarding the Access Regions Other Than NYC Class and the NYC Class, there is no standing to pursue claims on behalf of those putative classes, and this Court therefore respectfully recommends that claims as to those putative classes be dismissed.

## II.     Class Certification

### A.     Legal Standard

Certification of a class requires satisfaction of the prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure.  Specifically, Plaintiffs must show that "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a); *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011) (quotation marks omitted).  If the Rule 23(a) prerequisites have been satisfied, Plaintiffs must then show by a preponderance of the evidence that the proposed class is "maintainable" by meeting at least one of the requirements set forth in Rule 23(b) of the Federal Rules of Civil Procedure.  *WILC*, 331 F.R.D. at 287; *see Dukes*, 564 U.S. at 345.  "Where a putative class seeks certification pursuant to Rule 23(b)(2), [Plaintiffs] must show that 'the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.'"  *WILC*, 331 F.R.D. at 287. (quoting Fed. R. Civ. P. 23(b)(2)).  "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them."  *Dukes*, 564 U.S. at 360 (quotation marks omitted).  Stated

differently, "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Id.* "Civil rights cases against parties charged with unlawful, class-based discrimination are prime examples of what (b)(2) is meant to capture." *Id.* at 361 (cleaned up).

"The plaintiff carries the burden of establishing by a preponderance of the evidence that each of the requirements of Rule 23 is met." *Buffington v. Progressive Advanced Ins. Co.*, 342 F.R.D. 66, 70 (S.D.N.Y. 2022). "The Court's determination involves a 'rigorous analysis,' to ensure actual, not presumed, conformance with Rule 23." *Id.* "Such an analysis will frequently entail overlap with the merits of the plaintiff's underlying claim because the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Id.* (cleaned up). "Merit based inquiries, at the class certification stage, however, are permitted only to the extent that they are relevant to determining whether the Rule 23 prerequisites are satisfied." *Id.* (quotation marks omitted).

### B.    Application of Legal Standard

In light of the Court's standing analysis, the Court considers only the proposed Non-Access Region Class, the proposed New York State Other Than NYC Class, and the proposed Westchester Class for certification.

Plaintiffs allege that Lyft is in violation of Title III of the ADA, which prohibits discrimination "on the basis of disability in the full and equal enjoyment of specified public transportation services provided by a private entity that is primarily engaged in the business of transporting people and whose operations affect commerce." 42 U.S.C. § 12184(a); *see* Am. Compl. ¶ 126. Moreover, Plaintiffs allege that "[b]y failing to make reasonable modifications to its policies, practices, and procedures to make [WAVs] available with equivalent reliability and

similar wait times as inaccessible vehicles, Defendant denies users of motorized and other non-folding wheelchairs, including Plaintiff . . . Lowell, WDOMI members, and class members, full and equal enjoyment of Defendant's transportation service in violation of Title III of the ADA." Am. Compl. ¶ 138; *see* 42 U.S.C. § 12184(b)(2)(A) (discrimination includes the failure to "make reasonable modifications consistent with those required under section 12182(b)(2)(A)(ii) of this title"[17]).  In their motion for class certification, Plaintiffs argue that "[w]ithin each class, Lyft's discriminatory policies and procedures are identical, and Plaintiffs have proposed uniform and reasonable modifications to remedy that discrimination that equally benefit all class members." Pls.' Revised Mem. at 4.  Each class must separately satisfy the requirements of Rule 23 in order to be certified.

### 1.    The Rule 23(a) Factors

#### a.    Numerosity

The numerosity requirement is satisfied if the Court determines that "the class is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  Courts in this Circuit presume that this requirement is met when there are 40 or more members of the putative class. *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995).  But "where

---

[17] Section 12182(b)(2)(A)(ii) states that discrimination "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation" includes

> *a failure to make reasonable modifications* in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations.

42 U.S.C. § 12182(b)(2)(A)(ii) (emphasis added).

the putative class seeks injunctive and declaratory relief pursuant to Rule 23(b)(2), as opposed to monetary relief under Rule 23(b)(3)[,] the Second Circuit has relaxed the numerosity requirement." *WILC*, 331 F.R.D. at 288 (cleaned up).  "[A] plaintiff need not establish the precise number of class members so long as the plaintiff reasonably estimates that the number is substantial, and relies on reasonable inferences drawn from the available facts." *Wedra v. Cree, Inc.*, No. 19-cv-3162 (VB), 2022 WL 2116760, at *2 (S.D.N.Y. June 13, 2022) (cleaned up); *see Alexander A. ex rel. Barr v. Novello*, 210 F.R.D. 27, 33 (E.D.N.Y. 2002) ("A class action may proceed upon estimates as to the size of the proposed class, and courts may make common sense assumptions to support a finding of numerosity." (cleaned up)).

Plaintiffs offer statistical information to support a finding of numerosity as to each of the proposed classes.  Pls.' Revised Mem. at 31-34.  They start with the statistic, taken from U.S. Census Bureau data, that 2.3 percent of adults over the age of 18 use a wheelchair.  *Id.* at 31 & n.68.  Plaintiffs also cite the statistic that approximately 36 percent of American adults have used a ridesharing service.  *Id.* at 32 & n.71.[18]  With respect to the proposed Westchester Class, using U.S. Census Bureau data regarding the adult population in Westchester County, as well as the assumptions that 2.3 percent of that population uses a wheelchair and 36 percent of adults have used a ridesharing service, Plaintiffs estimate a total of 6,269 putative class members.  *Id.* at 31-32.[19]  With respect to the New York State Other Than NYC Class, using U.S. Census Bureau

---

[18] The study cited by Plaintiffs, which was conducted in fall 2018, found that "36% of U.S. adults say they have ever used a ride-hailing service such as Uber or Lyft."  Jingjing Jiang, *More Americans are using ride-hailing apps*, Pew Research Center (Jan. 4, 2019), *available at* https://www.pewresearch.org/fact-tank/2019/01/04/more-americans-are-using-ride-hailing-apps/ (last visited Dec. 21, 2022).

[19] Plaintiffs cite U.S. Census Bureau webpages from 2019, but when these pages were accessed in December 2022, the data on the pages appeared to be from 2021.  Thus, there are some differences between the data on the referenced webpages and the figures used by Plaintiffs

data regarding the adult population of New York State outside of New York City, as well as the assumptions that 2.3 percent of that population uses a wheelchair and 36 percent of adults have used a ridesharing service, Plaintiffs estimate a total of 72,993 putative class members. *Id.* at 33. Lastly, with respect to the Non-Access Region Class, using U.S. Census Bureau data regarding the adult population of the relevant areas, as well as the assumptions that 2.3 percent of that population uses a wheelchair and 36 percent of adults have used a ridesharing service, Plaintiffs estimate a total of 1,970,078 putative class members. *Id.* at 34. Notably, even if these data assumptions are each overstated by *a factor of ten*—in other words, if only 3.6 percent of adults use a ridesharing service, and if only 0.23 percent of the adult population uses a wheelchair— each of the classes would still have more than 40 members.

"Courts within this Circuit have frequently relied on reasonable inferences based on statistical data to establish numerosity." *WILC*, 331 F.R.D. at 288-89; *see also, e.g.*, *Hernandez*, 323 F.R.D. at 502 ("Hernandez relies on data from publicly available sources to argue that more than 40 people have or will visit AutoZone stores. . . . The Court may take judicial notice of the foregoing sources of data, which together show that there are enough class members to satisfy the numerosity requirement for class certification."); *BCID*, 290 F.R.D. at 418 ("Relying on the 2008 American Community Survey from the United States Census Bureau . . . plaintiffs estimate that there are roughly 900,000 people with disabilities in New York City . . ., a number clearly rendering joinder impracticable.").

---

in their briefing. But in each instance, the relevant population figures are *larger* than the numbers cited by Plaintiffs, which only strengthens Plaintiffs' numerosity arguments. Accordingly, the Court will rely on the numbers referenced in Plaintiffs' briefing, as the differences are not material to either the Court's analysis or its conclusion regarding this issue.

Moreover, in addition to the statistical data, Plaintiffs provide declarations of putative class members that bolster their contention that the classes they seek to have certified are sufficiently numerous. *See* Non-Public Frei-Pearson Decl. Exs. 2, 4-7. Additionally, the amicus briefs filed by the National Council on Independent Living, Paralyzed Veterans of America, and the United Spinal Association, ECF Nos. 223-225, support the finding that the various classes are sufficiently numerous. Each of these national organizations has members and/or represents entities with members numbering in the tens of thousands nationwide, and each has enough members in each of the relevant regions to satisfy the requirement of numerosity with respect to each of the classes sought to be certified. *Id.*

Lyft raises various objections to these declarations, as well as to the deposition testimony of some of the declarants; in particular, Lyft maintains that the declarations and testimony fail to demonstrate a concrete injury. Def.'s Opp. at 40-43. But the Rule 23(a) numerosity analysis is distinct from standing, and these arguments challenging numerosity are the same as its arguments challenging the standing of putative class members, which this Court has already rejected. *Compare* Def.'s Opp. at 40-43 *with* Def.'s Opp. at 33-38; *see also BCID*, 290 F.R.D. at 418 (in finding that the plaintiffs had established numerosity, the court noted that "[i]n contending otherwise, defendants largely rehash their arguments about standing . . ., rejected above").

In sum, the Court finds that each of the classes satisfies the requirement of numerosity.[20]

---

[20] Lyft has provided evidence that approximately 35 out of 175 putative class members for whom Lyft was given cell phone numbers and/or email addresses have downloaded the Lyft app and thereby agreed to its terms of service, including the requirement that their legal claims be submitted to arbitration. *See* Yasay Decl. ¶¶ 9-13 & Ex. A. There is no question that such individuals cannot be included in any of the classes. Nevertheless, this percentage of disqualified class members is not so substantial as to preclude a finding that Plaintiffs have satisfied the numerosity requirement for each of the proposed classes.

### b.   Commonality

Rule 23(a)(2) requires a showing that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Commonality does not mean that all issues must be identical as to each member, but it does require that plaintiffs identify some unifying thread among the members' claims that warrants class treatment." *WILC*, 331 F.R.D. at 291 (cleaned up). "Generally, courts have liberally construed the commonality requirement to mandate a minimum of one issue common to all class members." *Id.* (quotation marks omitted). "Consideration of this requirement obligates a district court to determine whether plaintiffs have 'suffered the same injury.'" *Id.* at 292 (quotation marks omitted). Class members' claims "must depend upon a common contention," and "[t]hat common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. "What matters to class certification is not the raising of common questions— even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* (emphasis in original) (cleaned up). "This test presents a low hurdle." *Buffington*, 342 F.R.D. at 71 (quotation marks omitted).

Here, with respect to the three Non-Access Region classes, Plaintiffs maintain that the claims of each of the putative classes raise common questions as to whether Lyft has policies or practices uniformly applicable to each of those classes that prevent class members from accessing WAV services, and whether these allegedly discriminatory policies or practices can be remedied by reasonable modifications that are common to each class. The answers to those questions will drive the resolution of the litigation, as any proposed reasonable modification applicable to a given class that would allow class members to access WAV services would

benefit each class in its entirety.  Where, as here, "the plaintiff class seeks to enjoin a practice or policy, rather than individualized relief, commonality is assumed."  *WILC*, 331 F.R.D. at 292 (cleaned up).

With respect to the three Non-Access Region classes, Plaintiffs assert that "Lyft has a uniform, centralized policy and practice of affirmatively and categorically precluding WAV service in all non-Access Regions (which are over 96% of Lyft's service regions)."  Pls.' Revised Mem. at 44.  More specifically, Plaintiffs state that "[d]rivers in non-Access Regions are prevented from identifying as WAVs on Lyft's app, and riders do not have the option of selecting a WAV ride in non-Access Regions."  *Id.*  Therefore, "even when a Lyft WAV driver is available in a non-Access Region (which Lyft's data shows is often the case), the driver would not be able to identify as such on the platform, nor would a user requiring a WAV be able to request a ride from that WAV driver."  *Id.*  Plaintiffs argue that "[g]iven Lyft's general policy of discrimination here, all Non-Access Regions class members suffer from Lyft's systemic policy, which thereby satisfies commonality."  *Id.*  This Court agrees.  Plaintiffs here challenge policies and practices that Lyft implements on class-wide bases with respect to each of the putative classes, and propose injunctive relief tailored to the respective classes.  This is sufficient to satisfy the requirement of commonality.  *See, e.g.*, *WILC*, 331 F.R.D. at 292.

By focusing its response on the question of whether reasonable modifications can be implemented to provide relief to Plaintiffs, Lyft misses the mark for purposes of the commonality requirement.  *See* Def.'s Opp. at 44-49.  Whether or not appropriate and effective reasonable modifications can be put in place goes to the merits of Plaintiffs' ADA claim, not the

resolution of Plaintiffs' motion for class certification.  *See* ECF No. 264 ("D&O") at 5.[21]  The issue for the Court at the class certification stage is not whether the reasonable modifications that Plaintiffs propose Lyft could make to accommodate their disabilities are viable, but whether the question of what constitutes viable reasonable modifications *can be resolved* on a class-wide basis.  *See Houser v. Pritzker*, 28 F. Supp. 3d 222, 243 (S.D.N.Y. 2014).  For each of the three putative classes Plaintiffs have met this threshold.

### c.    Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  "Typicality is satisfied if each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability."  *WILC*, 331 F.R.D. at 293 (quotation marks omitted).  Moreover, "like commonality . . . typicality may be assumed where the nature of the relief sought is injunctive and declaratory."  *Id.* (cleaned up).  Here, Plaintiffs allege that with respect to each of the putative classes, Lyft imposed uniform discriminatory policies with respect to its WAV services.  Again, Lyft focuses on the merits of the reasonable modifications proposed by each of the putative classes—"the effectiveness and cost of the modifications in each location"—to argue lack of typicality.  Def.'s Opp. at 49-50.  But this does not diminish the fact that the ADA claim of each putative class arises from the same course of allegedly discriminatory conduct engaged in by Lyft with respect to the failure to provide WAV services, and that each putative class makes uniform arguments regarding the reasonable modifications that Lyft could implement to make its services accessible.  "Where, as here, the alleged injuries

---

[21]  As noted above, 42 U.S.C. § 12184(b)(2)(A) states that discrimination includes the failure to "make reasonable modifications consistent with those required under section 12182(b)(2)(A)(ii) of this title."

derive from a unitary course of conduct by a single system, typicality is generally found." *BCID*, 290 F.R.D. at 419 (quotation marks omitted).  Accordingly, with respect to each of the putative classes, Plaintiffs have satisfied the typicality requirement.

### d.    Adequacy

Under Rule 23(a)(4), the Court "must examine whether the named plaintiff's interests are antagonistic to those of the other proposed members of the class." *Buffington*, 342 F.R.D. at 72 (cleaned up).  "A class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *WILC*, 331 F.R.D. at 298 (quotation marks omitted).  "The adequacy inquiry is twofold: the proposed class representative must have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of other class members." *Id.* (quotation marks omitted).  "In addition, to establish adequacy, class counsel must be qualified, experienced and generally able to conduct the litigation." *Id.* (quotation marks omitted).

Lyft's argument with respect to adequacy is based on the suggestion that differences in the potential level of WAV services that could be provided between Access and Non-Access Regions if Plaintiffs' proposed reasonable modifications were adopted give rise to conflicting interests between the class representatives and putative class members.  Def.'s Opp. at 50-52. This argument speaks once again to the merits of the proposed modifications and whether they are reasonable, as well as whether they will be effective; moreover, in light of the Court's recommendation regarding the lack of standing of Scudieri, Burr, Lowell, and WDOMI with respect to the Access Regions and NYC classes, any possible conflict between the Access Region and Non-Access Region classes is moot.

Lowell and WDOMI are adequate class representatives for the Non-Access Region Class, the New York State Other Than NYC Class, and the Westchester Class.  Lowell is an individual with disabilities who requires WAVs to travel, and WDOMI is an entity with a mission of advocating for people with disabilities.  Lowell and WDOMI have actively engaged in discovery.  Pls.' Revised Mem. at 49-50.  As Plaintiffs note, "each Class seeks slightly different relief.  However, the relief sought does not conflict.  All relief sought would force Lyft to provide WAV service everywhere it operates and would benefit *all* class members."  Pls.' Reply at 25 (emphasis in original).  The class representatives here have an interest in vigorously pursuing the claims of the class; they seek the same relief as the class members they seek to represent; and they do not have interests that are antagonistic to the class members.  Accordingly, Plaintiffs have demonstrated the adequacy of Lowell and WDOMI to serve as class representatives for the three remaining classes at issue.

There has been no challenge the adequacy of class counsel, and this Court finds that Finkelstein, Blankinship, Frei-Pearson & Garber, LLP, Morgan & Morgan, P.C., and Michael Hellman—all of whom are qualified and experienced and have proven themselves capable of conducting this litigation—are adequate class counsel for this matter.

## 2. Ascertainability

"[A] class is ascertainable if it is defined using objective criteria that establish a membership with definite boundaries."  *In re Petrobras Secs.*, 862 F.3d 250, 257 (2d Cir. 2017).  As a threshold matter, however, "[i]t is not clear that the ascertainability requirement applies to Rule 23(b)(2) class actions[,] as notice is not obligatory and the relief sought is injunctive rather than compensatory."  *WILC*, 331 F.R.D. at 299 (cleaned up).  At a minimum "[i]n Rule 23(b)(2) cases, where the relief sought does not include class-wide monetary damages, the ascertainability

requirement is less stringent than in cases certified under Rule 23(b)(3)."  *Robinson v. N.Y.C. Transit Auth.*, No. 19-cv-01404 (AT) (BCM), 2020 WL 5884055, at *8 (S.D.N.Y. Aug. 31, 2020), *adopted by* 2020 WL 5814189 (S.D.N.Y. Sept. 30, 2020).  "Both the Second Circuit and numerous district courts in the circuit have approved of class definitions without precise ascertainability under Rule 23(b)(2)."  *Id.* (quotation marks omitted).  "It would be illogical to require precise ascertainability in a suit that seeks no class damages."  *Id.* (cleaned up).

Although Lyft makes a passing reference to the requirement of ascertainability, *see* Def.'s Opp. at 33 n.13, the only challenges it makes to the class definitions relate to the issue of standing, *see* Def.'s Opp. at 33-38, and those challenges have been rejected for the reasons explained above.  In any event, this Court finds that Plaintiffs have satisfied the ascertainability requirement.  Each of the proposed classes is defined using objective criteria—specifically, that an individual requires a WAV for vehicular transportation, resides in or visits the geographic area specific to the class, and is denied access to Lyft's services.  *See* Pls.' Revised Mem. at 3. To the extent that the classes might include future members, this "does not pose an obstacle to certification."  *WILC*, 331 F.R.D. at 299 (quotation marks omitted).  In sum, Plaintiffs' class definitions meet the "less stringent" standard for ascertainability applicable to this case.

* * * * * * * * * *

In sum, Plaintiffs have carried their burden with respect to all four requirements of Rule 23(a) and the ascertainability requirement.

### 3.    The Rule 23(b)(2) Standard

Rule 23(b)(2) provides that "[a] class action may be maintained if Rule 23(a) is satisfied and if . . . the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate

respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Dukes*, 564 U.S. at 360 (quotation marks omitted).

The parties dispute whether uniform injunctive relief could be provided as to each of the proposed classes. Plaintiffs contend that "[i]njunctive relief under Rule 23(b)(2) is appropriate because [Lyft] has acted on grounds generally applicable to each of the classes, and because such relief would apply to and benefit each of the respective classes as a whole." Pls.' Revised Mem. at 54. In response, Lyft states that "Plaintiffs have given this Court no basis on which it could conclude that the Court could fashion some form of injunction that would benefit all members of Plaintiffs' proposed classes," pointing out that this Court noted in a prior decision that Plaintiffs do not cite their expert's opinions in discussing the issue of whether they satisfy the requirements of Rule 23(b)(2). Def.'s Opp. at 53; *see* D&O at 7. But this Court's prior decision went on to say that

> [a]s one district court aptly stated in addressing a motion for certification of a Rule 23(b)(2) class in a case involving claims of racial discrimination,
>
> > [i]n the event that the Court determines that the challenged hiring procedures had a disparate impact on minority applicants, there are a number of injunctive and declaratory remedies that the Court could order that would apply equally to all class members. . . . *At this stage in the litigation, it is not necessary to speculate about the precise contours of such relief. All that matters is that the Court has the equitable power and the practical ability to fashion some form of injunctive or declaratory relief that would apply to all members of the proposed (b)(2) class.*
>
> *Houser*, 28 F. Supp. 3d at 249 (emphasis added).

D&O at 7.

Here, too, the issue on Plaintiffs' class certification motion is whether the Court "has the equitable power and the practical ability to fashion some form of injunctive or declaratory relief that would apply to all members" of Plaintiffs' proposed Rule 23(b)(2) classes—not what the specifics of that relief would be. Plaintiffs challenge uniform policies that Lyft follows in each of the different regions covered by each of the proposed classes and seek the implementation of proposed reasonable modifications tailored to each of those uniform policies. "[A] plaintiff class seeking classwide structural relief that would clearly redound to the benefits of each class member is the paradigmatic Rule 23(b)(2) class action." *Shepard v. Rhea*, No. 12-cv-7220 (RLE), 2014 WL 5801415, at *6 (S.D.N.Y. Nov. 7, 2014) (quotation marks omitted). This is precisely the situation presented in this matter.

The Court thus finds that Plaintiffs have satisfied the requirements of Rule 23(b)(2) with respect to each of their proposed classes.

## CONCLUSION

For the foregoing reasons, I respectfully recommend that Plaintiffs' motion for class certification (ECF No. 282) be GRANTED IN PART AND DENIED IN PART.

I respectfully recommend that Your Honor certify three proposed classes:[22]

- All residents of or visitors to any and all regions serviced by Lyft, aside from Lyft's Access Regions or NYC, who require WAVs for vehicular transportation, and who are denied equal access to Lyft's transportation services (the Non-Access Region Class) (represented by Lowell and WDOMI and asserting claims under the ADA);

- All residents of or visitors to any and all regions serviced by Lyft in New York State aside from NYC who require WAVs for vehicular transportation, and who are denied equal access to Lyft's

---

[22] Because the Court "is not bound by the class definition proposed in the complaint, and is empowered to carve out an appropriate class," *WILC*, 331 F.R.D. at 301 (quotation marks omitted), the Court adopts the class definitions, including the class representatives, as set forth in Plaintiffs' moving brief, *see* Pls.' Revised Mem. at 3.

transportation services (the New York State Other Than NYC Class) (represented by Lowell and WDOMI and asserting claims under the ADA and NYSHRL); and

- All residents of or visitors to Westchester County who require WAVs for vehicular transportation, and who are denied equal access to Lyft's transportation services (the Westchester Class) (represented by Lowell and WDOMI and asserting claims under the ADA and NYSHRL).

Excluded from the classes are people who (1) have downloaded the Lyft app; (2) have brought separate litigation against Lyft for its failure to serve people with disabilities; and/or (3) are residents of Ohio State University or the University of Texas at Austin who do not leave those campuses.

## NOTICE

Pursuant to 28 U.S.C. § 636(b)(l) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections.  *See also* Fed. R. Civ. P. 6(a).  A party may respond to another party's objections within fourteen (14) days after being served with a copy.  Fed. R. Civ. P. 72(b)(2).  Such objections, and any responses to such objections, shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Philip M. Halpern, United States District Court, Southern District of New York, 300 Quarropas Street, White Plains, New York, 10601, and to the chambers of the Honorable Andrew E. Krause at the same address.

Any request for an extension of time for filing objections or responses to objections must be directed to Judge Halpern, and not to the undersigned.

**Failure to file timely objections to this Report and Recommendation will result in a waiver of objections and will preclude appellate review.** *See Thomas v. Arn*, 474 U.S. 140 (1985); *Smith v. Campbell*, 782 F.3d 93, 102 (2d Cir. 2015).

Dated: December 22, 2022
　　　White Plains, New York

                                        Respectfully submitted,

                                        _____
                                        ANDREW E. KRAUSE
                                        United States Magistrate Judge