# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

HARRIET LOWELL and WESTCHESTER
DISABLED ON THE MOVE, INC.,
individually and on behalf of all other
similarly situated,

        Plaintiffs,

v.

LYFT, INC.,

        Defendant.

Case No.  7:17-cv-06251-PMH-AEK

**Joint Proposed Findings of Fact and
Conclusions of Law**

# Table Of Contents

I.      Background Facts. ...........................................................................................5

II.     Lyft Refuses To Provide Access
        Mode In 96 Percent Of Lyft's Service Regions .............................................11

III.    Plaintiffs' Experts Project
        Ample Supply And Demand For Access Mode In The Non-Access Regions. ..........14

IV.     Plaintiffs Have Standing ..............................................................................18

        A.      Findings of Fact .............................................................................19

        B.      Conclusions of Law .......................................................................22

V.      Legal Standard Under The ADA And The NYSHRL ....................................24

VI.     Plaintiffs Satisfy The First Element Of Both Statutes. .................................26

VII.    Plaintiffs Satisfy The Second Element Of Both Statutes. .............................26

        C.      Findings Of Fact  Related To Lyft Being
                A Public Accommodation Under The ADA. ......................................26

        D.      Conclusions Of Law Related To
                Lyft Being A Public Accommodation Under The ADA. .....................27

VIII.   Plaintiffs Satisfy The Third Element Of Both Statutes. .................................29

        A.      Legal Standard ...............................................................................29

        B.      Plaintiffs' First Reasonable Modification ........................................34

                1.      Findings of Fact....................................................................34

                2.      Conclusions of Law ..............................................................41

        C.      Plaintiffs' Second Reasonable Modification.....................................46

                1.      Findings of Fact....................................................................46

                2.      Conclusions of Law ..............................................................48

        D.      Plaintiffs' Third Reasonable Modification.......................................49

| | | 1. | Findings of Fact | 49 |
| | | 2. | Conclusions Of Law | 53 |
| E. | | Plaintiffs' Fourth Reasonable Modification | 55 |
| | | 1. | Findings Of Fact | 55 |
| | | 2. | Conclusions of Law | 57 |
| F. | | Plaintiffs' Fifth Reasonable Modification | 58 |
| | | 1. | Findings of Fact | 58 |
| | | 2. | Conclusions Of Law | 60 |
| G. | | Plaintiffs' Sixth Reasonable Modification | 62 |
| | | 1. | Findings Of Fact | 62 |
| | | 2. | Conclusions Of Law | 63 |
| H. | | Plaintiffs' Seventh Reasonable Modification | 65 |
| | | 1. | Findings Of Fact | 65 |
| | | 2. | Conclusions Of Law | 67 |
| I. | | Plaintiffs' Eighth Reasonable Modification | 68 |
| | | 1. | Findings Of Fact | 68 |
| | | 2. | Conclusions Of Law | 71 |
| J. | | Plaintiffs' Ninth Reasonable Modification | 73 |
| | | 1. | Findings Of Fact | 73 |
| | | 2. | Conclusions Of Law | 75 |
| K. | | Plaintiffs Meet Their Burden To Articulate A Plausible Proposal For Barrier Removal. | 76 |

        1.      Legal Standard............................................................................................76

        2.      Conclusions Of Law. ...............................................................................76

   IX.    Plaintiffs Are Entitled To Attorneys' Fees And Costs.....................................81

   X.     The Court Issues The Following Order...........................................................82

LYFT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
IN SUPPORT OF ITS AFFIRMATIVE DEFENSE OF FUNDAMENTAL ALTERATION TO
PLAINTIFFS' FIRST AND SECOND CLAIMS FOR RELIEF UNDER THE ADA AND THE
NYSHRL....................................................................................................................................84

   FACTS RELEVANT TO AFFIRMATIVE DEFENSE..........................................84

LYFT'S PROPOSED CONCLUSIONS OF LAW ............................................................92

   PLAINTIFFS' PROPOSAL TO HAVE LYFT OFFER ACCESS MODE EVERYWHERE
   WOULD FUNDAMENTALLY ALTER THE NATURE OF LYFT'S BUSINESS...........92

## PLAINTIFFS' PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW

### I.    Background Facts.

1.    Plaintiff Harriet Lowell ("Ms. Lowell") is a disabled citizen of White Plains, New York, who relies on a motorized scooter for travel.  Stip. Fact ¶ 1.

2.    Plaintiff Westchester Disabled on the Move, Inc. ("WDOMI") is a non-profit community-based organization headquartered in Yonkers, New York.  Stip. Fact ¶ 2.

3.    Ms. Lowell has never downloaded Defendant Lyft, Inc.'s ("Lyft" or "Defendant") mobile-based application (the "App").  Stip. Fact ¶ 4.

4.    A significant percentage of WDOMI's constituents, clients, and staff are persons with disabilities, including mobility-related disabilities.  WDOMI is staffed, directed, and driven by the individuals with disabilities that it seeks to serve, including wheelchair-users.  Stip. Fact ¶ 5.

5.    Plaintiffs Ms. Lowell and WDOMI seek to use Lyft's wheelchair-accessible vehicle ("WAVs") mode ("Access mode"), but do not currently use Lyft because Lyft does not offer Access mode in Westchester County, New York State outside of NYC, and approximately 96 percent of its service regions (the "non-Access Regions").[1]

6.    WAVs are vehicles built to accommodate fixed-frame wheelchairs, and typically feature a wheelchair ramp or lift, a lowered floor to accommodate the equipment, and a securement device to keep the wheelchair in place when the vehicle is in motion.  Stip. Fact ¶ 27.

7.    Lyft launched its peer-to-peer marketplace for on-demand ridesharing in or about 2012.  Stip. Fact ¶ 7.

8.    Lyft operates multimodal transportation networks in the United States that offer

---

[1] Affidavit of Harriet Lowell at ¶¶ 14-20, 28-45; Affidavit of Melvyn Tanzman at ¶¶ 29-46.

As of May 2023, "Access mode" is called "Wheelchair mode" at Lyft. For consistency with prior filings and orders, we will continue to refer to the mode as "Access mode."

access to a variety of transportation options through Lyft's platform and App. Stip. Fact ¶ 8.

9. Members of the general public may download the App and agree to the Terms of Service. Stip. Fact ¶ 11.

10. Lyft offers its standard mode service ("Standard mode") in all 50 states and in all regions where it operates, regardless of population density, wait time, number of available vehicles, or any other considerations or metrics. Stip. Fact ¶¶ 16-17.

11. With Standard mode, riders are able to request a ride in that "mode" at any time, 24 hours a day, but Lyft makes no guarantee that the ride request will be matched or that a driver will be available or accept the ride request. Stip. Fact ¶ 19.

### Lyft's Response to Fact Nos. 7-11

Lyft is a two-sided, supply-and-demand based platform that connects independent drivers and riders in order to facilitate on-demand transportation. Both drivers and riders can download and open the Lyft app ("App"). In the App, users see an icon for "Standard mode," along with other ride "modes" that may be available in a specific region. (Testimony of Leon Treger, Abbas Bozorgirad.)

The performance of Lyft's platform, as measured by metrics such as ride volume, wait times, and completion rates, turns in large part on the regional volume of supply and demand. Where there are more riders and drivers available in a specific area, the App facilitates more rides, thereby generating revenue for drivers and Lyft, and providing access to a more reliable transportation option to riders. (Testimony of Dr. Marc Rysman, Leon Treger, Abbas Bozorgirad.)

Several ride modes are offered on the Lyft platform depending on the location. Lyft's ride modes include: (a) Standard (its basic rideshare option), (b) XL (larger vehicles for up to 6 riders), (c) Lux (high-end luxury vehicles), (d) Lux Black (premium black car), and (e)

Lux Black XL (premium black SUV for up to 6 riders). Not all "modes" are available in all regions. In general, the more specialized the mode, the more expensive the ride will be. The rider pays more, and the driver (and Lyft) receives more. (Testimony of Leon Treger, Abbas Bozorgirad.)

12. Lyft allows riders to request a ride and for drivers to appear on the platform in areas where a vehicle is rarely, if ever, available, including all parts of New York State and areas as sparsely populated as Wyoming. (Testimony of Alex Elegudin).

13. Lyft has never restricted, blocked, or withdrawn its Standard mode from a region after beginning operations in that region.[2]

14. Wait times (*i.e.,* the amount of time between the time a ride is requested and the time when the driver arrives) and completion rates (*i.e.,* the percentage of requested rides that are completed) on the Lyft platform vary by location and by mode. Stip. Fact ¶ 21.

15. Lyft does not restrict its Standard mode in any Region based upon the level of service, including wait times and completion rates. Stip. Fact ¶ 23.

**Lyft's Response to Fact Nos. 12-15**

Lyft's ridesharing platform, which is premised on fundamental principles of supply and demand, may yield different outcomes for riders depending on their location or time of day. The analysis by Lyft's expert, Dr. Marc Rysman, confirmed that local population density is a key determinant of the effectiveness of Lyft's ridesharing platform as measured by metrics such as completion rates, expected wait times, and ride volumes. This is consistent with a platform model. (Testimony of Dr. Marc Rysman.)

---

[2] Transcript of March 18, 2022, Deposition of Marc Rysman ("Rysman Dep. Tr."), 71:16-21 ("Lyft is not preventing riders and drivers from using the app in markets that have say 20-minute wait times and very low completion rates and that sort of – those sort of metrics."), 119:1-120:17, 145:16-146:1, 254:20-255:10.

Areas of higher population density, like New York City, tend to have greater supply and demand, which leads to more rides, with higher completion rates and lower wait times. But in areas of low population density, Lyft's ridesharing platform may cease to function due to the lack of supply and demand. Lyft's platform is not an effective or reliable transportation option for riders in those areas. (Testimony of Dr. Marc Rysman, Leon Treger.)

While Standard mode is available in all areas where the Lyft App is operational, Lyft's Terms of Service state that "Lyft reserves the right, for example, to limit or eliminate access to the Lyft Platform for Rideshare Services in specific geographic areas and/or at specific times based on commercial viability, public health concerns, or changes in law." Furthermore, while Standard mode is available everywhere, Lyft does not offer specialized modes in all regions. Rather, Lyft thinks strategically about where to offer specialized modes to attempt to ensure a balance in supply and demand. (Exhibit A (Terms of Service); Testimony of Leon Treger, Abbas Bozorgirad.)

16. Between January 1, 2017, and January 31, 2021, in approximately ■ percent of the months, Lyft's Standard mode operations reported a completion rate of below ■ percent. In approximately ■ percent of those months, Lyft's Standard mode operations reported a completion rate of below ■ percent.[3]

17. Between January 1, 2017, and January 31, 2021, in approximately ■ percent of the months, Lyft's Standard mode operations reported a wait time of greater than ■ minutes and in approximately ■ percent of the months, Lyft's Standard mode operations reported a wait time of greater than ■ minutes.[4]

---

[3] Rebuttal Expert Report, at 31, Table 2; Demand 2021-09-20.
[4] Rebuttal Expert Report, at 31, Table 2; Demand 2021-09-20.

18.     During February 2020 in New York State, Lyft offered Standard mode in ██ ZIP Codes where Lyft received zero requests for a ride and in ██ ZIP Codes where no ride requests were completed.[5]

19.     Lyft makes Standard mode available in all regions where it operates regardless of the number of available vehicles.  Stip. Fact ¶ 17.

20.     Lyft offers Standard mode through an independent contractor model (the "IC model").  The IC model depends on drivers who personally own or rent a car.  These drivers set their own hours and drive where they want to drive.  Stip. Fact ¶¶ 24-25.

21.     Based on Lyft's data, there were ██ Regions where the average number of drivers per month on Standard mode was █ or fewer drivers for at least one year between 2017 and 2021.[6]

22.     Based on Lyft's data, between January 2017 and January 2021, Lyft began offering Standard mode in at least ██ Regions where the supply of drivers available in the first month of service was fewer than ██ drivers, including ██ Regions where the supply of drivers available in the first month of service was fewer than ██ drivers.  In each of these ██ Regions, Lyft continued to operate Standard mode.  Lyft continued to operate in ██ of these Regions where the supply of drivers on Standard mode was fewer than ██.[7] (Testimony of Claudia Stern).

**<u>Lyft's Response to Fact Nos. 16-22</u>**

Lyft offers all non-WAV ride modes via its independent contractor model. Independent drivers with qualifying personal vehicles may elect to drive in any mode for which their vehicle qualifies. If there is not demand for a mode in a specific area, the driver is not able to earn money from driving in that mode. Drivers tend not to drive on the

---

[5] Expert Rebuttal Report, at 4; Lowell-demand-2020-09-18.csv.
[6] Supply 2021-02-26.
[7] Supply 2021-02-26.

platform if there is not potential for earnings. (Testimony of Dr. Marc Rysman, Abbas Bozorgirad.)

The success of Lyft's platform in connecting riders to drivers depends on a density of a supply of drivers with qualifying vehicles and a corresponding demand for rides in a given region. The "completion rates" and "wait times" for ride requests in Standard (or any other) mode vary widely, and the differences in completion rates and wait times correlate strongly to the population density of an area. As Dr. Rysman's analysis showed, the ZIP Codes referenced in Paragraphs 16-22 above are where Lyft's ridesharing platform is not effective in attracting riders and drivers and, as a result, is not an effective or reliable transportation option for riders. (Testimony of Dr. Marc Rysman.)

Lyft has chosen to make its App operational in low- or no-use areas because it complements the App's operation in high density areas by allowing, for example, a Lyft user from New York City to search for available drivers at an airport in Wyoming, and because there is very little financial downside to Lyft in offering Standard and XL modes in these areas. That is because making the App generally available requires little to no "on the ground" support – the platform can largely be managed algorithmically. (Testimony of Isabella Gerundio, Leon Treger.)

However, Lyft's App does not show every type of car in every region. For example, while Lyft's App does list "Standard" mode in every region, other specialized modes, such as "Lux" or "Lux Black," are offered only in those regions where Lyft has determined there is sufficient supply of and demand for the mode in order to create an appealing product. Lyft must be strategic about where to offer specialized modes, because if there are not sufficient drivers with qualifying vehicle types, or demand from riders for higher-priced rides, it could

lead to a bad user experience, ultimately leading riders and drivers to stop using the Lyft

platform. (Testimony of Leon Treger, Abbas Bozorgirad.)

**Evidentiary Objections**:

- FN 3-7 (Data reports):  Plaintiffs rely on uninterpreted raw data reports to support extrapolations and conclusions about the underlying data without a foundational witness. This is improper. Fed. R. Evid. 401-403, 602.
- FN 3-5 (Expert reports): Plaintiffs also rely on the reports of their experts, Alex Elegudin and Claudia Stern. The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702. Moreover, no expert will testify that Standard mode service can be replicated for Access mode.

## II.     Lyft Refuses To Provide Access Mode In 96 Percent Of Lyft's Service Regions.

23.     Prior to 2016, Lyft did not offer WAV service in any Region.  To date, Lyft has

launched WAV service (called "Access" mode) in nine cities in the United States: Boston,

Massachusetts; Chicago, Illinois; Dallas, Texas; Los Angeles, California; New York, New York;

Philadelphia, Pennsylvania; Portland, Oregon; Phoenix, Arizona; and San Francisco, California

("Access Regions").  Lyft does not offer Access mode in Regions other than the Access Regions

("the non-Access Regions").  Stip. Fact ¶¶ 26, 32, 35.

24.     Lyft launched Access mode in these nine markets in response to regulatory

requirements, financial incentives, or a partnership with a transit agency.  Stip. Fact ¶ 33.

25.     Lyft offers Access mode in the Access Regions using two models: the IC model and

the "Partner model."  The IC model for WAV depends on drivers who personally own or rent

WAVs.  These drivers ("IC WAV drivers"), like other independent drivers on the Lyft platform, set

their own hours and drive where they want to drive.  Stip. Fact ¶¶ 37-38.

26.     The Partner model relies on third-party transportation companies with whom Lyft

contracts.  Under the Partner model, Lyft pays the third-party companies a negotiated hourly rate

that varies by city and by company.  In exchange, the third-party companies provide the contracted-

for number of WAVs and drivers to drive the WAVs on the Lyft platform.  Stip. Fact ¶¶ 39-40.

**Lyft's Response to Fact Nos. 23-26**

Plaintiffs' heading is misleading: no evidence was presented that Lyft "refuses to provide Access mode" despite a sufficient supply of WAVs. To the contrary, evidence showed that Lyft does not offer Access mode everywhere because there is no known available supply of WAVs anywhere. Indeed, no evidence was presented that any entity, either public or private, had found a way to offer on-demand WAV service without incurring significant costs, or that any entity had found a way to provide on-demand WAV service across an entire state or all 50 states.

No party presented evidence of a known supply of available IC WAV drivers who are willing to drive on the Lyft platform in any non-Access Region. Evidence showed that individuals who rely on WAVs for transportation are estimated to be less than 1% of the population, and no evidence was presented showing the rate of WAV ownership to be greater than 1%. Moreover, WAVs can cost over $40,000, compared to vehicles that can be driven in Standard mode which can cost as little as $10,000. (Testimony of Dr. Marc Rysman; Plaintiffs' Corrected Expert Report at 33 (estimating 2.2 million wheelchair users in the United States); Plaintiffs' Expert Rebuttal Report at 21 ("People with disabilities are half as likely to own or have access to vehicles in their households").)

Because there is no known WAV supply in any non-Access Region, Lyft cannot rely on its platform model to deliver effective and reliable WAV service. Lyft has used expensive and operationally complex supply models to offer WAV service in the nine regions where Access mode is required or incentivized. Lyft has spent over ▮▮▮▮▮▮ annually to create a supply of WAVs under the "Partner" and "IC" models in the nine Access Regions. (Testimony of Isabella Gerundio, Leon Treger.)

There is no evidence that there exists a more cost-effective way to provide on-demand WAV service that is effective and reliable. Indeed, there is no evidence that on-demand WAV service is possible *anywhere* in the country, without significant government subsidies or mandates. (Testimony of Isabella Gerundio.)

27.     Lyft uniquely and categorically precludes WAVs from appearing on the App in the regions outside of Lyft's nine Access Regions (the "non-Access Regions").[8] (Testimony of Alex Elegudin).

28.     Christopher Wu ("Mr. Wu"), the former head of Lyft's national WAV team, stated that Lyft's WAV program is "incentivized to keep WAV programs as small as possible while meeting regulatory requirements" and thus, Lyft "will do as little as possible unless forced[.]"[9]

29.     Instead of working to expand Access mode or provide better service, Lyft's employees work to "impair service levels" and "suppress performance" for WAVs so that Lyft can point to the unsuccessful nature of Access mode to convince regulators and courts that it should not have to provide more or better service to people with disabilities.[10]

**Lyft's Response to Fact Nos. 27-29**

There is no evidence supporting the conclusion that Lyft "uniquely" or "categorically precludes" WAVs from appearing on the App in non-Access regions because there is no evidence of a WAV supply in those regions. (Testimony of Abbas Bozorgirad, Leon Treger.)

Contrary to Plaintiffs' characterization, the evidence establishes that Lyft has attempted to comply with regulations while minimizing the costs of its WAV program to the extent possible. Among other things, there was no evidence that Lyft deliberately drove up the costs of a regulatorily mandated program, or that Lyft intentionally has done "as little as

---

[8] Gerundio Dep. Tr. 88:8-15; Chan Dep. Tr. 119:14-19; Zhou Dep. Tr. 165:21-166:2.
[9] LYFT_ILRC00022617; Wu Dep. Tr. 183:8-25.
[10] LYFT0031721.

possible" to provide WAV service. After all, Lyft offers Access mode in San Francisco, Los Angeles, and Dallas without any government mandate. (Dr. Marc Rysman, Isabella Gerundio.)

**Evidentiary Objections**:

- FN 8: The deposition testimony cited does not support the proposed fact. Fed. R. Evid. 401-403, 602.
- FN 9: This material has no relevance to this case. Fed. R. Evid. 401-403. Chris Wu has not worked for Lyft since August 2019. He testified at deposition that "I mean I think at this time with the appetite the company had this was probably true not related to health care transit university opportunities like in Austin, in Boston, but that was, you know, that was at that time," but he is "unaware" of any changes because he hasn't "been there in so long."
- FN 10: The material is inadmissible hearsay. Fed. R. Evid. 801-803. The proposed finding is based on an inadmissible email; and, in any event, one out of context email from one Lyft employee from over three years ago discussing Access mode in one city (New York City) for one point in time, cannot support the proposed statement of fact.
- Testimony of Alex Elegudin: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702.

## III. Plaintiffs' Experts Project Ample Supply And Demand For Access Mode In The Non-Access Regions.

30.    Between 2017 and 2021, Lyft received approximately ▮▮▮▮▮ requests for WAV rides in the Access Regions. Plaintiffs' experts project that Lyft provided Access mode to approximately 36 percent of the individuals who attempted to turn on the Access mode toggle (which requires users to navigate to a different page of Lyft's App and enable the Access mode setting of Lyft's App, which is not required for any other users). As a result, the number of people who enable the toggle is only a fraction of the people who would use Access mode. Plaintiffs' experts' projections indicate substantial unmet demand for Access mode.[11] (Testimony of Alex Elegudin.)

31.    Plaintiffs' experts project that approximately 1,862 drivers, or 6 drivers per Region, are

---

[11] Corrected Expert Report, at 26, 45-46; Highly Confidential – Subject to Protective Order – Toggle Report 2021-02-26.csv ("Toggle 2021-02-26").

sufficient to offer Access mode in each non-Access Regions.[12]  (Testimony of Alex Elegudin).

**Lyft's Response to Fact Nos. 30-31**

The heading is misleading: Plaintiffs' experts do not "project ample supply" and Paragraphs 30-36 do not set out any opinions by Plaintiffs' experts of any WAV supply in Westchester County, New York State, or all non-Access Regions across the United States.

Plaintiffs' expert, Alex Elegudin, has no prior experience working for or studying ridesharing platforms. His testimony regarding the alleged latent demand for rides, or the necessary supply of drivers to serve such rides, is speculation and is not based on any specialized experience or knowledge.

The admissible evidence establishes that the population of WAV users is likely less than 1% of the population. Moreover, even in Lyft's most developed WAV ridesharing market, New York City, WAV rides comprise just 0.1% of all rides. This means that the density of demand for on-demand WAV service anywhere is extremely low. Any figures related to the "toggle" were not effectively explained and have no apparent relevance. (Testimony of Dr. Marc Rysman, Abbas Bozorgirad.)

The projection that just 1,862 drivers can provide on-demand transportation for WAV users across over 3 million square miles of the United States is not credible, because that suggests one driver for every 1,611 square miles. The projection is also contradicted by the testimony of Plaintiffs' expert, who opined that over 1,000 IC WAV drivers in New York City, an area comprising just 302 square miles, provided "limited and unequal" service. If 1,000 IC WAV drivers was inadequate for New York City, it is not clear how 1,862 drivers would be sufficient to cover the entire country. (Corrected Expert Report at 27, Testimony of Dr. Marc Rysman, Isabella Gerundio, Abbas Bozorgirad, Leon Treger.)

---

[12] Corrected Expert Report, at 37-38.

Finally, even if six IC WAV drivers per region could be deemed "sufficient" to offer WAV service, there was no evidence offered to show that there were, in fact, six IC WAV drivers per region who want to drive their WAVs on the Lyft platform. Lyft established that it has been extremely difficult and expensive to procure the limited supply of WAVs and WAV drivers that are available in the nine Access Regions. There is no evidence that it would be any easier or less expensive in Westchester County, New York State (outside of New York City), or the over 300 non-Access Regions across the United States. (Testimony of Dr. Marc Rysman, Isabella Gerundio, Abbas Bozorgirad, Leon Treger.)

**Evidentiary Objections**:

- FN 11 (Data reports):  Once again, Plaintiffs rely on uninterpreted raw data reports to support extrapolations and conclusions about the underlying data without a foundational witness. This is improper. Fed. R. Evid. 401-403, 602.
- FN 11-12 (Expert reports) and Testimony of Alex Elegudin: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702.

32.     Based on Lyft's data, WAV drivers attempted to drive in Access mode in ▮ non-Access Regions in 2019 and ▮ non-Access regions in 2020.  In 2019, WAV drivers attempted to drive in Access mode in non-Access Regions ▮ times and, in 2020, WAV drivers attempted to drive in Access mode in non-Access Regions ▮ times.[13]

33.     Based on Lyft's data, there was an average of four drivers per month on Access Mode for at least one year between 2017 and 2021 in 14 non-Access Regions in 8 states.[14]

34.     Based on Lyft's data, in 2020, five different non-Access Regions in New York, New Jersey, and Connecticut had a higher per-month average of Access mode drivers than each Access Region other than NYC.[15]

---

[13] Supply 2021-02-26.
[14] Supply 2021-02-26.
[15] Supply 2021-02-26.

35. Based on Lyft's data, in 2019 and 2020, WAV drivers were registered on Access mode in ten Regions in New York State outside of NYC.[16]

36. Based on Lyft's data, an average of 331 WAV drivers per month were registered on Access mode in Westchester in 2020. This amount is greater than the number of Standard mode drivers in 115 of Lyft's 331 Regions.[17]

### Lyft's Response to Fact Nos. 32-36

Notably, Plaintiffs' experts did not opine that there were drivers who "attempted to drive" their WAVs on the Lyft platform in any of the non-Access Regions identified by Plaintiffs in Paragraphs 32-36. Moreover, the uninterpreted data reports relied on by Plaintiffs do not establish that drivers "attempted to drive" WAVs in these locations. There was no testimony from any drivers, Lyft employees, or experts with knowledge that any of the WAV drivers who allegedly appeared in the data in non-Access Regions: (1) had WAVs, (2) would drive WAVs on the Lyft platform for a material amount of time in any particular non-Access Region, or (3) would provide WAV (as opposed to Standard mode) rides in any non-Access Region. Indeed, the most likely explanation for why WAV drivers appear in the data in non-Access Regions is because they had crossed over from Access Regions (such as New York City) into neighboring non-Access regions to drop off riders. (Testimony of Leon Treger, Abbas Bozorgirad.)

The inference that WAV drivers in the New York City area would be interested in providing WAV rides outside of the city is not supported by the evidence. First, there was no direct evidence from any WAV drivers in New York City that they would be interested in driving WAV outside of that region. Second, the evidence establishes that the New York

---

[16] Supply 2021-02-26.
[17] Supply 2021-02-26.

City market provides unique and significant financial and regulatory incentives for WAV drivers to drive in the five boroughs rather than in any neighboring region. This is because under the regulatory structure in New York City, WAV drivers can make more money driving in New York City than elsewhere to offset the higher acquisition and operating costs of WAVs. Finally, due to regulatory and other barriers, no TLC-licensed drivers, regardless of whether they drive a WAV or a Standard mode vehicle, are allowed to pick up rides in other New York State regions. Thus, anecdotal evidence of WAV drivers appearing in the data in regions around New York City is not probative of the actual availability of WAV drivers who are willing and able to operate in those areas. (Testimony of Leon Treger.)

**Evidentiary Objections**:

- FN 13-17: Plaintiffs again rely exclusively on uninterpreted raw data reports to support extrapolations and conclusions about the underlying data without a foundational witness. Fed. R. Evid. 401-403, 602.

## IV. **Plaintiffs Have Standing**

37. The standing inquiry requires a three-part analysis. "First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not conjectural or hypothetical.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal citations omitted) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)). "Second, there must be a causal connection between the injury and the conduct complained of . . . ." *Id.* at 560 (citing *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976)). "Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.* at 561 (quoting *Simon*, 426 U.S. at 38, 43).

38. "In the ADA context, [the Second Circuit] ha[s] held that a plaintiff seeking injunctive relief has suffered an injury in fact when: '(1) the plaintiff alleged past injury under the ADA; (2) it was reasonable to infer that the discriminatory treatment would continue; and (3) it was

reasonable to infer, based on the past frequency of plaintiff's visits and the proximity of defendants' [businesses] to plaintiff's home, that plaintiff intended to return to the subject location.'" *Calcano v. Swarovski N. Am. Ltd.*, 36 F.4th 68, 74 (2d Cir. 2022) (quoting *Kreisler v. Second Ave. Diner Corp.*, 731 F.3d 184, 187 (2d Cir. 2013)); *see also Disabled in Action v. Bd. of Elections in City of New York*, 752 F.3d 189, 200 (2d Cir. 2014) (quoting *Kreisler*, 731 F.3d at 188) ("deterrence constitutes an injury under the ADA"); *Calcano*, 36 F.4th at 75 (quoting *Kennedy v. Floridian Hotel, Inc.*, 998 F.3d 1221, 1233 (11th Cir. 2021) (The court must examine whether the plaintiffs "plausibly allege[] 'a real and immediate threat of future injury.'").

39. An organization may establish associational standing by showing that at least one of its members has standing, that the interests at stake are germane to the organization's purpose, and that neither the claim nor the relief requires participation of the organization's individual members. *Bronx Indep. Living Servs. v. Metro. Transp. Auth.*, No. 16-5023, 2021 WL 1177740, at *12 (S.D.N.Y. Mar. 29, 2021) (citing *Nat. Res. Def. Council v. Dep't of Interior*, 410 F. Supp. 3d 582, 592 (S.D.N.Y. 2019)). "To establish associational standing '[w]here an association is not a traditional voluntary membership organization, its constituents must nevertheless possess sufficient indicia of membership.'" *Westchester Indep. Living Ctr., Inc. ("WILC") v. State Univ. of New York, Purchase Coll.*, 331 F.R.D. 279, 296 (S.D.N.Y. 2019) (Seibel, J.) (alteration in original) (quoting *Mental Hygiene Legal Serv. v. Cuomo*, 609 F.App'x 693, 695 (2d Cir. 2015)).

A.     **Findings of Fact**

40. Ms. Lowell, and many of WDOMI's members, seek to use Access mode, but do not currently use Lyft and have not downloaded the App because Lyft does not offer Access mode in Westchester and New York State outside of NYC.[18]

---

[18] Affidavit of Harriet Lowell at ¶¶ 14-20, 28-45; Affidavit of Melvyn Tanzman at ¶¶ 29-46.

41.     Ms. Lowell knows that Lyft refuses to serve her and other people who use motorized scooters or wheelchairs except in regions where regulators force it to provide service.[19]

42.     A significant percentage of WDOMI's constituents, clients, and staff are persons with disabilities, including mobility-related disabilities.  WDOMI is staffed, directed, and driven by individuals with disabilities that it seeks to serve, including wheelchair-users.  Stip. Fact. ¶ 5.

43.     Not having access to Lyft WAVs prevents Ms. Lowell from fully enjoying many aspects of life, including assisting with her husband's medical needs.  For example, when her husband was hospitalized at WestMed in White Plains, she could not visit him because it was too far to travel without a WAV.  Similarly, when her husband was hospitalized in Greenwich, Connecticut, she was sometimes unable to visit him.  On some occasions, her friend, who also owns a WAV, would drive her to visit her husband, but this was an imposition.  She was unable to call a Lyft to visit her husband as would any able-bodied person.[20]

44.     Ms. Lowell seeks to use Lyft to go out for gatherings with family and friends in White Plains.  Ms. Lowell intends to regularly use Lyft to get to appointments, run errands, go to restaurants, and visit friends.  Ms. Lowell intends to use Lyft to travel to and from the hair salon every three weeks, which currently requires her husband to drive her.[21]

45.     Prior to the pandemic, Ms. Lowell travelled to NYC once or twice a month for medical reasons, and will likely have to attend medical appointments in person in the future.  Ms. Lowell also has many friends in NYC and enjoys going to restaurants, visiting museums, and attending events such as advocacy events in NYC and across New York.  Right now, Ms. Lowell's husband has to drive her on each of these trips.  Ms. Lowell would regularly use Lyft to travel to and

---

[19] Affidavit of Harriet Lowell at ¶¶ 19-20.
[20] Affidavit of Harriet Lowell at ¶¶ 14-16.
[21] Affidavit of Harriet Lowell at ¶¶ 19-20.

from NYC without the need for her husband to drive her.[22]

46.     Without WAV service, many of WDOMI's constituents cannot access Lyft's transportation services.[23]

47.     For example, Ansel Lurio, a WDOMI constituent, was stranded in a snowstorm in Westchester because he could not call a WAV through Lyft. Due to the snow, he was unable to use his wheelchair. Lyft directed Ansel to call paratransit, which requires 24-hour advance notice to schedule a ride. After searching all options, Ansel was forced to call a local ambulance to pick him up and spent the night in the hospital, despite no medical need.[24] Moreover, many WDOMI members who use WAVs would use Lyft in their every-day life if Lyft did not refuse to serve them.[25]

**Lyft's Response to Fact Nos. 40-47**

Ms. Lowell admitted that to use the App she would "have to know that Lyft had reliable service," which means that she would "have to be certain that [she] could get a Lyft" when she needed one. This is consistent with the testimony of many other witnesses in this action, who repeatedly testified that they needed "reliable" access to WAV service before they would download the App. Witnesses who visited or reside in regions where Lyft currently offers Access mode, including Ms. Lowell, testified that they have not downloaded the App to date because they perceive the service as inadequately reliable. The injury alleged to have been suffered is not a lack of "Access mode" displayed in the App; instead, it is the absence of effective and reliable on-demand WAV transportation. (Amended Complaint [ECF 20] ¶ 138 ("By failing to make reasonable modifications to its policies, practices, and procedures to make wheelchair accessible vehicles available with equivalent reliability and

---

[22] Affidavit of Harriet Lowell at ¶ 10.
[23] Affidavit of Melvyn Tanzman ¶¶ 29-32.
[24] Transcript of Aug. 17, 2021, Deposition of Ansel Lurio at 128:21-130:12; Affidavit of Melvyn Tanzman at ¶¶ 40-44.
[25] Affidavit of Melvyn Tanzman at ¶¶29-46.

similar wait times as inaccessible vehicles," Lyft denies Plaintiffs "full and equal enjoyment of Defendant's transportation service"; Deposition of Harriet Lowell at 121:18-122:5, 123:6-7; Deposition of Pauline Scudieri at 74:5-75:23; Deposition of Pamela Daly at 27:18-30:7.)

**B.      Conclusions of Law**

48.      Ms. Lowell has demonstrated that she is unable to use Lyft in Westchester, that she is deterred from using Lyft due to its refusal to serve WAV users in Westchester, and that she will use Lyft if it stops discriminating against people who require WAVs.[26]

49.      WDOMI has associational standing because its employees, members, and constituents are people with disabilities, including mobility-related disabilities; these people have acquired knowledge of Lyft's ongoing discrimination; Lyft has refused to serve some of WDOMI's members and other WDOMI members have been deterred from even attempting to use Lyft; and Lyft has rejected WDOMI's requests that Lyft change its policies and serve people with disabilities. Indeed, WDOMI "is staffed, directed, and driven by the individuals with disabilities that it seeks to serve," including wheelchair-users. *WILC*, 331 F.R.D. at 297.

50.      Courts in the Second Circuit and elsewhere routinely find that independent living centers such as WDOMI have associational standing to represent people with disabilities. *See, e.g.*, *Bronx Indep. Living Servs.*, 2021 WL 1177740, at *12 ("[The plaintiff] is an independent living center that provides services and advocacy for persons with disabilities and disabled individuals make up more than half of its leadership and staff. Courts in this District have found similar centers have sufficient indicia of membership to support associational standing."); *WILC*, 331 F.R.D. at 297 (holding that the plaintiff has associational standing because "WILC is staffed, directed, and driven

---

[26] *See Lowell v. Lyft, Inc.*, No. 17-6251, 2023 U.S. Dist. LEXIS 50722, at *19, 21 (S.D.N.Y. Mar. 24, 2023) (Halpern, J.). *See also* Lowell Decl., ¶¶ 8-18; Declaration of Harriet Lowell in Opposition to Defendant Lyft, Inc.'s Motion to Dismiss, ECF No. 36 ("Lowell Decl."), ¶¶ 6-14.

by the individuals with disabilities that it seeks to serve . . . while WILC is not a traditional membership organization, I find that its constituents have sufficient indicia of membership in the organization, and therefore WILC has associational standing"); *Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg*, 290 F.R.D. 409, 417 (S.D.N.Y. 2012) ("CIDNY is a 'service provider[ ] managed and directed by persons with disabilities for the purpose of serving persons with disabilities'" and thus "has sufficient 'indicia of membership' to 'function effectively as a membership organization' for the purposes of associational standing.") (quoting *Disability Advocs., Inc. v. New York Coal. for Quality Assisted Living, Inc.*, 675 F.3d 149, 157 (2d Cir. 2012)).

### Lyft's Response to Conclusion of Law Nos. 48-50

Plaintiffs failed to establish Article III standing.

First, neither Lowell nor WDOMI presented any evidence of a concrete intention to use WAV transportation on the Lyft platform in any non-Access Region other than in Westchester County. *See Calcano v. Swarovski N. Am. Ltd.*, 36 F.4th 68, 74 (2d Cir. 2022) (among the factors plaintiff must establish to prove injury-in-fact necessary for injunctive relief is that she intends "to return to the subject location"). Neither Plaintiff has standing to pursue injunctive relief outside of Westchester County.

Second, as Plaintiffs acknowledge in Paragraph 37, in order to establish standing, they must establish "a causal connection between the injury and the conduct complained of." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citing *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976)). This element of standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lewis v. Casey*, 518 U.S. 343, 358 (1996) (quoting *Lujan*, 504 U.S. at 561). Here, Plaintiffs have failed to prove, by a preponderance of the evidence, a causal connection between Lyft's conduct

and their inability to access transportation by WAVs on Lyft's platform because they failed to put forth any evidence demonstrating a ready supply of WAVs and WAV drivers anywhere, including in Westchester County.

Third, Plaintiffs have likewise failed to prove, by a preponderance of the evidence, that it is "'likely,' as opposed to merely 'speculative,' that their injury will be 'redressed by a favorable decision.'" *Lujan,* 504 U.S. at 561 (quoting *Simon*, 426 U.S. at 38, 43); *see also W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 106-07 (2d Cir. 2008). Plaintiffs rely exclusively on data which displays WAVs occasionally appearing in non-Access Regions, especially around New York City, including in Westchester County, New Jersey, and Connecticut. There is no evidence that this data evinces a supply of drivers with WAVs in those regions willing to drive meaningful amounts of time there. As Lyft witnesses testified, those drivers are likely New York City drivers who are taking riders from New York City to adjacent areas. Moreover, no witness, including Plaintiffs' experts, presented any evidence of the number of properly licensed and willing WAV rideshare drivers in any of the non-Access Regions. Because Plaintiffs have failed to present any evidence of a ready supply of WAVs and WAV drivers for the Lyft platform, Plaintiffs have failed to prove that it is likely that a favorable ruling by this Court will redress their injury.

## V. Legal Standard Under The ADA And The NYSHRL.

51. To state a claim under Title III of the ADA, Plaintiffs must prove "(1) that [they] are disabled within the meaning of the ADA; (2) that defendant[] own[s], lease[s], or operate[s] a place of public accommodation; and (3) that defendant[] discriminated against [them] by denying [them] a full an equal opportunity to enjoy the services defendant[] provide[s]." *Camarillo v. Carrols Corp.*, 518 F.3d 153, 156 (2d Cir. 2008); *see* 42 U.S.C. § 12182(a).

**Lyft's Response to Legal Standard No. 51**

The second element stated above does not apply to claims under § 12184. To prevail on their claim of discrimination, Plaintiffs must prove that Lyft discriminated "within the meaning of the ADA." *Roberts v. Royal Atl. Corp.,* 542 F.3d 363, 368 (2d Cir. 2008). *See also PGA Tour, Inc. v. Martin,* 532 U.S. 661, 681-82 (2001) (the question of whether a defendant has violated Title III's general rule against discrimination "depends on a proper construction of the term 'discrimination,' which is defined by Title III").

52.    To establish discrimination under § 12182(a) of the ADA, Plaintiffs must establish that Defendant "operates a place of public accommodation."  42 U.S.C. § 12182(a).

53.    To establish discrimination under § 12184(a) of the ADA, Plaintiffs must establish that Defendant is a "specified public transportation service."  42 U.S.C. § 12184(a).

54.    "Entities that provide public accommodations or public transportation: . . . (2) must make 'reasonable modifications in polices, practices, or procedures, when such modifications are necessary' to provide disabled individuals full and equal enjoyment, §§ 12182(b)(2)(A)(ii), 12184(b)(2)(A); . . . and (4) must remove architectural and structural barriers, or if barrier removal is not readily achievable, must ensure equal access for the disabled through alternative methods, §§ 12182(b)(2)(A)(iv)-(v), 12184(b)(2)(C)."  *Spector v. Norwegian Cruise Line Ltd.,* 545 U.S. 119, 128 (2005).

**Lyft's Response to Legal Standard No. 54**

Consistent with the above quote from *Spector,* the "Specific Prohibitions" set forth in Sections 12182 and 12184 define the acts that constitute "discrimination" under the statute. *See* 42 U.S.C. § 12182(b)(2) (defining "discrimination" "[f]or purposes of Section 12182(a)"), § 12184(b) (defining "discrimination" "[f]or purposes of Section 12184(a)"). This means to prove "discrimination" under ADA Title III, Plaintiffs must prove that Lyft engaged in

"discrimination" as defined by one of the subsections of Sections 12184(b) or 12182(b)(2). *See, e.g., Krist v. Kolombos Rest. Inc.,* 688 F.3d 89, 94-95 (2d Cir. 2012); *Staron v. McDonald's Corp.,* 51 F.3d 353, 355 (2d Cir. 1995).

55. "To prevail on their claims, Plaintiffs must prove a violation of Title III of the ADA by a preponderance of the evidence." *U.S. v. Asare*, 476 F. Supp. 3d 20, 26 (S.D.N.Y. 2020) (citing *Krist v. Kolombos Rest. Inc.,* 688 F.3d 89, 96 (2d Cir. 2012)).

56. "A claim of discrimination under the New York State Human Rights Law is governed by the same legal standards as govern federal ADA claims." *Graves v. Finch Pruyn & Co., Inc.,* 457 F.3d 181, 184 n.3 (2d Cir. 2006).

## VI. Plaintiffs Satisfy The First Element Of Both Statutes.

57. Ms. Lowell is disabled within the meaning of the ADA and the NYSHRL. Stipulation ¶¶ 1-2.

## VII. Plaintiffs Satisfy The Second Element Of Both Statutes.

58. Lyft is engaged in "specified public transportation" under the Americans with Disabilities Act, 42 U.S.C. § 12184. Stipulation ¶ 5.

59. Lyft is a public accommodation under the NYSHRL. Stipulation ¶¶ 6-7.

60. Lyft disputes that it is a public accommodation under the ADA.

## C. Findings Of Fact
## Related To Lyft Being A Public Accommodation Under The ADA.

61. Lyft operates multimodal transportation networks in the United States that offer access to a variety of transportation options through Lyft's platform and App. Stip. Fact ¶ 8.

62. Lyft's transportation network is designed to address a wide range of mobility needs. The Lyft network spans rideshare, car rentals, bikes, scooters, and transit. Stip. Fact ¶ 9.

63. Lyft's stated mission is to "improve people's lives with the world's best transportation." Stip. Fact ¶ 10.

64.     Members of the general public may download the App and agree to the Terms of

Service.  Stip. Fact ¶ 11.

**D.     Conclusions Of Law**
**Related To Lyft Being A Public Accommodation Under The ADA.**

65.     The ADA includes "travel service" among its categories of entities that qualify as

"public accommodations." 42 U.S.C. § 12181(7).

**Lyft's Response to Conclusion of Law No. 65**

For purposes of this lawsuit, Lyft has stipulated that it will not contest that it is a

"private entity" that provides "specified public transportation services" for purposes of

Section 12184 of ADA Title III. A finding that Lyft is also subject to Section 12182 as a

"place of public accommodation" is not necessary, because the theories of discrimination

Plaintiffs assert are the same under Sections 12184 and 12182. *See* 42 U.S.C. § 12184(b)(2)(A)

and (C), which expressly incorporate § 12182(b)(2)(A)(ii) and (b)(2)(A).

66.     A public accommodation's mobile application is bound by Title III.  *See, e.g., Robles v.*

*Domino's Pizza, LLC*, 913 F.3d 898, 905 (9th Cir. 2019), *cert. denied*, 140 S. Ct. 122 (2019) (Title III of

the "ADA applies to Domino's website and app").

67.     "Title III's mandate that the disabled be accorded 'full and equal' enjoyment of the

goods, [and] services . . . of any place of public accommodation,' suggests to us that the statute was

meant to guarantee them more than mere physical access."  *Pallozzi v. Allstate Life Ins. Co.*, 198 F.3d

28, 32 (2d Cir. 1999) (alterations and ellipses in original).

68.     "In *Pallozzi's* wake, multiple district courts in this circuit – including this one – have

held that websites qualify as places of public accommodation, even when they are not attached to a

traditional brick-and-mortar store."  *Jaquez v. Dermpoint, Inc.*, No. 20-7589, 2021 WL 2012512, at *3

(S.D.N.Y. May 20, 2021); *see also Andrews v. Blick Art Materials, LLC*, 268 F. Supp. 3d 381, 395–96

(E.D.N.Y. 2017) ("The 'broad mandate' of the ADA and its 'comprehensive character' are resilient

enough to keep pace with the fact that the virtual reality of the Internet is almost as important now as physical reality alone was when the statute was signed into law.") (quoting *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998)); *see also Nat'l Fed'n of the Blind v. Scribd Inc.*, 97 F. Supp. 3d 565, 575 (D. Vt. 2015) ("Now that the Internet plays such a critical role in the personal and professional lives of Americans, excluding disabled persons from access to covered entities that use it as their principal means of reaching the public would defeat the purpose of this important civil rights legislation.").

### Lyft's Response to Conclusion of Law Nos. 66-68

This case is about the lack of accessible transportation on the Lyft platform for individuals who use motorized wheelchairs or scooters; it is *not* about accessibility of Lyft's website or App to individuals who are visually impaired. The cases cited in Paragraphs 66 to 68 are irrelevant.

69.     Lyft facilitates travel for its consumers through its App, rendering it a modern-day travel service.

### Lyft's Response to Conclusion of Law No. 69

Lyft is not a travel agent or "service establishment" under the ADA. *See* 42 U.S.C. § 12181(7)(F) (defining, through examples of "service establishments," the term "public accommodation"). Instead, Lyft's technology platform facilitates on-demand transportation, and Lyft does not contest, for purposes of this lawsuit, that it is subject to Section 12184 as a "private entity" that provides "specified public transportation services."

70.     Lyft functions as a public accommodation. *See, e.g.*, *O'Hanlon v. Uber Techs., Inc.*, No. 19-00675, 2021 WL 2415073, at *6 (W.D. Pa. June 14, 2021) (plaintiffs plausibly alleged that Uber is a "travel service" under § 12182, "and Uber has fallen short of its burden of establishing that Uber vehicles are excluded by either the statutory language of Section 12182 or the interpretive law");

*Nat'l Fed'n of the Blind of California v. Uber Techs., Inc.*, 103 F. Supp. 3d 1073, 1083 (N.D. Cal. 2015) (Uber plausibly constitutes a "travel service" and therefore a "public accommodation" under § 12182).

### Lyft's Response to Conclusion of Law No. 70

The cases cited in Paragraph 70 were decided at the motion to dismiss stage. At the summary judgment or trial stage, courts have found that Lyft and Uber are subject to Section 12184 of ADA Title III as private entities who are primarily engaged in transportation. *See, e.g., Indep. Living Res. Ctr. San Francisco v. Lyft, Inc.*, No. C 19-01438 WHA, 2021 U.S. Dist. LEXIS 166229, *23-24 (N.D. Cal., Sept. 1, 2021) ("ILRC Trial Decision") (noting that at summary judgment, the court found Section 12184 applied to Lyft after Lyft did not contest that finding for purposes of summary judgment); *Crawford v. Uber Techs., Inc.*, Case No. 17-cv-02664-RS, 2021 U.S. Dist. LEXIS 161969 (N.D. Cal., Aug. 26, 2021) (on summary judgment, finding that Uber is a private entity "engaged in the business of transporting people" and thus subject to Section 12184).

## VIII. Plaintiffs Satisfy The Third Element Of Both Statutes.

### A. Legal Standard

71. Plaintiffs "bear[] the initial burdens of both production and persuasion as to the existence of an accommodation" and the effectiveness of the modification. *Dean v. Univ. at Buffalo Sch. Of Med. & Biomedical Scis.*, 804 F.3d 178, 189-90 (2d Cir. 2015); *Borkowski v. Valley Cent. School Dist.*, 63 F.3d 131, 138 (2d Cir. 1995); *Staron v. McDonald's Corp.*, 51 F.3d 353 (2d Cir. 1995).

72. An effective modification is one that accommodates Plaintiffs' and the Class's disabilities. *See US Airways, Inc. v. Barnett*, 535 US 391, 399-400 (2002) ("An ineffective 'modification' or 'adjustment' will not accommodate a disabled individual's limitations.").

## Lyft's Response to Legal Standard No. 72

Lyft agrees that an "effective modification" must accommodate Plaintiffs'
disabilities. *US Airways, Inc. v. Barnett*, 535 US 391, 399-400 (2002); 42 U.S.C.
§ 12182(b)(2)(A)(ii) (a reasonable modification is one that provides access to the entities'
"goods, services, facilities, privileges, advantages, or accommodations").

Here, Plaintiffs and members of the Class are individuals "who require WAVs for
vehicular transportation" (Opinion and Order [ECF 365] at 24), and they contend that they
have been denied access to reliable, on-demand transportation by WAVs on the Lyft
platform. *See* Amended Compl. ¶¶ 8-10; Lyft's Response to Fact Nos. 40-47; Lyft's Response
to Legal Standard Nos. 71-80. An effective modification, therefore, must accommodate
Plaintiffs' need for on-demand transportation by WAVs. *US Airways, Inc.*, 535 US at 399-400
(an effective modification must "accommodate a disabled individual's limitations").

73.     "To establish a 'reasonable accommodation,' a plaintiff 'bears only a burden of
production' that 'is not a heavy one.'  That is, it would be 'enough for the plaintiff to suggest the
existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its
benefits.  Once the plaintiff has done this, she has made out a *prima facie* showing that a reasonable
accommodation is available, and the risk of nonpersuasion falls on the defendant.'"  *Roberts v. Royal
Atl. Corp.*, 542 F.3d 363, 370 (2d Cir. 2008) (quoting *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131,
138 (2d Cir. 1995)).

## Lyft's Response to Legal Standard No. 73

Plaintiffs misstate their burden of proof in Paragraph 73. As they admit in Paragraph
71 above, "Plaintiffs 'bear[] the initial burdens of both production and persuasion as to the
existence of an accommodation' and the effectiveness of the modification. *Dean v. Univ. at
Buffalo Sch. Of Med. & Biomedical Scis.*, 804 F.3d 178, 189-90 (2d Cir. 2015)." *See also* Joint

Letter dated January 20, 2023 [ECF 351] (stipulating that Plaintiffs bear the burden of persuasion as to the effectiveness of the proposed modification).

74.     "'Reasonable' is a relational term: it evaluates the desirability of a particular accommodation according to the consequences that the accommodation will produce.  This requires an inquiry not only into the benefits of the accommodation but into its costs as well. . . .  [A]n accommodation is reasonable only if its costs are not clearly disproportionate to the benefits that it will produce." *Borkowski*, 63 F.3d at 138.

75.     "[T]he plaintiff's burden does not require him or her to furnish exact or highly detailed cost estimates." *Roberts*, 542 F.3d at 371.

76.     "In deciding what's reasonable, facilities may consider the costs of such accommodations, disruption of their business and safety.  But they must also take into account evolving technology that might make it cheaper and easier to ameliorate the plight of the disabled.  . . . As new devices become available, public accommodations must consider using or adapting them to help disabled guests have an experience more akin to that of non-disabled guests." *Baughman v. Walt Disney World. Co.*, 685 F.3d 1131, 1135 (9th Cir. 2012).

77.     Modifications need not generate perfectly equal service to be reasonable:

> Full and equal enjoyment means the right to participate and to have an equal opportunity to obtain the same results as others to the extent possible with such accommodations as may be required by the Act and these regulations.  It does not mean that an individual with a disability must achieve an identical result or level of achievement as persons without a disability.  For example, an exercise class cannot exclude a person who uses a wheelchair because he or she cannot do all of the exercises and derive the same result from the class as persons without a disability.

28 C.F.R. § Pt. 36, App. C (analyzing § 36.201).  "If [a public accommodation] can make [a person with disabilities'] experience less onerous and more akin to that enjoyed by its able-bodied patrons, it must take reasonable steps to do so." *Baughman*, 685 F.3d at 1136 (citing *Dept. Oregon Paralyzed Veterans of Am. v. Regal Cinemas*, 339 F.3d 1126, 1133 (9th Cir. 2003))

**Lyft's Response to Legal Standard No. 77**

To be reasonable, a modification must afford access to the service allegedly denied. *US Airways, Inc. v. Barnett*, 535 U.S. 391, 399-400 (2002). Here, Plaintiffs contend that they have been denied access to reliable, on-demand transportation by WAVs. *See* Amended Compl. ¶¶ 8-10; Lyft's Response to Fact Nos. 40-47; Lyft's Response to Legal Standard Nos. 71-80.

78.     Modifications a defendant has implemented in the past to accommodate people with disabilities are material to determining whether the requested modification is reasonable. *See, e.g.,* *Rogers v. W. Univ. of Health Scis.*, 787 F.App'x 932, 935 (9th Cir. 2019); *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 508 (4th Cir. 2016); *Smith v. McCarthy*, No. 20-419, 2021 WL 4034193, at *21 (D. Md. Sept. 3, 2021); *Wong v. Regents of the Univ. of Cal*, 192 F.3d 807, 820 (9th Cir. 1999); *Taylor v. Gilbert & Bennett*, No. 95-7228, 1997 WL 30948, at *2 (N.D. Ill. Jan. 15, 1997).

**Lyft's Response to Legal Standard No. 78**

This line of cases is irrelevant. Lyft has never implemented its WAV program in response to requests for reasonable modifications. Instead, it has undertaken the significant costs of implementing and managing on-demand WAV programs when doing so was required by regulation, or where there was an external funding source (via subsidies or contracts) to incentivize its implementation. *See* Lyft's Response to Fact Nos. 23-26; Lyft's Response to Legal Standard Nos. 71-80.

79.     Modifications required under state and local laws "provide[] powerful evidence that such modifications are reasonable, and that they certainly would not fundamentally alter the nature of defendants' programs." *Henrietta D. v. Giuliani*, 119 F. Supp. 2d 181, 209 (E.D.N.Y. 2000), *aff'd sub nom. Henrietta D. v. Bloomberg*, 331 F.3d 261 (2d Cir. 2003).

## Lyft's Response to Legal Standard No. 79

That certain local regulatory bodies require Lyft to provide Access mode does not eliminate Plaintiffs' burden to prove that the modifications they propose would be effective and can be done at a reasonable cost.

80. Plaintiffs are not required to request a reasonable modification prior to initiating a lawsuit when they have actual notice that doing so would be futile. *See also, e.g.*, *Fair Hous. Just. Ctr., Inc. v. Cuomo*, No. 18-3196, 2019 WL 4805550, at *14 (S.D.N.Y. Sept. 30, 2019) ("Plaintiffs have adequately alleged that the ACF Defendants had categorical policies against wheelchairs and that any request for a reasonable accommodation would have been futile. Accordingly, their failure to specifically ask for an accommodation does not render their allegations insufficient . . ."); *Hampson v. State Farm Mut. Auto Ins. Co.*, No. 12-00258, 2015 WL 12733387, at *13 (N.D.N.Y. Mar. 26, 2015) (futile gesture doctrine applies where an entity "has essentially foreclosed the interactive process through its policies or explicit actions"); *Davoll v. Webb*, 194 F.3d 1116, 1132-33 (10th Cir. 1999) ("If a disabled employee actually knows of an employer's discriminatory policy against reasonable accommodation, he need not ignore the policy and subject himself 'to personal rebuffs' by making a request that will surely be denied."); *Louiseged v. Akzo Nobel Inc.*, 178 F.3d 731, 739 (5th Cir. 1999) (same).

## Lyft's Response to Legal Standard Nos. 71-80

The elements of Plaintiffs' claim for reasonable modification under 42 U.S.C. § 12184(b)(2)(A) are: (a) that Plaintiffs requested a modification of a policy, practice, or procedure before filing this lawsuit, *Dudley v. Hannaford Bros. Co.*, 333 F.3d 299, 307 (1st Cir. 2003), (b) that the proposed modification would be effective in affording Plaintiffs WAV service on the Lyft platform, and (c) that the modifications would be reasonable in cost. *Staron v. McDonald's Corp.*, 51 F.3d 353, 356 (2d Cir. 1995). *See also PGA Tour, Inc. v. Martin*,

532 U.S. 661, 683 n.38 (2001) (plaintiff must prove that defendant failed to make a "requested reasonable modification").

As the parties stipulated before trial (*see* ECF 351), Plaintiffs bear the burden of production and persuasion to show that the modification they propose would be effective. *Jackan v. N.Y. State DOL*, 205 F.3d 562, 566-67 (2d Cir. 2000), *citing Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 137-138 (2d Cir. 1995).

Plaintiffs bear the burden to produce a cost estimate to show that the modification they propose is "reasonable." Once Plaintiffs have shown that a "reasonable modification" is available, Defendant has the burden of persuasion to show that the cost is not reasonable. *Roberts v. Royal Atl. Corp.*, 542 F.3d 363, 370-71 (2d Cir. 2008)

**B.      Plaintiffs' First Reasonable Modification**

**1.      Findings of Fact**

81.      Plaintiffs' first proposed modification is to remove the current block in place on the App in the non-Access Regions, which prohibits Access mode from being available for drivers or riders, and prevent implementation of Lyft's toggle requirement, which hides Access mode from riders.  This would allow for automatic display of Access mode on the App alongside other vehicle options.[27]  (Testimony of Alex Elegudin).

82.      In every Region where Lyft operates, Standard mode appears as an available ride mode when a user inserts their destination address.  The only step required for a user on the App to identify whether a Standard mode vehicle is available is to type in the address of their destination. Once a user inserts their destination address, any available Standard mode vehicle will automatically be displayed on the App.  (Testimony of Alex Elegudin).

---

[27] Corrected Expert Report, at 66.

83. Lyft allows all drivers who meet Lyft's vehicle requirements to drive on Standard mode in the non-Access Regions. Lyft allows all users to view available Standard mode vehicles on the App in the non-Access Regions. (Testimony of Alex Elegudin).

84. The effect of the block prevents WAV drivers from identifying as WAVs on the App and precludes riders from having the option to select WAVs, even when they are available.[28] Lyft does not allow drivers with WAVs to drive on Access mode in the non-Access Regions. Lyft does not allow passengers who require WAVs to request WAVs in non-Access Regions. If a driver with a WAV is in the same location as a rider who requires a WAV in a non-Access Region, there is no mechanism for the rider to request a WAV on the App.[29] (Testimony of Alex Elegudin).

**Lyft's Response to Fact Nos. 81-84**

There is no evidence of a "block" on the Lyft platform. A "block" suggests that there is a supply of WAVs that is being precluded by Lyft. Here, Plaintiffs presented no evidence that any supply of WAVs actually exists in any of the non-Access Regions, or that such supply is being "blocked."

Lyft does not offer Access mode in the non-Access Regions because based on its experience in the Access Regions, it knows that the supply of WAVs is sparse and that offering WAV service is expensive and operationally difficult. Moreover, without extensive investment and effort by Lyft to create a supply of WAVs, there is insufficient supply of and demand for WAVs to sustain an on-demand marketplace for WAVs that would provide a good user experience. Lyft's experience since 2017 with Access mode has shown that there is no path to profitability for this mode. (Testimony of Dr. Marc Rysman, Isabella Gerundio, Leon Treger.)

---

[28] Chan Dep. Tr. 118:12-21, 120:1-6.
[29] Chan Dep. Tr. 118:12-21, 120:1-6; Gerundio Dep. Tr. 242:22-25; 243:1-5.

Lyft does not make specialized modes for specific vehicle types (such as "Lux" or "Lux Black") available in every region. In most places, only "Standard" and "XL" modes are available. In these regions, users cannot request a "luxury" vehicle or any other vehicle specifications. In evaluating where to offer specialized modes, Lyft considers the likely available supply and demand for the mode in that region. (Testimony of Abbas Bozorgirad, Leon Treger.)

As to Access mode, evidence showed that the overall supply and demand for WAV rides is very low compared to all other modes. There is no evidence that any WAV driver who wanted to drive in Access mode in the non-Access Regions was actually "blocked" from doing so. (Testimony of Dr. Marc Rysman, Isabella Gerundio, Abbas Bozorgirad.)

**Evidentiary Objections**:

- FN 27 and Testimony of Alex Elegudin: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702.

85.  Implementing Access mode and removing the blocker in the non-Access Regions would enable any individual who requires a WAV to be able to request a WAV on the App and determine whether a WAV is available in the same manner as any able-bodied user on Standard mode. (Testimony of Alex Elegudin).

86.  Implementing Access mode and removing the blocker in the non-Access Regions would enable any individual who drives a WAV on the App to be able to display that their vehicle is a WAV and that they are available to offer a WAV ride. (Testimony of Alex Elegudin).

**Lyft's Response to Fact Nos. 85-86**

In Lyft's Standard mode, "able bodied" users are not able to select vehicles with special equipment, or to select vehicles of a certain make or model. Moreover, effective use of Lyft's platform is not limited to those users who have full mobility. For example, many

Lyft users with mobility disabilities are able to access rides through the App because they use collapsible wheelchairs, scooters, or walkers. Other users with disabilities, including those with visual impairments, can also access rides through Lyft's App. (Testimony of Leon Treger, Isabella Gerundio; Ex. C (Lyft's Policy Regarding Foldable Wheelchairs).)

Lyft does not "block" Access mode. It simply does not offer Access mode everywhere due to business reasons, such as the fact there is limited supply and demand for Access mode and the costs of providing WAV service far outweigh any revenues. (Testimony of Isabella Gerundio, Abbas Bozorgirad, Leon Treger.)

Plaintiffs' expert Alex Elegudin knows that simply displaying Access mode in the App (or in Plaintiffs' parlance, "removing the blocker") will not create reliable on-demand WAV service. After all, Mr. Elegudin knows that in New York City, the TLC did not simply decree that companies like Lyft and Uber merely "remove the block" for WAVs in their Apps, but instead put in place strict regulations requiring them to increase the supply of WAVs on their platforms at enormous cost. For that reason, Mr. Elegudin opined that allowing WAVs to appear on the platform would be a mere "starting point" for creating on-demand WAV service. In addition, Mr. Elegudin failed to provide any opinion as to how many WAVs would result on Lyft's ridesharing platform were this single change to be made, instead speculating that it is "entirely plausible" that "there might be" a supply of WAVs that would appear if the change were made. (Corrected Expert Report at 66-67; Deposition of Alex Elegudin at 183:12-184:16.)

Defendant's expert Claudia Stern, who was responsible for reviewing all data produced by Lyft in this case and performing data modeling at Mr. Elegudin's direction, admitted that she did not do any modeling to determine the number of WAVs that would appear on the Lyft platform if Access mode were to be implemented in all non-Access

Regions. Ms. Stern also admitted that she did not know how many WAV drivers would drive on the Lyft platform in Westchester County if Lyft implemented Access mode in Westchester County, and admitted that she did not do any analysis to determine how many WAVs would appear on the Lyft platform in New York State or throughout all 50 states if Lyft were to implement Access mode everywhere. Ms. Stern further admitted that she does not know, nor did she look into, how many WAVs existed generally anywhere. (Stern Depo. 75:5-23, 78:13-79:2.)

Ms. Stern admitted that she would have to look at the data after the modification was implemented to know whether making the modification would result in effective Access mode service. For Ms. Stern, it would be impossible to gauge the effectiveness of any modification without data analysis. (Stern Depo. 79:3-80:8.)

**Evidentiary Objections**:

- Testimony of Alex Elegudin: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702.

87.    Lyft has previously enabled Access mode in each of the nine Access Regions.  As a result, the cost of enabling Access mode and removing the blocker in the non-Access Regions would be *de minimis*.  (Testimony of Alex Elegudin).

**Lyft's Response to Fact Nos. 87**

The evidence contradicts Plaintiffs' claim that the cost of displaying Access mode in the App would be *de minimis*. That Lyft has the technical ability to display the mode in the App does not mean that to do so would be cost-free to Lyft. Lyft's witnesses testified that if Lyft were to make Access mode available in the App, it would incur operational expenses necessary to ensure that drivers have functional equipment and required training. In addition, Lyft would incur regulatory, litigation, and reputational risks from nominally

38

offering a specialized "mode" for individuals with disabilities without ensuring an adequate supply of WAVs. (Testimony of Dr. Marc Rysman, Isabella Gerundio.) That Lyft would incur litigation risk by offering Access mode that is "unequal" to Standard mode is demonstrated by Plaintiffs' Complaint in this case. *See, e.g.,* Complaint [ECF 1] at ¶¶ 42, 88, 92.

**Evidentiary Objections**:

- Testimony of Alex Elegudin: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702.

88.    Lyft accidentally enabled Access mode in Denver (a non-Access Region) and Lyft employees turned off Access mode within approximately four hours of notifying the WAV team.[30]

89.    The only step required for a user on the App to identify whether a Standard mode vehicle is available is to type in the address of their destination.  Once a user inserts their destination address, any available Standard mode vehicle will automatically be displayed on the App. (Testimony of Alex Elegudin).

**Lyft's Response to Fact Nos. 88-89**

That enabling Access mode is technically feasible is insufficient to prove the existence of a "block" in providing Access mode, nor does it prove that there exists a supply of WAV drivers waiting to drive on the platform if Lyft were to display Access mode everywhere. In the Access Regions, Lyft has expended significant resources to create a supply of WAVs sufficient to meet regulatory requirements and offer reliable service. In Lyft's experience across the nine Access Regions, there is no organic supply of WAVs waiting to drive on the Lyft platform. If Access mode were merely enabled in the non-Access Regions without Lyft expending significant effort and expense to ensure a supply of

---

[30] LYFT0012038.

WAVs, the most likely outcome is that a user who needs a WAV would never see an available WAV when she opens the App. (Corrected Expert Report at 26, 40; Testimony of Isabella Gerundio, Abbas Bozorgirad, Leon Treger.)

**Evidentiary Objections**:

- FN 30: The cited document is irrelevant hearsay. Fed. R. Evid. 401-403; Fed. R. Evid. 801-803.
- Testimony of Alex Elegudin: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702.

90.     In the Access Regions other than NYC, Lyft requires users to enable the toggle to request WAV rides. Users must navigate to a separate settings page where they must then activate the Access mode toggle, and finally return to the main screen where WAVs will appear below other ride modes. The toggle was created as an "easter egg" with the intention of hiding WAV service from riders.[31]

91.     NYC is the only Access Region in which Lyft does not use the Access mode toggle to enable WAV service. NYC regulators ordered Lyft to remove the toggle because it creates a barrier for WAV users and could "suppress[] trip demand."[32]  (Testimony of Alex Elegudin.)

92.     In or around September and October 2019, Lyft removed the toggle in NYC. Between August 2019 and December 2019, rides on Access mode increased by approximately 500 percent in NYC.[33]

93.     Ms. Gerundio acknowledged that Lyft has no reason to believe that a similar increase in ridership would not happen in other Access Regions.[34]

---

[31] Corrected Expert Report, at 21, 43-44, 67; Gerundio Dep. Tr. 243:21-244:5; Wu Dep. Tr. 67:24-68:3, 89:1-6, 108:12-25.
[32] Corrected Expert Report, at 44.
[33] Corrected Expert Report, at 67-68; Demand 2021-09-20.
[34] Gerundio Dep. Tr. 139:13-23.

**Lyft's Response to Fact Nos. 89-93**

Evidence related to the relative increase in the demand for Access mode in New York City after the "toggle" was removed is irrelevant. This is because even after the "toggle" was removed, the volume of WAV rides was just 0.1% of the total number of rides on the Lyft platform in New York City. As Dr. Marc Rysman testified, such a low density of demand would not generate a sufficient number of WAV rides to sustain a functioning ridesharing platform of WAVs in the non-Access Regions.

Because of the lack of supply and demand sufficient to create a functioning ridesharing platform for WAVs, Lyft has spent millions of dollars providing Access mode in New York City, where it is required to do so by regulation. Plaintiffs have nonetheless characterized Lyft's WAV service in New York City as "limited and unequal." (Testimony of Dr. Marc Rysman; Corrected Expert Report at 27.)

**Evidentiary Objections**:

- FN 31-33 (Expert Report) and Testimony of Alex Elegudin: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702.

2. **Conclusions of Law**

94. Plaintiffs' proposed modification to remove the current block in place on the App in the non-Access Regions and automatically display Access mode on the App alongside other vehicle options is effective and reasonable. Removing the current block will allow Plaintiffs and Class members to request a WAV on the App in a manner similar to able-bodied users. Lyft currently prohibits individuals who use wheelchairs from accessing rides through Lyft in the same manner as able-bodied individuals. Lyft's policy in its non-Access Regions prevents WAVs drivers from identifying their vehicles as WAVs and riders from having the option to select WAVs, even when they may be available. Similarly, Lyft does not require any users who do not seek to use Access

mode to proceed through a series of navigational steps similar to the toggle to see available vehicles. The Access mode toggle acts as a barrier to users to request a WAV through Access mode. Plaintiffs have met their burden to establish that this modification is reasonable and is not outweighed by any cost to Lyft.

### Lyft's Response to Conclusions of Law No. 94

Plaintiffs brought this lawsuit because they want "reliably accessible" transportation for people who use wheelchairs and other assistive devices. Am. Compl. [ECF 20] ¶ 8.

But Plaintiffs do not contend that their first proposed modification, of removing the alleged "block" in the App, would create a reliable transportation option for individuals who use WAVs. Instead, as set forth in Paragraph 94, they claim merely that "[r]emoving the current block will allow Plaintiffs and Class members to request a WAV on the App in a manner similar to able-bodied users." Notably, Plaintiffs do not claim that "removing the current block will allow Plaintiffs and Class members" to access "reliably accessible" transportation service so that they can "live more independently" as they sought to do in bringing this lawsuit. Am. Compl. [ECF 20] ¶ 8.

As Plaintiffs admit, "[a]n effective modification is one that accommodates Plaintiffs' and the Class's disabilities." *See* Plaintiffs' Proposed Conclusion of Law No. 72, citing *US Airways, Inc. v. Barnett*, 535 U.S. 391, 399-400 (2002). On its face, the first proposed modification fails because there is no causal connection between the ability "to request a WAV on the App" and the ability to access reliable on-demand transportation by WAV. In addition, as a matter of law, an experimental proposal that contemplates simply "turning on" Access mode in the App to see if any WAV drivers would appear is not a "reasonable modification." *See* ILRC Trial Decision, 2021 U.S. Dist. LEXIS 166229, *28 (reviewing successful reasonable modification cases under ADA Title III and concluding: "[n]o federal

court has ever held that an iterative, experimental, or trial-and-error proposal constituted a reasonable modification to a policy, practice, or procedure under Title III").

Plaintiffs did not bring this lawsuit to gain access to a feature of an App; they brought the lawsuit to gain access to "reliably accessible" transportation on Lyft's ridesharing platform. To prove that "removing the current block in place" would be a reasonable modification, Plaintiffs must prove, by a preponderance of the evidence, that the modification would be effective at generating on-demand WAV transportation on Lyft's ridesharing platform. *Jackan v. N.Y. State DOL*, 205 F.3d 562, 566-67 (2d Cir. 2000), *citing Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 137-138 (2d Cir. 1995) (plaintiff bears the burden of persuasion as to effectiveness). Next, Plaintiffs must produce a cost estimate to show that the modification they propose is "reasonable." *Roberts v. Royal Atl. Corp.*, 542 F.3d 363, 370-71 (2d Cir. 2008). They must provide evidence of effectiveness and cost in Westchester County, New York State, and all non-Access Regions. Order re: Class Certification (ECF 365).

Plaintiffs failed to prove that "removing the current block in place" would be effective in creating on-demand transportation in Westchester County or in any other non-Access Region in New York State or elsewhere across all 50 states. Plaintiffs presented no evidence of a supply of WAV drivers who are available and willing to drive on Lyft's platform in sufficient numbers to sustain an on-demand platform for WAV. Lyft's expert, Dr. Marc Rysman, provided compelling evidence that the population density for WAV users is so low that there would extremely few, if any, WAV rides completed on Lyft's ridesharing platform were Lyft to simply "open up" Access mode in Westchester County or in the State of New York, or throughout the United States. Similarly, Lyft witnesses testified that in all current Access mode regions, Lyft must spend significant amounts of money to incentivize

43

or procure a supply of WAVs. No evidence exists that WAV drivers would simply appear if Access mode were made visible in the App, or that drivers would choose to provide WAV rides in any of the non-Access Regions when WAV riders needed them.

Plaintiffs also failed to provide a reliable estimate of the cost to Lyft in providing WAV service, and Lyft has proven that the costs would be significant. Everywhere Access mode is currently offered requires active management by Lyft employees, creating substantial operational costs. In addition, potential litigation and reputational costs related to offering WAV service that is unreliable and ineffective are significant.

95. Lyft has not met its burden to demonstrate that Plaintiffs' proposed modification would fundamentally alter Lyft's business. Currently, Lyft enables Access mode in the Access Regions. Thus, enabling Access mode in the non-Access Regions would not fundamentally alter its business. Lyft has not established that turning on Access mode in the non-Access Regions would require substantial cost to outweigh the benefits of offering Access mode. Lyft's defense that enabling Access mode in the non-Access Regions does not guarantee identical wait times, completion rates, or vehicle supply to Standard mode in the non-Access Regions does not rise to the standard of an undue burden. Lyft does not guarantee certain service level or vehicle supply requirements for Access mode in the non-Access Regions.

### Lyft's Response to Conclusions of Law No. 95

Plaintiffs bear the burden of production and persuasion to show that the modification they propose would be effective in creating reliable on-demand WAV service on the Lyft platform. *Jackan v. N.Y. State DOL*, 205 F.3d 562, 566-67 (2d Cir. 2000), *citing Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 137-138 (2d Cir. 1995). Because Plaintiffs have failed to meet that burden, Lyft need not prove its affirmative defenses. *But see* Proposed Findings of Fact and Conclusions of Law Regarding Lyft's Affirmative Defense.

96. Similarly, Lyft does not require a toggle-like feature for other modes and Lyft does not require users in NYC to turn on the toggle in order to use Access mode. Thus, prohibiting implementation of the toggle for Access mode in the non-Access Regions will allow WAVs to be automatically displayed in a similar manner to Lyft's other ride modes and will not fundamentally alter Lyft's business.

97. By categorically blocking WAVs from appearing as such on Lyft's app, Lyft necessarily and discriminatorily prevents people with disabilities from using its services. Lyft's unique WAV restrictions deny people with disabilities access to Lyft. *See, e.g.*, *Crawford v. Uber Techs., Inc.,* No. 17-02664, 2022 WL 74161, at *2 (N.D. Cal. Jan. 7, 2022), ("A policy that does not allow WAVs to operate on the Uber platform has the direct result of preventing people who use WAVs from using the platform[.]"); *Indep. Living Res. Ctr. San Francisco v. Lyft, Inc. ("ILRC"),* No. 19-01438, 2020 WL 6462390, at *2 (N.D. Cal. Nov. 3, 2020) (Lyft's failure to extend some of its non-WAV and Access Region WAV policies to WAV services in the Bay Area counties is discriminatory).

98. *Celano v. Marriott Int'l, Inc.* is particularly instructive. As Judge Hamilton explained in granting summary judgment and holding that Marriott discriminates under Title III by its policy of refusing to provide accessible carts to mobility-impaired golfers:

> Marriott's current policy does not provide plaintiffs, mobility-impaired golfers, with an experience that is functionally equivalent to that of other non-disabled golfers. Plaintiffs here have presented overwhelming evidence that they are unable to golf at Marriott's courses under the current policy. By contrast, non-disabled golfers can simply show up at the course and Marriott will provide them with a functional cart as part of the cost of their round of golf. Accordingly, Marriott provides golf carts for able-bodied golfers, but does not provide accessible carts for mobility-impaired golfers like plaintiffs. Because Marriott's policy places plaintiffs in a distinctly unequal situation, as compared to their able-bodied counterparts, it is discriminatory under the ADA.

No. 05-4004, 2008 WL 239306, at *14 (N.D. Cal. Jan. 28, 2008).

99. Lyft's policy with respect to blocking WAV services in non-Access Regions is distinctly unequal to its policy for able-bodied riders, and is, therefore, discriminatory.

The toggle is not relevant because there is no evidence that removing the toggle for riders will create a supply of WAVs and WAV drivers.

Plaintiffs' citations to cases in Paragraphs 97-98, moreover, are not apt. As Plaintiffs admit in Paragraph 71 above, they "bear[] the initial burdens of both production and persuasion as to the existence of an accommodation" and the effectiveness of the proposed modification. *Dean v. Univ. at Buffalo Sch. Of Med. & Biomedical Scis.*, 804 F.3d 178, 189-90 (2d Cir. 2015). Here, as set forth in Lyft's Response to Conclusions of Law No. 94, Plaintiffs have failed to prove that removing the alleged "blocker" would result in effective WAV service in Westchester County or in any non-Access Region.

## C. Plaintiffs' Second Reasonable Modification

### 1. Findings of Fact

100. Plaintiffs' second proposed modification is to ask all drivers on Lyft's platform and those onboarding whether they have access to WAVs. This modification applies to all classes. (Testimony of Alex Elegudin).

101. When a driver applies to drive for Lyft, Lyft asks the drivers a series of questions about the driver and their vehicle in an "onboarding process." The onboarding process includes a survey that asks for basic information about the driver, including license information, a background check, Social Security number, and vehicle information. In some markets, drivers' vehicles must pass an inspection, the driver must take a defensive driving course, or undergo a medical exam. Lyft asks prospective drivers all necessary information to determine whether a driver's vehicle meets Lyft's requirements to drive on Standard mode.[35]

102. Lyft does not currently ask its drivers whether their vehicle is a WAV or whether

---

[35] Corrected Expert Report, at 69; Chan Dep. Tr. 83:8-84:22; Gerundio Dep. Tr. 204:2-11.

they have access to a WAV.[36]

103.    In most of its markets, including most of its Access Regions, Lyft does not know which of its drivers have WAVs.[37]  Lyft's current methods of discerning whether a driver drives a WAV are inefficient and require duplicative and iterative processes.  For example, in NYC, Lyft must repeatedly check the TLC database to determine whether a driver has a WAV.[38]

104.    Including a single additional question in the onboarding process regarding whether the driver has access to a WAV would incur a *de minimis* cost.  (Testimony of Alex Elegudin).

105.    Including a single additional question in the onboarding process regarding whether the driver has access to a WAV would allow Lyft to identify the number of drivers who have access to WAVs and increase the availability of WAVs on the App.  (Testimony of Alex Elegudin).

## Lyft's Response to Fact Nos. 100-105

Mr. Elegudin has no specialized knowledge or experience with the onboarding process for drivers on ridesharing platforms. His testimony is speculative.

Plaintiffs failed to produce any evidence that if Lyft were to ask drivers the proposed questions, the outcome would be effective on-demand transportation by WAVs on the Lyft platform. WAVs are expensive, and the population of individuals who are likely to own WAVs is 1% or less of the general population. In addition, Lyft has surveyed drivers regarding WAV ownership in the past. One survey in the Philadelphia area involved sending a promotional text and in-app console card to over 26,000 drivers with an offer of monetary incentives for WAV drivers. This survey resulted in just one additional WAV on Lyft's platform. There is thus no evidence on which this Court could conclude that asking drivers

---

[36] Gerundio Dep. Tr. 201:5-9.
[37] Chan Dep. Tr. 84:23-85:1; Gerundio Dep. Tr. 201:5-9.
[38] Selinger Dep. Tr. 56:8-57:21.

about WAVs would "increase the availability of WAVs on the App." (Testimony of Isabella Gerundio.)

There is no evidence that the costs of this modification would be *de minimis*. That asking one additional question is technically feasible is not evidence that the costs are negligible. If any drivers responded affirmatively, Lyft would need to verify that those drivers had equipment that met applicable regulatory requirements for ramps, lifts, and securement devices. Lyft would also need to ensure that drivers met applicable training requirements, which vary by region. Equipment inspection and training of WAV drivers are not tasks that Lyft is equipped to handle. (Testimony of Isabella Gerundio.)

### 2.    Conclusions of Law

106.    Plaintiffs' second proposed modification to ask all drivers on Lyft's platform and those onboarding whether they have access to WAVs is effective and reasonable.  Currently, Lyft asks drivers all necessary questions during its onboarding survey to ensure the driver and their vehicle meets Lyft's requirements to drive on a particular ride mode.  Lyft does not ask its drivers whether they have a WAV or have access to a WAV as part of the onboarding process in any of its Regions.  For a driver to be able to drive on Access mode, it is necessary for Lyft to know whether the driver's vehicle is a WAV.  Asking a driver whether they have a WAV or have access to a WAV will also enable Lyft to better understand its organic WAV supply.  Plaintiffs have met their burden to establish that this modification is reasonable and is not outweighed by any cost to Lyft.

107.    Lyft has not met its burden to demonstrate that Plaintiffs' proposed modification would fundamentally alter Lyft's business.  Lyft currently includes numerous questions on its onboarding survey regarding a driver's vehicle.  Lyft has not met its burden to establish that inclusion of one additional question during the onboarding survey would deter drivers from driving for Lyft or impose a substantial cost on Lyft sufficient to outweigh the benefits of this modification.

Plaintiffs do not claim that asking drivers if they have WAVs will be effective in creating reliable on-demand transportation in any non-Access Region. Absent evidence that asking drivers if they have WAVs would lead to reliable transportation by WAVs, Plaintiffs cannot prove their reasonable modification claim.

Plaintiffs failed to produce any evidence that "asking all drivers…whether they have Access to WAVs" would be effective in creating reliable on-demand WAV transportation in Westchester County or in any non-Access Region in New York State or across all 50 states. *See Jackan v. N.Y. State DOL*, 205 F.3d 562, 566-67 (2d Cir. 2000) (Plaintiffs bear the burden of production and persuasion to show that a modification would be effective). "Better understanding organic WAV supply" is not the same as creating reliable on-demand WAV transportation. Plaintiffs produced no evidence as to the number of drivers who own WAVs in Westchester County or in any non-Access Region. Lyft has surveyed drivers in the past regarding whether they had WAVs and received very few responses.

Plaintiffs also failed to provide any cost-estimate for this proposed modification despite the fact that they bear the burden to produce a cost estimate to show that the modification they propose is "reasonable." *Roberts v. Royal Atl. Corp.*, 542 F.3d 363, 370-71 (2d Cir. 2008). Lyft, on the other hand, has proven that the operational costs, in the form of training and vehicle inspection, would be significant.

## D.     Plaintiffs' Third Reasonable Modification

### 1.      Findings of Fact

108.     Plaintiffs' third proposed reasonable modification is to utilize cross-dispatching for all drivers.  (Testimony of Alex Elegudin).

## Lyft's Response to Fact No. 108

All IC WAV drivers are currently able to cross-dispatch. The only locations where WAVs are unable to cross-dispatch are in Access Regions where Lyft uses the Partner model, paying a contracting partner an hourly rate to provide vehicles and drivers on the platform to serve exclusively Access rides. Plaintiffs have dismissed their claims as to these Access Regions. This modification is irrelevant to the non-Access Regions because the Partner model is not being used in any of those regions.

109.     Cross-dispatching means that if a vehicle meets the requirements of more than one mode (*e.g.*, Standard and XL, or Standard and Access), the driver may accept ride requests in both modes.  For example, a Lyft driver in a luxury vehicle can offer "Lux" rides to riders who select Lyft's luxury vehicle option and can also accept Standard mode requests from riders who select a standard vehicle.  As a result, when no riders request "Lux" rides, but there are riders requesting Standard mode rides, the luxury vehicle driver can continue generating revenue for himself and Lyft.[39]

## Lyft's Response to Fact No. 109

Cross-dispatching is a simple term for the application of a complicated algorithm to Lyft's different ride modes. That a driver can choose from multiple modes does not mean that the driver will elect to drive in one mode over another, or be matched with one specific rider. (Testimony of Abbas Bozorgirad.)

Cross-dispatching WAVs involves special considerations. There is a significant difference between Lux and Access modes from the rider's perspective. In Lux mode, if a Lux driver is not available, the rider has the option to choose another mode, such as "Standard" or "XL." But an Access mode rider does not have that same option. For this reason, if a Partner WAV driver is not available to drive in Access mode because they are

---

[39] Chan Dep. Tr. 57:23-58:6.

busy driving in Standard mode, this will have a more significant impact on the Access mode rider's ability to get a ride. (Testimony of Isabella Gerundio, Abbas Bozorgirad.)

110. Lyft allows all independent contractors, including IC WAV drivers, who drive on Lyft in any mode to cross-dispatch. Lyft does not allow Partner drivers who drive on Access mode to cross-dispatch their WAVs.[40]

### Lyft's Response to Fact No. 110

Lyft does not have Partner drivers in non-Access Regions. Lyft has experimented with cross-dispatching Partner WAV drivers in its existing Access Regions, and has found that, in general, the benefits in cost-savings are outweighed by the negative impacts on service levels. (Testimony of Abbas Bozorgirad.)

111. Mr. Wu previously described allowing Partner drivers to cross-dispatch as "low hanging fruit" for increasing profitability of Access mode.[41]

112. Richard Zhou, a Senior Analyst at Lyft, stated that cross-dispatching drivers yielded "driver benefits" and "at the market level, of course, incremental, but small benefit there."[42]

113. Enabling cross-dispatching for Partner WAV drivers "does not require a lot of effort."[43]

114. Lyft has previously experimented with a series of cross-dispatching pilot programs in multiple Access Regions to test the effects of cross-dispatching Partner WAV drivers. (Testimony of Alex Elegudin).

115. In Phoenix, Partner drivers were allowed to cross-dispatch in 27 of the 49 months for which Lyft provided data. During the months where cross-dispatching was allowed, the average wait

---

[40] Chan Dep. Tr. 113:25-114:10.
[41] LYFT_ILRC00016900.
[42] Transcript of November 5, 2021, Deposition of Richard Zhou ("Zhou Dep. Tr."), 95:8-25.
[43] Chan Dep. Tr. 60:20-61:2.

time for WAV service was two minutes less than months where no cross-dispatching was allowed. The completion rate for Access mode was fourteen percent higher in months with cross-dispatching than months without cross-dispatching. Lyft calculates that the average cost of providing WAV service was $187 per ride in months with cross-dispatching and $316 in months without cross-dispatching.[44]

116. Lyft was able to profitably offer Access mode in Phoenix during December of 2019, one of the months in which Lyft allowed its Partner WAV drivers to cross-dispatch.[45]

117. In Portland, Partner drivers were allowed to cross-dispatch in nine of the 49 months for which Lyft provided data. During the months where cross-dispatching was allowed, the average wait time for WAV service was one minute longer than months where no cross-dispatching was allowed. The completion rate for Access mode was thirteen percent higher in months with cross-dispatching than months without cross-dispatching. Lyft calculates that the average cost of providing WAV service was $60 per ride in months with cross-dispatching and $129 in months without cross-dispatching.[46]

## Lyft's Response to Fact Nos. 111-117

Evidence regarding Lyft's cross-dispatching experiments in the Access Regions confirms the difficulty and expense involved in offering Access mode. Moreover, cross-dispatching has no relevance except in those Access Regions where Lyft implements the Partner model at significant, on-going costs to Lyft. In the non-Access Regions, Lyft has not implemented the Partner model.

### Evidentiary Objections:

---

[44] Corrected Expert Report, at 78-79; Demand 2021-09-20; Highly Confidential – Subject to Protective Order – WAV 2021-02-26.csv ("WAV 2021-02-26").
[45] Corrected Expert Report, at 36; Demand 2021-09-20; WAV 2021-02-26.
[46] Corrected Expert Report, at 79-80; Demand 2021-09-20; WAV 2021-02-26.

- FN 41: The cited document is irrelevant hearsay. Fed. R. Evid. 401-403; Fed. R. Evid. 801-803.
- FN 44-46 (Data Reports): Plaintiffs rely on uninterpreted raw data reports to support extrapolations and conclusions about the underlying data without a foundational witness. This is improper. Fed. R. Evid. 401-403, 602.
- FN 44-46 (Expert Report) and Testimony of Alex Elegudin: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702.

118. Cross-dispatching all of Lyft's WAV drivers would allow Lyft to offer Access mode in a more efficient and cost-effective manner. (Testimony of Alex Elegudin).

**Lyft's Response to Fact No. 118**

Ms. Stern admitted that this modification does not address the supply of WAVs on the Lyft platform but is merely directed to optimize drivers' efficiencies.

**Evidentiary Objections**:

- Testimony of Alex Elegudin: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702.

**2. Conclusions Of Law**

119. Plaintiffs' third proposed modification to utilize cross-dispatching for all drivers, including Partner WAV drivers, is effective and reasonable. Lyft allows all non-WAV drivers and IC WAV drivers to cross-dispatch on different ride modes if their vehicles meet the requirements for different ride modes. Partner WAV drivers are the only drivers prevented from cross-dispatching. Allowing Partner WAV drivers to cross-dispatch would allow Lyft to offer Access mode at a lower cost, improve the service levels of Access mode, and increase the supply of WAVs. Plaintiffs have met their burden to establish that this modification is effective and reasonable, and is not outweighed by any cost to Lyft.

120. Lyft's refusal to cross-dispatch WAVs denies people with disabilities the opportunity to participate in programs or activities that are not separate or different. *See Kalani v. Stabucks Coffee*

*Co.*, 698 F.App'x 883, 886-87 (9th Cir. 2017) (finding that Starbucks exclusively offering exterior facing accessible seating, while offering inaccessible interior and exterior seating, violated the ADA and "deprived its wheelchair-bound customers of the opportunity to participate, to the same extent as non-disabled patrons"); *Mortland v. Local Cantina Dublin LLC*, No. 19-01123, 2021 WL 3033355, at *11 (S.D. Ohio July 19, 2021) (finding that a restaurant with seating at a bar and at tables, yet only provided accessible seating at the tables, violated the ADA's integration mandate because it offered a distinctly alternative experienced for disabled customers).

121.    Lyft has not met its burden to demonstrate that Plaintiffs' proposed modification would fundamentally alter Lyft's business. Lyft already allows many drivers to cross-dispatch. Lyft allows IC WAV drivers to cross-dispatch and has performed pilot programs enabling Partner WAV drivers to cross-dispatch. Lyft's defense that allowing Partner WAV drivers to cross-dispatch in some Access Regions has increased the wait time or completion rate is not sufficient to meet its burden. Lyft has not met its burden to show that cross-dispatching Partner WAV drivers outweighs the benefits of this modification.

## Lyft's Response to Conclusions of Law Nos. 119-121

Plaintiffs failed to prove that "utilizing cross-dispatching for all drivers" would be effective in creating reliable on-demand WAV transportation in Westchester County or in any non-Access Region in New York State or in any other state. *See Jackan v. N.Y. State DOL*, 205 F.3d 562, 566-67 (2d Cir. 2000) (Plaintiffs bear the burden of production and persuasion to show that a modification would be effective).

Lyft already cross-dispatches IC WAV drivers so this issue is only relevant to Partner WAV drivers. Plaintiffs have failed to explain how cross-dispatching of Partner WAV drivers would create on-demand WAV service on the Lyft platform in any non-Access Region. *See* ILRC Trial Decision, 2021 U.S. Dist. LEXIS 166229, *26-27 (federal courts have

"routinely rejected" claims of reasonable modifications that were not "concrete and specific"). Cross-dispatching does not lead to a supply of WAVs on Lyft's platform, but instead addresses efficiencies of Lyft's Partner drivers in Access Regions where Lyft uses the Partner model. But Lyft does not use the Partner model in Westchester County or in any other non-Access Region. Nothing about "utilizing cross-dispatching" will create a supply of WAVs to drive on Lyft's platform to perform WAV rides.

Because Plaintiffs have not shown that the modification would be effective in creating on-demand WAV transportation, the Court need not reach potential "costs" of such a modification.

## E.    Plaintiffs' Fourth Reasonable Modification

### 1.    Findings Of Fact

122.    Plaintiffs' fourth proposed reasonable modification is that Lyft should implement prioritization logic for Access mode.  (Testimony of Alex Elegudin).

123.    Prioritization logic directs Lyft's ride-matching algorithm to give priority to trip requests received for a particular ride mode.  Ride requests that receive priority are serviced or assigned over other rides that are pending assignment on the App.[47]

124.    Currently, Lyft only uses prioritization logic for Access mode in limited circumstances. In NYC, Lyft implemented prioritization logic for IC WAV drivers.  When a WAV driver is en route to a Standard mode request and an Access mode request is made within one minute of the Standard mode request, Lyft's algorithm reroutes the WAV driver to the Access mode request if the driver is the closest available WAV.[48]

---

[47] Corrected Expert Report, at 81; Zhou Dep. Tr. 110:6-111:1.
[48] Corrected Expert Report, at 81.

**Lyft's Response to Fact Nos. 122-124**

Prioritization logic matters only if there is an existing supply of WAVs on the Lyft platform; it has nothing to do with creating a supply of WAVs. Alex Elegudin has no experience that qualifies him to testify regarding Lyft's prioritization logic, which is a complex set of algorithms governing the assignment of rides. There is no testimony regarding what this modification seeks to change about prioritization logic or what impact it would have in Westchester County, New York State, or nationwide.

**Evidentiary Objections**:

- FN 47-48 (Expert Reports) and Testimony of Alex Elegudin: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702.

125. Because Lyft has already implemented prioritization logic in other ride modes, including Access mode, enabling prioritization logic for Access mode in the non-Access Regions would entail a *de minimis* cost. (Testimony of Alex Elegudin).

126. Prioritization logic enables substantial benefits for Access mode requests, by increasing the utilization of WAVs for Access mode rides, thereby decreasing the potential wait time and increasing the percentage of accepted WAV rides, with minimal effects on Standard mode requests. (Testimony of Alex Elegudin).

127. Lyft has not implemented prioritization logic in a similar manner outside of NYC IC WAV drivers.[49]

**Lyft's Response to Fact Nos. 125-127**

Prioritization logic has nothing to do with creating a supply of WAVs that would lead to the creation of reliable on-demand transportation in the non-Access Regions, and Plaintiffs do not contend that it would be effective in creating such accessible transportation.

---

[49] Zhou Dep. Tr. 110:6-111:1.

Plaintiffs have not specified what changes to prioritization logic must be made. There is no admissible evidence regarding either the costs or the impact of implementing "prioritization logic" in the non-Access Regions as Plaintiffs envision. It is not clear what Plaintiffs think "prioritization logic" is, or how they suggest that it be implemented in any of the non-Access Regions.

In general, prioritization logic is a complicated set of rules and criteria that takes into account the location and availability of drivers, what modes they are offering, and demand from other riders. Changes to prioritization logic can have negative impacts on the user experience for users in other modes. (Testimony of Abbas Bozorgirad.)

**Evidentiary Objections**:

- Testimony of Alex Elegudin: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702.

### 2. Conclusions of Law

128. Plaintiffs' fourth proposed modification that Lyft should implement prioritization logic for Access mode is effective and reasonable. Lyft previously enabled prioritization logic for IC WAV drivers in NYC to improve service for Access mode. The burden to implement prioritization logic in other cities and for Partner WAV drivers is diminished by Lyft already doing so. Plaintiffs have met their burden to establish that this modification is effective and reasonable, and is not outweighed by any cost to Lyft.

129. Lyft has not met its burden to demonstrate that Plaintiffs' proposed modification would fundamentally alter Lyft's business. Lyft has previously implemented prioritization logic in Access mode and in other ride modes. Lyft has not established that any cost of implementing prioritization logic outweighs the substantial benefit to Access mode.

**Lyft's Response to Conclusions of Law Nos. 128-129**

Plaintiffs failed to prove that "implementing prioritization logic" would be effective in creating reliable on-demand WAV transportation in Westchester County or in any other non-Access Region in New York State or any other state. *See Jackan v. N.Y. State DOL*, 205 F.3d 562, 566-67 (2d Cir. 2000) (Plaintiffs bear the burden of production and persuasion to show that a modification would be effective); *see also* ILRC Trial Decision, 2021 U.S. Dist. LEXIS 166229, *26-27 (federal courts have "routinely rejected" claims of reasonable modifications that were not "concrete and specific"). There is no reliable evidence regarding what Plaintiffs mean by this "modification" or what impact it would have. Prioritization logic is a complex matching algorithm that interacts with the existing supply and demand of vehicles and modes in a specific region. "Prioritization logic" will not create a supply of WAVs on Lyft's platform in Westchester County or in any other non-Access Region.

Because Plaintiffs have not shown that the modification would be effective in creating on-demand WAV transportation, the Court need not reach potential "costs" of such a modification.

**F.    Plaintiffs' Fifth Reasonable Modification**

**1.    Findings of Fact**

130.    Plaintiffs' fifth proposed modification is to increase marketing for Access mode and WAV service, including targeted advertising, to attract potential WAV drivers, as well as to increase awareness of WAVs on Lyft's platform among potential riders.  (Testimony of Alex Elegudin).

131.    Lyft spends hundreds of millions of dollars a year advertising and marketing its brand and Standard mode.  Lyft's marketing efforts include sending communications to users through the App, e-mail campaigns, text message campaigns, posters and physical advertising, and

pay media channels.[50]

**Lyft's Response to Fact Nos. 130-131**

Mr. Elegudin admitted that he is not a "marketing expert." That Lyft has spent money on advertising is not evidence that advertising targeted at Access mode would be effective in creating a supply of or demand for WAVs in any non-Access Region. Mr. Elegudin did not explain what kind of "targeted" advertising would be needed on which marketing platforms, or for how long, in order for Lyft to "attract potential WAV drivers" or "to increase awareness" among riders.

132.    For WAV-specific marketing in 2021, Lyft did nothing except make available approximately $100,000 in coupons to disability rights organizations.  Lyft gave these coupons to disability rights organizations in San Francisco, Los Angeles, Dallas, and NYC in the hopes that those organizations would distribute the coupons to users.[51]

133.    Lyft's coupons for Access mode were not used by any users in San Francisco or New York.  In Dallas, Lyft did not have a very high success rate for use of the coupons.  Thus, the actual amount of spending on marketing and advertising for Access mode was far below the $100,000 budgeted in 2021.[52]

134.    Lyft's coupon campaign for Access mode was admittedly a strategy designed to grow demand of WAV rides in order to "impair service levels at current supply."  As one Lyft employee stated, "We've been thinking through how to suppress performance via supply levers, but we can instead take the alternate approach via demand. . . . IE, contact an accessibility org and offer them a coupon to distribute to all their members for the end of the month."[53]

---

[50] Corrected Expert Report, at 47; Zhou Dep. Tr. 39:15-25, 67:25-68:8, 69:25-69:8; Chan Dep. Tr. 81:18-82:4.
[51] Corrected Expert Report, at 18-19; Gerundio Dep. Tr. 77:1-23, 108:13-24, 129:19-130:4.
[52] Corrected Expert Report, at 18-19; Gerundio Dep. Tr. 108:13-24, 110:22-25.
[53] LYFT0031721.

135.    Lyft's marketing and advertising for Access mode did not involve direct engagement or communication with users.  Lyft engages in no other marketing or advertising that is specific to Access mode.[54]

### Lyft's Response to Fact Nos. 132-135

Plaintiffs offer edited quotations to suggest that advertising and marketing that Lyft has attempted for Access mode has had limited success. Even if Plaintiffs are right, allegedly unsuccessful advertising and marketing attempts done in the past is not relevant because it does not speak to what Plaintiffs claim should be done as a "reasonable modification."

No evidence was presented as to what a successful WAV marketing campaign would look like, how much such a marketing campaign would cost, or the impact of such marketing in the short term or the long term on the supply of or demand for WAVs on the Lyft platform in any non-Access Region. Plaintiffs failed to present the testimony of any knowledgeable expert. No other witness offered reliable testimony as to whether marketing campaigns tailored for Access mode would be effective in creating on-demand transportation by WAVs on the Lyft platform.

**Evidentiary Objections**:

- FN 52 (Expert Report) and Testimony of Alex Elegudin: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702.

### 2.    Conclusions Of Law

136.    Plaintiffs' fifth proposed modification to increase marketing for Access mode, including targeted advertising, to attract potential WAV drivers, as well as to increase awareness of WAVs on Lyft's platform among potential riders is effective and reasonable.  Plaintiffs establish that Lyft does not implement similar marketing and advertising strategies for Access mode as it does for

---

[54] Gerundio Dep. Tr. 77:1-23, 108:13-24, 129:19-130:4.

Standard mode or its general brand. Plaintiffs establish that Lyft does not use many of the typical methods of advertising and communications to drivers and users for Access mode that Lyft relies on for Standard mode. Plaintiffs establish that the benefit of an increased supply of WAVs and increased number of users for Access mode outweighs the cost of marketing and advertising for Access mode.

137. Lyft has not met its burden to demonstrate that Plaintiffs' proposed modification would fundamentally alter Lyft's business. Lyft spends heavily on advertising and marketing and routinely advertises for its Standard mode and general brand. Lyft has not established that its advertising or marketing is ineffective nor that Access mode is uniquely unresponsive to advertising or marketing. Lyft has not established that the cost of advertising and marketing for Access mode outweighs the substantial benefit to Access mode.

**Lyft's Response to Conclusions of Law Nos. 136-137**

Plaintiffs failed to prove that "increasing marketing for Access mode" would be effective in creating reliable on-demand WAV transportation in Westchester County or in any other non-Access Region in New York State or any other state. *See Jackan v. N.Y. State DOL*, 205 F.3d 562, 566-67 (2d Cir. 2000) (Plaintiffs bear the burden of production and persuasion to show that a modification would be effective). Plaintiffs offer just vague statements, not reliable testimony, as to what "marketing" they propose or what effect it would have. Specifically, Plaintiffs have not shown that hypothetical "marketing" would be effective in creating a supply of WAVs to drive on Lyft's platform to perform WAV rides in Westchester County or in any other non-Access Region in New York State or any other state. *See* ILRC Trial Decision, 2021 U.S. Dist. LEXIS 166229, *26-27 (federal courts have "routinely rejected" claims of reasonable modifications that were not "concrete and specific").

Plaintiffs presented no cost-estimates of any marketing campaigns for Westchester County or any other non-Access Region in New York State or any other state, despite the fact they bear the burden to produce a cost estimate to show that the modification they propose is "reasonable." *Roberts v. Royal Atl. Corp.*, 542 F.3d 363, 370-71 (2d Cir. 2008). Instead, Plaintiffs' expert suggests that Lyft should spend "a couple of million dollars" every year for 10 years. (Deposition of Alex Elegudin at 195:3-21.) This is not reasonable.

## G. Plaintiffs' Sixth Reasonable Modification

### 1. Findings Of Fact

138.    Plaintiffs' sixth proposed modification is to increase the supply of WAVs on its platform by offering potential drivers baseline bonuses and incentives for guaranteed periods of time.  This modification applies to all classes.  (Testimony of Alex Elegudin).

139.    In 2021, Lyft recorded more than $1.3 billion in driver incentives, which included "minimum guaranteed payments, volume-based discounts and performance-based bonus payments."[55]  (Testimony of Alex Elegudin).

140.    Lyft uses incentives and bonuses across different ride modes to increase the supply of vehicles on the App.[56]

### Lyft's Response to Fact Nos. 139-140

Evidence establishes that Lyft uses pricing and incentives to balance supply and demand on the Lyft platform. Driver incentives are used by Lyft for driver "generation," *i.e.,* to increase the number of drivers on the platform, as well as for driver "shaping," *i.e.,* to encourage drivers to drive in a certain area. Other than unique subsidies that were intended

---

[55] Corrected Expert Report, at 47.
[56] Chan Dep. Tr. 85:5-19, 161:6-23; Corrected Expert Report, at 73-74.

to incentivize drivers to rent WAVs in New York City, Lyft does not offer incentives so that drivers can fund the acquisition of vehicles. (Testimony of Leon Treger.)

141. Lyft does not offer consistent bonuses or incentives for Access mode drivers. Lyft no longer offers bonuses and incentives to WAV drivers in Dallas or San Francisco. Lyft reduced the per ride bonus available to WAV drivers in NYC from $30 per ride to $15 per ride.[57]

142. Lyft could increase or offer consistent bonuses or incentives for Access mode drivers to increase the supply of WAVs on the App. (Testimony of Alex Elegudin).

**Lyft's Response to Fact Nos. 141-142**

The evidence establishes that Lyft does offer consistent per-ride bonuses to IC WAV drivers in the Access Regions and changes the size of those bonuses to maximize driver engagement, at great expense to Lyft. In Dallas and San Francisco, Lyft does not pay any incentives or bonuses because there are no active IC WAV drivers in those locations. Instead, Lyft uses the Partner model in Dallas and San Francisco, which means it need not rely on "bonuses" or "incentives" to influence driver behavior in those cities. (Gerundio Depo. 141:6-13; 144:23-145:2; Testimony of Isabella Gerundio and Exhibit G ("Lyft Wheelchair Accessible Vehicle Overview"); Testimony of Leon Treger.)

It is not clear what "consistent bonuses or incentives" would look like, how much they would cost in Westchester County or in any other non-Access Region, or how effective they would be in generating a supply of IC WAV drivers who would join the platform in Westchester County or in any other non-Access Region.

### 2. Conclusions Of Law

143. Plaintiffs' sixth proposed modification that Lyft offer potential WAV drivers baseline

---

[57] Gerundio Dep. Tr. 141:6-13, 144:23-145:2; Treger Dep. Tr. 29:15-22; Selinger Dep. Tr. 65:2-10; Corrected Expert Report at 73-74.

bonuses and incentives for guaranteed periods of time is effective and reasonable. Plaintiffs establish that Lyft typically offers drivers bonuses and incentives when Lyft determines that the supply of vehicles is insufficient to meet demand. Plaintiffs establish that Lyft has offered bonuses and incentives to Access mode drivers in many of the Access Regions to increase the available supply of WAVs. Plaintiffs establish that offering baseline bonuses and incentives for guaranteed periods of time will alleviate Lyft's concern that there is an insufficient supply of WAV drivers available to provide Access mode. Plaintiffs demonstrate that the cost of offering bonuses and incentives is outweighed by the benefit of increasing the supply of WAVs, allowing Lyft to increase the number of Access mode rides, and reduce the cost of Access mode over time. Plaintiffs have met their burden to establish that this modification is effective and reasonable, and is not outweighed by any cost to Lyft.

144. Lyft has not met its burden to demonstrate that Plaintiffs' proposed modification would fundamentally alter Lyft's business. Lyft routinely employs incentives and bonuses for Access mode drivers and drivers on other ride modes in order to increase the available supply of vehicles. Lyft has not demonstrated that the cost of offering incentives and bonuses outweighs the benefits of improved Access mode service and increased supply of WAVs.

### Lyft's Response to Conclusions of Law Nos. 143-144

Plaintiffs have failed to prove that "providing baseline bonuses and incentives" would be effective in creating reliable on-demand WAV transportation in Westchester County or in any other non-Access Region in New York State or any other state. *See Jackan v. N.Y. State DOL*, 205 F.3d 562, 566-67 (2d Cir. 2000) (Plaintiffs bear the burden of production and persuasion to show that a modification would be effective); *see also* ILRC Trial Decision, 2021 U.S. Dist. LEXIS 166229, *26-27 (federal courts have "routinely rejected" claims of reasonable modifications that were not "concrete and specific").

Plaintiffs have not specified what the bonuses would look like, or showed that these hypothetical bonuses or incentives would be effective in creating a supply of WAVs to drive on Lyft's platform to perform WAV rides. For example, Plaintiffs submitted no evidence showing what the amount of bonus or incentive should be in order to incentivize a driver to purchase or lease a WAV to drive on Lyft's ridesharing platform. There is no evidence to support the causal conclusion that "offering baseline bonuses and incentives for guaranteed periods of time will alleviate Lyft's concern that there is an insufficient supply of WAV drivers available to provide Access mode."

Plaintiffs have not attempted to estimate what the cost for these "bonuses and incentives" would be in Westchester County or in any other non-Access Region in New York State or any other state, despite the fact that they bear the burden to produce a cost estimate to show that the modification they propose is "reasonable." *Roberts v. Royal Atl. Corp.*, 542 F.3d 363, 370-71 (2d Cir. 2008). Even if one assumes the incentive would be equal to or greater than the $15 per WAV ride that Lyft offers in some of its Access Regions, that would lead to Lyft losing money on every WAV ride performed. This is not reasonable.

## H. Plaintiffs' Seventh Reasonable Modification

### 1. Findings Of Fact

145. Plaintiffs' seventh proposed modification is to include WAVs as an option in Lyft's Express Drive and FlexDrive programs. (Testimony of Alex Elegudin).

146. Express Drive is Lyft's flexible car rentals program for drivers who want to drive for Lyft. FlexDrive is a wholly-owned subsidiary of Lyft and a partner in the Express Drive program. Express Drive and FlexDrive offer vehicles that drivers can use on Standard mode and other ride

modes on the App.[58]

147.  Lyft can and does request or dictate the particular types of vehicles available to drivers through Express Drive and FlexDrive.[59]

### **Lyft's Response to Fact Nos. 146-147**

FlexDrive is an independent partner in the Express Drive program. Lyft offers Express Drive in just 30 cities throughout the United States, none in the State of New York. (Lyft 10-K for 2021; Testimony of Leon Treger.)

148.  Express Drive and FlexDrive do not offer WAVs as part of the rental programs.[60]

149.  Lyft employees previously proposed an initiative called Perseus, which would integrate WAVs into Express Drive and allow independent contractor drivers to rent WAVs at a similar price to renting non-WAVs.  The former director of Lyft's WAV program projected that the Perseus program would cost Lyft less than $5 million and allow Lyft to provide more than 500,000 rides in the United States at approximately $10.25 per ride.  Lyft did not pursue or attempt to pursue the Perseus program.[61]

150.  Lyft's own projections for its Perseus program would allow Lyft to provide more WAV rides per year than it is currently offering at a lower cost per ride and lower total cost than Lyft's current WAV offerings.  (Testimony of Alex Elegudin).

### **Lyft's Response to Fact Nos. 148-150**

Lyft never launched the Perseus program, and thus any evidence regarding the program is inadmissible and speculative. No witness testified that "Perseus," a program that

---

[58] Selinger 201:1-203:14; Corrected Expert Report, at 5, 7, 57.
[59] Bousta Dep. Tr. 25:8-26:10.
[60] Corrected Expert Report, at 57-58; Lee Dep. Tr. 47:4-6.
[61] Corrected Expert Report, at 57; LYFT0120393; LYFT_ILRC00009589; Lee Dep. Tr. 47:4-6.

never got off the ground, would have had the results projected by Lyft employees who had never engaged in a similar program in the past.

However, after it studied Perseus, Lyft did have the experience of establishing a rental program in New York City under which it procured WAVs for rent to independent contractor drivers. This program required Lyft to undertake the significant cost of procuring new WAVs because WAVs were not already in the rental provider's fleet. (Testimony of Isabella Gerundio, Leon Treger.)

**Evidentiary Objections**:

- FN 60-61 (Corrected Expert Report) and Testimony of Alex Elegudin: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702.

### 2. Conclusions Of Law

151. Plaintiffs' seventh proposed modification that Lyft should include WAVs as an option in Lyft's Express Drive and FlexDrive programs is effective and reasonable. Plaintiffs establish that Lyft offers Standard mode vehicles through Express Drive and FlexDrive that are responsive to Lyft's drivers' needs. Plaintiffs establish that Express Drive and FlexDrive offer an important option for drivers to rent vehicles for use on Lyft that can be effective in increasing the supply of WAVs for Access mode. Plaintiffs establish that the cost of adding WAVs to Express Drive and FlexDrive is outweighed by the benefit of increasing the supply of WAVs for Access mode. Plaintiffs have met their burden to establish that this modification is effective and reasonable, and is not outweighed by any cost to Lyft.

152. Lyft has not met its burden to demonstrate that Plaintiffs' proposed modification would fundamentally alter Lyft's business. Lyft has not established that any cost of including WAVs as an option in Lyft's Express Drive and FlexDrive programs outweighs the substantial benefit to

Access mode service.

**Lyft's Response to Conclusions of Law Nos. 151-152**

Plaintiffs have failed to prove that "including WAVs as an option in Lyft's Express Drive and FlexDrive programs" would be effective in creating reliable on-demand WAV transportation in Westchester County or in any other non-Access Region in New York State or any other state. *See Jackan v. N.Y. State DOL*, 205 F.3d 562, 566-67 (2d Cir. 2000) (Plaintiffs bear the burden of production and persuasion to show that a modification would be effective); *see also* ILRC Trial Decision, 2021 U.S. Dist. LEXIS 166229, *26-27 (federal courts have "routinely rejected" claims of reasonable modifications that were not "concrete and specific"). Plaintiffs have not identified any FlexDrive or Express Drive locations in any non-Access Region, established that FlexDrive or any other company would be willing or able to provide WAVs as part of Express Drive, identified the number of vehicles that would be needed to create reliable on-demand WAV service via these rental programs, or identified any drivers who would be interested in renting WAVs, which are expensive to rent and operate, if they were available to rent in these unidentified non-Access Regions.

Plaintiffs have also failed to provide any cost-estimate for Westchester County or for any other non-Access Region in New York State or any other state for such a rental program, despite the fact that they bear the burden to produce a cost estimate to show that the modification they propose is "reasonable." *Roberts v. Royal Atl. Corp.*, 542 F.3d 363, 370-71 (2d Cir. 2008).

## I. Plaintiffs' Eighth Reasonable Modification

### 1. Findings Of Fact

153. Plaintiffs' eighth proposed modification is to form partnerships with car rental, taxi, and other transportation companies that have WAVs. (Testimony of Alex Elegudin).

154. Currently, Lyft engages in partnerships with transportation companies to increase the available supply of WAVs in Access Regions. In NYC, Lyft partners with three transportation companies who supply WAVs to drivers to use on the App. [62]

155. Lyft's website identifies approximately 208 transportation companies with WAVs across the United States. (Testimony of Alex Elegudin).

### Lyft's Response to Fact Nos. 154-155

Lyft uses the "Partner" model to create a supply of WAVs in certain Access Regions. Under the Partner model, Lyft contracts with a third-party company to provide both the WAVs and the drivers to drive them at an hourly cost per vehicle that ranges from approximately $40-$65. The cost to Lyft of a single vehicle under the Partner model thus exceeds $300,000 (assuming $50 per hour and 18 hours per day of coverage) each year. Transportation partners are subject to change over time. Evidence shows that since 2019, Lyft has contracted with several third-parties to provide rental vehicles or Partner WAVs in New York City and other Access Regions at significant expense.

That "transportation companies" are listed on Lyft's website has no relevance to this case. No witness testified that any of the providers on this list would agree to a "partnership" with Lyft, or the basic terms (including the price terms) of such hypothetical "partnerships."

### Evidentiary Objections:

- Testimony of Alex Elegudin: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702.

156. Mr. Wu previously proposed an initiative called NewCo or LyftSub, which was designed to expand Lyft's supply of WAVs and offer a nationwide WAV program by expanding

[62] Gerundio Dep. Tr. 102:23-105:5.

Lyft's partnerships. LyftSub was a program to engage a staffing agency to provide contracted drivers and lease WAVs through a third-party, LyftSub, to those drivers. LyftSub would be a wholly-owned subsidiary of Lyft.[63]

157.    My. Wu projected that LyftSub would offer a nationwide WAV solution for Lyft. Mr. Wu anticipated that giving three rides a day through LyftSub would be more cost-efficient than the way Lyft currently offers Access mode. Mr. Wu projected that LyftSub would allow Lyft to profitably offer a nationwide WAV program at eight to eleven rides per day.[64]

158.    Lyft executives did not approve LyftSub and none of Lyft's 30(b)(6) witnesses, who were obligated to explain why Lyft did not go forward with LyftSub, could explain why Lyft did not go forward with LyftSub.[65]

159.    After Mr. Wu's departure from Lyft, Ms. Gerundio stated that she attempted to create a WAV partnership program which "was almost exactly like the LyftSub." Ms. Gerundio did not pursue LyftSub any further. Despite two heads of the national WAV team each designing a virtually identically pilot WAV partnership program, none was ever implemented or piloted.[66]

160.    The projections of the LyftSub program or a similar partnership would allow Lyft to provide more WAV rides per year than it is currently offering at a lower cost per ride and lower total cost than Lyft's current WAV offerings. (Testimony of Alex Elegudin).

### Lyft's Response to Fact Nos. 156-160

Evidence regarding "LyftSub" and similar programs is speculative and irrelevant. Mr. Wu has not worked at Lyft since August 2019. The proposed findings regarding LyftSub are based on inadmissible presentations and emails from three or more years ago. No witness

---

[63] LYFT_ILRC0022617; LYFT0120393; LYFT_ILRC00009589; Wu Dep. Tr. 176:2-5.
[64] LYFT_ILRC00022617; LYFT_ILRC00009589; Wu Dep. Tr. 169:1-14, 188:21-25.
[65] Wu Dep. Tr. 170:9-23; Lee Dep. Tr. 133:21-25.
[66] Gerundio Dep. Tr. 167:9-168:17, 197:2-15.

offered testimony that any of these "programs" would have been effective or explained how much they would have cost to implement.

Mr. Wu testified at deposition that his proposals were "the beginning of strategy work" with "assumptions, upon assumptions, upon assumptions" that would "be required to be validated." Evidence confirms that, since Mr. Wu left Lyft, Lyft's WAV team has continued to work to find ways to lower the cost and improve the effectiveness of its WAV service. (Wu Dep. Tr. 186:11-187:2.)

Ms. Gerundio testified that although she explored a LyftSub-like program, Lyft "never actually got into the piloting stage because we stopped at the conversations because the math didn't work out and we couldn't find vendors for it." She explained that even if Lyft could have found vendors, the LyftSub-like program would not have yielded any cost savings to Lyft and would have required "a lot more operational work." (Gerundio Dep. Tr. 172:4-12, 173:2-9.)

**Evidentiary Objections**:

- FN 63-64 (Lyft documents): The materials relied on are inadmissible hearsay. Fed. R. Evid. 801-803.
- Testimony of Alex Elegudin: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702.

2. **Conclusions Of Law**

161. Plaintiffs' eighth proposed modification that Lyft form partnerships with car rental, taxi, and other transportation companies that have WAVs is effective and reasonable. Plaintiffs have established that Lyft currently engages in partnerships with transportation companies in order to increase the supply of WAVs. Plaintiffs have established that engaging in partnerships may allow Lyft to feasibly offer Access mode nationwide profitably or at little cost. Plaintiffs have established that transportation companies who may be available partners are situated across much of the

country and that Lyft has knowledge of many of these companies. Plaintiffs have met their burden to establish that this modification is effective and reasonable, and is not outweighed by any cost to Lyft.

162. Lyft has not met its burden to demonstrate that Plaintiffs' proposed modification would fundamentally alter Lyft's business. This modification would not alter Lyft's business because it currently engages in this practice in some of the Access Regions. The cost of entering into partnerships does not outweigh the benefit of increasing the supply of WAVs, enabling Lyft to expand Access mode, and increasing the economics of offering Access mode over time. Lyft has not established that any cost of forming partnerships with car rental, taxi, and other transportation companies that have WAVs outweighs the substantial benefit to Access mode service

### Lyft's Response to Conclusions of Law Nos. 161-162

Plaintiffs have failed to prove that "forming partnerships with…transportation companies" would be effective in creating on-demand transportation in Westchester County or in any other non-Access Region in New York State or in any other state. *See Jackan v. N.Y. State DOL*, 205 F.3d 562, 566-67 (2d Cir. 2000) (Plaintiffs bear the burden of production and persuasion to show that a modification would be effective) ); *see also* ILRC Trial Decision, 2021 U.S. Dist. LEXIS 166229, *26-27 (federal courts have "routinely rejected" claims of reasonable modifications that were not "concrete and specific"). Plaintiffs have not specified which transportation companies in which non-Access Regions Lyft could partner with, what the terms of those partnerships might be, or whether the partnership would lead to reliable on-demand WAV service in any location. In contrast, Lyft provided evidence that locating reliable partners in its existing Access mode regions is difficult due to the limited number of existing companies who are willing to provide on-demand WAV transportation on a ridesharing platform.

Plaintiffs also failed to provide any cost-estimate for this proposed modification for Westchester County or for any other non-Access Region in New York State or elsewhere. *See Roberts v. Royal Atl. Corp.*, 542 F.3d 363, 370-71 (2d Cir. 2008) (Plaintiffs bear the burden to produce a cost estimate to show that the modification they propose is "reasonable"). In contrast, Lyft provided evidence that third party partnerships are incredibly costly and operationally challenging.

## J. Plaintiffs' Ninth Reasonable Modification

### 1. Findings Of Fact

163. Plaintiffs' ninth proposed reasonable modification is to implement a ten-cent accessibility surcharge on all rides in order to fund Access mode. (Testimony of Alex Elegudin).

164. Lyft and other ridesharing companies impose various surcharges across the country, some of which are imposed at the discretion of Lyft and some of which are required by local regulators or municipalities. Lyft has imposed surcharges of 30 cents, 55 cents, and 75 cents in different regions of the United States.[67]

165. In San Francisco and Los Angeles, Lyft receives financial incentives from the California Public Utilities Commission ("CPUC") to offer WAV service. The CPUC requires Lyft to collect a ten-cent "Access fee" on every ride on the App in California. (Testimony of Alex Elegudin).

166. Ms. Gerundio stated that Lyft was considering imposing a five-cent accessibility surcharge in 2022 to support its WAV program.[68]

167. Lyft has tested price elasticity and has not found that its consumers are affected by

---

[67] Corrected Expert Report, at 82.
[68] Gerundio Dep. Tr. 280:24-282:4.

price changes of less than 15 cents.[69]  A ten-cent surcharge would be smaller than a one percent increase to the average price of a Lyft ride.[70]

168.    Plaintiffs' experts project that a ten-cent surcharge on all Lyft rides would have raised approximately $76 million in 2019 and $42 million in 2020.  Plaintiffs' experts project that the ten-cent surcharge would have funded 487,518 WAV rides in 2019 and 268,784 rides in 2020 even if those rides were provided via Lyft's current inefficient methodologies.  Plaintiffs' experts project that implementation of the ten-cent surcharge would allow Lyft to operate Access mode at a profit in Westchester, New York State outside of NYC, and all of the non-Access Regions, even using Lyft's current inefficient WAV methodologies.[71]

169.    Implementation of the ten-cent surcharge on all Lyft rides would provide funds larger than Lyft's historical budget for Access mode.[72]

### Lyft's Response to Fact Nos. 163-169

Plaintiffs' final proposed modification is a revenue-generating strategy that has no connection to providing WAV service.

Dr. Rysman testified that a 10-cent surcharge on the price of Lyft rides would have an adverse impact on the number of overall rides on the Lyft platform, particularly if the surcharge were not imposed on Lyft's competitors, and the reduction in ride volume will reduce Lyft's revenues and profitability. (Testimony of Dr. Marc Rysman.)

### Evidentiary Objections:

- FN 67, 70-72 (Expert reports) and Testimony of Alex Elegudin: The opinions of Plaintiffs' experts are unreliable, unhelpful to the trier of fact, and not based on the application of discernable principles or methods. Fed. R. Evid. 702.

---

[69] Chan Dep. Tr. 229:10-231:16
[70] Chan Dep. Tr. 229:10-231:16; Corrected Expert Report, at 82.
[71] Corrected Expert Report, at 83, 95,102, 109.
[72] Corrected Expert Report, at 110.

### 2.      Conclusions Of Law

170.      Plaintiffs' ninth proposed modification that Lyft should implement a ten-cent accessibility surcharge on all rides in order to fund Access mode is effective and reasonable. Plaintiffs offer a detailed and reasonable estimate of how the surcharge would enable Lyft to increase the funding and budget for Access mode.  Plaintiffs have met their burden to establish that this modification is effective and reasonable, and is not outweighed by any cost to Lyft.

171.      Lyft has not met its burden to demonstrate that Plaintiffs' proposed modification would fundamentally alter Lyft's business.  Lyft has implemented surcharges in different areas of the country, including ten-cent surcharges for accessibility purposes.  This accessibility surcharge would be more cost-effective for Lyft because it retains the proceeds of the surcharge.  Lyft has not established that implementing this surcharge would reduce the total number of rides or revenue in a manner that outweighs the benefits of increased funding for Access mode.  Lyft has not established that any cost of implementing a ten-cent accessibility surcharge outweighs the substantial benefit to Access mode service.

### Lyft's Response to Conclusions of Law Nos. 170-171

Plaintiffs have failed to prove that "implementing a 10-cent accessibility surcharge" would be effective in creating reliable on-demand WAV transportation in Westchester County or in any other non-Access Region in New York State or in any other state. This modification is targeted only at generating revenue, like a tax. It would have no impact on creating effective on-demand WAV transportation in Westchester County. *See Jackan v. N.Y. State DOL*, 205 F.3d 562, 566-67 (2d Cir. 2000) (Plaintiffs bear the burden of production and persuasion to show that a modification would be effective) ); *see also* ILRC Trial Decision, 2021 U.S. Dist. LEXIS 166229, *26-27 (federal courts have "routinely rejected" claims of reasonable modifications that were not "concrete and specific").

Plaintiffs provided no competent evidence that a 10-cent price increase on all of

Lyft's rides would not have a negative impact on overall ride volume, thus negating any

potential revenue generation and imposing significant costs on Lyft. *See Roberts v. Royal Atl.*

*Corp.*, 542 F.3d 363, 370-71 (2d Cir. 2008) (Plaintiffs bear the burden to produce a cost

estimate to show that the modification they propose is "reasonable").

**K.      Plaintiffs Meet Their Burden To
          Articulate A Plausible Proposal For Barrier Removal.**

**1.      Legal Standard.**

172.    To evaluate whether barrier removal is readily achievable, "once a plaintiff

'articulates a plausible proposal for barrier removal, the costs of which, facially, do not clearly exceed

its benefits,' the burden shifts to the defendant to 'prove that the proposals were not readily

achievable.'" *Kreisler*, 731 F.3d at 189 (quoting *Roberts*, 542 F.3d at 373, 378).

173.    "Neither the estimates nor the proposal are required to be exact or detailed, for the

defendant may counter the plaintiff's showing by meeting its own burden of persuasion and

establishing that the costs of a plaintiff's proposal would in fact exceed the benefits. Because the

concept of 'readily achievable' is a broad one, either party may include in its analysis, as costs or

benefits, both monetary and non-monetary considerations." *Roberts*, 542 F.3d at 373.

**2.      Conclusions Of Law.**

174.    Lyft currently imposes a barrier in its non-Access Regions by blocking WAV service

and not allowing Access mode to be available. Lyft has already removed this barrier in its Access

Regions, which demonstrates that removal is readily achievable elsewhere.

**Lyft's Response To Conclusion of Law No. 174**

The ADA does not require the removal of a transportation barrier if such barrier

removal would require the retrofitting of vehicles to create WAVs, *see* 42 U.S.C. §

12182(b)(2)(A)(iv), or, in the cases of private entities like Lyft, the purchase or lease of

WAVs, *id., § 12184(b)(3). The ADA also does not require Lyft to provide different goods or services. *See Dominguez v. Banana Republic, LLC,* No. 19-CV-10171-GHW, 2020 U.S. Dist. LEXIS 72193, *14 (S.D.N.Y., April 23, 2020) *aff'd. on other grounds, Calcano v. Swarovski N. Am. Ltd.,* 36 F.4th 68 (2d Cir. 2022) ("a plain reading of [the ADA] makes clear that Title III prohibits a place of public accommodation from discriminating on the basis of disability when providing access to whatever goods and services [are] *ordinarily provided* at that place of public accommodation") (emphasis added). Because the alleged "barrier" is explicitly permitted under the ADA, Plaintiffs' claim fails as a matter of law.

Plaintiffs' barrier removal claim also fails because the only types of "barriers" subject to removal under the plain language of the statute are architectural barriers, "communication barriers that are structural in nature," and "transportation barriers in existing vehicles and rail passenger cars." 42 U.S.C. § 12182(b)(2)(A)(iv). The alleged "barrier" does not fit into any of these three categories of barriers enumerated by Congress. Finally, Plaintiffs' claim fails because Plaintiffs have not articulated a plausible proposal for barrier removal. *See Roberts v. Royal Atl. Corp.,* 542 F.3d 363, 373 (2d Cir. 2008). As the Second Circuit explained in *Roberts* and *Borkowski,* a "plausible" proposal of barrier removal means the proposal would be beneficial, because at least facially, the costs of such proposal would not exceed its benefits. *See Roberts,* 542 F.3d at 373, *quoting Borkowski,* 63 F.3d at 138. Here, there was no evidence that the proposal would yield any benefit because Plaintiffs failed to show that if the alleged "barrier" were removed, WAV service would appear on the Lyft platform. *See* Lyft's Response to Fact Nos. 81-89. Moreover, as the U.S. Supreme Court explained in *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009), a claim has "facial plausibility" for purposes of a motion to dismiss when the plaintiff has pled "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This

"plausibility" standard is "not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.'" *Id.* The Supreme Court's standard for "plausibility" is consistent with the common definitions of the word "plausible," meaning "reasonable" or "appearing worthy of belief." *See* https://www.merriam-webster.com/dictionary/plausible (last visited May 27, 2023).

Here, borrowing from the Supreme Court's standard for "plausibility" articulated in *Ashcroft,* Plaintiffs offered no "factual content that allows the court to draw the reasonable inference" that if the alleged "barrier" were to be removed, access to on-demand transportation by WAVs will be achieved. "[T]o meet the burden of demonstrating that removal of a barrier is readily achievable, plaintiff must 'proffer evidence, including expert testimony, as to the ease and inexpensiveness of their proposed method of barrier removal.'" *Hurley v. Tozzer, Ltd.,* No. 15 Civ 2785 (GBD)(HBP), 2018 U.S. Dist. LEXIS 18808, *18 (S.D.N.Y., Feb. 2, 2018), *quoting Panzica v. Ms-Maz, Inc.,* CV 05-2595 (ARL), 2007 U.S. Dist. LEXIS 42171, *15 (E.D.N.Y., June 11, 2007). In contrast, Lyft offered (among other evidence) the uncontradicted testimony of its expert, Dr. Marc Rysman, who explained that a supply-and-demand based platform for WAV service was not feasible. *See* Lyft's Response to Fact Nos. 89-93.

The very notion of "barrier removal" assumes that access will be achieved if the barrier is removed. Plaintiffs' experts provided no such testimony, and Plaintiffs presented no other evidence from which this Court could draw any such inference. Plaintiffs have failed their burden to come forward with a plausible proposal because they failed to present any evidence that access to on-demand transportation would be achieved upon the removal of the alleged "barrier." *See, e.g., Antolini*, 2021 U.S. Dist. LEXIS 135989, at *7-9 (at summary judgment, rejecting expert's proposal to install lifts because it was "shockingly short on

details"; the proposal did not include any architectural renderings or information regarding the feasibility of designing and orienting the lifts to provide access); *Range,* 2020 U.S. Dist. LEXIS 99045, at *17, 20 (at summary judgment, rejecting claim that proposals were readily achievable as "rank speculation" because plaintiff failed to offer sufficient evidence to evaluate the plausibility and cost of his proposals). *See also* ILRC Trial Decision, 2021 U.S. Dist. LEXIS 166229, *26-27 (federal courts have "routinely rejected" claims of reasonable modifications that were not "concrete and specific").

175.     Lyft has failed to demonstrate that, despite its ability to remove this barrier to WAV service in its nine Access Regions, doing so in its current non-Access Regions would not be readily achievable. Lyft has not established that enabling Access mode in the non-Access Regions would require substantial cost to outweigh the benefits of offering Access mode. Lyft's defense that enabling Access mode in the non-Access Regions does not guarantee identical wait times, completion rates, or vehicle supply to Standard mode in the non-Access Regions does not rise to the standard of proving the barrier removal is not readily achievable. Lyft does not guarantee certain service level or vehicle supply requirements for Access mode in the non-Access Regions.

### Lyft's Response to Conclusion of Law No. 175

Because Plaintiffs failed to meet their burden of presenting a plausible proposal for barrier removal, Lyft need not produce any evidence. Nonetheless, Lyft has produced the following evidence demonstrating that Plaintiffs' proposal would not yield any benefit and would impose unreasonable costs on Lyft.

First, Lyft presented evidence that merely "enabling Access mode" in its app – that is, merely showing "Access mode" as an option – in the non-Access Regions would not result in any Access mode service being offered. Dr. Rysman's analysis showed that based on the lack of population density of potential WAV riders and drivers, and corresponding lack

of density of supply-and-demand, a platform model for WAVs will not work. *See also* Lyft's Response to Fact Nos. 81-93.

Second, no witness, including Plaintiffs' expert, testified that an independent WAV supply existed anywhere, including in the largest cities, such that if the alleged "barrier" were removed, on-demand WAV transportation would result in those cities.

Third, Dr. Rysman and Ms. Gerundio testified that simply showing "Access mode" as an option in the app without any supply of WAVs will result in costs to Lyft. As Dr. Rysman testified, wheelchair users would be frustrated by the non-existent service, which would lead to a degraded brand image for Lyft, as well as increased customer complaints and customer service needs. Riders who can never find a ride, or worse yet, find themselves stranded away from home in their wheelchair, may create significant problems and costs for Lyft, including adverse publicity, degraded image, and potential lawsuits. There is no doubt that Lyft would face adverse publicity – or worse – if a wheelchair user found themselves stranded because Lyft had no actual WAV supply despite showing "Access mode" in its app. Moreover, operational costs in the form of ensuring completion of vehicle inspections and driver training, as well as deciphering and complying with any additional or specific local requirements, would be significant.

Plaintiffs produced no evidence of a benefit to be gained from this proposal. Lyft's evidence showed the proposal would have no benefit, but would result in costs to Lyft.

176.    Lyft's block of Access mode constitutes an unlawful barrier to access.  *See, e.g.*, *Walters v. Fischer Skis U.S., LLC*, No. 21-1115, 2022 WL 3226352, at *7 (N.D.N.Y. Aug. 10, 2022) (holding that digital barriers constitute "specific barriers to accessibility" in violation of Title III); *Duncan v. Skin Bar NYC, LLC*, No. 19-5188, 2021 WL 9204082, at *4 (S.D.N.Y. May 18, 2021) (holding that the defendant's failure to make "modifications to its website that would allow plaintiff

and other visually impaired individuals to have 'equal access'" constitutes a violation of the ADA) (collecting cases); *Robles v. Domino's Pizza, LLC*, 913 F.3d 898, 905 (9th Cir. 2019), *cert. denied*, 140 S. Ct. 122 (2019) (Title III's non-discrimination "requirement applies to [a public accommodations]'s website and app").

177.    That the barrier interferes with access is sufficient.  *See, e.g., Farr v. Hobby Lobby Stores, Inc.*, No. 19-5949, 2020 WL 3978078, at *3-4 (C.D. Cal. Apr. 29, 2020) (Title III injury exists where "web-based accessibility barriers" "interfere[d] with [the plaintiff's] access to [the d]efendant's goods and services") (citing *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 949-50 (9th Cir. 2011)); *Reed v. CVS Pharmacy, Inc.*, No. 17-3877, 2017 WL 4457508, at *1 (C.D. Cal. Oct. 3, 2017) ("that plaintiff is unable to fully access the website and app's offerings . . . due to a number of access barriers" is a violation of the ADA).

### Lyft's Response to Conclusions of Law Nos. 176-177

*See* Lyft's Response to Conclusions of Law Nos. 174 and 175. This is not a web- or App-based accessibility barrier that prevents individuals who are sight-impaired from accessing products and services. Instead, Plaintiffs are individuals who rely on wheelchairs or motorized scooters who complain of a lack of reliable, on-demand WAV transportation. Plaintiffs presented no evidence suggesting that merely changing a setting in the App will cause WAVs to appear on the Lyft platform.

## IX.    Plaintiffs Are Entitled To Attorneys' Fees And Costs.

178.    The ADA and the NYSHRL allow prevailing plaintiffs in an action to recover reasonable attorneys' fees and costs.  *See* 42 U.S.C. § 12205; N.Y. Exec. Law § 297(10); N.Y.C. Admin. Code § 8-502(f); *see also Dominguez v. New York Equestrian Ctr., Ltd.*, No. 18-9799, 2020 WL 5796275, at *4 (S.D.N.Y. Sept. 28, 2020).

179.    Plaintiffs are entitled to an award of reasonable attorneys' fees and reimbursement of

all costs and expenses reasonably incurred in litigating this action.

180. Plaintiffs and witnesses may also apply for a service award.

### Lyft's Response to Conclusions of Law Nos. 178-180

As the losing party, Plaintiffs are not entitled to recover any fees or costs.

## X. The Court Issues The Following Order

181. This Court hereby orders:

a. Lyft is hereby enjoined from operating its WAV programs and Access mode in a manner that is discriminatory pursuant to section 12182 of the ADA, including subsections 12182(b)(1)(A)(ii), (b)(2)(A)(i)- (v).

b. Lyft is hereby enjoined from operating its WAV programs and Access mode in a manner that is discriminatory pursuant to section 12184 of the ADA, including subsections 12184(b)(1), (b)(2)(A)-(C).

c. Lyft is hereby enjoined from operating its WAV programs and Access mode in a manner that is discriminatory pursuant to section 296(2)(a) of the NYSHRL, including subsections 296(2)(c)(i)-(iii).

d. The Court hereby orders Lyft to implement the following remedial measures:

   i. Remove the current categorical preclusion ("blocker") of WAVs on its platform in the non-Access Regions and prevent the implementation of the Access Mode toggle by automatically displaying WAV options on Lyft's home screen alongside other vehicle options. Lyft's policies and practices prevent WAV drivers from identifying their vehicles as WAVs and riders from having the option to select WAVs, even when they are available.

   ii. Ask all drivers on its platform and those onboarding whether they have access to WAVs and whether they are interested in driving WAVs on Lyft's platform. Plaintiffs envision that this question would be added to Lyft's mandatory driver onboarding process, during which Lyft requires drivers to disclose all relevant information about their vehicles, such as makes and models, and insurance information.

   iii. Utilize cross-dispatching and prioritization logic to optimize WAV drivers' efficiencies and profitability.

   iv. Explore and form partnerships with car rental, taxi, non-emergency medical transportation, and other transportation companies that have WAVs, as Lyft's competitors have done to improve WAV service.

   v. Include WAVs as options in Lyft's Express Drive and FlexDrive programs for its existing and potential drivers.

  vi. Engage in both WAV driver- and rider-facing marketing to attract potential WAV drivers and to increase awareness of WAVs on Lyft's platform among potential WAV riders, and thereby increase the supply of WAVs and demand for WAV services on Lyft's app. Lyft may do so by employing targeted advertising and advertising campaigns similar to those Lyft uses for its standard and other non-WAV services.

  vii. Increase the supply of WAVs on its platform by offering potential drivers baseline bonuses and incentives for guaranteed periods of time, such as six months, one year, or eighteen months.

  viii. Implement a ten-cent accessibility surcharge on all rides nationwide to fund robust WAV services.

182. The Court also find that Plaintiffs are entitled to an award of reasonable attorneys' fees and reimbursement of all costs and expenses reasonably incurred in connection with this action and that Plaintiffs and witnesses may apply to receive a service award.

183. This Court directs the Parties to mediate the issue of attorneys' fees and costs within 45 days of the issuance of this Order. Plaintiffs shall submit their application for reasonable attorneys' fees, costs, and service awards within 30 days of the mediation.

## **Lyft's Response to Conclusions of Law Nos. 181-183**

The Court hereby directs the Clerk to enter judgment for Lyft.

**LYFT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**
**IN SUPPORT OF ITS AFFIRMATIVE DEFENSE OF FUNDAMENTAL**
**ALTERATION TO PLAINTIFFS' FIRST AND SECOND CLAIMS FOR RELIEF**
**UNDER THE ADA AND THE NYSHRL**

**FACTS RELEVANT TO AFFIRMATIVE DEFENSE**

1.      Lyft launched its on-demand ridesharing platform just over ten years ago, in 2012. (Stip. Fact No. 9.)

>       **Plaintiffs' Response:**  Plaintiffs have no response or objection to this proposed fact.

2.      Lyft's ridesharing platform is a two-sided technology platform that is premised on fundamental principles of supply and demand. The supply and demand required of the platform is inherently local, and the platform works best in areas of high population density. (Testimony of Leon Treger, Dr. Marc Rysman.)

>       **Plaintiffs' Response:**  The opinions of Lyft's expert are unreliable, do not assist the trier of fact, and are contrary to Lyft's business practices. Fed. R. Evid. 702.  Lyft provides Standard mode in every region in which it operates, regardless of whether there is sufficient supply and demand.  Lyft does not make decisions about where to offer, alter, or restrict Standard mode based upon whether it functions effectively or whether there is an available supply of drivers.  Stip. Fact ¶¶ 19, 24.

>       Mr. Treger is not qualified to testify about where and how Lyft can function best and is not proffered as an expert on the market dynamics of how Lyft operates.  Fed. R. Evid. 702.

3.      Much of the operation of Lyft's platform is handled by technology, without human intervention. Computer algorithms not only match independent drivers and riders who use the Lyft app, but also help balance supply and demand through pricing and incentives, all in "real-time."

Lyft's algorithms use large amounts of data generated by rides in the Lyft app ("App") to adapt and learn. (Testimony of Leon Treger.)

> **Plaintiffs' Response:** Plaintiffs have no response or objection to this proposed fact.

4.      In most Regions, Lyft offers just two ride modes, "Standard" and "XL," on its App. "Standard" mode is Lyft's basic ridesharing option. In that mode, a rider will be paired with a standard car for up to 4 passengers. If a rider needs extra seats, there is Lyft XL. XL costs more than Standard but will match a rider with a driver who has an SUV for up to 6 passengers. (Testimony of Leon Treger, Abbas Bozorgirad.)

> **Plaintiffs' Response:** Plaintiffs have no response or objection to this proposed fact.

5.      Standard and XL are available in over 300 Regions nationwide. This means that a rider who opens her App in those regions will see the current wait times for Standard and XL modes in her local area. (Testimony of Leon Treger, Abbas Bozorgirad.)

> **Plaintiffs' Response:** Plaintiffs have no response or objection to this proposed fact.

6.      In selected Regions, Lyft offers more specialized modes, such as "High Value Modes" or HVMs. In those Regions where HVMs are offered, a rider may see modes such as "Lux," "Lux Black," or "Lux Black XL" listed in the App. (Testimony of Leon Treger, Abbas Bozorgirad.)

> **Plaintiffs' Response:** This alleged fact has no relevance to the legal issues discussed. Fed. R. Evid. 401-403. Lyft's specialized modes for its premium offerings are not relevant to whether it is reasonable for Lyft to implement Plaintiffs' modifications.

7.      Lyft is strategic about where to offer specialized modes to ensure that they function well, to promote a good user experience, and to maximize revenue. Out of over 300 U.S. regions where Lyft offers Standard & XL, Lyft currently offers Lux Black and Lux Black XL in just 56 Regions. (Testimony of Abbas Bozorgirad.)

**Plaintiffs' Response:** This alleged fact has no relevance to the legal issues discussed. Fed. R. Evid. 401-403. Lyft's specialized modes for its premium offerings are not relevant to whether it is reasonable for Lyft to implement Plaintiffs' modifications.

The "main focus" for expanding Lyft's specialized modes is growth and increasing the number of passengers. Zhou Dep. 26:11-27:1 ("Q: And did you find that it would be profitable to expand [specialized mode] access so that there could be airport pickup? A: Well, I wouldn't use the word 'profitable.' I would say it would have led to increased adoption of that mode, and I think what we were trying to do was just increase the usage and the word-of-mouth spread of the mode as it being a valuable service.").

8.      Any person, including individuals who rely on wheelchair accessible vehicles ("WAVs"), may download and open the Lyft App to see what options or "modes" are available. However, since 2016, Lyft has offered Access mode in just nine cities (the "Access Regions"). (Testimony of Isabella Gerundio.)

**Plaintiffs' Response:** Lyft has not offered Access mode in each of nine cities during the entire duration of 2016 to the present. Lyft began offering Access mode in Portland in 2016 in response to regulatory requirements. Since then, Lyft has expanded Access mode to the remaining eight cities at varied intervals in response to regulatory requirements, financial incentives, or a partnership with a transit agency. Stip. Fact ¶ 35.

9.     Wheelchair accessible vehicles ("WAVs") are rare and expensive. To create a WAV, the floor of an existing minivan (such as a Chrysler Pacifica or a Toyota Siena) is typically lowered, and equipment such as a wheelchair ramp and securement device are added. The cost of creating a WAV can add $15,000-$25,000 (or more) on top of the cost of purchasing the minivan. WAVs are rare in part because of the high cost: most people are not likely to incur the cost of creating or purchasing a WAV unless they (or their family member) need one. (Testimony of Isabella Gerundio, Daniel Bussani.)

**Plaintiffs' Response:** Ms. Gerundio is not qualified to testify about the WAV manufacturing process, the average cost of modifying a vehicle to become a WAV, or the average individual's decision regarding the purchase of a WAV. Ms. Gerundio is not proffered as an expert on the WAV manufacturing process, the cost of a WAV, or the purchasing practices of individuals. Furthermore, Ms. Gerundio has not performed any competent research into the availability of WAVs and the evidence does not establish that she has any specialized knowledge of the WAV manufacturing process. Fed. R. Evid. 702; Gerundio Dep. Tr. 116:11-117:9, 199:21-200:1, 200:8-24. WAVs can be purchased for as little as $16,000 (Affidavit of Peter Ruprecht, ¶ 12; Affidavit of Daniel Bussani, ¶ 10), and many customers can receive subsidies and grants through health insurance and state-run programs (Affidavit of Daniel Bussani, ¶ 11).

In any event, although Ms. Gerundio and Lyft have not bothered to competently estimate or calculate how many WAVs there are in the United States, there are ample WAVs for Lyft to have a sufficient supply, with more than 15,000 WAVs being manufactured on an annual basis in the United States, a conservative estimate of more than 100,000 WAVs on the road at a given time, and, in particular, a relatively large quantity of WAVs in Westchester

County.  (Testimony of Alex Elegudin; Affidavit of Peter Ruprecht, ¶¶ 9-19; Affidavit of Daniel Bussani, ¶¶ 7-9).

10.     The biggest challenge in offering Access Mode is lack of supply. Unlike other modes, for which Lyft relies on an organic supply of drivers in a particular area, Lyft has found that an organic WAV supply needed to support a functioning platform does not exist. This is no doubt due to the fact that WAVs are expensive to create or purchase and only a very small percentage of the general population needs a WAV. (Testimony of Isabella Gerundio.)

**Plaintiffs' Response:** Ms. Gerundio has not performed any competent research into the availability of WAVs to determine whether Lyft is adequately engaging the available supply of WAVs.  Gerundio Dep. Tr. 116:11-117:9, 199:21-200:1, 200:8-24.  Ms. Gerundio is not qualified to testify about the average cost of a WAV, or the average individual's decision regarding the purchase of a WAV.  Ms. Gerundio is not proffered as an expert on the cost of a WAV, or the purchasing practices of individuals.  Fed. R. Evid. 702.

Moreover, Lyft has refused to ask its drivers whether they have WAVs during Lyft's onboarding process or use outreach and marketing to identify available WAV drivers, like it does in other ride modes.  (Testimony of Isabella Gerundio; Testimony of Alex Elegudin).

There is a sufficient supply of WAVs for Lyft to provide Access mode in the non-Access Regions.  (Testimony of Alex Elegudin).

11.     To overcome the lack of supply, Lyft has incurred significant cost to artificially create a supply of WAVs on its platform through incentives and partnerships with third parties who have access to these vehicles. In 2019, the total amount Lyft spent to create WAV supply in its nine Access Regions was $11.6 million; in 2020, the total amount was $13.1 million; and in 2021, the total amount was $13.8 million. (Testimony of Isabella Gerundio.)

**Plaintiffs' Response:** Lyft implements a number of driver outreach, advertising, and marketing initiatives to identify and engage a supply of drivers in each of its ride modes, (Zhou Dep. Tr. 67:25-68:8; 68:25-69:8), but does not implement similar outreach and advertising initiatives to engage Access mode drivers.

Ms. Gerundio is not qualified to testify about whether there is a sufficient supply of WAVs on Lyft. Ms. Gerundio is not proffered as an expert on the available supply of WAVs or the purchasing practices of individuals. Furthermore, Ms. Gerundio has not performed any competent research into the availability of WAVs to determine whether Lyft is adequately engaging the available supply of WAVs. Fed. R. Evid. 702; Gerundio Dep. Tr. 116:11-117:9, 199:21-200:1, 200:8-24.

Lyft operates its WAV program grossly inefficiently, with its only goal being to appease regulators while providing as little service as possible. As a result, Lyft's WAV program is far less economically efficient than a properly functioning WAV program. (Testimony of Alex Elegudin).

12. Lyft's experience is that the demand for Access mode is very small. This may be due to many factors, but the biggest one is that the percentage of individuals who need WAVs for transportation is a small percentage of the population at large: estimates range from .5% to 1% of the general population. Another factor may be the availability of subsidized transportation options, including paratransit, as well as non-emergency medical transportation subsidized or paid for by insurance. (Testimony of Isabella Gerundio, Dr. Marc Rysman.)

**Plaintiffs' Response:** The opinions of Lyft's expert are unreliable, do not assist the trier of fact, and are contrary to Lyft's business practices. Dr. Rysman has no experience designing or implementing accessible transportation and has no specialized knowledge regarding the

demand for Access mode or the demand for WAVs. Dr. Rysman is not qualified to testify regarding the availability of accessible transportation options. Fed. R. Evid. 702.

In the Access Regions, Lyft deliberately suppresses WAV demand via its hidden toggle to hide WAV from customers, and via other mechanisms. (Testimony of Isabella Gerundio)

Lyft did not perform any study of the demand for Access mode in the non-Access Regions and does not know what the demand for Access mode is in the non-Access Regions. *See* Plaintiffs' Proposed Findings of Fact ¶¶ 44-46.

13.     Actual demand for Access mode on Lyft's ridesharing platform as a percentage of total rides is incredibly low. Even in Lyft's biggest WAV market – New York City – WAV rides comprise approximately 1 in 1,000 of all rides on the platform. In Los Angeles, the demand is even less: WAV rides comprise approximately 1 in 5,000 of all rides on the platform. (Testimony of Isabella Gerundio, Abbas Bozorgirad.)

**Plaintiffs' Response:** In every Access region but New York City, Lyft deliberately suppresses WAV demand through the use of a hidden toggle to activate Access Mode. When Lyft removed the toggle in New York City, WAV rides on Access Mode increased by approximately 500 percent. See Plaintiffs' Proposed Findings of Fact ¶¶ 137-43. The same would likely happen if Lyft removed the toggle in other regions. (Testimony of Alex Elegudin).

14.     After analyzing data provided by Lyft, Dr. Marc Rysman, Professor of Economics at Boston University, opined that based on the population density of potential WAV riders, it is not feasible for Lyft to rely on its platform model to provide Access mode service. (Testimony of Dr. Marc Rysman.)

**Plaintiffs' Response:** The opinions of Lyft's expert are unreliable, do not assist the trier of fact, and are contrary to Lyft's business practices. Fed. R. Evid. 702.

Dr. Rysman admitted that Lyft offers Standard mode in many areas that he would find infeasible. Rysman Dep. Tr. 119: 1-120:17. Furthermore, Lyft does not make decisions about where to offer, alter, or restrict Standard mode based upon the population density, supply of drivers, demand of riders, or any other considerations or metrics. Stip. Facts ¶¶ 19, 25.

15.     Lyft has not yet identified a way to operate Access mode profitably. Lyft is not aware of any other entity, either private or public, that has figured out how to operate an on-demand ridesharing service for WAVs efficiently and effectively. (Testimony of Isabella Gerundio, Abbas Bozorgirad, Leon Treger.)

**Plaintiffs' Response**: In ten years, Lyft has never operated its standard service profitably, often recording annual losses of billions of dollars while it fought to expand market share. Lyft has never operated Access mode with the goal of doing so profitably. As Joyce Chan, Lyft's 30(b)(6) witness stated, "the primary goal of WAV is actually not today to be profitable. It's to meet our regulatory requirements. . . . I think Lyft's primary goal is to . . . make every effort we can to meet our regulatory requirements." Chan Dep. Tr. 110:18-111:14.

Many companies and car-service operators offer efficient and profitable WAV service throughout the United States and have experienced consistent and long-term success. Plaintiffs' experts also propose modifications that would allow Lyft to operate Access mode profitably. (Testimony of Alex Elegudin).

## LYFT'S PROPOSED CONCLUSIONS OF LAW

## PLAINTIFFS' PROPOSAL TO HAVE LYFT OFFER ACCESS MODE EVERYWHERE WOULD FUNDAMENTALLY ALTER THE NATURE OF LYFT'S BUSINESS

16.     At issue in this lawsuit is whether Lyft must offer Access mode as an option in every non-Access Region. The parties do not dispute that anyone, including individuals who rely on WAVs for transportation, can download and open the Lyft App in every region. But the issue is whether Access mode must be shown among the menu of options in the App. Plaintiffs' proposed modification to have Lyft offer Access mode in every non-Access Region would fundamentally alter the nature of Lyft's business.

**Plaintiffs' Response**: "WAV services would not fundamentally alter Lyft's business because WAVs are not a 'new transportation service.'  Lyft already provides WAV services where compelled to do so by local governments and voluntarily in Los Angeles and San Francisco (on a pilot basis)."  Findings of Fact and Conclusions of Law, *Independent Living Resource Center San Francisco v. Lyft, Inc.*, No. 19-01438, 2021 WL 3910719, at *8 (N.D. Cal. Sept. 1, 2021) (hereinafter "*ILRC*").  Lyft "cannot argue that something it is already doing would fundamentally alter its business[.]"  Order Re Motions for Summary Judgment, *ILRC*, 2020 WL 6462390, at *6 (N.D. Cal. Nov. 3, 2020).

In the only instances where a rideshare company argued that a proposed modification of offering WAV programs in an area where it does not currently offer WAV programs constituted a fundamental alteration, both courts swiftly rejected Lyft's position. As stated in *Crawford v. Uber Technologies, Inc.*, 616 F. Supp. 3d 1001, 1009 (N.D. Cal. 2022), "[p]roviding no authority in support of this argument, Uber apparently contends that any requested modification of its services is a fundamental alteration, which would allow it to escape ADA liability for any requested modification.  This argument is therefore rejected."

As every other court to have considered Lyft's argument in this context has found, Plaintiffs' proposed modification to have Lyft offer Access mode in the non-Access Regions where Lyft does not currently offer Access mode is not a fundamental alteration of Lyft's business because Lyft currently offers Access mode in the Access Regions.

17.     As a matter of law, Plaintiffs' proposed modification to have Lyft offer Access mode in every non-Access Region fundamentally alters Lyft's "goods, services, facilities, privileges, advantages, or accommodations," by requiring Lyft to offer a specialized service. 42 U.S.C. § 12184(b)(2)(A), which incorporates § 12182(b)(2)(A)(ii), defines "discrimination" to include:

> a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations.

**Plaintiffs' Response**:  Plaintiffs incorporate by reference their response to ¶¶ 17.

18.     The plain language of this section distinguishes between two "categories" of things: (a) "policies, practices, or procedures," and (b) "goods, services, facilities, privileges, advantages, or accommodations." The fact that Congress used different language to describe these two categories "within the same sentence suggests Congress meant these categories to have different meanings." *Mary Jo C. v. N.Y. State & Local Ret. Sys.*, 707 F.3d 144, 156 (2d Cir 2013).

**Plaintiffs' Response**:  The Second Circuit in *Mary Jo. C.* does not compare the category of "policies, practices, or procedures" to "goods, services, facilities, privileges, advantage, or accommodations" as Lyft claims.  707 F.3d at 155-56.  In *Mary Jo C.*, the Second Circuit stated that the text of 42 U.S.C. § 12131(2), which is not at issue in this action, "distinguishes between two categories of requirements: (1) rules, policies, or

practices, which are subject to the requirement of reasonable modification, and (2) *essential eligibility requirements*, which are not." *Mary Jo C.*, 707 F.3d at 155-56 (emphasis added).

Lyft's argument that the essential eligibility requirements and reasonable modification standards are different categories has no bearing on whether Plaintiffs' modification is a fundamental alteration because Lyft does not argue (and cannot credibly do so) that requiring a non-WAV is an essential eligibility requirement. Indeed, the Second Circuit noted that the standard for a reasonable modification involves "flexibility[.]" *Id.*

Rather, the Second Circuit in *Mary Jo C.* found that the plaintiff's requested modification to submit a late application for state pension benefits because of the plaintiff's mental illness was not a fundamental alteration, despite the fact that implementation of the modification violated state law. *Id.* at 155-60.

Plaintiffs' modification does not request Lyft to alter the goods, services, facilities, privileges, advantages, or accommodations that it provides. Rather, Plaintiffs' modification requests that Lyft alter its policies and practices of refusing to allow Access mode to be available in the non-Access Regions.

19. Here, in the non-Access Regions including Westchester County, Plaintiffs want Lyft to offer WAV service. While Plaintiffs claim that they are merely seeking modifications in Lyft's "policies, practices, or procedures," what they actually seek is to have Lyft add specialized "goods or services" to its offerings in every non-Access Region. *See, e.g., Olmstead v. L.C. ex rel. Zimring,* 527 U.S. 581, 603 (1999) (under ADA Title II, observing that States may resist modifications that entail a "fundamental alteration" of their services and programs); *Powell v. Nat'l Bd. Of Medical Examiners,* 364 F.3d 79, 88 (2d Cir. 2004) ("a defendant may not make an accommodation at all if the requested accommodation 'would fundamentally alter the nature of the service, program, or activity.'").

**Plaintiffs' Response**:  Plaintiffs incorporate by reference their response to ¶¶ 15-16.

Lyft's reliance on *Olmstead* and *Powell* fail to demonstrate that Plaintiffs' modification

constitutes a fundamental alteration.  In *Olmstead*, the Supreme Court found that a

modification for an individual with disabilities to be placed in a community-based treatment

setting rather than in an institution was reasonable because the state offered community-

based treatment settings for other individuals.  527 U.S. at 604-07.

     *Powell* also does not support Lyft's argument.  Lyft misquotes the Second Circuit in

*Powell*, using the incorrect language of "may not" instead of the correct language that "a

defendant *need not* make an accommodation . . ."  364 F.3d at 88 (emphasis added).  In *Powell*,

the Second Circuit found that a medical school was not required to alter its core competency

requirements to be a practicing physician because such a modification would fundamentally

alter the medical school's "responsib[ility] for producing competent physicians[.]"  *Id.* at 88.

This consideration was only after the school made the following modifications for the

student: "The school supplied tutors for her, excused an honor code violation ostensibly

because of its sympathy for her high level of stress, allowed her to remain matriculated

without paying tuition, and gave her multiple opportunities to remediate classes that she had

previously failed."  *Id.* at 87-88.  Lyft's invocation of *Powell* and *Olmstead* fails to demonstrate

that Plaintiffs' modification is a fundamental alteration or that Plaintiffs do not seek to alter

Lyft's policies, practices, or procedures.

20.    Put differently, the only possible "modification" that will satisfy Plaintiffs is not a

modification in "policy, practice, or procedure," but the provision of transportation in vehicles that

have been specially modified to allow wheelchair access. But in enacting the ADA, Congress made

clear that private entities like Lyft are not required to purchase or lease WAVs, *see* 42 U.S.C.

§§ 12184(b)(3), 12182(b)(2)(A)(iv), or provide an accessible "good or service." *See, e.g., Weyer v.*

*Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1115 (9th Cir. 2000) (Title III "does not require provision of different goods or services, just nondiscriminatory enjoyment of those that are provided."); *Thorne v. Boston Mkt. Corp.,* 469 F. Supp. 3d 130, 143 (S.D.N.Y. 2020) ("Because the Court concludes that gift cards are goods sold by a public accommodation under the ADA, Defendant cannot be required to sell accessible gift cards."). Plaintiffs' requested modification is thus a request for a fundamental alteration. *See Pottgen v. Missouri State High School Activities Ass'n,* 40 F.3d 926, 930 (8th Cir. 1994) (under ADA Title II, where an individual cannot meet an eligibility requirement determined to be essential, "the only possible accommodation is to waive the essential requirement itself … [But] [w]aiving an essential eligibility standard would constitute a fundamental alteration in the nature of the program"); *see also PGA Tour, Inc. v. Martin,* 532 U.S. 661, 689 (2001) (the waiver of an essential rule of golf would be a fundamental alteration).

**Plaintiffs' Response**: Plaintiffs' modification does not fundamentally alter the nature of the goods or services that Lyft offers. Lyft connects people looking for a driver with people who have access to a vehicle and are willing to provide rides. However, in the non-Access Regions, Lyft prevents connections on its App by individuals who require WAVs with people who have a WAV and are willing to provide rides. Plaintiffs' request is not a fundamental alteration to the nature of the goods or services that Lyft offers. Rather, Plaintiffs request that individuals who require WAVs be given the opportunity to use Lyft's App in the same manner that individuals who do not require WAVs use Standard mode.

The court in *Weyer* further supports the reasonableness of Plaintiffs' modification. There, the court stated that "[t]he ordinary meaning of this [goods or services] language is that whatever goods or services the place provides, it cannot discriminate on the basis of disability in providing enjoyment of those goods and services." *Weyer*, 198 F.3d at 1115.

Here, Plaintiffs do not request a different good or service from Lyft. Plaintiffs request a similar opportunity to access a ride in the same manner as users do for Standard mode.

*Thorne* also does not support Lyft's defense. In *Thorne*, the court found that the "most natural reading of [a good] was 'wares; merchandise.'" 469 F. Supp. 3d at 142 (quoting *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 31 (2003)). Because a gift card is an item of merchandise that can be tangibly offered for sale and purchase, the court found that accessible gift cards were a distinct good and were not a reasonable modification. *Id.* Once again, Lyft's App connects riders and drivers, rather than disbursing merchandise like gift cards. Access mode would connect riders and drivers in the non-Access Regions in a similar manner to Standard mode. Plaintiffs' modifications would not require a new good or service.

Lyft's reliance on *Pottgen* does not establish that offering Access mode in the non-Access Regions is a fundamental alteration. In *Pottgen*, the court found that waiving the maximum age requirement for a high school baseball program for the plaintiff would constitute a fundamental alteration because the age requirement was an essential eligibility requirement. 40 F.3d at 930. Lyft has not and does not claim that requiring a non-WAV is an essential eligibility requirement for using the App, likely because doing so would violate the ADA. As a result, the holding in *Pottgen* has no bearing on whether Plaintiffs' modification is a fundamental alteration.

Finally, the Supreme Court in *Martin* repudiates Lyft's argument. In *Martin*, the Supreme Court held that the PGA Tour discriminated against a disabled golfer who sought to play in the PGA Tour's qualifying tournament, "Q-School," when the PGA Tour refused to allow the golfer to use a golf cart, rather than walk the course. 532 U.S. at 665. In doing so, the court found that the "use of carts is not itself inconsistent with the fundamental

character of the game of golf" and "the walking rule is not an indispensable feature of tournament gold either." *Id.* at 683-86. Here, Lyft has not made use of a WAV a condition of accessing its App or an essential eligibility requirement. Plaintiffs' modification seeks the same service for Access mode that Lyft currently offers for Standard mode.

21.     Regulations issued by the Department of Transportation ("DOT"), the entity charged by Congress with promulgating regulations to carry out the transportation provisions of Title III (see 42 U.S.C. § 12186(a)), confirm this. DOT guidance, published at 49 C.F.R. Part 37, Appendix E, states that a passenger's request for service outside the service area or outside regular operating hours may be denied as fundamental alterations. *Id.*, Example 11. Similarly, a passenger's request for special equipment (*e.g.*, the installation of specific handrails), for a dedicated vehicle so that a rider can avoid certain odors, or for an exclusive paratransit trip, also constitute fundamental alterations. *Id.*, Examples 9 and 10. Requiring Lyft to offer WAV service in the non-Access Regions thus constitutes a fundamental alteration.

**Plaintiffs' Response**: Examples 9, 10, and 11 fail to demonstrate that requiring Lyft to offer WAV service in the non-Access Regions constitutes a fundamental alteration. First, each of these examples is inapposite involving alterations to either (a) a specific vehicle's design and make or (b) service offerings of paratransit and fixed route services.

In Example 9, a request for a dedicated vehicle for a passenger or special equipment "can be denied so long as the requested equipment is not required by the Americans with Disabilities Act or the Department's rules." 49 C.F.R. Part 37, Appendix E. Similarly, in Example 10, seeking to make Paratransit, which is "by nature a shared-ride service," an exclusive service would be a fundamental alteration. However, neither instance is present for Lyft. Rather, a WAV on Access mode in the non-Access Regions, in the same manner as a vehicle on Standard mode, would be available for use by all users of the Lyft App and the

user has no ability to request a dedicated personal vehicle or special equipment beyond requirements set by Lyft for each ride mode.

Example 11 also demonstrates that these particular examples are not applicable to the current analysis. Example 11 prevents a request for a service outside of the entity's service area or operating hours. 49 C.F.R. Part 37, Appendix E. Lyft's service area for Standard mode is all the regions in which Lyft currently offers service. Lyft has not presented evidence that it does not offer service 24 hours a day on Standard mode in these regions. Plaintiffs' modification requests that Lyft offer Access mode in the non-Access Regions and for the same time period in which Lyft currently offers Standard mode. Thus, this modification is not a fundamental alteration of Lyft's service.

22. That Lyft may offer Access mode in the Access Regions does not change the fact that requiring Lyft to offer it in the non-Access Regions is a fundamental alteration. *See id.,* Example 11 (requests for service outside the service area is a fundamental alteration). By asking the Court to order Lyft to offer Access mode in all non-Access Regions, Plaintiffs ask the Court to ignore an "essential attribute" of Lyft's ridesharing platform, which is that the platform's operation depends on *local* supply and demand. *See PGA Tour,* 532 U.S. at 682-83. WAVs, unlike standard sedans or SUVs, are not ubiquitous. The evidence is that Lyft makes decisions regarding specialized modes such as Lux or Lux Black based on local conditions, and asking the Court to ignore the availability of local supply-and-demand on a ridesharing platform is a fundamental alteration.

**Plaintiffs' Response**: That Lyft offers Access mode in the Access Regions does, in fact, demonstrate that offering Access mode in the non-Access Regions is not a fundamental alteration. Indeed, every court to consider this defense has agreed. *ILRC*, 2021 WL 3910719, at *8 ("WAV services would not fundamentally alter Lyft's business because WAVs are not a 'new transportation service.' Lyft already provides WAV services where

compelled to do so by local governments and voluntarily in Los Angeles and San Francisco (on a pilot basis)." *ILRC*, 2020 WL 6462390, at *6 (Lyft "cannot argue that something it is already doing would fundamentally alter its business"); *see also Crawford*, 2022 WL 2913836, at *5.

Lyft now contends that this Court should impose standards that Lyft claims to apply only for its luxury ride mode, but does not apply for Standard mode, to Access mode. This Court should refuse to compare Access mode, which is the standard mode for people who require wheelchairs, to Lyft's luxury ride modes, which are an optional luxury service. Lyft makes Standard mode available in all regions where it operates, regardless of population density, wait time, number of available vehicles, or any other considerations or metrics. Stipulated Fact ¶ 19. Lyft does not determine whether to offer Standard mode based on Lyft's supposed "essential attribute" of local supply and demand. Lyft's argument is akin to a movie theater arguing that wheelchair seating is an optional luxury akin to Imax or 3D Movie theaters, as opposed to the reality that wheelchair seating is necessary for allowing people with disabilities to attend movie theaters. Just as accessible seats are necessary for wheelchair users to go to the movies, WAV vehicles are a necessity for people with disabilities to use Lyft. WAVs are not an optional luxury item. This Court should not impose Lyft's artificial standard on Access mode.

23.     While Plaintiffs point out that two Northern District of California judges previously rejected the fundamental alteration defense in similar cases, *see Indep. Living Res. Ctr. San Francisco v. Lyft, Inc.*, No. C 19-01438 WHA, 2021 U.S. Dist. LEXIS 166229 (N.D. Cal., Sept. 1, 2021) and *Crawford v. Uber Techs., Inc.,* No. 17-CV-02664-RS, 2022 U.S. Dist. LEXIS 131670 (N.D. Cal., Jul. 25, 2022), those cases are not controlling. Moreover, the plaintiffs in *ILRC* and *Crawford* did not ask

those courts to hold that Lyft and Uber must be compelled to open up WAV service on its app everywhere, regardless of whether any supply exists, as Plaintiffs do in this case.

**Plaintiffs' Response**: Plaintiffs in *ILRC* and *Crawford* requested the courts order Lyft and Uber to offer WAV service in areas where Lyft and Uber did not provide WAV service. *See ILRC*, 2021 WL 3910719, at \*1 ("Plaintiffs seek an expansion of wheelchair access mode to Alameda and Contra Costa Counties"); *Crawford*, 2022 WL 2913836, at \*5 ("Plaintiffs' requested modification is for Uber to 'turn on' the UberWAV option in New Orleans and Jackson."). Plaintiffs incorporate by reference their response to ¶ 22.

24. It would be bad policy and contrary to the interests of individuals with disabilities to interpret the ADA to hold that because Lyft offers Access mode in New York City, it would not be a fundamental alteration to require Lyft to offer it in Westchester County. Such a holding would discourage private entities from taking actions, either in response to local laws or otherwise, that are intended to create greater options for individuals with disabilities. *See, e.g., Holbrook v. City of Alpharetta,* 112 F.3d 1522, 1528 (11th Cir. 1997) ("We do not seek to discourage other employers from undertaking" accommodations that may exceed the requirements of the law); *Ragusa v. UPS,* No. 05 Civ. 6187 (WHP), 2009 U.S. Dist. LEXIS 25152, \*12 (S.D.N.Y., Mar. 3, 2009) ("To hold that an employer cannot eliminate or alter essential functions in order to accommodate an employee's disability would discourage employers who wished to do more than the ADA requires.").

**Plaintiffs' Response**: Lyft's argument that requiring Lyft to comply with the ADA may deter it and other private entities from taking initial steps to provide service for people with disabilities seeks to present a revisionist history of why Lyft currently offers Access mode. The only reason that Lyft began offering Access mode in 2016 was due to regulatory requirements. Currently, Lyft only offers Access mode in markets where it is required or

financially incentivized to do so.  It is false for Lyft to imply that it has voluntarily offered

Access mode to "create greater options for individuals with disabilities."

Notably, Uber made a similar argument that it should not be "punished" for offering

WAV service because it previously did so in other cities.  *Uber*, 2022 WL 2913836, at *10.

Judge Seeborg stated:

> Complying with the ADA and providing access to people with disabilities is
> not a punishment, it is the law.  Further, the argument that Uber has done its
> 'fair share' in providing WAV access in other cities mischaracterizes the
> purpose and design of the ADA. . . . WAV service must be provided whenever
> a plaintiff meets the burden of proving an ADA violation, regardless of
> whether the defendant already provides more or less WAV service than others.

*Id.*, at *10.

Lyft's claimed support from *Holbrook* and *Ragusa* is lacking.  In *Holbrook*, the court

found that the plaintiff was unable to perform essential functions of the job as a police

detective due to his disability, namely being able to fully collect evidence and perform a

complete investigation at a crime scene.  112 F.3d at 1527.  In *Ragusa*, the court found that

the plaintiff was unable to perform essential functions of heavy lifting as a UPS employee

due to his disability.  *Ragusa*, 2009 WL 637100, at *2-3.  Both *Holbrook* and *Ragusa* emphasize

the importance of essential functions of an employee's job.  However, as discussed above,

Lyft has never argued that the local supply and demand is an "essential function" that Lyft

uses to determine whether it offers, alters, or restricts Standard mode.

25.     Requiring Lyft to offer Access mode in all non-Access Regions thus contravenes

Congressional intent of allowing private companies like Lyft to exercise its own business judgment

as to what services it will offer in what locations. As a private entity, Lyft is subject to both ordinary

and extraordinary market events, including things such as pandemics, interest rates, gas prices, and

labor shortages. Like any other business, as it makes business decisions, Lyft must weigh factors

such as local regulatory requirements, supply-and-demand, costs, opportunities for profit, operational complexity, and budget constraints.

> **Plaintiffs' Response**: If Lyft were able to cite any case law or authority demonstrating that Congress favors business judgment over compliance with the ADA, Lyft would do so. Lyft offers no support that "business judgment" supports its fundamental alteration defense.

> Furthermore, Lyft has presented no evidence that it exercises business judgment, including consideration of such extraordinary market events as "gas prices," when it decides to offer, alter, or restrict Standard mode. Stip. Fact ¶ 19. Lyft does not apply its purported "business judgment" considerations to Standard mode and they are not relevant to determining whether Lyft can reasonably offer Access mode in the non-Access Regions.

26. By asking that the Court order Lyft to launch Access mode in all non-Access Regions, Plaintiffs effectively ask this Court to bar Lyft from exercising its business judgment. That is a fundamental alteration of the very essence of Lyft as a private entity. As the Seventh Circuit Court of Appeals observed in *Doe v. Mut. of Omaha Ins. Co.*, 179 F.3d 557, 560 (7th Cir. 1999):

> The common sense of the [ADA] is that the content of the goods or services offered by a place of public accommodation is not regulated. A camera store may not refuse to sell cameras to a disabled person, but it is not required to stock cameras specially designed for such persons. Had Congress purposed to impose so enormous a burden on the retail sector of the economy and so vast a supervisory responsibility on the federal courts, we think it would have made its intention clearer and would at least have imposed some standards.

> **Plaintiffs' Response**: Plaintiffs incorporate by reference to their Response to ¶ 27.

In addition, *Doe* fails to support Lyft's fundamental alteration defense. Rather, as Judge Posner stated:

> The core meaning of [42 U.S.C. § 12182(a)], plainly enough, is that the owner or operator of a store, hotel, restaurant, dentist's office, travel agency, theater, Web site, or other facility (whether in physical space or in electronic space)

that is open to the public cannot exclude disabled persons from entering the facility and, once in, from using the facility in the same way that the nondisabled do. The owner or operator of, say, a camera store can neither bar the door to the disabled nor let them in but then refuse to sell its cameras to them on the same terms as to other customers.

*Doe*, 179 F.3d at 559. Currently, Lyft allows users who requires WAVs to access its App in the non-Access Regions, but then refuses to provide any WAV service on the same terms as other users. *Doe* plainly demonstrates that Lyft's refusal to offer Access mode in the non-Access Regions is discriminatory within the meaning of the ADA.

27.    Lyft does not bar Plaintiffs from downloading and opening its App. In other words, Lyft does not exclude Plaintiffs from proverbially "entering the store." That Lyft does not offer Access mode as an option in its App, however, is akin to a camera store not stocking a camera that is specially designed for a person with a disability. Just as a camera store need not offer accessible goods, Lyft need not offer Access mode. As a private entity, Lyft should not only have the right to decide when it will offer a new service, but also when it will stop offering that service. This Court declines Plaintiffs' invitation to assume the role of the regulator of Lyft's business under the guise of applying the ADA.

**Plaintiffs' Response**:  Plaintiffs request Lyft apply similar judgment in its offering of Standard mode to its offering of Access mode, namely that Lyft provides Standard mode in every Region where Lyft operates.  Stip. Fact ¶ 20.  Lyft misinterprets what constitutes a "fundamental alteration" under the ADA, and fails to meet its burden to sustain its affirmative defense.

Respectfully submitted,


*s/ Jeremiah Frei-Pearson*
Andrew Finkelstein
Jeremiah Frei-Pearson
**Finkelstein, Blankinship,**
**Frei-Pearson & Garber, LLP**
1 North Broadway, Suite 900
White Plains, New York 10601
Tel: (914) 298-3281
Fax: (914) 824-1561
afinkelstein@lawampm.com
jfrei-pearson@fbfglaw.com

Michael F. Ram (*Pro Hac Vice*)
Marie Appel (*Pro Hac Vice*)
**Morgan and Morgan**
**Complex Litigation Group**
711 Van Ness Avenue, Suite 500
San Francisco, CA 94102
Tel: 415-358-6913
mram@forthepeople.com
mappel@forthepeople.com

Michael T. Hellmann (*pro hac vice*)
**ADA Compliance Service**
27 Fieldstone Drive, Suite 209
Hartsdale, NY 10530
adatty@aol.com
Tel. 646-662-1335
Fax. (914) 682-8518

*Attorneys for Plaintiffs*
*and the Classes*

By: _____
    Jiyun Cameron Lee (Admitted *Pro Hac Vice*)
    Marie Jonas (Admitted *Pro Hac Vice*)
    FOLGER LEVIN LLP
    199 Fremont Street, 20th Floor
    San Francisco, CA 94105
    Telephone: 415.625.1050
    Facsimile: 415.625.1091
    jlee@folgerlevin.com
    mjonas@folgerlevin.com

    Attorneys for Defendant Lyft, Inc.

4884-3828-7719, v. 3