## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

HARRIET LOWELL and WESTCHESTER
DISABLED ON THE MOVE, INC.,
individually and on behalf of all other
similarly situated,

        Plaintiffs,

        v.

LYFT, INC.,

        Defendant.

Case No.  7:17-cv-06251-PMH-AEK

**Joint Proposed Findings of Fact and
Conclusions of Law**

**Table Of Contents**

PLAINTIFFS' PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW ........... 1

I.     Background Facts. ....................................................................................... 1

II.    Lyft Refuses To Provide Access Mode In 96 Percent Of Lyft's Service Regions. ....... 7

III.   Plaintiffs' Experts Project Ample Supply And Demand For Access Mode In The Non-Access Regions. ................................................................................. 9

IV.   Plaintiffs Have Standing ........................................................................ 11

     A.     Findings of Fact ...................................................................... 13

     B.     Conclusions of Law ................................................................. 15

V.    Legal Standard Under The ADA And The NYSHRL. ........................................ 17

VI.   Plaintiffs Satisfy The First Element Of Both Statutes. ..................................... 18

VII.   Plaintiffs Satisfy The Second Element Of Both Statutes. ................................. 18

     A.     Findings Of Fact Related To Lyft Being A Public Accommodation Under The ADA. ....................................................................... 19

     B.     Conclusions Of Law Related To Lyft Being A Public Accommodation Under The ADA. ....................................................................... 19

VIII.   Plaintiffs Satisfy The Third Element Of Both Statutes. ................................... 21

     A.     Legal Standard ...................................................................... 21

     B.     Plaintiffs' First Reasonable Modification ...................................... 26

         1.     Findings of Fact ............................................................ 26

         2.     Conclusions of Law ........................................................ 30

     C.     Plaintiffs' Second Reasonable Modification ................................... 36

         1.     Findings of Fact ............................................................ 36

         2.     Conclusions of Law ........................................................ 38

     D.     Plaintiffs' Third Reasonable Modification ..................................... 39

1.     Findings of Fact................................................................................39

2.     Conclusions Of Law .......................................................................43

E.     Plaintiffs' Fourth Reasonable Modification ......................................................46

1.     Findings Of Fact...............................................................................46

2.     Conclusions of Law .......................................................................48

F.     Plaintiffs' Fifth Reasonable Modification.........................................................49

1.     Findings of Fact................................................................................49

2.     Conclusions Of Law .......................................................................51

G.     Plaintiffs' Sixth Reasonable Modification.......................................................53

1.     Findings Of Fact...............................................................................53

2.     Conclusions Of Law .......................................................................54

H.     Plaintiffs' Seventh Reasonable Modification ....................................................56

1.     Findings Of Fact...............................................................................56

2.     Conclusions Of Law .......................................................................58

I.     Plaintiffs' Eighth Reasonable Modification ......................................................60

1.     Findings Of Fact...............................................................................60

2.     Conclusions Of Law .......................................................................63

J.     Plaintiffs' Ninth Reasonable Modification .......................................................64

1.     Findings Of Fact...............................................................................65

2.     Conclusions Of Law .......................................................................66

K.     Plaintiffs Meet Their Burden To  Articulate A Plausible Proposal For Barrier Removal.........................................................................................................68

| | 1. | Legal Standard | 68 |
| | 2. | Conclusions Of Law. | 69 |
| IX. | Plaintiffs Are Entitled To Attorneys' Fees And Costs | 71 |
| X. | The Court Issues The Following Order | 72 |

**LYFT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** ....... 75

| I. | Lyft's Defense To Plaintiffs' First and Second Claims For Relief Under the ADA and the NYSHRL for Readily Achievable Barrier Removal | 75 |
| | A. | Lyft's Proposed Findings of Fact | 75 |
| | B. | Lyft's Proposed Conclusions of Law | 78 |
| II. | Lyft's Affirmative Defense of Fundamental Alteration to Plaintiffs' First and Second Claims for Relief Under the ADA and the NYSHRL for Reasonable Modifications | 82 |
| | A. | Lyft's Proposed Findings of Fact | 82 |
| | B. | Lyft's Proposed Conclusions of Law | 89 |

# PLAINTIFFS' PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW

## I.    Background Facts.

1.      Plaintiff Harriet Lowell ("Ms. Lowell") is a disabled citizen of White Plains, in Westchester County, New York, who relies on a motorized scooter for travel.  Stip. Fact ¶¶ 1, 3.

2.      Plaintiff Westchester Disabled on the Move, Inc. ("WDOMI") is a non-profit community-based organization headquartered in Yonkers, New York.  Stip. Fact ¶ 2.

3.      Ms. Lowell has never downloaded Defendant Lyft, Inc.'s ("Lyft" or "Defendant") mobile-based application (the "App").  Stip. Fact ¶ 4.

4.      A significant percentage of WDOMI's constituents, clients, and staff are persons with disabilities, including mobility-related disabilities.  WDOMI is staffed, directed, and driven by the individuals with disabilities that it seeks to serve, including wheelchair-users.  Stip. Fact ¶ 5.

5.      Plaintiffs Ms. Lowell and WDOMI seek to use Lyft's wheelchair-accessible vehicle ("WAVs") mode ("Access mode"), but do not currently use Lyft because Lyft does not offer Access mode in Westchester County, New York State outside of NYC, and approximately 96 percent of its service regions (the "non-Access Regions").[1]

> **Lyft's Response**: This is an incomplete statement of fact.  Plaintiffs testified they would use Lyft only if it afforded reliable access to transportation by WAVs.  Specifically, Ms. Lowell testified that she needs service to be "reliable," which means she would "have to be certain that [she] could get a Lyft" and that it "wouldn't leave [her] stranded."  Deposition of Harriet Lowell ("Lowell Dep.") 122:11-123:7, 124:9-12, 132:22-24.  Class member Pauline Scudieri testified that she wants "reliable" access to WAVs on the Lyft platform.  Having only a fifty percent chance

---

[1] Affidavit of Harriet Lowell at ¶¶ 14-20, 28-45; Affidavit of Melvyn Tanzman at ¶¶ 29-46.

As of May 2023, "Access mode" is called "Wheelchair mode" at Lyft. For consistency with prior filings and orders, we will continue to refer to the mode as "Access mode."

of getting a ride was "a risk" for her, because she "can't afford to be stranded with a 450-pound wheelchair." Deposition of Pauline Scudieri ("Scudieri Dep.") 52:23-53:10, 55:18-22, 56:7-10, 59:2-5. WDOMI testified that one of its constituents, Ansel Lurio, was negatively impacted by lack of access to transportation services when he was "stranded in a snowstorm in Westchester because he could not call a WAV through Lyft." Affidavit of Melvyn Tanzman at ¶¶ 40-44. *See also* Am. Compl. [ECF 20] ¶ 8 (seeking "reliably accessible" transportation).

6. WAVs are vehicles built to accommodate fixed-frame wheelchairs, and typically feature a wheelchair ramp or lift, a lowered floor to accommodate the equipment, and a securement device to keep the wheelchair in place when the vehicle is in motion.[2] Stip. Fact ¶ 27.

7. Lyft, Inc., is incorporated under the laws of the State of Delaware, with its principal

---

[2] Throughout this document, Lyft employs two distinct response strategies. First, it repeatedly provides non-responsive or irrelevant responses to Plaintiffs' assertions. *See infra* ¶¶ 6, 21, 23-25, 28-29. 37, 38, 56-58, 60, 88, 114, 162. For instance, Plaintiffs' paragraphs 23-25 describe historical completion rates and wait times for Lyft's Standard mode. In response, Lyft does not address Plaintiffs' calculations for Standard mode and instead provides a response that has no bearing on paragraphs 23-25:

> People who use wheelchairs make up less than 1% of the population of the United States. CER at 33. Even in New York City, Lyft's largest WAV market, WAV rides only make up approximately 0.1% of rides on the platform. Bozorgirad Aff. ¶ 11. Given the population density of potential WAV users, if Lyft were to make Access mode available everywhere, the platform would not function as a means of reliable transportation. The platform would not connect a single WAV rider with a single WAV driver in the vast majority of New York State and the United States."

Second, Plaintiffs followed the Court's guidance to eliminate repetition and Lyft exploits this to attack Plaintiffs' for nor restating facts and/or law. For example, Plaintiffs outline legal standards in this order: (1) the legal standard for establishing a reasonable accommodation in paragraph 87; (2) the legal standard for defining reasonableness in an accommodation in paragraph 88; and (3) Plaintiff's burden for demonstrating the costs of a reasonable accommodation in paragraph 89. However, in its extensive response to paragraph 87, Lyft discusses its interpretation of Plaintiffs' burden regarding costs in a manner that implies that Plaintiffs fail to acknowledge their burden. This pattern of response by Lyft is consistent throughout the entirety of this document. *See, e.g., infra* ¶¶ 87, 108, 170, 190.

place of business in San Francisco, California. Stip. Fact ¶ 6.

8. Lyft launched its peer-to-peer marketplace for on-demand ridesharing in or about 2012. Stip. Fact ¶ 7.

9. Lyft operates multimodal transportation networks in the United States that offer access to a variety of transportation options through Lyft's platform and App. Stip. Fact ¶ 8.

10. Members of the general public may download the App and agree to the Terms of Service. Stip. Fact ¶ 11.

11. Drivers on the Lyft ridesharing platform must agree to the Terms of Service and Driver Addendum and meet applicable state and/or local regulatory vehicle, driver, and documentation requirements that vary by region. Stip. Fact ¶ 12.

12. Charges, fares, and payments are governed by the Lyft Terms of Service and the Driver Addendum. Stip. Fact ¶ 13.

13. Lyft organizes its coverage areas into more than 300 geographic regions. Stip. Fact ¶ 14.

14. Lyft offers a variety of ride modes on its App, but does not offer every ride mode in every Region. Stip. Fact ¶ 15.

15. Lyft offers its standard mode service ("Standard mode") in all 50 states and in all regions where it operates, regardless of population density, wait time, number of available vehicles, or any other considerations or metrics. Stip. Fact ¶¶ 16-17.

16. In every Region where Lyft operates, Standard mode appears as an available ride mode when a user inserts their destination address. Stip. Fact ¶18.

17. With Standard mode, riders are able to request a ride in that "mode" at any time, 24 hours a day, but Lyft makes no guarantee that the ride request will be matched or that a driver will be available or accept the ride request. Stip. Fact ¶ 19.

18.     Lyft allows riders to request a ride and for drivers to appear on the platform in areas where a vehicle is rarely, if ever, available, including all parts of New York State and areas as sparsely populated as Wyoming.  (Testimony of Alex Elegudin).

**Lyft's Response**: This is an incomplete statement of fact.  In regions where vehicles are unavailable, riders who open the Lyft app are unable to request or get a ride.  The key driver of success of a platform industry, such as Lyft's ridesharing platform, is the number of transactions it generates.  Testimony of Dr. Marc Rysman ("Rysman Testimony").  Lyft's platform is highly successful in areas of high population density, such as New York City and San Francisco.  Rysman Testimony and Trial Exhibit ("TX") Q-0001; Affidavit of Abbas Bozorgirad ("Bozorgirad Aff.") ¶¶ 13-14; TX M-0001.  For example, the number of total rides completed in a single day on the Lyft platform in New York City is greater than the total number of rides completed everywhere else in New York State combined.  Affidavit of Leon Treger ("Treger Aff.") ¶ 12.  Making the Lyft App available throughout New York State or Wyoming complements what riders expect in big cities like New York City and presents no financial downsides to Lyft.  Treger Aff. ¶ 13.

19.     Lyft has never restricted, blocked, or withdrawn its Standard mode from a region after beginning operations in that region.[3]

20.     Wait times (*i.e.,* the amount of time between the time a ride is requested and the time when the driver arrives) and completion rates (*i.e.,* the percentage of requested rides that are completed) on the Lyft platform vary by location and by mode.  Stip. Fact ¶ 21.

21.     Lyft does not guarantee any service levels or outcomes to its users, including wait

---

[3] Transcript of March 18, 2022, Deposition of Marc Rysman ("Rysman Dep. Tr."), 71:16-21 ("Lyft is not preventing riders and drivers from using the app in markets that have say 20-minute wait times and very low completion rates and that sort of – those sort of metrics."), 119:1-120:17, 145:16-146:1, 254:20-255:10.

times, completion rates, or that a requested ride will be completed.  Stip. Fact ¶ 22.

22.     Lyft does not restrict its Standard mode in any Region based upon the level of service, including wait times and completion rates.  Stip. Fact ¶ 23.

23.     Between January 1, 2017, and January 31, 2021, in approximately █ percent of the months, Lyft's Standard mode operations reported a completion rate of below █ percent. In approximately █ percent of those months, Lyft's Standard mode operations reported a completion rate of below █ percent.[4]

    **Lyft's Response**: This statement of fact is irrelevant to the issue to be decided in this case, which is whether a modification proposed by Plaintiffs can generate reliable, on-demand transportation by WAVs on the Lyft platform.

    People who use wheelchairs make up less than 1% of the population of the United States. CER at 33.  Even in New York City, Lyft's largest WAV market, WAV rides only make up approximately 0.1% of rides on the platform.  Bozorgirad Aff. ¶ 11.  Given the population density of potential WAV users, if Lyft were to make Access mode available everywhere, the platform would not function as a means of reliable transportation.  The platform would not connect a single WAV rider with a single WAV driver in the vast majority of New York State and the United States.  Rysman Testimony.

24.     Between January 1, 2017, and January 31, 2021, in approximately █ percent of the months, Lyft's Standard mode operations reported a wait time of greater than █ minutes and in approximately █ percent of the months, Lyft's Standard mode operations reported a wait time of greater than █ minutes.[5]

    **Lyft's Response**: *See* Response to Para. 23.

---

[4] Rebuttal Expert Report, at 31, Table 2; Demand 2021-09-20.
[5] Rebuttal Expert Report, at 31, Table 2; Demand 2021-09-20.

25.     During February 2020 in New York State, Lyft offered Standard mode in ██ ZIP Codes where Lyft received zero requests for a ride and in ██ ZIP Codes where no ride requests were completed.[6]

**Lyft's Response**: *See* Response to Para. 23.  Given the success and nature of its technology platform in highly populated areas, Lyft incurs little financial or operational costs by making the Lyft App operational for Standard mode in other places, including in low- or no-use areas.  Treger Aff. ¶¶ 12-13.

26.     Lyft makes Standard mode available in all regions where it operates regardless of the number of available vehicles.  Stip. Fact ¶ 17.

27.     Lyft offers Standard mode through an independent contractor model (the "IC model").  The IC model depends on drivers who personally own or rent a car.  These drivers set their own hours and drive where they want to drive.  Stip. Fact ¶¶ 24-25.

28.     Based on Lyft's data, there were ██ Regions where the average number of drivers per month on Standard mode was █ or fewer drivers for at least one year between 2017 and 2021.[7]

**Lyft's Response**: This statement of fact is irrelevant to the issue to be decided in this case, which is whether a modification proposed by Plaintiffs can generate reliable, on-demand transportation by WAVs on the Lyft platform. Given the population density of potential WAV users, if Lyft were to make Access mode available everywhere, the platform would not function as a means of reliable transportation.  The platform would not connect a single WAV rider with a single WAV driver in the vast majority of New York State and the United States.  Rysman Testimony.

29.     Based on Lyft's data, between January 2017 and January 2021, Lyft began offering

---

[6] Expert Rebuttal Report, at 4; Lowell-demand-2020-09-18.csv.
[7] Supply 2021-02-26.

Standard mode in at least █ Regions where the supply of drivers available in the first month of service was fewer than █ drivers, including █ Regions where the supply of drivers available in the first month of service was fewer than █ drivers. In each of these █ Regions, Lyft continued to operate Standard mode. Lyft continued to operate in █ of these Regions where the supply of drivers on Standard mode was fewer than █.[8] (Testimony of Claudia Stern).

**Lyft's Response**: *See* Response to Para. 28.

## II. Lyft Refuses To Provide Access Mode In 96 Percent Of Lyft's Service Regions.

30. Prior to 2016, Lyft did not offer WAV service in any Region. To date, Lyft has launched WAV service (called "Access" mode) in nine cities in the United States: Boston, Massachusetts; Chicago, Illinois; Dallas, Texas; Los Angeles, California; New York, New York; Philadelphia, Pennsylvania; Portland, Oregon; Phoenix, Arizona; and San Francisco, California ("Access Regions"). Lyft does not offer Access mode in Regions other than the Access Regions ("the non-Access Regions"). Stip. Fact ¶¶ 26, 32, 35.

31. Lyft launched Access mode in these nine markets in response to regulatory requirements, financial incentives, or a partnership with a transit agency. Stip. Fact ¶ 33.

32. Whenever local regulators require Lyft to provide WAV service as a condition of doing business, Lyft has complied with the regulators and provided WAV service. Stip. Fact ¶ 34.

33. Lyft spent approximately $10-13 million on its WAV programs in 2019. Stip. Fact ¶ 28.

34. Lyft spent approximately $13-15 million on its WAV programs in 2020. Stip. Fact ¶ 29.

35. Lyft's WAV budget for 2021 was $20 million. Stip. Fact ¶ 30.

---

[8] Supply 2021-02-26.

36.     Lyft's projected WAV budget for 2022 is $25 million.  Stip. Fact ¶ 31.

37.     Lyft offers Access mode in the Access Regions using two models: the IC model and the "Partner model."  The IC model for WAV depends on drivers who personally own or rent WAVs.  These drivers ("IC WAV drivers"), like other independent drivers on the Lyft platform, set their own hours and drive where they want to drive.  Stip. Fact ¶¶ 37-38.

38.     The Partner model relies on third-party transportation companies with whom Lyft contracts.  Under the Partner model, Lyft pays the third-party companies a negotiated hourly rate that varies by city and by company.  In exchange, the third-party companies provide the contracted-for number of WAVs and drivers to drive the WAVs on the Lyft platform.  Stip. Fact ¶¶ 39-40.

39.     Lyft uniquely and categorically precludes WAVs from appearing on the App in the regions outside of Lyft's nine Access Regions (the "non-Access Regions").[9]  (Testimony of Alex Elegudin).

        **Lyft's Response**: This statement of fact is not correct.  Providing specialized modes, such as Access mode, in a limited number of geographic regions is not "unique."  Treger Aff. ¶¶ 15-16.  Lyft limits the availability of specialized modes based on the available supply of drivers with those specialized vehicles.  Treger Aff. ¶¶ 15-16.  There is no evidence of a supply of drivers with WAVs. People who use wheelchairs make up less than 1% of the population of the United States.  CER at 33.  People typically do not buy a WAV unless they or someone in their household relies on a wheelchair for mobility.

40.     The non-Access Regions include Westchester County and all of New York State outside of New York City.  Stip. Fact ¶ 36.

41.     Christopher Wu ("Mr. Wu"), the former head of Lyft's national WAV team, stated

---

[9] Gerundio Dep. Tr. 88:8-15; Chan Dep. Tr. 119:14-19; Zhou Dep. Tr. 165:21-166:2.

that Lyft's WAV program is "incentivized to keep WAV programs as small as possible while meeting regulatory requirements" and thus, Lyft "will do as little as possible unless forced[.]"[10]

**Lyft's Response**: There is no admissible evidence supporting this statement of fact. There is no evidence that *any* public or private entity – including Lyft and Uber – has found a way to offer reliable, on-demand transportation via WAVs without significant government subsidies or regulations, such as in New York City. Gerundio Aff. ¶ 34. Moreover, Lyft offers WAV service in regions where it is not "forced" to do so by regulators, including in San Francisco, Los Angeles, and Dallas. *See* Stip. Fact No. 33.

42.     Instead of working to expand Access mode or provide better service, Lyft's employees work to "impair service levels" and "suppress performance" for WAVs so that Lyft can point to the unsuccessful nature of Access mode to convince regulators and courts that it should not have to provide more or better service to people with disabilities.[11]

**Lyft's Response**: *See* Response to Para. 41. Even if considered, the cited evidence does not support this statement of fact.

## III.     Plaintiffs' Experts Project Ample Supply And Demand For Access Mode In The Non-Access Regions.

43.     Between 2017 and 2021, Lyft received approximately ▮▮▮▮ requests for WAV rides in the Access Regions. Plaintiffs' experts project that Lyft provided Access mode to approximately 36 percent of the individuals who attempted to turn on the Access mode toggle (which requires users to navigate to a different page of Lyft's App and enable the Access mode setting of Lyft's App, which is not required for any other users). As a result, the number of people who enable the toggle is only a fraction of the people who would use Access mode. Plaintiffs'

---

[10] LYFT_ILRC00022617; Wu Dep. Tr. 183:8-25.
[11] LYFT0031721.

experts' projections indicate substantial unmet demand for Access mode.[12] (Testimony of Alex Elegudin).

**Lyft's Response**: There is no admissible evidence supporting this statement of fact. Plaintiffs' expert is not qualified and his "projections" are not reliable. Any Lyft user can activate the Access mode toggle in the App settings, and there is no evidence as to how many who did so actually need WAVs.

44. Plaintiffs' experts project that approximately 1,862 drivers, or 6 drivers per Region, are sufficient to offer Access mode in each non-Access Regions.[13] (Testimony of Alex Elegudin).

**Lyft's Response**: This statement of fact is not correct. Plaintiffs' expert is not qualified and his "projections" are not reliable. The United States is approximately 3 million square miles, which means there would be, on average, just one driver for every 1,611 square miles. On its face, that is not "sufficient" to provide on-demand WAV service.

45. Based on Lyft's data, WAV drivers attempted to drive in Access mode in ███ non-Access Regions in 2019 and ███ non-Access Regions in 2020. In 2019, WAV drivers attempted to drive in Access mode in non-Access Regions ███ times and, in 2020, WAV drivers attempted to drive in Access mode in non-Access Regions ███ times.[14]

**Lyft's Response**: There is no admissible evidence supporting this statement of fact. Plaintiffs' expert did not opine there were drivers who "attempted to drive" their WAVs on the platform in any of the non-Access regions, and no one testified that Lyft's data shows "WAV drivers attempt[ing] to drive in Access mode in non-Access Regions." The most likely explanation for why WAV drivers appear in the data in non-Access Regions is because they had

---

[12] Corrected Expert Report, at 26, 45-46; Highly Confidential – Subject to Protective Order – Toggle Report 2021-02-26.csv ("Toggle 2021-02-26").
[13] Corrected Expert Report, at 37-38.
[14] Supply 2021-02-26.

crossed over from Access Regions (such as New York City) into neighboring non-Access regions to drop off riders. Bozorgirad Aff. ¶ 10.

46. Based on Lyft's data, there was an average of four drivers per month on Access mode for at least one year between 2017 and 2021 in 14 non-Access Regions in 8 states.[15]

**Lyft's Response**: *See* Response to Para. 45.

47. Based on Lyft's data, in 2020, five different non-Access Regions in New York, New Jersey, and Connecticut had a higher per-month average of Access mode drivers than each Access Region other than NYC.[16]

**Lyft's Response**: *See* Response to Para. 45.

48. Based on Lyft's data, in 2019 and 2020, WAV drivers were registered on Access mode in ten Regions in New York State outside of NYC.[17]

**Lyft's Response**: *See* Response to Para. 45.

49. Based on Lyft's data, an average of 331 WAV drivers per month were registered on Access mode in Westchester in 2020. This amount is greater than the number of Standard mode drivers in 115 of Lyft's 331 Regions.[18]

**Lyft's Response**: *See* Response to Para. 45.

## IV.    Plaintiffs Have Standing

50. The standing inquiry requires a three-part analysis. "First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not conjectural or hypothetical.'"  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal citations omitted) (quoting *Whitmore v. Arkansas*, 495 U.S.

---

[15] Supply 2021-02-26.
[16] Supply 2021-02-26.
[17] Supply 2021-02-26.
[18] Supply 2021-02-26.

149, 155 (1990)). "Second, there must be a causal connection between the injury and the conduct complained of . . . ." *Id.* at 560 (citing *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976)). "Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.* at 561 (quoting *Simon*, 426 U.S. at 38, 43).

51.     "In the ADA context, [the Second Circuit] ha[s] held that a plaintiff seeking injunctive relief has suffered an injury in fact when: '(1) the plaintiff alleged past injury under the ADA; (2) it was reasonable to infer that the discriminatory treatment would continue; and (3) it was reasonable to infer, based on the past frequency of plaintiff's visits and the proximity of defendants' [businesses] to plaintiff's home, that plaintiff intended to return to the subject location.'" *Calcano v. Swarovski N. Am. Ltd.*, 36 F.4th 68, 74 (2d Cir. 2022) (quoting *Kreisler v. Second Ave. Diner Corp.*, 731 F.3d 184, 187 (2d Cir. 2013)); *see also Disabled in Action v. Bd. of Elections in City of New York*, 752 F.3d 189, 200 (2d Cir. 2014) (quoting *Kreisler*, 731 F.3d at 188) ("deterrence constitutes an injury under the ADA"); *Calcano*, 36 F.4th at 75 (quoting *Kenndy v. Floridian Hotel, Inc.*, 998 F.3d 1221, 1233 (11th Cir. 2021) (The court must examine whether the plaintiffs "plausibly allege[] 'a real and immediate threat of future injury.'").

52.     An organization may establish associational standing by showing that at least one of its members has standing, that the interests at stake are germane to the organization's purpose, and that neither the claim nor the relief requires participation of the organization's individual members. *Bronx Indep. Living Servs. v. Metro. Transp. Auth.*, No. 16-5023, 2021 WL 1177740, at *12 (S.D.N.Y. Mar. 29, 2021) (citing *Nat. Res. Def. Council v. Dep't of Interior*, 410 F. Supp. 3d 582, 592 (S.D.N.Y. 2019)). "To establish associational standing '[w]here an association is not a traditional voluntary membership organization, its constituents must nevertheless possess sufficient indicia of membership.'" *Westchester Indep. Living Ctr., Inc. ("WILC") v. State Univ. of New York, Purchase Coll.*, 331 F.R.D. 279, 296 (S.D.N.Y. 2019) (Seibel, J.) (alteration in original) (quoting *Mental Hygiene Legal*

*Serv. v. Cuomo*, 609 F.App'x 693, 695 (2d Cir. 2015)).

## A. Findings of Fact

53.     Ms. Lowell, and many of WDOMI's members, seek to use Access mode, but do not currently use Lyft and have not downloaded the App because Lyft does not offer Access mode in Westchester and New York State outside of NYC.[19]

> **Lyft's Response**: *See* Response to Para. 5 (Plaintiffs would only use the Lyft App if it afforded reliable access to on-demand transportation by WAVs).

54.     Ms. Lowell knows that Lyft refuses to serve her and other people who use motorized scooters or wheelchairs except in regions where regulators force or strongly incentivize it to provide service.[20]

> **Lyft's Response**: This statement is not accurate.  Lyft offers WAV service in regions where it is not "forced" to do so by regulators, including in San Francisco, Los Angeles, and Dallas.

55.     A significant percentage of WDOMI's constituents, clients, and staff are persons with disabilities, including mobility-related disabilities.  WDOMI is staffed, directed, and driven by individuals with disabilities that it seeks to serve, including wheelchair-users.  Stip. Fact. ¶ 5.

56.     Not having access to Lyft WAVs prevents Ms. Lowell from fully enjoying many aspects of life, including assisting with her husband's medical needs.  For example, when her husband was hospitalized at WestMed in White Plains, she could not visit him because it was too far to travel without a WAV.  Similarly, when her husband was hospitalized in Greenwich, Connecticut, she was sometimes unable to visit him.  On some occasions, her friend, who also owns a WAV, would drive her to visit her husband, but this was an imposition.  She was unable to call a Lyft to

---

[19] Affidavit of Harriet Lowell at ¶¶ 14-20, 28-45; Affidavit of Melvyn Tanzman at ¶¶ 29-46.
[20] Affidavit of Harriet Lowell at ¶¶ 19-20.

visit her husband as would any able-bodied person.[21]

>  **Lyft's Response**: This statement is incomplete and misleading.  Ms. Lowell wants access to reliable, on-demand transportation by WAVs.  Plaintiffs have offered no evidence demonstrating what modifications Lyft would have to make to its policies, practices, or procedures, to make on-demand WAV rides consistently available to Ms. Lowell on the Lyft platform, or how much such modifications would cost.

57.     Ms. Lowell seeks to use Lyft to go out for gatherings with family and friends in White Plains.  Ms. Lowell intends to regularly use Lyft to get to appointments, run errands, go to restaurants, and visit friends.  Ms. Lowell intends to use Lyft to travel to and from the hair salon every three weeks, which currently requires her husband to drive her.[22]

>  **Lyft's Response**: *See* Response to Para. 56.

58.     Prior to the pandemic, Ms. Lowell travelled to NYC once or twice a month for medical reasons, and will likely have to attend medical appointments in person in the future.  Ms. Lowell also has many friends in NYC and enjoys going to restaurants, visiting museums, and attending events such as advocacy events in NYC and across New York.  Right now, Ms. Lowell's husband has to drive her on each of these trips.  Ms. Lowell would regularly use Lyft to travel to and from NYC without the need for her husband to drive her.[23]

>  **Lyft's Response**: *See* Response to Para. 56.

59.     Without WAV service, many of WDOMI's constituents cannot access Lyft's transportation services.[24]

60.     For example, Ansel Lurio, a WDOMI constituent, was stranded in a snowstorm in

---

[21] Affidavit of Harriet Lowell at ¶¶ 14-16.
[22] Affidavit of Harriet Lowell at ¶¶ 19-20.
[23] Affidavit of Harriet Lowell at ¶ 10.
[24] Affidavit of Melvyn Tanzman ¶¶ 29-32.

Westchester because he could not call a WAV through Lyft. Due to the snow, he was unable to use his wheelchair. Lyft directed Ansel to call paratransit, which requires 24-hour advance notice to schedule a ride. After searching all options, Ansel was forced to call a local ambulance to pick him up and spent the night in the hospital, despite no medical need.[25] Moreover, many WDOMI members who use WAVs would use Lyft in their every-day life if Lyft did not refuse to serve them.[26]

> **Lyft's Response**: This statement is incomplete and misleading. Plaintiffs offered no evidence that any independent contractor driver on the Lyft platform would have been available during a snowstorm to pick up any rider. *See also* Response to Para. 56.

### B. Conclusions of Law

61. Ms. Lowell has demonstrated that she is unable to use Lyft in Westchester, that she is deterred from using Lyft due to its refusal to serve WAV users in Westchester, that at least some of the specific relief requested would be redressed by a favorable decision herein,[27] and that she will use Lyft if it stops discriminating against people who require WAVs.[28]

> **Lyft's Response**: As Plaintiffs admit in Paragraph 50, "[t]he standing inquiry requires a three-part analysis." The only evidence Ms. Lowell has submitted relates to the first element, which is whether she has suffered an "injury in fact." Even if it is assumed that she has proven "injury in fact," Ms. Lowell and the Plaintiffs have failed to meet their burden of proving the second element (that a causal connection exists between the injury and the alleged conduct) or the third element (that it is "likely," and not "merely 'speculative,' that the injury will be

---

[25] Transcript of Aug. 17, 2021, Deposition of Ansel Lurio at 128:21-130:12; Affidavit of Melvyn Tanzman at ¶¶ 40-44.
[26] Affidavit of Melvyn Tanzman at ¶¶29-46.
[27] *See Lowell v. Lyft, Inc.*, No. 17-6251, 2023 U.S. Dist. LEXIS 50722, at *20-21 (S.D.N.Y. Mar. 24, 2023) (Halpern, J.).
[28] *See id. See also* Lowell Decl., ¶¶ 8-18; Declaration of Harriet Lowell in Opposition to Defendant Lyft, Inc.'s Motion to Dismiss, ECF No. 36 ("Lowell Decl."), ¶¶ 6-14.

redressed by a favorable decision") by a preponderance of the evidence. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Lewis v. Casey*, 518 U.S. 343, 358 (1996).

62.     WDOMI has associational standing because its employees, members, and constituents are people with disabilities, including mobility-related disabilities; these people have acquired knowledge of Lyft's ongoing discrimination; Lyft has refused to serve some of WDOMI's members and other WDOMI members have been deterred from even attempting to use Lyft; and Lyft has rejected WDOMI's requests that Lyft change its policies and serve people with disabilities. Indeed, WDOMI "is staffed, directed, and driven by the individuals with disabilities that it seeks to serve," including wheelchair-users. *WILC*, 331 F.R.D. at 297.

**Lyft's Response**: WDOMI has failed to meet its burden of proving that any of its members has standing because it, like Ms. Lowell, has failed to produce any evidence in support of the second and third elements of standing. *See* Response to Para. 61.

63.     Courts in the Second Circuit and elsewhere routinely find that independent living centers such as WDOMI have associational standing to represent people with disabilities. *See, e.g.*, *Bronx Indep. Living Servs.*, 2021 WL 1177740, at *12 ("[The plaintiff] is an independent living center that provides services and advocacy for persons with disabilities and disabled individuals make up more than half of its leadership and staff. Courts in this District have found similar centers have sufficient indicia of membership to support associational standing."); *WILC*, 331 F.R.D. at 297 (holding that the plaintiff has associational standing because "WILC is staffed, directed, and driven by the individuals with disabilities that it seeks to serve . . . while WILC is not a traditional membership organization, I find that its constituents have sufficient indicia of membership in the organization, and therefore WILC has associational standing"); *Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg*, 290 F.R.D. 409, 417 (S.D.N.Y. 2012) ("CIDNY is a 'service provider[ ] managed and directed by persons with disabilities for the purpose of serving persons with disabilities'" and thus

"has sufficient 'indicia of membership' to 'function effectively as a membership organization' for the purposes of associational standing.") (quoting *Disability Advocs., Inc. v. New York Coal. for Quality Assisted Living, Inc.*, 675 F.3d 149, 157 (2d Cir. 2012)).

> **Lyft's Response**: These cases concerning associational standing are not relevant because WDOMI has failed to meet its burden to prove standing, including the elements of causation and redressability, by a preponderance of the evidence. *See* Response to Paras. 61 and 62.

## V.  Legal Standard Under The ADA And The NYSHRL.

64.     To state a claim under Title III, § 12182(a) of the ADA, Plaintiffs must prove "(1) that [they] are disabled within the meaning of the ADA; (2) that defendant[] own[s], lease[s], or operate[s] a place of public accommodation; and (3) that defendant[] discriminated against [them] by denying [them] a full an equal opportunity to enjoy the services defendant[] provide[s]." *Camarillo v. Carrols Corp.*, 518 F.3d 153, 156 (2d Cir. 2008); *see* 42 U.S.C. § 12182(a).

> **Lyft's Response**: This is an incorrect and incomplete statement of the applicable law. The second element stated above does not apply to claims under § 12184. To prevail on their claim of discrimination, Plaintiffs must prove that Lyft discriminated "within the meaning of the ADA." *Roberts v. Royal Atl. Corp.*, 542 F.3d 363, 368 (2d Cir. 2008).

65.     To establish discrimination under § 12182(a) of the ADA, Plaintiffs must establish that Defendant "operates a place of public accommodation." 42 U.S.C. § 12182(a).

> **Lyft's Response**: Section 12182(a) of the ADA does not apply to Lyft because it is not a "place of public accommodation."

66.     To state a claim under Title III, § 12184(a) of the ADA, Plaintiffs must prove (1) that they are disabled within the meaning of the ADA; (2) that defendant is a private entity provides a specified public transportation service; and (3) that defendant discriminated against them by denying them a full an equal opportunity to enjoy the specified public transportation services defendant

provides.  *See* 42 U.S.C. § 12184(a).

     **Lyft's Response**: This is an incomplete statement of the applicable law.  To prevail on their claim of discrimination, Plaintiffs must prove that Lyft discriminated "within the meaning of the ADA." *Roberts*, 542 F.3d at 368. *See* Para. 68 (citing 42 U.S.C. §§ 12182(b)(2)(A)(ii), 12184(b)(2)(A)).

67.     To establish discrimination under § 12184(a) of the ADA, Plaintiffs must establish that Defendant is a "specified public transportation service."  42 U.S.C. § 12184(a).

68.     "Entities that provide public accommodations or public transportation: . . . [1] must make 'reasonable modifications in polices, practices, or procedures, when such modifications are necessary' to provide disabled individuals full and equal enjoyment, §§ 12182(b)(2)(A)(ii), 12184(b)(2)(A); and . . . [2] must remove architectural and structural barriers, or if barrier removal is not readily achievable, must ensure equal access for the disabled through alternative methods, §§ 12182(b)(2)(A)(iv)-(v), 12184(b)(2)(C)." *Spector v. Norwegian Cruise Line Ltd.*, 545 U.S. 119, 128 (2005).

69.     "To prevail on their claims, Plaintiffs must prove a violation of Title III of the ADA by a preponderance of the evidence." *U.S. v. Asare*, 476 F. Supp. 3d 20, 26 (S.D.N.Y. 2020) (citing *Krist v. Kolombos Rest. Inc.*, 688 F.3d 89, 96 (2d Cir. 2012)).

70.     "A claim of discrimination under the New York State Human Rights Law is governed by the same legal standards as govern federal ADA claims." *Graves v. Finch Pruyn & Co., Inc.*, 457 F.3d 181, 184 n.3 (2d Cir. 2006).

**VI.**     **Plaintiffs Satisfy The First Element Of Both Statutes.**

71.     Ms. Lowell is disabled within the meaning of the ADA and the NYSHRL. Stipulation ¶¶ 1-2.

**VII.**     **Plaintiffs Satisfy The Second Element Of Both Statutes.**

72. Lyft is a private entity engaged in "specified public transportation" under the Americans with Disabilities Act, 42 U.S.C. § 12184. Stipulation ¶ 5.

73. Lyft is a public accommodation under the NYSHRL. Stipulation ¶¶ 6-7.

74. Lyft disputes that it is a public accommodation under the ADA.

### A. Findings Of Fact
### Related To Lyft Being A Public Accommodation Under The ADA.

75. Lyft operates multimodal transportation networks in the United States that offer access to a variety of transportation options through Lyft's platform and App. Stip. Fact ¶ 8.

76. Lyft's transportation network is designed to address a wide range of mobility needs. The Lyft network spans rideshare, car rentals, bikes, scooters, and transit. Stip. Fact ¶ 9.

77. Lyft's stated mission is to "improve people's lives with the world's best transportation." Stip. Fact ¶ 10.

78. Members of the general public may download the App and agree to the Terms of Service. Stip. Fact ¶ 11.

### B. Conclusions Of Law
### Related To Lyft Being A Public Accommodation Under The ADA.

79. The ADA includes "travel service" among its categories of entities that qualify as "public accommodations." 42 U.S.C. § 12181(7).

**Lyft's Response**: Lyft is not a "travel service" or a "place of public accommodation," and thus Section 12182 does not apply. As Lyft has stipulated, it will not contest for purposes of this case that it is a "private entity" that provides "specified public transportation services" under Section 12184. Based on Lyft's stipulation, the Court need not reach the question of whether Lyft is a "place of public accommodation" subject to Section 12182.

80. A public accommodation's mobile application is bound by Title III. *See, e.g.*, *Robles v. Domino's Pizza, LLC*, 913 F.3d 898, 905 (9th Cir. 2019), *cert. denied*, 140 S. Ct. 122 (2019) (Title III of

the "ADA applies to Domino's website and app").

    **Lyft's Response**: This statement of the law and the case cited are not relevant because Plaintiffs did not bring this lawsuit to ensure the accessibility of Lyft's website and App to individuals who are blind or visually impaired. Instead, Plaintiffs brought this lawsuit because they seek reliable access to on-demand transportation by WAVs for individuals who use motorized wheelchairs and scooters.

    81.    "Title III's mandate that the disabled be accorded 'full and equal' enjoyment of the goods, [and] services . . . of any place of public accommodation,' suggests to us that the statute was meant to guarantee them more than mere physical access." *Pallozzi v. Allstate Life Ins. Co.*, 198 F.3d 28, 32 (2d Cir. 1999) (alterations and ellipses in original).

    **Lyft's Response**: *See* Response to Para. 80.

    82.    "In *Pallozzi's* wake, multiple district courts in this circuit – including this one – have held that websites qualify as places of public accommodation, even when they are not attached to a traditional brick-and-mortar store." *Jaquez v. Dermpoint, Inc.*, No. 20-7589, 2021 WL 2012512, at *3 (S.D.N.Y. May 20, 2021); *see also Andrews v. Blick Art Materials, LLC*, 268 F. Supp. 3d 381, 395–96 (E.D.N.Y. 2017) ("The 'broad mandate' of the ADA and its 'comprehensive character' are resilient enough to keep pace with the fact that the virtual reality of the Internet is almost as important now as physical reality alone was when the statute was signed into law.") (quoting *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998)); *see also Nat'l Fed'n of the Blind v. Scribd Inc.*, 97 F. Supp. 3d 565, 575 (D. Vt. 2015) ("Now that the Internet plays such a critical role in the personal and professional lives of Americans, excluding disabled persons from access to covered entities that use it as their principal means of reaching the public would defeat the purpose of this important civil rights legislation.").

    **Lyft's Response**: *See* Response to Para. 80.

83.     Lyft facilitates travel for its consumers through its App, rendering it a modern-day travel service.

**Lyft's Response**: Lyft is not a travel service or "service establishment" under the ADA. *See* 42 U.S.C. § 12181(7)(F) (defining, through examples of brick-and-mortar "service establishments," the term "public accommodation").

84.     Lyft functions as a public accommodation. *See, e.g., O'Hanlon v. Uber Techs., Inc.*, No. 19-00675, 2021 WL 2415073, at *6 (W.D. Pa. June 14, 2021) (plaintiffs plausibly alleged that Uber is a "travel service" under § 12182, "and Uber has fallen short of its burden of establishing that Uber vehicles are excluded by either the statutory language of Section 12182 or the interpretive law"); *Nat'l Fed'n of the Blind of California v. Uber Techs., Inc.*, 103 F. Supp. 3d 1073, 1083 (N.D. Cal. 2015) (Uber plausibly constitutes a "travel service" and therefore a "public accommodation" under § 12182).

**Lyft's Response**: These court decisions from the motion to dismiss stage do not apply. At the summary judgment or trial stage, courts have concluded that Lyft and Uber are subject to Section 12184 of ADA Title III as private entities who are primarily engaged in transportation. *See, e.g., Indep. Living Res. Ctr. San Francisco v. Lyft, Inc.*, No. C 19-01438 WHA, 2021 U.S. Dist. LEXIS 166229, *23-24 (N.D. Cal., Sept. 1, 2021) ("ILRC Trial Decision") (noting that Section 12184 applied to Lyft after Lyft did not contest that finding for purposes of summary judgment); *Crawford v. Uber Techs., Inc.*, Case No. 17-cv-02664-RS, 2021 U.S. Dist. LEXIS 161969 (N.D. Cal., Aug. 26, 2021) (on summary judgment, finding that Uber is a private entity "engaged in the business of transporting people" and thus subject to Section 12184).

## VIII.    **Plaintiffs Satisfy The Third Element Of Both Statutes.**

### A.    **Legal Standard**

85.     Plaintiffs "bear[] the initial burdens of both production and persuasion as to the

existence of an accommodation" and the effectiveness of the modification. *Dean v. Univ. at Buffalo Sch. Of Med. & Biomedical Scis.*, 804 F.3d 178, 189-90 (2d Cir. 2015); *Borkowski v. Valley Cent. School Dist.*, 63 F.3d 131, 138 (2d Cir. 1995); *Staron v. McDonald's Corp.*, 51 F.3d 353 (2d Cir. 1995).

86. An effective modification is one that accommodates Plaintiffs' and the Class's disabilities. *See US Airways, Inc. v. Barnett*, 535 U.S. 391, 399-400 (2002) ("An ineffective 'modification' or 'adjustment' will not accommodate a disabled individual's limitations.").

87. "To establish a 'reasonable accommodation,' a plaintiff 'bears only a burden of production' that 'is not a heavy one.' That is, it would be 'enough for the plaintiff to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits. Once the plaintiff has done this, she has made out a *prima facie* showing that a reasonable accommodation is available, and the risk of nonpersuasion falls on the defendant.'" *Roberts v. Royal Atl. Corp.*, 542 F.3d 363, 370 (2d Cir. 2008) (quoting *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 138 (2d Cir. 1995)).

**Lyft's Response**: Plaintiffs misstate their burden of proof. As the Second Circuit has stated, to prove that a proposed modification is reasonable, Plaintiffs must show that the modification (1) would be effective and (2) is reasonable in cost. *Staron v. McDonald's Corp.*, 51 F.3d 353, 356 (2d Cir. 1995). As Plaintiffs admit in Paragraph 84 above, "Plaintiffs 'bear[] the initial burdens of both production and persuasion as to the existence of an accommodation' and the effectiveness of the modification." *Dean v. Univ. at Buffalo Sch. Of Med. & Biomedical Scis.*, 804 F.3d 178, 189-90 (2d Cir. 2015); *Roberts,* 542 F.3d at 372 (proposed modification must achieve "desired access" to facilities or services). *See also Crawford v. Uber Techs., Inc.,* 2023 U.S. App. LEXIS 28733 (9th Cir., Oct. 30, 2023) ("Crawford Ninth Circuit Ruling") (rejecting plaintiff's attempt to shift the burden of proof at trial to defendant); Joint Letter dated January 20, 2023

[ECF 351] (stipulating that Plaintiffs bear the burden of persuasion as to the effectiveness of the proposed modification). Such a showing necessarily entails a concrete description of the proposed modification. ILRC Trial Decision, 2021 U.S. Dist. LEXIS 166229, *26-27 (federal courts have "routinely rejected" claims of reasonable modifications that were not "concrete and specific").

As for the cost, Plaintiffs bear the burden to produce a "plausible" cost estimate to show that the modification is "reasonable." Lyft then has the burden of persuasion to show that the cost is not reasonable. *Roberts*, 542 F.3d at 370-72.

88. "'Reasonable' is a relational term: it evaluates the desirability of a particular accommodation according to the consequences that the accommodation will produce. This requires an inquiry not only into the benefits of the accommodation but into its costs as well. . . . [A]n accommodation is reasonable only if its costs are not clearly disproportionate to the benefits that it will produce." *Borkowski*, 63 F.3d at 138.

**Lyft's Response**: The quoted portion of *Borkowski* addresses Plaintiffs' burden to prove the cost of the proposed modification. In *Borkowski,* the Second Circuit confirmed that in reasonable accommodation cases brought by employees, the plaintiff bears the burden of production and persuasion on the issues of the existence and effectiveness of the accommodation. 63 F.3d at 137; *see also Dean*, 804 F.3d at 189-90.

89. "[T]he plaintiff's burden does not require him or her to furnish exact or highly detailed cost estimates." *Roberts*, 542 F.3d at 371.

90. "In deciding what's reasonable, facilities may consider the costs of such accommodations, disruption of their business and safety. But they must also take into account evolving technology that might make it cheaper and easier to ameliorate the plight of the disabled. . . . As new devices become available, public accommodations must consider using or adapting them

to help disabled guests have an experience more akin to that of non-disabled guests." *Baughman v. Walt Disney World. Co.*, 685 F.3d 1131, 1135 (9th Cir. 2012).

91.    Modifications need not generate perfectly equal service to be reasonable:

> Full and equal enjoyment means the right to participate and to have an equal opportunity to obtain the same results as others to the extent possible with such accommodations as may be required by the Act and these regulations.  It does not mean that an individual with a disability must achieve an identical result or level of achievement as persons without a disability.  For example, an exercise class cannot exclude a person who uses a wheelchair because he or she cannot do all of the exercises and derive the same result from the class as persons without a disability.

28 C.F.R. § Pt. 36, App. C (analyzing § 36.201).  "If [a public accommodation] can make [a person with disabilities'] experience less onerous and more akin to that enjoyed by its able-bodied patrons, it must take reasonable steps to do so." *Baughman*, 685 F.3d at 1136 (citing *Dept. Oregon Paralyzed Veterans of Am. v. Regal Cinemas*, 339 F.3d 1126, 1133 (9th Cir. 2003))

**Lyft's Response**: To be reasonable, a modification must afford access to the service allegedly denied. *US Airways, Inc. v. Barnett*, 535 U.S. 391, 399-400 (2002).  Here, Plaintiffs contend that they have been denied access to reliable, on-demand transportation by WAVs.  *See* Amended Compl. ¶¶ 8-10; Lowell Dep. 122:11-123:7, 124:9-12, 132:22-24.

92.    Modifications a defendant has implemented in the past to accommodate people with disabilities are material to determining whether the requested modification is reasonable.  *See, e.g., Rogers v. W. Univ. of Health Scis.*, 787 F.App'x 932, 935 (9th Cir. 2019); *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 508 (4th Cir. 2016); *Smith v. McCarthy*, No. 20-419, 2021 WL 4034193, at *21 (D. Md. Sept. 3, 2021); *Wong v. Regents of the Univ. of Cal*, 192 F.3d 807, 820 (9th Cir. 1999); *Taylor v. Gilbert & Bennett*, No. 95-7228, 1997 WL 30948, at *2 (N.D. Ill. Jan. 15, 1997).

**Lyft's Response**: This line of cases is irrelevant.  Lyft has never implemented its WAV program in response to requests for reasonable modifications.

93.    Modifications required under state and local laws "provide[] powerful evidence that

such modifications are reasonable, and that they certainly would not fundamentally alter the nature of defendants' programs." *Henrietta D. v. Giuliani*, 119 F. Supp. 2d 181, 209 (E.D.N.Y. 2000), *aff'd sub nom. Henrietta D. v. Bloomberg*, 331 F.3d 261 (2d Cir. 2003) (post-trial verdict requiring defendants to implement reasonable modifications under the ADA).

      **Lyft's Response**: *Henrietta D.* does not apply. That case was about the plaintiffs' access to social welfare benefits and services to which they were entitled by law. 119 F. Supp. 2d at 208-209. Here, in contrast, the ADA does not require Lyft to provide on-demand transportation service by WAVs. *See Noel v. N.Y.C. Taxi & Limousine Comm'n*, 687 F.3d 63, 73 (2d Cir. 2012).

94.     Plaintiffs are not required to request a reasonable modification prior to initiating a lawsuit when they have actual notice that doing so would be futile. *See* 42 U.S.C. § 12188(a)(1) ("Nothing in this section shall require a person with a disability to engage in a futile gesture if such person has actual notice that a person or organization covered by [Title III] does not intend to comply with its provisions."). *See also, e.g., Fair Hous. Just. Ctr., Inc. v. Cuomo*, No. 18-3196, 2019 WL 4805550, at *14 (S.D.N.Y. Sept. 30, 2019) ("Plaintiffs have adequately alleged that the ACF Defendants had categorical policies against wheelchairs and that any request for a reasonable accommodation would have been futile. Accordingly, their failure to specifically ask for an accommodation does not render their allegations insufficient . . ."); *Hampson v. State Farm Mut. Auto Ins. Co.*, No. 12-00258, 2015 WL 12733387, at *13 (N.D.N.Y. Mar. 26, 2015) (futile gesture doctrine applies where an entity "has essentially foreclosed the interactive process through its policies or explicit actions"); *Davoll v. Webb*, 194 F.3d 1116, 1132-33 (10th Cir. 1999) ("If a disabled employee actually knows of an employer's discriminatory policy against reasonable accommodation, he need not ignore the policy and subject himself 'to personal rebuffs' by making a request that will surely be denied.").

**Lyft's Response:** This is an incorrect statement of the law. None of the cited cases arise under ADA Title III. Under Title III, "[a]n essential element of the reasonable modification claim is that a plaintiff has requested and been denied a modification from defendant before filing suit." *Crawford v. Uber Techs., Inc.,* No. 17-CV-02664-RS, 2022 U.S. Dist. LEXIS 131670, *14-15 (N.D. Cal., Jul. 25, 2022) ("Crawford Trial Decision"), *affirmed on other grounds*, Crawford Ninth Circuit Ruling, 2023 U.S. App. LEXIS 28733; ILRC Trial Decision, 2021 U.S. Dist. LEXIS 166229, *25 ("this order begins with the premise that no discrimination exists unless the evidence shows that Lyft has failed to implement a requested – and reasonable – modification."). *See also Dudley v. Hannaford Bros. Co.,* 333 F.3d 299, 307 (1st Cir. 2003); *Shaywitz v. Am. Bd. Of Psychiatry & Neurology*, 848 F. Supp. 2d 460, 467 (S.D.N.Y. 2012).

**B.      Plaintiffs' First Reasonable Modification**

**1.      Findings of Fact**

95.      Plaintiffs' first proposed modification is to remove the current block in place on the App in the non-Access Regions, which prohibits Access mode from being available for drivers or riders, and prevent implementation of Lyft's toggle requirement, which hides Access mode from riders. This would allow for automatic display of Access mode on the App alongside other vehicle options.[29]  (Testimony of Alex Elegudin).

**Lyft's Response**: There is no evidence that if this Court were to order Lyft to display Access mode in the App in all non-Access Regions, that WAV drivers would elect to drive on the Lyft platform or that riders would be able to get WAV rides.

96.      In every Region where Lyft operates, Standard mode appears as an available ride mode when a user inserts their destination address. The only step required for a user on the App to

---

[29] Corrected Expert Report, at 66.

identify whether a Standard mode vehicle is available is to type in the address of their destination. Once a user inserts their destination address, any available Standard mode vehicle will automatically be displayed on the App. (Testimony of Alex Elegudin).

**Lyft's Response**: There is no evidence that if this Court were to order Lyft to display Access mode in the App in a non-Access Region, that a rider who needed a WAV would see one displayed in the App.

97. Lyft allows all drivers who meet Lyft's vehicle requirements to drive on Standard mode in the non-Access Regions. Lyft allows all users to view available Standard mode vehicles on the App in the non-Access Regions. (Testimony of Alex Elegudin).

98. The effect of the block prevents WAV drivers from identifying as WAVs on the App and precludes riders from having the option to select WAVs, even when they are available.[30] Lyft does not allow drivers with WAVs to drive on Access mode in the non-Access Regions. Lyft does not allow passengers who require WAVs to request WAVs in non-Access Regions. If a driver with a WAV is in the same location as a rider who requires a WAV in a non-Access Region, there is no mechanism for the rider to request a WAV on the App.[31] (Testimony of Alex Elegudin).

**Lyft's Response**: There is no evidence in support of this statement of fact. Plaintiffs presented no evidence that any supply of WAVs is "available" in any of the non-Access Regions, or that WAV drivers interested in driving on the App are being "blocked." It costs $16,000 to $75,000 to modify or to purchase a WAV. People typically do not buy a WAV unless they or someone in their household relies on a wheelchair for mobility. *See* Crawford Trial Decision, 2022 U.S. Dist. LEXIS 131670, *21 ("Plaintiffs have provided scant evidence of a sufficient existing base of WAVs in New Orleans and Jackson.").

---

[30] Chan Dep. Tr. 118:12-21, 120:1-6.
[31] Chan Dep. Tr. 118:12-21, 120:1-6; Gerundio Dep. Tr. 242:22-25; 243:1-5.

99.     Implementing Access mode and removing the blocker in the non-Access Regions would enable any individual who requires a WAV to be able to request a WAV on the App and determine whether a WAV is available in the same manner as any able-bodied user on Standard mode. (Testimony of Alex Elegudin).

**Lyft's Response**: This statement of fact is misleading. Plaintiffs' expert did not testify, and has not done any analysis to show, that displaying Access mode would "enable any individual who requires a WAV" to get a ride using the App. His testimony is merely that if Access mode is displayed in the App, an individual who requires a WAV could open the App to see if a WAV driver is available. *See* Stip. Fact 19. Unrefuted evidence demonstrates that a vast majority of the time, the answer will be "no." Rysman Testimony.

100.     Implementing Access mode and removing the blocker in the non-Access Regions would enable any individual who drives a WAV on the App to be able to display that their vehicle is a WAV and that they are available to offer a WAV ride. (Testimony of Alex Elegudin).

**Lyft's Response**: There is no evidence that if this Court were to order Lyft to display Access mode everywhere regardless of supply or demand it would result in drivers with WAVs who are interested in driving on the Lyft platform in any non-Access Regions. *See* Response to Para. 98-99.

101.     Lyft has previously enabled Access mode in each of the nine Access Regions. As a result, the cost of enabling Access mode and removing the blocker in the non-Access Regions would be *de minimis*. (Testimony of Alex Elegudin).

**Lyft's Response**: The evidence contradicts this statement of fact. Lyft has never simply enabled Access mode in any region but has spent tens of millions of dollars each year to create a supply of WAVs in the Access Regions. Stip. Fact Nos. 28-31. In the Access Regions, Lyft spends anywhere from $40 to $1,200 per WAV ride to create WAV supply. Bozorgirad Aff. ¶¶

32-33 and TX H-0002. Lyft must also manually operate Access mode to meet regional goals. Treger Aff. ¶ 31. In addition to operational costs, Lyft would likely incur significant reputational and legal costs if it were to display Access mode without ensuring an adequate supply of vehicles. Gerundio Aff. ¶¶ 35-37.

102. Lyft accidentally enabled Access mode in Denver (a non-Access Region) and Lyft employees turned off Access mode within approximately four hours of notifying the WAV team.[32]

**Lyft's Response**: There is no admissible evidence supporting this statement of fact.

103. The only step required for a user on the App to identify whether a Standard mode vehicle is available is to type in the address of their destination. Once a user inserts their destination address, any available Standard mode vehicle will automatically be displayed on the App. (Testimony of Alex Elegudin).

**Lyft's Response**: Standard mode is not relevant. Plaintiffs presented no evidence that the proposed modification would create a sufficient supply of WAVs to ensure reliable, on-demand WAV service on the Lyft platform in any non-Access Region.

104. In the Access Regions other than NYC, Lyft requires users to enable the toggle to request WAV rides. Users must navigate to a separate settings page where they must then activate the Access mode toggle, and finally return to the main screen where WAVs will appear below other ride modes. The toggle was created as an "easter egg" with the intention of hiding WAV service from riders.[33]

**Lyft's Response**: The toggle has no impact on the supply of WAVs and is not relevant to the non-Access Regions where Lyft does not provide WAV service. Lyft uses the toggle in the

---

[32] LYFT0012038.
[33] Corrected Expert Report, at 21, 43-44, 67; Gerundio Dep. Tr. 243:21-244:5; Wu Dep. Tr. 67:24-68:3, 89:1-6, 108:12-25.

Access Regions as a way of preserving the limited supply of WAVs for riders who need them. *See* Deposition of Isabella Gerundio ("Gerundio Dep.") 245:6-16.

105.    NYC is the only Access Region in which Lyft does not use the Access mode toggle to enable WAV service. NYC regulators ordered Lyft to remove the toggle because it creates a barrier for WAV users and could "suppress[] trip demand."[34]  (Testimony of Alex Elegudin).

**Lyft's Response**: New York City is the only Access Region where Lyft has thousands of WAVs on its platform due to unique regulatory requirements that have increased WAV supply since 2018. Treger Aff. ¶¶ 17-26. But even after the "toggle" was removed, Access mode rides accounted for just 0.1% of the total number of rides on the Lyft platform in New York City. Bozorgirad Aff. ¶ 11.

106.    In or around September and October 2019, Lyft removed the toggle in NYC. Between August 2019 and December 2019, rides on Access mode increased by approximately 500 percent in NYC.[35]

**Lyft's Response**: *See* Response to Paras. 103-104.

107.    Ms. Gerundio acknowledged that Lyft has no reason to believe that a similar increase in ridership would not happen in other Access Regions.[36]

**Lyft's Response:** *See* Response to Paras. 103-104.  Plaintiffs presented no evidence that removing the toggle would generate an increase in supply that would be needed to meet the increase in demand to assure reliable, on-demand WAV service.

### 2.    Conclusions of Law

108.    Plaintiffs' proposed modification to remove the current block in place on the App in

---

[34] Corrected Expert Report, at 44.
[35] Corrected Expert Report, at 67-68; Demand 2021-09-20.
[36] Gerundio Dep. Tr. 139:13-23.

the non-Access Regions and automatically display Access mode on the App alongside other vehicle options is effective and reasonable. Removing the current block will allow Plaintiffs and Class members to request a WAV on the App in a manner similar to able-bodied users. Lyft currently prohibits individuals who use wheelchairs from accessing rides through Lyft in the same manner as able-bodied individuals. Lyft's policy in its non-Access Regions prevents WAVs drivers from identifying their vehicles as WAVs and riders from having the option to select WAVs, even when they may be available. Similarly, Lyft does not require any users who do not seek to use Access mode to proceed through a series of navigational steps similar to the toggle to see available vehicles. The Access mode toggle acts as a barrier to users to request a WAV through Access mode. Lyft has previously enabled Access mode in other regions and the cost of enabling Access mode and removing the blocker in the non-Access Regions would be *de minimis*,. *See supra* ¶¶ 101-02. Thus, Plaintiffs have met their burden by establishing that this modification is reasonable and is not outweighed by any cost to Lyft. *See Roberts*, 542 F.3d at 371 (explaining that the plaintiff is not required to furnish a detailed cost estimate).

**Lyft's Response**: Plaintiffs failed to meet their burden of production or persuasion to prove that this proposed modification would be effective in creating Plaintiffs' "desired access" of reliable on-demand transportation via WAVs on the Lyft platform. *Dean,* 804 F.3d at 189-90; *Roberts,* 542 F.3d at 372. Critical to Plaintiffs' ability to prove the effectiveness of this proposed modification is proof of a sufficient supply of independent drivers with WAVs for the Lyft platform. Plaintiffs failed to come forward with any such evidence. *See* Crawford Ninth Circuit Ruling, 2023 U.S. App. LEXIS 28733, *2 ("Given the scant underlying WAV supply in Plaintiffs' cities, Plaintiffs did not prove that offering incentive payments to prospective WAV drivers would generate adequate WAV options."). In addition, Plaintiffs failed to meet their burden to produce a cost estimate. *Roberts,* 542 F.3d at 370-71. Among other things, no drivers with

WAVs testified that if this Court were to order Lyft to display Access mode on the App, they would sign up to drive their WAVs on the Lyft platform. Plaintiffs presented no evidence that a supply of WAV drivers who are available and willing to drive on Lyft's platform existed in sufficient numbers to sustain an on-demand platform for WAV. While Plaintiffs rely heavily on the testimony of their expert, Alex Elegudin, Mr. Elegudin offered no analysis, only speculation. *See* Crawford Trial Decision, 2022 U.S. Dist. LEXIS 131670, *10 ("With a lack of support in the data, serious comparison to other cities, or other methods of analysis, many of [the expert's] opinions verged on speculation"); ILRC Trial Decision, 2021 U.S. Dist. LEXIS 166229 *28 ("No federal court has ever held that an iterative, experimental, or trial-and-error proposal constituted a reasonable modification to a policy, practice, or procedure under Title III").

In contrast, Lyft's expert, Dr. Marc Rysman, demonstrated based on his analysis of Lyft's data that given the likely population density of potential WAV users, if Lyft were to make Access mode available everywhere, the platform would not function as a means of reliable transportation. Dr. Rysman opined that, in any given month, the platform would not connect a single WAV rider with a single WAV driver in the vast majority of New York State and the United States. Further, Lyft witnesses testified that in all current Access mode regions, Lyft must spend significant amounts of money to incentivize or procure a supply of WAVs.

Ms. Lowell and Plaintiffs' other witnesses testified that they seek a reliable transportation option. That they could open up the Lyft App to see "Access mode" displayed alongside Standard mode is useless to individuals like Ms. Lowell if that modification does not result in any meaningful access to WAV rides. Plaintiffs also overlook the real cost and risk that this proposed modification would impose on Lyft. Simply enabling Access mode without any active management to ensure an adequate WAV supply exposes Lyft to litigation and reputational costs, as demonstrated by this lawsuit. Plaintiffs filed this lawsuit in 2017 because they were

dissatisfied with the level of WAV service Lyft was providing in New York City. *See* Complaint [Dkt. 1], ¶¶ 42, 88-89, 144-59. If Access mode were the only mode in a region with no available supply, there is a real likelihood that Lyft would face additional claims.

109. Lyft has not met its burden to demonstrate that Plaintiffs' proposed modification would fundamentally alter Lyft's business. Currently, Lyft enables Access mode in the Access Regions. Thus, enabling Access mode in the non-Access Regions would not fundamentally alter its business. Lyft has not established that turning on Access mode in the non-Access Regions would require substantial cost to outweigh the benefits of offering Access mode. Lyft's defense that enabling Access mode in the non-Access Regions does not guarantee identical wait times, completion rates, or vehicle supply to Standard mode in the non-Access Regions does not rise to the standard of an undue burden. Lyft does not guarantee certain service level or vehicle supply requirements for Access mode in the non-Access Regions.

> **Lyft's Response**: Because Plaintiffs have failed to meet their burden of proving a
> reasonable modification, Lyft need not prove its affirmative defenses. *But see* Proposed Findings
> of Fact and Conclusions of Law Regarding Lyft's Affirmative Defense.

110. Similarly, Lyft does not require a toggle-like feature for other modes and Lyft does not require users in NYC to turn on the toggle in order to use Access mode. Thus, prohibiting implementation of the toggle for Access mode in the non-Access Regions will allow WAVs to be automatically displayed in a similar manner to Lyft's other ride modes and will not fundamentally alter Lyft's business. *See Roberts*, 542 F.3d at 370-71 ("[P]laintiff's burden does not require him or her to furnish exact or highly detailed cost estimates" to make "a prima facie showing that a reasonable accommodation is available."); 42 U.S.C. § 12182(b)(2)(A)(ii); *United States v. Asare*, No. 15-3556, 2018 U.S. Dist. LEXIS 93023, at *19 (S.D.N.Y. June 1, 2018) ("[I]t is Defendant['s] burden to prove that the proposed modification would 'fundamentally alter'" its business.).

**Lyft's Response**: Plaintiffs have failed to meet their burden of production or persuasion to prove that removing the toggle would be effective in creating Plaintiffs' "desired access" of reliable on-demand transportation via WAVs on the Lyft platform. For example, Plaintiffs did not submit any evidence that removing the toggle would create a supply of WAVs or WAV drivers or what the cost impact of this change would be. *See* ILRC Trial Decision, 21 U.S. Dist. LEXIS 166229, *39 (observing, with respect to the toggle, that "how much in cost savings would occur remains unproven and speculative"). Because Plaintiffs have failed to meet their burden of proving a reasonable modification, Lyft need not prove its affirmative defense of fundamental alteration. *But see* Proposed Findings of Fact and Conclusions of Law Regarding Lyft's Affirmative Defense.

111. By categorically blocking WAVs from appearing as such on Lyft's app, Lyft necessarily and discriminatorily prevents people with disabilities from using its services. Lyft's unique WAV restrictions deny people with disabilities access to Lyft. *See, e.g.*, *Crawford v. Uber Techs., Inc.*, No. 17-02664, 2022 WL 74161, at *2 (N.D. Cal. Jan. 7, 2022), ("A policy that does not allow WAVs to operate on the Uber platform has the direct result of preventing people who use WAVs from using the platform[.]"); *Indep. Living Res. Ctr. San Francisco v. Lyft, Inc. ("ILRC")*, No. 19-01438, 2020 WL 6462390, at *2 (N.D. Cal. Nov. 3, 2020) (Lyft's failure to extend some of its non-WAV and Access Region WAV policies to WAV services in the Bay Area counties is discriminatory).

**Lyft's Response**: Plaintiffs have failed to meet their burden of production or persuasion to prove that their first proposed modification would be effective in creating Plaintiffs' "desired access" of reliable on-demand transportation via WAVs on the Lyft platform.

In addition, Plaintiffs misstate the law. No court has ruled that Lyft must display WAVs in its App. To the contrary, the ADA does not require private entities such as Lyft to purchase or lease WAVs, *Noel v. N.Y.C. Taxi & Limousine Comm'n*, 687 F.3d 63, 73 (2d Cir. 2012), or modify

the goods or services which it offers. *Thorne v. Boston Mkt. Corp.,* 469 F.Supp.3d 130, 142-43 (S.D.N.Y. 2020). Moreover, in the two cases cited by Plaintiffs, judgments were entered in favor of Uber and Lyft following bench trials, based on the courts' findings that the plaintiffs had failed to prove discrimination under the ADA. *See* Crawford Trial Decision, 2022 U.S. Dist. LEXIS 131670; ILRC Trial Decision, 2021 U.S. Dist. LEXIS 166229. The Ninth Circuit recently affirmed the trial court's decision in *Crawford,* holding that "Uber did not fail to make a 'reasonable modification' by not turning on UberWAV in Plaintiffs' cities." Crawford Ninth Circuit Ruling, 2023 U.S. App. LEXIS 28733, *1.

112. *Celano v. Marriott Int'l, Inc.* is particularly instructive. As Judge Hamilton explained in granting summary judgment and holding that Marriott discriminates under Title III by its policy of refusing to provide accessible carts to mobility-impaired golfers:

> Marriott's current policy does not provide plaintiffs, mobility-impaired golfers, with an experience that is functionally equivalent to that of other non-disabled golfers. Plaintiffs here have presented overwhelming evidence that they are unable to golf at Marriott's courses under the current policy. By contrast, non-disabled golfers can simply show up at the course and Marriott will provide them with a functional cart as part of the cost of their round of golf. Accordingly, Marriott provides golf carts for able-bodied golfers, but does not provide accessible carts for mobility-impaired golfers like plaintiffs. Because Marriott's policy places plaintiffs in a distinctly unequal situation, as compared to their able-bodied counterparts, it is discriminatory under the ADA.

No. 05-4004, 2008 WL 239306, at *14 (N.D. Cal. Jan. 28, 2008).

**Lyft's Response**: *Celano* is not "instructive." In that case, there was no dispute as to the effectiveness of the modification. All that Marriott had to do was buy an accessible golf cart at each golf course and have it available on request. *Celano v. Marriott Int'l, Inc.,* Case No. 05-4004-PJH, 2008 U.S. Dist. LEXIS 6172, *12-13 (N.D. Cal. Jan. 28, 2008) (summarizing grounds of Marriott's motion for summary judgment). Here, in contrast, providing access to reliable transportation requires willing third-party drivers with WAVs in sufficient numbers in all regions

throughout the United States, providing 24/7 service on-demand. Unlike in *Celano,* effectiveness is disputed and Plaintiffs failed to prove it.

113. Lyft's policy with respect to blocking WAV services in non-Access Regions is distinctly unequal to its policy for able-bodied riders, and is, therefore, discriminatory.

**Lyft's Response**: As set forth in Lyft's Response to Paragraph 107, Plaintiffs failed to meet their burden of proof and thus failed to prove discrimination.

## C. Plaintiffs' Second Reasonable Modification

### 1. Findings of Fact

114. Plaintiffs' second proposed modification is to ask all drivers on Lyft's platform and those onboarding whether they have access to WAVs. This modification applies to all classes. (Testimony of Alex Elegudin).

**Lyft's Response**: There is no evidence that if this Court were to order Lyft to ask all drivers whether they "have access to WAVs" that it would result in any drivers with WAVs who would elect to drive on the Lyft platform or that riders would be able to get WAV rides.

Lyft has previously implemented driver surveys in Access regions. In August 2020, when Lyft reached out to over 26,000 regional drivers to see if it could find ones with WAVs who might be interested in driving on the Lyft platform in Philadelphia, Lyft received fewer than 130 responses and roughly 30 referrals. Of that number, just one ended up driving a WAV on the Lyft platform. Gerundio Aff. ¶¶ 17-18.

115. When a driver applies to drive for Lyft, Lyft asks the drivers a series of questions about the driver and their vehicle in an "onboarding process." The onboarding process includes a survey that asks for basic information about the driver, including license information, a background check, Social Security number, and vehicle information. In some markets, drivers' vehicles must pass an inspection, the driver must take a defensive driving course, or undergo a medical exam. Lyft

asks prospective drivers all necessary information to determine whether a driver's vehicle meets Lyft's requirements to drive on Standard mode.[37]

**Lyft's Response**: *See* Response to Para. 114.

116.     Lyft does not currently ask its drivers whether their vehicle is a WAV or whether they have access to a WAV.[38]

**Lyft's Response**: *See* Response to Para. 114.

117.     In most of its markets, including most of its Access Regions, Lyft does not know which of its drivers have WAVs.[39] Lyft's current methods of discerning whether a driver drives a WAV are inefficient and require duplicative and iterative processes. For example, in NYC, Lyft must repeatedly check the TLC database to determine whether a driver has a WAV.[40]

**Lyft's Response**: Plaintiffs presented no evidence or analysis to show how many drivers on the Lyft platform (if any) have a WAV, or that if Lyft "kn[e]w which of its drivers ha[d] WAVs," Lyft could offer reliable access to on-demand transportation via WAVs.

118.     Including a single additional question in the onboarding process regarding whether the driver has access to a WAV would incur a *de minimis* cost. (Testimony of Alex Elegudin).

**Lyft's Response**: There is no admissible evidence supporting this statement of fact. Plaintiffs' expert is not qualified, and his opinions are not reliable.

That asking one additional question is technically feasible is not evidence that the costs are negligible. If any drivers responded affirmatively, Lyft would need to verify that those drivers had equipment that met applicable regulatory requirements for ramps, lifts, and securement devices. Lyft would also need to ensure that drivers met applicable training requirements, which

---

[37] Corrected Expert Report, at 69; Chan Dep. Tr. 83:8-84:22; Gerundio Dep. Tr. 204:2-11.
[38] Gerundio Dep. Tr. 201:5-9.
[39] Chan Dep. Tr. 84:23-85:1; Gerundio Dep. Tr. 201:5-9.
[40] Selinger Dep. Tr. 56:8-57:21.

vary by region. Equipment inspection and training of WAV drivers are not tasks that Lyft is equipped to handle. (Testimony of Isabella Gerundio.)

119. Including a single additional question in the onboarding process regarding whether the driver has access to a WAV would allow Lyft to identify the number of drivers who have access to WAVs and increase the availability of WAVs on the App. (Testimony of Alex Elegudin).

**Lyft's Response**: *See* Response to Para. 114. There is no admissible evidence supporting this statement of fact. Plaintiffs' expert is not qualified, and his conclusion is not reliable.

120. 100% of Lyft's drivers complete Lyft's mandatory onboarding. Gerundio Dep. Tr. 203:22-23. The "survey" Lyft conducted in Philadelphia was not mandatory and was very likely ignored or overlooked by almost all drivers, resulting in a response rate of less than 0.005%, which is more than 99.995% lower than the response rate to a question in the mandatory onboarding. Gerundio Aff. ¶ 18.

**Lyft's Response**: There is no admissible evidence supporting the statement that the survey was "very likely ignored or overlooked by almost all drivers." A more plausible conclusion is that the response rate was low because very few drivers own or have access to WAVs. *See* Response to Para. 6, 117-118. It is pure speculation to conclude that asking one question would result in WAV service on the Lyft platform.

### 2. Conclusions of Law

121. Plaintiffs' second proposed modification to ask all drivers on Lyft's platform and those onboarding whether they have access to WAVs is effective and reasonable. Currently, Lyft asks drivers all necessary questions during its onboarding survey to ensure the driver and their vehicle meets Lyft's requirements to drive on a particular ride mode. Lyft does not ask its drivers whether they have a WAV or have access to a WAV as part of the onboarding process in any of its Regions. For a driver to be able to drive on Access mode, it is necessary for Lyft to know whether

the driver's vehicle is a WAV. Asking a driver whether they have a WAV or have access to a WAV will also enable Lyft to better understand its organic WAV supply. Plaintiffs have met their burden to establish that this modification is reasonable and is not outweighed by any cost to Lyft. While Plaintiffs are not required to furnish a detailed cost estimate, Plaintiffs have met their burden by establishing that the cost of this modification, *i.e.* the cost of including a single additional question in the onboarding process, will be *de minimis*. *See supra* ¶ 118; *Roberts*, 542 F.3d at 371.

**Lyft's Response**: Plaintiffs failed to meet their burden of production or persuasion to prove that this proposed modification would be effective in creating Plaintiffs' "desired access" of reliable on-demand transportation via WAVs on the Lyft platform. *Dean,* 804 F.3d at 189-90; *Roberts,* 542 F.3d at 372. In addition, Plaintiffs failed to meet their burden to produce a plausible cost estimate. *Roberts,* 542 F.3d at 370-372 (plaintiff's burden of demonstrating cost of achieving "desired access" may be met with cost estimates for proposal that are "facially plausible" such that the "defendant can assess its feasibility and cost").

122.     Lyft has not met its burden to demonstrate that Plaintiffs' proposed modification would fundamentally alter Lyft's business. Lyft currently includes numerous questions on its onboarding survey regarding a driver's vehicle. Lyft has not met its burden to establish that inclusion of one additional question during the onboarding survey would deter drivers from driving for Lyft or impose a substantial cost on Lyft sufficient to outweigh the benefits of this modification.

**Lyft's Response**: Because Plaintiffs have failed to meet their burden of proving a reasonable modification, Lyft need not prove its affirmative defense. *But see* Proposed Findings of Fact and Conclusions of Law Regarding Lyft's Affirmative Defense.

### D.     Plaintiffs' Third Reasonable Modification

#### 1.     Findings of Fact

123.     Plaintiffs' third proposed reasonable modification is to utilize cross-dispatching

(i.e., allow WAV drivers to receive and accept ride requests for different ride modes) for all drivers. (Testimony of Alex Elegudin).

**Lyft's Response**: This proposed modification will not create a supply of WAVs on the Lyft platform. In addition, all IC WAV drivers are currently able to cross-dispatch. The only locations where WAVs are unable to cross-dispatch are in Access Regions where Lyft uses the Partner model, paying a contracting partner an hourly rate to provide vehicles and drivers on the platform to serve exclusively Access rides. Plaintiffs have dismissed their claims as to these Access Regions.

124. Cross-dispatching means that if a vehicle meets the requirements of more than one mode (*e.g.,* Standard and XL, or Standard and Access), the driver may accept ride requests in both modes. For example, a Lyft driver in a luxury vehicle can offer "Lux" rides to riders who select Lyft's luxury vehicle option and can also accept Standard mode requests from riders who select a standard vehicle. As a result, when no riders request "Lux" rides, but there are riders requesting Standard mode rides, the luxury vehicle driver can continue generating revenue for himself and Lyft.[41]

**Lyft's Response**: This proposed modification is not relevant because Plaintiffs have dismissed their claims as to the Access Regions and Lyft does not have any Partner WAVs in the non-Access Regions. In addition, that a driver can choose from multiple modes does not mean that the driver will elect to drive in one mode over another, or be matched with one specific rider.

125. Lyft allows all independent contractors, including IC WAV drivers, who drive on Lyft in any mode to cross-dispatch. Lyft does not allow Partner drivers who drive on Access mode

_____

[41] Chan Dep. Tr. 57:23-58:6.

to cross-dispatch their WAVs,[42] despite its own employees endorsing the practice and a review of data from Lyft drivers in Phoenix showing it increased the reliability of WAV rides. *See infra* ¶¶ 126-31.

**Lyft's Response**: This proposed modification is not relevant because Plaintiffs have dismissed their claims as to the Access Regions and Lyft does not have any Partner WAVs in the non-Access Regions. In addition, cross-dispatching Partner WAVs does nothing to create WAV supply. In any event, the admissible evidence shows that allowing Partner WAVs to cross-dispatch reduces the reliability of WAV rides. Bozorgirad Aff. ¶¶ 34-35. *See* Response to Paras. 130, 132.

126. Mr. Wu previously described allowing Partner drivers to cross-dispatch as "low hanging fruit" for increasing profitability of Access mode.[43]

**Lyft's Response**: *See* Response to Para. 125.

127. Richard Zhou, a Senior Analyst at Lyft, stated that cross-dispatching drivers yielded "driver benefits" and "at the market level, of course, incremental, but small benefit there."[44]

**Lyft's Response**: *See* Response to Para. 125.

128. Enabling cross-dispatching for Partner WAV drivers "does not require a lot of effort."[45]

**Lyft's Response**: *See* Response to Para. 125.

129. Lyft has previously experimented with a series of cross-dispatching pilot programs in multiple Access Regions to test the effects of cross-dispatching Partner WAV drivers. (Testimony of Alex Elegudin).

---

[42] Chan Dep. Tr. 113:25-114:10.
[43] LYFT_ILRC00016900.
[44] Transcript of November 5, 2021, Deposition of Richard Zhou ("Zhou Dep. Tr."), 95:8-25.
[45] Chan Dep. Tr. 60:20-61:2.

**Lyft's Response**: *See* Response to Para. 125.

130.     In Phoenix, Partner drivers were allowed to cross-dispatch in 27 of the 49 months for which Lyft provided data.  During the months where cross-dispatching was allowed, the average wait time for WAV service was two minutes less than months where no cross-dispatching was allowed.  The completion rate for Access mode was fourteen percent higher in months with cross-dispatching than months without cross-dispatching.  Lyft calculates that the average cost of providing WAV service was $187 per ride in months with cross-dispatching and $316 in months without cross-dispatching.[46]

    **Lyft's Response**: This proposed modification is not relevant because Plaintiffs have
    dismissed their claims as to the Access Regions and Lyft does not have any Partner WAVs in the
    non-Access Regions.  There is no admissible evidence supporting this statement of fact.
    Plaintiffs' expert is not qualified, and his analysis of Lyft's data and business records is not
    reliable.  The analysis failed to account for the fact that the cross-dispatching experiment in
    Phoenix occurred at a time when Lyft had obtained a free supply of WAVs.  *See* Deposition of
    Claudia Stern ("Stern Dep.") 170:17-172:4. Regardless, paying $187 per ride in perpetuity is not
    reasonable.  Assuming there was a single WAV ride each day in every region, the cost would be
    over $20.4 million annually.

131.     Lyft was able to profitably offer Access mode in Phoenix during December of 2019, one of the months in which Lyft allowed its Partner WAV drivers to cross-dispatch.[47]

    **Lyft's Response**: *See* Response to Para. 130.

132.     In Portland, Partner drivers were allowed to cross-dispatch in nine of the 49 months

---

[46] Corrected Expert Report, at 78-79; Demand 2021-09-20; Highly Confidential – Subject to
Protective Order – WAV 2021-02-26.csv ("WAV 2021-02-26").
[47] Corrected Expert Report, at 36; Demand 2021-09-20; WAV 2021-02-26.

for which Lyft provided data.  During the months where cross-dispatching was allowed, the average

wait time for WAV service was one minute longer than months where no cross-dispatching was

allowed.  The completion rate for Access mode was thirteen percent higher in months with cross-

dispatching than months without cross-dispatching.  Lyft calculates that the average cost of

providing WAV service was $60 per ride in months with cross-dispatching and $129 in months

without cross-dispatching.[48]

> **Lyft's Response**: This proposed modification is not relevant because Plaintiffs have
>
> dismissed their claims as to the Access Regions and Lyft does not have any Partner WAVs in the
>
> non-Access Regions.  There is no admissible evidence supporting this statement of fact.
>
> Plaintiffs' expert is not qualified, and his analysis of Lyft's data and business records is not
>
> reliable.  Lyft experimented with cross-dispatch to reduce the high cost of offering Access mode
>
> via the Partner model.  In general, it found that the benefits in cost-savings are outweighed by
>
> the negative impacts on service levels, such as increased wait times.  Bozorgirad Aff. ¶¶ 34-35.
>
> Regardless, paying $60 per ride in perpetuity is not reasonable.  Assuming there was a single
>
> WAV ride each day in every region, the cost would be over $6.5 million annually.

133.    Cross-dispatching all of Lyft's WAV drivers would allow Lyft to offer Access mode

in a more efficient and cost-effective manner.  (Testimony of Alex Elegudin.)

> **Lyft's Response**: *See* Response to Para. 130.  Ms. Stern admitted that this modification
>
> does not address the supply of WAVs on the Lyft platform but is merely directed to optimize
>
> drivers' efficiencies.  Stern Dep. 118:20-23.

### 2.    Conclusions Of Law

134.    Plaintiffs' third proposed modification to utilize cross-dispatching for all drivers,

---

[48] Corrected Expert Report, at 79-80; Demand 2021-09-20; WAV 2021-02-26.

including Partner WAV drivers, is effective and reasonable. Lyft allows all non-WAV drivers and IC WAV drivers to cross-dispatch on different ride modes if their vehicles meet the requirements for different ride modes. Partner WAV drivers are the only drivers prevented from cross-dispatching. Allowing Partner WAV drivers to cross-dispatch would allow Lyft to offer Access mode at a lower cost, improve the service levels of Access mode, and increase the supply of WAVs. *US Airways, Inc.*, 535 U.S. at 399-400 (considering the need to accommodate disabled individuals' limitations in determining effectiveness). Plaintiffs have met their burden to establish that this modification is effective and reasonable, and is not outweighed by any cost to Lyft. While Plaintiffs are not required to furnish a detailed cost estimate, Plaintiffs have met their burden by establishing that Lyft will likely save money by implementing this modification. *See supra* ¶¶ 128-32; *Roberts*, 542 F.3d at 371.

    **Lyft's Response**: This proposed modification is not relevant because Plaintiffs have dismissed their claims as to the Access Regions and Lyft does not have any Partner WAVs in the non-Access Regions. Even if it were considered, Plaintiffs failed to meet their burden of proof in three ways. First, Plaintiffs failed to meet their burden of production and persuasion as to the existence of a reasonable modification. *See* Para. 84, *citing Dean,* 804 F.3d 189-90. As a matter of law, this Court cannot order Lyft to "utilize cross-dispatching for all drivers." *See* Fed. R. Civ. Proc. 65(d)(1) ("[e]very order granting an injunction must . . . state its terms specifically" and "describe in reasonable detail . . . the act or acts restrained or required"); ILRC Trial Decision, 2021 U.S. Dist. LEXIS 166229, *26-27 (federal courts have "routinely rejected" claims of reasonable modifications that were not "concrete and specific"). Second, Plaintiffs failed to meet their burden of production or persuasion to prove that the proposed modification would be effective in creating Plaintiffs' "desired access" of reliable on-demand transportation via WAVs on the Lyft platform. *Dean,* 804 F.3d at 189-90. *See also* Crawford Trial Decision, 2022 U.S. Dist. LEXIS 131670, *26 (finding that "while cross-dispatching could reduce costs, it would

also decrease the effectiveness of the service"); ILRC Trial Decision, 2021 U.S. Dist. LEXIS 166229, *39 ("Testimony showed that tests of 'cross-dispatching,' to date, have increased wait times and lowered WAV availability"). Third, Plaintiffs failed to meet their burden to produce a cost estimate (*Roberts,* 542 F.3d at 370-71), including how much it would cost to engage Partner WAVs in the non-Access Regions to provide reliable on-demand transportation by WAVs and how cross-dispatching would impact the cost, as well as the effectiveness, of such service.

135.     Lyft's refusal to cross-dispatch WAVs denies people with disabilities the opportunity to participate in programs or activities that are not separate or different.  *See Kalani v. Starbucks Coffee Co.*, 698 F.App'x 883, 886-87 (9th Cir. 2017) (finding that Starbucks exclusively offering exterior facing accessible seating, while offering inaccessible interior and exterior seating, violated the ADA and "deprived its wheelchair-bound customers of the opportunity to participate, to the same extent as non-disabled patrons"); *Mortland v. Local Cantina Dublin LLC*, No. 19-01123, 2021 WL 3033355, at *11 (S.D. Ohio July 19, 2021) (finding that a restaurant with seating at a bar and at tables, yet only provided accessible seating at the tables, violated the ADA's integration mandate because it offered a distinctly alternative experienced for disabled customers).

     **Lyft's Response**: These cases are not relevant because Plaintiffs have dismissed their claims as to the Access Regions and Lyft does not have any Partner WAVs in the non-Access Regions.  The legal issue to be tried is whether Plaintiffs have proposed a reasonable modification which, if implemented, would result in reliable on-demand transportation by WAVs in the non-Access Regions, not whether Partner WAVs should be cross-dispatched in the Access Regions.

136.     Lyft has not met its burden to demonstrate that Plaintiffs' proposed modification would fundamentally alter Lyft's business.  Lyft already allows many drivers to cross-dispatch.  Lyft allows IC WAV drivers to cross-dispatch and has performed pilot programs enabling Partner WAV

drivers to cross-dispatch. Lyft's defense that allowing Partner WAV drivers to cross-dispatch in some Access Regions has increased the wait time or completion rate is not sufficient to meet its burden. Lyft has not met its burden to show that cross-dispatching Partner WAV drivers outweighs the benefits of this modification.

**Lyft's Response**: Because Plaintiffs have failed to meet their burden of proving a reasonable modification, Lyft need not prove its affirmative defense. *But see* Proposed Findings of Fact and Conclusions of Law Regarding Lyft's Affirmative Defense.

### E.    Plaintiffs' Fourth Reasonable Modification

#### 1.    Findings Of Fact

137.    Plaintiffs' fourth proposed reasonable modification is that Lyft should implement prioritization logic for Access mode for Access mode (*i.e.*, whereby Lyft prioritizes dispatching WAVs to riders seeking WAVs to ensure efficient vehicle allocation) to optimize WAV drivers' efficiencies and profitability. (Testimony of Alex Elegudin). This modification seeks for Lyft to use the same prioritization logic that it uses in NYC for IC WAV service in the non-Access Regions. *See infra* ¶¶ 138-142.

**Lyft's Response**: This proposed modification will not create a supply of WAVs on the Lyft platform. Plaintiffs' expert is not qualified, and his conclusions are not reliable. In addition, Plaintiffs produced no evidence or testimony as to what impact the "same prioritization logic that [Lyft] uses in NYC" would have in the non-Access Regions. Evidence establishes that market conditions in New York City are unique. *See* Response to Paras. 18, 23, 41, 138.

138.    Prioritization logic directs Lyft's ride-matching algorithm to give priority to trip requests received for a particular ride mode. Ride requests that receive priority are serviced or

assigned over other rides that are pending assignment on the App.[49]

**Lyft's Response**: This proposed modification is not relevant because Plaintiffs have dismissed their claims as to the Access Regions and because they failed to produce any evidence that a supply of WAVs exist or are available on the Lyft platform in the non-Access Regions such that prioritization logic could be applied if drivers chose to drive in Access mode.

139. Currently, Lyft only uses prioritization logic for Access mode in limited circumstances. In NYC, Lyft implemented prioritization logic for IC WAV drivers. When a WAV driver is en route to a Standard mode request and an Access mode request is made within one minute of the Standard mode request, Lyft's algorithm reroutes the WAV driver to the Access mode request if the driver is the closest available WAV.[50]

**Lyft's Response**: *See* Response to Paras. 135 and 136.

140. Because Lyft has already implemented prioritization logic in other ride modes, including Access mode, enabling prioritization logic for Access mode in the non-Access Regions would entail a *de minimis* cost. (Testimony of Alex Elegudin).

**Lyft's Response**: There is no admissible evidence supporting this statement of fact. Plaintiffs' expert is not qualified, and his conclusions are not reliable. *See also* Response to Paras. 135 and 136.

141. Prioritization logic enables substantial benefits for Access mode requests, by increasing the utilization of WAVs for Access mode rides, thereby decreasing the potential wait time and increasing the percentage of accepted WAV rides, with minimal effects on Standard mode requests. (Testimony of Alex Elegudin).

---

[49] Corrected Expert Report, at 81; Zhou Dep. Tr. 110:6-111:1.
[50] Corrected Expert Report, at 81.

**Lyft's Response**: There is no admissible evidence supporting this statement of fact. Plaintiffs' expert is not qualified, and his conclusions are not reliable. Moreover, Mr. Elegudin never testified regarding what changes to prioritization logic were needed, or what impact those specific changes would have. *See also* Response to Paras. 135 and 136.

142. Lyft has not implemented prioritization logic in a similar manner outside of NYC IC WAV drivers.[51]

## 2. Conclusions of Law

143. Plaintiffs' fourth proposed modification that Lyft should implement prioritization logic for Access mode is effective and reasonable. Lyft previously enabled prioritization logic for IC WAV drivers in NYC to improve service for Access mode. The burden to implement prioritization logic in other cities and for Partner WAV drivers is diminished by Lyft already doing so. By prioritizing WAV rides for people with disabilities, this modification will effectively increase access to Lyft's service for people with disabilities. *See US Airways, Inc.*, 535 U.S at 399-400 (considering the need to accommodate disabled individuals' limitations in determining effectiveness). Plaintiffs have met their burden to establish that this modification is effective and reasonable, and is not outweighed by any cost to Lyft. While Plaintiffs are not required to furnish a detailed cost estimate, Plaintiffs have met their burden by establishing that the cost of this modification will be *de minimis*. *See supra* ¶ 140; *Roberts*, 542 F.3d at 371.

**Lyft's Response**: This proposed modification is not relevant because Plaintiffs have dismissed their claims as to the Access Regions and because they failed to produce any evidence that a supply of WAVs exist or are available on the Lyft platform in the non-Access Regions such that prioritization logic can be applied.

---

[51] Zhou Dep. Tr. 110:6-111:1.

Even if it were considered, Plaintiffs failed to meet their burden of proof in three ways. First, Plaintiffs failed to meet their burden of production and persuasion as to the existence of a reasonable modification. *See* Para. 84, *citing Dean,* 804 F.3d 189-90. As a matter of law, this Court cannot order Lyft to "implement prioritization logic." *See* Fed. R. Civ. Proc. 65(d)(1) ("[e]very order granting an injunction must . . . state its terms specifically" and "describe in reasonable detail . . . the act or acts restrained or required"); ILRC Trial Decision, 2021 U.S. Dist. LEXIS 166229, *26-27 (federal courts have "routinely rejected" claims of reasonable modifications that were not "concrete and specific"). Second, Plaintiffs failed to meet their burden of production or persuasion to prove that the proposed modification would be effective in creating Plaintiffs' "desired access" of reliable on-demand transportation via WAVs on the Lyft platform. *Dean,* 804 F.3d at 189-90; *Roberts,* 542 F.3d at 372. In addition, Plaintiffs failed to meet their burden to produce a cost estimate (*Roberts,* 542 F.3d at 370-71), including how much it would cost to Lyft to provide reliable on-demand transportation by WAVs in the non-Access Regions and how prioritization logic would impact the cost, as well as the effectiveness, of such service.

144.     Lyft has not met its burden to demonstrate that Plaintiffs' proposed modification would fundamentally alter Lyft's business. Lyft has previously implemented prioritization logic in Access mode and in other ride modes. Lyft has not established that any cost of implementing prioritization logic outweighs the substantial benefit to Access mode.

**Lyft's Response**: Because Plaintiffs have failed to meet their burden of proving a reasonable modification, Lyft need not prove its affirmative defense. *But see* Proposed Findings of Fact and Conclusions of Law Regarding Lyft's Affirmative Defense.

F.     **Plaintiffs' Fifth Reasonable Modification**

1.     **Findings of Fact**

145. Plaintiffs' fifth proposed modification is to increase marketing for Access mode and WAV service, including targeted advertising, to attract potential WAV drivers, including many drivers who already have WAVs but do not currently drive on Lyft's service, as well as to increase awareness of WAVs on Lyft's platform among potential riders. (Testimony of Alex Elegudin).

**Lyft's Response**: Plaintiffs produced no evidence to show how many drivers "already have WAVs" or that if Lyft were forced to spend unspecified amounts marketing Access mode, these hypothetical WAV drivers would elect to drive on the Lyft platform or riders would be able to get WAV rides. Plaintiffs also failed to produce any evidence as to the nature of "marketing" that would lead a driver to spend $16,000-$75,000 modifying or acquiring a WAV. Plaintiffs' expert admitted that he is not a "marketing expert." Deposition of Alex Elegudin ("Elegudin Dep.") 190:17.

146. Lyft spends hundreds of millions of dollars a year advertising and marketing its brand and Standard mode. Lyft's marketing efforts include sending communications to users through the App, e-mail campaigns, text message campaigns, posters and physical advertising, and pay media channels.[52]

**Lyft's Response**: The amount Lyft spends on advertising and marketing generally is not relevant. *See also* Response to Para. 145.

147. For WAV-specific marketing in 2021, Lyft did nothing except make available approximately $100,000 in coupons to disability rights organizations. Lyft gave these coupons to disability rights organizations in San Francisco, Los Angeles, Dallas, and NYC in the hopes that those organizations would distribute the coupons to users.[53]

---

[52] Corrected Expert Report, at 47; Zhou Dep. Tr. 39:15-25, 67:25-68:8, 69:25-69:8; Chan Dep. Tr. 81:18-82:4.
[53] Corrected Expert Report, at 18-19; Gerundio Dep. Tr. 77:1-23, 108:13-24, 129:19-130:4.

**Lyft's Response**: *See* Response to Para. 145.

148.  Lyft's coupons for Access mode were not used by any users in San Francisco or New York. In Dallas, Lyft did not have a very high success rate for use of the coupons. Thus, the actual amount of spending on marketing and advertising for Access mode was far below the $100,000 budgeted in 2021.[54]

**Lyft's Response**: *See* Response to Para. 145.

149.  Lyft's coupon campaign for Access mode was admittedly a strategy designed to appease regulators and "impair service levels at current supply." As one Lyft employee stated, "We've been thinking through how to suppress performance via supply levers, but we can instead take the alternate approach via demand. . . . IE, contact an accessibility org and offer them a coupon to distribute to all their members for the end of the month."[55]

**Lyft's Response**: This statement of fact is misleading and the underlying evidence is inadmissible. There is no evidence that coupons for Access mode were intended to impair, or that they actually impaired, service levels. *See* Response to Para. 145.

150.  Lyft's marketing and advertising for Access mode did not involve direct engagement or communication with users. Lyft engages in no other marketing or advertising that is specific to Access mode.[56]

**Lyft's Response**: *See* Response to Para. 145.

### 2.  Conclusions Of Law

151.  Plaintiffs' fifth proposed modification to increase marketing for Access mode, including targeted advertising, to attract potential WAV drivers, as well as to increase awareness of

---

[54] Corrected Expert Report, at 18-19; Gerundio Dep. Tr. 108:13-24, 110:22-25.
[55] LYFT0031721.
[56] Gerundio Dep. Tr. 77:1-23, 108:13-24, 129:19-130:4.

WAVs on Lyft's platform among potential riders is effective and reasonable. Plaintiffs establish that Lyft does not implement similar marketing and advertising strategies for Access mode as it does for Standard mode or its general brand. Plaintiffs establish that Lyft does not use many of the typical methods of advertising and communications to drivers and users for Access mode that Lyft relies on for Standard mode. Plaintiffs establish that the benefit of an increased supply of WAVs and increased number of users for Access mode outweighs the cost of marketing and advertising for Access mode. Plaintiffs have met their burden in showing that this modification will increase access to Lyft for people with disabilities. *See US Airways, Inc.*, 535 U.S. at 399-400; (Testimony of Alex Elegudin). While Plaintiffs are not required to furnish a detailed cost estimate, Plaintiffs have met their burden by establishing that Defendants' current advertising program and spending for WAV programs are insufficient. *See supra* ¶¶ 148-50; *Roberts*, 542 F.3d at 371.

**Lyft's Response**: Plaintiffs failed to meet their burden of proof in three ways. First, Plaintiffs failed to meet their burden of production and persuasion as to the existence of a reasonable modification. *See* Para. 84, *citing Dean,* 804 F.3d 189-90. As a matter of law, this Court cannot order Lyft to "increase marketing for Access mode, including targeted advertising." *See* Fed. R. Civ. Proc. 65(d)(1) ("[e]very order granting an injunction must . . . state its terms specifically" and "describe in reasonable detail . . . the act or acts restrained or required"); ILRC Trial Decision, 2021 U.S. Dist. LEXIS 166229, *26-27 (federal courts have "routinely rejected" claims of reasonable modifications that were not "concrete and specific"). Second, Plaintiffs failed to meet their burden of production or persuasion to prove that marketing and advertising would be effective in creating Plaintiffs' "desired access" of reliable on-demand transportation via WAVs on the Lyft platform. *Dean,* 804 F.3d at 189-90; *Roberts,* 542 F.3d at 372. Third, Plaintiffs failed to meet their burden to produce an estimate of how much the marketing and advertising would cost. *Roberts,* 542 F.3d at 370-71.

152.     Lyft has not met its burden to demonstrate that Plaintiffs' proposed modification would fundamentally alter Lyft's business.  Lyft spends heavily on advertising and marketing and routinely advertises for its Standard mode and general brand.  Lyft has not established that its advertising or marketing is ineffective nor that Access mode is uniquely unresponsive to advertising or marketing.  Lyft has not established that the cost of advertising and marketing for Access mode outweighs the substantial benefit to Access mode.

**Lyft's Response**: Because Plaintiffs have failed to meet their burden of proving a reasonable modification, Lyft need not prove its affirmative defense.  *But see* Proposed Findings of Fact and Conclusions of Law Regarding Lyft's Affirmative Defense.

### G.     Plaintiffs' Sixth Reasonable Modification

### 1.     Findings Of Fact

153.     Plaintiffs' sixth proposed modification is to increase the supply of WAVs on its platform by offering potential drivers baseline bonuses and incentives for guaranteed periods of time.  This modification applies to all classes.  (Testimony of Alex Elegudin).

**Lyft's Response**: There is no evidence that if Lyft guaranteed an unspecified "baseline" bonus or incentive for a specific period of time, drivers with WAVs would elect to drive on the Lyft platform or riders would be able to get WAV rides.

154.     In 2021, Lyft recorded more than $1.3 billion in driver incentives, which included "minimum guaranteed payments, volume-based discounts and performance-based bonus payments."[57]  (Testimony of Alex Elegudin).

155.     Lyft uses incentives and bonuses across different ride modes to increase the supply of vehicles on the App.[58]

---

[57] Corrected Expert Report, at 47.
[58] Chan Dep. Tr. 85:5-19, 161:6-23; Corrected Expert Report, at 73-74.

156.     Lyft does not offer consistent bonuses or incentives for Access mode drivers.  For example, Lyft reduced the per ride bonus available to WAV drivers in NYC from $30 per ride to $15 per ride.[59]

**Lyft's Response**: This statement of fact is incorrect and misleading.  Lyft offers consistent per-ride bonuses to IC WAV drivers in all Access Regions where it uses the IC model in order to incentivize the IC WAV drivers to accept WAV rides.  Gerundio Aff. ¶ 16.

157.     Lyft could increase or offer consistent bonuses or incentives for Access mode drivers to increase the supply of WAVs on the App.  (Testimony of Alex Elegudin).

**Lyft's Response**: There is no admissible evidence in support of this statement of fact.  Plaintiffs' expert is not qualified, and his analysis and conclusions are not reliable.  Without identifying the specific amount of the bonus or incentive to be offered, there is no way to determine whether the change would be effective in generating WAV supply, or whether the cost would be reasonable.

158.     This modification's cost is equal to the amount it would spend on standardized incentives, which is reasonable.  (Testimony of Alex Elegudin).

**Lyft's Response**: *See* Response to Paras. 153, 157. Mr. Elegudin has not defined "standardized incentives" or explained their total costs or impacts on IC WAV drivers.

### 2.     Conclusions Of Law

159.     Plaintiffs' sixth proposed modification that Lyft offer potential WAV drivers baseline bonuses and incentives for guaranteed periods of time is effective and reasonable.  Plaintiffs establish that Lyft typically offers drivers bonuses and incentives when Lyft determines that the supply of vehicles is insufficient to meet demand.  Plaintiffs establish that Lyft has offered bonuses

---

[59] Gerundio Dep. Tr. 141:6-13, 144:23-145:2; Treger Dep. Tr. 29:15-22; Selinger Dep. Tr. 65:2-10; Corrected Expert Report at 73-74.

and incentives to Access mode drivers in many of the Access Regions to increase the available supply of WAVs. Plaintiffs establish that offering baseline bonuses and incentives for guaranteed periods of time will alleviate Lyft's concern that there is an insufficient supply of WAV drivers available to provide Access mode rides. By increasing the number of consistent WAV drivers on the Lyft App, this modification will effectively accommodate the needs of WAV users to access Lyft's services. *See US Airways, Inc.*, 535 U.S. at 399-400 (considering the need to accommodate disabled individuals' limitations in determining effectiveness). Plaintiffs demonstrate that the cost of offering bonuses and incentives is outweighed by the benefit of increasing the supply of WAVs, allowing Lyft to increase the number of Access mode rides, and reduce the cost of Access mode over time. Plaintiffs have met their burden to establish that this modification is effective and reasonable, and is not outweighed by any cost to Lyft. While Plaintiffs are not required to furnish a detailed cost estimate, Plaintiffs have met their burden by establishing that this modification's cost is equal to the amount it spends on increased incentives. *See supra* ¶ 158; *Roberts*, 542 F.3d at 371.

**Lyft's Response**: Plaintiffs failed to meet their burden of proof in three ways. First, Plaintiffs failed to meet their burden of production and persuasion as to the existence of a reasonable modification. *See* Para. 84, *citing Dean,* 804 F.3d 189-90. As a matter of law, this Court cannot order Lyft to "offer potential WAV drivers baseline bonuses and incentives for guaranteed periods of time." *See* Fed. R. Civ. Proc. 65(d)(1) ("[e]very order granting an injunction must . . . state its terms specifically" and "describe in reasonable detail . . . the act or acts restrained or required"); ILRC Trial Decision, 2021 U.S. Dist. LEXIS 166229, *26-27 (federal courts have "routinely rejected" claims of reasonable modifications that were not "concrete and specific"). Second, Plaintiffs failed to meet their burden of production or persuasion to prove that "offering bonuses and incentives" would be effective in increasing the number of "consistent WAV drivers" or in creating Plaintiffs' "desired access" of reliable on-

demand transportation via WAVs on the Lyft platform. *Dean,* 804 F.3d at 189-90; *Roberts,* 542 F.3d at 372. *See also* Crawford Ninth Circuit Ruling, 2023 U.S. App. LEXIS 28733, *2 ("Given the scant underlying WAV supply in Plaintiffs' cities, Plaintiffs did not prove that offering incentive payments to prospective WAV drivers would generate adequate WAV options."). Third, Plaintiffs failed to meet their burden to produce an estimate of how much these "bonuses and incentives" would cost. *Roberts,* 542 F.3d at 370-71.

160.    Lyft has not met its burden to demonstrate that Plaintiffs' proposed modification would fundamentally alter Lyft's business. Lyft routinely employs incentives and bonuses for Access mode drivers and drivers on other ride modes in order to increase the available supply of vehicles. Lyft has not demonstrated that the cost of offering incentives and bonuses outweighs the benefits of improved Access mode service and increased supply of WAVs.

**Lyft's Response**: Because Plaintiffs have failed to meet their burden of proving a reasonable modification, Lyft need not prove its affirmative defense. *But see* Proposed Findings of Fact and Conclusions of Law Regarding Lyft's Affirmative Defense.

### H.    Plaintiffs' Seventh Reasonable Modification

#### 1.    Findings Of Fact

161.    Plaintiffs' seventh proposed modification is to include WAVs as an option in Lyft's Express Drive and FlexDrive programs. (Testimony of Alex Elegudin).

**Lyft's Response**: There is no evidence that if Lyft acquired WAVs to offer for rent through a rental program that drivers would elect to rent WAVs or that riders would be able to get WAV rides.

162.    Express Drive is Lyft's flexible car rentals program for drivers who want to drive for Lyft. FlexDrive is a wholly-owned subsidiary of Lyft and a partner in the Express Drive program. Express Drive and FlexDrive offer vehicles that drivers can use on Standard mode and other ride

modes on the App.[60]

**Lyft's Response**: This statement of fact is irrelevant and misleading. FlexDrive is an independent partner in the Express Drive program. Lyft offers Express Drive in just 30 cities throughout the United States, none in the State of New York.

163.     Lyft can and does request or dictate the particular types of vehicles available to drivers through Express Drive and FlexDrive.[61] Lyft is capable of including WAVs on Express Drive and FlexDrive. (Testimony of Alex Elegudin)

**Lyft's Response**: There is no evidence that Lyft could "request or dictate" that Express Drive and FlexDrive offer WAVs, or how much it would cost if it were to do so. Plaintiffs' expert is not qualified, and his analysis and conclusions are not reliable. Plaintiffs presented no evidence that major car rental providers offer WAVs for rental or that they have any WAVs in their existing fleets.

164.     Express Drive and FlexDrive do not offer WAVs as part of the rental programs.[62]

165.     Lyft employees previously proposed an initiative called Perseus, which would integrate WAVs into Express Drive and allow independent contractor drivers to rent WAVs at a similar price to renting non-WAVs. The former director of Lyft's WAV program projected that the Perseus program would cost Lyft less than $5 million and allow Lyft to provide more than 500,000 rides in the United States at approximately $10.25 per ride. Lyft did not pursue or attempt to pursue the Perseus program.[63]

**Lyft's Response**: This proposed fact is irrelevant and misleading, and the supporting evidence is inadmissible. Lyft never launched the Perseus program, and thus any evidence

---

[60] Selinger 201:1-203:14; Corrected Expert Report, at 5, 7, 57.
[61] Bousta Dep. Tr. 25:8-26:10.
[62] Corrected Expert Report, at 57-58; Lee Dep. Tr. 47:4-6.
[63] Corrected Expert Report, at 57; LYFT0120393; LYFT_ILRC00009589; Lee Dep. Tr. 47:4-6.

regarding the program is hearsay and speculation. Lyft did, however, offer a WAV rental program to its drivers in New York City from 2018 to 2022. From that experience, Lyft learned that such a program is costly and ineffective. Gerundio Aff. ¶¶ 22-25.

166.    Lyft's own projections for its Perseus program would allow Lyft to provide more WAV rides per year than it is currently offering at a lower cost per ride and lower total cost than Lyft's current WAV offerings. (Testimony of Alex Elegudin).

**Lyft's Response**: *See* Response to Para. 165.

## 2.    Conclusions Of Law

167.    Plaintiffs' seventh proposed modification that Lyft should include WAVs as an option in Lyft's Express Drive and FlexDrive programs is effective and reasonable. Plaintiffs establish that Lyft offers Standard mode vehicles through Express Drive and FlexDrive that are responsive to Lyft's drivers' needs. Plaintiffs establish that Express Drive and FlexDrive offer an important option for drivers to rent vehicles for use on Lyft that can be effective in increasing the supply of WAVs for Access mode. Plaintiffs establish that the cost of adding WAVs to Express Drive and FlexDrive is outweighed by the benefit of increasing the supply of WAVs for Access mode. Plaintiffs meet their burden of proving that this modification will effectively accommodate WAV users' limitations by increasing the supply of WAVs available to drivers on Lyft's app, providing vehicles for their use and drivers to operate those vehicles. *See US Airways, Inc.*, 535 U.S. at 399-400 (considering the need to accommodate disabled individuals' limitations in determining effectiveness). Plaintiffs have met their burden to establish that this modification is effective and reasonable, and is not outweighed by any cost to Lyft. While Plaintiffs are not required to furnish a detailed cost estimate, Plaintiffs have met their burden by establishing that Lyft's own calculations estimate a cost of less than $5 million. *See supra* ¶ 165, *see also Roberts*, 542 F.3d at 371.

**Lyft's Response**: Plaintiffs failed to meet their burden of proof in three ways. First, Plaintiffs failed to meet their burden of production and persuasion as to the existence of a reasonable modification. *See* Para. 84, *citing Dean,* 804 F.3d 189-90. As a matter of law, this Court cannot order Lyft to "include WAVs as an option in Lyft's Express Drive and FlexDrive programs." *See* Fed. R. Civ. Proc. 65(d)(1) ("[e]very order granting an injunction must . . . state its terms specifically" and "describe in reasonable detail . . . the act or acts restrained or required"); *City of New York v. Mickalis Pawn Shop, LLC,* 645 F.3d 114, 144 (2d Cir. 2011), *quoting Peregrine Myanmar Ltd. v. Segal,* 89 F.3d 41, 50 (2d Cir. 1996) (injunctive relief should be "narrowly tailored to fit specific legal violations"); ILRC Trial Decision, 2021 U.S. Dist. LEXIS 166229, *26-27 (federal courts have "routinely rejected" claims of reasonable modifications that were not "concrete and specific"). Second, Plaintiffs failed to meet their burden of production or persuasion to prove that requiring Lyft to offer WAVs as an option in its Express Drive and FlexDrive programs would be effective in creating Plaintiffs' "desired access" of reliable on-demand transportation via WAVs on the Lyft platform. *Dean,* 804 F.3d at 189-90; *Roberts,* 542 F.3d at 372. *See also* Crawford Trial Decision, 2022 U.S. Dist. LEXIS 131670, *22 ("Plaintiffs have not provided evidence that a rental or leasing model would lead to a significant number of WAVs on the platform"); ILRC Trial Decision, 2021 U.S. Dist. LEXIS 166229, *36 (observing that Lyft's experience in New York City showed that "rental WAV drivers spend most of their operating time in non-WAV mode picking up ordinary passengers"). Third, Plaintiffs failed to meet their burden to produce an estimate of how much these WAV rental programs would cost. *Roberts,* 542 F.3d at 370-71. *See* Response to Para. 165.

168.    Lyft has not met its burden to demonstrate that Plaintiffs' proposed modification would fundamentally alter Lyft's business. Lyft has not established that any cost of including WAVs as an option in Lyft's Express Drive and FlexDrive programs outweighs the substantial benefit to

Access mode service.

> **Lyft's Response**: Because Plaintiffs have failed to meet their burden of proving a reasonable modification, Lyft need not prove its affirmative defense. *But see* Proposed Findings of Fact and Conclusions of Law Regarding Lyft's Affirmative Defense.

## I.  Plaintiffs' Eighth Reasonable Modification

### 1.  Findings Of Fact

169.  Plaintiffs' eighth proposed modification is to form partnerships with car rental, taxi, and other transportation companies that have WAVs.  (Testimony of Alex Elegudin).

> **Lyft's Response**: There is no evidence that viable partners with excess WAV capacity exist nationwide, that they would be willing to form partnerships with Lyft, or what the terms of these partnerships would be.

170.  Currently, Lyft engages in partnerships with transportation companies to increase the available supply of WAVs in Access Regions.  In NYC, Lyft partners with three transportation companies who supply WAVs to drivers to use on the App.[64]  Lyft is capable of providing WAV service which meets all of the regulatory requirements in the areas in which it provides service. (Testimony of Alex Elegudin).  Lyft inflates the cost of its services in these regions through extremely inefficient and economically irrational business practices.  (*Id.*).

> **Lyft's Response**: This is an incomplete statement of fact.  There is no admissible evidence that Lyft "inflates the cost of its services." Plaintiffs' expert is not qualified, and his conclusions are not reliable. The hourly rate Lyft pays its contracting partners via the Partner model ranges from approximately $40-60 per hour. Gerundio Aff. ¶ 21 and TX G-0003. In 2019 and 2020, in San Francisco, Los Angeles, and Dallas-Fort Worth, where Lyft relies exclusively

---

[64] Gerundio Dep. Tr. 102:23-105:5.

on the Partner model to provide WAV rides, Lyft lost between $240 to $1,280 per WAV ride completed. Bozorgirad Aff. ¶¶ 32-33 and TX H-0002. At the time of the *ILRC* trial in June 2021, Lyft was paying $58.62 per hour, per vehicle to its third-party partner in San Francisco, meaning that the annualized cost per vehicle, at 17-hours per day, was approximately $365,000. Gerundio Aff. ¶ 21. There is no evidence that there are viable partners in the non-Access Regions with lower rates available.

171.    Lyft's website identifies approximately 208 transportation companies with WAVs across the United States. (Testimony of Alex Elegudin).

    **Lyft's Response**: There is no admissible evidence supporting this statement of fact. Plaintiffs' expert is not qualified, and his conclusions are not reliable. There is no evidence that these transportation companies currently have WAVs or drivers who are willing to drive the WAVs on the Lyft platform, that they would be willing to partner with Lyft, or the terms of such hypothetical partnerships.

172.    Mr. Wu previously proposed an initiative called NewCo or LyftSub, which was designed to expand Lyft's supply of WAVs and offer a nationwide WAV program by expanding Lyft's partnerships. LyftSub was a program to engage a staffing agency to provide contracted drivers and lease WAVs through a third-party, LyftSub, to those drivers. LyftSub would be a wholly-owned subsidiary of Lyft.[65]

    **Lyft's Response**: This proposed fact is irrelevant and misleading, and the supporting evidence is inadmissible. Lyft never launched "LyftSub" or "NewCo," and thus any evidence regarding the program is hearsay and speculation. Subsequent analysis of a very similar proposal

---

[65] LYFT_ILRC0022617; LYFT0120393; LYFT_ILRC00009589; Wu Dep. Tr. 176:2-5.

by Ms. Gerundio, a trial witness, revealed it would not be effective.  Gerundio Dep. Tr. 172:4-12, 173:2-9.

173.     My. Wu projected that LyftSub would offer a nationwide WAV solution for Lyft. Mr. Wu anticipated that giving three rides a day through LyftSub would be more cost-efficient than the way Lyft currently offers Access mode.  Mr. Wu projected that LyftSub would allow Lyft to profitably offer a nationwide WAV program at eight to eleven rides per day.[66]

**Lyft's Response**: *See* Response to Para. 172.

174.     Lyft executives did not approve LyftSub and none of Lyft's 30(b)(6) witnesses, who were obligated to explain why Lyft did not go forward with LyftSub, could explain why Lyft did not go forward with LyftSub.[67]

**Lyft's Response**: *See* Response to Para. 172.

175.     After Mr. Wu's departure from Lyft, Ms. Gerundio stated that she attempted to create a WAV partnership program which "was almost exactly like the LyftSub."  Ms. Gerundio did not pursue LyftSub any further.  Despite two heads of the national WAV team each designing a virtually identically pilot WAV partnership program, none was ever implemented or piloted.[68]

**Lyft's Response**: *See* Response to Para. 172.

176.     The projections of the LyftSub program or a similar partnership would allow Lyft to provide more WAV rides per year than it is currently offering at a lower cost per ride and lower total cost than Lyft's current WAV offerings.  (Testimony of Alex Elegudin).

**Lyft's Response**: *See* Response to Para. 172.  There is no admissible evidence supporting this statement of fact. Plaintiffs' expert is not qualified, and his conclusions are not reliable.

---

[66] LYFT_ILRC00022617; LYFT_ILRC00009589; Wu Dep. Tr. 169:1-14, 188:21-25.
[67] Wu Dep. Tr. 170:9-23; Lee Dep. Tr. 133:21-25.
[68] Gerundio Dep. Tr. 167:9-168:17, 197:2-15.

## 2. Conclusions Of Law

177. Plaintiffs' eighth proposed modification that Lyft form partnerships with car rental, taxi, and other transportation companies that have WAVs is effective and reasonable. Plaintiffs have established that Lyft currently engages in partnerships with transportation companies in order to increase the supply of WAVs. Plaintiffs have established that engaging in partnerships may allow Lyft to feasibly offer Access mode nationwide profitably or at little cost. Plaintiffs have established that transportation companies who may be available partners are situated across much of the country and that Lyft has knowledge of many of these companies. Forming partnership with rental services will accommodate disabled individuals' limitations by providing them with increased access to Lyft's app and services. *See US Airways, Inc.*, 535 U.S. at 399-400 ("An ineffective 'modification' or 'adjustment' will not accommodate a disabled individual's limitations."). Plaintiffs have met their burden to establish that this modification is effective and reasonable, and is not outweighed by any cost to Lyft. Indeed, Lyft's employees projected that LyftSub would enable Lyft to profitably provide WAV nationwide services. Lee Dep. Tr. 132:1-19. Plaintiffs have met their burden of proof regarding cost effectiveness, which does not require a detailed estimate. *See supra* ¶ 176; *see also Roberts*, 542 F.3d at 371.

**Lyft's Response**: Plaintiffs failed to meet their burden of proof in three ways. First, Plaintiffs failed to meet their burden of production and persuasion as to the existence of a reasonable modification. *See* Para. 84, *citing Dean,* 804 F.3d 189-90. As a matter of law, this Court cannot order Lyft to "form partnerships with car rental, taxi, and other transportation companies that have WAVs." *See* Fed. R. Civ. Proc. 65(d)(1) ("[e]very order granting an injunction must . . . state its terms specifically" and "describe in reasonable detail . . . the act or acts restrained or required"); *City of New York v. Mickalis Pawn Shop, LLC,* 645 F.3d 114, 144 (2d Cir. 2011), *quoting Peregrine Myanmar Ltd. v. Segal,* 89 F.3d 41, 50 (2d Cir. 1996) (injunctive relief

should be "'narrowly tailored to fit specific legal violations'"); ILRC Trial Decision, 2021 U.S. Dist. LEXIS 166229, *26-27 (federal courts have "routinely rejected" claims of reasonable modifications that were not "concrete and specific"). Second, Plaintiffs failed to meet their burden of production or persuasion to prove that requiring Lyft to form partnerships with transportation companies would be effective in creating Plaintiffs' "desired access" of reliable on-demand transportation via WAVs on the Lyft platform. *Dean,* 804 F.3d at 189-90; *Roberts,* 542 F.3d at 372. Third, Plaintiffs failed to meet their burden to produce an estimate of how much these transportation partnerships would cost. *Roberts,* 542 F.3d at 370-71. *See also* Crawford Trial Decision, 2022 U.S. Dist. LEXIS 131670, *31-32 (holding that the anticipated cost of partnerships makes the proposed modification unreasonable); ILRC Trial Decision, 2021 U.S. Dist. LEXIS 166229, *48 (holding that per-ride net costs of $1,500 in San Francisco to be unreasonable, and concluding per-ride net costs of $622 to be unreasonable as well). *See* Response to Para. 172.

178. Lyft has not met its burden to demonstrate that Plaintiffs' proposed modification would fundamentally alter Lyft's business. This modification would not alter Lyft's business because it currently engages in this practice in some of the Access Regions. The cost of entering into partnerships does not outweigh the benefit of increasing the supply of WAVs, enabling Lyft to expand Access mode, and increasing the economics of offering Access mode over time. Lyft has not established that any cost of forming partnerships with car rental, taxi, and other transportation companies that have WAVs outweighs the substantial benefit to Access mode service

**Lyft's Response**: Because Plaintiffs have failed to meet their burden of proving a reasonable modification, Lyft need not prove its affirmative defense. *But see* Proposed Findings of Fact and Conclusions of Law Regarding Lyft's Affirmative Defense.

**J.      Plaintiffs' Ninth Reasonable Modification**

### 1. Findings Of Fact

179. Plaintiffs' ninth proposed reasonable modification is to implement a ten-cent accessibility surcharge on all rides in order to fund Access mode. (Testimony of Alex Elegudin).

**Lyft's Response:** There is no evidence that if this Court were to order Lyft to raise its prices by $.10 per ride that WAV drivers would elect to drive on the Lyft platform or that riders would be able to get WAV rides. This is a revenue-generating strategy with no connection to WAVs or individuals with disabilities.

180. Lyft and other ridesharing companies impose various surcharges across the country, some of which are imposed at the discretion of Lyft and some of which are required by local regulators or municipalities. Lyft has imposed surcharges of 30 cents, 55 cents, and 75 cents in different regions of the United States.[69]

181. In San Francisco and Los Angeles, Lyft receives financial incentives from the California Public Utilities Commission ("CPUC") to offer WAV service. The CPUC requires Lyft to collect a ten-cent "Access fee" on every ride on the App in California. (Testimony of Alex Elegudin).

182. Ms. Gerundio stated that Lyft was considering imposing a five-cent accessibility surcharge in 2022 to support its WAV program.[70]

183. Lyft has tested price elasticity and has not found that its consumers are affected by price changes of less than 15 cents.[71] A ten-cent surcharge would be smaller than a one percent increase to the average price of a Lyft ride.[72]

---

[69] Corrected Expert Report, at 82.
[70] Gerundio Dep. Tr. 280:24-282:4.
[71] Chan Dep. Tr. 229:10-231:16
[72] Chan Dep. Tr. 229:10-231:16; Corrected Expert Report, at 82.

**Lyft's Response:** There is no admissible evidence supporting this statement of fact. As Dr. Rysman testified, a ten-cent surcharge on the price of Lyft rides, absent a corresponding increase in the price charged by Lyft's competitors, would adversely impact the number of rides on the Lyft platform. Rysman Testimony.

184.    Plaintiffs' experts project that a ten-cent surcharge on all Lyft rides would have raised approximately $76 million in 2019 and $42 million in 2020. Plaintiffs' experts project that the ten-cent surcharge would have funded 487,518 WAV rides in 2019 and 268,784 rides in 2020 even if those rides were provided via Lyft's current inefficient methodologies. Plaintiffs' experts project that implementation of the ten-cent surcharge would allow Lyft to operate Access mode at a profit in Westchester, New York State outside of NYC, and all of the non-Access Regions, even using Lyft's current inefficient WAV methodologies.[73]

**Lyft's Response**: There is no admissible evidence supporting this statement of fact. Plaintiffs' expert is not qualified, and his conclusions are not reliable. Among other things, the conclusion is derived exclusively from multiplying the number of standard rides on the platform by $.10, with no analysis of the impact of a price increase on demand in a competitive industry. *See* TX 23. As Dr. Rysman testified, a ten-cent surcharge on the price of Lyft rides, absent a corresponding increase in the price charged by Lyft's competitors, would adversely impact the number of rides on the Lyft platform. Rysman Testimony.

185.    Implementation of the ten-cent surcharge on all Lyft rides would provide funds larger than Lyft's historical budget for Access mode.[74]

**Lyft's Response**: *See* Response to Para. 184.

### 2.    Conclusions Of Law

---

[73] Corrected Expert Report, at 83, 95,102, 109.
[74] Corrected Expert Report, at 110.

186.     Plaintiffs' ninth proposed modification that Lyft should implement a ten-cent accessibility surcharge on all rides in order to fund Access mode is effective and reasonable. Plaintiffs offer a detailed and reasonable estimate of how the surcharge would enable Lyft to increase the funding and budget for Access mode.  Funding Access mode will permit Lyft to provide expanded access service and better accommodate the limitations of WAV users in the non-Access Regions. *See US Airways, Inc.*, 535 U.S. at 399-400.  Plaintiffs have met their burden to establish that this modification is effective and reasonable, and is not outweighed by any cost to Lyft.  Because Plaintiffs have established that this modification will provide WAV service at a profit, Plaintiffs have met their burden of proof regarding cost effectiveness, which does not include the provision of a detailed cost estimate.  *See supra* ¶ 184; *see also Roberts*, 542 F.3d at 371.

**Lyft's Response**: Plaintiffs failed to meet their burden of proof in at least three ways. First, Plaintiffs failed to meet their burden of production and persuasion as to the existence of a reasonable modification of a "policy, practice, or procedure."  *See* 42 U.S.C. § 12184(b)(2)(A), *citing* § 12182(b)(2)(A)(ii); Paragraph 84, *citing Dean,* 804 F.3d 189-90.  As a matter of law, this Court cannot order Lyft to raise its prices by ten cents. *City of New York v. Mickalis Pawn Shop, LLC,* 645 F.3d 114, 144 (2d Cir. 2011), *quoting Peregrine Myanmar Ltd. v. Segal,* 89 F.3d 41, 50 (2d Cir. 1996) (injunctive relief should be ""narrowly tailored to fit specific legal violations").  Second, Plaintiffs failed to meet their burden of production or persuasion to prove that requiring Lyft to raise its prices by ten cents would be effective in creating Plaintiffs' "desired access" of reliable on-demand transportation via WAVs on the Lyft platform.  *Dean,* 804 F.3d at 189-90; *Roberts,* 542 F.3d at 372.  Third, as Lyft demonstrated, there would be significant cost to Lyft if, as a result of this proposed modification, Lyft alone (but none of its competitors) is ordered to raise its prices by ten-cents across the board.  *See* Crawford Trial Decision, 2022 U.S. Dist. LEXIS 131670, *25-26 (holding that Plaintiffs failed to present "reliable evidence" that a 10-cent

fee to fund a WAV program "could diminish the cost of a WAV program without impacting revenue").

187.     Lyft has not met its burden to demonstrate that Plaintiffs' proposed modification would fundamentally alter Lyft's business.  Lyft has implemented surcharges in different areas of the country, including ten-cent surcharges for accessibility purposes.  This accessibility surcharge would be more cost-effective for Lyft because it retains the proceeds of the surcharge.  Lyft has not established that implementing this surcharge would reduce the total number of rides or revenue in a manner that outweighs the benefits of increased funding for Access mode.  Lyft has not established that any cost of implementing a ten-cent accessibility surcharge outweighs the substantial benefit to Access mode service.

**Lyft's Response**: Because Plaintiffs have failed to meet their burden of proving a reasonable modification, Lyft need not prove its affirmative defense.  *But see* Proposed Findings of Fact and Conclusions of Law Regarding Lyft's Affirmative Defense.

### K.   Plaintiffs Meet Their Burden To Articulate A Plausible Proposal For Barrier Removal.

#### 1.     Legal Standard.

188.     To evaluate whether barrier removal is readily achievable, "once a plaintiff 'articulates a plausible proposal for barrier removal, the costs of which, facially, do not clearly exceed its benefits,' the burden shifts to the defendant to 'prove that the proposals were not readily achievable.'"  *Kreisler*, 731 F.3d at 189 (quoting *Roberts*, 542 F.3d at 373, 378).

189.     "Neither the estimates nor the proposal are required to be exact or detailed, for the defendant may counter the plaintiff's showing by meeting its own burden of persuasion and establishing that the costs of a plaintiff's proposal would in fact exceed the benefits.  Because the concept of 'readily achievable' is a broad one, either party may include in its analysis, as costs or benefits, both monetary and non-monetary considerations."  *Roberts*, 542 F.3d at 373.

## 2. Conclusions Of Law.

190. Lyft currently imposes a barrier in its non-Access Regions by blocking WAV service and not allowing Access mode to be available. Lyft has already removed this barrier in its Access Regions, which demonstrates that removal is readily achievable elsewhere.

**Lyft's Response**: Plaintiffs' barrier removal claim fails because the only types of "barriers" subject to removal under the ADA's plain language are architectural barriers, "communication barriers that are structural in nature," and "transportation barriers in existing vehicles and rail passenger cars." 42 U.S.C. § 12182(b)(2)(A)(iv). The alleged "barrier" does not fit into any of these three categories of barriers enumerated by Congress.

Plaintiffs' barrier removal claim also fails because Plaintiffs have not articulated a plausible proposal for barrier removal. *See Roberts v. Royal Atl. Corp.,* 542 F.3d 363, 373 (2d Cir. 2008). As the Second Circuit explained in *Roberts* and *Borkowski,* a "plausible" proposal of barrier removal means the proposal would be beneficial, because at least facially, the costs of such proposal would not exceed its benefits. *See Roberts,* 542 F.3d at 373, *quoting Borkowski,* 63 F.3d at 138. Here, Plaintiffs failed to produce any evidence that if the alleged "barrier" were removed, they would derive any benefit. No evidence was produced that "barrier removal" would result in any, never mind reliable, on-demand transportation by WAVs on the Lyft platform. In addition, Plaintiffs ignore that displaying Access mode in the App without any supply has real risks and costs to Lyft, including the potential for lawsuits from users dissatisfied with the unreliable service. *See* Response to Paras. 100, 107. *See also Antolini v. Thurman*, Case No. 19-CV-9674, 2021 U.S. Dist. LEXIS 135989, at *7-9 (S.D.N.Y., July 21, 2021) (at summary judgment, rejecting expert's proposal to install lifts because it was "shockingly short on details"; the proposal did not include any architectural renderings or information regarding the feasibility of designing and orienting the lifts to provide access); *Range v. 230 W. 41ˢᵗ St., LLC,* Case No. 17

Civ. 149, 2020 U.S. Dist. LEXIS 99045, at *17, 20 (S.D.N.Y., June 5, 2020) (at summary judgment, rejecting claim that proposals were readily achievable as "rank speculation" because plaintiff failed to offer sufficient evidence to evaluate the plausibility and cost of his proposals). *See also* ILRC Trial Decision, 2021 U.S. Dist. LEXIS 166229, *26-27 (federal courts have "routinely rejected" claims of reasonable modifications that were not "concrete and specific").

191.    Lyft has failed to demonstrate that, despite its ability to remove this barrier to WAV service in its nine Access Regions, doing so in its current non-Access Regions would not be readily achievable. Lyft has not established that enabling Access mode in the non-Access Regions would require substantial cost to outweigh the benefits of offering Access mode. Lyft's defense that enabling Access mode in the non-Access Regions does not guarantee identical wait times, completion rates, or vehicle supply to Standard mode in the non-Access Regions does not rise to the standard of proving the barrier removal is not readily achievable. Lyft does not guarantee certain service level or vehicle supply requirements for Access mode in the non-Access Regions.

    **Lyft's Response**: Because Plaintiffs failed to meet their burden of presenting a plausible proposal for barrier removal, Lyft need not produce any evidence as to its affirmative defenses. Evidence submitted by Lyft, however, demonstrated that the alleged "barrier removal" would not generate any benefits to Plaintiffs but entail real costs to Lyft. *See* Response to Paras. 100, 107.

192.    Lyft's block of Access mode constitutes an unlawful barrier to access. *See, e.g.*, *Walters v. Fischer Skis U.S., LLC*, No. 21-1115, 2022 WL 3226352, at *7 (N.D.N.Y. Aug. 10, 2022) (holding that digital barriers constitute "specific barriers to accessibility" in violation of Title III); *Duncan v. Skin Bar NYC, LLC*, No. 19-5188, 2021 WL 9204082, at *4 (S.D.N.Y. May 18, 2021) (holding that the defendant's failure to make "modifications to its website that would allow plaintiff and other visually impaired individuals to have 'equal access'" constitutes a violation of the ADA)

(collecting cases); *Robles v. Domino's Pizza, LLC*, 913 F.3d 898, 905 (9th Cir. 2019), *cert. denied*, 140 S. Ct. 122 (2019) (Title III's non-discrimination "requirement applies to [a public accommodations]'s website and app").

> **Lyft's Response**: Plaintiffs failed to meet their burden of proving their barrier removal claim. In addition, the cases cited by Plaintiffs do not apply here. Plaintiffs are not visually impaired individuals seeking access to an app or a website. Instead, they are individuals who use motorized wheelchairs and scooters who want to be able to find reliable, on-demand transportation by WAVs on the Lyft platform.

193.    That the barrier interferes with access is sufficient. *See, e.g., Farr v. Hobby Lobby Stores, Inc.*, No. 19-5949, 2020 WL 3978078, at *3-4 (C.D. Cal. Apr. 29, 2020) (Title III injury exists where "web-based accessibility barriers" "interfere[d] with [the plaintiff's] access to [the d]efendant's goods and services") (citing *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 949-50 (9th Cir. 2011)); *Reed v. CVS Pharmacy, Inc.*, No. 17-3877, 2017 WL 4457508, at *1 (C.D. Cal. Oct. 3, 2017) ("that plaintiff is unable to fully access the website and app's offerings . . . due to a number of access barriers" is a violation of the ADA).

> **Lyft's Response**: *See* Response to Para. 191.

## IX.    Plaintiffs Are Entitled To Attorneys' Fees And Costs.

194.    The ADA and the NYSHRL allow prevailing plaintiffs in an action to recover reasonable attorneys' fees and costs. *See* 42 U.S.C. § 12205; N.Y. Exec. Law § 297(10); N.Y.C. Admin. Code § 8-502(f); *see also Dominguez v. New York Equestrian Ctr., Ltd.*, No. 18-9799, 2020 WL 5796275, at *4 (S.D.N.Y. Sept. 28, 2020).

195.    Plaintiffs are entitled to an award of reasonable attorneys' fees and reimbursement of all costs and expenses reasonably incurred in litigating this action.

196.    Plaintiffs and witnesses may also apply for a service award.

**Lyft's Response**: As the losing party, Plaintiffs are not entitled to recover fees or costs.

## X.   The Court Issues The Following Order

197.    This Court hereby orders:

    a.   Lyft is hereby enjoined from operating its WAV programs and Access mode in a manner that is discriminatory pursuant to section 12182 of the ADA, including subsections 12182(b)(1)(A)(ii), (b)(2)(A)(i)- (v).

    b.   Lyft is hereby enjoined from operating its WAV programs and Access mode in a manner that is discriminatory pursuant to section 12184 of the ADA, including subsections 12184(b)(1), (b)(2)(A)-(C).

    c.   Lyft is hereby enjoined from operating its WAV programs and Access mode in a manner that is discriminatory pursuant to section 296(2)(a) of the NYSHRL, including subsections 296(2)(c)(i)-(iii).

    d.   The Court hereby orders Lyft to implement the following remedial measures:

      i.   Remove the current categorical preclusion ("blocker") of WAVs on its platform in the non-Access Regions and prevent the implementation of the Access mode toggle by automatically displaying WAV options on Lyft's home screen alongside other vehicle options.  Lyft's policies and practices prevent WAV drivers from identifying their vehicles as WAVs and riders from having the option to select WAVs, even when they are available.

      ii.   Ask all drivers on its platform and those onboarding whether they have access to WAVs and whether they are interested in driving WAVs on Lyft's platform. Plaintiffs envision that this question would be added to Lyft's mandatory driver onboarding process, during which Lyft requires drivers to disclose all relevant information about their vehicles, such as makes and models, and insurance information.

      iii.   Utilize cross-dispatching and prioritization logic to optimize WAV drivers' efficiencies and profitability.

      iv.   Explore and form partnerships with car rental, taxi, non-emergency medical transportation, and other transportation companies that have WAVs, as Lyft's competitors have done to improve WAV service.

      v.   Include WAVs as options in Lyft's Express Drive and FlexDrive programs for its existing and potential drivers.

      vi.   Engage in both WAV driver- and rider-facing marketing to attract potential WAV drivers and to increase awareness of WAVs on Lyft's platform among potential WAV riders, and thereby increase the supply of WAVs and demand for WAV services on Lyft's app.  Lyft may do so by employing targeted advertising and advertising campaigns similar to those Lyft uses for its standard and other non-WAV

services.

vii. Increase the supply of WAVs on its platform by offering potential drivers baseline bonuses and incentives for guaranteed periods of time, such as six months, one year, or eighteen months.

viii. Implement a ten-cent accessibility surcharge on all rides nationwide to fund robust WAV services.

198. The Court also find that Plaintiffs are entitled to an award of reasonable attorneys' fees and reimbursement of all costs and expenses reasonably incurred in connection with this action and that Plaintiffs and witnesses may apply to receive a service award.

199. This Court directs the Parties to mediate the issue of attorneys' fees and costs within 45 days of the issuance of this Order. Plaintiffs shall submit their application for reasonable attorneys' fees, costs, and service awards within 30 days of the mediation.

**Lyft's Response**: The Court hereby directs the Clerk to enter judgment for Lyft.

**LYFT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

I.  **Lyft's Defense To Plaintiffs' First and Second Claims For Relief Under the ADA and the NYSHRL for Readily Achievable Barrier Removal**

    A.  **Lyft's Proposed Findings of Fact**

        1.       A key driver of success of a platform industry, such as Lyft's ridesharing platform, is the number of transactions it generates.  Testimony of Dr. Marc Rysman ("Rysman Testimony").  Lyft's platform is highly successful in areas of high population density, such as New York City and San Francisco. Rysman Testimony and Trial Exhibit ("TX") Q-0001; Affidavit of Abbas Bozorgirad ("Bozorgirad Aff.") ¶¶ 13-14; TX M-0001.

        2.       Wait times and completion rates on the Lyft platform depend on the number of ride requests in a particular geographic region. Areas with more ride requests have more reliable service, as measured by low wait times and high completion rates.  Rysman Testimony and TX V-0001; X-0001.

        3.       Plaintiff Harriet Lowell testified that she needs service to be "reliable," which means she would "have to be certain that [she] could get a Lyft" and that it "wouldn't leave [her] stranded." Deposition of Harriet Lowell ("Lowell Dep.") 122:11-123:7, 124:9-12, 132:22-24.  Class member Pauline Scudieri testified that she wants "reliable" access to WAVs on the Lyft platform.  Having only a fifty percent chance of getting a ride was "a risk" for her, because she "can't afford to be stranded with a 450-pound wheelchair."  Deposition of Pauline Scudieri ("Scudieri Dep.") 52:23-53:10, 55:18-22, 56:7-10, 59:2-5.  WDOMI testified that one of its constituents, Ansel Lurio, was negatively impacted by lack of access to transportation services when he was "stranded in a snowstorm in Westchester because he could not call a WAV through Lyft."  Affidavit of Melvyn Tanzman at ¶¶ 40-44.

4. People who use wheelchairs make up less than 1% of the population of the United States. Corr. Expert Report ("CER") at 33. Even in New York City, Lyft's largest WAV market, WAV rides only make up approximately 0.1% of rides on the platform. Bozorgirad Aff. ¶ 11.

5. WAVs are rare and expensive. To create a WAV, the floor of an existing minivan (such as a Chrysler Pacifica or a Toyota Siena) is typically lowered, and equipment such as a wheelchair ramp and securement device are added. The cost of creating a WAV can add $15,000-$25,000 (or more) on top of the cost of purchasing the minivan. WAVs are rare in part because of the high cost: most people are not likely to incur the cost of creating or purchasing a WAV unless they (or their family member) need one. Gerundio Aff. ¶ 6; Testimony of Daniel Bussani.

6. Plaintiffs presented no evidence that any supply of WAVs is "available" in any of the non-Access Regions, or that WAV drivers interested in driving on the App are being "blocked."

7. The most likely explanation for why, in limited instances, WAV drivers appear in Lyft's data in certain non-Access Regions is that they had crossed over from Access Regions (such as New York City) into neighboring non-Access regions (such as Westchester County) to drop off riders. Bozorgirad Aff. ¶ 10.

8. Plaintiffs' expert did not testify, and did not present any analysis to show, that displaying Access mode in any of the non-Access Regions would "enable any individual who requires a WAV" to get a ride using the App. His testimony is merely that if Access mode is displayed in the App, an individual who requires a WAV could open the App to see if a WAV driver is available. *See* Stip. Fact 19.

9. Lyft's expert, Dr. Marc Rysman, testified based on his analysis that given the population density of potential WAV users, if Lyft were to make Access mode available everywhere, the mode would not function as a means of reliable transportation. The platform would not

connect a single WAV rider with a single WAV driver in the vast majority of New York State and the United States. Rysman Testimony.

10. To create a supply of WAVs in the nine Access Regions, Lyft has spent tens of millions of dollars each year. In the Access Regions where Lyft relies on the Partner model to provide WAV service, the hourly rate Lyft pays its contracting partners ranges from approximately $40 to $60 per hour. Gerundio Aff. ¶ 21 and TX G-0003. In 2019 and 2020, in San Francisco, Los Angeles, and Dallas-Fort Worth, where Lyft relies exclusively on the Partner model to provide WAV rides, Lyft lost between $240 to $1,280 per WAV ride completed. Bozorgirad Aff. ¶ 32 and TX H-0002. At the time of the *ILRC* trial in June 2021, Lyft was paying $58.62 per hour, per vehicle to its third-party partner in San Francisco, meaning that the annualized cost per vehicle, at 17-hours per day, was approximately $365,000. Gerundio Aff. ¶ 21.

11. Even when Lyft uses the IC Model for WAV, Lyft pays special financial incentives that are not paid to drivers in Standard mode. Lyft currently pays WAV drivers a per ride bonus, which has ranged from $15-30 per WAV ride completed. Gerundio Aff. ¶ 16. This bonus normally exceeds Lyft's revenue per ride, meaning the more rides that are completed, the more money Lyft loses. Treger Aff. ¶ 32.

12. There are other costs associated with offering Access mode everywhere, regardless of supply. Simply enabling Access mode without any active management to ensure an adequate WAV supply exposes Lyft to litigation and reputational costs, as demonstrated by this lawsuit. Plaintiffs filed this lawsuit in 2017 because they were dissatisfied with the level of WAV service Lyft was providing in New York City. *See* Complaint [Dkt. 1], ¶¶ 42, 88-89, 144-59. If Access mode were the only mode in a region with no available supply, there is a real likelihood that Lyft would face additional claims. Gerundio Aff. ¶ 35.

13.     Offering Access mode entails other management challenges and costs. If any drivers sought to drive WAVs on Lyft's platform, Lyft would need to verify that those drivers had equipment that met applicable regulatory requirements for ramps, lifts, and securement devices. Lyft would also need to ensure that drivers met applicable training requirements, which vary by region. Equipment inspection and training of WAV drivers are not tasks that Lyft is equipped to handle. Gerundio Aff. ¶ 36.

14.     There is no evidence that if this Court were to implement Plaintiffs' proposed "barrier removal," and ordered Lyft to display Access mode in the App in all non-Access Regions, then WAV drivers would elect to drive on the Lyft platform, that riders would be able to get WAV rides, or that a rider who needed a WAV would see one displayed in the App.

### B. Lyft's Proposed Conclusions of Law

15.     Plaintiffs' barrier removal claim fails because the only types of "barriers" subject to removal under the ADA's plain language are architectural barriers, "communication barriers that are structural in nature," and "transportation barriers in existing vehicles and rail passenger cars." 42 U.S.C. §§ 12184(b)(2)(C), 12182(b)(2)(A)(iv).  Plaintiffs' alleged "barrier" does not fit into any of these three categories of barriers enumerated by Congress.

16.     The "barrier" Plaintiffs allege is not an architectural barrier or a communication barrier that is structural in nature. It is also not a "transportation barriers in existing vehicles and rail passenger cars." Instead, it is a request to have Lyft remove an alleged "block" of WAV service in a mobile app. Under the plain language of the ADA, this is not a cognizable claim for barrier removal.

17.     Even assuming that such "barrier removal" can be stated as a claim under the ADA, Plaintiffs have not identified an actual "block" or "barrier," other than to point out that Lyft does not offer WAV service in the non-Access Regions. *See* Pls. Para. No. 190 ("Lyft currently imposes a barrier in its non-Access Regions by . . . not allowing Access mode to be available."). But as a matter

of law, Lyft is not required to offer WAV service. *Noel v. N.Y.C. Taxi & Limousine Comm'n*, 687 F.3d 63, 73 (2d Cir. 2012); *see also Thorne v. Boston Mkt. Corp.,* 469 F.Supp.3d 130, 142-43 (S.D.N.Y. 2020) (the ADA does not require private entities to modify the goods or services which it offers); 49 C.F.R. § 37.29 ((b) Providers of taxi service are not required to purchase or lease accessible automobiles.).

18.     Plaintiffs have also failed to produce any evidence that not displaying Access mode in non-Access regions functions as a barrier or a block. A barrier or block is something that prevents, hinders, or separates. *See* https://www.merriam-webster.com/dictionary/barrier (last visited February 16, 2024). As applied in this context, a barrier suggests that WAV riders, on the one hand, are separated from WAV drivers, and that if the barrier were removed, these riders and drivers would connect to provide reliable transportation.

19.     No evidence was presented of such a barrier or block. Specifically, Plaintiffs failed to produce any evidence of drivers with WAVs in any non-Access Region, including in Westchester County. No admissible testimonial, survey, or statistical evidence was presented to show how many willing and qualified drivers with WAVs may be found in Westchester County or in any other non-Access Region.

20.     Rather, the evidence establishes that Lyft simply does not choose to offer Access mode in all geographic areas due to factors such as local regulatory requirements, supply-and-demand, costs, operational complexity, and budget constraints. This is not a "barrier." The ADA does not require businesses to offer different services than they would otherwise provide, just nondiscriminatory enjoyment of those that are provided.. *See, e.g., Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1115 (9th Cir. 2000) (Title III "does not require provision of different goods or services, just nondiscriminatory enjoyment of those that are provided."); *Thorne v. Boston Mkt. Corp.,* 469 F. Supp. 3d 130, 143 (S.D.N.Y. 2020) ("Because the Court concludes that gift cards are goods

sold by a public accommodation under the ADA, Defendant cannot be required to sell accessible gift cards.")

21.     Under Second Circuit law, it is Plaintiffs' burden to articulate a plausible proposal for barrier removal. "[O]nce a plaintiff 'articulates a plausible proposal for barrier removal, the costs of which, facially, do not clearly exceed its benefits,' the burden shifts to the defendant to 'prove that the proposals were not readily achievable.'" *Kreisler v. Second Ave. Diner Corp.*, 731 F.3d 184, 189 (2d Cir. 2013), *quoting Roberts v. Royal Atl. Corp.,* 542 F.3d 363, 378 (2d Cir. 2008).

22.     Plaintiffs failed to meet this burden because they have not articulated a plausible proposal for barrier removal. *See Roberts,* 542 F.3d at 373.  As the Second Circuit explained in *Roberts* and *Borkowski,* a "plausible" proposal of barrier removal means the proposal would be beneficial because at least facially, the costs of such proposal would not exceed its benefits.  *See Roberts,* 542 F.3d at 373, *quoting Borkowski v. Valley Cent. School Dist.*, 63 F.3d 131, 138 (2d Cir. 1995).  Here, Plaintiffs failed to produce any evidence that if the alleged "barrier" were removed, they would derive any benefit in the form of transportation.  No evidence was produced that "barrier removal" would result in any, never mind reliable, on-demand transportation by WAVs anywhere on the Lyft platform.

23.     Plaintiffs' proposal is also "shockingly short on details." *See Antolini v. Thurman*, Case No. 19-CV-9674, 2021 U.S. Dist. LEXIS 135989, at *7-9 (S.D.N.Y., July 21, 2021) (at summary judgment, rejecting expert's proposal to install lifts because it was "shockingly short on details"; the proposal did not include any architectural renderings or information regarding the feasibility of designing and orienting the lifts to provide access); *Range v. 230 W. 41ˢᵗ St., LLC,* Case No. 17 Civ. 149, 2020 U.S. Dist. LEXIS 99045, at *17, 20 (S.D.N.Y., June 5, 2020) (at summary judgment, rejecting claim that proposals were readily achievable as "rank speculation" because plaintiff failed to offer sufficient evidence to evaluate the plausibility and cost of his proposals). The parties' stipulated

facts show Lyft has spent millions of dollars on WAV service in nine Access Regions. *See* Stip. Fact Nos. 28-31. Plaintiffs offered no analysis as to how such costs could be avoided by Lyft or what the costs would be, across the fifty states, in the State of New York, or even in Westchester County, if Lyft were to offer Access mode.

24.     Plaintiffs also failed to consider the role of local, state, or federal regulations, or even inspection and training requirements, on the availability of supply. *See, e.g.,* 49 C.F.R. § 37.7(a) ("a vehicle shall be considered to be readily accessible to and useable by individuals with disabilities if it meets the requirements of this part and the standards set forth in part 38 of this title") and § 37.173 (requiring training to ensure safe operation of equipment and appropriate assistance to riders with disabilities); Cal. Pub. Util. C. § 5440 *et seq.* (initiating regulation of transportation network companies' provision of WAV service by California Public Utilities Commission (CPUC)), acknowledging "[i]n comparison to standard vehicles available via TNC technology applications, WAVs have higher purchase prices, higher operating and maintenance costs, higher fuel costs, and higher liability insurance, and require additional time to serve riders who use nonfolding motorized wheelchairs."); CPUC Rulemaking 19-02-012, Decision On Track 2 Issues: Offsets, Exemptions And Access Provider Disbursements at 87 (March 19, 2020) (setting forth training and inspection requirements to qualify for offsets to fund WAV service in California).

25.     In contrast, Lyft presented evidence that based on the population density of wheelchair users, the resulting ridesharing platform for WAVs would not connect a single WAV rider with a single WAV driver in the vast majority of New York State and the United States. Moreover, Lyft showed that in just nine Access Regions, it has spent millions of dollars every year to ensure a supply of WAVs on the platform.

26.     Lyft has also produced evidence that simply displaying Access mode in the App without a supply of WAVs will pose real risks and costs to Lyft. These costs include potential

lawsuits, such as this one, filed by riders dissatisfied with the unreliable service. *See* Complaint [Dkt. 1], ¶¶ 42, 88-89, 144-59. Moreover, Lyft cannot simply "turn on" Access mode in its App without ensuring that the vehicles meet ADA requirements and drivers are adequately trained to operate the equipment and assist individuals with disabilities. *See* 49 C.F.R. §§ 37.7(a), 37.173.

27.    Plaintiffs' barrier removal proposal is one that is based on speculation, not evidence. Because Plaintiffs failed to present any evidence that removing the alleged barrier would provide access to transportation, their claim for barrier removal is denied. *See Antolini* 2021 U.S. Dist. LEXIS 135989, at *7-9; *Range,* 2020 U.S. Dist. LEXIS 99045, at *17, 20

## II.    Lyft's Affirmative Defense of Fundamental Alteration to Plaintiffs' First and Second Claims for Relief Under the ADA and the NYSHRL for Reasonable Modifications

### A.    Lyft's Proposed Findings of Fact

28. Lyft launched its on-demand ridesharing platform just over ten years ago, in 2012.  (Stip. Fact No. 9.)

**Plaintiffs' Response:** Plaintiffs have no response or objection to this proposed fact.

29.    Lyft's ridesharing platform is a two-sided technology platform that is premised on fundamental principles of supply and demand.  The supply and demand required of the platform is inherently local, and the platform works best in areas of high population density.  (Testimony of Leon Treger, Dr. Marc Rysman.)

**Plaintiffs' Response:** The opinions of Lyft's expert are unreliable, do not assist the trier of fact, and are contrary to Lyft's business practices.  Fed. R. Evid. 702.  Lyft provides Standard mode in every region in which it operates, regardless of whether there is sufficient supply and demand.  Lyft does not make decisions about where to offer, alter, or restrict Standard mode based upon whether it functions effectively or whether there is an available supply of drivers. Stip. Fact ¶¶ 19, 24.

Mr. Treger is not qualified to testify about where and how Lyft can function best and is not proffered as an expert on the market dynamics of how Lyft operates. Fed. R. Evid. 702.

30. Much of the operation of Lyft's platform is handled by technology, without human intervention. Computer algorithms not only match independent drivers and riders who use the Lyft app, but also help balance supply and demand through pricing and incentives, all in "real-time." Lyft's algorithms use large amounts of data generated by rides in the Lyft app ("App") to adapt and learn. (Testimony of Leon Treger.)

**Plaintiffs' Response:** Plaintiffs have no response or objection to this proposed fact.

31. In most Regions, Lyft offers just two ride modes, "Standard" and "XL," on its App. "Standard" mode is Lyft's basic ridesharing option. In that mode, a rider will be paired with a standard car for up to 4 passengers. If a rider needs extra seats, there is Lyft XL. XL costs more than Standard but will match a rider with a driver who has an SUV for up to 6 passengers. (Testimony of Leon Treger, Abbas Bozorgirad.)

**Plaintiffs' Response:** Plaintiffs have no response or objection to this proposed fact.

32. Standard and XL are available in over 300 Regions nationwide. This means that a rider who opens her App in those regions will see the current wait times for Standard and XL modes in her local area. (Testimony of Leon Treger, Abbas Bozorgirad.)

**Plaintiffs' Response:** Plaintiffs have no response or objection to this proposed fact.

33. In selected Regions, Lyft offers more specialized modes, such as "High Value Modes" or HVMs. In those Regions where HVMs are offered, a rider may see modes such as "Lux," "Lux Black," or "Lux Black XL" listed in the App. (Testimony of Leon Treger, Abbas Bozorgirad.)

**Plaintiffs' Response:** This alleged fact has no relevance to the legal issues discussed. Fed. R. Evid. 401-403. Lyft's specialized modes for its premium offerings are not relevant to whether it is reasonable for Lyft to implement Plaintiffs' modifications.

34.     Lyft is strategic about where to offer specialized modes to ensure that they function well, to promote a good user experience, and to maximize revenue. Out of over 300 U.S. regions where Lyft offers Standard & XL, Lyft currently offers Lux Black and Lux Black XL in just 56 Regions. (Testimony of Abbas Bozorgirad.)

**Plaintiffs' Response:** This alleged fact has no relevance to the legal issues discussed. Fed. R. Evid. 401-403. Lyft's specialized modes for its premium offerings are not relevant to whether it is reasonable for Lyft to implement Plaintiffs' modifications.

The "main focus" for expanding Lyft's specialized modes is growth and increasing the number of passengers. Zhou Dep. 26:11-27:1 ("Q: And did you find that it would be profitable to expand [specialized mode] access so that there could be airport pickup? A: Well, I wouldn't use the word 'profitable.' I would say it would have led to increased adoption of that mode, and I think what we were trying to do was just increase the usage and the word-of-mouth spread of the mode as it being a valuable service.").

35.     Any person, including individuals who rely on wheelchair accessible vehicles ("WAVs"), may download and open the Lyft App to see what options or "modes" are available. However, since 2016, Lyft has offered Access mode in just nine cities (the "Access Regions"). (Testimony of Isabella Gerundio.)

**Plaintiffs' Response:** Lyft has not offered Access mode in each of nine cities during the entire duration of 2016 to the present. Lyft began offering Access mode in Portland in 2016 in response to regulatory requirements. Since then, Lyft has expanded Access mode to the

remaining eight cities at varied intervals in response to regulatory requirements, financial incentives, or a partnership with a transit agency. Stip. Fact ¶ 35.

36.     Wheelchair accessible vehicles ("WAVs") are rare and expensive. To create a WAV, the floor of an existing minivan (such as a Chrysler Pacifica or a Toyota Siena) is typically lowered, and equipment such as a wheelchair ramp and securement device are added. The cost of creating a WAV can add $15,000-$25,000 (or more) on top of the cost of purchasing the minivan. WAVs are rare in part because of the high cost: most people are not likely to incur the cost of creating or purchasing a WAV unless they (or their family member) need one. (Testimony of Isabella Gerundio, Daniel Bussani.)

**Plaintiffs' Response:** Ms. Gerundio is not qualified to testify about the WAV manufacturing process, the average cost of modifying a vehicle to become a WAV, or the average individual's decision regarding the purchase of a WAV. Ms. Gerundio is not proffered as an expert on the WAV manufacturing process, the cost of a WAV, or the purchasing practices of individuals. Furthermore, Ms. Gerundio has not performed any competent research into the availability of WAVs and the evidence does not establish that she has any specialized knowledge of the WAV manufacturing process. Fed. R. Evid. 702; Gerundio Dep. Tr. 116:11-117:9, 199:21-200:1, 200:8-24. WAVs can be purchased for as little as $16,000 (Affidavit of Peter Ruprecht, ¶ 12; Affidavit of Daniel Bussani, ¶ 10), and many customers can receive subsidies and grants through health insurance and state-run programs (Affidavit of Daniel Bussani, ¶ 11).

In any event, although Ms. Gerundio and Lyft have not bothered to competently estimate or calculate how many WAVs there are in the United States, there are ample WAVs for Lyft to have a sufficient supply, with more than 15,000 WAVs being manufactured on an annual basis in the United States, a conservative estimate of more than 100,000 WAVs on the road at a given

time, and, in particular, a relatively large quantity of WAVs in Westchester County. (Testimony of Alex Elegudin; Affidavit of Peter Ruprecht, ¶¶ 9-19; Affidavit of Daniel Bussani, ¶¶ 7-9).

37. The biggest challenge in offering Access mode is lack of supply. Unlike other modes, for which Lyft relies on an organic supply of drivers in a particular area, Lyft has found that an organic WAV supply needed to support a functioning platform does not exist. This is no doubt due to the fact that WAVs are expensive to create or purchase and only a very small percentage of the general population needs a WAV. (Testimony of Isabella Gerundio.)

**Plaintiffs' Response:** Ms. Gerundio has not performed any competent research into the availability of WAVs to determine whether Lyft is adequately engaging the available supply of WAVs. Gerundio Dep. Tr. 116:11-117:9, 199:21-200:1, 200:8-24. Ms. Gerundio is not qualified to testify about the average cost of a WAV, or the average individual's decision regarding the purchase of a WAV. Ms. Gerundio is not proffered as an expert on the cost of a WAV, or the purchasing practices of individuals. Fed. R. Evid. 702.

Moreover, Lyft has refused to ask its drivers whether they have WAVs during Lyft's onboarding process or use outreach and marketing to identify available WAV drivers, like it does in other ride modes. (Testimony of Isabella Gerundio; Testimony of Alex Elegudin).

There is a sufficient supply of WAVs for Lyft to provide Access mode in the non-Access Regions. (Testimony of Alex Elegudin).

38. To overcome the lack of supply, Lyft has incurred significant cost to artificially create a supply of WAVs on its platform through incentives and partnerships with third parties who have access to these vehicles. In 2019, the total amount Lyft spent to create WAV supply in its nine Access Regions was $11.6 million; in 2020, the total amount was $13.1 million; and in 2021, the total amount was $13.8 million. (Testimony of Isabella Gerundio.)

**Plaintiffs' Response:** Lyft implements a number of driver outreach, advertising, and marketing initiatives to identify and engage a supply of drivers in each of its ride modes, (Zhou Dep. Tr. 67:25-68:8; 68:25-69:8), but does not implement similar outreach and advertising initiatives to engage Access mode drivers.

Ms. Gerundio is ignorant about WAV supply; she has not performed any competent research into the availability of WAVs to determine whether Lyft is adequately engaging the available supply of WAVs. Gerundio Dep. Tr. 116:11-117:9, 199:21-200:1, 200:8-24.

Lyft operates its WAV program grossly inefficiently, with its only goal being to appease regulators while providing as little service as possible. As a result, Lyft's WAV program is far less economically efficient than a properly functioning WAV program. (Testimony of Alex Elegudin).

39.     Lyft's experience is that the demand for Access mode is very small. This may be due to many factors, but the biggest one is that the percentage of individuals who need WAVs for transportation is a small percentage of the population at large: estimates range from .5% to 1% of the general population. Another factor may be the availability of subsidized transportation options, including paratransit, as well as non-emergency medical transportation subsidized or paid for by insurance. (Testimony of Isabella Gerundio, Dr. Marc Rysman.)

**Plaintiffs' Response:** Dr. Rysman has no experience designing or implementing accessible transportation and has no specialized knowledge regarding the demand for Access mode or the demand for WAVs. Dr. Rysman is not qualified to testify regarding the availability of accessible transportation options. Fed. R. Evid. 702.

In the Access Regions, Lyft deliberately suppresses WAV demand via its hidden toggle to hide WAV from customers, and via other mechanisms. (Testimony of Isabella Gerundio)

Lyft did not perform any study of the demand for Access mode in the non-Access Regions and does not know what the demand for Access mode is in the non-Access Regions. *See* Plaintiffs' Proposed Findings of Fact ¶¶ 44-46.

40.    Actual demand for Access mode on Lyft's ridesharing platform as a percentage of total rides is incredibly low. Even in Lyft's biggest WAV market – New York City – WAV rides comprise approximately 1 in 1,000 of all rides on the platform. In Los Angeles, the demand is even less: WAV rides comprise approximately 1 in 5,000 of all rides on the platform. (Testimony of Isabella Gerundio, Abbas Bozorgirad.)

**Plaintiffs' Response:** In every Access region but New York City, Lyft deliberately suppresses WAV demand through the use of a hidden toggle to activate Access mode. When Lyft removed the toggle in New York City, WAV rides on Access mode increased by approximately 500 percent. *See* Plaintiffs' Proposed Findings of Fact ¶¶ 137-43. The same would likely happen if Lyft removed the toggle in other regions. (Testimony of Alex Elegudin).

41.    After analyzing data provided by Lyft, Dr. Marc Rysman, Professor of Economics at Boston University, opined that based on the population density of potential WAV riders, it is not feasible for Lyft to rely on its platform model to provide Access mode service. (Testimony of Dr. Marc Rysman.)

**Plaintiffs' Response:** The opinions of Lyft's expert are unreliable, do not assist the trier of fact, and are contrary to Lyft's business practices. Fed. R. Evid. 702.

Dr. Rysman admitted that Lyft offers Standard mode in many areas that he would find infeasible. Rysman Dep. Tr. 119: 1-120:17. Furthermore, Lyft does not make decisions about where to offer, alter, or restrict Standard mode based upon the population density, supply of drivers, demand of riders, or any other considerations or metrics. Stip. Facts ¶¶ 19, 25.

42.     Lyft has not yet identified a way to operate Access mode profitably.  Lyft is not aware of any other entity, either private or public, that has figured out how to operate an on-demand ridesharing service for WAVs efficiently and effectively.  (Testimony of Isabella Gerundio, Abbas Bozorgirad, Leon Treger.)

**Plaintiffs' Response**: In ten years, Lyft has never operated its standard service profitably, often recording annual losses of billions of dollars while it fought to expand market share.  Lyft has never operated Access mode with the goal of doing so profitably.  As Joyce Chan, Lyft's 30(b)(6) witness stated, "the primary goal of WAV is actually not today to be profitable.  It's to meet our regulatory requirements. . . . I think Lyft's primary goal is to . . . make every effort we can to meet our regulatory requirements."  Chan Dep. Tr. 110:18-111:14.

Many companies and car-service operators offer efficient and profitable WAV service throughout the United States and have experienced consistent and long-term success.  Plaintiffs' experts also propose modifications that would allow Lyft to operate Access mode profitably.  (Testimony of Alex Elegudin).

B.     **Lyft's Proposed Conclusions of Law**

43.     At issue in this lawsuit is whether Lyft must offer Access mode as an option in every non-Access Region.  The parties do not dispute that anyone, including individuals who rely on WAVs for transportation, can download and open the Lyft App in every region.  But the issue is whether Access mode must be shown among the menu of options in the App.  Plaintiffs' proposed modification to have Lyft offer Access mode in every non-Access Region would fundamentally alter the nature of Lyft's business.

**Plaintiffs' Response**: "WAV services would not fundamentally alter Lyft's business because WAVs are not a 'new transportation service.'  Lyft already provides WAV services where compelled to do so by local governments and voluntarily in Los Angeles and San

Francisco (on a pilot basis)." Findings of Fact and Conclusions of Law, *Independent Living Resource Center San Francisco v. Lyft, Inc.*, No. 19-01438, 2021 WL 3910719, at *8 (N.D. Cal. Sept. 1, 2021) (hereinafter "*ILRC*"). Lyft "cannot argue that something it is already doing would fundamentally alter its business[.]" Order Re Motions for Summary Judgment, *ILRC*, 2020 WL 6462390, at *6 (N.D. Cal. Nov. 3, 2020).

In the only instances where a rideshare company argued that a proposed modification of offering WAV programs in an area where it does not currently offer WAV programs constituted a fundamental alteration, both courts swiftly rejected Lyft's position. As stated in *Crawford v. Uber Technologies, Inc.*, 616 F. Supp. 3d 1001, 1009 (N.D. Cal. 2022), "[p]roviding no authority in support of this argument, Uber apparently contends that any requested modification of its services is a fundamental alteration, which would allow it to escape ADA liability for any requested modification. This argument is therefore rejected."

As every other court to have considered Lyft's argument in this context has found, Plaintiffs' proposed modification to have Lyft offer Access mode in the non-Access Regions where Lyft does not currently offer Access mode is not a fundamental alteration of Lyft's business because Lyft currently offers Access mode in the Access Regions.

44.     As a matter of law, Plaintiffs' proposed modification to have Lyft offer Access mode in every non-Access Region fundamentally alters Lyft's "goods, services, facilities, privileges, advantages, or accommodations," by requiring Lyft to offer a specialized service. 42 U.S.C. § 12184(b)(2)(A), which incorporates § 12182(b)(2)(A)(ii), defines "discrimination" to include:

> a failure to make reasonable modifications in policies, practices, or
> procedures, when such modifications are necessary to afford such
> goods, services, facilities, privileges, advantages, or accommodations
> to individuals with disabilities, unless the entity can demonstrate that
> making such modifications would fundamentally alter the nature of
> such goods, services, facilities, privileges, advantages, or
> accommodations.

**Plaintiffs' Response**: Plaintiffs incorporate by reference their response to ¶ 16.

45.     The plain language of this section distinguishes between two "categories" of things: (a) "policies, practices, or procedures," and (b) "goods, services, facilities, privileges, advantages, or accommodations."  The fact that Congress used different language to describe these two categories "within the same sentence suggests Congress meant these categories to have different meanings." *Mary Jo C. v. N.Y. State & Local Ret. Sys.,* 707 F.3d 144, 156 (2d Cir 2013).

**Plaintiffs' Response**: The Second Circuit in *Mary Jo. C.* does not compare the category of "policies, practices, or procedures" to "goods, services, facilities, privileges, advantage, or accommodations" as Lyft claims.  707 F.3d at 155-56.  In *Mary Jo C.*, the Second Circuit stated that the text of 42 U.S.C. § 12131(2), which is not at issue in this action, "distinguishes between two categories of requirements: (1) rules, policies, or practices, which are subject to the requirement of reasonable modification, and (2) *essential eligibility requirements*, which are not." *Mary Jo C.,* 707 F.3d at 155-56 (emphasis added).

Lyft's argument that the essential eligibility requirements and reasonable modification standards are different categories has no bearing on whether Plaintiffs' modification is a fundamental alteration because Lyft does not argue (and cannot credibly do so) that requiring a non-WAV is an essential eligibility requirement.  Indeed, the Second Circuit noted that the standard for a reasonable modification involves "flexibility[.]"  *Id.*

Rather, the Second Circuit in *Mary Jo C.* found that the plaintiff's requested modification to submit a late application for state pension benefits because of the plaintiff's mental illness was not a fundamental alteration, despite the fact that implementation of the modification violated state law.  *Id.* at 155-60.

Plaintiffs' modification does not request Lyft to alter the goods, services, facilities, privileges, advantages, or accommodations that it provides.  Rather, Plaintiffs' modification

requests that Lyft alter its policies and practices of refusing to allow Access mode to be available in the non-Access Regions.

46. Here, in the non-Access Regions including Westchester County, Plaintiffs want Lyft to offer WAV service. While Plaintiffs claim that they are merely seeking modifications in Lyft's "policies, practices, or procedures," what they actually seek is to have Lyft add specialized "goods or services" to its offerings in every non-Access Region. *See, e.g., Olmstead v. L.C. ex rel. Zimring,* 527 U.S. 581, 603 (1999) (under ADA Title II, observing that States may resist modifications that entail a "fundamental alteration" of their services and programs); *Powell v. Nat'l Bd. Of Medical Examiners,* 364 F.3d 79, 88 (2d Cir. 2004) ("a defendant may not make an accommodation at all if the requested accommodation 'would fundamentally alter the nature of the service, program, or activity.'").

**Plaintiffs' Response**: Plaintiffs incorporate by reference their response to ¶¶ 15-16. Lyft's reliance on *Olmstead* and *Powell* fail to demonstrate that Plaintiffs' modification constitutes a fundamental alteration. In *Olmstead*, the Supreme Court found that a modification for an individual with disabilities to be placed in a community-based treatment setting rather than in an institution was reasonable because the state offered community-based treatment settings for other individuals. 527 U.S. at 604-07.

Lyft misquotes the Second Circuit in *Powell*, using the incorrect language of "may not" instead of the correct language that "a defendant *need not* make an accommodation . . ." 364 F.3d at 88 (emphasis added). In *Powell*, the Second Circuit found that a medical school was not required to alter its core competency requirements to be a practicing physician because such a modification would fundamentally alter the medical school's "responsib[ility] for producing competent physicians[.]" *Id.* at 88. This consideration was only after the school made the following modifications for the student: "The school supplied tutors for her, excused an honor code violation ostensibly because of its sympathy for her high level of stress, allowed her to

remain matriculated without paying tuition, and gave her multiple opportunities to remediate classes that she had previously failed." *Id.* at 87-88.

47. Put differently, the only possible "modification" that will satisfy Plaintiffs is not a modification in "policy, practice, or procedure," but the provision of transportation in vehicles that have been specially modified to allow wheelchair access. But in enacting the ADA, Congress made clear that private entities like Lyft are not required to purchase or lease WAVs, *see* 42 U.S.C. §§ 12184(b)(3), 12182(b)(2)(A)(iv), or provide an accessible "good or service." *See, e.g., Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1115 (9th Cir. 2000) (Title III "does not require provision of different goods or services, just nondiscriminatory enjoyment of those that are provided."); *Thorne v. Boston Mkt. Corp.*, 469 F. Supp. 3d 130, 143 (S.D.N.Y. 2020) ("Because the Court concludes that gift cards are goods sold by a public accommodation under the ADA, Defendant cannot be required to sell accessible gift cards."). Plaintiffs' requested modification is thus a request for a fundamental alteration. *See Pottgen v. Missouri State High School Activities Ass'n,* 40 F.3d 926, 930 (8th Cir. 1994) (under ADA Title II, where an individual cannot meet an eligibility requirement determined to be essential, "the only possible accommodation is to waive the essential requirement itself … [But] [w]aiving an essential eligibility standard would constitute a fundamental alteration in the nature of the program"); *see also PGA Tour, Inc. v. Martin,* 532 U.S. 661, 689 (2001) (the waiver of an essential rule of golf would be a fundamental alteration).

**Plaintiffs' Response**: Plaintiffs' modification does not fundamentally alter the nature of the goods or services that Lyft offers. Lyft connects people looking for a driver with people who have access to a vehicle and are willing to provide rides. Plaintiffs merely request that individuals in the non-Access Regions who require WAVs be given the opportunity to use Lyft's App in the same manner that individuals who do not require WAVs use Standard mode and in the same manner in which Lyft serves individuals who require WAVs in certain Access Regions.

The court in *Weyer* further supports the reasonableness of Plaintiffs' modification. There, the court stated that "[t]he ordinary meaning of this [goods or services] language is that whatever goods or services the place provides, it cannot discriminate on the basis of disability in providing enjoyment of those goods and services." *Weyer*, 198 F.3d at 1115. Here, Plaintiffs do not request a different good or service from Lyft.

*Thorne* also does not support Lyft's defense. In *Thorne*, the court found that the "most natural reading of [a good] was 'wares; merchandise.'" 469 F. Supp. 3d at 142 (quoting *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 31 (2003)). Because a gift card is an item of merchandise that can be tangibly offered for sale and purchase, the court found that accessible gift cards were a distinct good and were not a reasonable modification. *Id.* Once again, Plaintiffs merely request that Lyft's app connect riders and drivers in the non-Access Regions in a similar manner to Standard mode and to the Access Regions.

Lyft's reliance on *Pottgen* does not establish that offering Access mode in the non-Access Regions is a fundamental alteration. In *Pottgen*, the court found that waiving the maximum age requirement for a high school baseball program for the plaintiff would constitute a fundamental alteration because the age requirement was an essential eligibility requirement. 40 F.3d at 930. Lyft has not and does not claim that requiring a non-WAV is an essential eligibility requirement for using the App, likely because doing so would violate the ADA. As a result, the holding in *Pottgen* has no bearing on whether Plaintiffs' modification is a fundamental alteration.

Finally, the Supreme Court in *Martin* repudiates Lyft's argument. In *Martin*, the Supreme Court held that the PGA Tour discriminated against a disabled golfer who sought to play in the PGA Tour's qualifying tournament, "Q-School," when the PGA Tour refused to allow the golfer to use a golf cart, rather than walk the course. 532 U.S. at 665. In doing so, the court found that the "use of carts is not itself inconsistent with the fundamental character of the game

of golf" and "the walking rule is not an indispensable feature of tournament gold either." *Id.* at 683-86. Here, Lyft has not made use of a WAV a condition of accessing its App or an essential eligibility requirement. Plaintiffs' modification seeks the same service for Access mode that Lyft currently offers for Standard mode.

48. Regulations issued by the Department of Transportation ("DOT"), the entity charged by Congress with promulgating regulations to carry out the transportation provisions of Title III (see 42 U.S.C. § 12186(a)), confirm this. DOT guidance, published at 49 C.F.R. Part 37, Appendix E, states that a passenger's request for service outside the service area or outside regular operating hours may be denied as fundamental alterations. *Id.*, Example 11. Similarly, a passenger's request for special equipment (*e.g.*, the installation of specific handrails), for a dedicated vehicle so that a rider can avoid certain odors, or for an exclusive paratransit trip, also constitute fundamental alterations. *Id.*, Examples 9 and 10. Requiring Lyft to offer WAV service in the non-Access Regions thus constitutes a fundamental alteration.

**Plaintiffs' Response**: Examples 9, 10, and 11 fail to demonstrate that requiring Lyft to offer WAV service in the non-Access Regions constitutes a fundamental alteration. First, each of these examples is inapposite involving alterations to either (a) a specific vehicle's design and make or (b) service offerings of paratransit and fixed route services.

In Example 9, a request for a dedicated vehicle for a passenger or special equipment "can be denied so long as the requested equipment is not required by the Americans with Disabilities Act or the Department's rules." 49 C.F.R. Part 37, Appendix E. Similarly, in Example 10, seeking to make Paratransit, which is "by nature a shared-ride service," an exclusive service would be a fundamental alteration. However, neither instance is present for Lyft. Rather, a WAV on Access mode in the non-Access Regions, in the same manner as a vehicle on Standard mode, would be available for use by all users of the Lyft App and the user has no ability to

request a dedicated personal vehicle or special equipment beyond requirements set by Lyft for each ride mode.

Example 11 also demonstrates that these particular examples are not applicable to the current analysis. Example 11 prevents a request for a service outside of the entity's service area or operating hours. 49 C.F.R. Part 37, Appendix E. Lyft's service area for Standard mode is all the regions in which Lyft currently offers service. Lyft has not presented evidence that it does not offer service 24 hours a day on Standard mode in these regions. Plaintiffs' modification requests that Lyft offer Access mode in the non-Access Regions and for the same time period in which Lyft currently offers Standard mode.

49. That Lyft may offer Access mode in the Access Regions does not change the fact that requiring Lyft to offer it in the non-Access Regions is a fundamental alteration. *See id.,* Example 11 (requests for service outside the service area is a fundamental alteration). By asking the Court to order Lyft to offer Access mode in all non-Access Regions, Plaintiffs ask the Court to ignore an "essential attribute" of Lyft's ridesharing platform, which is that the platform's operation depends on *local* supply and demand. *See PGA Tour,* 532 U.S. at 682-83. WAVs, unlike standard sedans or SUVs, are not ubiquitous. The evidence is that Lyft makes decisions regarding specialized modes such as Lux or Lux Black based on local conditions, and asking the Court to ignore the availability of local supply-and-demand on a ridesharing platform is a fundamental alteration.

**Plaintiffs' Response**: That Lyft offers Access mode in the Access Regions does, in fact, demonstrate that offering Access mode in the non-Access Regions is not a fundamental alteration. Indeed, every court to consider this defense has agreed. *ILRC,* 2021 WL 3910719, at *8 ("WAV services would not fundamentally alter Lyft's business because WAVs are not a 'new transportation service.'" *ILRC,* 2020 WL 6462390, at *6 (Lyft "cannot argue that something it is already doing would fundamentally alter its business"); *see also Crawford,* 2022 WL 2913836, at *5.

Lyft now contends that this Court should impose this supposed "essential attribute" that applies only for its luxury ride modes, but not its Standard mode, to Access mode. Lyft makes Standard mode available in all regions where it operates, regardless of population density, wait time, number of available vehicles, or any other considerations or metrics. Stipulated Fact ¶ 19. This Court should refuse to compare Access mode, which is the standard mode for people who require wheelchairs, to Lyft's luxury ride modes, which are an optional luxury service.

50.     While Plaintiffs point out that two Northern District of California judges previously rejected the fundamental alteration defense in similar cases, *see Indep. Living Res. Ctr. San Francisco v. Lyft, Inc.*, No. C 19-01438 WHA, 2021 U.S. Dist. LEXIS 166229 (N.D. Cal., Sept. 1, 2021) and *Crawford v. Uber Techs., Inc.,* No. 17-CV-02664-RS, 2022 U.S. Dist. LEXIS 131670 (N.D. Cal., Jul. 25, 2022), those cases are not controlling. Moreover, the plaintiffs in *ILRC* and *Crawford* did not ask those courts to hold that Lyft and Uber must be compelled to open up WAV service on its app everywhere, regardless of whether any supply exists, as Plaintiffs do in this case.

**Plaintiffs' Response**: Plaintiffs in *ILRC* and *Crawford* requested the courts order Lyft and Uber to offer WAV service in areas where Lyft and Uber did not provide WAV service. *See ILRC*, 2021 WL 3910719, at *1 ("Plaintiffs seek an expansion of wheelchair access mode to Alameda and Contra Costa Counties"); *Crawford*, 2022 WL 2913836, at *5 ("Plaintiffs' requested modification is for Uber to 'turn on' the UberWAV option in New Orleans and Jackson."). Plaintiffs incorporate by reference their response to ¶ 22.

51.     It would be bad policy and contrary to the interests of individuals with disabilities to interpret the ADA to hold that because Lyft offers Access mode in New York City, it would not be a fundamental alteration to require Lyft to offer it in Westchester County. Such a holding would discourage private entities from taking actions, either in response to local laws or otherwise, that are intended to create greater options for individuals with disabilities. *See, e.g., Holbrook v. City of*

*Alpharetta*, 112 F.3d 1522, 1528 (11th Cir. 1997) ("We do not seek to discourage other employers from undertaking" accommodations that may exceed the requirements of the law); *Ragusa v. UPS*, No. 05 Civ. 6187 (WHP), 2009 U.S. Dist. LEXIS 25152, *12 (S.D.N.Y., Mar. 3, 2009) ("To hold that an employer cannot eliminate or alter essential functions in order to accommodate an employee's disability would discourage employers who wished to do more than the ADA requires.").

**Plaintiffs' Response**: Lyft's argument that requiring Lyft to comply with the ADA may deter it and other private entities from taking initial steps to provide service for people with disabilities seeks to present a revisionist history of why Lyft currently offers Access mode. The only reason that Lyft began offering Access mode in 2016 was due to regulatory requirements. Currently, Lyft only offers Access mode in markets where it is required or financially incentivized to do so. It is false for Lyft to imply that it has voluntarily offered Access mode to "create greater options for individuals with disabilities."

Notably, Uber made a similar argument that it should not be "punished" for offering WAV service because it previously did so in other cities. *Uber*, 2022 WL 2913836, at *10. As Judge Seeborg stated, "[c]omplying with the ADA and providing access to people with disabilities is not a punishment, it is the law." *Id.*, at *10.

Lyft's claimed support from *Holbrook* and *Ragusa* is lacking. In *Holbrook*, the court found that the plaintiff was unable to perform essential functions of the job as a police detective due to his disability, namely being able to fully collect evidence and perform a complete investigation at a crime scene. 112 F.3d at 1527. In *Ragusa*, the court found that the plaintiff was unable to perform essential functions of heavy lifting as a UPS employee due to his disability. *Ragusa*, 2009 WL 637100, at *2-3. Both *Holbrook* and *Ragusa* emphasize the importance of essential functions of an employee's job. However, as discussed above, Lyft has never argued that the local supply and demand is an "essential function" for implementing its Standard mode.

52.     Requiring Lyft to offer Access mode in all non-Access Regions thus contravenes

Congressional intent of allowing private companies like Lyft to exercise its own business judgment

as to what services it will offer in what locations.  As a private entity, Lyft is subject to both ordinary

and extraordinary market events, including things such as pandemics, interest rates, gas prices, and

labor shortages.  Like any other business, as it makes business decisions, Lyft must weigh factors

such as local regulatory requirements, supply-and-demand, costs, opportunities for profit,

operational complexity, and budget constraints.

**Plaintiffs' Response**: If Lyft were able to cite any case law or authority demonstrating

that Congress favors business judgment over compliance with the ADA, Lyft would do so.  Lyft

offers no support that "business judgment" supports its fundamental alteration defense.

Furthermore, Lyft has presented no evidence that it exercises business judgment, including

consideration of such extraordinary market events as "gas prices," when it decides to offer, alter,

or restrict Standard mode.  Stip. Fact ¶ 19.

53.     By asking that the Court order Lyft to launch Access mode in all non-Access

Regions, Plaintiffs effectively ask this Court to bar Lyft from exercising its business judgment. That

is a fundamental alteration of the very essence of Lyft as a private entity. As the Seventh Circuit

Court of Appeals observed in *Doe v. Mut. of Omaha Ins. Co.*, 179 F.3d 557, 560 (7th Cir. 1999):

> The common sense of the [ADA] is that the content of the goods or
> services offered by a place of public accommodation is not regulated.
> A camera store may not refuse to sell cameras to a disabled person,
> but it is not required to stock cameras specially designed for such
> persons. Had Congress purposed to impose so enormous a burden
> on the retail sector of the economy and so vast a supervisory
> responsibility on the federal courts, we think it would have made its
> intention clearer and would at least have imposed some standards.

**Plaintiffs' Response**: Plaintiffs incorporate by reference to their Response to ¶ 27.  In

addition, *Doe* fails to support Lyft's fundamental alteration defense.  Rather, as Judge Posner

stated:

The core meaning of [42 U.S.C. § 12182(a)], plainly enough, is that the owner or operator of a store, hotel, restaurant, dentist's office, travel agency, theater, Web site, or other facility (whether in physical space or in electronic space) that is open to the public cannot exclude disabled persons from entering the facility and, once in, from using the facility in the same way that the nondisabled do. The owner or operator of, say, a camera store can neither bar the door to the disabled nor let them in but then refuse to sell its cameras to them on the same terms as to other customers.

*Doe*, 179 F.3d at 559. Currently, Lyft allows users who requires WAVs to access its App in the non-Access Regions, but then refuses to provide any WAV service on the same terms as other users. *Doe* plainly demonstrates that Lyft's refusal to offer Access mode in the non-Access Regions is discriminatory within the meaning of the ADA.

54.     Lyft does not bar Plaintiffs from downloading and opening its App. In other words, Lyft does not exclude Plaintiffs from proverbially "entering the store." That Lyft does not offer Access mode as an option in its App, however, is akin to a camera store not stocking a camera that is specially designed for a person with a disability. Just as a camera store need not offer accessible goods, Lyft need not offer Access mode. As a private entity, Lyft should not only have the right to decide when it will offer a new service, but also when it will stop offering that service. This Court declines Plaintiffs' invitation to assume the role of the regulator of Lyft's business under the guise of applying the ADA.

**Plaintiffs' Response**: Plaintiffs request Lyft apply similar judgment in its offering of Standard mode to its offering of Access mode, namely that Lyft provides Standard mode in every Region where Lyft operates. Stip. Fact ¶ 20. Lyft misinterprets what constitutes a "fundamental alteration" under the ADA, and fails to meet its burden to sustain its affirmative defense.

Respectfully submitted,

_s/ Jeremiah Frei-Pearson_
Andrew Finkelstein
Jeremiah Frei-Pearson
**Finkelstein, Blankinship,**
**Frei-Pearson & Garber, LLP**
1 North Broadway, Suite 900
White Plains, New York 10601
Tel: (914) 298-3281
Fax: (914) 824-1561
afinkelstein@lawampm.com
jfrei-pearson@fbfglaw.com

Michael F. Ram (_Pro Hac Vice_)
Marie Appel (_Pro Hac Vice_)
**Morgan and Morgan**
**Complex Litigation Group**
711 Van Ness Avenue, Suite 500
San Francisco, CA 94102
Tel: 415-358-6913
mram@forthepeople.com
mappel@forthepeople.com

Michael T. Hellmann (_pro hac vice_)
**ADA Compliance Service**
27 Fieldstone Drive, Suite 209
Hartsdale, NY 10530
adatty@aol.com
Tel. 646-662-1335
Fax. (914) 682-8518

_Attorneys for Plaintiffs_
_and the Classes_

By: _/s/ Jiyun Cameron Lee_
Jiyun Cameron Lee (Admitted _Pro Hac Vice_)
Marie Jonas (Admitted _Pro Hac Vice_)
FOLGER LEVIN LLP
199 Fremont Street, 20th Floor
San Francisco, CA 94105
Telephone: 415.625.1050
Facsimile: 415.625.1091
jlee@folgerlevin.com
mjonas@folgerlevin.com

Attorneys for Defendant Lyft, Inc.